# Exhibit A

**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
MICHAEL T. HOUCHIN (SBN 305541)
*mike@consumersadvocates.com*
LILACH HALPERIN (SBN 323202)
*lilach@consumersadvocates.com*
651 Arroyo Drive
San Diego, CA  92103
Tel: (619) 696-9006
Fax: (619) 564-6665

**BURSOR & FISHER, P.A.**
L Timothy Fisher (SBN 191626)
Sean Litteral (SBN 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            slitteral@bursor.com

**LAW OFFICE OF ROBERT L. TEEL**
ROBERT L. TEEL (SBN 127081)
*lawoffice@rlteel.com*
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
Tel: (866) 833-5529
Fax: (855) 609-6911

*Interim Class Counsel*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD HALL, KEVIN BRANCA, and GEORGE ABDELSAYED individually and on behalf of all others similarly situated,<br><br>    *Plaintiffs*,<br><br>v.<br><br>MARRIOTT INTERNATIONAL, INC., a Delaware corporation;<br><br>    *Defendant*. | Case No. 3:19-cv-01715-JO-AHG<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  July 27, 2022<br>Time: 9:30 a.m.<br>Court: 4C<br>Judge: Hon. Jinsook Ohta<br><br>**SPECIAL BRIEFING SCHEDULE ORDERED [Dkt. No. 138]** |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................... 1

II.  THE SUMMARY JUDGMENT STANDARD .............................................. 1

III. MARRIOTT HAS VIOLATED THE CONSUMERS LEGAL
     REMEDIES ACT ......................................................................... 2

     A.   It Is Undisputed that Marriott's Website Advertises a Room
          Rate that Does Not Include a Mandatory Resort Fee ........................ 3

     B.   It Is Undisputed that Marriott Intended to Advertise Its Room
          Rates Without Inclusion of Resort Fees to Increase Revenue
          and Profits ........................................................................... 9

     C.   It Is Undisputed that Marriott's Website Is Likely to Deceive a
          Reasonable Consumer ............................................................ 10

          1.   *Consumer Survey Evidence Shows Reasonable
               Consumers Were Deceived* ............................................. 10

          2.   *Internal Documents Show that Marriott Knows that Its
               Resort Fees Are Deceptive* ............................................ 12

     D.   Plaintiffs Relied on Marriott's Advertised Room Rate that Did
          Not Include a Resort Fee ....................................................... 13

          1.   *Plaintiff Todd Hall* .................................................... 14

          2.   *Plaintiff George Abdelsayed* ........................................ 14

     E.   The Court Should Enter Summary Judgment In Favor of
          Plaintiffs With Respect to the CLRA Claim ................................. 15

IV.  MARRIOTT HAS VIOLATED THE UNFAIR COMPETITION
     LAW ...................................................................................... 16

     A.   The Court Should Enter Summary Judgment in Favor of
          Plaintiffs With Respect to the "Unfair Prong" of the UCL ............... 17

          1.   *Marriott's Conduct Is Unfair Under the FTC Section 5
               Test* ..................................................................... 18

-i-

a.   Marriott's Resort Fees Have Caused Substantial
Consumer Injury...................................................19

b.   The Consumer Injury Is Not Outweighed by
Countervailing Benefits.......................................21

c.   The Consumer Injury Could Not Have Been
Reasonably Avoided ..........................................21

2.   *Marriott's Conduct Is Unfair Under the Balancing Test* .........22

3.   *Marriott's Conduct Is Unfair Under the Tethering Test* ..........23

B.   The Court Should Also Enter Summary Judgment in Favor of
Plaintiffs With Respect to the "Fraudulent" and "Unlawful"
Prongs of the UCL ..................................................................25

V.   MARRIOTT HAS VIOLATED THE FALSE ADVERTISING LAW .......25

VI.   THE COURT SHOULD ENTER PARTIAL SUMMARY
JUDGMENT IN FAVOR OF PLAINTIFFS WITH RESPECT TO
SEVERAL OF MARRIOTT'S AFFIRMATIVE DEFENSES ...................26

A.   Marriott's Affirmative Defenses that Fail as a Matter of Law ..........27

B.   Marriott's Affirmative Defenses that Fail For a Lack of
Evidence..................................................................................29

VII.   CONCLUSION ...........................................................................30

-ii-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*23andMe, Inc. v. Ancestry.com DNA, LLC,*
   356 F. Supp. 3d 889  (N.D. Cal. 2018) ............................................................ 17

*Abramson v. Marriott Ownership Resorts, Inc.,*
   155 F. Supp. 3d 1056 (C.D. Cal. 2016) .......................................................... 19

*Allen v. Hylands, Inc.,*
    773 Fed. Appx. 870 (9th Cir. 2019) .............................................................. 17

*Am. Fin. Servs. Ass'n v. FTC,*
   767 F.2d 957 (D.C. Cir. 1985) ........................................................................ 19

*America Online, Inc. v. Superior Court,*
   90 Cal.App.4th 1 (2001) ................................................................................... 3

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) .......................................................................................... 2

*Apex Oil Co v. DiMauro,*
   713 F. Supp. 587 (S.D.N.Y. 1989) ................................................................. 28

*Barriga v. JPMorgan Chase Bank, N.A.,*
   2010 WL 1037870 (N.D. Cal. March 19, 2010) ............................................. 19

*Camacho v. Automobile Club of Southern California,*
   142 Cal.App.4th 1394 (2006) .......................................................................... 18

*Cappello v. Walmart Inc.,*
   2019 WL 4051757 (N.D. Cal. Aug. 26, 2019) ................................................ 17

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .......................................................................................... 2

*Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.,*
   20 Cal. 4th 163 (1999) ............................................................................... 16, 18

*Clerkin v. MyLife.com, Inc.,*
   2011 WL 3607496 (N.D. Cal. Aug. 16, 2011) ................................................ 25

-iii-

*Comercializadora Recmaq v. Hollywood Auto Mall, LLC*,

    2014 WL 3628272 (S.D. Cal. July 21, 2014) ...................................................27

*Daugherty v. American Honda Motor Co., Inc.*,

    144 Cal.App.4th 824 (2006) ...............................................................................19

*Davis v. Ford Motor Credit Co.*,

    179 Cal.App.4th 581 (2009) ...............................................................................18

*Davis v. HSBC Bank*,

    691 F.3d 1152 (9th Cir. 2012) ...........................................................................17

*Delacruz v. Cytosport, Inc.*,

    2012 WL 1215243 (N.D. Cal. Apr. 11, 2012) ...................................................19

*Dodson v. CSK Auto, Inc.*,

    2013 WL 3942002 (E.D. Cal. July 20, 2013) ....................................................28

*Elias v. Hewlett–Packard Co.*,

    903 F.Supp.2d 843 (N.D. Cal. 2012) .................................................................22

*F.T.C. v. Amazon.com, Inc.*,

    71 F.Supp.3d 1158 (W.D. Wash. 2014) .............................................................19

*F.T.C. v. Neovi, Inc.*,

    604 F.3d 1150 (9th Cir. 2010) ...........................................................................19

*Farmers Ins. Exch. v. Super. Ct.*,

    2 Cal. 4th 377 (1992) .........................................................................................25

*FDIC v. White*,

    828 F. Supp. 304 (D.N.J. 1998) .........................................................................28

*G & G Closed Circuit Events, LLC v. Nguyen*,

    2010 WL 3749284 (N.D. Cal. Sept. 23, 2010) ..................................................29

*Garcia v. Overland Bond & Inv. Co.*,

    668 N.E.2d 199 (Ill. Ct. App. 1996) ..................................................................16

*Gen. Motors Acceptance Corp. v. Laesser*,

    718 So. 2d 276 (Fla. 4th Dist. App. 1998) .........................................................23

-iv-

*Harmon v. BankUnited, FSB*,

   2009 WL 10727188 (D. Md. Apr. 14, 2009) ...................................................15

*Helstern v. City of San Diego*,

   2014 WL 294496 (S.D. Cal. Jan. 24, 2014) ......................................................27

*Henderson v. Gruma Corp.*,

   2011 WL 1362188 (C.D. Cal. Apr. 11, 2011)...................................................13

*Hensley-Maclean v. Safeway, Inc.*,

   2014 WL 1364906 (N.D. Cal. Apr. 7, 2014)......................................................19

*Herron v. Best Buy Co. Inc.*,

   924 F. Supp. 2d 1161 (E.D. Cal. 2013) .............................................................24

*Hogya v. Superior Court*,

   75 Cal.App.3d 122 (1977) ..................................................................................2

*Hull v. Remington Arms Co., Inc.*,

   2011 WL 338803 (W.D. Wash. Feb. 3, 2011) ..................................................29

*In re Adobe Sys., Inc. Privacy Litig.*,

   66 F. Supp. 3d 1197 (N.D. Cal. 2014)...............................................................18

*In re Anthem, Inc. Data Breach Litig.*,

   162 F. Supp. 3d 953 (N.D. Cal. 2016).........................................................17, 18

*In re Tobacco II Cases*,

   46 Cal. 4th 298 (2009) ......................................................................................14

*J & J Sports Productions, Inc. v. Catano*,

   2012 WL 5424677 (E.D. Cal. Nov. 6, 2012) ....................................................27

*Jackson v. Ocwen Loan Servicing, LLC*,

   2011 WL 587587 (E.D. Cal. Feb. 9, 2011) .......................................................23

*Joe Hand Promotions, Inc. v. Davis*,

   2012 WL 480323 (N.D. Cal. Oct. 9, 2012) .......................................................28

*Johnson v. Gen. Mills, Inc.*,

   275 F.R.D. 282 (C.D. Cal. 2011).......................................................................13

-v-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

*Joseph v. J.M. Smucker Co.*,

    2019 WL 1219708 (C.D. Cal. Mar. 13, 2019) ....................................25

*Kasky v. Nike, Inc.*,

    27 Cal.4th 939 (2002) ..........................................................................26

*Khan v. Med. Bd.*,

    16 Cal. Rptr. 2d 385 (Cal. App. 2d Dist. 1993)...................................26

*Klamath Water Users Protective Ass'n v. Patterson*,

    204 F.3d 1206 (9th Cir. 2000) ...............................................................2

*Kwikset Corp. v. Superior Court*,

    51 Cal.4th 310 (2011) ..........................................................................26

*Lavie v. Procter & Gamble Co.*,

    105 Cal.App.4th 496 (2003) ...................................................................3

*Lozano v. AT & T Wireless Servs., Inc.*,

    504 F.3d 718 (9th Cir. 2007) ...............................................16, 17, 23

*McVicar v. Goodman Glob., Inc.*,

    1 F. Supp. 3d 1044 (C.D. Cal. 2014) ..................................................23

*Mlejnecky v. Olympus Imaging Am. Inc.*,

    2011 WL 1497096 (E.D.Cal. Apr. 19, 2011) .......................................22

*Munoz v. PHH Corp.*,

    2013 WL 1278509 (E.D. Cal. Mar. 26, 2013)................................27, 28

*Nationwide Biweekly Administration, Inc. v. Superior Court of Alameda County*,

    9 Cal.5th 279 (2020) ............................................................................26

*Oster v. OneWest Bank, F.S.B.*,

    2013 WL 12248149 (C.D. Cal. Jan. 16, 2013)....................................19

*Pemberton v. Nationstar Mortg. LLC*,

    331 F. Supp. 3d 1018 (S.D. Cal. 2018) ...............................................22

*Phipps v. Wells Fargo Bank, N.A.*,

    2011 WL 302803 (E.D. Cal. Jan. 27, 2011) .......................................18

-vi-

*Pinnacle Fitness & Rec. Mgmt., Ltd. Liab. Co. v. Jerry & Vickie Moyes Family Tr.*,
   844 F. Supp. 2d 1078 (S.D. Cal. Jan. 4, 2012) ...................................................... 1

*Reid v. Johnson & Johnson*,
   780 F.3d 952 (9th Cir. 2015) ........................................................................ 14, 26

*S.E.C. v. Sands*,
   902 F. Supp. 1149 (C.D. Cal. 1995) ....................................................................28

*Sacks v. DJA Automotive*,
   2013 WL 210248 (E.D. Pa. Jan. 18, 2013) ..........................................................30

*SEC v. Sands*,
   902 F. Supp. 1149 (C.D. Cal. 1995) ....................................................................27

*Solis v. Couturier*,
   2009 WL 3055207 (E.D. Cal. Sept. 17, 2009) .....................................................27

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
   72 Cal.App.4th 861 (1999) ..........................................................................17, 22

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
   687 F.3d 403 (D.C. Cir. 2012) ............................................................................15

*Standard Fabrics Int'l, Inc. v. Dress Barn Inc.*,
   2017 WL 240072 (C.D. Cal. Jan. 19, 2017) ........................................................29

*Thomas Bros. v. Sec'y of State*,
   282 N.W.2d 273 (Mich. Ct. App. 1979) ..............................................................15

*Vogel v. OM ABS, Inc.*,
   2014 WL 340662 (C.D. Cal. Jan. 30, 2014) .........................................................28

*Walsh v. Bank of Am., N.A.*,
   2014 WL 12589338 (C.D. Cal. Dec. 10, 2014) ....................................................19

*Warner Constr. Corp. v. City of Los Angeles*,
   2 Cal.3d 285 (1970) ...........................................................................................24

*Weeks v. Google LLC*,
   2018 WL 3933398 (N.D. Cal. Aug. 16, 2018) .....................................................17

*Williams v. Gerber Prod. Co.*,
    552 F.3d 934 (9th Cir. 2008) ........................................................3, 25

*Zivkovic v. S. Cal. Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002) ............................................................27

*Zuniga v. Bank of America N.A.*,
    2014 WL 7156403 (C.D. Cal., Dec. 9, 2014)................................18, 23

**Statutes**

15 U.S.C. § 45 ...............................................................................................18

Cal. Bus. & Prof. Code § 17200 ...............................................................1, 16

Cal. Bus. & Prof. Code § 17500 ...............................................................1, 25

Cal. Civ. Code § 1710 ..................................................................................23

Cal. Civ. Code § 1750 ....................................................................................1

Cal. Civ. Code § 1760 ....................................................................................3

Cal. Civ. Code § 1770 ....................................................................................2

Cal. Civ. Code § 1770(a)(9) ...............................................................3, 15, 16

Cal. Civ. Code § 1780(a) ..............................................................................13

Cal. Civ. Code §§ 1709 ................................................................................23

Cal. Civ. Code §§ 1710(3) ............................................................................23

Md. Code Ann., Com. Law § 13-101 ............................................................15

**Rules**

Fed. R. Civ. P. 56.......................................................................................1, 2

Fed. R. Civ. P. 56(a) .......................................................................................1

Fed. R. Civ. P. 56(c) .......................................................................................2

Fed. R. Civ. P. 9(b) .......................................................................................27

**Regulations**

16 C.F.R. § 238.1 ..........................................................................................24

16 C.F.R. § 238.2 ..........................................................................................22

16 CFR § 238.0 .............................................................................................24

## I.   **INTRODUCTION**

Plaintiffs Todd Hall and George Abdelsayed ("Plaintiffs") bring this consumer protection class action against Defendant Marriott International, Inc. ("Marriott") to vindicate a simple principle: the price should be the price.

Marriott advertises its hotel rooms with lowball initial prices that do not include mandatory resort fees. Marriott then switches the price to include the resort fees, which are obliquely disclosed later in the booking process. Marriott's deceptive bait and switch conduct uses what is known as drip pricing to make its rooms appear more price competitive then they really are. This conduct violates California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), and California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL").

Plaintiffs now move for partial summary judgment because there are no disputed material facts that Marriott's business practices violate the CLRA, UCL, and FAL. Plaintiffs also move for partial summary judgment on several of Marriott's affirmative defenses that fail as a matter of law or for which Marriott has no evidence. For the reasons set forth below, summary judgment should be entered in favor of Plaintiffs on these claims.

## II.   **THE SUMMARY JUDGMENT STANDARD**

Under the provisions of Rule 56, the Court may grant partial summary judgment to any claim or defense—"or the part of each claim or defense"—on which summary judgment is sought. *See* Fed. R. Civ. P. 56(a). This includes adjudication of issues within a claim. *See, e.g., Pinnacle Fitness & Rec. Mgmt., Ltd. Liab. Co. v. Jerry & Vickie Moyes Family Tr.*, 844 F. Supp. 2d 1078, 1093 (S.D. Cal. Jan. 4, 2012) ("[P]artial summary judgment 'on all or any part of a claim' may be entered as to that portion of the claim . . . .") (quoting Fed. R. Civ. P. 56(a)).

The legal standard for partial summary judgment is the Rule 56 standard—judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000) (recognizing that where material facts are undisputed, the court only decides the application of relevant law). A dispute is "genuine" only when "the evidence presented is such that a jury applying [the appropriate] evidentiary standard could reasonably find for either the plaintiff or the defendant." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Once the moving party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." *Id*. Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. To make such a showing, the non-moving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 325.

## III.   MARRIOTT HAS VIOLATED THE CONSUMERS LEGAL REMEDIES ACT

The CLRA prohibits "unfair or deceptive acts or practices" in connection with the sale of goods or services to a consumer. Cal. Civ. Code § 1770. "The self-declared purposes of the act are 'to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.'" *Hogya v. Superior Court*, 75 Cal.App.3d 122, 135 (1977). "[T]he [CLRA] is a legislative embodiment of a desire to protect California consumers and furthers a strong public policy of this state." *America Online, Inc. v. Superior Court,*

-2-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

90 Cal.App.4th 1, 14 (2001). The CLRA "shall be liberally construed and applied to promote its underlying purposes[.]" Cal. Civ. Code § 1760.

A CLRA claim is "governed by the reasonable consumer test," which requires a plaintiff to "show that members of the public are likely to be deceived." *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). This implies that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie v. Procter & Gamble Co.*, 105 Cal.App.4th 496, 508 (2003).

Among the twenty-four activities deemed unlawful within the CLRA, it is a violation of the act to advertise "goods or services with intent not to sell them as advertised." Cal. Civ. Code § 1770(a)(9); Third Amended Complaint ("TAC") ¶ 109. Marriott's website advertises rooms at prices that do not include the mandatory resort fees, and thus never intends to sell those rooms at the advertised prices, making this claim ripe for summary judgment.

## A. It Is Undisputed that Marriott's Website Advertises a Room Rate that Does Not Include a Mandatory Resort Fee

"Marriott is the largest hospitality company in the world; operating and franchising more than 7,000 properties and 30 brands worldwide." SUMF[1] 1. Marriott "offers lodging at its properties through its online reservation website, Marriott.com." SUMF 2. For certain of its hotels, Marriott charges additional mandatory fees that it refers to as "resort fees," "destination amenity fees," or "amenity fees" (collectively, "resort fees"). SUMF 3.[2] These fees are not included in the initial advertised room rates. TAC ¶¶ 9, 23-24.

---

[1] "SUMF" refers to Plaintiffs' Statement of Undisputed Material Facts filed concurrently herewith.

[2] A "Destination Fee" or "Destination Amenity Fee" is "basically a resort fee for non-resorts." SUMF 4. These fees are "similar to a resort fee, the difference is in those hotels that are not resorts." SUMF 4.

In a request for judicial notice previously filed in this case, Marriott provided an illustrative example of Marriott's website for a hotel that charges resort fees. SUMF 5. As Marriott admits in this example, if a consumer types in "San Diego" and "Nov. 4 to Nov. 5" on the "Find Hotels" page and then clicks "Find Hotels," a consumer is shown a list of Marriott hotels in San Diego for the selected dates. SUMF 6. A listing for the Marriott Marquis San Diego Marina, which charges a resort fee, is shown within the results as set forth below. SUMF 6.



From **293**
USD / night

VIEW RATES

**Four Points by Sheraton San Diego Downtown Little Italy**
1617 1st Avenue San Diego, California 92101
0.5 miles  from destination        3.9  396 Reviews     Category 4

From **158**
USD / night

VIEW RATES

**Marriott Marquis San Diego Marina**
333 West Harbor Drive San Diego, California 92101
0.5 miles  from destination        4.5  3493 Reviews     Category 6

From **420**
USD / night

VIEW RATES

**San Diego Marriott Gaslamp Quarter**

EXHIBIT B
14

-4-

1    The advertised room rate for the Marriott Marquis San Diego Marina is "From
2  420 USD/ night." SUMF 7. At this point in the process, Marriott does not display
3  any notifications of any resort fees of any kind or include any applicable resort fees
4  in the listed prices. SUMF 7. Further, the Marriott Marquis San Diego Marina, which
5  has a resort fee, is listed with other hotels that do not charge a resort fee. SUMF 7.

6    If a consumer clicks the "View Rates" box for the Marriott Marquis San Diego
7  Marina, then the consumer is taken to a web page "listing the rooms available at that
8  property for the selected dates and their corresponding rates." SUMF 8. In blue font
9  in a light blue box at the top of that web page, Marriott's website states: "Please
10 note- USD 35 daily destination amenity fee will be added to the room rate. Concierge
11 lounge closed 12noon Friday to 5:30pm Sunday" as set forth below. SUMF 8.



EXHIBIT C
26

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

This "blue box" statement is in a smaller font, in a different color, and is not located proximate to any of the room rates displayed. SUMF 9. Nonetheless, Marriott advertises a room rate of "420 USD/night," and does not include the resort fee. SUMF 9. The language used in the "blue box" disclosure leads consumers who happen to notice it to believe the resort fee has been already "added" to the quoted room rate, which is false.[3] SUMF 10. Jeffery M. Wolff ("Wolff"), Marriott's long-time Vice President for Guest Experience and Room Operations, who supervised the resort fee program for Marriott from 2010 through 2019, conceded this disclosure was at best ambiguous during a deposition conducted by the Washington D.C. Office of Attorney General where he testified as Marriott's corporate representative. SUMF 11. As a further testament to their deceptive nature, these "blue box" statements at times do not mention the amenities that are included with the resort fees or even mention the amount of the resort fees. SUMF 12. Marriott's current director of resort fees, Scott McCoy, testified that Marriott does not maintain any list of the blue box statements used by its hotels, and only reviews them *ad hoc*. SUMF 13.

Once a consumer selects a "1 King Bed, Bay View, Room" in the example, the consumer is taken to a web page entitled "Review Reservation Details." SUMF 14. This page displays a "Summary of Charges," which shows a "244 USD/ night" room rate plus "70.65 USD Taxes and Fees" for a "314.65 USD Subtotal." SUMF 14. This pricing practice represents the destination amenity fee to consumers as part of "USD Taxes and fees," as the destination amenity fee does not appear on the webpage at all:

---

[3] Some of Marriott's blue box statements say that the resort fee is "added" to the room rate as opposed to "will be added." For example, a webflow of Marriott's website for the Renaissance Las Vegas Hotel says: "Please note- USD 30 daily destination amenity fee added to room rate[.]" SUMF 10.



The "destination amenity fee" is only displayed in the illustrative example if the consumer independently clicks on "Summary of Charges," which reveals a dropdown box showing that the "USD Taxes and Fees" comprises a "Destination Amenity Fee," i.e., a resort fee, of "35.00" and "Estimated government taxes and fees" of "57.65." SUMF 15.

| RATE DETAILS | |
|---|---|
| 1 room(s) for 1 night(s) | Prices in USD |
| Monday, November 4, 2019 | 420.00 |
| Total cash rate | 420.00 |
| Destination Amenity Fee | 35.00 |
| Estimated government taxes and fees | 57.65 |
| Total for stay in hotel's currency | 512.65 USD |

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

If the consumer does not click on "Summary of Charges," the destination amenity fee is never again displayed prior to the completion of the reservation. SUMF 16.



The illustrative website example set out above is typical of the advertising webflow on Marriott's website. SUMF 17. Wolff testified that as of the date of his deposition on May 18, 2018, that Marriott's resort fee practices had been consistent for the past five years. SUMF 18. As stated by Wolff's successor, Scott McCoy, a resort fee is "mandatory." SUMF 19. Wolff also described it as "mandatory across the board." SUMF 19 ("All resort fees with Marriott are mandatory, that is correct"). Guests cannot opt out of the resort fee when making a reservation online. SUMF 20. Guests are also not made aware of any specific opportunity to contest the resort fee charge. SUMF 21.

-8-

**B.    It Is Undisputed that Marriott Intended to Advertise Its Room Rates Without Inclusion of Resort Fees to Increase Revenue and Profits**

The purpose of Marriott's resort fees is to increase Marriott's revenue and profit. In a 2014 email, Wolff stated that "one of our primary areas of focus to drive Ancillary Revenue and profit is through the thoughtful execution of resort fees." SUMF 22. When asked about this statement, he said that "resort fees, any types of – I mean my job and our job is to run a profitable company, and we do that through a balanced scorecard. So it wouldn't surprise me to say that we are driving revenue. We wanted to have profit." SUMF 22. McCoy also confirmed that part of Marriott's purpose in using resort fees is to drive revenue and profit. SUMF 23.

Marriott does not include the resort fees in the initial price quoted because to do so would harm Marriott's ability to compete with other hotels. When asked why Marriott does not include the resort fee in the room rate, Wolff responded that "it would put us at a competitive disadvantage against hotels, other hotels, our competitors by doing that." SUMF 24. Similarly, meeting minutes from July 2014 discussing destination fees state that "this Fee cannot be rolled into the Room Rate as this would put the properties at a disadvantage when price comparison shopping is performed." SUMF 25. McCoy confirmed that Marriott does not include resort fees in the room rate because it would put Marriott at a disadvantage when price comparison occurs and is "a potential disadvantage to have it included on the initial page when you are shopping for room rates." SUMF 26.

Marriott itself has made hundreds of millions, if not billions, of dollars from resort fees. In 2019 alone, Marriott hotels charged consumers approximately ███████████ in resort fees. SUMF 27. During the class period, approximately ███████████ in resort fees were charged to United States residents who booked rooms through the Marriott website and Marriott mobile app and approximately

██████████ in resort fees were charged to California residents who booked rooms through the Marriott website and Marriott mobile app. SUMF 28.

### C.    It Is Undisputed that Marriott's Website Is Likely to Deceive a Reasonable Consumer

#### 1.    *Consumer Survey Evidence Shows Reasonable Consumers Were Deceived*

Plaintiffs retained Dr. J. Michael Dennis, Ph.D. to conduct a consumer survey regarding the disclosure of resort fees on the Marriott website. SUMF 30. Dr. Dennis is a well-qualified consumer survey expert who has testified in numerous matters. SUMF 31. Dr. Dennis was asked "to design, conduct, and report on a consumer survey to measure the extent to which reasonable consumers' perceptions of the relevant Marriott.com website are consistent with the Plaintiffs' theories of liability, that is, the allegation that Defendant misled consumers into misunderstanding the (i) actual daily room rate and (ii) the cost components of the daily room rate." SUMF 32. Accordingly, Dr. Dennis designed a survey whereby respondents were assigned to two different groups: (1) a partial disclosure group whereby respondents were shown hotel website information that mapped Plaintiffs' allegations with respect to the specific ways Marriott engaged in price deception, and (2) a full disclosure group whereby respondents were shown website information that did not mislead consumers (*i.e.* contained no price deception), according to Plaintiffs. SUMF 33.

The hypothetical hotel room used for both groups had a room rate of $369 USD per night plus a $30 resort fee. SUMF 34. However, the advertised room rate for the partial disclosure group was $369 per night (not including the $30 resort fee and government-imposed taxes) whereas the advertised room rate for the full disclosure group was $446 per night (including the $30 resort fee and government-imposed taxes). SUMF 34. The partial disclosure group was shown a "blue box" stating the amount of the resort fee that replicates how Marriott displays resort fees on its website. SUMF 35. The partial disclosure group could also view the resort fee

-10-

amount by clicking on the "Summary of Charges" drop down box in a manner consistent with how Marriott displays resorts fees on its website. SUMF 35.

Dr. Dennis' survey measured "the extent to which Full Disclosure hotel information did or did not result in a difference in consumers' understanding of the actual price they would pay for a night of lodging, compared to being provided Partial Disclosure hotel information based on Defendant's actual practices, as alleged by Plaintiffs." SUMF 36. First, the survey found that "where consumers are shown only the $369 price point without any other cost information, consumers on average perceived the website to convey that the lowest price they would pay would be $372.63, compared to $450.67 for the Full Disclosure group." SUMF 37. Second, the survey "measured the impact of adding the light-blue disclosure statement to the Partial Disclosure version of the survey." SUMF 38. The survey found that "the impact of the disclosure was marginal. Whereas before the disclosure, consumers understood the lowest price would be $372.63 on average, the additional information increased consumers' understanding of the hotel website information to convey a total price of $385.64, compared to $449.55 for the Full Disclosure group." SUMF 38. Moreover, "[p]roviding respondents information about 'Taxes and fees' was not effective in communicating the presence of a 'Resort Fee' for the Partial Disclosure group respondents." SUMF 39.

Dr. Dennis concludes that his "***consumer survey demonstrates that reasonable consumers were deceived by Defendant's websites***" and "[t]hroughout the purchase journey of booking a hotel room online on Marriott's websites, consumers shown hotel website information mapped to Defendant's actual practices consistently understood the total cost of lodging to be substantially lower, compared to the understanding of consumers presented hotel website information meeting Plaintiffs' criteria as non-deceptive." SUMF 40 (emphasis added).

### 2. *Internal Documents Show that Marriott Knows that Its Resort Fees Are Deceptive*

Marriott is also aware that its resort fees are deceptive to consumers. In an email dated October 10, 2011 from Jim Fisher, Marriott's Chief Owner and Franchise Services Officer, sent to Mr. Wolff and others at Marriott, Mr. Fisher stated he "would still like to know where we are going relative to the overall [resort fee] concept… which just a few years ago we fought hard to get out of…now we are jumping back into. *It was all about nickel and diming the guest and being unable to handle the disclosure requirements*… or give a good value add for the fee." SUMF 42 (emphasis added). Another Marriott email concerning resort fees states that "this is a very sensitive topic that is attracting a lot of negative press. *The customers hate it.*" SUMF 43 (emphasis added).

In an email dated April 4, 2016 from Erika Alexander sent to Mr. Wolff and others at Marriott, Ms. Alexander stated that "I actually think *the comments about fees are fairly negative*" and that "many comments across each of these verbatim summaries were related to 1) *frustration around disclosure (may have been there, but guests didn't notice it)*, and 2) guests unable or unwilling to use the amenities due to the nature of visit or personal interest[.]" SUMF 44. Ms. Alexander is Marriott's chief global officer of global operations who serves on Marriott's resort fee committee. SUMF 45. Ms. Alexander was Mr. Wolff's supervisor at Marriott. SUMF 46. During her deposition, Ms. Alexander conceded that "no one likes the idea of a fee" and that it is conceivable that consumers could overlook Marriott's blue box notification. SUMF 47.

Marriott also hired a third-party company called Mercantile to perform mystery shops[4] at its hotels to monitor, among other things, compliance with Marriott's resort fee policies. SUMF 48. The results of mystery shops from 2015

---

[4] Mystery shops are random and periodic testing of Marriott hotels used to ensure compliance with Marriott's policies, including its resort fee policies. SUMF 48.

-12-

showed that only "67% (2/3) of the time the resort fee was disclosed at the time of booking the online reservation." SUMF 49. In an email from a Mercantile employee to Mr. Wolff, the Mercantile employee explained the resort fee information in a confirmation email for a Marriott hotel "was very hard to see[.]" SUMF 50.

Marriott has also considered changing its website to better disclose resort fees. In an October 21, 2016 Marriott presentation on resort fees, it was noted that "40+ State Attorney Generals launched investigations into whether resort fees violate consumer protection laws" and that Marriott had received subpoenas from two state attorneys' generals. SUMF 51. The presentation discussed "total price display," which is where "the first number the consumer sees when doing a search for a hotel is the room rate plus the resort fee." SUMF 52. The presentation noted that total price display "may have a negative competitive impact on resort fee hotels" and that one of Marriott's primary goals was to "retain resort fee revenue." SUMF 52. Instead of a total price display, Marriott considered what it called a "page one disclosure" where the amount of the resort fee would be "displayed in the same size font as the daily room rate" on the first page where the consumer sees the advertised room rate. SUMF 53. However, Marriott never implemented either the total price display or the page one disclosure. SUMF 54. In essence, Marriott chose to continue deceiving consumers.

### D. Plaintiffs Relied on Marriott's Advertised Room Rate that Did Not Include a Resort Fee

A plaintiff may assert a CLRA claim "if he has been damaged by a defendant's conduct that violated the CLRA." *Johnson v. Gen. Mills, Inc.*, 275 F.R.D. 282, 286 (C.D. Cal. 2011) (citing Cal. Civ. Code § 1780(a); *Henderson v. Gruma Corp.*, 2011 WL 1362188, at *6 (C.D. Cal. Apr. 11, 2011)). "In a false advertising case, plaintiffs meet this requirement if they show that, by relying on a misrepresentation....they 'paid more for a product than they otherwise would have paid, or bought it when they otherwise would not have done so.'" *Reid v. Johnson & Johnson*, 780 F.3d 952,

-13-

958 (9th Cir. 2015). In California, "[a] plaintiff is not required to [show] that []
misrepresentations were the sole or even the decisive cause of the injury-producing
conduct." *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009). Instead, "[i]t is
enough that the representation has played a substantial part, and so has been a
substantial factor, in influencing [plaintiff's] decision." *Id.* at 326. Here, both
Plaintiffs easily satisfy these requirements.

### 1.   *Plaintiff Todd Hall*

Plaintiff Todd Hall is a resident of Rancho Cucamonga, California who stayed
at the Marriott Marquis San Diego Marina from May 28, 2018 to May 29, 2018 and
was charged a destination fee in the amount of $25. SUMF 55. Plaintiff Hall booked
his room at the Marriott Marquis San Diego Marina from the Marriott website.
SUMF 56.  Plaintiff Hall also stayed at the Sheraton Maui from October 10, 2018 to
October 12, 2018. SUMF 57. Plaintiff Hall also booked his room at the Sheraton
Maui from the Marriott website. SUMF 58. Plaintiff Hall read and relied on the
representations on the Marriott website when booking his hotel room, including the
quoted room price and the omission of the fact that the estimated total price did not
disclose the mandatory resort fee. SUMF 59. Plaintiff Hall purchased the Marriott
hotel rooms in reliance on the false and deceptive bargain and bait advertising and
without knowledge of the true amount being charged based on Defendant's
deceptive advertising and misleading disclosure of resort fees, including listing the
resort fee within the 'USD Taxes and fees' category. SUMF 60.

### 2.   *Plaintiff George Abdelsayed*

Plaintiff George Abdelsayed is a resident of San Diego County, California
who stayed at the Marriott Coronado Island Resort and Spa in July 2020 and was
charged a resort fee of $25 per night. SUMF 61. Plaintiff Abdelsayed booked his
room from the Marriott website or Marriott mobile app. SUMF 62. Plaintiff
Abdelsayed read and relied on Marriott's representations when booking the hotel
room, including the quoted room price and the fact that the mandatory resort fee was

-14-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

omitted from the room price and not properly disclosed. SUMF 63.  Plaintiff Abdelsayed purchased his hotel room in reliance on the false and deceptive bargain and bait advertising and misleading disclosure of resort fees, including listing the resort fee under the 'USD Taxes and fees' category. SUMF 64.

**E.     The Court Should Enter Summary Judgment In Favor of Plaintiffs With Respect to the CLRA Claim**

Marriott's advertisement of a room rate without any intent to sell the room at that rate is a violation of California Civil Code Section 1770(a)(9).  Put succinctly, "it is an unfair and deceptive practice . . . to advertise reduced prices for products and not sell them at the advertised prices." *Thomas Bros. v. Sec'y of State*, 282 N.W.2d 273, 278 (Mich. Ct. App. 1979); *see generally Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 687 F.3d 403, 417 (D.C. Cir. 2012) ("When consumers purchase airline tickets, they assume that the price they pay for extra bags at the airport will be the price advertised when they bought their ticket. . . . Increasing the price of these very commonly purchased and practically necessary services . . . amounts to an unfair practice" and "a classic bait and switch.").

Courts interpreting language similar to California Civil Code Section 1770(a)(9) in other States' consumer protection statutes have found that conduct similar to Marriott's here violates the law. For instance, Maryland's Consumer Protection Act provides that "unfair, abusive, or deceptive trade practices include any . . . (5) Advertisement or offer of consumer goods, consumer realty, or consumer services: (i) Without intent to sell, lease, or rent them as advertised or offered." Md. Code Ann., Com. Law § 13-101. In *Harmon v. BankUnited, FSB*, 2009 WL 10727188 (D. Md. Apr. 14, 2009), the plaintiff alleged that a mortgage broker violated this provision by soliciting him with a low annual percentage rate and payment, and then significantly increasing those terms later in the loan process. *Id.* at *1. The plaintiff argued that the broker "used the original loan terms 'to attract and induce' him into entering a loan, and the 'variances in the loan term[s] . . . [were]

-15-

a conscious design to bait consumers into loans and them switch them into radically different loans.'" The *Harmon* court found that advertising lower rates and payments, and then significantly increasing them, would constitute "advertising consumer goods without the intent to sell them as advertised." *Id.*

Similarly, in *Garcia v. Overland Bond & Inv. Co.*, 668 N.E.2d 199, 206 (Ill. Ct. App. 1996), plaintiffs alleged that "they visited the Car Credit Center in response to the defendant's advertising of (1) no money down; (2) easy credit; (3) bank rate financing; (4) written guaranties; and (5) offers of specific merchandise which was not available at the advertised price," and "that the defendant rarely, if ever, makes available the terms in its advertisements." *Id.* at 204. In denying the motion to dismiss, the court noted that "the plaintiffs' allegations are that the defendant has advertised goods with an intent not to sell them as advertised. If proved, this constitutes the basis for a claim of deceptive practice under section 2 of the Consumer Fraud Act." *Id.* at 205. Here, such conduct by Marriott is undisputed.

On the face of its advertisements on the Marriott website, Marriott advertises rates for rooms in hotels with resort fees, and never sells or intends to sell the rooms at those rates because of the later mandatory addition of a fee. Because a consumer cannot buy the room at the advertised price, there is no genuine factual dispute that Marriott's advertising in this regard violates California Civil Code Section 1770(a)(9), and accordingly, summary judgment in favor of Plaintiffs is appropriate.

## IV.    MARRIOTT HAS VIOLATED THE UNFAIR COMPETITION LAW

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, "is a broad remedial statute that permits an individual to challenge wrongful business conduct 'in whatever context such activity might occur.'" *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (citing *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.*, 20 Cal. 4th 163, 181 (1999)). The UCL's "coverage is 'sweeping,'" and it protects consumers from "any unlawful, unfair, or fraudulent" business practice. *Cel-Tech*, 20 Cal. 4th at 180. "Each prong

-16-

of the UCL is a separate and distinct theory of liability; thus, the 'unfair' practices prong offers an independent basis for relief." *Lozano*, 504 F.3d at 731 (citing *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 85 Cal.Rptr.2d 301, 316–317 (1999)).

**A.     The Court Should Enter Summary Judgment in Favor of Plaintiffs With Respect to the "Unfair Prong" of the UCL**

"The UCL's prohibition of unfair business practices sweeps more broadly than the CLRA[.]" *Allen v. Hylands, Inc.*, 773 Fed. Appx. 870, 874 (9th Cir. 2019). Unlike the CLRA, a plaintiff need not prove actual reliance under the unfair prong of the UCL where such conduct is not exclusively related to misrepresentations. *See 23andMe, Inc. v. Ancestry.com DNA, LLC,* 356 F. Supp. 3d 889, 911 (N.D. Cal. 2018). The UCL does not define the term "unfair" and the proper definition of what qualifies as "unfair" conduct against consumers is currently in flux among California courts. *Davis v. HSBC Bank*, 691 F.3d 1152, 1169 (9th Cir. 2012).

When analyzing claims under the "unfair" prong of the UCL, some courts apply a "balancing test," which "requires courts to 'weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Weeks v. Google LLC*, 2018 WL 3933398, at *14 (N.D. Cal. Aug. 16, 2018). "[P]arties may proceed with a UCL claim under the balancing test by either alleging immoral, unethical, oppressive, unscrupulous, or substantially injurious conduct by Defendants or by demonstrating that Defendants' conduct violated an established public policy." *Weeks*, 2018 WL 3933398, at *14 (quoting *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 990 (N.D. Cal. 2016)).

"Other California courts apply a 'tethering' test, under which the 'unfairness must be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition.'" *Cappello v. Walmart Inc.*, 2019 WL 4051757, at *6 (N.D. Cal. Aug. 26, 2019) (quoting *Lozano*, 504 F.3d at 735). Under the "tethering" test, "parties need not show immoral, unethical, oppressive,

-17-

unscrupulous, or substantially injurious conduct in order to move forward with a UCL claim. The tethering test only requires parties to show 'that the public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL [is] tethered to specific constitutional, statutory, or regulatory provisions.'" *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d at 990 (citing *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014)).

"The test applied in a third line of cases draws on the definition of 'unfair' in section 5 of the Federal Trade Commission Act (15 U.S.C. § 45, subd. (n)), and requires that '(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.'" *Phipps v. Wells Fargo Bank, N.A.*, 2011 WL 302803, at *16 (E.D. Cal. Jan. 27, 2011) (parallel citations omitted).

Marriott's conduct constitutes unfair business practices under each of these tests and summary judgment should be entered in favor of Plaintiffs.

### 1.    Marriott's Conduct Is Unfair Under the FTC Section 5 Test

In *Cel–Tech*, the California Supreme Court stated that courts "may turn for guidance to unfair competition jurisprudence arising under the parallel section 5 of the Federal Trade Commission Act." *Cel-Tech*, 20 Cal. 4th at 166. In *Camacho v. Automobile Club of Southern California*, the California Court of Appeal adopted the Section 5 Test in part because the test is "on its face geared to consumers and is for that reason appropriate in consumer cases." 142 Cal.App.4th 1394, 1403 (2006).

Several courts have adopted the reasoning in *Camacho* and held that the FTC Section 5 Test applies in consumer cases.[5] "The factors that define unfairness under

---

[5] *See, e.g., Zuniga v. Bank of America N.A.*, 2014 WL 7156403, at *6 (C.D. Cal., Dec. 9, 2014) ("the Court believes that *Camacho* provides the best guidance on the issue and the adapted three-prong FTC Act test should be applied to determine whether a business practice is unfair under the UCL."); *Davis v. Ford Motor Credit Co.*, 179 Cal.App.4th 581, 596, 101 Cal.Rptr.3d 697, 708 (2009) ("*Camacho* ...

-18-

the test adopted in *Camacho* are: (1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." *Walsh v. Bank of Am., N.A.*, 2014 WL 12589338, at *5 (C.D. Cal. Dec. 10, 2014); *see also Abramson v. Marriott Ownership Resorts, Inc.*, 155 F. Supp. 3d 1056, 1066 (C.D. Cal. 2016) (noting that *Camacho* is the "better test" for claims arising under the unfair prong of the UCL). Applying *Camacho*, the Court should find that Marriott has engaged in unfair conduct.

### a. Marriott's Resort Fees Have Caused Substantial Consumer Injury

"An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people, or if it raises a significant risk of concrete harm.'" *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010) (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 972 (D.C. Cir. 1985)). "Consumer injury can occur in 'a variety of ways.'" *F.T.C. v. Amazon.com, Inc.*, 71 F.Supp.3d 1158, 1164 (W.D. Wash. 2014) (quoting *Neovi*, 604 F.3d at 1156). "While courts should look to any deception on the part of businesses, 'the absence of deceit is not dispositive.'" *Id.* "Nor is actual

---

contains an excellent analysis of the issue and we adopt its definition of 'unfair' in consumer cases."); *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 839, 51 Cal.Rptr.3d 118, 129 (2006) (adopting the *Camacho* test); *Barriga v. JPMorgan Chase Bank, N.A.*, 2010 WL 1037870, *3 (N.D. Cal. March 19, 2010) (same); *Delacruz v. Cytosport, Inc.*, 2012 WL 1215243, at *10 (N.D. Cal. Apr. 11, 2012) ("The Court is persuaded that the California Supreme Court would adopt the *Camacho* approach to unfairness in UCL consumer cases, and thus applies it in this case."); *Walsh v. Bank of Am., N.A.*, 2014 WL 12589338, at *5 (C.D. Cal. Dec. 10, 2014) ("This Court concludes that in fact the FTC test as articulated in [*Camacho*] should be applied to determine whether a business practice is unfair under the UCL."); *Oster v. OneWest Bank, F.S.B.*, 2013 WL 12248149, at *8 (C.D. Cal. Jan. 16, 2013) ("The appropriate standard for determining whether a consumer has stated a viable claim for relief under the 'unfair prong of the UCL is set forth in [*Camacho*]); *Hensley-Maclean v. Safeway, Inc.*, 2014 WL 1364906, at *8 (N.D. Cal. Apr. 7, 2014) (adopting the *Camacho* test).

-19-

1    knowledge on the part of the consumer a requirement to establish substantial harm."

2    *Id.*

3        Marriott's drip pricing practices have caused substantial consumer harm. As

4    shown by the consumer survey conducted by Dr. Dennis, reasonable consumers

5    were misled by Marriott's website. SUMF 40. Guest feedback and comments also

6    indicated that guests regularly found the resort fees misleading, deceptive, and

7    confusing. Market research possessed by Marriott in December 2015 showed that

8    "consumers' chief complaint with these fees is the lack of transparency. They are

9    poorly marked as separate charges to the room rate, or consumers have issues paying

10   for services that they don't use. . . . 80% of consumers want hotels to follow airlines

11   suit and disclose any and all resort fees as part of the price." SUMF 65.  Consumer

12   comments on Marriott resort fees were 62.1% negative, and customers were

13   frequently confused about the resort fee and what it covered. SUMF 66.

14       In November of 2012, the Federal Trade Commission ("FTC") "warned 22

15   hotels that resort fees were not adequately disclosed on their hotel reservation

16   websites, and that such practices may violate the law by misrepresenting the price

17   consumers expected to pay for their hotel rooms." SUMF 67.  Marriott-owned hotels

18   were among the 22 hotels that received such a letter, and Marriott's Chief Executive

19   Officer was copied on the letters to those hotels. SUMF 68.  The FTC also issued a

20   press release concerning its warning letters, thereby putting the broader industry on

21   notice. SUMF 69. The FTC letters stated that the hotels' resort fee practices "may

22   violate the law by misrepresenting the price consumers can expect to pay for their

23   hotel rooms[.]" SUMF 70.

24       Despite receiving the FTC's letter and therefore being fully on notice of the

25   FTC's concerns in this area, Marriott continues to charge resort fees and not include

26   them in the price quoted to consumers. It is undisputed that the price quoted to

27   consumers in response to searches on Marriott's website does not include the resort

28   fees, and the total price quoted before the reservation is made does not display the

resort fees unless the consumer takes the extra step of clicking on the "Summary of Charges" drop down box. SUMF 14-15. As stated in a presentation by Wolff and another Marriott Vice President, "when a consumer currently does a search and directs the website to sort hotels by price, just the room rate is the operative number for purposes of sorting – not the room rate plus resort fee which would result in a lower ranking for the hotel." SUMF 71.

      b.   The Consumer Injury Is Not Outweighed by Countervailing Benefits

The second factor of the FTC's Section 5 Test requires the Court to consider whether the injury is outweighed by countervailing benefits to consumers. In 2017, the FTC issued a study authored by Mary W. Sullivan (the "Sullivan Paper") demonstrating the consumer harm and confusion caused by resort fees. SUMF 72. The Sullivan Paper was "issued by the FTC's Bureau of Economics" and was publicized by the FTC through a press release on its website. SUMF 73. The Sullivan Paper assessed "the economic consequences of disclosing resort fees separately from the room rate." SUMF 74. The Sullivan Paper found that "separating mandatory resort fees from posted room rates without first disclosing the total price is likely to harm consumers by increasing the search costs and cognitive costs of finding and choosing hotel accommodations" and that "[f]orcing consumers to click through additional webpages to see a hotel's resort fee increases the cost of learning the hotel's price." SUMF 75. The Sullivan Paper concluded that "[u]nless the total price is disclosed up front, **separating resort fees from the room rate is unlikely to result in benefits that offset the likely harm to consumers**." SUMF 76. Accordingly, Marriott cannot reasonably dispute that the resort fees charged on its website cause substantial consumer injury that is not outweighed by countervailing benefits to consumers.

      c.   The Consumer Injury Could Not Have Been Reasonably Avoided

"In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Neovi*, 604

F.3d at 1158. Here, consumers are not able to make a free and informed choice because Marriott's resort fees are mandatory and misleading. SUMF 19; SUMF 40. In other words, guests cannot opt out of the resort fee when making a reservation online. SUMF 20. Not including the resort fee with the advertised room prevents consumers from effectively being able to compare prices for hotel rooms and/or comparable amenities. As stated by the Sullivan Paper: "When it becomes more costly to search and evaluate an additional hotel, a consumer's choice is either to incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly room, or both." SUMF 77. Further, "[e]ven though the true facts are subsequently made known to the buyer, the law is violated if the first contact or interview is secured by deception." *See* 16 C.F.R. § 238.2. Accordingly, Marriott has engaged in unfair competition under the FTC Section 5 Test.

### 2.    *Marriott's Conduct Is Unfair Under the Balancing Test*

"Under the balancing test, a business practice is 'unfair' 'when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Pemberton v. Nationstar Mortg. LLC*, 331 F. Supp. 3d 1018, 1051 (S.D. Cal. 2018) (quoting *South Bay Chevrolet*, 72 Cal.App.4th at 886). "This test requires courts to 'examine the practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer,' and 'weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Id*. (quoting *Davis*, 691 F.3d at 1169). Several courts have adopted the balancing test when analyzing consumer claims under the unfair prong of the UCL. *See, e.g., Mlejnecky v. Olympus Imaging Am. Inc*., 2011 WL 1497096, at *7 (E.D.Cal. Apr. 19, 2011) (adopting the balancing test); *Elias v. Hewlett–Packard Co.*, 903 F.Supp.2d 843, 858 (N.D. Cal. 2012) (same).

Here, Marriott's conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers because advertising a room rate at one price,

then switching to a higher price by adding a mandatory resort fee for the same accommodation is a classic "bait and switch." *See Gen. Motors Acceptance Corp. v. Laesser*, 718 So. 2d 276, 277 (Fla. 4th Dist. App. 1998) (finding that a "bait and switch" scheme is "[w]ithout question" conduct that is "immoral, unethical, unscrupulous and substantially injurious to consumers."). The utility of Marriott's conduct is also not outweighed by the gravity of harm to consumers. SUMF 76. Accordingly, the court should find that Marriott has engaged in unfair conduct under the balancing test.

### 3.   *Marriott's Conduct Is Unfair Under the Tethering Test*

Under the tethering test, the "unfairness must be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Lozano*, 504 F.3d at 735. Although some courts have adopted the tethering test in the consumer context, *Jackson v. Ocwen Loan Servicing, LLC*, 2011 WL 587587, at *4 (E.D. Cal. Feb. 9, 2011), other courts have criticized the use of the tethering test because "the requirement that the unfair practice be 'tethered' to a statutory or regulatory scheme 'does not comport with the broad scope of section 17200' and 'in the context of consumer cases, 'tethering' to positive law undercuts the ability of the courts to deal with new situations, and new abuses' as intended by the legislature in passing the UCL in such broad and flexible terms." *Zuniga*, 2014 WL 7156403, at *6 (internal quotations omitted). Other courts have suggested that this test potentially "collaps[es] the 'unfair' 'prong' into the 'unlawful' prong." *McVicar v. Goodman Glob., Inc.*, 1 F. Supp. 3d 1044, 1054 (C.D. Cal. 2014).

Here, Marriott conduct is tethered to legislative policies against deceptive advertising, including the CLRA as discussed above. Indeed, California has a strong public policy against the deceit of another. *See* Cal. Civ. Code §§ 1709-1710. Under California law, deceit may occur by the "suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code §§ 1710(3). Deceit occurs when

-23-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

a defendant makes partial representations but also suppresses some material facts. *Herron v. Best Buy Co. Inc.*, 924 F. Supp. 2d 1161, 1174 (E.D. Cal. 2013). A partial representation claim may also arise when "the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead." *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 294, 85 Cal.Rptr. 444, 466 P.2d 996 (1970).

It is undisputed that Marriott makes partial disclosures about the prices of its hotel rooms, but Marriott fails to disclose the total price of its rooms by not including mandatory resort fees with the advertised room rates and not stating what amenities are included in the fee.[6] As a result, a consumer has no idea what amenities, if any, he is actually paying for when he books his room and what he will be charged more for during his stay. The truth is the resort fee is just a price switch and this false advertising scheme is likely to mislead a reasonable consumer. SUMF 40.

Marriott's practices also violate FTC regulations. *See* 16 CFR § 238.0 (prohibiting advertising an alluring but insincere offer to sell a product or service which the advertiser in truth does not intend or want to sell); 16 C.F.R. § 238.1 ("No advertisement containing an offer to sell a product should be published when the offer is not a bona fide effort to sell the advertised product."). Here, Marriott

---

[6] Many Marriott hotels charging resort fees included amenities that would normally be included in the price of the room, for which a guest would not normally be charged additional amounts, in the bundle of resort products and services, such as parking, water, phone calls, or fitness center access. As specific examples, in response to one application for a resort fee, a Marriott officer noted that "at least 7 of the items listed are provided free of charge today (and at all [Ritz-Carlton] hotels in the system." SUMF 78. In response to another application, a Marriott officer noted a "concern that 26% of the value is ascribed to fitness center access . . . . Our brand standard is free fitness center access. I also note that a guest would be hard pressed to . . . only order the complimentary dessert (9%) – thus suggesting another amenity is bundled with a purchase . . . . At some point the value proposition gets a bit wobbly." SUMF 79. As Wolff bluntly put it, "we included telephone, long distance telephone, local calls, faxes, bottled water, stuff that is of no value these days." SUMF 80.

-24-

advertises its hotel rooms at prices that it does not intend to sell to consumers, as the initial prices advertised do not include mandatory resort fees. Accordingly, the Court should find that Marriott has engaged in unfair competition under the tethering test.

**B.     The Court Should Also Enter Summary Judgment in Favor of Plaintiffs With Respect to the "Fraudulent" and "Unlawful" Prongs of the UCL**

Liability under the fraudulent prong on the UCL is established when a plaintiff shows that a defendant's conduct is likely to deceive a reasonable consumer. *Joseph v. J.M. Smucker Co.*, 2019 WL 1219708, at *4 (C.D. Cal. Mar. 13, 2019) ("Analysis under the UCL's fraudulent prong is 'governed by the 'reasonable consumer' test.'") (quoting *Williams*, 552 F.3d at 938). As discussed, Marriott's advertising of hotel room rates followed by a subsequent additional charge for an opaque mandatory resort fee is likely to deceive a reasonable consumer (SUMF 40) and the Court should enter summary judgment in favor of Plaintiffs with respect to their claim under the fraudulent prong of the UCL.

The unlawful prong of the UCL simply "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [the UCL]." *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (1992); *Clerkin v. MyLife.com, Inc.*, 2011 WL 3607496, at *6 (N.D. Cal. Aug. 16, 2011) ("Violation of almost any federal, state or local law may serve as the basis for a UCL claim."). As discussed above, Marriott has violated the CLRA and, as discussed below, Marriott has violated the FAL. Accordingly, the Court should enter summary judgment in favor of Plaintiffs with respect to their claim under the unlawful prong of the UCL.

**V.     MARRIOTT HAS VIOLATED THE FALSE ADVERTISING LAW**

California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, prohibits advertising that is "untrue or misleading." *Nationwide Biweekly Administration, Inc. v. Superior Court of Alameda County*, 9 Cal.5th 279, 308

-25-

(2020). The FAL "is set forth in broad and open-ended language that is intended to permit a court of equity to reach any novel or creative scheme of false or misleading advertising that a deceptive business may devise." *Id.* (citing *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 320 (2011)). The FAL prohibits "'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Id.* (quoting *Kasky v. Nike, Inc*., 27 Cal.4th 939, 119 (2002)). Thus, to state a claim under the FAL "it is necessary only to show that "members of the public are likely to be deceived." *Id*. Like with the CLRA, this is judged by a reasonable consumer standard. *See Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) ("It is true that violations of the UCL, FAL, and CLRA are evaluated from the vantage point of a 'reasonable consumer.'"). A defendant's intent is not a required element under the FAL. *See Khan v. Med. Bd.*, 16 Cal. Rptr. 2d 385, 392 (Cal. App. 2d Dist. 1993).

Marriott's advertisements of its hotel rooms with lowball initial prices that do not include subsequently imposed opaque mandatory resort fees is a violation of the FAL. Consumer survey evidence shows that reasonable consumers are deceived by resort fees on Marriott's website. SUMF 40. Moreover, Plaintiffs reasonably relied on Marriott's advertised room rates. SUMF 59-60; SUMF 63-64. Accordingly, this Court should enter summary judgment in favor of Plaintiffs with respect to their claim under the False Advertising Law.

## VI. THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS WITH RESPECT TO SEVERAL OF MARRIOTT'S AFFIRMATIVE DEFENSES

Marriott's Answer to the Third Amended Complaint ("Answer," Dkt. No. 92) asserts 37 affirmative defenses. Several of Marriott's affirmative defenses fail as a matter of law or fail because Marriott has no supporting evidence.

-26-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

### A.   Marriott's Affirmative Defenses that Fail as a Matter of Law

"A defense is insufficient as a matter of law when there are no questions of fact, questions of law are clear and not in dispute, and the defense would not succeed under any circumstances." *J & J Sports Productions, Inc. v. Catano*, 2012 WL 5424677, at *1 (E.D. Cal. Nov. 6, 2012) (citing *SEC v. Sands*, 902 F. Supp. 1149, 1165 (C.D. Cal. 1995) (citations omitted)). "[T]he inclusion of a legally insufficient affirmative defense may result in 'prejudice . . . delay, and confusion of the issues.'" *Solis v. Couturier*, 2009 WL 3055207, at *1 (E.D. Cal. Sept. 17, 2009) (internal quotation omitted). "Denials of allegations in the complaint or allegations that the plaintiff cannot prove the elements of [her] claim are not affirmative defenses." *Munoz v. PHH Corp.*, 2013 WL 1278509, at *3 (E.D. Cal. Mar. 26, 2013) (citation omitted); *see also Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof as to an element plaintiff is required to prove is not an affirmative defense.").

Each of the following of Marriott's purported affirmative defenses are actually a mere denial of Plaintiffs' allegations, and not a proper affirmative defense, so each are ripe for summary judgment.

**Marriott's Affirmative Defenses 1 and 2**. Marriott's first affirmative defense states that "Plaintiffs' claims, in whole or in part, fail to state a claim upon which relief can be granted" (Dkt. No. 92 at 22) and Marriott's second affirmative defense states "[t]he TAC and any claim which is based on fraud fails to comply with Fed. R. Civ. Pro. 9(b) in that the allegations are not stated with particularity." *Id*. It is well- established, however, that "failure to state a claim" is not a cognizable affirmative defense. *Comercializadora Recmaq v. Hollywood Auto Mall, LLC*, 2014 WL 3628272, at *17 (S.D. Cal. July 21, 2014) ("'Failure to State Sufficient Facts to Constitute a Cause of Action,' is not a valid defense.") (citing *Helstern v. City of San Diego*, 2014 WL 294496, at *2 (S.D. Cal. Jan. 24, 2014)). Moreover, "[t]he allegation that the complaint does not state fraud with particularity is not an

-27-

affirmative defense on which the Defendants will produce evidence at trial." *S.E.C. v. Sands*, 902 F. Supp. 1149, 1166 (C.D. Cal. 1995).

**Marriott's Affirmative Defenses 11, 12, 18, 23, 27, 29, 30.** Each of these affirmative defenses are mere denials of the allegations in the complaint or denials that Plaintiffs cannot prove the elements of their claims. *Munoz*, 2013 WL 1278509, at *3. For example, Marriott's eleventh affirmative defense states that "Plaintiffs have failed to set forth any facts that Defendant attempted to deceive a reasonable consumer[.]" Dkt. No. 92 at 23. Marriott's twenty-third affirmative defense similarly states that "Plaintiffs are unable to demonstrate that members of the public are likely to be deceived. *Id.* at 25. However, these are merely elements of Plaintiffs' claims under the CLRA, UCL, and FAL. Marriott's twelfth, twenty-ninth, and thirtieth affirmative defenses are for lack of standing. *Id.* at 24, 26. However, "[a]s standing is an element of plaintiff's prima facie case, it is properly addressed through denial or a motion to dismiss." *Vogel v. OM ABS, Inc.*, 2014 WL 340662, at *3 (C.D. Cal. Jan. 30, 2014) (quoting *Dodson v. CSK Auto, Inc.*, 2013 WL 3942002, at *4 (E.D. Cal. July 20, 2013)). Marriott's twenty-seventh affirmative defense is for lack of proximate cause. Dkt. No. 92 at 26. However, causation is part of Plaintiffs' burden of proof and this defense merely denies the allegations in the TAC and is redundant of Marriott's denials. *See FDIC v. White*, 828 F. Supp. 304, 313 (D.N.J. 1998) ("all of the causation affirmative defenses are insufficient as a matter of law"); *Apex Oil Co v. DiMauro*, 713 F. Supp. 587, 604 (S.D.N.Y. 1989) (a "defense[] of lack of causation…[is] merely [a] denial of liability and not [an] affirmative defense[]").

**Marriott's Affirmative Defense 36** states that "Defendant reserves the right to raise and plead additional defenses and/or affirmative defenses which might become known during the course of discovery." Dkt. No. 92 at 27. However, "purporting to reserve future affirmative defenses is . . . redundant and immaterial," *Joe Hand Promotions, Inc. v. Davis*, 2012 WL 480323, at *7 (N.D. Cal. Oct. 9, 2012); *see also G & G Closed Circuit Events, LLC v. Nguyen*, 2010 WL 3749284,

-28-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

1  at \*5 (N.D. Cal. Sept. 23, 2010) ("Nor is the . . . reservation of right to amend . . . an

2  affirmative defense. Moreover, to the extent that the reservation defense attempts to

3  preserve rights already preserved by the Federal Rules, it is duplicative.").

4        Accordingly, the Court should enter summary judgment in favor of Plaintiffs

5  on these affirmative defenses.

6      **B.**   **Marriott's Affirmative Defenses that Fail For a Lack of Evidence**

7        The Court may also enter summary judgment on affirmative defenses that

8  have no supporting evidence. *See Hull v. Remington Arms Co., Inc.*, 2011 WL

9  338803, at \*4 (W.D. Wash. Feb. 3, 2011) (granting summary judgment where there

10  was no evidence supporting the defendant's affirmative defenses); *Standard Fabrics*

11  *Int'l, Inc. v. Dress Barn Inc.*, 2017 WL 240072, at \*7 (C.D. Cal. Jan. 19, 2017)

12  (granting the plaintiff's summary judgment motion as to affirmative defenses for

13  laches, waiver, and estoppel where the defendants "failed to produce any evidence

14  in support of their defenses"). Here, Marriott lacks evidence in support of the

15  following affirmative defenses:

16      **Marriott's Affirmative Defense Number 9** states that "[e]ach and every

17  claim asserted or raised in the TAC is barred by the doctrines of accord and

18  satisfaction, estoppel, waiver, payment and release, laches, and statutory or

19  regulatory compliance." Dkt. No. 92 at 23. However, Marriott cannot produce

20  admissible evidence in support of this defense. *Standard Fabrics Int'l, Inc.*, 2017

21  WL 240072, at \*7.

22      **Marriott's Affirmative Defense Number 22** states that "Plaintiffs' claims

23  against Defendant are barred, in whole or in part, because Plaintiffs failed to satisfy

24  conditions precedent to initiating litigation on the claims stated in this action, or

25  some of them." Dkt. No. 92 at 25. However, Marriott fails to allege which specific

26  "conditions precedent" were not satisfied and Marriott simply has no evidence in

27  support of this defense.

28

-29-

**Marriott's Affirmative Defense Number 24** states that "[s]ome or all of the putative class members are subject to mandatory arbitration and/or class action waiver provisions." Dkt. No. 92 at 26. Marriott has no evidence that an arbitration agreement applies in this action. Even if it did, the Court should still grant summary judgment because Marriott has waived this defense by proceeding with this litigation. *See Sacks v. DJA Automotive*, 2013 WL 210248, at \*6 (E.D. Pa. Jan. 18, 2013) ("defendant's failure to move to compel arbitration, its motion for summary judgment seeking dismissal of plaintiff's claims on their merits and its participation in discovery and settlement negotiations are sufficient to constitute a waiver of its right to elect arbitration.").

**Marriott's Affirmative Defense Number 25** states that "Defendant alleges that Plaintiffs' claims are barred, in whole or in part, by reason of Plaintiffs' failure to exhaust Plaintiffs' administrative remedies." Dkt. No. 92 at 26. Marriott does not allege which administrative remedies were not exhausted and, in any event, has no evidence in support of this defense.

## VII.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment should be granted

DATED: April 15, 2022                    Respectfully submitted,


/s/ *Michael T. Houchin*
**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
MICHAEL T. HOUCHIN (SBN 305541)
*mike@consumersadvocates.com*
LILACH HALPERIN (SBN 323202)
*lilach@consumersadvocates.com*
651 Arroyo Drive

-30-

San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**LAW OFFICE OF ROBERT L. TEEL**
ROBERT L. TEEL
*lawoffice@rlteel.com*
1425 Broadway, Mail Code: 20-6690
Seattle, Washington  98122
Telephone: (866) 833-5529
Facsimile: (855) 609-6911

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Sean L. Litteral (SBN 331985)
1990 N. California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: *ltfisher@bursor.com*
          *slitteral@bursor.com*
***Attorneys for Plaintiffs and the Proposed Classes***

# Exhibit B

**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
MICHAEL T. HOUCHIN (SBN 305541)
*mike@consumersadvocates.com*
LILACH HALPERIN (SBN 323202)
*lilach@consumersadvocates.com*
651 Arroyo Drive
San Diego, CA  92103
Tel: (619) 696-9006
Fax: (619) 564-6665

**BURSOR & FISHER, P.A.**
L Timothy Fisher (SBN 191626)
Sean L. Litteral (SBN 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
              slitteral@bursor.com

**LAW OFFICE OF ROBERT L. TEEL**
ROBERT L. TEEL (SBN 127081)
*lawoffice@rlteel.com*
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
Tel: (866) 833-5529
Fax: (855) 609-6911

*Interim Class Counsel*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD HALL, KEVIN BRANCA, and GEORGE ABDELSAYED individually and on behalf of all others similarly situated,<br><br>                    *Plaintiffs*,<br><br>v.<br><br>MARRIOTT INTERNATIONAL, INC., a Delaware corporation;<br><br>                    *Defendant*. | Case No. 3:19-cv-01715-JO-AHG<br><br>**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  July 27, 2022<br>Time: 9:30 a.m.<br>Court: 4C<br>Judge: Hon. Jinsook Ohta<br><br>**SPECIAL BRIEFING SCHEDULE ORDERED [Dkt. No. 138]** |

Plaintiffs Todd Hall and George Abdelsayed ("Plaintiffs") respectfully submit the following Statement of Undisputed Material Facts in Support of their Motion for Partial Summary Judgment:

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 1. | "Marriott is the largest hospitality company in the world; operating and franchising more than 7,000 properties and 30 brands worldwide." | Marriott's Motion to Dismiss the First Amended Complaint, Dkt. No. 18-1 at p. 1. |
| 2. | Marriott "offers lodging at its properties through its online reservation website, Marriott.com." | Marriott's Motion to Dismiss the First Amended Complaint, Dkt. No. 18-1 at p. 3. |
| 3. | For certain of its hotels, Marriott charges additional mandatory fees that it refers to as "resort fees," "destination amenity fees," or "amenity fees" (collectively, "resort fees") | Third Amended Complaint ("TAC," Dkt. No. 82) ¶¶ 5, 8; Declaration of Michael T. Houchin filed concurrently herewith ("Houchin Decl."), ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 23:3-19]. |

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 4. | A "Destination Fee" or "Destination Amenity Fee" is "basically a resort fee for non-resorts." These fees are "similar to a resort fee, the difference is in those hotels that are not resorts." | Houchin Decl., ¶ 3 & Ex. 2 [Wolff D.C. Dep. 159:15-16; 176:14-15]; Houchin Decl., ¶ 4 & Ex. 3 [McCoy D.C. Dep. 24:14-18]. |
| 5. | In a request for judicial notice previously filed in this case, Marriott provided an illustrative example of Marriott's website for a hotel that charges resort fees. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's Request for Judicial Notice in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("Marriott's RJN," Dkt. No. 18-2)]. |
| 6. | If a consumer types in "San Diego" and "Nov. 4 to Nov. 5" on the "Find Hotels" page on Marriott's website and then clicks "Find Hotels," a consumer is shown a list of Marriott hotels in San Diego for the selected dates. A listing for the Marriott Marquis San Diego Marina, which charges a resort fee, is shown within the results. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN at Exs. A & B at p. 14]. |

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 7. | In the example of Marriott's website provided by Marriott, the advertised room rate for the Marriott Marquis San Diego Marina is "From 420 USD/ night." At this point in the process, Marriott does not display any notifications of any resort fees of any kind or include any applicable resort fees in the listed prices. Further, the Marriott Marquis San Diego Marina, which has a resort fee, is listed with other hotels that do not charge a resort fee. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN at Ex. B at p. 14]. |
| 8. | If a consumer clicks the "View Rates" box for the Marriott Marquis San Diego Marina, then the consumer is taken to a web page "listing the rooms available at that property for the selected dates and their corresponding rates." In blue font in a light blue box at the top of that web page, Marriott's website states: "Please note- USD 35 daily destination amenity fee will be added to the room rate. Concierge lounge closed 12noon Friday to 5:30pm Sunday." | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN at Ex. C]. |
| 9. | Marriott's "blue box" statement is in a smaller font, in a different color, and is not located proximate to any of the room rates displayed. Marriott still advertises a room rate of "420 USD/night," and does not include the resort fee. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN at Ex. C]. |

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 10. | The language used in the "blue box" disclosure leads consumers who happen to notice it to believe the resort fee has already been "added" to the quoted room rate, which is false. For example, a webflow of Marriott's website for the Renaissance Las Vegas Hotel says: "Please note- USD 30 daily destination amenity fee added to room rate[.]" | Houchin Decl., ¶ 7 & Ex. 6 at Ex. C attached to the Points and Authorities. |
| 11. | Jeffery M. Wolff ("Wolff"), Marriott's long-time Vice President for Guest Experience and Room Operations, who supervised the resort fee program for Marriott from 2010 through 2019, conceded that the blue box disclosure was at best ambiguous during a deposition conducted by the Washington D.C. Office of Attorney General where he testified as Marriott's corporate representative. | Houchin Decl., ¶ 3 & Ex. 2 [Wolff D.C. Dep. Tr. at 181:8-182:1]. |
| 12. | Marriott's "blue box" statements at times do not mention the amenities that are included with the resort fees or even mention the amount of the resort fees. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN at Ex. C]; Houchin Decl., ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 95:17-21]; Houchin Decl., ¶ 6 & Ex. 5. |

-4-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 13. | Marriott's current director of resort fees, Scott McCoy, testified that Marriott does not maintain any list of the blue box statements used by its hotels, and only reviews them *ad hoc*. | Houchin Decl., ¶ 4 & Ex. 3 [McCoy D.C. Dep. Tr. at 108:16-109:20]. |
| 14. | Once a consumer selects a "1 King Bed, Bay View, Room" in the example of Marriott's website, the consumer is taken to a web page entitled "Review Reservation Details." This page displays a "Summary of Charges," which shows a "244 USD/ night" room rate plus "70.65 USD Taxes and Fees" for a "314.65 USD Subtotal." This pricing practice represents the destination amenity fee to consumers as part of "USD Taxes and fees," as the destination amenity fee does not appear on the webpage at all. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN at Ex. D]. |
| 15. | The "destination amenity fee" is only displayed in the illustrative example provided by Marriott if the consumer independently clicks on "Summary of Charges," which reveals a dropdown box showing that the "USD Taxes and Fees" comprises a "Destination Amenity Fee," i.e., a resort fee, of "35.00" and "Estimated government taxes and fees" of "57.65." | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN at Ex. D]. |

-5-

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 16. | If the consumer does not click on "Summary of Charges" on Marriott's website, the destination amenity fee is never again displayed prior to the completion of the reservation. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN at Ex. F]. |
| 17. | The illustrative website example provided by Marriott in this action is typical of the advertising webflow on Marriott's website. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN]; Houchin Decl., ¶ 7 & Ex. 6 at Exs. A-F. |
| 18. | Wolff testified that as of the date of his deposition on May 18, 2018 taken in the D.C. Action, that Marriott's resort fee practices had been consistent for the past five years. | Houchin Decl., ¶ 3 & Ex. 2 [Wolff D.C. Dep. 234:19-35-2]. |
| 19. | Marriott's resort fees are mandatory. | Houchin Decl., ¶ 4 & Ex. 3 [McCoy D.C. Dep. 26:10-11]; Houchin Decl., ¶ 3 & Ex. 2 [Wolff D.C. Dep. 76:7-10; *id*. at 63:20-21]; Houchin Decl., ¶ 2 & Ex. 1 [Wolff Dep. 28:23-29:1 ("All resort fees with Marriott are mandatory, that is correct")]. |

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 20. | Guests cannot opt out of the resort fee when making a reservation online from Marriott's website. | Houchin Decl., ¶ 4 & Ex. 3 [McCoy D.C. Dep. 69:16-18]. |
| 21. | Guests are also not made aware of any specific opportunity to contest the resort fee charge. | Houchin Decl., ¶ 4 & Ex. 3 [McCoy D.C. Dep. 72:8-12]. |
| 22. | In a 2014 email, Wolff stated that "one of our primary areas of focus to drive Ancillary Revenue and profit is through the thoughtful execution of resort fees." When asked about this statement, he said that "resort fees, any types of – I mean my job and our job is to run a profitable company, and we do that through a balanced scorecard. So it wouldn't surprise me to say that we are driving revenue. We wanted to have profit." | Houchin Decl., ¶ 8 & Ex. 7; Houchin Decl., ¶ 3 & Ex. 2 [Wolff D.C. Dep. 165:1-7; 165:7-14]. |
| 23. | Scott McCoy also confirmed that part of Marriott's purpose in using resort fees is to drive revenue and profit. | Houchin Decl., ¶ 4 & Ex. 3 [McCoy D.C. Dep. 125:8-21]. |

-7-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 24. | Marriott does not include the resort fees in the initial price quoted because to do so would harm Marriott's ability to compete with other hotels. When asked why Marriott does not include the resort fee in the room rate, Wolff responded that "it would put us at a competitive disadvantage against hotels, other hotels, our competitors by doing that." | Houchin Decl., ¶ 3 & Ex. 2 [Wolff D.C. Dep. 235:10-16]. |
| 25. | Meeting minutes from July 2014 discussing destination fees state that "this Fee cannot be rolled into the Room Rate as this would put the properties at a disadvantage when price comparison shopping is performed." | Houchin Decl., ¶ 9 & Ex. 8; Houchin Decl., ¶ 3 & Ex. 2 [Wolff D.C. Dep. 151:22-52:4]. |
| 26. | Scott McCoy confirmed that Marriott does not include resort fees in the room rate because it would put Marriott at a disadvantage when price comparison occurs and is "a potential disadvantage to have it included on the initial page when you are shopping for room rates." | Houchin Decl., ¶ 4 & Ex. 3 [McCoy D.C. Dep. 44:2-11]. |
| 27. | In 2019 alone, Marriott hotels charged consumers approximately ▆▆▆▆▆ in resort fees. | Houchin Decl., ¶ 10 & Ex. 9. |

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 28. | During the class period, approximately ▮▮▮▮▮ in resort fees were charged to United States residents who booked rooms through the Marriott website and Marriott mobile app and approximately ▮▮▮▮▮ in resort fees were charged to California residents who booked rooms through the Marriott website and Marriott mobile app. | Houchin Decl., ¶ 11 & Ex. 10 [Podlipna Expert Rpt. at ¶¶ 9-10]. |
| 29. | The amount of resort fees charged to class members in this action who booked a room from Marriott's website or Marriott's mobile app can be determined from Marriott's business records that were produced in this action. | Houchin Decl., ¶ 11 & Ex. 10 [Podlipna Expert Rpt. at ¶¶ 16-22]. |
| 30. | Plaintiffs retained Dr. J. Michael Dennis, Ph.D. to conduct a consumer survey regarding the disclosure of resort fees on the Marriott website. | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt.]. |
| 31. | Dr. Dennis is a well-qualified consumer survey expert who has testified in numerous matters. | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶¶ 5-20]. |

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 32. | Dr. Dennis was asked "to design, conduct, and report on a consumer survey to measure the extent to which reasonable consumers' perceptions of the relevant Marriott.com website are consistent with the Plaintiffs' theories of liability, that is, the allegation that Defendant misled consumers into misunderstanding the (i) actual daily room rate and (ii) the cost components of the daily room rate." | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 25]. |
| 33. | Dr. Dennis designed a survey whereby respondents were assigned to two different groups: (1) a partial disclosure group whereby respondents were shown hotel website information that mapped Plaintiffs' allegations with respect to the specific ways Marriott engaged in price deception, and (2) a full disclosure group whereby respondents were shown website information that did not mislead consumers (i.e. contained no price deception), according to Plaintiffs. | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 49]. |

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 34. | The hypothetical hotel room used for both groups in Dr. Dennis' survey had a room rate of $369 USD per night plus a $30 resort fee. However, the advertised room rate for the partial disclosure group was $369 per night (not including the $30 resort fee and government-imposed taxes) whereas the advertised room rate for the full disclosure group was $446 per night (including the $30 resort fee and government-imposed taxes). | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶¶ 56-57]. |
| 35. | The partial disclosure group in Dr. Dennis' survey was shown a "blue box" stating the amount of the resort fee that replicates how Marriott displays resort fees on its website. The partial disclosure group could also view the resort fee amount by clicking on the "Summary of Charges" drop down box in a manner consistent with how Marriott displays resort fees on its website. | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶¶ 60, 63]. |

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 36. | Dr. Dennis' survey measured "the extent to which Full Disclosure hotel information did or did not result in a difference in consumers' understanding of the actual price they would pay for a night of lodging, compared to being provided Partial Disclosure hotel information based on Defendant's actual practices, as alleged by Plaintiffs." | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 65]. |
| 37. | Dr. Dennis' survey found that "where consumers are shown only the $369 price point without any other cost information, consumers on average perceived the website to convey that the lowest price they would pay would be $372.63, compared to $450.67 for the Full Disclosure group." | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 66]. |
| 38. | Dr. Dennis' survey "measured the impact of adding the light-blue disclosure statement to the Partial Disclosure version of the survey." The survey found that "the impact of the disclosure was marginal. Whereas before the disclosure, consumers understood the lowest price would be $372.63 on average, the additional information increased consumers' understanding of the hotel website information to convey a total price of $385.64, compared to $449.55 for the Full Disclosure group." | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 67]. |

-12-

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 39. | Dr. Dennis' survey also found that "[p]roviding respondents information about 'Taxes and fees' was not effective in communicating the presence of a 'Resort Fee' for the Partial Disclosure group respondents." | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 68]. |
| 40. | Dr. Dennis concludes in his expert report that his "consumer survey demonstrates that reasonable consumers were deceived by Defendant's websites" and "[t]hroughout the purchase journey of booking a hotel room online on Marriott's websites, consumers shown hotel website information mapped to Defendant's actual practices consistently understood the total cost of lodging to be substantially lower, compared to the understanding of consumers presented hotel website information meeting Plaintiffs' criteria as non-deceptive." | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 91]. |
| 41. | Reasonable consumers are deceived by resort fees that are charged on Marriott's website. | Houchin Decl., ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 91]. |

-13-

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 42. | In an email dated October 10, 2011 from Jim Fisher, Marriott's Chief Owner and Franchise Services Officer, sent to Mr. Wolff and others at Marriott, Mr. Fisher stated he "would still like to know where we are going relative to the overall [resort fee] concept… which just a few years ago we fought hard to get out of…now we are jumping back into. It was all about nickel and diming the guest and being unable to handle the disclosure requirements… or give a good value add for the fee." | Houchin Decl., ¶ 13 & Ex. 12. |
| 43. | A Marriott email concerning resort fees states that "this is a very sensitive topic that is attracting a lot of negative press. The customers hate it." | Houchin Decl., ¶ 14 & Ex. 13. |
| 44. | In an email dated April 4, 2016 from Erika Alexander sent to Mr. Wolff and others at Marriott, Ms. Alexander stated "I actually think the comments about fees are fairly negative" and "many comments across each of these verbatim summaries were related to 1) frustration around disclosure (may have been there, but guests didn't notice it), and 2) guests unable or unwilling to use the amenities due to the nature of visit or personal interest[.]" | Houchin Decl., ¶ 15 & Ex. 14. |

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 45. | Ms. Alexander is Marriott's chief global officer of global operations who serves on Marriott's resort fee committee. | Houchin Decl., ¶ 16 & Ex. 15 [Alexander Dep. Tr. at 16:1-5; 19:12-22]. |
| 46. | Ms. Alexander was Mr. Wolff's supervisor at Marriott. | Houchin Decl., ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 12:23-13:3]. |
| 47. | During her deposition, Ms. Alexander conceded that "no one likes the idea of a fee" and that it is conceivable that consumers could overlook Marriott's blue box notification. | Houchin Decl., ¶ 16 & Ex. 15 [Alexander Dep. Tr. at 25:10-16; 117:17-118:1-4]. |
| 48. | Marriott hired a third-party company called Mercantile to perform mystery shops at its hotels to monitor, among other things, compliance with Marriott's resort fee policies. Mystery shops are random and periodic testing of Marriott hotels used to ensure compliance with Marriott's policies, including its resort fee policies. | Houchin Decl., ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 51:23-52:6; 53:2-8; 178:20-25]. |
| 49. | The results of mystery shops from 2015 showed that only "67% (2/3) of the time the resort fee was disclosed at the time of booking the online reservation." | Houchin Decl., ¶ 17 & Ex. 16 at MAR099824; Houchin Decl., ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 178:1-182:12]. |

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 50. | In an email from a Mercantile employee to Mr. Wolff, the Mercantile employee explained the resort fee information in a confirmation email for a Marriott hotel "was very hard to see[.]" | Houchin Decl., ¶ 18 & Ex. 17. |
| 51. | In an October 21, 2016 Marriott presentation on resort fees, it was noted that "40+ State Attorney Generals launched investigations into whether resort fees violate consumer protection laws" and that Marriott had received subpoenas from two state attorneys' generals. | Houchin Decl., ¶ 19 & Ex. 18 at MAR152274. |
| 52. | The October 21, 2016 presentation discussed "total price display," which is where "the first number the consumer sees when doing a search for a hotel is the room rate plus the resort fee." The presentation noted that total price display "may have a negative competitive impact on resort fee hotels" and that one of Marriott's primary goals was to "retain resort fee revenue." | Houchin Decl., ¶ 19 & Ex. 18 at MAR152275-MAR152276. |
| 53. | Instead of a total price display, Marriott considered what it called a "page one disclosure" where the amount of the resort fee would be "displayed in the same size font as the daily room rate" on the first page where the consumer sees the advertised room rate. | Houchin Decl., ¶ 19 & Ex. 18 at MAR152278. |

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 54. | Marriott never implemented either the total price display or the page one disclosure on its website. | Houchin Decl., ¶ 5 & Ex. 4 [Marriott's RJN]. |
| 55. | Plaintiff Todd Hall is a resident of Rancho Cucamonga, California who stayed at the Marriott Marquis San Diego Marina from May 28, 2018 to May 29, 2018 and was charged a destination fee in the amount of $25. | TAC ¶ 55; Declaration of Todd Hall filed in support of Plaintiffs' Motion for Class Certification ("Hall Decl."), ¶¶ 2-5 & Ex. A [Hall Dep. Tr. at 47:17-24; 72:11-17]. |
| 56. | Plaintiff Hall booked his room at the Marriott Marquis San Diego Marina from the Marriott website. | TAC ¶ 55; Hall Decl., ¶ 6 & Ex. A [Hall Dep. Tr. at 54:21 -55:6]. |
| 57. | Plaintiff Hall also stayed at the Sheraton Maui from October 10, 2018 to October 12, 2018. | TAC ¶ 56; Hall Decl., ¶ 7 & Ex. A [Hall Dep. Tr. at 60:1-13; 62:2-10; 62:23 – 63:10]. |
| 58. | Plaintiff Hall also booked his room at the Sheraton Maui from the Marriott website. | TAC ¶ 56. |
| 59. | Plaintiff Hall read and relied on the representations on the Marriott website when booking his hotel room, including the quoted room price and the omission of the fact that the estimated total price did not disclose the mandatory resort fee. | Hall Decl., ¶ 8 & Ex. A [Hall Dep. Tr. at 72:24 – 73:6; 78:20-25; 80:9-16; 97:25 – 98:12; 132:3-6]. |

-17-

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 60. | Plaintiff Hall purchased the Marriott hotel rooms in reliance on the false and deceptive bargain and bait advertising and without knowledge of the true amount being charged based on Defendant's deceptive advertising and misleading disclosure of resort fees, including listing the resort fee within the 'USD Taxes and fees' category. | Hall Decl., ¶ 9 & Ex. A [Hall Dep. Tr. at 84:19-23; 92:11-20; 132:11-17; 132:25 – 133:5; 133:16 – 134:19]. |
| 61. | Plaintiff George Abdelsayed is a resident of San Diego County, California who stayed at the Marriott Coronado Island Resort and Spa in July 2020 and was charged a resort fee of $25 per night. | TAC ¶¶ 76-76; Declaration of George Abdelsayed filed in support of Plaintiffs' Motion for Class Certification ("Abdelsayed Decl."), ¶¶ 2-5 & Ex. B [Abdelsayed Dep. Tr. at 61:24 – 62:5; 87:12-20]. |
| 62. | Plaintiff Abdelsayed booked his room from the Marriott website or Marriott mobile app. | Abdelsayed Decl., ¶ 6 & Ex. B [Abdelsayed Dep. Tr. at 208:16-22]. |

-18-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 63. | Plaintiff Abdelsayed read and relied on Marriott's representations when booking the hotel room, including the quoted room price and the fact that the mandatory resort fee was omitted from the room price and not properly disclosed. | Abdelsayed Decl., ¶ 7 & Ex. B [Abdelsayed Dep. Tr. at 50:2-5; 109:23 – 110:2; 117:1-25; 176:25 – 177:5; 189:6-18; 196:7-12; 238:3-6]. |
| 64. | Plaintiff Abdelsayed purchased his hotel room in reliance on the false and deceptive bargain and bait advertising and misleading disclosure of resort fees, including listing the resort fee under the 'USD Taxes and fees' category. | Abdelsayed Decl., ¶ 7 & Ex. B [Abdelsayed Dep. Tr. at 100:3-25; 218:11 – 219:21]. |
| 65. | Market research possessed by Marriott in December 2015 showed that "consumers' chief complaint with these fees is the lack of transparency. They are poorly marked as separate charges to the room rate, or consumers have issues paying for services that they don't use. . . . 80% of consumers want hotels to follow airlines suit and disclose any and all resort fees as part of the price." | Houchin Decl., ¶ 20 & Ex. 19. |
| 66. | Consumer comments on Marriott resort fees were 62.1% negative, and customers were frequently confused about the resort fee and what it covered. | Houchin Decl., ¶ 21 & Ex. 20. |

-19-

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 67. | In November of 2012, the Federal Trade Commission ("FTC") "warned 22 hotels that resort fees were not adequately disclosed on their hotel reservation websites, and that such practices may violate the law by misrepresenting the price consumers expected to pay for their hotel rooms." | Houchin Decl., ¶ 22 & Ex. 21 [Sullivan Paper]. |
| 68. | Marriott-owned hotels were among the 22 hotels that received an FTC warning letter, and Marriott's Chief Executive Officer was copied on the letters to those hotels. | Houchin Decl., ¶¶ 23-25 & Exs. 22-24. |
| 69. | The FTC also issued a press release concerning its warning letters, thereby putting the broader industry on notice. | Houchin Decl., ¶ 26 & Ex. 25. |
| 70. | The FTC letters stated that the hotels' resort fee practices "may violate the law by misrepresenting the price consumers can expect to pay for their hotel rooms[.]" | Houchin Decl., ¶¶ 23-24 & Exs. 22-23. |
| 71. | A presentation by Wolff and another Marriott Vice President states that "when a consumer currently does a search and directs the website to sort hotels by price, just the room rate is the operative number for purposes of sorting – not the room rate plus resort fee which would result in a lower ranking for the hotel." | Houchin Decl., ¶ 19 & Ex. 18 at MAR152257. |

-20-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 72. | In 2017, the FTC issued a study authored by Mary W. Sullivan (the "Sullivan Paper") demonstrating the consumer harm and confusion caused by resort fees. | Houchin Decl., ¶ 22 & Ex. 21. |
| 73. | The Sullivan Paper was "issued by the FTC's Bureau of Economics" and was publicized by the FTC through a press release on its website. | Houchin Decl., ¶ 22 & Ex. 21. |
| 74. | The Sullivan Paper assessed "the economic consequences of disclosing resort fees separately from the room rate." | Houchin Decl., ¶ 22 & Ex. 21 [Sullivan Paper at 4]. |
| 75. | The Sullivan Paper found that "separating mandatory resort fees from posted room rates without first disclosing the total price is likely to harm consumers by increasing the search costs and cognitive costs of finding and choosing hotel accommodations" and that "[f]orcing consumers to click through additional webpages to see a hotel's resort fee increases the cost of learning the hotel's price." | Houchin Decl., ¶ 22 & Ex. 21 [Sullivan Paper at 4]. |
| 76. | The Sullivan Paper concluded that "[u]nless the total price is disclosed up front, separating resort fees from the room rate is unlikely to result in benefits that offset the likely harm to consumers." | Houchin Decl., ¶ 22 & Ex. 21 [Sullivan Paper at 37]. |

-21-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| No. | Undisputed Material Fact | Evidence |
|---|---|---|
| 77. | The Sullivan Paper states that "[w]hen it becomes more costly to search and evaluate an additional hotel, a consumer's choice is either to incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly room, or both." | Houchin Decl., ¶ 22 & Ex. 21 [Sullivan Paper at 4]. |
| 78. | In response to one application for a resort fee, a Marriott officer noted that "at least 7 of the items listed are provided free of charge today (and at all [Ritz-Carlton] hotels in the system." | Houchin Decl., ¶ 27 & Ex. 26. |
| 79. | In response to another application, a Marriott officer noted a "concern that 26% of the value is ascribed to fitness center access . . . . Our brand standard is free fitness center access. I also note that a guest would be hard pressed to . . . only order the complimentary dessert (9%) – thus suggesting another amenity is bundled with a purchase . . . . At some point the value proposition gets a bit wobbly." | Houchin Decl., ¶ 28 & Ex. 27. |
| 80. | Wolff testified that "we included telephone, long distance telephone, local calls, faxes, bottled water, stuff that is of no value these days" as resort fee amenities. | Houchin Decl., ¶ 3 & Ex. 2 [Wolff D.C. Dep. 180:2-4]. |

-22-

| No. | Undisputed Material Fact | Evidence |
|-----|--------------------------|----------|
| 81. | On July 9, 2019, the Office of the Attorney General for the District of Columbia filed a consumer protection lawsuit against Marriott regarding the disclosure of resort fees on the Marriott website. | Houchin Decl., ¶¶ 29-30 & Exs. 28-29. |

DATED: April 15, 2022          Respectfully submitted,

/s/ *Michael T. Houchin*
**LAW OFFICES OF RONALD A.**
**MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
MICHAEL T. HOUCHIN (SBN 305541)
*mike@consumersadvocates.com*
LILACH HALPERIN (SBN 323202)
*lilach@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**LAW OFFICE OF ROBERT L. TEEL**
ROBERT L. TEEL
*lawoffice@rlteel.com*
1425 Broadway, Mail Code: 20-6690
Seattle, Washington  98122
Telephone: (866) 833-5529
Facsimile: (855) 609-6911

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Sean L. Litteral (SBN 331985)
1990 N. California Blvd., Suite 940

-23-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: *ltfisher@bursor.com*
   *slitteral@bursor.com*
***Attorneys for Plaintiffs and the Proposed Classes***

-24-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

# Exhibit C



THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM

PHONE 855.525.3860 | 323.938.8750

**EXHIBIT 1 - PAGE 1**

Page 3

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
 5   TODD HALL, KEVIN BRANCA, and    )
     GEORGE ABDELSAYED individually  )
 6   and on behalf of all others     )
     similarly situated,             )
 7                                   )
                                     )
 8            PLAINTIFFS,            )
                                     ) Case No.
 8        vs.                        ) 3:19-cv-01715-H-AHG
 9                                   )
                                     )
     MARRIOTT INTERNATIONAL, INC.,   )
10   a Delaware corporation,         )
                                     )
11            DEFENDANT.             )
                                     )
12
13
14           DEPOSITION OF
15        JEFFREY MICHAEL WOLFF
16          DECEMBER 1, 2021
17
18
     Reported by:
19   DIANE DELANEY-DAUPHINE
     CSR 3612
20   No. 21-105832
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL:
 2
     For Plaintiffs:
 3
 4       LAW OFFICES OF RONALD A. MARRON
         BY MICHAEL T. HOUCHIN, ESQ.
 5       651 Arroyo Drive
         San Diego, California 92103
 6       619.696.9006
         mike@consummersadvocates.com
 7
         BURSOR & FISHER, P.A.
 8       BY SEAN L. LITTERAL, ESQ.
         1990 North California Boulevard
 9       Suite 940
         Walnut Creek, California 94596
10       slitteral@bursor.com
11
     For Defendant:
12
         COZEN O'CONNOR, P.C.
13       BY PAUL LEARY, ESQ.
         One Liberty Place
14       1560 Market Street
         Suite 2800
15       Philadelphia, Pennsylvania 19103
         215.665.2000
16       pleary@cozen.com
17
         MARRIOTT INTERNATIONAL, INC.
18       BY THERESA COETZEE, ESQ.
         10400 Fernwood Road
19       Bethesda, Maryland 20817
         301.380.6614
20       theresa.coetzee@marriott.com
21
22
23
24
25
```

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 3
     TODD HALL, KEVIN BRANCA, and    )
 4   GEORGE ABDELSAYED individually  )
     and on behalf of all others     )
 5   similarly situated,             )
                                     )
 6            PLAINTIFFS,            )
                                     ) Case No.
 7        vs.                        ) 3:19-cv-01715-H-AHG
                                     )
 8   MARRIOTT INTERNATIONAL, INC.,   )
     a Delaware corporation,         )
 9                                   )
              DEFENDANT.             )
10                                   )
11
12
13
14
15
16
17   DEPOSITION OF JEFFREY MICHAEL WOLFF, a witness

17   herein, taken on behalf of the plaintiffs at a

18   remote location at 8:04 a.m., on Wednesday, December

19   1, 2021, before Diane Delaney-Dauphine, CSR 3612.

20
21
22
23
24
25
```

Page 4

```
 1             I N D E X
 2   WITNESS:  JEFFREY MICHAEL WOLFF
 3   EXAMINATION BY                      PAGE
 4   MR. HOUCHIN                           8
     MR. LEARY                           220
 5   MR. LITTERAL                        245
 6
 7
             E X H I B I T S
 8
     DEFENDANTS'    DESCRIPTION          PAGE
 9
     Ex 1      Deposition of Jeffrey Wolff
10             dated 5-18-18             14
11   Ex 2      Consolidated Third Amended
             Class Action Complaint     20
12
     Ex 3      Memorandum to Resort General
13             Manager from Jeff Wolff dated
             9-10-14, Bates stamped MAR21 -
14             24                        24
15   Ex 4      Memorandum to Resort General
             Manager from Jeff Wolff dated
16             November 2015, Bates stamped
             MAR36 - 39                  53
17
     Ex 5      Memorandum to Hotel General
18             Manager from Jeff Wolff dated
             November 2015, Bates stamped
19             MAR41 - 44                55
20   Ex 6      Memorandum to Marriott Rewards
             Hotel General Manager from
21             Jeff Wolff dated October 2017,
             Bates stamped MAR54 - 57    58
22
     Ex 7      The Americas, Resort/Destination
23             Fee Policy, Bates stamped MAR72 -
             78                          62
24
     Ex 8      Resort Amenities Fee - Process
25             Checklist, Bates stamped MAR16  67
```

**EXHIBIT 1 - PAGE 2**

Page 5

| | E X H I B I T S | |
|---|---|---|
| DEFENDANTS' | DESCRIPTION | PAGE |
| Ex 9 | Resort Fee Procedures, Bates stamped MAR17- 20 | 69 |
| Ex 10 | Resort Amenities Fee Approval Form, Bates stamped MAR25 - 27 | 72 |
| Ex 11 | Resort/Destination Fee Amenity Guidance, Bates stamped MAR68 - | 76 |
| Ex 12 | Points and Authorities in Support of Defendant Marriott International, Inc.'s Opposed Motion to Dismiss | 79 |
| Ex 13 | Defendant Marriott International, Inc.'s Request for Judicial Notice in Support of Motion to Dismiss First Amended Class Action Complaint | 90 |
| Ex 14 | Web flow page, Bates stamped MAR81 - 103 | 99 |
| Ex 15 | Web flow page, Bates stamped MAR104 - 126 | 105 |
| Ex 16 | Resort Fee Audit Process, Bates stamped MAR99954 - 55874 | 110 |
| Ex 17 | Mandatory Fee Discussion - Thought Starters (not for distribution), Bates stamped MAR113340 - 113343 | 120 |
| Ex 18 | NYC Proof of Concept (POC) for Destination Fee, Bates stamped MAR14749 - 14751 | 125 |
| Ex 19 | Marriott document entitled "The Truth About Resort Fees," Bates stamped MAR150573 | 128 |
| Ex 20 | e-mail chain, Bates stamped MAR190155 - 190157 | 131 |

Page 7

| | E X H I B I T S | |
|---|---|---|
| DEFENDANTS' | DESCRIPTION | PAGE |
| Ex 35 | Letter to Mary Engle from Marriott dated 12-14-12, Bates stamped MAR14 | 192 |
| Ex 36 | Letter to Kemp Gallineau from the Federal Trade Commission dated 11-26-12, Bates stamped MAR12 - 13 | 193 |
| Ex 37 | Document entitled "Working Draft - Confidential," Bates stamped MAR102604 - 102607 | 195 |
| Ex 38 | Document entitled "Resort Fees/ Destination Amenity Fees," Bates stamped MAR152245 - 152311 | 195 |
| Ex 39 | e-mail, Bates stamped MAR90432 - 90434 | 207 |
| Ex 40 | Hotel Level Report & Destination Fee Revenue by Year, Bates stamped MAR43722 - 43736 | 211 |
| Ex 41 | Spreadsheet, Bates stamped MAR173540 | 215 |
| Ex 42 | Spreadsheet (Retained by counsel) | 218 |

Page 6

| | E X H I B I T S | |
|---|---|---|
| DEFENDANTS' | DESCRIPTION | PAGE |
| Ex 21 | e-mail chain, Bates stamped MAR190304 - 190315 | 137 |
| Ex 22 | e-mail chain, Bates stamped MAR190616 - 190624 | 141 |
| Ex 23 | e-mail chain, Bates stamped MAR190626 - 190628 | 144 |
| Ex 24 | e-mail chain, Bates stamped MAR158852- 158853 | 147 |
| Ex 25 | e-mail chain, Bates stamped MAR126192 - 126196 | 152 |
| Ex 26 | e-mail chain, Bates stamped MAR145935 - 145944 | 156 |
| Ex 27 | e-mail chain, Bates stamped MAR140447 - 140449 | 160 |
| Ex 28 | e-mail, Bates stamped MAR86890 | 163 |
| Ex 29 | e-mail from Jeff Holdaway dated 3-30-17, Bates stamped MAR156567 | 168 |
| Ex 30 | Resort Amenities Fee Approval Form, MAR092881 | 171 |
| Ex 31 | e-mail chain, Bates stamped MAR121992 - 121995 | 174 |
| Ex 32 | Elite Arrival Executive | 178 |
| Ex 33 | Options for displaying resort fees, Bates stamped MAR153692 - 153709 | 189 |
| Ex 34 | Warning Letter from Federal Trade Commission dated 11-26-12, Bates stamped MAR10 - 11 | 191 |

Page 8

DECEMBER 1, 2021

THE REPORTER:  Good morning.  My name is Diane Delaney-Dauphine and I'm a California Certified Shorthand Reporter with license number 3612.  Following the deposition, the transcript will be handled pursuant to CCP section 2025.520.

Would all attendees except the deponent and questioning attorney please mute yourselves unless you're speaking.

Would the witness please raise your right hand and I'll swear you in, Mr. Wolff.

JEFFERY MICHAEL WOLFF,

HAVING BEEN DULY ADMINISTERED AN

OATH BY THE REPORTER, WAS EXAMINED

AND TESTIFIED AS FOLLOWS:

-EXAMINATION-

BY MR. HOUCHIN:

Q.  Good morning, Mr. Wolff.

A.  Good morning.

**EXHIBIT 1 - PAGE 3**

1    Q.  My name is Mike Houchin.  I represent the
2  plaintiffs in this matter.
3        Can I start by just having you state and spell
4  your full legal name for the record.
5    A.  My full name is Jeffrey Michael Wolff.
6    Q.  Okay.  Thank you.
7        Today I'm just going to ask you a few
8  questions.  I'd ask that you wait to respond to my
9  question until I finish asking it because if we're both
10  talking at the same time it makes it difficult for the
11  court reporter to write it down.  Do you understand
12  that?
13    A.  I do.
14    Q.  Okay.  And your attorney might object from time
15  to time.  If he does, you must still answer the question
16  unless he specifically instructs you not to answer.  Do
17  you understand that?
18    A.  I do.
19    Q.  And please only give verbal answers, and you're
20  doing a great job at that.  Things like head shaking or
21  saying uh-huh is difficult for the court reporter to
22  write down.  So if you do that, I'll prompt you with a
23  yes or no type of answer.  Do you understand that?
24    A.  Yes.
25    Q.  We can take a break if you need one.  Just let

1  me know.  It's not a race.  So at any time you need a
2  break just feel free to let me know.  If I have a
3  question pending, though, I will ask you to answer the
4  question before the break.  Do you understand that?
5    A.  Yes.
6    Q.  At the end of the deposition everything will be
7  reduced to a booklet transcript, and you will have the
8  opportunity to review it for accuracy.  Do you
9  understand that?
10    A.  I do.
11    Q.  Okay.  If you make any changes, though, it
12  could reflect negatively on your credibility.  Do you
13  understand that?
14    A.  I do.
15    Q.  I'm entitled to your best testimony here today.
16  Is there any physical, mental or medical reason why
17  you're not able to give your best testimony?
18    A.  No.
19    Q.  Are you under the influence of any substances
20  or medications that would impair your ability to testify
21  here today?
22    A.  No.
23    Q.  And it's my understanding that you retired from
24  Marriott International, Inc.; is that correct?
25    A.  That is correct.

1    Q.  Okay.  And when did you retire?
2    A.  My last day on the payroll was December 31st,
3  2019.
4    Q.  Okay.  And before your retirement, what
5  position did you hold with Marriott?
6    A.  My last position was vice president of guest
7  operations.
8    Q.  Okay.  And can you briefly describe what that
9  job entailed.
10    A.  Yes.  So it was -- my position with Marriott
11  was overseeing the operations for full service and
12  select service for hotels primarily managed by Marriott,
13  but it was all 30 of our brands.  It was for the
14  Americas which included the United States, Canada,
15  Caribbean and Latin America.  I would basically
16  oversee -- I had a team that reported to me, and we
17  oversaw operations within those hotels.  Marriott
18  working with property management as well as regional
19  team leaders within those specific markets.
20    Q.  Okay.  How long did you hold that position with
21  Marriott?
22    A.  I held that position -- I believe it was 2008.
23  I took -- there was a couple iterations of the position,
24  but basically it was the same thing.  When I went to a
25  corporate role, which I think, again, was 2008, I

1  oversaw different hotels in different areas.  But for
2  the most part it was focused on overseeing operations
3  within the hotels.
4    Q.  Okay.  And prior to taking the position in
5  2008, did you hold another position with Marriott?
6    A.  I did.  I held numerous positions with
7  Marriott.  I can quickly go through those, but I started
8  actually with Marriott in 1972 as an hourly employee and
9  worked for the next four years, you know, during summers
10  and vacations with Marriott.  In 1976 I went into a
11  management training program, and then from 1976 through
12  I think it was probably 1988, I -- or actually 1981 I
13  held different operation positions at different hotels
14  primarily in food and beverage across the United States
15  in different positions.  Denver, New Jersey, Florida,
16  Kentucky and so on.  And then from -- from '88 through
17  '92 I was general manager at two different hotels, and
18  then from '92 I want to say through -- for the next four
19  years I held a regional position.  And then, again,
20  prior to that my last position was just some overall
21  operations of property, operations position with the
22  Marriott.
23    Q.  Okay.  And during your last position that you
24  held with Marriott, who was your supervisor at the time?
25    A.  At the time that I retired I -- my direct

**EXHIBIT 1 - PAGE 4**

Page 13

1  supervisor was Erika, E-r-i-k-a, Alexander.
2     Q.  And do you know what her job title with
3  Marriott was?
4     A.  She was -- oh, boy.  Global -- excuse me.  Oh,
5  I don't remember exactly but operations for the
6  Americas.  She was the senior executive within the
7  organization.
8     Q.  Okay.  And was she your supervisor that entire
9  time from that 2008 period until you retired?
10    A.  Well, when I took the position that I just
11 described, my last position -- my first boss when I took
12 that position was a gentleman by the name of Tuni,
13 T-u-n-i, and the last name is Kyi, K-y-i.  I don't
14 remember when he moved to his position, but then a
15 gentleman by the name of Ray Bennett took his position.
16 And then when Ray went on to another job, that's when
17 Erika assumed her position.
18    Q.  Okay.  Do you know if Erika is still with
19 Marriott today?
20    A.  She is.  I understand she is, yes.
21    Q.  Okay.  You have been deposed before; is that
22 correct?
23    A.  Yes.
24    Q.  And was that in the D.C. action I'll call it.
25 It's an investigative action that was brought by the

Page 14

1  Washington D.C. Attorney General?
2     A.  That is correct.
3        MR. HOUCHIN:  Okay.  And I'm going to mark as
4  my first exhibit the transcript from that deposition.
5  Give me one moment.
6        (Exhibit 1 was marked for identification.)
7        THE WITNESS:  Am I supposed to look at that?
8        MR. HOUCHIN:  Sure.  Let me just get it up in
9  the Chat box real quick.
10    A.  Okay.
11    Q.  Okay.  It should be there.  Are you able to
12 open that?
13    A.  Let me try it.  Okay.  Yes, it opened up, and
14 it offers up the video -- you know, the people on the
15 screen but I have it up, correct.
16       MR. LEARY:  Mike, one second.  On mine several
17 things popped up when I tried to open it up.  Advanced
18 installers.  I mean -- let's see if I can save it.  So
19 on my pop-up screen, Mike, I have Exhibit 1, Marriott,
20 Jeff Wolff, click to download.  When I click to
21 download, I have a screen that comes up that says "save
22 as," and it has a list of things that are very short I
23 don't even know what they are, but I can't -- I'm not
24 seeing even a transcript.
25       MS. COETZEE:  You have to click on it and then

Page 15

1  let it download, see the green arrow.  Then once it has
2  the green arrow on the PDF, you open it.  But, Mike, it
3  looks like your whole exhibit list shows up as well.
4        MR. LEARY:  Well, it's more than that.  I mean,
5  there's stuff in here from other cases.  So when you say
6  click on it --
7        MR. HOUCHIN:  Yeah, when I click on it, it
8  should just be a PDF of the transcript of Jeff Wolff.
9  Does anyone else have issues with that?
10       THE WITNESS:  That's what I'm seeing.
11       MS. COETZEE:  That's what I have too.
12       MR. LEARY:  Literally I'll take a picture and
13 send it to the court reporter.  Maybe you guys can guide
14 me on it.
15       MS. COETZEE:  You can also pop out the Chat
16 into a separate box and have it on a different screen.
17 If you have more than one screen, It makes life easier.
18       MR. LEARY:  I only have one screen.
19       Bear with me one second.  I have someone down
20 the hall that's a tech person.
21       MR. HOUCHIN:  No worries.
22       MR. LEARY:  I just want to show you, Mike.  I'm
23 going to send you an e-mail just to show you what I
24 have, and maybe by looking at that you can point me to
25 the actual file.

Page 16

1        MR. HOUCHIN:  Okay.  Do you guys want to go off
2  the record just for a minute while we --
3        MR. LEARY:  Let's just go off the record.
4        (Discussion held off the record.)
5  BY MR. HOUCHIN:
6     Q.  Mr. Wolff, you can see Exhibit 1 that I
7  introduced; correct?
8     A.  I do, yes.
9     Q.  Okay.  And this is a copy of your deposition
10 transcript from the District of Columbia matter.  Have
11 you reviewed this before?
12    A.  I have.
13    Q.  Okay.  Did you review it after your deposition
14 was taken?
15    A.  Yes.
16    Q.  Okay.  Did you have any corrections to this
17 transcript that you submitted?
18    A.  I did not, no.
19    Q.  Okay.  So you believe that everything that you
20 stated during this deposition is accurate?
21       MR. LEARY:  Well, let me just first object.
22 This was an investigation questionnaire of which within
23 the record clearly states the Rules of Civil Procedure
24 do not apply in terms of objections to questions.  So as
25 indicated on the record, this was a proceeding

**EXHIBIT 1 - PAGE 5**

Page 17

1  pertaining to an investigation whereby the civil rules
2  of Civil Procedure do not apply to the extent objections
3  could not be lodged as to things such as work product,
4  guess or speculation, lack of foundation. So it was
5  taken in a completely different context. And certainly
6  there are many questions in that transcript which would
7  have otherwise been met with an objection to the witness
8  to not guess or speculate or at least a foundation would
9  require to be laid. So it is taken in a totally
10  different context in connection with a civil litigation
11  case.
12       But with that, Mr. Wolff, you can answer.
13    A.  I'm sorry, Mike. Can you repeat the question,
14  please.
15  BY MR. HOUCHIN:
16    Q.  Sure. My question is pretty simple. Is the
17  testimony that you gave during that deposition accurate?
18    A.  It appears to be.
19    Q.  Okay. And did you review this transcript again
20  in preparation for today's deposition?
21    A.  I did review this, yes.
22    Q.  Okay. And you understood that you were under
23  oath at the time of the Washington, D.C. deposition; is
24  that correct?
25    A.  Yes.

Page 18

1    Q.  And do you understand that you're under oath
2  today?
3    A.  Yes.
4    Q.  Okay. Okay. So aside from the Marriott -- I'm
5  sorry -- the Washington, D.C. deposition, have you ever
6  been deposed before in any other matters?
7    A.  Yeah. The only -- I don't think it was a
8  deposition. Back when I was a general manager, there
9  was some legal -- brief legal issue, you know, that I
10  was questioned on, but that was the only thing as I was
11  thinking back. But beyond this deposition -- excuse me
12  -- the D.C. deposition and today, no others.
13    Q.  Okay. And what's your general understanding of
14  the Washington, D.C. case?
15       MR. LEARY:  Objection to the form.
16       You can answer.
17       THE WITNESS:  Basically they were making
18  allegations that Marriott wasn't disclosing fees that
19  were on our Website. That was my understanding of their
20  allegation.
21       Did you hear me okay?
22       THE REPORTER:  Yes. Thank you.
23  BY MR. HOUCHIN:
24    Q.  Okay. Aside from reviewing the transcript in
25  the Washington, D.C. case, what else did you do to

Page 19

1  prepare for today's deposition?
2    A.  I had various conversations with Paul and
3  Theresa just to update me because of the fact that I've
4  been retired for two years. I wanted to make sure that
5  I understood or refreshed my memory on some of the
6  information and the documents. You know, this document
7  that's in front of me right now.
8    Q.  Okay. Aside from Paul and Theresa, did you
9  speak to anyone else at Marriott about today's
10  deposition?
11    A.  I did not, no.
12    Q.  Okay. And did you review any documents aside
13  from the transcript in preparation for today's
14  deposition?
15    A.  I saw the -- I don't know what -- the legal
16  document, the terminology is. The document that, I
17  guess, your law firm produced to initiate the claim.
18  Again, I don't know what it's called. And then I also,
19  I believe, reviewed some documents from Washington, D.C.
20  Some follow-up documents.
21    Q.  Okay. And can you briefly describe what those
22  documents were.
23    A.  I don't know what the legal terminology, but it
24  was some type of formal legal document. Maybe a summary
25  judgment document or something like that. But, I mean,

Page 20

1  again, it was a formal document from Washington, D.C.
2  from the Attorney General's Office, perhaps summary
3  judgment request.
4    Q.  Okay. And you said that you reviewed the
5  document from this case. Are you referring to the
6  consolidated Complaint that was filed, if you know what
7  the term is?
8    A.  I don't know if that's the terminology on it.
9  I mean, you know, it was a document from, I believe,
10  your law firm that referred to several plaintiffs,
11  Mr. Branca and so on. So that's what I -- I mean,
12  again, I'm sorry. I didn't note the specific document.
13    Q.  Okay. And that's fine.
14       I'm going to mark as the next exhibit the
15  Complaint in this action, the consolidated Complaint. I
16  just want you to take a look at that, and let me know if
17  that's the document that you reviewed.
18       (Exhibit 2 was marked for identification.)
19       MR. LEARY:  Okay. I'm going to try to save as
20  to the desktop. Bear with me one second. Got it.
21  Thank you.
22       THE WITNESS:  I'm looking through it now just
23  to make sure. Yes, this appears to be the document that
24  I reviewed.
25  ///

**EXHIBIT 1 - PAGE 6**

1 BY MR. HOUCHIN:
2     Q.  Okay.  And it's your understanding that there's
3 three plaintiffs in this case; correct?
4     A.  That's my understanding.
5     Q.  Okay.  And what's your understanding of what
6 the allegations are in this case?
7         MR. LEARY:  Object to the form, calls for
8 speculation.
9         Go ahead and answer it to the extent you can.
10        THE WITNESS:  Yeah, I think that the claim
11 being made has something to do with a class action, and
12 it's alleging that the three plaintiffs noted in the
13 document were apparently -- claim to be unaware of a
14 resort fee.
15 BY MR. HOUCHIN:
16    Q.  Okay.  And did you ever speak with anyone at
17 Marriott about the Complaint that was filed in this
18 case?
19    A.  The one that you just put on the screen?
20    Q.  Correct.  And I'll also represent that there
21 were prior versions of this Complaint.  So this is the
22 Third Amended Complaint.  There were three other
23 versions.
24    A.  Other than Theresa, again who is a Marriott
25 employee.

1         MR. LEARY:  Yeah, just to the extent -- hold
2 on, Jeff.  To the extent you spoke with anyone, in-house
3 lawyers, you can identify who you speak with but not the
4 content of it.  Okay?
5         THE WITNESS:  Okay.  The only person that I
6 spoke to within Marriott, that's a Marriott employee, is
7 Theresa Coetzee.
8 BY MR. HOUCHIN:
9     Q.  Okay.  And can you describe your understanding
10 of what a resort fee is with respect to Marriott.
11    A.  A resort fee is a bundle of goods and services
12 that are packaged together at a specific rate and
13 provided to our guests, our customers to enhance their
14 experience at the hotel.
15    Q.  Okay.  Do you know when Marriott began charging
16 resort fees?
17    A.  I took my position in -- well, the corporate
18 position, I think, was 2008, 2009.  At that point there
19 were some resort fees in effect.  I don't know when off
20 the top of my head they began.
21    Q.  Okay.  And so you mentioned there were some
22 resort fees.  Do you have an estimate about how many
23 hotels were charging resort fees when you started your
24 position in 2008?
25    A.  I don't remember.  I can't recollect that.  I'm

1 sorry.  It's been so long.
2     Q.  Okay.  Fair enough.
3         The Complaint also refers to other types of
4 fees, including a destination amenity fee.  Can you
5 describe what your understanding of the destination
6 amenity fee is with respect to Marriott.
7     A.  Destination amenity fee is basically the same
8 as a resort fee but for destination hotels as opposed to
9 resorts.
10    Q.  Okay.  And do you know when Marriott began
11 charging a destination amenity fee?
12    A.  It's speculation at this point, but I would say
13 2017.  But, again, I'm just going from memory having
14 been out of this for two years, and it was quite a while
15 ago.
16    Q.  Okay.  And the Complaint also refers to a
17 destination fee.  Your understanding of that that's
18 basically the same as a destination amenity fee?
19    A.  That is correct.
20    Q.  Okay.  With respect to resort fees, do you know
21 why Marriott began charging resort fees?
22    A.  From the perspective to remain competitive with
23 our competition hotels and also to enhance the guest
24 experience at the -- at the hotels, the resorts and
25 destinations.

1     Q.  Okay.  And what do you mean by to remain
2 competitive?
3     A.  Some of our other hotels -- excuse me --
4 competition hotels, different companies, different
5 hotels, had resort fees in place at that time.  And they
6 were able to bundle this group of amenities and services
7 and provide them to their customers which in our
8 estimation -- my estimation improved guest service and
9 the guest experience when those folks were at those
10 hotels.
11    Q.  Okay.  And is it correct that Marriott was
12 written policies and procedures with respect to resort
13 fees and destination amenity fees?
14    A.  Yes, that is correct.
15    Q.  Okay.  So I'm going to mark another exhibit.
16 This going to be one of those policies.  Hold on.  Just
17 one moment.  All right.  This will be Exhibit No. 3.
18        (Exhibit 3 was marked for identification.)
19        MR. LEARY:  Just one second.
20        THE WITNESS:  I have it.  I'm reviewing it now.
21        MR. LEARY:  I have it too.  Thank you.  This
22 begins with Bates stamp MAR21, Mike?
23        MR. HOUCHIN:  Yeah, MAR21 and it goes through
24 MAR24.
25        MR. LEARY:  Okay.

**EXHIBIT 1 - PAGE 7**

Page 25

1        THE WITNESS:  And is this the document?  I
2   don't see that MAR number on it.  September 10th, 2014
3   memo from me, Jeff Wolff.  That one?
4   BY MR. HOUCHIN:
5        Q.  Yeah, that's correct.  So the MAR number should
6   be in the bottom --
7        A.  Oh, I see it.
8        Q.  -- right-hand corner.
9        A.  Yes.  Okay.
10       Q.  Have you seen this document before?
11       A.  I have, yes.
12       Q.  Okay.  And can you briefly describe what this
13   document is.
14       A.  This was a critical document that I was
15   responsible for, and basically this document when I as
16   the administrator of resort fees for the company during
17   my tenure at Marriott during the tenure at corporate at
18   Marriott, if a property submitted a request for a resort
19   fee or expressed interest in putting in a resort fee, I
20   would send this document to the general manager of the
21   hotel.  And there may have been some attachments with
22   this as well, but this was a cover memo that was sent to
23   describe the requirements that the property must adhere
24   to in order to implement a resort fee.
25       MR. LEARY:  Mike, can I just interrupt.  I'm

Page 26

1   able to scroll through mine.  I just want to understand
2   whether the witness could as well, or do you control the
3   scrolling?
4        MR. HOUCHIN:  No, you guys should be able to
5   control the scrolling.  It's just a PDF.
6        MR. LEARY:  That's what I figured.  I just
7   wasn't sure to the extent, you know, if the witness
8   needs to scroll through a document to look for an
9   attachment, I just want to make sure that Mr. Wolff
10   could do that.
11       MR. HOUCHIN:  Yeah.  All of the exhibits I
12   introduce you guys should be able to scroll through them
13   yourself.  There may be times where I do a share screen
14   where I'll point out certain things, but I'll let you
15   guys know.
16       MR. LEARY:  Okay.
17   BY MR. HOUCHIN:
18       Q.  So this document is dated September 10th, 2014.
19   Do you know if there were any prior versions of this
20   document?
21       A.  I would have to review files, but I suspect
22   that there were, but I don't know for sure.  As needed I
23   would make modifications to this document for, you know,
24   whatever reason.  If there was terminology change or
25   something like that.  So there could have been versions

Page 27

1   prior to this.
2        Q.  Okay.  And is this a document that you drafted?
3        A.  This is a document that I would have sent out.
4   It may have had a -- it may have been in place prior to
5   my -- some form of it may have been in place prior to my
6   assuming the position.  But at this point the September
7   10th, 2014 document that has my name on it I would have
8   composed this.
9        Q.  Okay.  And aside from yourself, was there
10   anyone else at Marriott who had a role in drafting this
11   document?
12       A.  I would always engage other individuals,
13   primarily our legal department to review this.  And if
14   there were technical aspects about this -- and, again,
15   I'm just scrolling through this right now to see -- I
16   believe there was probably some additional pages or
17   additional attachments.  If memory serves me correctly,
18   it may have been on there that I would have possibly
19   referred to other experts within the company.
20       But, for example, if you look at 6, No. 6 on
21   the document that's on the screen, when it talks about
22   different types of segments and then it refers to the
23   GSA Manual Library of Clauses, I would have worked with
24   our legal department or other experts on this
25   information.

Page 28

1        Q.  Okay.  And we'll go through that here in just a
2   minute.  I just want to point you out to the first
3   paragraph in this document.
4        Do you see the last sentence that reads, "This
5   procedure only applies for resort fees that are
6   automatically included and not where a guest may choose
7   to opt in"?
8        A.  Can you repeat the question.  I'm sorry.
9        MR. LEARY:  He just wants to know if you can
10   see the last sentence, Jeff.
11       THE WITNESS:  I see the last sentence, yes.
12   BY MR. HOUCHIN:
13       Q.  Okay.  What does that mean by "automatically
14   included and where a guest may choose to opt in"?
15       A.  The resort fee process, the one -- the document
16   that is in front of me right now sets out the procedure
17   for resort fees that are mandated.  In other words,
18   they're automatically included.  If there is a hotel --
19   if there were -- was a hotel that wanted to have an
20   optional resort fee or other bundle of amenities, this
21   policy would not apply.  This was only for mandatory
22   fees, resort fees.  This document.
23       Q.  Okay.  So is it your understanding that all
24   resort fees at Marriott are mandatory?
25       A.  All resort fees with Marriott are mandatory,

**EXHIBIT 1 - PAGE 8**

1 that is correct.
2    Q.  Okay.  So --
3    A.  Please let me clarify one thing.  Resort fee --
4 and that would be only at resort fee hotels where resort
5 fees were approved by myself and the committee.
6    Q.  Okay.  So with respect to those hotels that
7 charge a resort fee that were approved, is it your
8 understanding that a hotel guest would not be able to
9 opt out of the resort fee?
10    A.  At the time of booking a customer would not be
11 able to opt out of a resort fee.  However, there were
12 other means for a guest if they did not want to have the
13 resort fee, did not want to pay the resort fee, they
14 could opt out at the time of check-in.
15    Q.  Okay.  And how would that process play out?
16 Would the guest have to specifically ask for that, or
17 did Marriott have some other type of policy as far as
18 opting out of the resort fee goes?
19    A.  Yes.  So what would happen is our policy and
20 procedure states that at check-in we do everything in
21 our power to make sure that guests know about the resort
22 fee, that they can enjoy all the amenities and services
23 when they check in.  However, if a customer said I'm not
24 going to be able to use the services and amenities.
25 Perhaps that person came in at 10 a.m. (sic) late at

1 night and for whatever reason they're leaving at 6 a.m.
2 the following morning and they're not going to be able
3 to enjoy the amenities, they could request that the
4 resort fee be removed.
5       At that point they would be instructed to let
6 them know that if they use any of the amenities included
7 in the resort fee, they would be charged.
8    Q.  Okay.  Can you go down to the paragraph that
9 starts with "Eligibility" and eligibility is in bold.
10    A.  Okay.  I'm here.
11    Q.  Okay.  And it says, "Resorts that meet each of
12 the following criteria may apply for an exception to the
13 existing resort fee standard which generally prohibits
14 the imposition of a resort fee."
15       What does that mean, "the existing resort fee
16 standard that generally prohibits the imposition of a
17 resort fee"?
18    A.  Are you talking the very -- the only sentence
19 after eligibility?  "Resort fees that meet each of the
20 following criteria may apply for an exception to the
21 existing resort fee standard which generally prohibits
22 the imposition of a resort fee."  That's what your
23 question is?
24    Q.  Yeah.  My question -- let me be more specific.
25 So my question is about the existing resort fee standard

1 that's referenced in that sentence.  Can you explain
2 what that is?
3    A.  Marriott had a policy during the time that I
4 was employed by Marriott that prohibited resort fees or
5 other mandatory fees without prior approval.  So in this
6 specific case, it was very specific.  This was our
7 control process whereby we told hotels that they did not
8 have the option of putting a resort fee in without going
9 through the approval process that is spelled out on the
10 document that's in front of me right now.
11    Q.  Okay.  And do you know why that was Marriott's
12 general policy?
13    A.  Because to my understanding we did not want
14 guests to be charged fees that we were not aware of or
15 were not authorized.  It was important to us from a
16 customer perspective that guests knew about any charges
17 or fees prior to paying them.  And, again, this was a
18 strict control policy that we had in place throughout
19 our company during my tenure to prohibit fees being
20 charged to customers without their knowledge.
21    Q.  Okay.  And under the paragraph that says
22 eligibility there's the No. 1 and it says --
23    A.  Yes.
24    Q.  -- "Resort fees are the market norm" --
25       MR. LEARY:  Jeff, Mike was reading from the

1 paragraph.  He cut out.  And the court reporter just
2 wants him to restate it.  Okay?
3       THE WITNESS:  Thank you.
4 BY MR. HOUCHIN:
5    Q.  Okay.  Yeah.  All I'm saying is do you see that
6 No. 1 where it says, "Resort fees are the market norm,
7 defined as 75 or more of the hotels in the resort's
8 competitive set"?
9    A.  Yes, I see that.
10    Q.  Can you explain what the "competitive set"
11 means?
12    A.  The competitive set for a particular hotel or
13 resort was basically defined through their -- what we
14 call the STAR, S-T-A-R, market report, and basically
15 that was a list of the competitor hotels.  A resort or a
16 hotel might have more than one STAR competitive set.
17       So, for example, you would have a resort -- I'm
18 just going to pick out one and say Palm Springs,
19 California.  You may have a hotel that is in that
20 market, and it's known for having a lot of resorts.
21 There would be a specific list of resorts that they were
22 competing against in the market.
23       Additionally, a resort such as -- a big resort
24 like the JW there in -- in Palm Springs might have
25 another STAR competitive set which included properties

**EXHIBIT 1 - PAGE 9**

Page 33

1  outside of their market.  So they may be competing with
2  resorts in San Diego.  They may be competing with
3  resorts in Tucson and so on.  So that's how we defined
4  their competitive sets.
5      Q.  Okay.  And you mentioned the STAR report.  Is
6  that a report that Marriott prepares, or is that like a
7  third-party company that prepares those reports?
8      A.  That is an independent third party.
9      Q.  Do you know the name of that third party?
10     A.  I believe that's the name, STAR, but that's the
11  best I remember at this point, but we always referred to
12  them as STAR.  That was an acronym for something but
13  anyway.
14     Q.  Okay.  So under this policy in order for a
15  Marriott hotel to be approved for a resort fee, 75
16  percent or more of the other hotels in the competitive
17  set would also have to charge a resort fees; is that
18  your understanding?
19     A.  Yes, that is correct.  And the reason for that,
20  again, is Marriott didn't want to be the market leader,
21  so to speak, in charging fees.  We wanted to know that
22  they were predominant within the market.
23     Q.  And why didn't Marriott want to be the market
24  leader with respect to resort fees?
25     A.  I just think it was from the perspective that,

Page 34

1  you know, we didn't want to be perceived as, you know,
2  adding fees.  We're a very customer-focused company.
3  However, if our competition was using fees, we would
4  have been at a disadvantage if we didn't put them in
5  place in terms of customer satisfaction, providing
6  amenities and so on.
7      Q.  Okay.  And do you see the next paragraph down,
8  No. 2?
9      A.  Yes, I do.
10     Q.  Okay.  And it says, "The resort has achieved a
11  GSS Overall Satisfaction/GuestVoice score."
12         What does that mean, the GSS Overall
13  Satisfaction/GuestVoice score?
14     A.  Yeah.  So GSS is just a phrase, an internal
15  phrase that we use, and it talks about our system that
16  Marriott has used for many, many years to monitor guest
17  satisfaction at hotels.  And so what happens with that
18  is that if you stay at a hotel -- excuse me -- we
19  randomly send out guest satisfaction reports and ask you
20  -- ask those customers to fill them in and send them
21  back to us.  And with that we monitored the performance
22  of every single hotel within the company, and we have
23  minimum levels of service.  You know, we have Red Zone.
24  This was again back when I was in position.  There could
25  be green.  There could be yellow.  There was some other

Page 35

1  colors but red.  And basically it ranked the hotel in
2  terms of how they were performing against guest
3  expectations as well as against other hotels within the
4  company.
5      Q.  Okay.  And then in that paragraph it says, "51
6  for all full service brands in the Americas and 42 for
7  Ritz-Carlton hotels."
8         So is it your understanding that in order to
9  charge a resort fee at a full service brand hotel that
10  the GSS score would have to be 51?
11     A.  That is correct.  That would be the minimum
12  score, correct.
13     Q.  Okay.  And do you know how that 51 number was
14  determined?
15     A.  Again, it was a while ago, but if memory serves
16  me correctly, 51 was the number of people that rated us
17  on a scale of 1 10 ten -- and, again, this is going back
18  a while.  It could have been a different scale, but on a
19  scale of 1 to 10, 10 being the highest, 9 or 10, 51
20  percent or more were rating the hotel.  And it's a 9 or
21  10 which in our research means that customers were
22  extremely happy.  It was like the peak satisfaction.
23  Eights and sevens were good but they weren't great.  So
24  that's how the 51 -- and that went up every year.  So
25  this was in 2014.  We would do detail analysis and say,

Page 36

1  okay, now we're moving the score up to 52.  And then
2  maybe the next year up to 54 to constantly strive to
3  improve customer service.
4      Q.  Okay.  And then if you look at No. 3, it says,
5  "The resort's owner/franchisee is requesting the
6  implementation of a resort fee."
7         So is it your understanding that the individual
8  hotel owners or franchisees would have to specifically
9  come to Marriott in order to request a resort fee?
10     A.  Typically what happened is we would receive a
11  request most likely through e-mail from the property
12  general manager, and this No. 3 was used to ensure that
13  there was complete alignment with the hotel general
14  manager and/or the owner or the franchisee.  So the
15  owner meeting if it was the Marriott managed hotel, we
16  wanted to ensure that the owner was in agreement with
17  the request.  And for a franchise hotel, we want to make
18  sure the franchise operator was also in concurrence with
19  the general manager as they made a request to implement
20  a resort fee.
21     Q.  Okay.  Do you recall any instances where
22  Marriott would go to any specific hotel and ask them to
23  start charging a resort fee?
24         MR. LEARY:  Object to the form, calls for
25  speculation.

**EXHIBIT 1 - PAGE 10**

Page 37

1    You can answer if you know.
2         THE WITNESS: Yeah, I'm trying to think back.
3  You know, I don't -- well, again, I was in a corporate
4  position, and as a corporate representative, I did not
5  have authorization to go and ask a hotel to implement a
6  resort fee. And I'm speaking for myself and I'm
7  speaking -- again I'm recollecting if I ever went. If I
8  did, I had no authorization to do that.
9  BY MR. HOUCHIN:
10    Q. Okay. And the last paragraph there it says,
11  "The resort resides in a jurisdiction in which the
12  imposition of a resort fee will not result in
13  significant legal risks."
14         What does that mean by "significant legal
15  risks"?
16         MR. LEARY: Objection to the form.
17         THE WITNESS: I'm sorry.
18         MR. LEARY: You can answer.
19         THE WITNESS: Okay. Thank you.
20         Basically what that means is that in my
21  position at corporate I oversaw hotels -- and this is,
22  again, corporate folks besides myself. But myself
23  primarily as the person responsible for this is that I
24  oversaw hotels. You know, there was maybe 150 or 200
25  resorts, but I also oversaw hotels, you know, in

Page 38

1  probably three or 400 different markets in different
2  countries, in different states. And I was not the
3  person that would be able to determine if there was a
4  significant legal risk within that market. Meaning the
5  general manager or the leaders of that hotel were
6  responsible to understand if there was any laws or any
7  significant legal risks to the hotel before implementing
8  a resort fee. It was basically a way to ask the hotels
9  to ensure that there were no issues prior to moving
10  forward.
11  BY MR. HOUCHIN:
12    Q. Can you give an example of what a significant
13  legal risk would be.
14    A. Basically --
15         MR. LEARY: Objection. Calls for
16  speculation -- hold on. Objection. Calls for
17  speculation, a legal conclusion.
18         But you can answer to the extent you know.
19         THE WITNESS: Right. And, again, and I'm not
20  going to -- I won't speculate about what a significant
21  legal risk is. I'll use an example of one that I'm
22  aware of or was aware of at the time I was in position.
23  That was in Hawaii. Hawaii had some regulations around
24  resort fees, and, again, this would be if a hotel didn't
25  adhere to them, they would have legal risks. Beyond

Page 39

1  that, it would be speculation on my part to state what
2  that is at other hotels.
3  BY MR. HOUCHIN:
4    Q. Okay. If you can scroll down to the next page
5  where it says, "Executive Approval." Do you see that?
6    A. I do.
7    Q. Okay. And then it talks about an approval
8  committee for resort fees, and it looks like there's
9  five people listed. Can you explain what the function
10  of that Resort Fee Committee is.
11    A. Yes. So Resort Fee Committee I don't remember
12  when it was formally put in place, but it was always
13  something that I used. And the people that are listed
14  here -- and this executive approval list obviously
15  changed through the years as people left or, you know, a
16  new position was -- was made or an old position was
17  eliminated or whatever it was. But this was a committee
18  that I would go to to review any resort fee requests.
19         And basically -- you know, you see in there
20  obviously at that point Jim Kauffman was the president
21  of full service hotels in the United States and Canada.
22  Ray Bennett, that's the title chief lodging services
23  officer. That's now Erika Alexander but he was the
24  person. We had brand representation. Tina Edmundson
25  was in charge of full service brands at that time, and

Page 40

1  Brian King was in charge of select service or extended
2  stay brands. Jeff Holdaway was our legal counsel at
3  that point. And myself and my position I was pretty
4  much the person that coordinated this. When I received
5  requests, I would send this information or review it
6  with those other four committee members before approving
7  any resort fees.
8    Q. Okay. And when you started your position in
9  about 2008 you said, were you on the Resort Fee
10  Committee during that time?
11    A. At the very beginning when I moved into the
12  corporate position which, again, I think the years are a
13  little bit foggy. But the approximate time of 2008 I
14  was not, I believe -- and, again, I'm not a hundred
15  percent certain -- that I took over responsibility for
16  the resort fee process 2009, 2010 approximately. And
17  that's when I started overseeing the process and most
18  likely went on to the committee at that time.
19    Q. Okay. And so this committee is responsible for
20  approving resort fees at each individual hotel. Can you
21  generally describe what that process entails?
22    A. Yes. Again, not jumping ahead but if you look
23  down at the implementation requirements, as I mentioned,
24  there are some other documents, I believe, that were
25  attached to this memorandum. Those documents would be

**EXHIBIT 1 - PAGE 11**

Page 41

1  sent to the hotel, specifically the general manager who
2  is the ultimate person at that hotel accountable for
3  that property would review all of the implementation
4  requirements and send that information back in to me for
5  review and for approval.
6       And then at that point what I would do is I
7  would do a detailed review at -- with that hotel general
8  manager or the representative from that hotel to ensure
9  that they were meeting all of the requirements that
10  Marriott set forth in order to charge a resort fee.  At
11  times, you know -- you know, it could be seen in all the
12  documentation I produced there would be 10, 15, 20
13  e-mails back and forth between myself and the hotel on
14  the order to make sure that they were meeting the
15  requirements set forth by Marriott.
16       Once it reached the point where I felt that
17  they were meeting the requirements set forth in this
18  document to implement a resort fee, I would then send it
19  to the other four members of the committee with a
20  recommendation to approve or not to approve.  And then
21  all of them would vote whether or not they authorized
22  the hotel to move forward with the resort fee.
23    Q.  Okay.  And with respect to that voting process,
24  would that have to be a majority vote or a unanimous
25  vote or how did that work?

Page 42

1    A.  It always had to be unanimous.
2    Q.  Okay.  Do you recall any instances where you
3  recommended that a hotel be approved for a resort fee
4  but then the committee decided not to approve the resort
5  fee?
6       MR. LEARY:  Objection.  Relevance.
7       Go ahead.  You can answer.
8       THE WITNESS:  I'm trying to remember.  So your
9  question, I believe, stated was there a time when I put
10  forth a resort fee request that I said -- I recommended
11  approval and it was turned down by the committee; is
12  that the question?
13  BY MR. HOUCHIN:
14    Q.  Yeah, that's correct.
15    A.  Okay.  I don't remember any situation where the
16  committee came back -- it's possible, but if it did, it
17  was an extreme anomaly.  They came back and said, we
18  know, we're not going to approve this.  You were wrong,
19  Jeff, because normally what I would do is if I thought a
20  hotel could not meet the qualifications, I might
21  verbally review it with the committee and say do you
22  think I'm, you know, too stringent on this?  And they
23  would give me their opinion, but there were times when
24  hotels made requests for resort fees.  They weren't
25  resorts.  They didn't meet the qualifications.  Their

Page 43

1  guest satisfaction scores were too low.  They didn't
2  have the amenities.  It would never make it to the
3  committee.
4       So, again, just to summarize.  In answer to
5  your question, I don't remember a situation where the
6  committee came back to me and said we don't approve it
7  despite my recommendation that they approve it.
8    Q.  Okay.  And with respect to this Resort Fee
9  Committee, do you know who at Marriott or there might be
10  multiple people at Marriott but who decided that these
11  five people would sit on this committee?
12       MR. LEARY:  Objection.  Calls for speculation.
13       You can answer if you know.
14       THE WITNESS:  Yeah.  I'm trying to think back
15  but when the committee was first implemented, I'm
16  speculating that --
17       MR. LEARY:  I don't want you to speculate,
18  Jeff.
19       THE WITNESS:  Okay.  All right.
20       MR. LEARY:  If you know, please tell him.  If
21  you don't --
22       THE WITNESS:  I don't know.  I don't know.
23  BY MR. HOUCHIN:
24    Q.  Who asked you to serve on the committee?
25    A.  My boss at that time would have been -- well,

Page 44

1  it was -- I was asked to be on the committee because I
2  took over responsibility for resort fees.  And at that
3  time it would have been the global -- the chief lodging
4  services officer, and that would have been Tuni Kyi.
5  That's by memory.  I'm trying to think back over ten
6  years ago, but that's my best recollection.
7    Q.  Okay.  And when you took over your position in
8  2008, who held that position before you?
9    A.  That position that I went into I believe was --
10  that position was a new position at that point.  I'm
11  assuming there might have been some reorganization
12  taking place, but the position itself I think would have
13  been considered new.
14    Q.  Okay.  So you didn't necessarily have a
15  predecessor to that position?
16    A.  The predecessor in that position and the job
17  was very different, if memory serves me correctly, was
18  more focused on rooms operation.  There was additionally
19  a gentleman by the name of John Adams who was global
20  rooms operations.  And I believe at that point he may
21  have been the person that was overseeing resort fees but
22  on a very limited basis.  And when I took my position,
23  this responsibility came over to me.
24    Q.  Okay.  And do you know if that person was on
25  the Resort Fee Committee before you were?

**EXHIBIT 1 - PAGE 12**

Page 45

1      A.  I do not know that.
2          MR. LEARY:  Mike, are you going to have more
3  questions on this doc?  I don't want to interrupt your
4  flow, but we've been going about an hour, and I want to
5  take a break.
6          MR. HOUCHIN:  Yeah.  I just have a few more
7  questions about the implementation requirements, and
8  then I think I'll be done with this document.
9          MR. LEARY:  Okay.
10 BY MR. HOUCHIN:
11     Q.  So, Mr. Wolff, we'll just quickly go through
12 these, but can you look where it says implementation
13 requirements.
14     A.  I see that.
15     Q.  Okay.  And then the paragraph that's No. 1 it
16 talks about a ratio of 5 to 1, and it gives an example.
17 "$125 daily value for a $25 daily resort fee."  Can you
18 describe what that is.
19     A.  Yes.  Part of -- as it says there, requirement
20 implement a resort fee at a hotel.  We wanted to ensure
21 as a company that resort fees included, as it states
22 there, a "bundle of resort products and services that
23 would not normally be included in the price of the
24 room."
25          And so, in other words, that would mean is that

Page 46

1  if there were amenities at a resort, there would
2  normally need to be a charge associated with them.  We
3  would not allow hotels to list amenities as part of the
4  resort fee that were items that were normally provided
5  to the guest complimentary as part of their room rates.
6          So as an example of that, we would not allow
7  hotels to include access to the guest fitness center
8  because that was typically provided free.  However, if
9  there was a yoga class that was provided at a cost or
10 something similar, a spinning class, Pelaton, whatever
11 it might be, that guests would normally have to pay a
12 fee to join.  Those could be included within the bundle
13 of products or services as part of the 5 to 1 value
14 proposition.
15     Q.  Okay.  And how is the value proposition
16 determined to be 5 to 1 as opposed to some other number?
17     A.  We just felt -- I don't remember the exact
18 reasoning, but we wanted to ensure that there was a
19 very, very strong value proposition.  If a customer was
20 being charged a resort fee at the resort, we wanted to
21 make sure that they were able to enjoy all of the
22 amenities and services at a resort and that they felt
23 that it was a high value to them.
24     Q.  Okay.  Can you go down to paragraph three on
25 that same page where it says No. 3.  It starts with "The

Page 47

1  resort fee must be effectively and consistently
2  communicated through all Marriott/Ritz-Carlton and
3  third-party reservation channels."
4      A.  I see that.
5      Q.  It says, "It must be disclosed at the time of
6  reservation and at check-in."
7          And then if you go to the next page, there's
8  letter A and it says basically if guests book over the
9  phone, they should be quoted the room rate at the time
10 of the reservation.  And then it says, "The
11 reservationist should disclose the resort fee and the
12 products/services received for the fee."
13          Is that the general policy to always disclose
14 the products and services received with the fee?
15     A.  Per -- per that item number A.  What happened
16 -- and, again, this was back in 2014.  I think the
17 document was in 2014 when 800 number reservation systems
18 were more prevalent as opposed to online.  And so there
19 was a system that was put in place.  Training and
20 technical systems that were put in place so if a call
21 came through, the 800 operator would quote the rate.
22 And then once it was booked, there was some type of -- I
23 don't know the technical term, but it was a pop-up that
24 would come on that required the reservation agent to
25 provide to the guest making the reservation request the

Page 48

1  fact that there was a fee and what was included in that
2  fee.
3      Q.  Okay.  And then if you look down at letter B,
4  it talks about making reservations through non-live
5  channel, and it gives an example of marriott.com and OTA
6  Websites.  And it says, "Guests making reservations
7  through non-live channels similarly should be advised of
8  the resort fee at the time of reservation."
9          When it says "similarly," does that also mean
10 that the product and services received for the fee
11 should also be disclosed through the Website and OTA
12 Website?
13         MR. LEARY:  I just object to the extent you
14 paraphrased this paragraph, but since it's in front of
15 the witness, he can review the document.
16         THE WITNESS:  Yeah, I mean it is what it says.
17 It says, "For example, guests making reservations
18 through marriott.com/OTA must see the additional charge
19 referenced on the screen at the time of the reservation,
20 along with the applicable taxes."
21         Yeah, that's what it says, and that's what I
22 recall.
23 BY MR. HOUCHIN:
24     Q.  Okay.  So my question is:  In addition to the
25 charge on the Marriott Website, was it also Marriott's

**EXHIBIT 1 - PAGE 13**

1  policy that the products and services received for the
2  fees should also be disclosed on the Website?
3     A.  Can you give me -- I guess I'm not
4  understanding your full question.  What are you asking
5  specifically?  I don't quite --
6     Q.  Well, sure.  In paragraph A it says that the
7  products and services received for the fees should be
8  disclosed, but it doesn't necessarily say that in
9  paragraph B.  It just says, "Guests making reservations
10  through non-live channels similarly should be advised of
11  the resort fee at the time of reservation."
12        So my question is basically is it Marriott's
13  policy that if a guest books a room through the
14  marriott.com Website, the products and services received
15  for the fee should also be disclosed on the Marriott
16  Website?
17        MR. LEARY:  Object to the form just to the
18  extent there's an entire document in front of this
19  witness back from 2014.  But generally we can talk about
20  Marriott's policy and disclosure and amenities.
21        THE WITNESS:  Yeah.  I mean what we did is with
22  the blue box that was on the reservation page we
23  provided some generic general information and
24  additionally -- and, again, this is by recollection, you
25  know, from quite a while ago is that there would be

1  information on the hotel Website as to what amenities
2  were at the hotel were provided.  That's my recollection
3  of it.
4  BY MR. HOUCHIN:
5     Q.  Okay.  I think that answers my question for
6  now, and we'll get to the blue box a little bit later.
7        My last question with respect to this document
8  it's on paragraph D.  It says, "Evidence of effective
9  communications will be demonstrated through periodic
10  testing, which is the responsibility of the hotel
11  leadership team, to show that 90 percent or more of
12  guests charged the resort fee received notice at the
13  time of reservation and 100 percent of guests received
14  notice at or before check-in."
15        Can you explain that periodic testing process,
16  how that worked.
17        MR. LEARY:  Just for the record, Mike, you're
18  saying it's 3(d); correct?
19        MR. HOUCHIN:  3(d), correct.
20        MR. LEARY:  Okay.
21        THE WITNESS:  Yeah.  Like other things within
22  the Marriott policy, we held, again, the general manager
23  accountable for all of the service and product at the
24  hotel.  The general manager in turn would hold their
25  teams accountable, and so with this we put into place

1  this policy.  And we asks that the hotel teams
2  effectively went back, monitored this, tested it to make
3  sure that customers were receiving this information to a
4  very high standard of 90 percent or more which, you
5  know, to me I don't know if that's realistic or not.
6  But, you know, our standards are extremely high, and we
7  wanted to make sure that our customers knew about the
8  resort fee when they were checking in so that they could
9  take advantage of the amenities and services that were
10  there.
11        As far as monitoring this, we constantly -- we
12  had an extensive system that we referred to earlier, the
13  guest satisfaction system, GSS.  We use that to judge
14  the performance of a hotel, and if a hotel was not
15  performing as noted in 3(d), that information would most
16  likely come to our attention or the above property
17  leader's attention during that process.
18        When we had a conversation with hotels, we
19  would ask them about this.  We would remind them about
20  this as well that they were accountable to adhere to
21  3(d).
22  BY MR. HOUCHIN:
23     Q.  Okay.  And so would this periodic testing be
24  performed by the hotels individually, or is this
25  something that Marriott International would do?

1     A.  The primary responsibility was with the hotels.
2  However, we did random -- excuse me -- mystery, not
3  random, mystery shops at hotels.  And I don't know in
4  2014 if that was part of the mystery shop, but we
5  continued to monitor this to see whether or not they
6  were adhering to this policy.
7     Q.  Okay.  And aside from the mystery shops, was
8  there any other type of periodic testing that Marriott
9  International would do?
10     A.  I don't remember any others at that point.
11     Q.  Okay.  Now would be a good time for a break if
12  you guys want to take five or ten minutes.
13        MR. LEARY:  Yes, that's fine.  Let's take ten
14  minutes.
15        MR. HOUCHIN:  Okay.  Sounds good.
16        (Recess.)
17  BY MR. HOUCHIN:
18     Q.  Mr. Wolff, before the break, we were talking
19  about mystery shops the Marriott performed.  I just had
20  a question about that.  Is that something that Marriott
21  International itself would do, or did it hire third
22  parties to perform those mystery shops?
23     A.  Are we still on the same document before the
24  break?
25     Q.  Yes.  The document doesn't refer to the mystery

EXHIBIT 1 - PAGE 14

Page 53

1  shops.  It's just something that you stated earlier.
2     A.  So the answer -- the question is does Marriott
3  do the shops or do we hire an outside company?
4     Q.  Yeah, that's correct.
5     A.  Outside company.
6     Q.  Okay.  And do you know what the name of that
7  company is?
8     A.  If memory serves me correctly, Mercantile.
9     Q.  Okay.  And aside from Mercantile, are you aware
10  of any other third parties that Marriott hired to
11  perform mystery shops?
12     A.  There may have been, but I don't remember the
13  names.
14     Q.  Okay.  I'm going to introduce the next exhibit.
15  This one will be No. 4.
16        (Exhibit 4 was marked for identification.)
17        MR. LEARY:  Give me a minute to get it on my
18  desktop.  Okay.  I have it.  Is this beginning with on
19  the lower right-hand corner Bates stamp MAR36?
20        MR. HOUCHIN:  Correct.  It goes MAR36 through
21  39.
22        MR. LEARY:  Okay.  Thanks.
23  BY MR. HOUCHIN:
24     Q.  And, Mr. Wolff, this appears to be the resort
25  fee process memo from November of 2015.  It appears that

Page 54

1  this document just updated the last document that we
2  will looked at.  Is that your understanding?
3     A.  It appears that way; however, I need to look at
4  the two side by side, but, yes, it appears to be an
5  update.
6     Q.  Okay.  Okay.  If you go down to the Executive
7  Approval section.  That's on page MAR37.
8     A.  Hold on okay.  I'm here.
9     Q.  Okay.  It appears that this document -- well,
10  it appears from this document that there was some
11  changes made to the resort fee approval committee in
12  2015.  For example, it looks like Erika Alexander was
13  added to the committee.
14     A.  If that's a question, yes.
15     Q.  Okay.  And do you know why Erika Alexander was
16  added to the committee at this time?
17        MR. LEARY:  Objection.  Calls for speculation.
18        You can answer.
19        THE WITNESS:  No, I don't.
20  BY MR. HOUCHIN:
21     Q.  Do you know if Erika Alexander was employed by
22  Marriott prior to 2015?
23     A.  To my understanding she was, yes.
24     Q.  Okay.  But you don't have a specific
25  understanding as to why she joined the committee in

Page 55

1  2015?
2        MR. LEARY:  Same objection.  Asked and
3  answered.
4        THE WITNESS:  I mean, I'm speculating.  I would
5  speculate on that, but, no, I do not.
6  BY MR. HOUCHIN:
7     Q.  Okay.  Okay.  Let's take a look at another
8  exhibit.  This one is Exhibit No. 5.
9        (Exhibit 5 was marked for identification.)
10        THE WITNESS:  I see it.  I have the document
11  up, yes.
12        MR. LEARY:  Just give me one second.  It takes
13  mine a little bit longer to get on my desktop.  I'm not
14  finding it on my desktop.  Is it -- okay.  Again, is
15  this another request for approval destination amenity
16  fee process and it's Bates MAR41?
17        MR. HOUCHIN:  That's right, 41 through 44.
18        MR. LEARY:  Okay.
19  BY MR. HOUCHIN:
20     Q.  Mr. Wolff, can you describe what this document
21  is?
22     A.  As it states on the subject it's a "Request for
23  approval - destination amenity fee process."
24     Q.  Okay.  And this is dated November 2015.  Do you
25  know if there was a separate policy in place for

Page 56

1  destination amenity fees prior to November 2015?
2     A.  I do not remember.
3     Q.  Okay.  And based on this document, it appears
4  that Marriott was charging destination amenity fees in
5  November of 2015?
6        MR. LEARY:  Objection to the form, foundation.
7        You can answer.
8        THE WITNESS:  This process was put in place
9  because requests for destination amenity fees were
10  coming in at that point.  Marriott did not implement the
11  destination amenity fees.
12  BY MR. HOUCHIN:
13     Q.  Okay.  You said Marriott did not implement
14  destination amenity fees.  What do you mean by that?
15  I'm just trying to understand the timeline.
16     A.  We were responding to hotel requests.
17     Q.  Okay.  So a hotel specifically came to Marriott
18  and asked if they could charge a destination amenity
19  fee?
20     A.  Yes.
21     Q.  Do you know what the first Marriott hotel was
22  that charged a destination amenity fee?
23     A.  I do not.
24     Q.  Okay.  We talked about this a little bit
25  earlier, but it looks like the criteria for charging a

**EXHIBIT 1 - PAGE 15**

1  destination amenity fee is roughly the same as charging
2  a resort fee. Can you just describe any differences
3  between the two.
4      MR. LEARY: Which section of the memo are you
5  on, Mike?
6      MR. HOUCHIN: Oh, I'm just looking at the
7  eligibility.
8      Q. For example, under eligibility paragraph one,
9  it says, "...market norm, defined as 75 percent or more
10  of the hotels in the hotel's competitive set."
11      That appears to be the same as the resort fee
12  policy. So I'm just trying to get an understanding of
13  what the difference is between the resort fee policy and
14  the destination fee policy.
15      A. The section on eligibility items 1 through 4
16  appear without putting these two documents side by side
17  to be the same requirements.
18      Q. Okay. Okay. And then if you look at executive
19  approval, it appears that the committee who approved
20  destination fees was the same committee who also
21  approved the resort fees; is that correct?
22      A. Yes.
23      Q. Okay. And do you know why Marriott had a
24  separate policy for destination amenity fees as opposed
25  to resort fees?

1      A. The policy, the eligibility, the requirements,
2  the implementation were all similar. However,
3  destination hotels were considered different from resort
4  hotels.
5      Q. Okay. And can you explain how they're
6  different.
7      A. Resorts are called resorts. They have to meet
8  specific resort amenity requirements from location
9  amenities and service. For destination hotels, those
10  would be considered for a destination amenity fee, we
11  had other criteria. They would not normally be a
12  resort. They might be in markets that are considered a
13  highly sought after destination, and they might have
14  upgraded amenities and so on. So they were very nice
15  hotels in very nice locations. That were not designated
16  officially as a resort.
17      MR. HOUCHIN: Okay. I'm going to mark another
18  exhibit. This one will be Exhibit No. 6.
19      (Exhibit 6 was marked for identification.)
20      MR. LEARY: I'm good, Mike. I have it. I
21  assume it's -- MAR54 is the next Bates stamped document,
22  another memo?
23      MR. HOUCHIN: That's correct.
24      MR. LEARY: Okay. Thanks.
25  ///

1  BY MR. HOUCHIN:
2      Q. So, Mr. Wolff, this document is dated October
3  2017. This document appears to me to combine the resort
4  fee and the destination fee policy into one document.
5  Is that your understanding?
6      A. Let me review it, please.
7      Q. Sure.
8      A. Yes, that is correct.
9      Q. Okay. And do you know why it was decided that
10  the resort fee policy and the destination fee policy be
11  combined?
12      MR. LEARY: Objection. Calls for speculation.
13      You can answer, though, if you know.
14      THE WITNESS: Yeah, probably as a matter of
15  convenience because this document and the requests for a
16  resort or destination fee went to me and went to the
17  same committee. It was one and the same.
18  BY MR. HOUCHIN:
19      Q. Okay. If you look down at Eligibility and you
20  go down to paragraph two.
21      A. Uh-huh.
22      Q. Do you see that?
23      A. I have see it.
24      Q. Earlier we talked about this GuestVoice score.
25  On the previous documents I just showed you, it looks

1  like the GuestVoice score was 51 for full service
2  hotels. But in the document we're looking at now it's
3  55 for all full service hotels.
4      Do you know why that GuestVoice score was
5  increased from 51 to 55 in 2017?
6      A. Yeah. I believe I mentioned this before.
7  However, Marriott because we're so focused on guest
8  satisfaction rather than leaving the number stagnant and
9  saying, you know, this is as good as we're going to get
10  every year, we would look at the scores for all of our
11  properties and determine, you know, that we were going
12  to improve the minimum standards.
13      So going to 51 to 55 over that period of time,
14  which I think was three years, was a pretty dramatic
15  improvement. We continued to push hotels to improve
16  customer service.
17      Q. Okay. And then if you look down at the
18  Executive Approval section on the following page.
19      A. Yes.
20      Q. It appears there's seven people on the Resort
21  Fee Committee as compared to five. Do you know why a
22  few additional people were added to the committee in
23  2017?
24      A. I don't remember specifically, but we just
25  probably wanted diversity of opinions as we went

EXHIBIT 1 - PAGE 16

Page 61

1  forward, and these were senior leaders who had an
2  interest in the matter.
3      Q.  Okay.  And it looks like one of the people who
4  was added is the chief revenue officer Mark Martens.  Do
5  you have any understanding of why he was added to the
6  Resort Fee Committee?
7          MR. LEARY:  Objection.  Calls for speculation.
8      You can answer.
9          THE WITNESS:  I do not, no.
10 BY MR. HOUCHIN:
11     Q.  Okay.  And then if you go down to the
12 Implementation Requirements.
13     A.  Uh-huh.
14     Q.  And that's No. 1.  In the last documents we
15 looked at, it was a 5 to 1 value ratio, but it looks
16 like in 2017 the value ratio was decreased from 5 to 1
17 down to 4 to 1.  Do you have any understanding of why
18 that ratio was decreased?
19     A.  Yes.  We removed -- we disallowed hotels from
20 including items, as we always have, that were of no
21 value or little value or free to the customers.  When
22 the previous documents were in place, part of the 5 to 1
23 ratio included bottled water.  It included complimentary
24 local calls, complimentary long distance calls and some
25 other things like DVD library which because of the

Page 62

1  advent of cell phones and other technology and, again,
2  bottled water lost value to the customer.  So we asked
3  the properties to take that out and not to include it in
4  their value proposition and thus lowered it to 4 to 1.
5      Q.  Okay.  When this value proposition was lowered
6  to 4 to 1, was there an increase in the number of hotels
7  that were approved to charge resort fees or destination
8  fees?
9      A.  There was no impact.
10     Q.  Okay.  I'm going to introduce another exhibit.
11 This one will be No. 7.
12         (Exhibit 7 was marked for identification.)
13         MR. LEARY:  Just a second.  For the record,
14 this is Americas, Resort/Designation Fee Policy, and
15 we're starting with Bates MAR72, Mike?
16         MR. HOUCHIN:  That's correct.
17         MR. LEARY:  Thank you.
18 BY MR. HOUCHIN:
19     Q.  Mr. Wolff, you need to scroll down to the very
20 bottom of the first page.  In the footer of the document
21 it says, "Confidential and proprietary information," and
22 then it says, "January of 2020."
23         It's my understanding based on that that this
24 document is from January of 2020.  I know that you left
25 Marriott in 2019.  So my question is:  Have you ever

Page 63

1  seen this document before?
2      A.  Let me go through it, please.  I can't state if
3  I saw this particular document.  However, I do believe
4  I've seen a document similar to this.
5      Q.  Okay.  When you say "similar to this," do you
6  mean that you might have reviewed drafts of this
7  document?
8      A.  I think you said January 2020.  I would imagine
9  that I was involved with this document, the formation of
10 this document.  It looks familiar.
11     Q.  Okay.  And this document appears to be an
12 update to the resort fee policy.  The last one we looked
13 at was dated in 2017.  This one is 2020.  So is it your
14 understanding that this document updates the 2017
15 document that we previously looked at?
16         MR. LEARY:  Objection.  Foundation.
17         THE WITNESS:  Yes.
18         MR. LEARY:  You can answer.
19         THE WITNESS:  Sorry.  Yes.
20         MR. LEARY:  Go ahead and answer.
21         THE WITNESS:  Uh-huh, yes.
22 BY MR. HOUCHIN:
23     Q.  Okay.  And between 2017 and 2020, were there
24 any other updates to the 2017 document aside from the
25 one we're looking at now?

Page 64

1      A.  I don't remember.
2      Q.  Okay.  Do you see the heading where it says
3  Program Administration Charges?
4      A.  I do.
5      Q.  Okay.  And then says, "Application charge of
6  $1500."  It appears from this document that Marriott
7  charges the hotels to apply for a resort fee or a
8  destination fee.  Is that your understanding?
9      A.  It appears -- I don't remember specifically --
10 with the advent of this new document, this policy, that
11 is the case.
12     Q.  Okay.  Do you know if prior to 2020 Marriott
13 charged hotels an application fee for a resort fee
14 approval?
15     A.  I don't remember the exact dates.  Whenever
16 this policy was put into effect is most likely when that
17 happened.
18     Q.  Okay.  Okay.  If you go down to the next page
19 on the document.  The heading that says "Eligibility."
20     A.  Uh-huh.
21     Q.  And then paragraph two it talks about the
22 GuestVoice score that we discussed before.  It appears
23 that the GuestVoice score was increased again in 2020 up
24 to 56.  Is that your understanding?
25     A.  Yes.

**EXHIBIT 1 - PAGE 17**

1   Q.  Okay.  And, again, can you explain why that was
2 increased to 56 in 2020?
3   A.  That basically was a reflection of the overall
4 Marriott policy.  The 56 was not specific to resort or
5 destination fee hotels.  That was applicable to all
6 hotels in the system.  And, again, in the spirit of
7 constant improvement trying to be better than our
8 competition, we would continuously raise the standards
9 for our hotels in terms of guest satisfaction.
10   Q.  Okay.  And then do you see the paragraph
11 towards the bottom -- I'm sorry -- it's the paragraph
12 that says, "Fees are the market norm"?
13   A.  I see that.
14   Q.  Okay.  And then it says, "For hotels applying
15 for a destination fee, market norm is generally defined
16 as 50 percent or more of the hotels in the hotel's
17 competitive set."
18     When you looked at the prior document, I
19 believe it was 70 percent of hotels had to be in the
20 competitive set.  Do you know why it changed from 70
21 percent down to 50 percent?
22   A.  I don't remember.
23   Q.  And one question with this market norm.  I'm
24 sorry.  One more question with the GuestVoice score.  So
25 under this document it's 56.  Is that 56 out of 100?

1   A.  It is 56 out of 100.  Again, just a reminder.
2 The 56 would most likely reference the top two boxes
3 which is considered excellence.
4   Q.  Okay.  And then going back down to the market
5 norm.  You said that you don't remember why it was
6 changed from 70 percent to 50 percent.  Do you know who
7 at Marriott would know that information?
8     MR. LEARY:  Objection.  Calls for speculation.
9     But you can answer.
10     THE WITNESS:  I'm sure it was the committee
11 that made that decision.
12 BY MR. HOUCHIN:
13   Q.  Okay.  And when you retired from Marriott, who
14 took over your position?
15   A.  Scott McCoy.
16   Q.  Okay.  And do you know if he currently holds
17 the same job title that you previously held?
18     MR. LEARY:  Objection.  Calls for speculation.
19     THE WITNESS:  I don't know what his job title
20 is.
21 BY MR. HOUCHIN:
22   Q.  Okay.  Prior to your retirement, do you know if
23 Scott McCoy worked at Marriott?
24   A.  Yes.
25   Q.  Okay.  And do you know what his position at

1 Marriott was before you retired?
2   A.  He was in a position at corporate headquarters,
3 and it had something to do with brand management.
4 That's all I remember.
5   Q.  Okay.  Give me a minute.  I'm going to
6 introduce a few more exhibits here.
7     All right.  The next one is going to be
8 Exhibit 8, and it's a one-page document and it's MAR16.
9     MR. LEARY:  I have it, Mike.  Thanks.
10     (Exhibit 8 was marked for identification.)
11     THE WITNESS:  Yes.
12 BY MR. HOUCHIN:
13   Q.  Mr. Wolff, have you seen this document before?
14   A.  I have.
15   Q.  Okay.  And earlier I believe you testified that
16 there were certain documents attached to the Marriott
17 resort fee memorandum that we looked at earlier.  Do you
18 know if this was one of the documents that was typically
19 attached to those?
20   A.  From memory it appears so but I would have to
21 see the entire document in its entirety to state
22 unequivocally that this was part of it.
23   Q.  Okay.  And can you generally describe what this
24 document is?
25   A.  This was simply a document that we provided to

1 the hotel, checklist to make sure that they provided all
2 the information necessary to the Resort Fee Committee.
3   Q.  Okay.  If you look down at the third box
4 total potential revenue model."  It's the third box
5 down.  Do you see that?
6   A.  Yes.
7   Q.  Okay.  Do you have an understanding of what
8 that means, the total potential revenue model?
9   A.  It was speculation on their part of what the
10 potential revenue would be from implementation of these.
11   Q.  Okay.  Is that something that the hotels would
12 have to share with Marriott?
13   A.  It was sent in, and it was simply meant for
14 them to ensure that they understood the ramifications of
15 implementing that fee.
16   Q.  Okay.  And then the next box down it asks about
17 creating -- it says, "Create communication plans."  And
18 then it says, "Internal to hotel" and then "external
19 departments."
20     What's your understanding of what the
21 communications plan is?
22   A.  Basically it was pretty simple, and that is if
23 something new was being implemented, we wanted them to
24 communicate to the entire hotel and then to outside
25 departments -- departments outside the hotel that could

**EXHIBIT 1 - PAGE 18**

1  be impacted by the implementation of a fee.
2      Q.  Okay.  And the next box down is "Create risk
3  assessment."  What's your understanding of what that
4  means?
5      A.  Similar to what I answered before.  We just
6  wanted to make sure hotel teams were assessing any risks
7  legally or otherwise to their hotels.
8          MR. HOUCHIN:  Okay.  I'm going to enter the
9  next exhibit which will be No. 9.  That starts with
10  MAR17.
11          (Exhibit 9 was marked for identification.)
12          THE WITNESS:  Okay.
13          MR. LEARY:  I'm ready.  17.  Thank you.
14  BY MR. HOUCHIN:
15      Q.  Have you seen this document before, Mr. Wolff?
16      A.  I have.
17      Q.  Okay.  And can you explain what this document
18  is.
19      A.  It's basically again in the interest of making
20  sure that we execute any process or procedure 100
21  percent, this is simply checklist provided to the hotel
22  to make sure that they implemented all the procedures
23  for a fee.
24      Q.  Okay.  And the first heading there is says
25  MARSHA.  Do you have an understanding of what that

1  means?
2      A.  MARSHA -- I don't know what the acronym is off
3  the top of my head.  I don't remember.  It was part of
4  our reservation system.
5      Q.  Okay.  You said part of the reservation system.
6  Can you be more specific about what exactly MARSHA is and how
7  it relates to the reservation system?
8      A.  I don't remember a lot about it because I
9  didn't deal with the technicalities of it, but basically
10  it was the system that hotels put information in, and
11  then it would disseminate that information to all of the
12  potential reservation channels.  Voice, marriott.com and
13  so on.  It provided that information.
14      Q.  Okay.  At the time when you left Marriott, do
15  you know who was responsible or who oversaw the MARSHA
16  system?
17      A.  I don't know the name of the person.  There
18  were senior people overseeing Marriott's reservation
19  system because of its importance and complexity.  I
20  don't know who that was when I left.
21      Q.  Okay.  Do you know the names of any people who
22  were involved with the MARSHA system regardless of
23  whether they oversaw it?
24          MR. LEARY:  Objection.  Asked and answered.
25          THE WITNESS:  I would be guessing, and I don't

1  want to guess.
2  BY MR. HOUCHIN:
3      Q.  Okay.  Below MARSHA it says the "general
4  inventory facts," and then it refers to it as "VIF
5  screen must be updated with resort fee, the amount of
6  fee and description of inclusions."
7          Do you know what they mean by the "general
8  inventory facts screen"?
9      A.  To my understanding again, this was basically
10  the hotel putting in information, in this case
11  specifically related to the daily resort fee.  And as
12  you can see in the box that's right below the sentence
13  you just read, it lists the amenities, the information,
14  some technical codes but also some of the information
15  about what's included in the resort fee.
16      Q.  Okay.  Do you know if the information that gets
17  uploaded to the VIF screen is the same information that
18  displays on the marriott.com Website with respect to
19  resort fees?
20      A.  I believe so.
21      Q.  Okay.  So is it your understanding that it's
22  the responsibility of each hotel to update this VIF
23  screen and describe the resort fee amount and what
24  amenities are included?
25      A.  That's my understanding, yes.

1      Q.  Then if you go down, there's another heading
2  that says "Marriott.com" on the bottom of the same page.
3      A.  Yes.
4      Q.  Okay.  And then it says, "The hotel must
5  complete the hotel alert form found on HDX plus and
6  return to the EPIC help desk."
7          Do you know what they -- what this document
8  means when it refers to the hotel alert form?
9          MR. LEARY:  Objection.  Calls for speculation.
10          You can answer.
11          THE WITNESS:  Yeah, I don't remember on that.
12  BY MR. HOUCHIN:
13      Q.  Okay.  Earlier you talked about a blue box that
14  appears on the marriott.com Website.  Do you know if the
15  blue box is the same as the hotel alert?
16      A.  I do not know.
17      Q.  Okay.  Do you have an understanding of what the
18  EPIC help desk is?
19      A.  Just generally it was, as is stated, a help
20  desk and related to matters about entering this
21  technical information into a system which was typically
22  done by reservationists and not operations.
23          MR. HOUCHIN:  Okay.  I'm going to introduce
24  another exhibit.  This one will be No. 10.
25          (Exhibit 10 was marked for identification.)

EXHIBIT 1 - PAGE 19

1    MR. LEARY:  This is resort fees -- Resort
2  Amenities Fee Approval Form, MAR25.
3    MR. HOUCHIN:  Yeah, that's right.
4    MR. LEARY:  Thank you.
5  BY MR. HOUCHIN:
6    Q.  Mr. Wolff, have you seen this document before?
7    A.  Yes.
8    Q.  Okay.  Can you describe what this document is?
9    A.  This again appears to be one of the attachments
10  from the resort fee request document that we looked at I
11  think at the very beginning, and this was attached to
12  it.  The hotels were required to fill this information
13  and submit it back to us when they applied for a resort
14  fee.
15    Q.  Okay.  Can you look at the second page of this
16  document where it says, "Proposed resort fee
17  components."
18    A.  Yes.
19    Q.  It says, "Please indicate which amenities will
20  be includes" -- it says includes but it should be
21  included -- "will be included in the resort fee and what
22  the a la carte cost of those items would be."
23    Do you know what it means by cost of a la carte
24  items?
25    A.  Yes.  As mentioned before, hotels were required

1  to submit amenities that had a very significant dollar
2  value attached to them and so as they entered in
3  whatever the amenity would be.  Using an example, again,
4  if it was a yoga, professional yoga class that they
5  normally charged $35 for at the resort, they could put
6  that down here.  And if there's a document -- documented
7  cost of $35, they would enter that price into this
8  document to show their 5 to 1 value proposition.
9    Q.  Okay.  And so is it your understanding that the
10  value of the amenities that's determined by the
11  individual hotels and not Marriott itself?
12    A.  On the individual hotels price all of the
13  amenities.  As a normal course of business, I would
14  review all of those and critique any that I thought were
15  out of line.  It didn't happen often, but I would
16  question them if I had any questions or concerns.
17    Q.  Okay.  And can you explain how that critique
18  process worked.  What specifically you would look for.
19    A.  Basically when the hotel submitted the packet
20  of information to me, I would do a detailed review.  And
21  if I saw any issues that I had questions on, just had a
22  lack of understanding, didn't know enough about the
23  hotel or just were questioning in general, I would
24  normally contact the person that submitted this to me
25  and have a dialogue with that individual.

1    Q.  Okay.  Can you scroll down to the next page it
2  says, "Competitive hotel summary."
3    A.  Uh-huh.
4    Q.  And then it says, "Please list those hotels in
5  your competitive set which currently charge resort fees
6  and identify the components of those fees."
7    So this was up to the individual hotels to
8  decide?  That's not something that Marriott determined;
9  is that correct?
10    A.  Marriott not determine who the competition was
11  for the hotel.  The hotels would submit it, backed up by
12  the STAR report.
13    Q.  Okay.  And would the hotels also have to submit
14  the STAR report to Marriott in order to -- along with
15  this document?
16    A.  I don't remember the specific year that this
17  one -- this document that we are looking at was in.
18  However, that was a requirement at some point.  I don't
19  remember the dates.
20    MR. HOUCHIN:  Okay.  I'm uploading another
21  exhibit.  This one will be Exhibit No. 11.  It's MAR68.
22  Can everyone see that?
23    MR. LEARY:  Yes.  Thank you.  What number is
24  this, Mike?
25    MR. HOUCHIN:  This is Exhibit No. 11 and it

1  starts with MAR number 68.
2    (Exhibit 11 was marked for identification.)
3  BY MR. HOUCHIN:
4    Q.  Mr. Wolff, have you seen this document before?
5    A.  I have.
6    Q.  Okay.  And can you describe what this is?
7    A.  Yeah.  What was the date on this?
8    Q.  If you look down underneath the Marriott
9  International logo on the bottom of the document.
10    A.  Okay.
11    Q.  The footer it says March 2019.
12    A.  Okay.  All right.  Yeah.  Because this is not
13  part of the packet from the previous documents we were
14  looking at, but I do see this, yes.
15    MR. LEARY:  What was the question?
16  BY MR. HOUCHIN:
17    Q.  Can you just describe what this document is?
18    A.  This was a document that we put together simply
19  as a matter of convenience because at times when hotels
20  would submit their resort fee applications to me, resort
21  or destination fee applications, they ask questions
22  about offering.  So at this point we decided to put
23  together some acceptable amenity examples and then also
24  on the right-hand side I think highlighted in a blue
25  color were items that we would not accept.  Examples of

**EXHIBIT 1 - PAGE 20**

1  items that we would not accept that we did not consider
2  having guest value that would not enhance the customer
3  experience.
4      Q.  And one of those items is bottled water.  So
5  the hotels can include bottled water as part of the
6  hotel fee?
7      A.  No, that was -- maybe I misunderstood you.  Not
8  acceptable.  So we did not allow them to include bottled
9  water as part of the resort or destination fee value.
10     Q.  Okay.  One of the other excluded items was the
11 hotel fitness center access.  Do you know why that's
12 excluded?
13     A.  Yes.  Because hotel fitness center, you know,
14 the workout room with treadmills and other equipment, is
15 industry, and Marriott standard normally included free
16 of charge to our customers when they rent a guest room.
17         MR. HOUCHIN:  Okay.  This might be a good point
18 for a quick break.  I think I'm going to kind of shift
19 gears a little bit.
20         MR. LEARY:  Okay.  And then let's talk about
21 that for a second just because I know we're all on
22 different time zones.  More importantly the witness is
23 approaching lunch on his end.  I'm past lunch but I'm
24 fine.
25         So any thought on how long your next session

1  you want to go and when the right time might be to grab
2  something light to eat or quick to eat?
3         MR. HOUCHIN:  I plan to probably go about
4  another hour for the next session.  I'm fine if
5  Mr. Wolff wants to take lunch now.  I know you're on
6  central time or if you just want to take a quick break
7  now, we can go another hour and then take a lunch break.
8  It's up to you.
9         THE WITNESS:  Yeah, maybe let's do a quick
10 lunch break.  I only need -- I don't need more than a
11 half an hour on that, if that's okay.  Maybe even less
12 if that's better for the group, but I wouldn't mind
13 taking that break now.
14         MR. HOUCHIN:  Yeah, that's fine.  A half an
15 hour then for lunch.
16         MR. LEARY:  Yeah, we'll do 30 minutes.  So it's
17 1:12 my time.  12:12 his time.  So why don't we just say
18 a quarter on the hour, whatever hour we're in.
19         MR. HOUCHIN:  Okay.  Yeah 1:45 your time and
20 10:45 our time.
21         MR. LEARY:  You got it.  Let's do that.
22         (Luncheon recess.)
23 BY MR. HOUCHIN:
24     Q.  Mr. Wolff, we're just coming back from a lunch
25 break.  You understand you're still under oath; correct?

1      A.  I do, yes.
2      Q.  Okay.  And I just want to confirm that you
3  haven't been looking at any notes during the course of
4  this deposition?
5      A.  No, I have not been.
6      Q.  And you've not been communicating with anyone
7  during the course of this deposition?
8      A.  At breaks I chatted briefly with the attorney.
9      Q.  Not while on the record, though?
10     A.  Correct.
11         MR. HOUCHIN:  Okay.  I'm going to mark my next
12 exhibit.  This one will be No. 12.
13         (Exhibit 12 was marked for identification.)
14         MR. LEARY:  One second.  Sorry, Michael.  There
15 it is.
16         MR. HOUCHIN:  Okay.  This is the Points and
17 Authorities in Support of Marriott's Motion to Dismiss
18 in the D.C. case.
19     Q.  Okay.  Mr. Wolff, have you reviewed this
20 before?
21     A.  This does not look familiar.
22     Q.  Okay.  That's fine.  I just want to direct your
23 attention towards the very end of the document.  If you
24 go past page 15, there's an Exhibit A.
25     A.  Okay.  That's the one that says 25 percent off?

1      Q.  Yeah.  So it's heading Exhibit A and then it's
2  a screenshot of the Marriott Website.  Do you see that?
3  It says 25 percent off on the Website.
4      A.  I see this, yes.
5      Q.  Okay.  So I'll represent that these are
6  screenshots that Marriott attached to their Motion to
7  Dismiss in the D.C. action.  And I just kind of want to
8  discuss the Web flows here of the Marriott Website.
9         So this first one, Exhibit A, appears to be the
10 first page on the Marriott Website where you can search
11 for a hotel.  Would you agree with that?
12     A.  Yes.
13     Q.  Okay.  And then if you scroll down to
14 Exhibit B, it looks like in this example whoever was
15 doing the search was searching for a hotel in Las Vegas,
16 Nevada with a reservation for August 23rd, 2019 through
17 August 24th, 2019.  Do you see that?
18     A.  I do, yes.
19     Q.  Okay.  It would be the next page in the -- on
20 the Marriott Website, and it lists hotels that are
21 available in Las Vegas.  Do you see that?
22     A.  I do.
23     Q.  Okay.  So if you look at the Renaissance Las
24 Vegas hotel, the last one that's listed there --
25     A.  Correct.

**EXHIBIT 1 - PAGE 21**

1    Q.  -- it says the from rate is 142 USD per night?
2    A.  Yes.
3    Q.  Okay.  Is it your understanding that that
4  amount does not include a resort fee?
5    A.  That does not -- that does not include a resort
6  fee, correct.
7    Q.  Okay.  And is it your understanding that a
8  resort fee is nowhere disclosed on this page?
9    A.  That appears to be the case, yes.
10   Q.  Okay.  And so where it says "from 142 USD per
11 night," do you know why Marriott makes no reference to
12 the resort fee on this page of the booking process?
13   A.  On this page, Exhibit A, is the very first page
14 of the process, and then we're going down to Exhibit B.
15 What this does after you've expressed interest, in this
16 case going to Las Vegas, you are then presented with the
17 options that are available in Las Vegas.  And what they
18 do is show different types of hotels and the lowest
19 possible rate.  So this is a point where you would come
20 in and select the hotel based on the rates that you see
21 on this page.
22   Q.  Okay.  And my question is:  Why is there no
23 mention of the resort fee on this page?
24   A.  That's not the intent of this page.  It's the
25 daily rate, and it allows you to determine which hotel

1  you're interested in based on the rates presented to you
2  on this page.
3    Q.  Okay.  So would you agree that at this stage of
4  the booking process a consumer would have no
5  understanding that there would be a resort fee in
6  connection with the Renaissance Las Vegas hotel?
7        MR. LEARY:  Objection.  Calls for speculation
8  as to what a consumer would understand or not
9  understand.
10       THE WITNESS:  Yeah, and I'm not going to state
11 what a consumer -- it depends on the sophistication of
12 the consumer.  I don't know.  I have no idea.
13 BY MR. HOUCHIN:
14   Q.  Okay.  If you scroll down to Exhibit C, this is
15 the next stage of the booking process.  So if a consumer
16 clicks on the Renaissance Las Vegas hotel, this page
17 would pop up.  Would you agree with that?
18   A.  Correct.
19   Q.  And then there's a box there.  This is in black
20 and white.  My understanding is that this box was
21 actually a blue box.  But do you see there it says,
22 "Please note USD" -- I believe it says, "20 daily
23 destination amenity fee added to room rate"?
24   A.  I see that, yes.
25   Q.  "Includes free play at local casino, whiskey,

1  wine tasting and more"?
2        MR. LEARY:  Mike, just to clarify just because
3  you said it on the record, but I think you would agree
4  it's black and white because of the copy; correct?
5        MR. HOUCHIN:  Correct.  And this was pulled
6  from the D.C. docket so it was black and white.
7        MR. LEARY:  Yeah.
8        THE WITNESS:  And I'm sorry.  Did you ask me a
9  question?
10 BY MR. HOUCHIN:
11   Q.  Sure.  I have a question with respect to this
12 box.  Do you know why Marriott decided to add this box
13 at this stage of the booking process?
14   A.  Because at this point presumably this being the
15 example the consumer chose the Renaissance Las Vegas
16 hotel.  The rate on the previous page was $142.  The
17 rate on this page is $142 plus there's another option.
18 So at this point the consumer has chosen the Renaissance
19 Las Vegas hotel, and there is a resort fee associated
20 with that.  So we have put it in a prominent location
21 that's easily seen.  And, again, to your point, my
22 understanding is that this is blue.  So it clearly
23 stands out to the consumer that there is a resort fee
24 associated with this hotel.
25   Q.  Okay.  Did you personally have any involvement

1  with where this box would be placed on the Marriott
2  Website?
3    A.  No.
4    Q.  Do you know who at Marriott had involvement
5  with that?
6    A.  Not off the top of my head, no.
7    Q.  Okay.  At the time you started your position in
8  2008, did the Marriott Website always include this box?
9    A.  I'm trying to think back.  I don't know if it
10 was the same font, the same color, but, yes, there's
11 always been some type of notification of resort fees
12 disclosing it prominently to our consumers.
13   Q.  Okay.  And in this box it states the USD -- I
14 think it says 20 daily destination amenity fee amount,
15 and then it also talked about some of the amenities that
16 are included.
17       Do you believe that this disclosure complies
18 with the Marriott's policy and procedures that we looked
19 at earlier?
20   A.  Yes.
21   Q.  Okay.  And is it your understanding that this
22 box should also always include what services are
23 included with the amenity fee?
24   A.  It is an example of some of the services
25 included.  If memory serves me correctly, there was a

EXHIBIT 1 - PAGE 22

Page 85

1  limitation on the number of letters that -- and numbers
2  that would be included in this box.
3      Q.  Okay.  So is it your understanding that this
4  box doesn't necessarily include all of the amenities
5  that would be covered by the resort fee or the amenity
6  fee?
7      A.  Yes.
8      Q.  Okay.  Is it Marriott's policy that at least
9  some of the amenities should be included in this blue
10  box?
11      A.  I think you said is it Marriott's policy that
12  at least some of the amenities should be included in the
13  blue box; is that correct?
14      Q.  That's correct.
15      A.  Okay.  Yes.  We require hotels to provide a
16  sampling of the an amenities, again, within the
17  restrictions of how much space there was, correct.
18      Q.  Okay.  All right.  And if you look down, it
19  says, "guest one king room" and then it says.  "142 USD
20  per night."  Do you see that?
21      A.  I do.
22      Q.  And that amount does not include the amenity
23  fee; correct?
24      A.  That is correct.  It is the same rate from the
25  previous page because the customer hasn't selected one

Page 86

1  yet.
2      Q.  Okay.  And do you know why the amenity fee
3  isn't included in that 142 price?
4      A.  Because the guest hasn't selected the room and
5  notify the customer, the guest, in the blue box above.
6      Q.  Okay.  Would you agree that the $142 amount is
7  more prominent than the $20 amount listed in the blue
8  box?  It's in bigger font?
9      MR. LEARY:  If I could just object.  Well,
10  first, I think it was $30, Mike, at least the one I'm
11  reading.  Just the copying of that document is not
12  great, but I think it's 30 but otherwise --
13      MR. HOUCHIN:  That could be correct.  Looking
14  at this a little closer, I think you're right.
15      MR. LEARY:  Yeah, it's just not a great copy.
16  But are you trying -- so is the question, so I
17  understand, comparing the 142 font to the 30 -- USD 30
18  font?
19      MR. HOUCHIN:  Correct.
20      MR. LEARY:  Okay.  Thank you.
21      Yeah, you can answer.
22      THE WITNESS:  So please repeat the question.
23  BY MR. HOUCHIN:
24      Q.  My question is:  Would you agree that the 142
25  amount is displayed more prominently than the $30 amount

Page 87

1  in the blue box?
2      MR. LEARY:  Objection to the form in terms of
3  the definition of "prominent."
4      But you can answer.
5      THE WITNESS:  Yeah.  I don't know that I would
6  say that's the case.  I think that if you're looking at
7  this document, again that's in blue.  It's right in the
8  center.  I think they're both equivalent.
9  BY MR. HOUCHIN:
10      Q.  Okay.  Would you agree that the 142 is in
11  larger font, though?
12      A.  I would agree with that, yes.
13      Q.  Okay.  All right.  So if you scroll down to
14  Exhibit D.  So if a consumer were to click on the 142
15  amount on the previous page and then you go down to
16  Exhibit D, would you agree that this would be the next
17  page that would be displayed during the booking process?
18      A.  Yes.
19      Q.  Okay.  And you see it says, "Summary of
20  charges"?
21      A.  Yes.
22      Q.  And then it says, "142 USD a night plus 53.01
23  USD taxes and fees" and then the total price is 195.01?
24      A.  Yes.
25      Q.  Okay.  And on this page it makes no mention of

Page 88

1  a destination amenity fee; correct?
2      A.  I do not see it on this page.  The way it's
3  presented on this page, however, if one were to click
4  the summary of charges, it would show the fee.
5      Q.  Okay.  That's on the next exhibit.  So if you
6  scroll down to Exhibit E, a consumer would have to click
7  on the summary charges page, and then in the middle
8  there it says, "Destination amenity fee $30"; correct?
9      A.  That is correct.
10      Q.  Okay.  And below that it says, "Estimated
11  government taxes and fees 23.01"; correct?
12      A.  Correct.
13      Q.  So on the previous page on Exhibit D, that
14  53.01 amount includes both the destination fee and the
15  government taxes and fees; correct?  Marriott lumps them
16  into the same --
17      A.  Correct.
18      Q.  -- right?
19      A.  Yes.  Correct.
20      Q.  Okay.  And then on the summary of charges
21  there's also additional charges listed under there which
22  include on-site parking, valet parking.  And those are
23  also not included in the 142 room rate; correct?
24      A.  That is correct.  They are not included.
25      Q.  Okay.  For those charges a consumer would only

**EXHIBIT 1 - PAGE 23**

Page 89

1  pay those if they parked on site or utilized the valet
2  parking; correct?
3      A.  That's correct, yes.
4      Q.  Okay.  But for the destination amenity fee,
5  that's a mandatory charge; correct?
6      A.  Correct.
7      Q.  Okay.  If you scroll down to Exhibit F, so this
8  would be the next stage of the booking process where it
9  asks for the consumer's information?
10      A.  Yes.
11      Q.  Okay.  And then there's a book now button?
12      A.  Yes.
13      Q.  Okay.  And would you agree on this page the
14  total price of the room is not displayed?
15      A.  I'm just looking at the pages to make sure.
16  Yes, correct.
17      Q.  Okay.  And there's also no mention of the
18  destination fee on this page; correct?
19      A.  Yeah.  It's a blank page.  A blank.  Yeah, it's
20  blank, correct.  I don't know that it's meant to show --
21  it's meant to get information from a customer.  So I
22  don't -- correct, it's not showing that.
23      Q.  Okay.  All right.  I would like to go through a
24  few more examples of Web flows.  That's one Marriott
25  provided from the D.C. case.  As a follow-up to that, do

Page 90

1  you know --
2      MR. LEARY:  Let me just clarify, Mike, to the
3  extent that was actually what D.C. had utilized as well
4  in their briefs, and so we tried to use the D.C. example
5  in this part of our briefing as well.
6      MR. HOUCHIN:  Okay.  Understood.
7      Q.  My question for Mr. Wolff is:  Do you know who
8  captured these screenshots?
9      A.  No.
10      Q.  Okay.  And have you ever seen these screenshots
11  before that we just looked at?
12      A.  I don't know if they were the exact screenshots
13  but they look familiar because the Renaissance Las Vegas
14  has been used by D.C., I think, for a while.  So I
15  believe I've seen this unless -- you know, minor
16  changes.  I have seen this.
17      Q.  Okay.  All right.  Let's look at another one.
18  This will be Exhibit 13.
19          (Exhibit 13 was marked for identification.)
20  BY MR. HOUCHIN:
21      Q.  So this was a Request for Judicial Notice that
22  Marriott submitted in support of their motion to dismiss
23  in the current case called the Hall case.  And Marriott
24  attached to this some more Web flows that I want to go
25  through.  So if you scroll down you'll see there's an

Page 91

1  Exhibit A.
2      A.  Okay.  I'm at the beginning of Exhibit A, yes.
3      Q.  Okay.  And this again appears to be the first
4  page of the Marriott Website where you can find a hotel.
5  And it looks the same?
6      A.  Yes.
7      Q.  Okay.  And it looks like federal --
8      MR. LEARY:  Mike -- I just want to clarify,
9  Mike.  Are you saying this is the first page of
10  marriott.com?
11      MR. HOUCHIN:  I believe it's the first page of
12  the booking process where it says -- where you can
13  search for a hotel.
14      MR. LEARY:  No, I understand.  But is it
15  marriott.com or --
16      MR. HOUCHIN:  It's marriott.com.  You'll see in
17  the bottom is says marriott.com.
18      MR. LEARY:  Okay.
19  BY MR. HOUCHIN:
20      Q.  Okay.  And there's a date at the top.  It looks
21  like these were captured on 10-24- 2019.  Do you see
22  that?
23      A.  Where is that?  No, I don't see that.
24      Q.  Okay.  It's at the very top of the Exhibit A,
25  the first page of Exhibit A.  Do you see in blue where

Page 92

1  it says case number and then to the left of that it says
2  10-24-2019?
3      A.  I'm going to have to take your word because it
4  overlaps some other print.
5      MR. LEARY:  I can't see it either.
6      THE WITNESS:  It's blue print over black print,
7  so I can't see a date.
8      MR. LEARY:  Oh, on the far left.  Okay.
9      THE WITNESS:  I think it says page 8 of 47 or
10  something in blue over it.
11  BY MR. HOUCHIN:
12      Q.  Right.  If you look on the left side, though,
13  to the left of where it says case --
14      A.  Okay.  I see it.  Got you.  I was looking at
15  the blue where there's a different date.  I'm sorry.
16  Yes.
17      Q.  Okay.  And it looks like whoever captured this
18  was searching for a hotel in San Diego for November 4th
19  through November 5th, 2019.  So then if you click the
20  find hotels button, you'll go to the next page of the
21  booking process, and this is Exhibit B.
22      A.  Right.  Yes.
23      Q.  This lists several hotel options.
24      A.  Okay.
25      Q.  Okay.  And then if you scroll down, there's --

EXHIBIT 1 - PAGE 24

1  you'll see a hotel for the Marriott Marquis San Diego.
2  That's on page 14 of 47 in the blue letters on the top.
3      A.  14.  Okay.  Okay.  I'm there now.
4      Q.  Okay.  And then there it says from 420 USD per
5  night.  Is it your understanding that that amount does
6  not include a destination amenity fee?
7      A.  Yeah, I'm just trying to see -- so the 420 is
8  the one right below.  Okay.  I'm looking at the one
9  right below.  That is my understanding, correct.
10     MR. LEARY:  Is it the one that says 158, Mike?
11  Is that where you're at?
12     THE WITNESS:  That's what I was trying to
13  figure out.
14     MR. HOUCHIN:  I think that's -- I'm sorry.  I
15  believe the from 158 per night is the one for the
16  Marriott Marquis.
17     A.  Yeah, that's what it looks like.  Correct.
18     Q.  Okay.  So you would agree that the 158 per
19  night does not include a destination amenity fee?
20     A.  Correct.
21     Q.  Okay.  So if you were to click the view rate
22  button on the Marriott Marquis San Diego and then if you
23  scroll down to the next exhibit, it's Exhibit C.
24     A.  Hold on.  I'm not there yet.  Okay.  I'm at
25  Exhibit C now.

1      MR. LEARY:  I'm still not there.  Hold on a
2  second.
3      THE WITNESS:  420 is the rate.
4      MR. HOUCHIN:  Okay.  Yeah.  Sorry.  That was
5  confusing.  So 420 was rate for the Marriott Marquis.
6      MR. LEARY:  Exhibit C.  Is that where we're at,
7  Mike?
8      MR. HOUCHIN:  That's right.
9      MR. LEARY:  Yeah.  Okay.
10  BY MR. HOUCHIN:
11     Q.  Okay.  And then again do you see the blue box?
12  This copy of the Web flow is in color, and the box is
13  blue; correct?
14     A.  Yes.  Correct.
15     Q.  Okay.  And the blue box says, "USD 35 daily
16  destination amenity fee will be added to the room rate."
17  Do you see that?
18     A.  Uh-huh, yes.
19     Q.  Okay.  And this example, though, it doesn't
20  list any of the amenities that come with the destination
21  amenity fee; right?
22     A.  In this one, correct, because it's limited by
23  the number of letters that could be included.
24     Q.  Okay.  It does say that "Concierge lounge is
25  closed 12 noon Friday to 5:30 p.m. Sunday."  Does the

1  concierge lounge have anything to do with the
2  destination amenity fee?
3      A.  No.
4      MR. LEARY:  Objection.  Form.
5  BY MR. HOUCHIN:
6      Q.  Okay.  So earlier I believe you testified that
7  it's Marriott's policy to at least include some of the
8  -- a sampling of amenities from this blue box.  Would
9  you agree that this blue box doesn't contain a sampling
10  of amenities?
11     MR. LEARY:  Objection to form.  Rel -- excuse
12  me.  Objection to form, relevance and foundation.
13     You can answer.
14     THE WITNESS:  Yeah, that question was -- can
15  you repeat it, please.
16  BY MR. HOUCHIN:
17     Q.  Sure.  Earlier you testified that it's
18  Marriott's policy to include a sampling of amenities in
19  this blue box.  Would you agree that this blue box shown
20  on this page does not include a sampling of amenities?
21     A.  Yes.
22     MR. LEARY:  Same objection.
23  BY MR. HOUCHIN:
24     Q.  And, again, if you scroll down, you'd see the
25  member rate and then it says 420 USD per night?

1      A.  Yes.
2      Q.  And that 420 USD per night does not include the
3  $35 destination amenity fee; correct?
4      A.  Correct.
5      Q.  Okay.  And the 420 USD per night is in larger
6  font than the $35 amount listed in the blue box;
7  correct?
8      A.  It appears that way.
9      Q.  Do you know if Marriott ever did any type of
10  consumer survey or market research to understand whether
11  consumers would notice this blue box?
12     A.  I do not know.
13     Q.  Do you know who might know that information?
14     A.  No.
15     Q.  Okay.  So if you keep scrolling down, then
16  again the next exhibit is Exhibit D, and this would be
17  the next stage of the booking process; correct?
18     A.  I'm not there yet.  Hold on.  Excuse me.  Yes.
19     Q.  Okay.  And then it says summary of charges and
20  then it's 244 USD per night plus 70.65 USD taxes and
21  fees and then the subtotal is 314.65?
22     A.  Yes.
23     MR. LEARY:  Hold on.  I just want to make sure
24  I'm understanding the flow, Mike.  Because the room rate
25  of 244 is not tied to the other two earlier print

**EXHIBIT 1 - PAGE 25**

Page 97

1  screens, if we're looking at the same hotel and same
2  room.
3          MR. HOUCHIN:  That's right.  And, again, this
4  is what Marriott submitted to the Court in support of
5  their Motion to Dismiss.  I would agree with that.
6          MR. LEARY:  Okay.  I'm not sure this is the
7  entire document but -- I just don't see the room rate
8  being the same but go ahead.
9  BY MR. HOUCHIN:
10    Q.  Okay.  So for the summary of charges box here
11  there's no mention of a destination amenity fee;
12  correct?
13    A.  Hold on.  Let me get back to this, please.  On
14  this page, that's correct.
15    Q.  Okay.  So if you were to actually click on the
16  summary of charges box, though, that would be the next
17  exhibit, Exhibit E.
18    A.  Yes, I'm here.
19    Q.  Okay.  And then it breaks out total cash rate
20  420.  Again that number is different.  And then it says
21  destination amenity fee 35 and then estimated government
22  taxes and fees 57.65?
23    A.  Yes.
24    Q.  Okay.  And if you scroll up to the first page
25  of Exhibit E, do you see in orange where it says, "Rooms

Page 98

1  held for 8 minutes 57 seconds"?
2    A.  I see that.
3    Q.  Okay.  So it looks like this is a timer that
4  holds the room rate so long as the consumer books the
5  hotel within the specified amount of time.  Is that your
6  understanding?
7    A.  This is not my department, but I'm just reading
8  what it says.  And it says the room is being held for 8
9  minutes and 54 seconds.  That's all I know.
10    Q.  Okay.  Do you know when this timer was added to
11  the Marriott Website?
12    A.  No.
13    Q.  Okay.  Do you know who at Marriott would know
14  that information?
15    A.  No.
16    Q.  Do you know who at Marriott was in charge of
17  the Website during the time when you were there?
18    A.  I can't remember.  It was a while ago.  I don't
19  remember.
20    Q.  Okay.  All right.  So if you go down to
21  Exhibit F, this appears to be the last page of the
22  booking process where it asks for the customer's
23  information; correct?
24    A.  Yes.
25    Q.  Okay.  And on this part of the Web flow there's

Page 99

1  no mention of the destination amenity fee?
2    A.  I don't see mention of any fees, so correct.
3  There's no fees on here.
4          MR. HOUCHIN:  Okay.  All right.  So I'm going
5  to introduce another exhibit.  This is Exhibit 14.
6          (Exhibit 14 was marked for identification.)
7          MR. HOUCHIN:  It's MAR81.
8          MR. LEARY:  Just hold on one second, Mike.  14
9  is MAR81.  Okay.
10  BY MR. HOUCHIN:
11    Q.  Okay.  This is a Web flow that Marriott
12  produced in this case.  This was for the San Diego
13  Marriott Marquis.  And if you see on the first page
14  there, it looks like it was first day December 17th
15  through December 18th?
16    A.  Yes.
17    Q.  And if you scroll down to MAR84, this appears
18  to be the next page in the booking process for the San
19  Diego Marriott Marquis?
20    A.  Yes.
21          MR. LEARY:  Mike, what's date on this, do you
22  know?
23          MR. HOUCHIN:  I don't know when this was
24  captured, but if you see on MAR84, it looks like they
25  tried to book a room for December 17, 2020 through

Page 100

1  December 18, 2020.  So I believe this would be some time
2  before that.
3          MR. LEARY:  Okay.
4  BY MR. HOUCHIN:
5    Q.  And then you see the selection for the Marriott
6  Marquis San Diego Marina; right?
7    A.  Yes.  149, yes.
8    Q.  Okay.  And that 149 amount does not include a
9  destination amenity fee?
10    A.  Right.  That's the daily rate.
11    Q.  Okay.  So I'm interested in these two boxes at
12  the top here.  These weren't part of the prior Web flows
13  that we looked at.  So there's one that says, "Show
14  rates with taxes and all fees."  Do you see that?
15    A.  I do.
16    Q.  Okay.  And what's your understanding of what
17  that box does if someone were to click on it?
18          MR. LEARY:  Objection to form, foundation.
19  Sorry.  Can you repeat your question, Mike, because I
20  spoke over you.
21  BY MR. HOUCHIN:
22    Q.  Sure.  What's your understanding of what that
23  "show rates with taxes and all fees" box does?
24          MR. LEARY:  Objection.  Foundation, calls for
25  speculation to the extent Mr. Wolff was not at the

EXHIBIT 1 - PAGE 26

1  company at this time.
2         But you can answer if you know.
3         THE WITNESS: I don't know.
4  BY MR. HOUCHIN:
5    Q. Okay. You have no understanding of that box?
6    A. Well, it says show rates, taxes and all fees.
7  I mean, if there's an exhibit or an example below this,
8  I think it will show what it means. But I was not with
9  the company that I remember when this was implemented.
10   Q. Okay. Were you involved with any discussions
11 while you were at Marriott about this show rates with
12 taxes and all fees box?
13   A. Not that I remember.
14   Q. Okay. All right. So if you keep scrolling
15 down, you'll get to MAR91.
16   A. I'm here.
17   Q. Okay. And then you see that blue box again?
18   A. Yes, uh-huh.
19   Q. Okay. And in the blue box it says, "Please
20 note USD 35 daily destination amenity fee will be added
21 to the room rate"; correct?
22   A. Yes.
23   Q. But the blue box doesn't have a sampling of any
24 amenities that will be included with the destination
25 amenity fee; correct?

1         MR. LEARY: Hold on. Just an objection to form
2  to the extent there's other information in the box.
3         But go ahead.
4         THE WITNESS: It appears to be the case. This
5  was after I was with the company because COVID was
6  active at that point apparently due to this box. So I
7  can't -- I mean, I'm agreeing with what you're saying,
8  but I was not with the company at this time.
9  BY MR. HOUCHIN:
10   Q. Okay. So above where it says, "USD 35 daily
11 destination amenity fee" it says, "Please note face
12 coverings are required. Customers should review
13 government guidance to confirm eligibility to travel and
14 stay at hotel. See travelguidance.marriott.com."
15        Do you see that?
16   A. I do, yes.
17   Q. Okay. So that's additional information that
18 Marriott was able to include in the blue box. Would you
19 agree with that?
20   A. It appears that way. I wasn't with the company
21 at that time.
22   Q. Okay. So I think when we were looking at the
23 last Web flow you testified that a sampling of amenities
24 wasn't included in the blue box because there's a
25 limited amount of space in the blue box. But it appears

1  in this example that Marriott was able to expand the
2  blue box and add more information about COVID
3  guidelines. Would you agree with that?
4         MR. LEARY: Objection to form, foundation.
5         THE WITNESS: I wasn't with the company at that
6  time. There's more information in here. I didn't count
7  how many letters and numbers there are, but I wasn't
8  with the company.
9  BY MR. HOUCHIN:
10   Q. Okay. Do you know what the limit on the number
11 of words or characters was in the blue box at the time
12 you were with Marriott?
13   A. Sorry. I don't remember. But, no, I don't
14 remember the exact amount.
15   Q. Okay. But it's your understanding that it was
16 limited to what could be included in the blue box?
17   A. It was a maximum number in numbers. It was
18 included in there for technical reasons. I don't know
19 but there was a limit. What it was I don't remember.
20   Q. Okay. And then again you see the rate for the
21 one king bed of 175 USD per night. That 175 number does
22 not include the destination amenity fee?
23   A. Correct.
24   Q. Okay. And then if you go down to Marriott 94,
25 again this is the summary of charges page?

1    A. Yes. Okay. I'm on that page.
2    Q. And on this page there's also no mention of the
3  daily destination amenity fee; correct?
4    A. Not calling it out as part of U.S. taxes and
5  fees. U.S. dollars, taxes and fees.
6    Q. Okay. So if you were to click on that summary
7  of charges box, it would take you to the next part of
8  the Web flow which is Marriott 96?
9         MR. LEARY: That's a technical objection.
10 There's no box there. It's just a summary of charges
11 dropdown.
12        MR. HOUCHIN: I would agree it's a dropdown
13 menu.
14        MR. LEARY: Go ahead, Jeff. You can answer.
15        THE WITNESS: Yes, I see the charges underneath
16 that, yes, including the destination amenity fee.
17 BY MR. HOUCHIN:
18   Q. Okay. And then if you keep scrolling down,
19 Marriott98 appears to be the page where consumers enter
20 their information to book the room?
21   A. Yes.
22   Q. And there's no mention of the destination
23 amenity fee on this page?
24   A. There's no mention of the destination amenity
25 fee, room rate or any other fees on this page. It's

EXHIBIT 1 - PAGE 27

1 simply to fill out the information for the customer to
2 book.
3    Q.  Okay.  I would like you to take a look at one
4 last Web flow.  This will be Exhibit 15.
5    (Exhibit 15 was marked for identification.)
6    THE WITNESS:  Okay.  I think I'm there.
7    MR. LEARY:  Hold on.  I'm having difficulty
8 with mine.  Okay.  I'm there and this is Bates stamp
9 104?
10    MR. HOUCHIN:  104, correct.
11    MR. LEARY:  Okay.
12 BY MR. HOUCHIN:
13    Q.  It looks like whoever was booking this room
14 searched for the Marriott Marquis San Diego December 17
15 through December 18 which are the same dates as the
16 previous exhibit that I showed you.  And then if you
17 scroll down and you go to MAR 107.
18    A.  Okay.
19    Q.  And earlier we talked about that "show rates
20 with taxes and all fees" button at the top there.  Do
21 you see that above the San Diego Marquis?
22    A.  I do.
23    Q.  Okay.  In this example the box is clicked on;
24 correct?
25    A.  It appears that way, yes, uh-huh.

1    Q.  Okay.  And so the "from rate is 237 USD per
2 night."  Do you see that?
3    A.  Yes.
4    Q.  Okay.  And so in the previous example I showed
5 you the from rate was 149 USD per night?
6    A.  I don't remember exactly to be honest with you,
7 but if that's an accurate representation, I'll take your
8 word.
9    Q.  Okay.  So when you click that "show rates with
10 taxes and fees," it appears the price increases by
11 almost $70.  Do you see that?
12    MR. LEARY:  Objection to the form?
13    THE WITNESS:  Yeah.  I don't necessarily agree
14 with that.  I don't know.  I would like to see them side
15 by side, number one, but also I would also need to be
16 able to see which room type was booked, you know, to
17 make sure we're comparing apples to apples with the
18 comparisons that you're stating.  So, no, I wouldn't
19 agree with that at this point without further
20 information.
21 BY MR. HOUCHIN:
22    Q.  Okay.  That's fine.  I have them side by side.
23 I can do a screen share if that would be helpful.
24    A.  You can do that.  I mean, the 149 I'll take
25 your word for it, but that doesn't mean the same room on

1 the first -- on the previous -- the 149 is the same room
2 that's on this page 237.  I don't know that.  That's all
3 I'm saying.  It may be, but I don't know that to be.  So
4 I'm not going to say that it is the same because I don't
5 know what's behind this.
6    Q.  Okay.  So we'll go through that.  So if you go
7 down to the next stage of the booking process.  Let's
8 see here.  MAR114.
9    A.  114.  Hold on.  Okay.  I'm at 114.
10    Q.  Okay.  And then for the king bed, city view
11 room it's 237 USD per night.  It says, "Taxes and all
12 fees included."
13    A.  Okay.
14    Q.  And if you scroll down to MAR117, it gives you
15 the summary of charges?
16    A.  So I'm confused.  So 237 -- wait.  Let me just
17 go back to the previous page.  I just want to make sure
18 I'm understanding the flow before I go any further.
19 Okay.  So you're at 237 the previous page.  Okay.  And
20 then I'm going back down.  That was page 114; correct?
21 114.  Okay.  All right.  So I'm back at 114.
22    Q.  Okay.  So 114 says for the king bed, city view
23 room 237 per night.  So if you scroll down to 117, you
24 see the summary of charges.  The USD subtotal is 237.02
25 a night?

1    A.  Okay.  Yes.
2    Q.  Okay.  And then do you see the 175 number USD
3 per night?
4    A.  Yes.
5    Q.  Okay.  Would you agree that that's the base
6 room price?
7    MR. LEARY:  Objection to the form.
8    THE WITNESS:  It appears that way.
9 BY MR. HOUCHIN:
10    Q.  Okay.  And then if you look down, it breaks out
11 everything.  It gives you the total cash rate of 175
12 plus the destination fee of 35 and then the estimated
13 government taxes and fees of 27.02?
14    A.  119?
15    MR. LEARY:  Are you on 119?
16    MR. HOUCHIN:  Yeah, that's 119 under the
17 summary of charges.
18    MR. LEARY:  Okay.  Thank you.
19    THE WITNESS:  Yeah.  Just what it states,
20 correct.  That's right.
21 BY MR. HOUCHIN:
22    Q.  Okay.  And then MAR121 is the final page of the
23 booking process where consumers enter their information?
24    A.  Yes.
25    Q.  Okay.  So in this example it has that toggle

EXHIBIT 1 - PAGE 28

1  switch where you can see the room rates with all taxes
2  and fees.  When were you with Marriott, was there ever
3  any discussion of including the taxes and fees with the
4  base room price on the Marriott Web page?
5      MR. LEARY:  Objection.  Asked and answered.
6      THE WITNESS:  Yeah, I don't remember that
7  conversation.
8  BY MR. HOUCHIN:
9      Q.  Since you've retired from Marriott, have you
10 ever booked a room personally on the marriott.com
11 Website?
12     A.  The only room that I booked since I retired
13 from Marriott, we rented an apartment in California to
14 be near my daughter with her kids.  And so when we
15 traveled -- during the pandemic I haven't booked a room.
16 The only room that I booked recently and had to cancel
17 was at the Cleveland downtown Marriott hotel.  And that
18 was done through the Quarter Century Club, so I did not
19 go on the Website.  So the answer to your question is I
20 have not booked a room on marriott.com since I retired,
21 the best I remember.
22     Q.  Okay.  So is today the first time that you're
23 seeing this "show rates with taxes and all fees" box?
24     A.  To my recollection, yes.  I'm just trying to
25 think back again if I booked or was on marriott.com

1  since I retired because travel stopped.  We had an
2  apartment in California which we gave up recently, and
3  we haven't been back to California since then.  And,
4  again, the only time that I booked a reservation with
5  Marriott was actually for last week in Cleveland which I
6  had to cancel due to illness.  And that was done through
7  an 800 number by the way.
8      Q.  Okay.  So to the best of your recollection,
9  today is the first time you've ever seen that "show rate
10 with all taxes and fees" box?
11     A.  To best of my recollection, yes.
12     MR. HOUCHIN:  Okay.  All right.  I'm going to
13 introduce another exhibit.  This one will be 16.
14     (Exhibit 16 was marked for identification.)
15     MR. LEARY:  Can we take ten minutes, Mike?
16 We've been going about an hour.
17     MR. HOUCHIN:  Yes, ten minutes is fine.
18     (Recess.)
19 BY MR. HOUCHIN:
20     Q.  Mr. Wolff, before we go to Exhibit 16, I just
21 have a few additional questions about the Marriott
22 Website.
23     A.  Okay.
24     Q.  Do you know approximately what percentage of
25 guests book through the marriott.com Website compared to

1  people who book over the phone or in person or through
2  an OTA?
3      A.  No.
4      Q.  Okay.  Have you ever seen any numbers on that
5  at your time at Marriott?
6      A.  It's possible but, again, I've been away from
7  Marriott for two years, and that's pretty detailed
8  information.  So if I did, I don't remember.
9      Q.  Okay.  All right.  If you want to take a look
10 at Exhibit 16.
11     MR. LEARY:  Hold on one second, Mike.
12     THE WITNESS:  Okay.  I'm on that page now.
13     MR. LEARY:  Hold on one second, Jeff.
14     THE WITNESS:  I have to review this.
15     MR. LEARY:  I got to bring me up still.  16.
16 Is this entitled "Resort Fee Audit Process"?
17     MR. HOUCHIN:  Yeah.  It starts with MAR99954.
18     MR. LEARY:  Okay.  I have it.  Thanks.  And
19 it's 16 now we're at.  Okay.
20 BY MR. HOUCHIN:
21     Q.  Mr. Wolff, take your time to review this and
22 let me know when you're ready.
23     A.  What was the date on this document?
24     Q.  I'm not seeing a date on this document.  It's
25 something that Marriott produced during discovery.

1      A.  Okay.  I've glanced through it.
2      Q.  Okay.  Have you ever seen this document before?
3      A.  The reason that I asked for the date is because
4  this was -- this appears to be a document that was a
5  test document, and that's why I'm trying to understand.
6  I'm looking through it again, but this is -- it looks
7  somewhat familiar, but it was not one that we use
8  usually.
9      Q.  Okay.  And what do you mean by "test document"?
10     A.  If memory serves me, if I recollect correctly,
11 at some point -- I don't remember the date -- we were --
12 I was going through and just in my effort which I did
13 over the ten years with Marriott to make sure that the
14 resort fee procedures followed all of the guidelines and
15 the documentation that we require in disclosure and so
16 on.  I was constantly looking for ways to ensure that
17 the consumers knew about the resort fee and the benefits
18 that they would accrue from it.
19     And, again, if memory serves me correctly on
20 this document, at one point we thought let's go back and
21 have a little bit more of a detailed audit on the resort
22 fee process.  Again, if memory serves me correctly, I
23 think I sent this out to two or three general managers
24 at hotels that had fees and asked them to review it and
25 look at it.  And, again, if memory serves me correctly,

**EXHIBIT 1 - PAGE 29**

Page 113

1 I think it was considered redundant, and it was never
2 implemented.
3    Q.   Okay.  To the best of your recollection, this
4 audit process was never actually implemented by
5 Marriott?
6    A.   We did a test.  I did a test amongst three -- I
7 think it was three hotels.  And I would have to go back
8 and be shown documents which I have no access to right
9 now since I don't work for Marriott.  But, again, my
10 recollection this was a trial, and it was determined
11 that it was redundant.  That we already had all these
12 audit processes in place, and it was redundant and a
13 waste of time.
14    Q.   Okay.  You already had audit processes in
15 place.  Can you describe what those were.
16    A.   Yeah.  I think I touched on some of them
17 before, but our processes, first of all, as stated
18 in the resort fee -- let me go back.  As stated in the
19 resort fee policy, general managers -- and, again, I use
20 that term because the general manager at a hotel is
21 ultimately accountable for the results at his or her
22 hotels.  That person can then delegate responsibility to
23 others, but the general manager is responsible to follow
24 the processes, the rules, the procedures and all of the
25 guidelines on the resort or destination fee document.

Page 114

1 Part of that was audit -- self audits.
2    Additionally, as we talked about before, we did
3 unannounced visits to hotels where we tested the
4 processes and procedures.  We also monitored guest
5 satisfaction scores at all hotels and looked for trends,
6 you know, within those hotels to see if there were any
7 issues with resort fees.
8    So, again, we had a pretty robust process in
9 place at our hotels to make sure that they were
10 following the rules and procedures as outlined in resort
11 and destination fee policies.
12    Q.   Okay.  Can you just a look at where it says
13 "Disclosure compliance requirements."
14    A.   Okay.
15    Q.   And then it's letter A.  It says, "Properties
16 must accurately disclose the amount of the resort fee,
17 as well as the services covered by the resort fee (shows
18 in PURE to list the inclusions in the fee), at the time
19 of reservation or booking on any internal or external
20 channel."
21    A.   Yes.
22    Q.   And I understand this policy was never -- well,
23 this document was never implemented.  But was that
24 Marriott's general policy that the amount of the resort
25 fee as well as the services covered by the resort fee

Page 115

1 should be disclosed?
2    MR. LEARY:  Objection to the form and
3 foundation.
4    But you can answer, Jeff.
5    THE WITNESS:  I'm trying to think if this was
6 something that was recommended at that time or was a
7 process.  I don't remember what PURE -- that was another
8 system.  I don't know what that means.  I don't remember
9 what it was.  "At the time of reservation or booking on
10 an internal or external channel."  I don remember if
11 this was actually implemented.  It may have been, but
12 you know, as we've seen from previous documents that
13 you've gone through, you know, from hotels, we disclosed
14 what's part of the destination and amenity fees.
15 BY MR. HOUCHIN:
16    Q.   Okay.  Okay.  So on letter B there it says,
17 "Properties must accomplish compliance in the following
18 guest communication areas to ensure the resort fee is
19 being disclosed in accordance with point A."
20    And then one of the bullet points says,
21 "marriott.com:  Hotel alert."
22    My question is:  Is the hotel alert the same as
23 that blue box that we looked at earlier?
24    MR. LEARY:  Same objection.
25    THE WITNESS:  I'm trying to remember, and I

Page 116

1 would be guessing if I gave you an answer, and I don't
2 want to guess.
3 BY MR. HOUCHIN:
4    Q.   Okay.  So you have no understanding on that?
5    A.   I would be guessing, and I'm not comfortable
6 guessing since I'm not sure.
7    Q.   Okay.  And then letter C it says, "Properties
8 must establish compliance in the following distribution
9 channels to ensure that the resort fee is being
10 disclosed in accordance with point A."
11    And then it lists several distribution
12 channels:  Marriott reservations, online travel agencies
13 or OTAs.  That would be Expedia, Travelocity, Orbit.  Is
14 roomkey.com considered an OTA?
15    MR. LEARY:  Objection to form.
16    You can answer if you know.
17    THE WITNESS:  If it was listed there, perhaps.
18 I don't remember what RoomKey was.
19 BY MR. HOUCHIN:
20    Q.   Okay.  Do you know what GDS is and then in
21 parenthesis it lists Sabre, other items?
22    A.   Where it says GDS, Sabre.  GDS stands for
23 Global Distribution Systems, I believe.  And those were,
24 I believe, third-party companies that perhaps were
25 distribution points for information.  But, again, that's

**EXHIBIT 1 - PAGE 30**

1 a very technical part of our business that I was not
2 involved with and am not familiar with how it worked.
3    Q.   Okay.  Do you know what Passkey is?
4    A.   If memory serves me correctly, Passkey was a
5 service where group rooms, groups who booked in hotels
6 could allow their attendees to make their reservations
7 at the hotel.  I believe that's what Passkey was.
8    Q.   Okay.  And then Cvent, do you have an
9 understanding what that is?
10    A.   I don't remember what Cvent was.
11    Q.   Okay, and QuickGroup?
12    A.   Same thing.  I don't remember.
13    Q.   Okay.  If you scroll down to MAR99956.
14    A.   Okay.
15    Q.   And do you see where it says in bold "Detailed
16 process for compliance verification"?
17    A.   I see that.
18    Q.   Okay.  And then if you look at where -- in the
19 longer paragraph where it says, "A screen like the
20 following will appear.  Verify that the resort fee is
21 communicated; similar to the example below."
22    A.   I see that.
23    Q.   Okay.  And then in parentheses it says, "The
24 items included in the resort fee may vary from this
25 example, but you must ensure that your property's unique

1 inclusions are communicated here."
2    A.   I see that.
3    Q.   Okay.  And was that the policy of Marriott that
4 the unique inclusions have to be communicated?
5    A.   Similar to what I said before when we talked
6 about the blue box is we wanted hotels to note the
7 resort or destination fee, the amount and a sampling of
8 the amenities that were included partially, you know,
9 just to make sure the customers knew the robust nature
10 of the offerings that were included with the resort
11 destination fees.
12    Q.   Okay.  And then below that it provides an
13 example of a blue box for the JW Marriott, Phoenix
14 Desert Ridge and it says 29 -- "USD 29 daily resort fee
15 added to rate, includes spa, fitness center access - age
16 18 plus, driving range use, bike rental and more."
17    MR. LEARY:  Again, object to the form.  The use
18 of this document.
19    You can answer.
20    THE WITNESS:  Are you talking about the JW says
21 -- let me make sure I am pointed to the right place.  Is
22 that the one that says, "USD 29 daily resort fee"?  Is
23 that the one you're referring to?
24 BY MR. HOUCHIN:
25    Q.   Yeah, that's correct.

1    A.   Fee added to rate increase, spa, fitness
2 access.  You know, that's the one.  I just want to make
3 sure I'm looking at the same one.
4    Q.   Yeah, that's right.
5    A.   Okay.  I see it.
6    Q.   Okay.  So the spa, fitness center access that
7 would be an example of the property's unique inclusions;
8 correct?
9    A.   That is correct.
10    Q.   Okay.  But the exhibit that we looked at
11 earlier for the San Diego Marriott Marquis there was no
12 unique inclusions listed; correct?
13    MR. LEARY:  Objection.  Asked and answered.
14    You can answer.
15    THE WITNESS:  Okay.  If my memory serves me
16 back on that one, yes, that's the case.
17 BY MR. HOUCHIN:
18    Q.   Okay.
19    A.   Was that the one -- had the reference to COVID?
20    Q.   That's correct.
21    A.   Yeah.  And, again, I will point out I was not
22 with the company at that time, but I'm answering your
23 question that you asked.
24    MR. HOUCHIN:  Okay.  Give me one minute here.
25 I'm going to introduce another exhibit.

1    All right.  This one will be Exhibit 17.
2    (Exhibit 17 was marked for identification.)
3    MR. LEARY:  This is a four-page document.
4 "Mandatory fee discussion" and it's MAR-113340.
5    MR. HOUCHIN:  Correct.
6    Q.   Take your time to look over this document,
7 Mr. Wolff.
8    A.   Okay.  Do you have any information on the date
9 or the context of this document?
10    MR. HOUCHIN:  I do not.  It's just a document
11 that Marriott produced in discovery.
12    MR. LEARY:  Well, in fairness, though, Mike, it
13 was a document produced in response to certain document
14 requests and may have come with others.  So it wasn't
15 just one randomly produced.  It was something that was
16 produced as part of other documentation.  I don't see it
17 here, and I don't see the date of it so -- or if you
18 have any more context to it.
19    THE WITNESS:  And the reason I ask this
20 question is it's hard to believe that there would be a
21 document like this distributed without some kind of
22 cover note or put in perspective of where it's from, who
23 issued it.  I may have seen this before.  This looks
24 totally unfamiliar to me.  So if you have questions, I'm
25 going to need to review this because I don't think I was

EXHIBIT 1 - PAGE 31

Page 121

1  the author of this.
2  BY MR. HOUCHIN:
3      Q.  Okay.  And that's fine.  That was my general
4  question.  If you recall ever seeing this document
5  before?
6      A.  I don't recall.  This looks just by the looks
7  of it -- you know, it says, "Resort fee hotels - 72."
8  This could have been early on.  Well, it says Starwood.
9  So it was after the Starwood takeover.
10     Q.  Okay.  Do you see where it says, "Current state
11  (MI fee policy)."  I believe MI refers to Marriott
12  International.
13     A.  The very first box, the very first page?
14     Q.  Correct.
15     A.  Okay.  Yes.
16     Q.  And then it says the 5 to 1 value ratio?
17     A.  Yes.
18     Q.  And that value ratio is changed to 4 to 1
19  around 2017; is that correct?
20     A.  I don't remember the exact date or year but
21  that sounds correct.
22     Q.  Okay.  And then it discusses high level issues.
23  It says, "The number (and variation in type) of fees
24  being requested by owners and hotels is escalating."
25     A.  Uh-huh.

Page 122

1      Q.  Do you know what they mean by that in this
2  document?
3      A.  Let me read the rest of that section there just
4  to see if --
5      MR. LEARY:  Objection.  Form, lacks foundation
6  as to this document and the context of it.
7      But you can answer it.
8      THE WITNESS:  I just was reading it.  Can you
9  please restate the question.  Ask the question, please,
10  so I can remember what it was.
11  BY MR. HOUCHIN:
12     Q.  Sure.  Under high level issues it says, "The
13  number" -- and in parentheses "(and variation in type)"
14  end parentheses, "of fees being requested by owners and
15  hotels is escalating."
16      Do you know what that means, what this document
17  is referring to with respect to that?
18     A.  That's why I would really need to put this
19  document in perspective of where it came from, who
20  issued it.  Because if somebody issued this and they
21  weren't in the know, it's hard to state.  I mean, so I'm
22  not comfortable answering that question as I don't know
23  the perspective of this document.
24     Q.  Okay.  That's fine.  Just a couple more
25  questions about this document.

Page 123

1      If you go to the next page, it says, "Strategic
2  questions for consideration."
3      A.  Okay.
4      Q.  And then it says, "Could the," quote, "'avoid
5  nickel and diming,'" end quote, pendulum be swinging too
6  far, too fast?"
7      Have you ever heard that term before, the
8  nickel and diming pendulum?
9      MR. LEARY:  Same objection.
10     THE WITNESS:  I've heard nickel and diming.  I
11  don't remember hearing about nickel and diming pendulum,
12  but I know what nickel and diming refers to.
13  BY MR. HOUCHIN:
14     Q.  Okay.  The next bullet sentence it says, "Move
15  from 5 to 1 to 4 to 1 or 3 to 1 value ratio."  We talked
16  about this earlier.  Marriott has 5 to 1 value ratio and
17  then it moved from a 4 to 1.  Do you recall any
18  discussions within Marriott about that change?
19     A.  As I said earlier when that question was
20  brought up about the 5 to 1 to 4 to 1 change in the
21  value proposition, it was done basically to remove from
22  consideration hotels putting into the resort fee or
23  destination fee bucket of goods items that customers
24  considered to be valueless at that time.  And that was
25  not because they were put in with the intention of them

Page 124

1  being valueless.  It was because their effectiveness,
2  their value was outlined.
3      So, in other words, I used the example before.
4  There was a time when long distance phone calls was a
5  sought after amenity.  Local phone calls, there were
6  charges for them.  Bottled water, you know, used to be a
7  amenity that was valued, and now they're basically of no
8  value at all.  Everybody's got a cell phone.  So we told
9  hotels these are the things you cannot include, and as
10  we did that, we adjusted it down to 4 to 1.  And the
11  value proposition in our estimation and based on what I
12  perceive as customer feedback at resorts was positive.
13     Q.  And then the next full sentence says,
14  "Should we eliminate Red Zone"?  Do you know what this
15  refers to when it says Red Zone?
16     MR. LEARY:  Objection.  Form, foundation to
17  this document.
18      You can answer.
19     THE WITNESS:  Okay.  When you asked the
20  questions before about the guest satisfaction scores, I
21  think the first one we looked at was 51, and then there
22  might have been some other ones.  But then the last one
23  you questioned me about was the number 56.  So the Red
24  Zone refers to any hotels that are below that number.
25  That is the guest satisfaction score, and if you're in

**EXHIBIT 1 - PAGE 32**

Page 125

1  the Red Zone, you're failing as a hotel.  And we hold
2  you accountable for it because the customers are saying
3  that your hotel does not meet guest standards.
4        So it looks like somebody was in a
5  brainstorming session here and asked that we eliminate
6  Red Zone.  Up until the time that I left in December of
7  2019, that was not eliminated.  And any conversation
8  that I had with anybody about that was strong
9  objections, and you know, I don't know what's happening
10  today.  But it was never a consideration because that
11  was a deal breaker when it came to guest satisfaction
12  the at our hotels.
13  BY MR. HOUCHIN:
14    Q.  Okay.  That's all the questions I about that
15  document.
16        I'll introduce the next one.  This is
17  Exhibit 18.
18        (Exhibit 18 was marked for identification.)
19        THE WITNESS:  I have the document.
20        MR. LEARY:  Hold on.  My computer keeps telling
21  me I have a weak connection for some reason, so it's a
22  little slow.  Just bear with me.
23        I'm looking for 18, Mike?
24        MR. HOUCHIN:  Yeah, Exhibit 18.  It starts with
25  MAR14749.

Page 126

1        MR. LEARY:  Yes, I'm there.  Thank you.
2  BY MR. HOUCHIN:
3    Q.  And, again, Mr. Wolff, just take your time to
4  review this document, and let me know when you're ready.
5    A.  Okay.
6    Q.  Have you seen this document before?
7    A.  It looks familiar but, again, some of these
8  documents seem to be taken out of context.  In other
9  words, if there was a cover memo on this to see who it
10  was from and when it was and who was included, it would
11  be more helpful to me.  But the overall concept, the New
12  York City Proof of Concept for Destination Fees, I'm
13  familiar with that.  I don't think I was the author of
14  this document, though.
15    Q.  Okay.  And that's my next question.  So what's
16  your understanding of what the NYC Proof of Concept for
17  Destination Fees was?
18    A.  Is there a date on this?
19    Q.  I don't believe so.
20    A.  Okay.  Yes, I mean, again, that would be
21  somewhat helpful, but the situation in New York City is
22  a lot of hotels, non-Marriott hotels in New York City,
23  were charging destination fees.  As a company, we were
24  not, and we felt a competitive disadvantage, you know,
25  in that situation.  So owners and hotels requested that

Page 127

1  we review this, and this appears to be someone
2  attempting to frame up the issue.
3    Q.  Okay.  Do you know if hotels in New York City
4  were the first Marriott hotels to charge a destination
5  fee?
6    A.  No, they were not.
7    Q.  Okay.  Do you know which hotels were?
8    A.  I don't remember specific hotels, but there
9  were some hotels in -- you know, one that comes to mind
10  right away is Cusco Peru, you know, which is not a
11  resort but in a phenomenal location.  That hotel had a
12  destination fee, and there were other ones, specific
13  situations, but New York was not the first.
14    Q.  Okay.  And then in the overview section there's
15  a bullet point that says "How", and it says in the
16  second sentence, "Tie the ability to charge additional
17  fee to the hotel being renovation compliant."
18        Do you know what that's referring to?
19    A.  Again, this was not authored by me.  However,
20  when you're talking about hotels being renovation
21  compliant, there are certain contractual obligations for
22  a hotel owner to renovate their hotel at certain points
23  of the contract or the age of the hotel.  And I assume
24  that it's referring to that situation, if they are
25  compliant with the renovation.

Page 128

1    Q.  Okay.  Do you know if the destination fees
2  charged by Marriott were, in fact, ever complied to --
3  were ever tied to hotels being renovation compliant?
4        MR. LEARY:  Mike, you cut off.  Hold on, guys.
5  I apologize.  Maybe it's my computer.  You cut out at
6  the end, Mike.  I heard you say do you know if the fees
7  were tied to, and then I didn't get the end of the
8  question.
9  BY MR. HOUCHIN:
10    Q.  Okay.  Do you know if the fees were actually
11  ever tied to a hotel being renovation compliant?
12        MR. LEARY:  Objection to form, foundation,
13  calls for speculation.
14        You can answer.
15        THE WITNESS:  Okay.  During my tenure, the
16  answer to that was no.
17  BY MR. HOUCHIN:
18    Q.  Okay.
19        Okay.  The next one will be Exhibit No. 19.
20        (Exhibit 19 was marked for identification.)
21        MR. LEARY:  And this is a Marriott150573,
22  one-page document.  Again, Mike, just for the purposes
23  of the questioning, is there an e-mail or cover letter
24  with this or anything to date this?
25        MR. HOUCHIN:  There's not.  Again, this is just

EXHIBIT 1 - PAGE 33

Page 129

1 a document that was produced by Marriott. I would just
2 like to ask Mr. Wolff the same questions.
3      MR. LEARY: I understand, again, but just for
4 the record, it's not just a document we throw out there.
5 We throw out lot of documents. So we try to do it in a
6 manner that we had cover letters or e-mails that went
7 with whatever a document might be. And I was just
8 wondering if that's the case here. If you know, fine.
9 If you don't know, that's fine. You can ask Jeff if he
10 knows.
11      THE WITNESS: So what was the question, Mike?
12 BY MR. HOUCHIN:
13   Q. My questions is: Have you ever seen this
14 document before?
15   A. It's possible but I did not author this. This
16 is not my style, you know, of a document. It's not my
17 style. And so I'm looking at now trying to remember if
18 I saw it, and I can't tell you if I did or not. To the
19 point that was made by Paul, it would be or helpful if I
20 saw who this came from and why it was presented or who
21 produced it, but it's very difficult for me to answer
22 that.
23 BY MR. HOUCHIN:
24   Q. Okay. That's fine. And just to be clear, you
25 don't know who authored this document; correct?

Page 130

1   A. That is correct, yes.
2   Q. Do you see where it says in that box that
3 "Marriott's typical resort fee is $25 per night but
4 often provides much greater value"?
5   A. Yes.
6   Q. Is that your understanding from your time at
7 Marriott that the typical resort fee was about $25 per
8 night?
9   A. So, again, if it says that there's 54 hotels
10 out of 3000, it would seem to date this back to a time
11 when $25 was a typical resort fee. I don't think there
12 would be any reason that that statement is not true. I
13 don't know when this was. So, again, I guess I'll
14 speculate and say -- you know, if you're asking me at
15 that point was it, yeah. But I don't know for sure
16 because there's no information on the date or who
17 authored this.
18   Q. Okay. Fair enough. If you're not familiar
19 with this document.
20      Now might be a good time for another break.
21 I'm going to kind of shift gears a little bit.
22      MR. LEARY: Okay. Let's take ten minutes or
23 so.
24      MR. HOUCHIN: Yeah. That's fine.
25      (Recess.)

Page 131

1      MR. HOUCHIN: I'm going to introduce another
2 exhibit. This one will be Exhibit 20.
3      (Exhibit 20 was marked for identification.)
4      THE WITNESS: I have it.
5      MR. LEARY: Hold on one second. 20, MAR190154.
6 Thanks.
7      MR. HOUCHIN: That's correct.
8   Q. Mr. Wolff, just take your time to review this.
9   A. Okay.
10   Q. Okay. This is an e-mail that you're copied on.
11 You've seen this before; correct?
12   A. I have.
13   Q. Okay.
14      MR. LEARY: Just to clarify, did you read the
15 entire string of e-mails, Jeff, or the first page?
16      THE WITNESS: I read the one that starts off at
17 the bottom from a Michael Harvey.
18      MR. LEARY: Okay.
19      THE WITNESS: December 16, 2014, correct.
20      MR. LEARY: Okay.
21 BY MR. HOUCHIN:
22   Q. Okay. This e-mail chain generally discusses
23 destination fees at a Park City Marriott hotel. Would
24 you agree with that?
25   A. Yes.

Page 132

1   Q. Okay. And then it looks like someone named
2 -- on MAR190155 at the bottom there's an e-mail on
3 December 16, 2014 at 2:50 p.m. from Bob Jones. And he
4 says, "Let me know what we need to do and forward the
5 forms, I would appreciate it."
6      And it looks like this e-mail was sent to
7 yourself, Mr. Wolff. Do you agree with that?
8   A. Yes.
9   Q. Okay. Do you know who Bob Jones is?
10   A. Yes. Bob Jones was a Marriott area vice
11 president representing -- overseeing a group of
12 franchise Marriott hotels.
13   Q. Okay. And do you know which group of franchise
14 hotels?
15   A. Not off the top of my head but the hotel
16 referred to here appeared to be owned based on the
17 comments here with Sunstone, and there's also a
18 gentleman that looks like Interstate Hotels maybe in the
19 title. So I'm just speculating that that's who it is,
20 but that would most likely be the case.
21   Q. Okay. And then on that same page on December
22 16, 2014 at 2:52 p.m., you wrote, "Bob, need to know
23 more about this hotel before we start the process."
24      And then the e-mail chain continues, and then
25 on December 16, 2014 at 3:03 p.m. you wrote, "Unless

**EXHIBIT 1 - PAGE 34**

Page 133

1  this hotel has special amenities or services, it won't
2  qualify."
3      MR. LEARY:  Jeff Wolff wrote that.
4      MR. HOUCHIN:  Correct.
5      MR. LEARY:  Okay.
6      THE WITNESS:  I see that, yes.
7  BY MR. HOUCHIN:
8      Q.  Okay.  Do you know if this particular Park City
9  hotel was ever approved to charge a destination fee?
10     A.  If memory serves me correctly, at this time
11  2014 I believe it was not approved.  I would have to
12  verify that on the records, but I'm relatively certain
13  based on this note that it wasn't approved.
14     Q.  Okay.  So MAR190154, the bottom e-mail, it's
15  from Bob Jones to you, and it says, "Nope, it doesn't.
16  So I'm fine telling them no."  And then he says, "I've
17  heard that Marc Hoffman with Sunstone will tell them to
18  implement one without permission so we'll need to keep
19  an eye out on it."
20     A.  Uh-huh.
21     Q.  And in the e-mail above you responded, "We have
22  pretty fight controls on this.  The team that enters
23  these fees comes to me first to see if it is approved."
24         What do you mean by "pretty tight controls"?
25     MR. LEARY:  Objection.  Form.

Page 134

1      You can answer.
2      THE WITNESS:  So tight controls means, number
3  one, when a hotel requests a resort or destination fee
4  they have to go through the process.  The forms that we
5  reviewed earlier, resort fee documentation, submit all
6  the information.  But, additionally, over and above
7  that, if the hotel is approved, the only person that
8  would allow -- that could allow a hotel to be entered
9  into the system and to charge a resort fee was me.
10         And there were two ladies who worked for
11  Marriott in that department, the reservations department
12  or whatever it was called, that I would work with.  And
13  say -- I would send that person a note and say, Shirley,
14  effective, you know, May 15th, 2019 the following hotel
15  has been approved for a resort fee.  So when I said
16  that, you know, there was a comment in here that the
17  hotel was planning on going ahead and doing it without
18  approval.  And I said that they can't do that because
19  they couldn't put it in the system.  They couldn't put
20  it in the Marriott reservation system to charge
21  customers.  So that was the tight control we had.
22  BY MR. HOUCHIN:
23     Q.  So you mentioned you worked with two ladies
24  from the reservation department.  You mentioned one was
25  named Shirley.  Do you know Shirley's last name?

Page 135

1      A.  Coghill.
2      Q.  Okay.  Do you know what her job
3  responsibilities included with respect to resort fees
4  with the Marriott Website?
5      A.  She really had no responsibilities per se from
6  Marriott resort fees other than telling -- other than
7  herself putting the resort fee into the system once I
8  gave her the approval.  That's the only interaction I
9  had with her, but she led a team in the reservations
10  world.  And everyone knew that no one could enter a
11  resort or destination fee without my approval and
12  without her entering their resort fee.  That's how we
13  made sure that there were no hotels entering any types
14  of fees without our knowledge.
15     Q.  Okay.  And you mentioned a second lady that I
16  you worked with in the reservation department.  Do you
17  know her name?
18     A.  It was Bonnie -- I can't remember her last
19  name, but I worked probably 95 percent of the time with
20  Shirley.  I think Bonnie was just a backup.
21     Q.  Okay.  And do you recall Bonnie's last name?
22     A.  I don't off the top of my head.
23     Q.  Okay.  So looking back to that e-mail you
24  wrote, you say, "He could try to collect it at the hotel
25  without putting it on the Website, however that is

Page 136

1  unlikely."
2      Why did you think that would be unlikely?
3      A.  Just because we -- I don't think the person I
4  was talking about was that brazen to actually go against
5  Marriott and do something that wasn't authorized in
6  regards to any types of fees.  You know, the person that
7  I was referring to, Marc, at one time worked for
8  Marriott.  I don't remember when he left, but I just
9  never thought Marc would actually do it.  Marc was the
10  kind of person that might say I'm going to do this, you
11  know, to try to intimidate us into allowing him to do
12  it, but it never happened.
13     Q.  Okay.  And then in the next e-mail above that
14  Bob wrote back, and he says, "Spoke to the RVP with
15  Interstate, and he said Marc will push it."
16         Is that the same Marc you're referring to?
17     A.  Correct.
18     Q.  Okay.  And then there's two other people copied
19  on this e-mail.  It looks like Michele Pajot and Kip
20  Vreeland.
21     A.  Yes.
22     Q.  Are you familiar with those two individuals?
23     A.  Yes.
24     Q.  And do you know what Michele's role at Marriott
25  was?

**EXHIBIT 1 - PAGE 35**

Page 137

1    A.   Michele was also an area vice president
2  overseeing a group of franchise hotels.  She was an
3  equivalent of Bob Jones.  So he may have copied her as
4  an FYI, and Kip Vreeland was both of their bosses.
5    Q.   Okay.
6         All right.  I'll mark another exhibit here.
7  This one will be Exhibit 21.
8         (Exhibit 21 was marked for identification.)
9         THE WITNESS:  Okay.  I have it but I have to
10 read it, though.
11        MR. HOUCHIN:  Yeah.  Take your time.
12        MR. LEARY:  It starts with the June 2016 e-mail
13 and it's MAR190304.
14        MR. HOUCHIN:  Right.
15        MR. LEARY:  Okay.
16 BY MR. HOUCHIN:
17   Q.   Just let me know when you're ready, Mr. Wolff.
18   A.   Okay.  Was there any attachments to this, Mike?
19 They're referring to some attachments.  Do you know if
20 they were --
21   Q.   I'm not sure if the attachments are included.
22 It looks like there's one for a JPEG image.  I'm not
23 sure what that is.
24   A.   Okay.  I've read through this.
25   Q.   Okay.  So I just like to direct you to the

Page 138

1  first page of the document and it's an e-mail --
2    A.   At the beginning of the document, the very
3  bottom you mean?
4    Q.   No, I'm referring to the first page of the
5  document.
6    A.   Okay.
7    Q.   I just wanted you to read over the entire thing
8  for context.
9    A.   Got you.  Okay.
10   Q.   Okay.  So on June 23rd you sent an e-mail to
11 the general manager Santa Monica, and it appears this
12 entire e-mail chain is discussing a destination amenity
13 fee at the JW Marriott in Santa Monica; is that correct?
14   A.   Yes.
15   Q.   Okay.  And you wrote to someone name Kai and
16 you said, "By copy of this note, I am instructing
17 Shirley Coghill to take down your destination amenity
18 fee.  You have not posted the required notifications for
19 your guests and are out of compliance."
20        MR. LEARY:  It says, "See attachment."  But the
21 attachment is not provided with this exhibit; is that
22 right?
23        MR. HOUCHIN:  That's correct.
24        MR. LEARY:  Object to the form, foundation.
25        THE WITNESS:  Mike, was there a question?  I'm

Page 139

1  sorry.
2  BY MR. HOUCHIN:
3    Q.   Yeah.  My question is:  Why was this
4  destination amenity fee taken down at the JW Santa
5  Monica?
6         MR. LEARY:  Same objection.
7         THE WITNESS:  Yeah.  If you go further down,
8  basically this is -- kind of goes back to how strong our
9  policy was with hotels and per the note -- but there's
10 no attachment but per the note, it says, "The example
11 guest information document is low quality and not
12 acceptable.  It must be changed to a format similar to
13 the examples that I sent you," which I don't have the
14 attachment.  "Please forward samples to Roy" -- Roy was
15 another ABP like Bob Jones, Michele Pajot.  So I asked
16 -- he was the key representative from Marriott for that
17 hotel.  So I said, "Please forward samples to Roy and me
18 before reprinting.  We have strict policies around
19 destination amenity fees" in your hotel, "and until your
20 hotel is in compliance, you are not authorized to charge
21 this fee.  Please make sure that no guest is paying the
22 DAF," destination amenity fee, "until you meet our
23 requirements."
24        So basically the hotel was given authorization
25 to charge a destination amenity fee.  After being given

Page 140

1  that approval, they did not follow the standards that we
2  set forward to make sure that our customers were getting
3  notified and were provided the information as per the
4  documents that we reviewed earlier.  And so I instructed
5  Shirley -- that's the person I mentioned earlier -- to
6  that it down.  You know, that it was no longer
7  acceptable.
8         I don't know if there's another document after
9  that, you know, talks about what happened after.  I
10 don't remember, but that was the case with this.  I
11 think it shows that we had strong policies in place.
12   Q.   Do you know if the destination fee was ever
13 reinstated for this hotel?
14   A.   Yeah, that's why I was wondering.  They had to
15 be some other document with this.  I'm guessing.  But if
16 memory serves me correctly, at some point the hotel was
17 authorized to charge a fee.  But I would need to see the
18 documents to provide an answer to that.
19   Q.   Okay.  And do you know how long this hotel
20 continued to charge the fee while being out of
21 compliance?
22        MR. LEARY:  Objection to form, foundation.
23        You can answer.
24        THE WITNESS:  I'm just looking at the dates of
25 the memos that they came to me.  So it was June 22nd.

**EXHIBIT 1 - PAGE 36**

Page 141

1  So apparently -- I mean, the note right below that has a
2  date of June 22nd, and they were sent to me at that
3  point, and I took it down on June 23rd.  So as soon as I
4  received the information, which was unacceptable, the
5  next day I took it down.
6  BY MR. HOUCHIN:
7     Q.  Okay.  Let's look at another exhibit.  This
8  will be Exhibit 22.
9        (Exhibit 22 was marked for identification.)
10       THE WITNESS:  Okay.  I'm going to review it.
11       MR. LEARY:  September 24, 2014, begins
12  MAR190616.
13       MR. LEARY:  Again, Mike, there's reference to
14  attachments here.  Do you have attachments to this
15  document?
16       MR. HOUCHIN:  No, I don't.  I'm just asking
17  about the e-mail.
18       MR. LEARY:  Just for the record, object to the
19  form and the foundation of this question, incomplete
20  document.
21       THE WITNESS:  Okay.  I'm ready.
22  BY MR. HOUCHIN:
23     Q.  Okay.  Would you agree that this e-mail chain
24  generally discusses a mystery shop that was done at the
25  JW Marriott Camelback Inn Resort?

Page 142

1     A.  Yes.
2     Q.  Okay.  And if you look on the first page of the
3  document, a Matt Reid from Mercantile Systems wrote you
4  an e-mail, and we talked about Mercantile Systems
5  before.  They're the company that does mystery shops on
6  behalf of Marriott; correct?
7     A.  That's correct.
8     Q.  Okay.  And do you know what Matt Reid's role
9  with Mercantile was?
10    A.  I don't remember specifically.  However, since
11  I contacted him and he contacted me, I'm assuming he was
12  the senior person with the company.
13    Q.  Okay.  Was he your primary point of contact
14  with Mercantile?
15    A.  I don't remember.  I typically did not deal
16  with the individuals at Mercantile unless there was an
17  issue or exception.  So I don't remember.  The person
18  that's noted, Matt, somewhere down here was the primary
19  contact within Marriott with Mercantile.
20    Q.  Okay.  And Matt from Mercantile he wrote, "I
21  spoke to the shopper and he reiterated that when he
22  checked in, he was not explained the resort fee or any
23  of the amenities that came with the fee."
24        Was that your understanding as well with
25  respect to this?

Page 143

1        MR. LEARY:  Objection.  Calls for speculation.
2  It's based on a hearsay document.
3        Go ahead.
4        THE WITNESS:  Yeah.  It's hard to say.  I read
5  through the document starting at the bottom.  You know
6  starting from the first one, the bottom, the earliest
7  one.  But -- so I'm guessing that would be the case.
8  BY MR. HOUCHIN:
9     Q.  Okay.  And then it says, "He also forwarded me
10 his confirmation e-mail that shows what he got."  And
11 then Matt from Mercantile says, "The first two times I
12 looked at this I saw nothing explaining the amenities
13 with the resort fee.  All I saw was 'a resort fee
14 applies.'"
15        And then it says, parentheses, "(twice, one for
16 each night)" and then "'resort fear $25.'"  And then he
17 says, "Looking at this e-mail a third time, I have found
18 towards the bottom it says, 'daily resort fee of 25 USD
19 in addition to room rate includes Internet, bicycle
20 rental, use of driving range and more.'"
21        So with respect to these confirmation e-mails,
22 is that generally the type of language that's included
23 in these e-mails?
24        MR. LEARY:  Objection to form.
25        THE WITNESS:  Yeah.  This was from 2013, and I

Page 144

1  really am not comfortable answering that.  I don't know.
2  I mean, I can't remember ten years ago.  You know, what
3  I'm seeing on this form or what he's putting in here.
4  So I don't know the answer to that.
5  BY MR. HOUCHIN:
6     Q.  Okay.  Fair enough.  Let's look at another
7  exhibit.  This will be Exhibit 23.
8        (Exhibit 23 was marked for identification.)
9        MR. LEARY:  February 22nd, 2016 begins at
10 MAR190626.
11 BY MR. HOUCHIN:
12    Q.  Take your time to review this and let me know
13 when you're ready.
14    A.  And there's no attachment with this either?
15    Q.  Correct.
16    A.  Okay.  Because it refers to one.  That's why
17 I'm asking.  Okay.  Okay.
18    Q.  Can you go down to the page MAR190627.
19    A.  Okay.
20        MR. LEARY:  Object to the document.  It's
21 hearsay and not a complete document.
22 BY MR. HOUCHIN:
23    Q.  Okay.  There's an e-mail from Jennifer Laughner
24 to yourself dated February 12, 2016 at 10:16 a.m.  Do
25 you see that?

**EXHIBIT 1 - PAGE 37**

Page 145

1    A.  Yes.
2    Q.  Okay.  Do you know who Jennifer Laughner is,
3  what her role was at Marriott?
4    A.  Jennifer was in rooms operations, and she was a
5  part of my team at the time of this note.
6    Q.  Okay.  Do you know if she's still with
7  Marriott?
8    A.  I do not know if she's still with Marriott.
9    Q.  Okay.  She says, "Last night Mercantile
10  provided a list of hotels not disclosing the resort fees
11  at the time of online booking."  And it says, "Out of
12  seven hotels one is not on the resort fee list."  And it
13  says, parentheses, "(Coronado)" and then "five showed
14  fees in the right place and one showed two steps in, the
15  Grand Cayman."
16    And then she says, "After investigating online
17  via marriott.com, I also found the following
18  inconsistencies."  She explained those inconsistencies.
19    A.  Yes.  So this is -- okay.  Yes.  So the
20  question.  Sorry.
21    Q.  Then if you go down to the next page, there's a
22  box that says, "Rate details," and under that she says,
23  "All resorts display the resort fees in summary of
24  charges under 'total taxes and fees' link.  My
25  suggestion is to list the resort fees under the nightly

Page 146

1  rate to make it readily visible for our guests."
2    Do you know if that suggestion was ever
3  implemented?
4    MR. LEARY:  Objection.
5    THE WITNESS:  No.  I mean, this was her
6  personal opinion about that, and to my knowledge, that
7  was never implemented.
8  BY MR. HOUCHIN:
9    Q.  Okay.  So did you disagree with her suggestion?
10    A.  If memory serves me correctly, she was a junior
11  member, new in her role, and provided a summary to me.
12  Out system had been in place for quite some time
13  successfully, and so I think she was making a
14  recommendation.  The answer is no, it was not
15  implemented.  I did not take her recommendation.
16    Q.  Okay.  So you didn't think that putting the
17  resort fees under the nightly rate would make it more
18  visible to the guests?
19    A.  No.  Because our system, you know, that we've
20  gone through several times already, has all of the
21  resort or destination fees called out multiple times
22  during the booking process.  And so, again, as a junior
23  person coming into a new role, I don't think she had the
24  same perspective.  And what I'm reading on this there
25  was only one hotel that was not reporting correctly

Page 147

1  after, you know, the seven were identified the way I'm
2  reading this.  And that was an international hotel.  So,
3  no, it was not implemented.
4    Q.  Okay.  Going back up to MAR190627 where it
5  says, "Out of seven hotels, one is not on your resort
6  fee list (Coronado)."
7    So is it your understanding that the Coronado
8  hotel was charging a resort fee without being approved?
9    A.  No, that's not the case.
10    MR. LEARY:  Hold on.  Objection to form,
11  misconstrues the document.
12    Go ahead.
13    THE WITNESS:  Yeah.  No, that is not true.  It
14  basically says one hotel is not on your resort fee list,
15  Coronado.  That means they were not charging a resort
16  fee at that time.
17  BY MR. HOUCHIN:
18    Q.  Okay.  I see.
19    All right.  Let's look at another exhibit.
20  This is 24.
21    (Exhibit 24 was marked for identification.)
22    MR. LEARY:  October 21st, 2013 string of
23  e-mails that begins at MAR158852.
24    MR. HOUCHIN:  Correct.
25    MR. LEARY:  There are multiple attachments

Page 148

1  referenced.  Are any of them attached to this exhibit?
2    MR. HOUCHIN:  No.
3    MR. LEARY:  Once again, I will object to the
4  extent these exhibits are used later on as an incomplete
5  document without reference to any of the attachments for
6  the witness to understand or put in context the
7  reference with the e-mails.  This is about the tenth
8  exhibit now that's taken place.
9    THE WITNESS:  Okay.  I'm ready.
10  BY MR. HOUCHIN:
11    Q.  Okay.  If you look to the last page MAR158853.
12  There's a discussion between gene Jean Paul Nel and
13  Andrew Houghton.  Do you know who those individuals are?
14    A.  Yeah.  I'm just trying to make sure I'm on the
15  right page.  Okay.  Yes.  Jean Paul Nel was at that time
16  the general manager of the Frenchmen's Reef Resort in
17  the U.S. Virgin Islands.  And Andrew Houghton was the
18  area vice president overseeing the Caribbean hotels,
19  worked for Marriott.  He was the area vice president.
20  He was Jean Paul's boss.
21    Q.  Okay.  And then the e-mail discusses increasing
22  the resort fee to $45 from the current $25.  Do you know
23  which hotel this was for?
24    A.  It came from Jean Paul Nel.  So that would have
25  been for the Frenchmen's Reef Resort as he was the

EXHIBIT 1 - PAGE 38

Page 149

1  general manager. I should say that I'm couching that
2  and making an assumption since it doesn't have the name
3  of the resort on this note, but I would say -- I'm
4  pretty comfortable saying it was from the Frenchmen's
5  Reef Resort in Virgin Islands, U.S. Virgin Islands.
6      Q. Okay. Then it looks like on October 20th, 2013
7  at 11:33 a.m. Andrew forwarded you this e-mail chain.
8  And he says, "Jeff, seems like a logical request.
9  Please let me know if you agree with me to increase
10 $10."
11      And then you wrote back with some certain
12 issues that you highlighted, and that was on October
13 21st at 8:56 a.m. Do you see that?
14     A. I do.
15     Q. And they say that the Diamond Rock Hotel would
16 have to move out of the red Zone by December 31st. And
17 you say that, "While GSS has improved, the hotel is
18 still in the Red Zone and will have to move to 69
19 percent to exit this status."
20     Can you explain why that hotel was in the Red
21 Zone?
22     MR. LEARY: Object to the form.
23     You can answer.
24     THE WITNESS: This was primarily due to
25 physical issues at the hotel. Being in the U.S. Virgin

Page 150

1  Islands right on the beach there was a lot of wear and
2  tear. It was a very popular resort, and I can't
3  remember at that point in 2013 if there had been a
4  hurricane. It may have impacted the physical part of
5  the property, but that was something unfortunately that
6  frequently happened to that resort. It sat on a high
7  peak, and so I'm guessing it was primarily physical
8  issues at the hotel.
9  BY MR. HOUCHIN:
10     Q. Okay. And the second bullet point down it
11 says, "The hotel increased their resort fee to $35 from
12 $30 without our authorization."
13     When did you become aware of that?
14     A. I don't know without more context to this memo.
15 I don't know when I became aware of that. Back in 2013.
16     Q. Okay. Did you do anything to make them change
17 their resort fee back to $30?
18     A. Unless there is some other documentation here,
19 I don't remember.
20     Q. Okay.
21     A. I don't know if I was stating something that
22 had happened and was reversed or if it stood. I don't
23 remember without documentation.
24     Q. Okay. Are you aware of any other instances
25 where hotels increased their resort fee without

Page 151

1  authorization?
2      A. No.
3      MR. LEARY: Object to the form, foundation.
4      THE WITNESS: The answer is no, I am not
5  familiar, and that goes back to my process that I had in
6  place where Shirley Coghill is the only one that could
7  enter in changes to any rate to any fee, destination or
8  resort fee. That's how we controlled that.
9  BY MR. HOUCHIN:
10     Q. So how is this hotel able to increase their
11 resort fee to $35 from $30 without authorization if
12 those controls were in place?
13     MR. LEARY: Objection. Form.
14     THE WITNESS: Speculation. However, at that
15 point because it was in the Caribbean, they may have
16 reported into the Caribbean reservation department until
17 that was changed where we put all resort fees under
18 myself and that's a guess.
19 BY MR. HOUCHIN:
20     Q. Okay. And do you know if this hotel was ever
21 eventually approved to charge a $35 resort fee?
22     A. Without seeing documents, I couldn't tell you
23 that.
24     Q. Okay. Let's look at another one. This is
25 Exhibit 25.

Page 152

1      (Exhibit 25 was marked for identification.)
2      MR. LEARY: September 14, 2013 e-mail.
3      MR. HOUCHIN: Correct.
4      MR. LEARY: Okay. MAR126192.
5      THE WITNESS: Okay.
6  BY MR. HOUCHIN:
7      Q. Okay. Can you go to page MAR126194.
8      A. Okay.
9      Q. And there's an e-mail on September 9, 2013 at
10 7:31 a.m., and it's from yourself to a Mark Sahler and
11 Brian Regula. Do you know who those individuals are?
12     A. Mark Sahler was the area director of operations
13 for Ritz-Carlton. He reported directly to me. And I
14 don't remember Brian specifically, but looking down at
15 the bottom of the document, it states that he's the
16 director of finance at the Ritz-Carlton Kapalua.
17     Q. Okay. You say, "Mark, looking back through my
18 records, it does not appear that Kapalua was ever
19 formally approved for a resort fee. Let me know if I'm
20 wrong about that."
21     So is it your understanding from this e-mail
22 that the Kapalua resort was charging a resort fee
23 without approval?
24     MR. LEARY: Objection to form.
25     THE WITNESS: I need to see a little bit more

**EXHIBIT 1 - PAGE 39**

Page 153

1 information on this, but if I put it in this document,
2 they were charging a resort fee. But I also point out
3 that the Ritz-Carlton Company came in -- that was
4 another acquisition by Marriott. And so without, again,
5 seeing backup to this, it's possible that the resort fee
6 was in place prior to Marriott taking it on. And this
7 document was now setting the standard that they needed
8 to meet in order to continue charging a resort fee.
9    Q.   Okay. So you say, "We have a very strict
10 approval process in place so that all hotels are
11 protected in terms of governmental regulations as well
12 as potential class action lawsuits."
13       Are you aware of any other class action
14 lawsuits involving the resort fees that were charged by
15 Marriott?
16       MR. LEARY: Objection to form.
17       You can answer.
18       THE WITNESS: The only one that vaguely comes
19 to mind was during my tenure, I think, was one in Hawaii
20 which was dismissed without merit or without cause or
21 whatever the legal term was. Other than that, I am not
22 aware of any other class action lawsuits regarding
23 Marriott resort fees.
24 BY MR. HOUCHIN:
25    Q.   Okay. And then if you go to the very first

Page 154

1 page of the document, 126192, there's another e-mail
2 from yourself to Brian and Mark dated September 14,
3 2013. And then you say, "As I was preparing for this
4 first submission, I just looked at the attachments and I
5 have two concerns."
6       And then there's a bullet point. It says, "It
7 shows the resort fee is already listed at $30. When was
8 it changed? It has not been approved by the committee
9 yet."
10       So based on this, is it your understanding that
11 they changed the resort fee amount to $30 without it
12 being approved?
13       MR. LEARY: Objection to form. Presenting the
14 witness again. It's an incomplete document. You're
15 asking him questions in reference to a referenced
16 attachment, and I don't see the attachment provided
17 here. So I object on completeness of the document. It
18 calls for speculation.
19       But if you answer, Jeff, please go ahead and do
20 so.
21       THE WITNESS: Yeah, without the backup, I can't
22 answer that. I don't feel comfortable answering.
23 BY MR. HOUCHIN:
24    Q.   You're not going to answer that question?
25    A.   Without the backup documents, I can't answer

Page 155

1 that question.
2       MR. HOUCHIN: Okay. Paul, we might have to
3 have a discussion off the record as to whether Marriott
4 actually produced the attachments to these e-mails. We
5 believe that many of them are actually missing from
6 Marriott's document productions.
7       MR. LEARY: Not only have we produced the
8 attachments it's my understanding, but I've been off
9 during the breaks looking at some of the other documents
10 that I asked you to put into context. And I have found
11 the e-mail that puts the document into context,
12 including e-mails of memos dating. For example, that
13 resort fee audit form that was never put into place,
14 there's e-mails leading up to it explaining that this
15 might be a test about this process. We may not put it
16 into place.
17       So I know that we've attached and provided it,
18 but we can certainly have a discussion again afterwards
19 if there's certain attachments that you don't believe
20 you have. But we endeavored to produce all related
21 attachments to documents.
22       MR. HOUCHIN: Okay. We can talk off the
23 record.
24       Now might be a good time for another break
25 actually.

Page 156

1       MR. LEARY: Okay.
2       MR. HOUCHIN: Take ten minutes.
3       (Recess.)
4       MR. HOUCHIN: We're back on the record. I'm
5 going to introduce another exhibit. This is Exhibit 26.
6       (Exhibit 26 was marked for identification.)
7 BY MR. HOUCHIN:
8    Q.   Take your time to review this and let me know
9 when you're ready.
10       MR. LEARY: Looks like a January 30, 2017
11 string of e-mails. The first Bates is MAR145935.
12       MR. HOUCHIN: That's correct.
13       THE WITNESS: Okay.
14 BY MR. HOUCHIN:
15    Q.   Okay. So this is generally the e-mail chain
16 discussed, and the resort fee is from the Legacy
17 Starwood brand hotels; is that correct?
18    A.   Yes.
19    Q.   Okay. And if you look at the first page of the
20 document, MAR145935 --
21    A.   Yes.
22    Q.   -- it's an e-mail from yourself to Risa Clark?
23    A.   Correct.
24    Q.   And who is Risa Clark?
25    A.   Risa worked in Marriott reservations. By the

**EXHIBIT 1 - PAGE 40**

Page 157

1 e-mail below her title is senior director, revenue
2 management operations for the U.S. and Canada.  So she
3 was an above property leader in our revenue management
4 operations department.
5     Q.  Okay.  And can you describe what the revenue
6 management operation department does.
7     A.  Basically they oversee the pricing.  They work
8 with hotels to establish pricing in the Marriott managed
9 properties.  And in addition to that, they would be the
10 backstop or the individual department that would enter
11 resort fees into the system.  So that's who Shirley --
12 the department that Shirley worked for and Bonnie.
13     Q.  Okay.  And you say, "Thanks, Risa, I appreciate
14 the follow-up.  When do you think that you will have an
15 indication if we can develop a process to stop hotels
16 from posting fees without approval?"
17        What did you mean by that?
18     MR. LEARY:  Objection.  Just foundation and
19 without taking it wholly out of context.
20        But you can answer, Jeff.
21     THE WITNESS:  Yeah, I mean, if you go down to
22 the beginning of the e-mail chain where it lays out --
23 reading through this it pretty much sets this up.  And
24 that is sometime in -- I forgot the exact date that we
25 took over Starwood hotels, but the original note on this

Page 158

1 was dated December of 2016.
2        And similarly to when we took over, for
3 example, Gaylord or other companies, I immediately got
4 involved when it came to resort or other fees.  And this
5 whole e-mail chain shows that we were moving quickly to
6 understand the resort fee process for the Legacy
7 Starwood hotels and then move aggressively to get them
8 into compliance with our policy since the FTC had
9 previously noted that we were in compliance with their
10 guidelines.
11        And so I was trying to verify that the Starwood
12 hotels were in compliance and what their process was,
13 did they have a formal process.  And this note basically
14 told senior leaders we need to move forward and make
15 sure that there's a formal process in place and make it
16 happen.
17 BY MR. HOUCHIN:
18     Q.  Okay.  So at that time were hotels posting fees
19 without approval?
20     A.  It is based on the note, trying to remember
21 back to then, but in my note it looks as if Starwood
22 prior to -- prior to Marriott taking over, may have been
23 able to do that.  That was at least my understanding at
24 that time.
25     Q.  Okay.  And do you know when Marriott acquired

Page 159

1 Starwood approximately?
2     A.  I don't remember the exact date, but the first
3 note here -- I assume it's in 2016.  I just don't
4 remember off the top of my head.  I'm sure we can find
5 out.
6     Q.  Okay.  And you mentioned the FTC, and you said
7 that the FTC noted Marriott was in compliance with their
8 guidelines.  Did the FTC specifically ever send Marriott
9 anything saying that they're in compliance with the
10 guidelines?
11     A.  Back there 2012, I believe it was, notes were
12 sent out to hotels.  Hotel chains and specific hotels
13 that were not in compliance with the FTC guidelines.
14 Gaylord hotels received a note.  However, that note went
15 to them before Marriott owned -- took over the brand,
16 and so we received a copy of that.  We did not receive a
17 notification saying we were not compliant, and so in
18 actuality we were compliant with the FTC guidelines in
19 2012.
20        When we took over, Starwood just like in this
21 note -- excuse me -- Gaylord.  Excuse me.  Just like in
22 this note with Starwood, we immediately went to work to
23 get them in compliance with Marriott policies and
24 procedures which were compliant with the FTC.
25        We presented that information back to the FTC,

Page 160

1 and we invited them to look at our systems and processes
2 because Starwood was now part of them.  So we wanted to
3 ensure them that Starwood was fully compliant.  So
4 that's -- when I refer to the FTC approval, we received
5 FTC approval.  We offered our systems for review to FTC,
6 and we were very pound as a company that we did not
7 receive any notification of noncompliance from the FTC
8 at that time.
9     Q.  Okay.  You say you never received a
10 notification of noncompliance, but did you ever receive
11 anything from the FTC saying that you were, in fact, in
12 compliance?
13     A.  To my knowledge, they don't send out notes
14 saying that you're compliant.  We asked them to come and
15 look at our systems after we -- Gaylord received that
16 notification, and the implication was, no, you're fine.
17 But we did not receive any notification.  You know, we
18 were probably at that point the largest hotel company
19 out there.
20     Q.  Okay.  Let's look at another one.  This is
21 Exhibit 27.
22        (Exhibit 27 was marked for identification.)
23     MR. LEARY:  Are we on 27 now, Mike?
24     MR. HOUCHIN:  Yeah, Exhibit 27.  It starts with
25 MAR140447.

EXHIBIT 1 - PAGE 41

Page 161

1    MR. LEARY:  Okay.  That would be beginning July
2  of '16.
3    MR. HOUCHIN:  That's right.
4    THE WITNESS:  Okay.
5  BY MR. HOUCHIN:
6    Q.  Okay.  So if you look at MAR 140449.
7    A.  Uh-huh.
8    Q.  It's an e-mail from Larry Dulski to yourself
9  dated July 7, 2016 at 12:50 p.m.
10   A.  Uh-huh.
11   Q.  And, first of all, do you know who Larry Dulski
12  is?
13   A.  Larry, if memory serves me correctly, was the
14  director of finance at the Gaylord Texas Hotel, I
15  believe.  Yeah, Grapevine, Texas.
16   Q.  Okay.  And he is attaching a document that's an
17  updated resort fee document with changes to include and
18  then among other things they're requesting an increase
19  pricing from $18 to $20?
20   A.  Yes.
21   Q.  Is it your understanding that that $18 to $20
22  is the resort fee charge?
23   A.  Yes.
24   Q.  Okay.  Then in the e-mail above that you
25  respond to Larry, and then you say here's some questions

Page 162

1  that need to be answered about the resort fee.  And then
2  if you look at the e-mail above that, it starts on
3  MAR140447, and it's an e-mail from you to Larry, July
4  7th at 1:56 p.m.?
5    A.  Yes.
6    Q.  And you said, "I just went to marriott.com and
7  the resort fee was already moved from $18 to $20.  How
8  is this done without approval of the Resort Fee
9  Committee, question mark, question mark, question mark,
10  question mark.  Please advise immediately as this is
11  clearly outside of the policy."
12       So is it your understanding that Texas hotel
13  they just moved their resort fee from $18 to $20 without
14  any approval from Marriott?
15       MR. LEARY:  Object to the form, context.
16       Go ahead and answer.
17       THE WITNESS:  Per this note here, yes, that is
18  correct.
19  BY MR. HOUCHIN:
20   Q.  Okay.  And then in the e-mail above that you
21  write to Bonnie and Shirley and you say, "Would you
22  please find out how this resort fee increase was
23  implemented without our approval.  This is the second
24  time that this has happened recently."
25       Do you recall the first time that happened?

Page 163

1  You said it was the second time.
2    A.  I'm just reading the note above it, you know,
3  where she refers to a hotel JAXAM.  I don't know what
4  hotel that is, but as you can see, Shirley admitted in
5  there within her department and apologized for it and
6  said it wasn't going to happen again.  Obviously an
7  anomaly took place, an error took place.  However, it
8  was caught and corrected.
9    Q.  Okay.  And for this Texas hotel do you know if
10  the resort fee was ever approved, eventually approved to
11  be moved from $18 to $20?
12   A.  Without further documents from this time, I
13  can't answer that.  In order to be certain, I would need
14  to see any additional memos or documents from that time.
15   Q.  Okay.  Take a look at Exhibit 28 here.
16       (Exhibit 28 was marked for identification.)
17       THE WITNESS:  Okay.
18  BY MR. HOUCHIN:
19   Q.  Okay.  So it starts at MAR86890.  And there's
20  an e-mail from Vicente Salaverri to several people,
21  including yourself who is cc'd on the e-mail.  Do you
22  see that?
23   A.  Yes.
24   Q.  Okay.
25       MR. LEARY:  Mike, there's no reference --

Page 164

1  there's no attachments referenced in this exhibit;
2  right?  Meaning there are attachments identified but
3  they're not part of this exhibit?
4    MR. HOUCHIN:  That's correct.
5    MR. LEARY:  Okay.  Object to the form,
6  foundation.
7    Go ahead and answer whatever the question is.
8    THE WITNESS:  What was the question?
9    MR. LEARY:  I don't think there was one.
10  BY MR. HOUCHIN:
11   Q.  Okay.  So Vicente says, "I will be sending out
12  very shortly an Outlook invite for a conference call on
13  Wednesday at 5 p.m. Eastern Time to discuss the resort
14  fee.  As you know, this is a very sensitive topic that
15  is a tracking a lot of negative press.  The customers
16  hate it.  We need to fully understand the implications
17  and requirements of a resort fee.  We must be completely
18  aligned on the understanding and execution of a resort
19  fee."
20       Do you know if that conference call ever
21  happened?
22   A.  Without any documentation to show me that, I
23  don't know.  I can't answer that.
24   Q.  Okay.  And do you know what Vicente's role at
25  Marriott was?

EXHIBIT 1 - PAGE 42

Page 165

1    A.  Yes.  Vicente was vice president of operations.
2   He covered our hotels in the Caribbean and Latin
3   America, and he reported to myself as well as to the --
4   I think it was called the president of Marriott hotels
5   Caribbean and Latin America.  It was a dual reporting
6   relationship.
7    Q.  Okay.  And then when he said "this is a very
8   sensitive top topic," do you know what he meant by that?
9    A.  No.  I would be speculating.  I think it sounds
10   like his personal opinion.
11    Q.  Okay.  And then he says, "The customers hate
12   it."  Do you know what that's based on?
13       MR. LEARY:  Objection to form, calls for
14   speculation.
15       THE WITNESS:  No.  I don't know what Vince was
16   thinking then.
17   BY MR. HOUCHIN:
18    Q.  Okay.  Do you know if Marriott ever received
19   complaints from consumers about resort fees?
20    A.  Marriott received millions of customer comments
21   per year, and over the years that I was in, I received
22   some customer complaints about resort fees.
23    Q.  Okay.  So you personally have reviewed customer
24   complaints about resort fees?
25    A.  Yeah.  Whenever I go to any hotel -- and I

Page 166

1   visited a lot of hotels -- I would review guests'
2   satisfactions.  That was a primary part of my job.  I
3   would look at verbatims, information, have conversations
4   with the hotel team about their guest satisfaction
5   scores.
6    Q.  Okay.  And do those consumer complaints ever
7   influence Marriott to change its policies with respect
8   to resort fees?
9    A.  When I looked at customer comments, there was a
10   couple ways we looked at it.  Number one, was by hotel
11   to determine if a hotel was executing not only resort
12   fees but all other service attributes and expectations,
13   and additionally I would look at overall trends.  I
14   would look at the big picture for the entire company.
15   Not the entire company.  Excuse me.  My continent.  The
16   Americas.  I would look at the comments for those hotels
17   and look for trends.
18       And if there were any type of negative trends
19   or positive trends, I would normally react.  And, again,
20   I would say based on the fact that we made no changes to
21   Marriott resort or destination fees while some people
22   may have had issues with them, it was a very small
23   minority of our customers.
24    Q.  Okay.  And did Marriott ever do any market
25   research as to consumer perceptions about resort fees?

Page 167

1    A.  If it was done, it was not conducted by me.
2    Q.  Okay.  And do you know what trends the
3   complaints were about?
4       MR. LEARY:  Will you say that again, Mike.  I
5   missed it.
6       MR. HOUCHIN:  I'm sorry.  That was a bad
7   question.  Let me rephrase that.
8    Q.  You said there were certain trends about
9   consumer complaints.  Can you describe those trends?
10    A.  That was a generic overall comment that in my
11   job that I was in for nine, whatever, nine years, eight,
12   nine years, you know, when I was above a property, one
13   of the things I would do -- I had literally hundreds of
14   hotels that were under my area of control.  Some of
15   those hotels were big hotels that I would look at
16   specifically.  But then I would look at overall trends
17   for all the hotels, and it could be something relating
18   to housekeeping.  You know, a process or a procedure.
19   Maybe we weren't doing as good a job in sanitation or
20   cleaning.  It might have been food and beverage.  You
21   know, those were the trends I'm talking about.
22       So what I did as the overall operations leader
23   I would look for trends and then determine what the
24   issues were and come up with solutions for them.  So
25   when I say I looked for trends, those would also include

Page 168

1   any types of trends relating to resort fees.  And I can
2   say that in the time that I was there, it did not come
3   up as a major overall issue or trend.  And it is
4   difficult for me to think of any specific property where
5   it came up as a major customer complaint as well.
6       One other comment, Mike.  You know, the other
7   thing that we look at too is the overall guest
8   satisfaction trends.  And with one exception and that
9   was due to a strike, the overall guest satisfaction
10   scores for Marriott and almost all of our resorts every
11   single year increased.  And that was back to your
12   question before about the minimum standard it was 51,
13   and it eventually went up to 56.  We constantly kept
14   increasing our guest satisfaction scores standards
15   because of guests' expectations of improving performance
16   overall.
17    Q.  Okay.  Look at another exhibit.  This one is
18   Exhibit 29.
19       (Exhibit 29 was marked for identification.)
20       THE WITNESS:  I'm not seeing it.  I'm only
21   seeing like three sentences on this.  Is that the one?
22   BY MR. HOUCHIN:
23    Q.  That's right.  This e-mail is produced by
24   Marriott.  It's kind of a bit confusing because it says
25   it's from Jeff Holdaway, but it doesn't say who it was

EXHIBIT 1 - PAGE 43

Page 169

1  sent to.
2       MR. LEARY: Hold on, Mike. I haven't pulled it
3  up yet, but I'll see if I can recognize it. 29. Okay.
4  And this is one-page, Marriott 156567. Okay. It's one
5  document.
6       MR. HOUCHIN: Correct.
7       MR. LEARY: Okay.
8  BY MR. HOUCHIN:
9    Q. So like I was saying, this e-mail is a bit
10 confusing because it says it's from Jeff Holdaway, and
11 it says it was sent on March 30, 2017, but it doesn't
12 list who it was sent to. It appears it might have been
13 a draft e-mail. But my question for you is: Have you
14 seen this before?
15      MR. LEARY: Let me just say I don't -- you're
16 right. I don't know who it was sent to. Jeff Holdaway
17 was -- my understanding was in the legal department.
18 This could be a document that was produced if it's an
19 internal communication attorney-client privilege
20 document, but since I can't tell who it was sent to,
21 I'll just put the objection on, Mike. But just make a
22 note that Jeff Holdaway is in legal. And I don't know
23 if these e-mails were before this or after this as well.
24 So if you know, fine. If you don't, I just put that
25 objection on the record.

Page 170

1  BY MR. HOUCHIN:
2    Q. Okay. And that's fine. So my question for
3  Mr. Wolff is: Have you ever seen this before?
4    A. I don't think so, especially in this form with
5  two sentences and one of them being incomplete. I don't
6  think so.
7    Q. Okay. And Mr. Holdaway says, "Not sure how
8  hard you want to push the value proposition but there's
9  some creative accounting going on."
10     Do you have an understanding of what he might
11 have meant by creative accounting going on?
12      MR. LEARY: Objection. Calls for speculation.
13      THE WITNESS: No, I do not.
14 BY MR. HOUCHIN:
15   Q. Okay. Are you aware of any instances of
16 creative accounting with respect to the value ratio?
17 For example, the 5 to 1 value ratio we talked about
18 earlier.
19   A. I am not because, again, I was the person that
20 oversaw the approval -- the review and approval of all
21 value propositions for all hotels. Looking at the date
22 of this and the name of the hotel, this was probably one
23 of the hotels, Starwood hotels, that we were working to
24 get into compliance with the Marriott policy 5 to 1.
25     So I'm guessing that was the case, but even if

Page 171

1  there was supposed creative accounting, I would never
2  have let that go any further, you know, to the
3  committee. I mean, the whole thing on the 5 to 1 was
4  something that, you know, was -- it was -- you never
5  broke that proposition.
6    Q. Okay. And you mentioned earlier that when it
7  comes to determining the 5 to 1 value ratio the hotels
8  themselves put a value on the amenities and then you
9  review that; correct?
10   A. That's correct.
11   Q. Okay. Let's look at Exhibit 30 here.
12     (Exhibit 30 was marked for identification.)
13      MR. LEARY: Exhibit 30 and it's MAR092988; is
14 that right?
15      MR. HOUCHIN: That's correct.
16      THE WITNESS: Okay. I've reviewed it.
17 BY MR. HOUCHIN:
18   Q. Okay. It appears to me that this is a resort
19 fee approval form that was submitted by the failed
20 Marriott; is that correct?
21   A. Yes.
22   Q. Okay. And then it talks about the proposed
23 resort fee component and the 5 to 1 value ratio.
24   A. Yes.
25   Q. And you see where it says "Amenity water

Page 172

1  bottles"?
2    A. Yes, uh-huh.
3    Q. And then it's checked included. And then it
4  says, "Cost a la carte $20"?
5    A. Okay.
6    Q. Do you know if this hotel was approved to
7  charge a resort fee using $20 for two bottles of water
8  for the 5 to 1 value ratio?
9    A. What I would say is, first of all, the document
10 again is incomplete because there would have to be --
11 either this would have been sent to me by the general
12 manager Kellie Newman saying we propose that this is our
13 resort fee and these are the proposed amenities.
14     Once I receive that, I would go through there,
15 and, again, I would ask if we could pull further
16 documents. However, it is extremely, extremely unlikely
17 that I would have allowed $20 valuation to be applied
18 for the resort fee. You know and that's why I'm saying
19 I need to know if this came to me initially saying here
20 is our proposal or if by chance in the unlikely event I
21 sent it to the committee saying here is the resort fee
22 and, by the way, you know, we approve it.
23     That couldn't have happened because I'm looking
24 at this, and there's all sorts of things in here that
25 are not allowed. We don't allow discounts. You know,

EXHIBIT 1 - PAGE 44

Page 173

1   like -- so, in other words, the reason we didn't allow
2   discounts to have a value is because that would force
3   the customer to have to buy something in order to get
4   the value. So those were not allowed. Shuttle service,
5   spa, locker room, access ski valet. I'm looking at the
6   rest of them. Those probably -- if the valuation was
7   proper, they would probably have been approved. The
8   welcome gift would not have been approved. Out standard
9   on that is it's a one-time gift. It's divided by the
10  average length of stay. So I'm guessing if this hotel
11  was three days, four days. So that value would have
12  been, you know, four or five dollars only.
13      The discount -- bottled wine discount would not
14  have been allowed because they have to buy it. The spa
15  discount would not have been allowed. So I would be
16  very surprised if this was approved. This probably was
17  the initial document that was sent to me.
18      MR. LEARY: Just I would like to make an
19  objection on reference. It's unclear to me whether it's
20  bottles of water or actual water bottles. For example,
21  those that skiers might use to take up on the mountain.
22  Just make a reference it was referred to as water
23  bottles.
24      THE WITNESS: Good point. Could have been.
25  ///

Page 174

1   BY MR. HOUCHIN:
2       Q. Okay. Fair enough. Just give me one moment,
3   here.
4       The next one will be Exhibit 31.
5       (Exhibit 31 was marked for identification.)
6       MR. LEARY: This is October 2011 memo -- or
7   string of e-mails.
8       MR. HOUCHIN: Correct.
9       MR. LEARY: MAR121992.
10  BY MR. HOUCHIN:
11      Q. Take your time to review this.
12      A. Okay.
13      Q. Okay. So this e-mail chain talks about a
14  resort fee approval request for the Ritz-Carlton Dove
15  Mountain; correct?
16      A. Correct.
17      Q. Do you know where that hotel is located?
18      A. That is -- I believe it's Tucson.
19      Q. Tucson. Okay.
20      If you go to the first page there, there's an
21  e-mail chain, but there's an e-mail on the first page.
22  It's from yourself to several people, including Jeff
23  Holdaway, and it was sent on October 7, 2011 at 6:42
24  p.m.
25      A. Just a second. Let me make sure I'm on the

Page 175

1   page. What was the date? I'm sorry. October --
2       Q. Yeah, it's October 7, 2011.
3       A. Okay. "Hello, Gentlemen, I wanted to double
4   check." That one?
5       Q. Yeah. It says, "Hello, Gentlemen, I wanted to
6   double check to make sure were you okay with this resort
7   fee approval request. Dave has approved."
8       A. Yes.
9       Q. So my first question is: Why was this e-mail
10  sent to these specific people, Jeff Holdaway, Ken
11  Rehmann and Jim Fisher?
12      A. And Dave Grissen were most likely -- at that
13  time that was 2011. I am guessing that that is the
14  Resort Fee Committee at that time. Those four
15  individuals and myself.
16      Q. Okay. And we discussed earlier that Jeff
17  Holdaway is in the legal department. Ken Rehmann do you
18  know what his job responsibilities were back when this
19  e-mail was dated in 2011?
20      A. I believe he -- I think it was finance. I
21  think. He eventually went into some different roles
22  which is why I'm struggling to remember. They were
23  non-finance, but I think it was finance.
24      Q. Okay. And then Jim Fisher?
25      A. OFS means Owner and Franchise Services. So he

Page 176

1   was a person that interacted with our ownership groups
2   and our franchise groups on a high level.
3       Q. Okay. And then in that e-mail you say, "Dave
4   has approved." Who is Dave? Who are you referring to
5   there?
6       A. Dave Grissen. At that time I believe he was
7   the group president for North America hotels or some
8   other high -- he was -- I don't remember the exact
9   position, but he was the leader of our Marriott
10  organization at that point. Probably the president.
11      Q. Okay. And then Jim Fisher responded to your
12  e-mail, and he says, "I approve but would still like to
13  know where we are going relative to the overall concept
14  which just a few years ago we fought hard to get out of.
15  Now we're jumping back into."
16      Do you know what he meant by that?
17      MR. LEARY: Calls for speculation but he can
18  answer.
19      THE WITNESS: I mean, exactly that. It's
20  speculation. You would have to ask Jim.
21  BY MR. HOUCHIN:
22      Q. Okay. Is it true, though, that a few years
23  prior to this e-mail that Marriott fought hard to get
24  out of charging resort fees?
25      A. I wasn't aware of that.

**EXHIBIT 1 - PAGE 45**

Page 177

1    Q.   Okay.  You're not aware of any instances where
2  Marriott sought to stop charging resort fees?
3    A.   No, not during my tenure at corporate when I
4  was responsible, and, you know, before that I don't
5  think I would have been privy to that information.  But,
6  no, I wasn't aware of any.
7    Q.   Okay.  And it says, "It was all about nickel
8  and diming the guests and being unable to handle the
9  disclosure requirement."
10       Do you have any understanding what he means by
11  being unable to handle the disclosure requirements?
12       MR. LEARY:  Objection to form.
13       You can answer if you know.
14       THE WITNESS:  No idea.
15  BY MR. HOUCHIN:
16    Q.   Okay.  Are you aware of any instances where
17  Marriott's been unable to handle the disclosure
18  requirements for resort fees?
19    A.   Not during my tenure.
20    Q.   Do you know if anyone ever responded to this
21  e-mail?
22    A.   Unless you can provide me with additional
23  documents, I don't know.  I mean, that was over ten
24  years ago.
25    Q.   Okay.  Just give me one second here.  The next

Page 178

1  one will be Exhibit 32.
2       (Exhibit 32 was marked for identification.)
3       MR. LEARY:  This is starting -- called Elite
4  Arrival Executive dated -- MAR099809.
5       MR. HOUCHIN:  That's right.
6       MR. LEARY:  Is this a 21-page document?
7       MR. HOUCHIN:  That's right.
8       MR. LEARY:  Okay.
9       THE WITNESS:  Okay.
10  BY MR. HOUCHIN:
11    Q.   Have you seen this document before?
12    A.   This one -- it seems somewhat familiar.
13  Bridget was our area vice president for the Southern
14  California hotels.  It's 2016 but I understand it.
15    Q.   Okay.  And you said Bridget.  So on the first
16  page of this document it says, "AVP Results, Bridge
17  Billinsky."  Is that referring to Bridget Billinsky?
18    A.   Correct.  Misspelling there.
19    Q.   Do you know what AVP results mean?
20    A.   Yes.  So the Elite Arrival process when --
21  these were the mystery shops, and part of the mystery
22  shops was shopping resort fee compliance.  So what we
23  did when we say Elite Arrival process, Elite refers to
24  Marriott rewards/Marriott Bonvoy.  Elites are very best
25  customers.

Page 179

1       So we had shoppers pose as Elite members and
2  visit all the hotels and provide results back.  This
3  goes again to determining trends, and these results were
4  specifically for Bridget.  It looks like she must have
5  put this together or her assistant.
6    Q.   Okay.  And so it appears this document
7  discusses data that was provided by the mystery shopper
8  Mercantile Systems as you stated; correct?
9    A.   Correct.
10    Q.   Okay.  So if you go down to page MAR99824.
11       MR. LEARY:  824?
12       MR. HOUCHIN:  Correct.
13       MR. LEARY:  Okay.
14       THE WITNESS:  Okay.
15  BY MR. HOUCHIN:
16    Q.   Is that says, "Resort fees 2015" and then below
17  that it says, "67 percent of the time the resort fee was
18  disclosed" --
19       MR. LEARY:  Hold on.  Read it in full.  Come
20  on.
21       MR. HOUCHIN:  Okay.  "67 percent," parentheses
22  "(two-thirds) of the time the resort fee was disclosed
23  at the time of booking the online recollection."
24       Do you see that?
25    A.   Yes.

Page 180

1       MR. LEARY:  I think you're taking liberties
2  with two-thirds.  It could be 2 out of 3.
3       MR. HOUCHIN:  I mean, 67 percent is two-thirds,
4  right, Paul?
5       MR. LEARY:  Well, what's the next one down?
6  What's a hundred percent?  Out of what?  2 out of 2
7  would be what?  100 percent.  2 out of 3 would be 60
8  percent; right?
9       MR. HOUCHIN:  That's right.  I mean, I'm asking
10  the questions here, so I would ask that you --
11       MR. LEARY:  Well, I think you've misinterpreted
12  the information.
13  BY MR. HOUCHIN:
14    Q.   Okay.  So let's go back to "67 percent,"
15  parentheses, "(2/3)" in parentheses "the time the resort
16  fee was disclosed at the time of booking the online
17  reservation?"
18       Do you see that?
19    A.   Yeah.  What page again was it again. -24?
20    Q.   Yes, -24.
21    A.   I see it.  Yes, uh-huh.
22    Q.   Okay.  Do you have an understanding of what
23  those results mean?
24    A.   It's a little bit difficult right here because
25  I was -- when Paul and you were talking, I was trying to

**EXHIBIT 1 - PAGE 46**

Page 181

1  look at the list of hotels to determine which hotels,
2  you know. Because I do think it's unusual because on
3  the first one, you know, it says -- it's two hotels, two
4  hotels, and one hotel. So it's almost as if, you know,
5  some were missed. I don't quite understand it, but
6  nonetheless it says there's "67 percent (2/3) of the
7  time the resort fee was disclosed at the time of booking
8  the online reservation."
9      So, yes, I'm seeing that. I'm looking at the
10 other items in here. These were questions that we asked
11 the mystery shopper to look at when they went to a hotel
12 as a mystery shopper.
13     Q. Okay. So do you know what the 2/3 means?
14     A. So my guess on this is at this point -- and,
15 again, this was back in 2015, these results. But as
16 pointed out previously, Mercantile used local -- at
17 times used local shoppers. And when we received
18 comments from them that it wasn't disclosed online, it
19 was typically because they didn't read it correctly. So
20 I would need to see the specific shops that this refers
21 to in order to comment on this further. It seems highly
22 unlikely to me. So, again, I would want to see the
23 three -- the two or three results -- resorts -- excuse
24 me -- two or three resorts where the shoppers took place
25 in order to answer that question.

Page 182

1      Q. Okay. So you mentioned that oftentimes the
2  mystery shoppers would not see the disclosures, is
3  that --
4      A. Sometimes. Not often but sometimes they
5  wouldn't see it, and when we went and dug into that --
6  because that was one of the things that would come to me
7  right way, is we would go back. They would actually
8  have copies -- most of the time have copies of
9  reservations because that was part of the process that
10 we wanted back up. So if that, in fact, happened, they
11 would need to come to me. That would come to me, and I
12 would investigate. So to me this is unusual.
13     Q. Okay. Did you take any action after seeing
14 these results saying the 67 percent the time the
15 resort fee was disclosed?
16     A. Well it's either only two or three hotels,
17 first of all, but if this had come to me, I suspect I
18 would have taken action. But because I don't have any
19 further information on this, I can't tell you about --
20 answer this in a specific sense. Because I don't have
21 the information shown that it came to me or didn't come
22 to me.
23     Q. Okay. Do you think that 67 percent disclosure
24 rate is adequate?
25     MR. LEARY: Objection to form. Misstates the

Page 183

1  document.
2      Go head and answer.
3      THE WITNESS: It's either two or three hotels.
4  My expectation is that disclosure takes place at all
5  times as per the documents. I would need to see the
6  backup to see the context of this to comment further.
7  BY MR. HOUCHIN:
8      Q. Okay, and I think earlier you testified that
9  it's Marriott's policy to show that 90 percent or more
10 of guests charged the resort fee received notice at the
11 time of reservation; is that correct? That was in the
12 resort fee policies that we looked at earlier.
13     A. Notification at the time of reservation. I
14 believe they're referring to notification at the time of
15 check-in. Because the expectation is that if you're
16 making a reservation on marriott.com or any other
17 channel, you're going to see that. So I think that's --
18 I think that's what you're referring to. I may be
19 wrong, but I don't want to misstate that.
20     Q. Okay. Well, on this document it says, "67
21 percent of the time, two out of three, the resort fee
22 was disclosed at the time of booking the online
23 reservation." So this would be at the time of booking,
24 not the time of check-in; correct?
25     A. Yes. Maybe I'm misunderstanding your question

Page 184

1  because you said, you know, that my standard or the
2  company's standard was 90 percent. The 90 percent
3  refers to a standard that's in the resort fee --
4  standard refers to at the point of check-in. The 90
5  percent, I believe.
6      When it comes to online booking, our standard
7  is that if there's a resort fee it is disclosed at the
8  time of booking in all situations.
9      Q. Okay. Do you have Exhibit 3 that we looked at
10 earlier?
11     A. Let's see here.
12     Q. Can you just go back to that for a minute.
13     A. Okay. I've pulled it up.
14     Q. Okay. Can you go to the page --
15     MR. LEARY: Hold on. I'm trying to find it. I
16 got it. Thank you.
17 BY MR. HOUCHIN:
18     Q. Okay. So can you go to the page MAR23.
19     A. Okay.
20     Q. And it starts with (a) at the top of the page
21 of that document.
22     A. "(a) guests making reservations." That's the
23 one you're talking about?
24     Q. Yeah. Can you go down to letter (d) below that
25 where it says, "Evidence of effective communications."

**EXHIBIT 1 - PAGE 47**

Page 185

1    A.  Okay.  Show 90 percent or more of guests
2  charged the resort fee received notice at the time of
3  reservation and 100 percent of received at check-in.
4  Okay.
5    Q.  Okay.  So does that refresh your memory that
6  it's 90 percent at the time of reservation?
7    A.  Uh-huh, yes.
8    Q.  Okay.  So if you go back to Exhibit 32, it
9  looks like in this case the resort fee was only
10  disclosed 67 percent of the time.
11      MR. LEARY:  Objection to form, misstates the
12  document.
13  BY MR. HOUCHIN:
14    Q.  At the time of the online reservation.
15    A.  So 90 percent of the time -- these are
16  either two or three hotels, and so you're taking in my
17  opinion out of context the percentage.  It says 67
18  percent of the two or three hotels, wherever that is,
19  didn't do it.  If it was two hotels and one did it, it
20  would be 50 percent.
21      The point on the 90 percent -- back then that
22  was 2014, that document.  The point at that point was
23  that if you had a thousand customers calling, you know,
24  the hotel to make reservations, 90 percent.  You know,
25  this is talking about one person, and, you know, then

Page 186

1  it's being applied to two hotels or three hotels.  So
2  it's not an accurate representation, and, again, if I
3  don't know which hotel it is or what the circumstances
4  were, I really can't comment on it.  You know, that's
5  certainly an anomaly, and I would want to investigate it
6  further before I comment that this was a big issue.
7    Q.  Okay.  On Exhibit 32 can you scroll to the next
8  page where it says, "Key Findings of Core Questions."
9    A.  Uh-huh.
10    Q.  And then it has several items here.  The first
11  one it says, "At the time of booking the online
12  reservation was the resort fee disclosed, inclusive of
13  the price point and included items?"
14      And then it has three columns.  One goes to
15  100, the other goes to 100, and the other goes to 67.
16  Do you know what those columns represent?
17    A.  It's hard to see, but right below it it refers
18  to the years.  So it's showing progression.
19    Q.  Okay.  Do you know how many hotels were sampled
20  during those years?
21    A.  If you go down to -- I don't know what slide.
22  I guess it's slide 826 and 827.  There's 2, 4, 6, 8 --
23  excuse me.  10, 12, 14, 16, 18 -- 19 hotels for the year
24  2015.  Beyond that I don't know how many hotels.  I
25  assume it was less, but I don't know for sure.  It could

Page 187

1  have been more.  Oh, it says right above.  Yeah.  Yeah,
2  it says right below the number of hotels.
3    Q.  Okay.  Going back to that -- those columns,
4  those three columns we looked at, you said that those
5  represent the years.  It looks like the years are at the
6  bottom there.  It says 2012, 2013, 2014 and 2015.
7    A.  Yes.
8    Q.  And they're different colors.  But there's only
9  -- there's four different years but only three different
10  colors on the columns.
11    A.  Because --
12      MR. LEARY:  Objection.
13      THE WITNESS:  If you read the date below, it
14  says zero in 2012 because the resort fees questions were
15  not added to 2013.  So it's 2014 -- '13, '14 and '15.
16      THE REPORTER:  What was your objection,
17  Mr. Leary?
18      MR. LEARY:  My objection was just that -- he
19  explained why there's three versus four, so that's fine.
20  BY MR. HOUCHIN:
21    Q.  Okay.  For the column that says 67, that
22  appears to represent the year 2015.  Is that your
23  understanding?
24      MR. LEARY:  Objection on form.
25      THE WITNESS:  Yeah.  I'm looking -- trying to

Page 188

1  see, you know, below the corresponding color.  If you're
2  saying that's the case, then I guess that is.  It would
3  seem to be because the 67 applies to the number on the
4  previous page that he mentions.
5    Q.  Okay.  So does that column represent that 67
6  percent of the hotels were disclosed in the fee and that
7  would be based on 19 hotels in 2015?
8      MR. LEARY:  Objection to form, calls for
9  speculation.
10      To the extent you know exactly what this data
11  means.
12      THE WITNESS:  I do not know what the data
13  means.  All I can tell you is that on this it says
14  resort fees, and there was only two or three hotels
15  charging a resort fee, not 19 or 20.
16  BY MR. HOUCHIN:
17    Q.  Okay.  And what's your basis for saying there's
18  only two or three hotels charging the resort fee, not
19  the 19 or 20?
20    A.  Because of the previous documents.  And, again,
21  I just went down -- and if I don't have information,
22  it's very difficult for me to comment on that.  I'm
23  looking at the hotels below, and I'm trying to see which
24  ones through memory, which my memory is not that good,
25  were charging a resort fee out of group below.  I mean,

**EXHIBIT 1 - PAGE 48**

Page 189

1  I can go through and eliminate some that I know weren't
2  charging.  You know, I'm just looking at it now, and I'm
3  not going to speculate.  But I can tell you that it was
4  in the two or three category of hotels charging resort
5  fees.  The rest of them were not resorts.  Most of these
6  they were not resorts.
7      Q.  Okay.  That's all the questions I have for that
8  document.  Let's look at another one.  This is going to
9  be Exhibit 33.
10         (Exhibit 33 was marked for identification.)
11         MR. LEARY:  Hang on one second.  MAR153692.
12         MR. HOUCHIN:  That's right.
13         THE WITNESS:  Can you tell me what the date is
14  on this and who it's from?
15  BY MR. HOUCHIN:
16      Q.  I don't see that information in the document.
17  My question to you is:  Have you seen this before?
18      A.  Let me look at it again, but my initial
19  response is no, but let me just review it to make sure.
20  That's why I was asking for the date, if it was during
21  my time or after my time.
22         No, I have not seen this.  I'm looking at the,
23  you know, hotels.  There's a lot of non-Marriott hotels,
24  and there is Expedia.  There's OTAs in here.  So, no, I
25  am not familiar with this, and it could have been after

Page 190

1  my time.  And if it was during my time, I haven't seen
2  it, no.
3      Q.  Okay.  Fair enough.
4         This document appears to show different options
5  for displaying resort fees.  The first one says, "Future
6  display:  Total price inclusive if a resort fees, and
7  other mandatory fees, is prominently displayed on the
8  first page."
9         And then if you scroll down, it gives an
10  example of where the resort fee is disclosed under the
11  price of the room.  Do you see that?
12      A.  The ones that says, "Option one proposed
13  solution"?
14      Q.  Yeah.
15      A.  Yeah, I see that, uh-huh.
16      Q.  Okay.  During your time at Marriott, did
17  Marriott ever consider displaying resort fees similar to
18  this?
19      A.  I don't know.  I never saw this document, and I
20  can't recall being involved in OTA conversations other
21  than maybe on the periphery they sought my advice or
22  input.  No.  No, I have not.
23      Q.  Okay.  Yeah.  And my understanding you haven't
24  seen this document before.  I'm just asking if during
25  your time with Marriott ever considered displaying

Page 191

1  resort fees below the advertised room rate?
2      A.  Not that I'm aware of, no.  I don't know.
3      Q.  Okay.  Fair enough.
4         All right.  The next one will be Exhibit 34.
5      A.  I see it.
6         (Exhibit 34 was marked for identification.)
7  BY MR. HOUCHIN:
8      Q.  Okay.  I'll give you a minute to take a look at
9  this, but earlier we were discussing letters that were
10  sent to Gaylord from the FTC, and this appears to be one
11  of those letters 'is that correct?
12      A.  Let me read it.  Yeah, this is a letter to one
13  of the Gaylord hotels.
14      Q.  Okay.  And we discussed this letter earlier,
15  and you mentioned that they have -- the FTC found an
16  issue with the Gaylord hotel's Website.  But this was
17  before Marriott acquired the brand; is that correct?
18      A.  That is correct.
19      Q.  Okay.  But you see on this letter on the last
20  page there's a cc and it cc's Arne Sorenson who is the
21  president and CEO of Marriott?
22      A.  Yes.
23      Q.  Okay.  Do you recall when you first saw this
24  letter?
25      A.  The specific date I couldn't tell you.

Page 192

1  However, because I was in charge of resort fee
2  implementation for the company, my understanding is
3  Mr. Sorenson was copied on this letter because of the
4  time it was sent.  Marriott had acquired Gaylord hotels.
5  So it was copied to Arne to advise him, and, again, this
6  information came down, you know, to members of the
7  resort fee, myself included.
8         And, you know, we were asked to comment, but
9  bottom line is we did not get a letter from the FTC --
10  Marriott International did not get a letter to any
11  hotels which again specifically meant we were compliant
12  with the FTC guidelines.  We were very proud of that
13  fact.
14         MR. HOUCHIN:  Okay.  My next exhibit is going
15  to be 35.
16         (Exhibit 35 was marked for identification.)
17         MR. LEARY:  This is 35?
18         MR. HOUCHIN:  Correct.  And it's MAR14.
19         MR. LEARY:  14, okay.
20         THE WITNESS:  Okay.
21  BY MR. HOUCHIN:
22      Q.  This appears to be a letter in response to the
23  first letter that I showed you; is that correct?
24      A.  It appears to be, yes, uh-huh.  What -- well,
25  it says Gaylord Opryland and Gaylord Palms.  The display

**EXHIBIT 1 - PAGE 49**

Page 193

1   you showed me was for Opryland only.
2       Q.   Okay.  So there was a second letter; right?
3   Just so the record is clear, let me introduce the second
4   letter.  The second letter was to the Gaylord Palms; is
5   that correct?
6       A.   Did you put it up?
7       Q.   Sure.  This will be Exhibit 36.
8           (Exhibit 36 was marked for identification.)
9           THE WITNESS:  Is this the same letter?
10  BY MR. HOUCHIN:
11      Q.   So Exhibit 36 was addressed to the Gaylord
12  Palms, and then if you look at Exhibit 34, it's
13  addressed to the Gaylord Opryland.
14          MR. LEARY:  One is to the Opryland and one is
15  to Palms, Jeff.
16          THE WITNESS:  Okay.  So there is two letters.
17  Okay.
18  BY MR. HOUCHIN:
19      Q.   Okay.  And then going back to Exhibit 35, if
20  you read the subject line, it appears to be a response
21  from Marriott to both of the letters.
22      A.   Okay.
23      Q.   It says, "Federal Trade Commission letters to
24  Gaylord Opryland and Gaylord Palms regarding resort
25  fees"?

Page 194

1       A.   Yes.
2           MR. LEARY:  Can you hold on for a minute.  I
3   deleted my 35.  Just bear with me, Mike, for one second.
4           MR. HOUCHIN:  No problem.
5           MR. LEARY:  Okay.  Thank you.
6           THE WITNESS:  All right.
7   BY MR. HOUCHIN:
8       Q.   Okay.  And then I just want to direct your
9   attention to the last paragraph that says October 1st,
10  2012.  It says that's when Marriott acquired the Gaylord
11  brand; is that your understanding?
12      A.   Yes.
13      Q.   Okay.  "Since October 1st" -- it says, "Since
14  the October 1st acquisition, a consumer seeking to make
15  a room reservation at Gaylordhotels.com is now directed
16  to Marriott.com?
17      A.   Yes.
18      Q.   And that's your understanding as well?
19      A.   Yes.
20      Q.   Okay.  Aside from these letters, are you aware
21  of any other communications that Marriott has had with
22  the FTC regarding resort fees?
23      A.   Other than this letter -- these letters, I am
24  not -- I was not privy to any additional FTC letters.
25  They didn't come to me, and they probably wouldn't have

Page 195

1   come me.  So I am not aware of other letters.
2       Q.   Okay.  Let's take a look at another one here.
3   This will be Exhibit 37.
4           (Exhibit 37 was marked for identification.)
5           MR. LEARY:  This is MAR102604.  Is there a date
6   on this, Mike?
7           MR. HOUCHIN:  There's no date.
8           THE WITNESS:  Do you know who it's from?
9   BY MR. HOUCHIN:
10      Q.   I don't know.
11          My question to you is:  If you've ever seen
12  this, or do you know what this document is?
13      A.   I've never seen this document.
14      Q.   Okay.  Fair enough.  If you've never seen it,
15  then I have no questions on it.
16      A.   Okay.
17      Q.   Let's look at Exhibit 38 which is uploading
18  now.
19          (Exhibit 38 was marked for identification.)
20          MR. LEARY:  38.  Hold on.  I'm having problems
21  with mine.  Okay.  38.  It's 2016 resort fees/
22  destination amenity fees, MAR152245.
23          MR. HOUCHIN:  That's right.
24      Q.   Let me know when you're ready, Mr. Wolff.
25      A.   Okay.  Yeah.  I'm still looking at the slides

Page 196

1   here.  Okay.  I'm ready.
2       Q.   Okay.  Have you seen this document before?
3       A.   I have.  It's been a while but, yes.
4       Q.   Okay.  And can you describe what this document
5   is?
6       A.   This was one of the webinars that we as a
7   company would do on a regular basis one, two times a
8   year, maybe more, you know, with smaller groups to
9   discuss any aspects around resort or destination amenity
10  fees for leaders, leaders or above property leaders for
11  franchisees as well.  Or this one actually is probably
12  only for Marriott.  I don't know if franchise is
13  included.
14      Q.   Okay.  Do you know who typically would
15  participate in these webinars?
16      A.   Again I would have to see the cover memo on
17  this, but looking at this one, I'm just trying to see if
18  this -- I know for sure that it was managed Marriott
19  hotels.  What I don't know off the top of my head if
20  franchise hotels were included on this or not.  I don't
21  know.
22      Q.   Okay.  And it looks like this is dated October
23  21st, 2016; correct?
24      A.   Yes.
25      Q.   Okay.  If you go down to MAR152274.

**EXHIBIT 1 - PAGE 50**

Page 197

1    A.  Okay.
2         MR. LEARY:  174?
3         THE WITNESS:  274; right?
4         MR. HOUCHIN:  Correct.
5         THE WITNESS:  274.
6         MR. LEARY:  Okay.  Thanks.
7    BY MR. HOUCHIN:
8    Q.  Okay.  And it says, "Renewed interest in resort
9    fees by FTC and state AFS."  Do you see that?
10   A.  Yes.
11   Q.  Okay.  And then it says, "FTC Chairwoman
12   Ramirez questioning adequacy of Drip Pricing Guidelines.
13   Seeks total price display disclosure resort -- seeks
14   total price display disclosure for resort fees."
15        Do you know what that total price display
16   refers to?
17   A.  Based on --
18        MR. LEARY:  Objection to form.
19        You can answer if you know.
20        THE WITNESS:  I mean, just based on looking at
21   the rest of this document, I believe there's an attempt
22   to explain it.  If you ask me to explain it without
23   looking at this document, I couldn't.
24   BY MR. HOUCHIN:
25   Q.  Okay.  So your understanding is based on this

Page 198

1    document?
2    A.  Yes.
3    Q.  And your understanding the total price display
4    would be the price of the room in addition to the resort
5    fee?
6    A.  I believe that is --
7         MR. LEARY:  Objection to form.
8         THE WITNESS:  Sorry.  I assume that --
9         MR. LEARY:  Don't assume.  If you know what the
10   chairwoman meant, fine.  If you don't, don't assume.
11        MR. HOUCHIN:  Paul, don't interrupt witness
12   when he's answering a question.
13        MR. LEARY:  Well, when he starts with "I
14   assume," Mike, I will because you never gave the
15   instruction at the beginning of this deposition to not
16   guess, so I have to do that.
17        THE WITNESS:  I don't know what the chairwoman
18   was talking about so I'll defer.
19   BY MR. HOUCHIN:
20   Q.  Okay.  And then it says, "40 plus State
21   Attorney Generals launched investigations into whether
22   resort fees violate consumer protection laws.  Marriott
23   received subpoenas from D.C. and PA."  I believe
24   referring to Pennsylvania.  Do you see that?
25        Do you see that?

Page 199

1    A.  I do.
2    Q.  Have you ever seen the subpoena from the --
3    from the D.C. A.G.'s?
4    A.  I don't remember if I saw it.  I was certainly
5    aware of D.C. specifically because I testified or gave a
6    deposition.  Excuse me.
7    Q.  With respect to the D.C. subpoena, did you
8    personally search for documents to produce in response
9    to that subpoena?
10   A.  No.  I mean, my -- let me just say this.  I did
11   not search.  My computer was provided.  My backup
12   documents were provided to the legal department, but I
13   did not search.
14   Q.  Okay.  How about the subpoena from
15   Pennsylvania?
16   A.  That is one that I have not been involved in at
17   all.  I have not been deposed.  I don't know what
18   documents have been sent to them.  I have not been
19   involved in Pennsylvania.
20   Q.  Okay.  And then it says, "The goal is to
21   resolve both investigations simultaneously with a single
22   solution."
23        And then if you scroll to the next page, it's
24   notes for the slides.
25   A.  Uh-huh, yes.

Page 200

1    Q.  And then if you scroll to the page after that,
2    it says, "Marriott's advocacy to protect resort fees."
3    Do you see that?
4    A.  Yeah, I was just reading.  You referred to the
5    notes.  Should I read the notes?
6    Q.  No, that's all right.  You can go to the next
7    page.  I'm sorry.
8    A.  Okay.  I see that.  The slide, yes.
9    Q.  Okay, and then it says, "TPD" which I believe
10   was referring to Total Price Disclosure as we talked
11   about earlier.  Is that your understanding?
12   A.  That's the -- yeah.  Yes.  Per the previous --
13   Q.  Okay.  It says, "TPD may have a negative
14   competitive impact on resort fees hotels due to the
15   potential impact on sort order and competitive impact
16   from neighboring hotels that do not charge resort fees."
17        Do you know what is meant by that statement?
18        MR. LEARY:  Objection.  Form.
19        THE WITNESS:  Yeah, that was presented by
20   Harvey.  So he probably be a better person to ask that
21   specifically.
22   BY MR. HOUCHIN:
23   Q.  Okay.  Then the next says, "Working with AHLA."
24   Do you know what AHLA stands for?
25   A.  American Hotel Lodging Association.

**EXHIBIT 1 - PAGE 51**

Page 201

1    Q.   Okay.  And it says, "We are promoting an
2  'Enhanced Page One Display' proposal to the FTC and AGs
3  that would preserve the room rate as the operative rate
4  in search, with an enhanced breakout of the resort fees
5  on the first page displayed to the consumer."
6         During your time at Marriott, were you ever
7  involved in those discussions regarding the Enhanced
8  Page One Display?
9    A.   At some point I was brought in from a technical
10  perspective.  I was not a decision maker on that.  I was
11  not a designated representative on any of those
12  committees, but I was asked, you know, my thoughts on
13  that.
14    Q.   Okay.  And you say you were brought in from a
15  technical perspective.  What did that entail?
16    A.   Well, as an expert on the person who oversaw
17  resort fees, but, again, my connection with this was
18  extremely limited because this is working with
19  regulatory, with Attorney Generals, with the FTC, and
20  with the technical part.  The technology part of our
21  company.  So my interaction on this was somewhat
22  limited.
23    Q.   Okay.  And did you provide any recommendations
24  to Marriott with respect to the Enhanced Page One
25  Display?

Page 202

1    A.   Not that I remember.
2    Q.   Do you know if Marriott ever decided to
3  implement an Enhanced Page One Display?
4    A.   I do not know if a decision was made.
5    Q.   Okay.  The next paragraph down it says, "Our
6  primary goals are to, one, be able to retain resort fee
7  revenue; two, achieve resolution on both the FTC and AG
8  investigations; three, require OTAs and their affiliates
9  to be bound by the same rules; four, not have resort
10  fees subject to OTA commissions and occupancy taxes;
11  and, five, gain sufficient time to do the required IT
12  development."
13         Do you know why it was a primary goal for
14  Marriott to be able to retain resort fee revenue?
15    A.   Well, as I mentioned earlier, we felt resort
16  fees were a convenient way to bundle services and
17  amenities for our customers, and we felt we enhanced
18  their experience.  And if we gave away those revenues,
19  we wouldn't be able to provide those services and
20  amenities to our customers.  So I would imagine that
21  would be the primary reason we would want to keep resort
22  fee revenues.
23    Q.   And do you know why Marriott -- one of the
24  primary goals was to not have resort fees subject to OTA
25  commissions and occupancy taxes?

Page 203

1    A.   Because the revenue that was received from
2  resort fees was used to support non-room amenities.  In
3  other words, as we gave examples before, might be yoga
4  classes.  It might be, you know, ski amenities, things
5  that were not related to the room rental.  These were
6  specific amenities and services that were being offered
7  to our customers to enhance their stay, and that is what
8  mine my belief -- my belief why they took that position.
9    Q.   Okay.  If you scroll down to 152278.
10    A.   Okay.
11    Q.   There's "Enhanced page one display - options
12  being considered" it says at the top?
13    A.   Yes.
14    Q.   Okay.  And the first example it says, "XYZ
15  hotel resort 250 per night" and then below that in
16  parentheses it says, "(Plus $25 mandatory hotel room
17  charge)?
18    A.   Yes.
19    Q.   And then it provides another example.  It says,
20  "XYZ hotel resort 250 per night" parentheses "($25
21  mandatory hotel room charge)" and then below that in
22  bold it says, "Total room charge 275 per night"?
23    A.   Yes.
24    Q.   And then below that it says, "Strong preference
25  for exhibit" -- I'm sorry:  Strong preference for

Page 204

1  example one"?
2    A.   Okay.
3    Q.   Do you know why Marriott had a strong
4  preference for going with example one as compared to
5  example two?
6    A.   Because if we were up against hotels that
7  weren't showing their resort fees, it would hurt our
8  source, I imagine.
9    Q.   Okay.  That brings me back to that acronym
10  earlier, the AHLA that the said that's the American
11  Hotel and Lodging Association?
12    A.   Yes.  Correct.
13    Q.   And is Marriott a member of that association?
14    A.   Yes.
15    Q.   Okay.
16    A.   I mean, it was when I was in the company,
17  correct.
18    Q.   Okay.  Do you know if other major hotel brands
19  are also members of that association?  For example,
20  Hilton hotels?
21    A.   I don't have a list of the companies, but it's
22  the overarching organization for hotels, so I assume but
23  I don't know.
24    Q.   Okay.  Do you know -- going back to 152278
25  where it says, "Strong preference for example one."

EXHIBIT 1 - PAGE 52

Page 205

1   A.  Yes.
2   Q.  Do you know if that refers to -- that's
3  Marriott's strong preference or that's the strong
4  preference for the lodging association or both?
5   A.  I don't know.
6   Q.  Then it says -- it gives examples of what this
7  page one display would entail including "Display of
8  mandatory hotel room charge on page one on first
9  exposure of the room rate to the consumer."
10   A.  Okay.
11   Q.  When we looked at the Web flows earlier, it's
12  your understanding, correct, that the resort fee was not
13  on the first page of exposure to the room rate to the
14  consumer; is that correct?
15   MR. LEARY:  Objection.  Asked and answered.
16   You can answer again.
17   THE WITNESS:  Yeah, I mean the first page is --
18  the hotel hasn't been picked, so I disagree with that.
19  BY MR. HOUCHIN:
20   Q.  Okay.  Why do you disagree with that?  I'm
21  sorry.
22   A.  Because on the first page the customer is
23  looking at the rate and there's a multitude of hotels to
24  choose from, and they're doing their sort to find the
25  lowest rate.  They haven't selected a hotel yet.

Page 206

1   Q.  Okay.  Now might be a good time for a break.
2  I'll have a few more questions, but I hope to not keep
3  you a whole lot longer.
4   MR. LEARY:  Do you have an estimate, Mike, on
5  how long you have?
6   MR. HOUCHIN:  Maybe an hour.
7   MR. LEARY:  You've gone over the limit then by
8  then.  So is there any way you can tighten that up?
9   MR. HOUCHIN:  I can do my best.  I don't think
10  I've gone over the limit.  I mean it's seven hours on
11  the record.  We've taken a half hour lunch break and
12  other breaks.
13   MR. LEARY:  You're saying it's a total of seven
14  hours we've been on the record?
15   MR. HOUCHIN:  No, I'm saying we haven't been on
16  the record for seven hours.
17   MR. LEARY:  But we're over seven hours right
18  now.
19   MR. HOUCHIN:  Not on the record.
20   MR. LEARY:  How long have we been on the
21  record?
22   MR. HOUCHIN:  I don't know.  I would have to
23  ask the court reporter if she can provide that.
24   MR. LEARY:  We're at 7:20 right now right;
25  right?  So -- I mean total time.

Page 207

1   MR. HOUCHIN:  Total time, right.
2   MR. LEARY:  Total time.  So we're not going to
3  go another hour.  I can just tell you that.  I have to
4  clean up a couple of quick questions.  I'm going to be
5  ten minutes.  So I would ask you just to think about
6  that as you go through.  We're taking an extraordinary
7  amount of time here, but see if you can maybe truncate
8  it.  We have been taking very short breaks, and we took
9  a 20-minute lunch break -- or half hour lunch break.  So
10  we have not eaten up lot of time off the clock.
11   MR. HOUCHIN:  Okay.  I'll do my best to be
12  quick.  I don't think I'll have a whole lot more.
13   MR. LEARY:  Okay.  Let's take ten.
14   (Recess.)
15   MR. HOUCHIN:  We'll go back on the record.
16   The next exhibit I'm going to introduce is
17  Exhibit 39.  It starts MAR90432.
18   MR. LEARY:  90432.  Okay.
19   (Exhibit 39 was marked for identification.)
20   MR. LEARY:  Okay.  "Subject:  Resort fee 2014,
21  mid-year update."
22   MR. HOUCHIN:  Yeah.
23   Q.  And, Mr. Wolff, let me know when you're ready.
24   A.  Okay.  Yeah, I'm ready.
25   Q.  Okay.  This e-mail appears to be sent from you.

Page 208

1  It doesn't have a from line, but if you look at the
2  bottom, it's your signature block.
3   A.  Correct.
4   Q.  Okay.  Is this an e-mail that you actually
5  sent, if you can remember?
6   A.  Yes.
7   Q.  Okay.  At the top of the e-mail on the first
8  page it says, "As you know, one of our primary areas of
9  focus to drive ancillary revenue and profit is through
10  the thoughtful execution of resort fees."
11   What did you mean by that?
12   A.  Ancillary revenue is something that is in
13  operations later I was focused in on, and basically,
14  again, "As you know, one of the primary areas of focus
15  to drive ancillary revenue and profits is through the
16  thoughtful execution of resort fees."
17   So are you asking why I sent the note?
18   Q.  Yeah.  I'm asking what you meant by that
19  statement.
20   A.  Same thing that I've said throughout the day is
21  that when I drive ancillary revenue, it allows our
22  hotels to provide better service.  You know, allows our
23  properties to keep people employed at the front desk and
24  housekeepers around the swimming pool and all other
25  areas.  So that was one of the reasons and also

**EXHIBIT 1 - PAGE 53**

Page 209

1 ancillary revenue should help hotels become more
2 profitable.
3     Q.  Couldn't Marriott accomplish the same goals by
4 just including the resort fee amount in the quoted room
5 rate?
6         MR. LEARY:  Objection to form.
7         THE WITNESS:  No.
8 BY MR. HOUCHIN:
9     Q.  Why not?
10     A.  For the reasons we talked about before.  We
11 needed that revenue, you know, in order to provide guest
12 services and provide excellent service to customers, you
13 know, and provide, you know, kind of a package that
14 benefited customers.
15     Q.  Okay.  So on this document it says, "Resort fee
16 revenue review," and then there's the heading that says,
17 "revenue (managed resorts only.)"  And, for example, in
18 2012 it says, "Resort fee revenue equals ██████."
19     A.  Uh-huh.
20     Q.  Is that amount the total resort fee revenue
21 that was received by managed hotels or just the amount
22 of resort fee revenue that Marriott International, Inc.
23 gets from the resort fees?
24     A.  No.  This was the revenue that was received by
25 the hotels.  Marriott probably received -- I mean, I

Page 210

1 don't know.  I would have to look at all the contracts,
2 but I'm guessing at the most 10 to 15 percent of that
3 which is part of our management fee.  But the ██████
4 dollars goes to the hotel, is used to pay for the
5 services and amenities that are part of the resort fee.
6 And it says at the hotel except the management fee that
7 Marriott gets for running the properties.
8     Q.  Okay.  So the amount of revenue that Marriott
9 International receives that's based on specific
10 contracts with each hotels?
11     A.  That's correct.
12     Q.  And is that the same for the managed hotels?
13 They have contracts with Marriott International?
14     A.  Can you repeat the question.  I'm sorry.
15     Q.  Sure.  So there's franchise hotels and managed
16 hotels; correct?
17     A.  Yes.
18     Q.  Okay.  So does Marriott International have
19 contracts with the managed hotels as well?
20     A.  Yes.  Marriott has contracts, I believe, for
21 every hotel we manage.
22     Q.  Okay.  And you said that the typical amount of
23 the resort fee revenue that Marriott International
24 receives is about 10 to 15 percent depending on the
25 specific contract?

Page 211

1     A.  Yeah, that's probably on average.  There's
2 situations where Marriott gets nothing at a hotel
3 because, for example, they may be having a bad year.
4 And our payment may be based on profitability.  And if
5 the hotel is not making profit, Marriott would not get
6 it.  So it could be anywhere from zero, 1, 2 percent to
7 10 or 15 percent.  You know, Marriott does not get that
8 revenue.  It's not profit for Marriott.
9     Q.  Okay.  And then if you look at the heading for
10 2013 resort fee revenue, it says ██████ --
11     A.  Yes.
12     Q.  -- and then there's --
13     A.  Yes.
14     Q.  -- there's a parentheses and it says, "Plus 24
15 percent."  Do you know what that plus 24 percent means?
16     A.  I would have to do the math on this, but it
17 seems like it would be 24 percent over 2012.  I mean, I
18 can do the math and check it, but that's more than
19 likely what it means.
20     Q.  Okay.  That answers that.
21         Let me introduce one more exhibit or another
22 exhibit here.  This will be Exhibit 40.
23         (Exhibit 40 was marked for identification.)
24         MR. LEARY:  Starts with MAR43722.
25         THE WITNESS:  Do you know who this came from?

Page 212

1         MR. LEARY:  Do you know if there's a cover
2 e-mail or anything on this, Mike?  Mike?
3         He might be frozen.  Oh, no.  Mike?  Can you
4 hear us, Mike?
5         You can hear me, Jeff?
6         THE WITNESS:  I can hear you, yes.
7         MR. LEARY:  Diane, can you hear me?
8         THE REPORTER:  Yes I can.
9         MR. LEARY:  Mike, can you hear us?
10         MS. COETZEE:  I can hear you too.
11         MR. LEARY:  I can't hear Mike.
12         MR. LITTERAL:  Is it possible to go off the
13 record while this is resolved?  Diane?
14         THE REPORTER:  Yes.  Is that okay, Counsel,
15 with you?
16         MR. LEARY:  Yeah.  I mean --
17         MR. HOUCHIN:  Can you guys hear me?  I'm sorry.
18 My phone was off.
19         MR. LEARY:  We're good.
20         The question asked on the document, Mike, was
21 for Exhibit 40.  Do you have a -- can you put this in
22 context in terms of who authored it and the date of it?
23 Was there any e-mail or anything that came with this was
24 the question.
25         MR. HOUCHIN:  No, there was no e-mails or

**EXHIBIT 1 - PAGE 54**

Page 213

1 anything that came with this.  This was a document that
2 Marriott produced in discovery.  I was hoping the
3 witness would be able to shed some light on this
4 document.
5        THE WITNESS:  Yeah, I mean, I'm trying to
6 remember if I've seen this before, and I can't remember.
7 You know, I'm looking at the numbers on the first page,
8 you know, about how much Marriott makes, and it's
9 actually less than I thought.  You know, when I told you
10 on the previous question.  I said 10, 15 percent.  If
11 this document came from a Marriott financial person, it
12 would seem to indicate, you know, that Marriott's profit
13 is 3 or 4 percent on resort fees.  Maybe a little bit
14 more.  I just did a couple.  But anyway it appears --
15 BY MR. HOUCHIN:
16     Q.  Okay.
17     A.  -- that's what it is.
18     Q.  Yeah.  So the title of the PDF says that it's
19 management resort and destination fee revenues.  It's my
20 assumption that this revenue includes only managed
21 hotels instead of franchise hotels.  Would that explain
22 why you think it's lower?
23        MR. LEARY:  Objection to the form.
24        But you can answer.  Foundation.
25        THE WITNESS:  Yeah, I'm looking at the

Page 214

1 attachment now or the document that shows the hotels
2 that are included.  And those do appear to be managed
3 hotels, but even if we took the franchise hotels, the
4 fees -- and, again, I'm not a franchise expert, but I
5 don't think it would be anywhere close to what I said
6 before.  You know, there's contracts on the fees,
7 franchise fees, and they're probably in the neighborhood
8 of what you se here percentagewise so...
9 BY MR. HOUCHIN:
10     Q.  Okay.  It looks like from 2015 through 2019
11 Marriott's resort fee revenue increased every year
12 during that time frame.
13        MR. LEARY:  Let me just clarify.  Are you
14 saying Marriott's revenue or resort fee revenue?
15        MR. HOUCHIN:  The resort fee revenue.
16        MR. LEARY:  Okay.
17 BY MR. HOUCHIN:
18     Q.  It looks like the revenue increased every year
19 from 2015 until 2019.  Do you know why the revenue
20 consistently increased during those years?
21     A.  Yeah, I believe so.  One of them is because we
22 acquired Gaylord which were four major hotels that had
23 resort fees already in place, and then we acquired
24 Starwood.  Again, a bunch of their hotels had resort
25 fees in place already, and so that went through the

Page 215

1 Marriott system, and then, you know, we had some other
2 hotels come online, some new resorts that we opened up
3 and other properties that were authorized.  So that
4 would seem to make sense, but I think the biggest part
5 of it is through Gaylord and Starwood.
6     Q.  Okay.  It looks like in 2020 the resort fee
7 revenue decreased.  I would assume that's likely because
8 of the pandemic.
9     A.  I didn't belong to the company at that time, so
10 I can't answer that.
11     Q.  Okay.  And you said looking at the list that's
12 attached to this these all appear to be managed hotels?
13     A.  Let me just look again, but, again, this is --
14 this is 2015.  Yes, these appear to be managed hotels.
15        MR. HOUCHIN:  Okay.  The next one I'm going to
16 introduce is a spreadsheet.  It's Exhibit 41.
17        (Exhibit 41 was marked for identification.)
18 BY MR. HOUCHIN:
19     Q.  And I don't believe the Bates number is on the
20 document because it's a spreadsheet but it's MAR43737 is
21 the Bates label for the native document.
22        MR. LEARY:  Bear with me one second.  I haven't
23 pulled it up yet.  And you're saying the Bates was what?
24        MR. HOUCHIN:  MAR43737.
25        MR. LEARY:  43737?

Page 216

1        MR. HOUCHIN:  Right.
2        MR. LEARY:  Okay.
3        THE WITNESS:  What is this document entitled?
4 Sorry.
5 BY MR. HOUCHIN:
6     Q.  Spreadsheet -- the title of the spreadsheet is
7 U.S. and Canada franchise list of resort fee charging
8 hotels underscore 2021 dot 6.
9     A.  Okay.
10     Q.  And have you seen this spreadsheet before?
11     A.  No.  It was done after I left the company.  It
12 says, "Audit year 2019."  I left at the end of 2019.  I
13 think they referenced 2020, and I was retired at that
14 point, so I've never seen this.
15     Q.  Okay.  It appears all of these hotels are
16 franchise hotels listed in the spreadsheet; correct?
17     A.  I'm randomly looking at some of them that I'm
18 familiar with, and they appear to be franchise, but I
19 can't state 100 percent since I wasn't with the company
20 at this time.
21     Q.  Okay.  If you look at the resort column, it
22 lists resort revenue for some of the hotels and not
23 others.  Do you know if Marriott is able to determine
24 the revenue for -- the resort fee revenue for franchise
25 hotels, for all of them?

**EXHIBIT 1 - PAGE 55**

Page 217

1    MR. LEARY: Objection. Speculation.
2    You can answer.
3    THE WITNESS: So your question is does Marriott
4 track resort fee revenues for franchise hotels?
5 BY MR. HOUCHIN:
6    Q. Correct.
7    A. We did when I was in position. I don't know
8 about this year since I wasn't with the company.
9    Q. Okay. Does Marriott perform audits on the
10 resort fee revenue for franchise hotels?
11    A. I don't know.
12    MR. LEARY: Objection. Calls for speculation.
13 BY MR. HOUCHIN:
14    Q. Okay. Let's see here. I have one last
15 exhibit. This one is one of the documents that contains
16 the personally identifiable information, and there's a
17 special court order in place for that. I have the
18 document on an encrypted drive, but I'm just hesitant to
19 share it through Zoom given the Court's order. I was
20 just going to do a screen share for this one and just
21 ask the witness a few questions, and then I think I'll
22 be done with that, if that's all right.
23    MR. LEARY: 42? Is this going to be
24 Exhibit 42?
25    MR. HOUCHIN: Yeah, 42. And the Bates number

Page 218

1 is MAR173540.
2    (Exhibit 42 was marked for identification.)
3    MR. HOUCHIN: I'm going to share my screen
4 then, and then we can kind of go through this real
5 quick. Can you guys see my screen okay? There's a
6 spreadsheet on here.
7    MR. LEARY: Yes.
8    THE WITNESS: Yes. I see a bunch of numbers.
9    MR. LEARY: Hold on. I'm getting out of the
10 other one you just had. Can you -- okay. All right.
11 Yeah, I have it.
12 BY MR. HOUCHIN:
13    Q. Okay. This is an example of one spreadsheet
14 that Marriott produced. I believe there's close to 1700
15 total in Marriott's document production, but these
16 appear to show specific customer transactions, the dates
17 they stayed at the hotels, their addresses, e-mail
18 addresses, and what they were charged for. Have you
19 ever seen this type of data before?
20    A. No.
21    Q. Okay. Do you know who would have compiled this
22 spreadsheet?
23    MR. LEARY: Objection. Calls for speculation.
24    THE WITNESS: No.
25 ///

Page 219

1 BY MR. HOUCHIN:
2    Q. Okay. One last question. There's a column
3 here called "PMS ACCT CNTCH." Do you have any idea what
4 that stands for?
5    A. No.
6    Q. Okay. And below that it says "Internet." Do
7 you know what that stands for or what that means?
8    A. I mean, I know what Internet is, but I have no
9 idea what that column is.
10    Q. Okay. All right. It appears to show to me
11 anyway -- and I don't know if you have a different
12 understanding -- but this column appears to represent
13 how the customer booked the room. For example, it says
14 "Internet' and then it says "self." Then there's
15 examples where it says Expedia. Do you have the same
16 understanding, if you know?
17    MR. LEARY: Objection to form. He's never seen
18 this document. He doesn't know who created or how it
19 was created. It would be total speculation.
20    THE WITNESS: I don't know.
21    MR. HOUCHIN: Okay. Fair enough.
22 I have no further questions.
23    MR. LEARY: Give me like five minutes just to
24 look at my notes to see if I need to cover anything, and
25 then we'll come back. Does that work?

Page 220

1    MR. HOUCHIN: That's fine.
2    MR. LEARY: Okay.
3    (Recess.)
4
5         -EXAMINATION-
6 BY MR. LEARY:
7    Q. I just have a couple of follow-ups, Mr. Wolff.
8 I'm just going to really jump around based upon some
9 notes I took in trying to get some clarification on
10 answers. I'm going to start towards the very end of the
11 testimony where you just were asked some questions about
12 tracking resort fees, both to managed and franchise
13 properties. Do you remember those questions?
14    A. Yes.
15    Q. Okay. And as to franchise properties while you
16 were there at Marriott, did you have an ability to track
17 the overall revenue that franchise properties received?
18    A. Marriott International tracked overall revenues
19 that -- from franchisees because that's how Marriott
20 received the fees, the franchise fees.
21    Q. Okay. But in your department or to your
22 knowledge at Marriott, did anyone track the resort fee
23 revenue that Marriott received -- strike that.
24    The resort fee revenue that the franchisees
25 received from resort fees?

**EXHIBIT 1 - PAGE 56**

Page 221

1    A.  I did not track that.
2    Q.  Okay.  You were able to identify and track,
3  though, the resort fee revenue that Marriott received
4  from managed properties; correct?
5    A.  That is correct.
6    Q.  And I believe your testimony was you think it
7  was somewhere -- it could be as low as 3 percent based
8  on the documents you saw but perhaps higher?
9    A.  Yeah.  I believe based on some typical
10  contracts that it could be in the neighborhood of 10
11  percent, 15 percent.  But one of the documents that Mike
12  put up indicated that fees paid to Marriott was
13  substantially less than I quoted during -- on the
14  question.
15    Q.  And to put that in context, there were under
16  your -- while you were there approximately 6500 to 7000
17  Marriott hotels?
18    A.  That sounds right, yes.
19    Q.  And owned, operated and managed?
20    A.  Owned, operated, managed franchise.  Total
21  hotels; correct.
22    Q.  Total hotels.
23        And of that there was approximately 200 hotels
24  that were resort fee destination?
25    A.  Resort or destination fee hotels, correct.

Page 222

1    Q.  Okay.  A total of 200 out of 7000?
2    A.  Correct.
3    Q.  Okay.  And you just made the differentiation
4  regarding destination fee versus resort fee, and earlier
5  in your testimony you indicated that destination fees
6  arose from requests being made by owners of hotels; is
7  that correct?
8    A.  Correct.  Yes.
9    Q.  Would the same hold true for resort fees, did
10  that come about by request by owners of the hotels?
11    A.  Yes.
12    Q.  Okay.  And I would like to quickly show you --
13  if you could bring up on your screen and I'll try to do
14  the same.  Give me one second.  Exhibit 36 which was a
15  November 26, 2012 letter from the FTC directed to the
16  Gaylord Palms.  Do you have that in front of you?
17    A.  I do.
18    Q.  Okay.  I would like to draw your attention to
19  the second page and first -- and in the second to the
20  last paragraph where it says, "We reviewed your
21  Website."  Do you see that paragraph?
22    A.  I only got one page on 36.
23    Q.  It should be a two-page document.  If you
24  scroll down.
25    A.  It's a -- what I have here is December 14, 2012

Page 223

1  letter to a Mrs. Engle is that the one?
2    Q.  No.
3    A.  Oh.  I'm sorry.  I see it now.  My mistake.
4  Excuse me.  Because there was an attachment.  There's
5  two on there.  I didn't see the toggle at the top.
6  Sorry.
7    Q.  It's the FTC warning letter directed to the
8  Gaylord Palms.  Do you have that?
9    A.  Yes.  And it's addressed to "Dear
10  Mr. Gallineau"?
11    Q.  Kemp Gallineau, yes.
12    A.  Yes.  Okay.  I have that in front of me.
13    Q.  Could you go to the second page.
14    A.  Yes.
15    Q.  Okay.  And on that page there do you see in the
16  second to the last paragraph where it says, "We reviewed
17  your Website at www.gaylordhotels.com.  Do you see that?
18    A.  I do.
19    Q.  When you -- in 2012 were you primarily
20  responsible for the oversight of resort fees at
21  Marriott?
22    A.  I was.
23    Q.  In connection with this letter that was copied
24  on Mr. Sorenson -- you explained why you understood he
25  was copied -- but would you have been the person that

Page 224

1  would have answered or been directed to answer any
2  questions regarding this letter that was directed to
3  Gaylord hotels?
4    A.  I would have been involved in the response.
5    Q.  Have you ever seen any letter from the FTC that
6  in any way indicates they reviewed Gaylord hotels as
7  part of an FTC warning letter?
8    A.  Gaylord hotels?
9    Q.  Excuse me.  Marriott.com.
10    A.  Can you repeat that, please.
11    Q.  Yeah.
12        Have you ever reviewed any letters from the FTC
13  directed to Marriott of which the FTC indicated they
14  reviewed marriott.com and found instances where resort
15  fees were not being included in quotes to consumers?
16    A.  No.
17    Q.  Now, in this letter at the top of page 2 there,
18  there's a sentence that indicates "We believe."  It's
19  the second sentence.  Do you see that?
20    A.  Yes.
21    Q.  And it says, "We believe that online hotel
22  reservation sites should include in the quoted total
23  price any unavoidable and mandatory fees, such as resort
24  fees, that consumers will be charged to stay at the
25  hotel."  Did I read that correctly?

**EXHIBIT 1 - PAGE 57**

1    A.  Yes.
2    Q.  And did you have an understanding from looking
3  at the FTC letter when it came out that that's what
4  their expectation was regarding where resort fees should
5  be disclosed and specifically in the total price?
6    A.  Yes.
7    Q.  Prior to the FTC letter of 2012, did Marriott,
8  in fact, include in the quoted total price any
9  unavoidable and mandatory fees such as resort fees?
10    A.  Yes.
11    Q.  Did Marriott continue its practice after the
12  2012 letter to include on its Website in the quoted
13  total price any unavoidable and mandatory fees such as
14  resort fees that consumers would be charged?
15    A.  Yes.
16    Q.  At any time has Marriott ever been advised by
17  the Marriott that it is in violation of this
18  requirement?  And let me be more clear.  That Marriott
19  is not including within the total price unavoidable and
20  mandatory fees?
21    A.  Can you repeat that.  I think you said --
22    Q.  Sure.  Has the FTC ever informed Marriott that,
23  in fact, it is not including in the quoted total price
24  any unavoidable and mandatory fees such as resort fees?
25    A.  No, the FTC has not notified us.

1    Q.  And on the first page of the Web flow wages --
2  I'm not going to go through them again -- but you recall
3  you were shown several Web flow pages; correct?
4    A.  Yes.
5    Q.  On the first page when multiple daily room
6  rates are presented for various hotels, is the quoted
7  total price that a consumer will pay -- will be charged
8  at the hotel listed on the first page?
9    A.  No.
10    Q.  Is it listed on the second page where once a
11  consumer wants to view rates they can see the various
12  rates and are advised of the resort fee?
13    A.  No.
14    Q.  On the third page before the consumer has the
15  option to book a room, is the total price listed for the
16  consumer?
17    A.  Yes, two or three times.
18    Q.  Okay.  And the two or three times meaning at
19  the top of the page is it listed and then in the middle
20  of the page and in prominent bold font is it listed
21  there as well?
22    A.  Yes.  And then in the dropdown box.
23    Q.  And then in the dropdown box once again.  So
24  there is at least three occasions before a consumer
25  purchases a room that they are provided with the total

1  price that includes unavoidable and mandatory fees such
2  as resort fees?
3    A.  Yes.
4    Q.  And on the first page of the Web flow pages
5  that you were shown today, I think you were asked to
6  identify what that number stood for.  And I think your
7  testimony was that was the lowest from daily rate
8  available?
9    A.  Yes.
10    Q.  And that was the lowest daily rate Marriott
11  advertised on that first page; correct?
12    A.  Correct.
13    Q.  And through the Web flow wages that you
14  observed Marriott throughout the Web flow pages intended
15  to honor that lowest daily rate if they selected a room
16  related to that rate; correct?
17    A.  Correct.  Yes.
18    Q.  In other words, there could be rooms at hire
19  rates because they're nicer rooms?
20    A.  Yes.
21    Q.  But if the consumer looked on and saw that
22  daily room rate and then after they viewed rates
23  selected the room that corresponded with the rate on the
24  first page, Marriott honored that rate throughout the
25  booking process; correct?

1    A.  Yes.
2    Q.  That rate never changed throughout Marriott's
3  booking process, did it?
4    A.  Never changed, correct.
5    Q.  However, the total price at the end was higher
6  than the initial daily advertised rate; correct?
7    A.  Correct.
8    Q.  And is that because the total price contained
9  any unavoidable and mandatory fees such as resort fees
10  along with government taxes?
11    A.  Correct.  Yes.
12    Q.  Has Marriott at any time ever represented that
13  its resort fee is a government tax?
14    A.  No.
15    Q.  Now, the next sentence of that letter that's in
16  front of you states, "While a hotel reservation site may
17  breakdown the components of the reservation estimate
18  (e.g., room rate, estimated taxes, and any mandatory and
19  unavoidable fees), the most prominent figure for the
20  consumers should be the total inclusive estimate";
21  correct?
22    A.  Correct.
23    Q.  You were asked about the prominence of certain
24  figures in the middle of the booking process where there
25  were different room rates on the same page as the resort

EXHIBIT 1 - PAGE 58

1  fee blue box.  Do you remember that?
2      A.  Yes.
3      Q.  That page does not identify or represent or
4  advertise the total inclusive estimate that a consumer
5  was going to pay for that room; correct?
6      A.  Correct.
7      Q.  It wasn't until the third page where all room
8  rate estimated taxes and mandatory and unavoidable fees
9  are identified that the total inclusive estimate is
10  presented; correct?
11      A.  Yes.
12      Q.  And that is the most prominent figure listed on
13  that third page?
14      A.  Yes.
15      Q.  And typically it's larger font and darker font?
16      A.  Yes.
17      Q.  Okay.  And so -- and has that been the way
18  Marriott has presented room information to consumers on
19  marriott.com since you have been at the company?
20      A.  Yes, during my tenure.
21      Q.  Okay.  And you were actually asked about, I
22  guess, an e-mail from a woman with the last name
23  Laughner back in 2016?
24      A.  Yes.
25      Q.  And in 2016 that was four years after the FTC

1  had sent out warning letters to 22 hotels; correct?
2      A.  Correct.
3      Q.  That was four years after Marriott sent a
4  letter back to the FTC inviting them to review
5  marriott.com which is where all Gaylord hotel properties
6  were now going to be found; correct?
7      A.  Correct.
8      Q.  And I believe your testimony is it wasn't your
9  understanding over the years that FTC didn't reach out
10  of congratulate hotels for complying with their
11  standards; correct?
12      A.  Correct.
13      Q.  But you understood they would reach out if they
14  found that hotels were not in compliance with their
15  standards or expectations?
16      A.  Yes.
17      Q.  And after you directed the FTC to the
18  marriott.com Web site so they could view it and
19  particularly look up Gaylord hotel properties, the FTC
20  never came back to Marriott and indicated that they were
21  in violation of FTC standards; correct?
22      A.  Correct.
23      Q.  And so, again, getting back to this e-mail from
24  Ms. Laughner in 2016, that was four years after the 2012
25  FTC letter.  By the way, was she on the audit committee

1  at Marriott for resort fees?
2      A.  No.
3      Q.  Was she on the Resort Fee Committee?
4      A.  No.
5      Q.  Did she draft any of the resort fee policies or
6  protocols that were in place that were reviewed today?
7      A.  No.
8      Q.  Have you seen today -- I think you've seen most
9  of the policies and procedures regarding resort fee
10  protocols; correct?
11      A.  Yes.
12      Q.  I think counsel may have showed you maybe 13,
13  14, 15, maybe even 16?
14      A.  That sounds correct.
15      Q.  And consistently throughout there does
16  Marriott as one of the prerequisites for a resort that
17  is charging resort fees mandate that they disclose
18  consistently resort fees at their property?
19      A.  Yes.
20      Q.  Now, you were shown a couple of isolated
21  documents today or incidents where the full amenity was
22  not listed in the blue box; correct?
23      A.  Correct.
24      Q.  And as far as you know, is that because of font
25  limitation, word limitation, letter limitation?

1      A.  Yes.
2      Q.  Okay.  You were also shown a couple of
3  documents regarding Legacy hotels and e-mail
4  communications wherein you were insisting that they
5  comply with Marriott standards; correct?
6      A.  Correct.
7      Q.  And as Marriott took on these new brands, was
8  it your role to make sure as quickly as you could that
9  those hotels met Marriott's standards?
10      A.  Yes.
11      Q.  You saw a few instances where hotels, whether
12  they were franchised -- think most of them were
13  franchised was your testimony -- attempted to increase
14  the resort fee on their own without approval; correct?
15      A.  There were some, yes.
16      Q.  But you identified those through your audit
17  measures, and you were able to detect and I think
18  confirm if a Marriott protocol wasn't being followed;
19  correct?
20      A.  Yes.
21      Q.  So was that evidence of your group diligently
22  working to make sure that any new brands that came on
23  board to Marriott were following Marriott's brand
24  standards?
25      A.  Yes.

EXHIBIT 1 - PAGE 59

Page 233

1    Q.  But at no time had you been shown any documents
2  here today indicating through marriott.com that there
3  was never a disclosure of a resort fee during the
4  booking process; correct?
5    A.  Correct.
6    Q.  And the booking process by and large in terms
7  of the Web flow pages has remained fairly consistent
8  over your tenure of ten years in terms of the three
9  pages perhaps or four pages?
10    A.  Yes.
11    MR. HOUCHIN:  Objection.  Vague.
12  BY MR. LEARY:
13    Q.  And to be clear -- I accept that objection.
14  Meaning once you go on to search, a consumer can get
15  through the booking process in three pages before they
16  provide their personal information?
17    A.  Yes.
18    Q.  Okay.  And you were asked multiple times about
19  that last page.  I guess the fourth page.  And if there
20  were any fees represented.  Was that page designed at
21  all to identify fees that are involved?
22    A.  No.
23    Q.  Was that instead to simply get the consumer's
24  information after they had been told the total inclusive
25  price so they could book their room?

Page 234

1    A.  Yes.
2    Q.  And then after a consumer books a room, was it
3  customary, as far as you know, that they would receive
4  an e-mail immediately afterwards confirming their
5  reservation?
6    A.  Yes.
7    Q.  And in that e-mail would Marriott identify the
8  total cost of the stay?
9    A.  Yes.
10    Q.  And would they also include a breakdown of
11  those costs including the resort fee?
12    A.  Yes.
13    Q.  So by my count when someone goes through the
14  booking process, they are aware of and are told of the
15  resort fee on the very first page where they're invited
16  to view rates at a specific hotel; correct?
17    A.  Yes.
18    MR. HOUCHIN:  Objection.  Form.
19  BY MR. LEARY:
20    Q.  And to be clear, they are made aware of a
21  resort fee at a hotel that charges resort fees; correct?
22    A.  Yes.
23    Q.  All right.  So on that very first page where
24  the consumer is invited to view rates, the first thing
25  that comes up at the top of the page has been that blue

Page 235

1  box identifying a resort fee?
2    A.  Yes.
3    Q.  And on the next page the total inclusive price
4  is provided to the consumer two, if not three times;
5  correct?
6    A.  Correct.
7    Q.  And if a consumer had any confusion or simply
8  just wanted to make sure they understood the summary of
9  charges, there was a dropdown feature under summary of
10  charges?
11    A.  Yes.
12    Q.  And as far as you know, has that summary of
13  charges always been available to consumers?
14    A.  As far as I know, yes.
15    Q.  And if the consumer accessed that, would they
16  see for the fourth time the total inclusive price?
17    A.  Yes.
18    Q.  Would they also see, once again, a reference to
19  the resort fee being charged?
20    A.  Yes.
21    Q.  And that would all be before they go ahead and
22  book their room; correct?
23    A.  Yes.  Correct.
24    Q.  And then immediately after they book their room
25  but before they ever arrive at the hotel, they are once

Page 236

1  again informed of the resort fee, if a resort fee is
2  being charged through the e-mail confirmation system?
3    A.  Yes.  Correct.
4    Q.  And to the extent you were asked some questions
5  about the 90 percent ratio, you know, in terms of making
6  sure they understood or had disclosure on the 90 percent
7  ratio --
8    A.  Yes.
9    Q.  -- is there any reason why it was 90 percent?
10  Is there an expectation that some may not care about the
11  resort fee, some may simply miss it as they're going
12  through the booking process?  Tell me about that as far
13  as you know.
14    MR. HOUCHIN:  Objection.  Form.
15    THE WITNESS:  I'm sorry.  Paul, can you repeat
16  the question.
17  BY MR. LEARY:
18    Q.  Just that 90 percent ratio and the expectation
19  with Marriott as people were booking their rooms.
20    A.  It's always possible that somebody is going to
21  miss it and not pay attention to it.  It's also possible
22  that somebody else is booking the room for a person
23  that's going to the hotel, an administrative assistant,
24  a spouse or somebody else.  So there's always going to
25  be some minimal amount.  We try to mitigate that or

**EXHIBIT 1 - PAGE 60**

Page 237

1  minimize it.
2     Q.  And at the same token when you were shown some
3  documents at Exhibit 33, do you remember that Mercantile
4  report?
5     A.  Yes.
6     Q.  And there was some numbers that represented at
7  times 2 of 3 then 2 of 2, 2 of 2 along the line.  Did
8  that -- did you have an understanding of why those
9  numbers varied?  Meaning some there was three, others
10  there were two, others there was one?
11     A.  Yeah.  The 2s, the 3s, 1s referred to the
12  number of hotels in Bridget Billinsky's region that were
13  charging resort fees.  It was not two-thirds or one-half
14  of the 19 or 20 hotels.  That question -- those
15  questions were only applied to hotels charging a resort
16  or destination fee which would explain why there was
17  one, two or three as the number of hotels.
18     Q.  To the extent you were asked questions
19  where it would indicate on the two or three where there
20  was a disclosure of the resort fee at check-in, did you
21  have any backup data from that report to understand why,
22  I guess, two of the three understood and one did not?
23     A.  I did not have any backup information.
24     Q.  So is there any way for you to understand why
25  it was on that particular slide that there was a two,

Page 238

1  three ratio in terms of why the resort fee was not
2  identified?
3     A.  No.
4     Q.  And then finally if you have in front of you
5  Exhibit 1, that takes us back to the very beginning of
6  the day.  Could you bring that up.  Tell me when you
7  have it up.  It's your transcript from the investigation
8  hearing --
9     A.  I have it in front of me, yes.
10     Q.  If you could, could you -- up in the box there
11  do you see where it says 343?  Up above -- in the kind
12  of font numbers just up above where you could type in a
13  number in the box.
14     A.  I'm sorry.  No, I'm not following that.
15     Q.  Because it's going -- it would be easier to get
16  you to a page quickly.
17     A.  Oh.
18     Q.  Do you see where it says search box?
19     A.  Search box?
20     Q.  Yes, search box.  And then it's slash 343.  343
21  means the total number of pages.  Do you see that across
22  the top bar there?
23     A.  Slash 343?
24     Q.  Yeah.
25     A.  Does that get me there?

Page 239

1     Q.  Yeah.  So if you type a number -- can you get
2  into that box and type a number in?
3     A.  I'm typing in 343 but nothing is happening.
4     Q.  Can you type in another number?
5     A.  Hold on.  Yeah, I'll try another number.
6     Q.  Type in 181.  Does that bring you to 181 of the
7  transcript?
8     A.  It does not.  I'm sorry.
9     Q.  Okay.  You're going to just have to scroll down
10  then on the right to get to page 181 of the transcript.
11     A.  Okay.
12     Q.  And just tell me when you're there.
13     A.  Okay.
14        MR. HOUCHIN:  Sorry, Paul.  Did you say page
15  181?
16        MR. LEARY:  Yes, Mike.  And I'll wait for
17  everyone to get there.
18        THE WITNESS:  I'm here, Mike -- or, Paul.
19  Sorry.
20        MR. HOUCHIN:  I'm there.
21        MR. LEARY:  Okay.  Are you there on 181 where
22  the first line -- if you look at the numbers on the
23  left, Mike -- I mean, Jeff, I'm going to show you where
24  it says number one next to it, do you see where it says
25  A which stands for answer and it says "correct"?

Page 240

1     A.  Yes, I see that.
2     Q.  Okay.  I'd like you to scroll down.  These are
3  questions asked of you, and specifically at line 8 you
4  were asked a question about the blue box and the
5  language within the blue box.  Do you see where it says,
6  quote, "25, USD 25 daily destination fee added to room
7  rate"?
8     A.  Yes, I see that.
9     Q.  Okay.  And then you were asked, "Does this mean
10  it has been added or it will be added?"  And your answer
11  was, "It will be added.  It's not included in the $332
12  rate."  Do you remember that?
13     A.  Uh-huh.
14     Q.  Okay.  And, again, you were shown Web pages
15  today and asked a very similar question.  If the resort
16  fee was included in the daily room rate that was listed
17  below; correct?
18     A.  Correct.
19     Q.  And on the Web pages that you saw the daily
20  rate that was listed below, the lowest rate of 142 I
21  think at one hotel, that was the original advertised
22  daily rate on the first page; correct?
23     A.  That is correct.
24     Q.  And, again, going through the Web flow pages
25  that you saw today, that initial advertised daily room

**EXHIBIT 1 - PAGE 61**

Page 241

1 rate of 142, at least on one example we saw, appeared on
2 the second page when someone could view rates; correct?
3    A.  Correct.
4    Q.  And then it also appeared on the third and
5 final page; correct?
6    A.  Correct.  It was part of it, yes, uh-huh.
7    Q.  And then it goes on to state at line 19, "Is it
8 possible that someone could think that the fee's already
9 have been added?"  Do you see that question?
10   A.  I do.
11   Q.  So at this point in time at this deposition of
12 which the Civil Rules of Procedure don't apply, you were
13 being asked to provide testimony as to what anyone out
14 there might have a perception of when looking at the
15 Website; correct?
16   A.  Correct.
17   Q.  Would you have any knowledge as you sit here
18 today as to what I might think of when I'm looking at
19 the Website?
20   A.  No.
21   Q.  Or the court reporter who is here today that's
22 been with us all day?
23   A.  No, I do not.
24   Q.  So when you provided your answer today, "I
25 suppose if they were looking at it that way.  I don't

Page 242

1 read it that way, but I suppose they could."  At that
2 point were you simply guessing as to how someone might
3 view it based upon the questions being asked of you?
4    A.  Yes, that was a guess.
5    Q.  But certainly as you stated, you didn't read it
6 that way, that someone would think the fee has already
7 been added; correct?
8    A.  Correct.
9    Q.  And explain why based upon walking through the
10 three-page Website you wouldn't believe that someone
11 would think it would be added?
12   A.  It was very clear to me that when they went on
13 the first page they were using it to look at the daily
14 rate.  The second page they selected the hotel, and then
15 the third rate once the room was selected, the resort
16 fee was specifically shown there in two or three
17 different locations.  The total rate, including resort
18 fee and all fees, mandatory fees.
19   Q.  And finally in your position -- and you held it
20 for, I think, 11 years or so -- again, so the record is
21 clear, you are were primarily responsible for the resort
22 fee policies, procedures, audits, mystery shops for
23 almost a ten-year period; correct?
24   A.  Correct.
25   Q.  And in that ten-year period, you were also

Page 243

1 involved in -- and were aware that the FTC sent out
2 letters to 22 of Marriott's competitors; correct?
3    A.  Correct.
4    Q.  And at that time did that give you a sense of
5 pride that Marriott had not received such a letter?
6    A.  Very much so.
7    Q.  And as you moved forward, were you mindful of
8 the FTC's concerns in the letters that were sent to
9 other hotels including the Gaylord?
10   A.  Yes.  Everything that we did was to ensure that
11 we were in compliance with FTC guidelines.
12   Q.  Okay.  In other words, you didn't rest on your
13 laurels.  You continued to have training sessions,
14 webinars and seminars for staff as well as managed
15 hotels and franchise hotels?
16   A.  Yeah.  The documentation shows that after those
17 letters came out, we continued with the policy.  We
18 increased the number of audits and everything we could
19 to make sure we were in full compliance.
20   Q.  And would that include things such as doing
21 mystery shops and doing audits and daily interaction
22 with management at various hotels?
23   A.  Yes.
24   Q.  And was all of that designed to make sure that
25 the resort fee policies were being carried out in a

Page 244

1 consistent, effective way?
2    A.  Yes.
3    Q.  And would that also include making sure that
4 hotels were providing the appropriate bundled packages
5 for its customers?
6    A.  Yes.
7    Q.  At any time as far as you were at the helm, was
8 it at any time your understanding, your belief, your
9 intent to have resort fees be hidden from consumers?
10   A.  No, never.
11   Q.  You're in the hospitality industry; correct?
12   A.  Yes.
13   Q.  Do you feel it's important to make sure that
14 you disclose as much as you can to consumers and not try
15 to hide or deceive information from them?
16   A.  Absolutely.
17   Q.  And to the extent that you were continuously
18 interacting with hotels and reading customer complaints,
19 did you at any time get the sense that there was a
20 belief that Marriott was deceiving consumers through its
21 resort fee policies?
22   A.  No.
23   Q.  That's all the questions I have.  Thank you.
24   A.  Thank you.
25       MR. HOUCHIN:  I think we're going to do a very

EXHIBIT 1 - PAGE 62

1 short redirect here.  I think Sean was going to take the
2 lead on that.
3      MR. LEARY:  Okay.  I just -- Mike, you know
4 where I'm coming from on this.  You noticed the dep.  We
5 typically don't have the tag team situation with
6 witnesses -- with a witness.  So I have a concern about
7 now having a fresh new attorney come in who hasn't asked
8 any questions and now going again for -- we are well
9 over the time limit.  But is this lengthy?  Can you give
10 me --
11     MR. LITTERAL:  You know, I'm going to ask about
12 five questions, and we can go from there.  Okay.  So,
13 Mr. Wolff, thank you for --
14     MR. LEARY:  Fair enough.
15
16         -EXAMINATION-
17 BY MR. LITTERAL:
18    Q.  Thank you for your time, Mr. Wolff, for
19 enduring this lengthy process.  So I want to jump right
20 in.  You know, one of the things that you had
21 mentioned --
22     THE WITNESS:  One question, Paul.
23     MR. LEARY:  What's that?  Am I gone?
24     THE REPORTER:  No, you're on.
25     MR. LEARY:  Okay.  Did you have a question,

1 Jeff?  Jeff's gone now.
2      THE REPORTER:  He's here.
3      MR. LITTERAL:  It looks like everyone is here;
4 is that right?
5      MR. LEARY:  Yeah.
6      THE WITNESS:  Can you hear me now?
7      MR. LEARY:  Yes.
8      THE WITNESS:  I lost you, Paul, when you were
9 making your statement.  I'm sorry.
10     MR. LEARY:  IT was just between counsel.  Sean
11 has assured me he has about five questions, so we're
12 going to proceed.  A couple more questions.
13 BY MR. LITTERAL:
14    Q.  So, Mr. Wolff, thank you again for taking the
15 time, and I'm just going to continue.
16        So you mentioned that the blue box presented
17 some limitations in adequately disclosing the fees.  For
18 example, you mentioned character limits, word limits,
19 these types of things.  Did you and committee consider
20 alternatives to, you know, perhaps make a larger blue
21 box?
22     MR. LEARY:  May I just object.  He didn't say
23 there limits on disclosing the fee.
24     MR. LITTERAL:  Where's the blue button?
25 Where's the fee disclosed again?

1      MR. LEARY:  In the blue box.  Your testimony
2 was the fee, not the amenities.
3 BY MR. LITTERAL:
4    Q.  So, Mr. Wolff, you can continue the -- you can
5 go ahead and answer unless there's an objection.
6        Paul, do you have an objection?
7      MR. LEARY:  Well, I object because you
8 misstated his testimony.
9      MR. LITTERAL:  Okay.  There's the objection.
10 Just state the objection and let's keep it moving.
11    Q.  So, Mr. Wolff, as you were saying.
12    A.  Okay.  So I'm sorry.  Are you saying that I
13 said that we were limiting what was being told to the
14 customer, that that was -- that we were doing --
15 BY MR. LITTERAL:
16    Q.  Yes.  Earlier in your testimony -- and I'm
17 going from a very good memory here -- you stated that in
18 the blue box there are character limits that limited
19 your ability to put too much more about the -- the fees.
20 Do you not recall talking at all about this?
21    A.  Diane, can you hear me?
22     THE REPORTER:  Yes.
23 BY MR. LITTERAL:
24    Q.  So let me start again.  So how many limit --
25 how many characters could you put in the box?

1      MR. LEARY:  I think Mr. Wolff is frozen.
2      THE WITNESS:  I don't know if it's mine or
3 somebody else's.  Can you all hear me?
4      MR. LEARY:  I can hear you.  There you go.
5      THE WITNESS:  All right.  Can you hear me now?
6 BY MR. LITTERAL:
7    Q.  Yes.
8    A.  All right.  I don't know what I missed, but
9 I'll go back, Sean, to what the question I think that
10 you're asking.  Let me see if I understand the question.
11    Q.  Okay.
12    A.  Limitation on the blue box is based on the
13 number of characters or numbers that can be put into it.
14 As I stated many times during my testimony, I don't
15 remember the exact amount.  I don't remember it's the
16 same with Twitter with the number of characters or
17 whatever it is.  But there was a restriction and a
18 limitation.
19        What we ask all hotels to do was to put, number
20 one, that there was a resort fee to be added and to put
21 a representation of the amenities and services that were
22 provided by the resort or destination key so that the
23 customer understood that there was high value in what
24 they were getting for what they paid.
25    Q.  Okay.  Thank you.

**EXHIBIT 1 - PAGE 63**

1    So there were character limitations in the box?
2  That's what you say; correct?
3     A.  There were, yes.  I said that numerous times.
4     Q.  Okay.  So why not make the box bigger?
5     A.  I can't answer that.  I'm not the technical.
6  That's a very complex system, and I had no control over
7  that.
8     Q.  So did Marriott, the committee that you sat on,
9  perhaps oversaw, did you consider alternative
10 possibilities?  Because -- you know, let me give you
11 context.  It sounds like you've said that, you know
12 Marriott, is a -- your primary concern is the consumer's
13 happiness.  Though Mike did a wonderful job of
14 demonstrating just how upset these fees made the
15 consumers, and yet a readily available alternative such
16 as making the box larger Marriott decided not to do.
17 Why not?
18    MR. LEARY:  Let me object.  This was
19 argumentative statement.  It misrepresented Mike's
20 direct examination of how people were being -- or
21 characterizing resort fees.
22    But to the extent you can answer, please go
23 ahead.
24    THE WITNESS:  Yeah, I don't -- well, first of
25 all, Marriott was very, very clear.  Hotels were very

1  clear in notifying customers in numerous occasions.  We
2  did it at the hotel as well.  We did it through e-mails.
3  So the customers were notified numerous times throughout
4  the process.
5  BY MR. LITTERAL:
6     Q.  So why not make the box larger?
7     MR. LEARY:  Objection.  Asked and answered.
8     THE WITNESS:  I answered that question, you
9  know, that I had no control over it.  And that was not
10 the primary way that we communicated resort fees.  It
11 was one of the ways we communicated resort fees.
12 BY MR. LITTERAL:
13    Q.  And what was the primary way you communicated
14 resort fees?
15    A.  It was just various methods throughout.  It was
16 on the Website.  It was at the hotel.  It was through
17 the blue box.  The e-mail that went to the customers
18 sometimes two, three, four times with information in
19 there.  There was numerous times that it's communicated
20 to the customers.
21    Q.  And do you recall in those e-mails where the
22 disclosures were located?
23    A.  Not if I don't see it.  I mean, I have to look
24 at it.  I've been retired for two years.
25    Q.  Okay.  Okay.  While you were on the committee,

1  did you consider the possibility of uploading the PDF to
2  the Marriott Website?
3     A.  I don't.
4     Q.  That could more fully or perhaps adequately
5  disclose the fees?
6     A.  Again, that would be somebody that would -- I
7  was not the technical person involved with that.  I
8  can't answer that.
9     Q.  Okay.  And who could?  Can you give me an
10 example of who would be a technical person?
11    A.  Somebody who oversaw the Marriott reservation
12 system.
13    MR. LITTERAL:  Okay.  So it sounds to me, Mike,
14 like we need somebody from that system.
15    Q.  Mr. Wolff, what would be a name of somebody in
16 that area?
17    A.  I can't answer that.
18    MR. LEARY:  Object to the form of the question.
19    THE WITNESS:  I've been gone for two years.
20 BY MR. LITTERAL:
21    Q.  And you've been gone for two years.  But what
22 was the name of a person there while you were there?
23    A.  I don't remember.
24    Q.  Okay.  So clearly there were a decent number --
25 well, let me start -- let me go back earlier.

1     Earlier you mentioned that you reviewed
2  consumer comments and you were able to discern trends in
3  the consumer comments, negative reviews, these types of
4  things.  How did you go about discerning these trends?
5     MR. LEARY:  Again, objection.  Misstates his
6  testimony.
7     You can answer.
8  BY MR. LITTERAL:
9     Q.  It's a quote.
10    MR. LEARY:  Well, you said negative trends.
11 He never said negative.
12    MR. LITTERAL:  Okay.  Thank you.  Thank you.
13    Q.  Mr. Wolff --
14    MR. LEARY:  Well, you keep -- we're well past
15 the hour, Sean.  I've give you limits.  You've gone
16 beyond five questions, and now you're just incorrectly
17 stating his testimony.  The witness is exhausted, and
18 it's unfair to him and --
19    MR. LITTERAL:  Paul, we are entitled to a
20 redirect, and I'm now doing that redirect because just
21 like you did when you asked 50 questions in a row to
22 which the witness said yes to all of them without a
23 serious moment of critical thought, I'm now going to
24 explore of those points to which I'm entitled.
25    MR. LEARY:  We'll go to the judge because we're

**EXHIBIT 1 - PAGE 64**

Page 253

1  well past the time.
2       MR. LITTERAL: And, Paul, I'm more than happy
3  to go to the judge. So that being said --
4    Q.  Mr. Wolff, so how did you go about discerning
5  these trends?
6    A.  I would look at overall comments. I was
7  provided information. There was a computer system. A
8  system that we had with guest satisfaction that provided
9  information to me by hotel, by region, by brand, by
10  whatever way I wanted. And I would go through those on
11  a regular basis, or I would be presented that
12  information from other senior executives about trends
13  that were happening at hotels.
14       In addition to resort fees, I would look at
15  housekeeping cleanliness. I would look at front office.
16  I would look at restaurants, anything that had to do
17  with taking care and providing the best service to our
18  customers. I would look at all that information, and
19  based on that, I would direct hotels. I would direct my
20  team to focus on those areas to continuously improve
21  customer service to our guests. That was a way that we
22  were successful as a company, and I imagine despite the
23  fact that I've been gone for two years now, that's the
24  way that Marriott continues to be successful. To
25  provide outstanding service and continuously improve

Page 254

1  that service to the customers.
2    Q.  Okay. Let's see here. So -- and thank you for
3  your patience. I'm about to wrap up here pretty soon.
4       So I guess I had asked you already whether or
5  not you all had considered, for example, uploading a PDF
6  to the Website, and your answer was that's not your
7  area?
8    A.  Correct.
9       MR. LEARY: Asked and answered.
10  BY MR. LITTERAL:
11    Q.  Okay. Though I've read numerous of these
12  e-mails -- I was larger in charge of doc review, so I'm
13  intimately familiar with the record. And just as Paul
14  did in previous depositions, I'm going to go from
15  memory, and I'm going to ask you a question.
16       Though you were aware and you are certainly
17  aware of these negative consumer comments -- and during
18  the next deposition I'm going to flesh that out a little
19  bit more -- why did it keep happening? How come you
20  guys didn't explore alternative possibilities to more
21  adequately disclose these resort fees?
22       MR. LEARY: Objection. Misstates his testimony
23  that they were criticizing the failure to disclose.
24  You're misleading this witness. Your memory is
25  horrible, Sean. That's not what he said.

Page 255

1       MR. LITTERAL: Did I say that that's what he
2  said? I said I've reviewed e-mails in the doc review.
3  Paul, that's exactly what I said.
4    Q.  So, Mr. Wolff --
5       MR. LEARY: Why weren't they presented today?
6  I didn't see one e-mail today that supports your memory.
7  Not one.
8       MR. LITTERAL: Okay. What's your objection?
9       MR. LEARY: You're misleading and misstating
10  the evidence.
11       MR. LITTERAL: Okay. Thank you.
12    Q.  Okay. Mr. Wolff.
13    A.  The question that you asked me you said that
14  why did I not respond to negative comments. I haven't
15  seen negative comments, and if there were negative
16  comments, show them to me. I said before that I looked
17  at literally tens of thousands of comments per year, and
18  Marriott received probably millions of comments per
19  year.
20       So you have to show me -- again, if you feel
21  that there were a lot of negative comments on these
22  fees, please present me with the evidence, and I'll
23  comment on them.
24    Q.  Okay. Let's see here. Okay. Did committee
25  members ever refer to themselves as resort fee fans?

Page 256

1    A.  Can you repeat that. I'm sorry.
2    Q.  Sure. Did Resort Fee Committee members ever
3  refer to themselves as resort fee fans?
4       MR. LEARY: Objection to form.
5       THE WITNESS: Not that I remember.
6  BY MR. LITTERAL:
7    Q.  Earlier Mike had asked you about water bottles
8  that were valued at $20, and you had said, I believe,
9  that you would not have approved of that; is that
10  accurate?
11       MR. LEARY: Objection to form.
12       THE WITNESS: Yeah, what I stated was the form
13  was presented out of context. I did not know if it was
14  received, it was being sent to me for approval or review
15  or if I had approved it and sent it back to the hotel
16  and said this was fine. My comment was that that would
17  be highly unlikely that I would have approved bottled
18  water, Evian or whatever the water is, at $20. That
19  would not have happened.
20  BY MR. LITTERAL:
21    Q.  And so if there's a majority vote from members
22  on the committee approving it, you could override their
23  votes or not?
24       MR. LEARY: Objection. Form.
25       THE WITNESS: No, I would present it -- as I

EXHIBIT 1 - PAGE 65

Page 257

1  said earlier, it had to be a unanimous approval of a
2  resort fee. All five or whatever members on there had
3  to do it. I would present the information to the Resort
4  Fee Committee, and it's highly unlikely that I would
5  have presented to the Resort Fee Committee two bottles
6  of water valued at $20 because they would have sent it
7  back to me and said that it's not acceptable.
8  BY MR. LITTERAL:
9     Q. Okay. Okay. That's good for now. I
10  appreciate your time, Mr. Wolff. Thank you. And, yeah,
11  I really appreciate it?
12    A. Okay. You're welcome.
13       MR. HOUCHIN: Thank you, Mr. Wolff.
14       THE REPORTER: Mr. Leary, did you want a copy
15  of this?
16       MR. LEARY: I do, yes.
17       (The proceedings concluded at 4:52 p.m.)
18              ***
19
20
21
22
23
24
25

Page 258

1     I, Jeffrey Michael Wolff, having appeared for my
2  deposition on December 1, 2021, do this date declare
3  under penalty of perjury that I have read the foregoing
4  deposition. I have made any corrections, additions or
5  deletions that I was desirous of making in order to
6  render the within transcript true and correct.
7     IN WITNESS WHEREOF, I have hereunto subscribed my
8  name this _____ day of_____,2021.
9
10
11              _____
                      JEFFREY MICHAEL WOLFF
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 259

1              DEPONENT'S CHANGES OR CORRECTIONS
2  Note: If you are adding to your testimony, print the
3  exact words you want to add. If you are deleting from
4  your testimony, print the exact words you want to
5  delete. Specify with "Add" or "Delete" and sign this
6  form.
7
8  DEPOSITION OF:        JEFFREY MICHAEL WOLFF
9  CASE:                 HALL vs. MARRIOTT INTERNATIONAL
10  DATE OF DEPOSITION:    DECEMBER 1, 2021
11
12  PAGE    LINE      CHANGE/ADD/DELETE/REASON
13  ____    ____      _____
14  ____    ____      _____
15  ____    ____      _____
16  ____    ____      _____
17  ____    ____      _____
18  ____    ____      _____
19  ____    ____      _____
20  ____    ____      _____
21  ____    ____      _____
22  ____    ____      _____
23  ____    ____      _____
24  ____    ____      _____
25  Deponent's Signature_____Date_____

Page 260

1              DEPONENT'S CHANGES OR CORRECTIONS
2  Note: If you are adding to your testimony, print the
3  exact words you want to add. If you are deleting from
4  your testimony, print the exact words you want to
5  delete. Specify with "Add" or "Delete" and sign this
6  form.
7
8  DEPOSITION OF:        JEFFREY MICHAEL WOLFF
9  CASE:                 HALL vs. MARRIOTT INTERNATIONAL
10  DATE OF DEPOSITION:    DECEMBER 1, 2021
11
12  PAGE    LINE      CHANGE/ADD/DELETE/REASON
13  ____    ____      _____
14  ____    ____      _____
15  ____    ____      _____
16  ____    ____      _____
17  ____    ____      _____
18  ____    ____      _____
19  ____    ____      _____
20  ____    ____      _____
21  ____    ____      _____
22  ____    ____      _____
23  ____    ____      _____
24  ____    ____      _____
25  Deponent's Signature_____Date_____

**EXHIBIT 1 - PAGE 66**

**EXHIBIT 1 - PAGE 67**

Page 261

1    I, DIANE DELANEY-DAUPHINE, a Certified

2  Shorthand Reporter of the State of California, do hereby

3  certify:

4       That the foregoing proceedings were taken

5  before me at the time and place herein set forth; that

6  any witnesses in the foregoing proceedings, prior to

7  testifying, were administered an oath; that a record of

8  the proceedings was made by me using machine shorthand

9  which was thereafter transcribed under my direction;

10  that the foregoing transcript is a true record of the

11  testimony given.

12       Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal Case,

14  before completion of the proceedings, review of the

15  transcript ( )was (x) was not requested.

16       I further certify I am neither financially

17  interested in the action nor a relative or employee of

18  any attorney or any party to this action.

19       IN WITNESS WHEREOF, I have this date subscribed

20  my name.

21  Dated: December 3, 2021

22

23     _Diane Delaney-Dauphine_

24  DIANE DELANEY-DAUPHINE

25  CSR No. 3612

**EXHIBIT 1 - PAGE 68**

**EXHIBIT 1 - PAGE 69**

**EXHIBIT 1 - PAGE 70**

**EXHIBIT 1 - PAGE 71**



**EXHIBIT 1 - PAGE 72**

**EXHIBIT 1 - PAGE 73**

**EXHIBIT 1 - PAGE 74**



**EXHIBIT 1 - PAGE 75**



**EXHIBIT 1 - PAGE 76**



**EXHIBIT 1 - PAGE 77**



**EXHIBIT 1 - PAGE 78**



**EXHIBIT 1 - PAGE 79**



**EXHIBIT 1 - PAGE 80**

**EXHIBIT 1 - PAGE 81**



**EXHIBIT 1 - PAGE 82**

**EXHIBIT 1 - PAGE 83**



**EXHIBIT 1 - PAGE 84**



**EXHIBIT 1 - PAGE 85**



**EXHIBIT 1 - PAGE 86**



**EXHIBIT 1 - PAGE 87**



**EXHIBIT 1 - PAGE 88**

**EXHIBIT 1 - PAGE 89**

**EXHIBIT 1 - PAGE 90**

**EXHIBIT 1 - PAGE 91**



**EXHIBIT 1 - PAGE 92**

**EXHIBIT 1 - PAGE 93**



**EXHIBIT 1 - PAGE 94**

**EXHIBIT 1 - PAGE 95**



**EXHIBIT 1 - PAGE 96**

# Exhibit D

GOVERNMENT OF THE DISTRICT OF COLUMBIA
OFFICE OF THE ATTORNEY GENERAL
+ + + + +

```
_____   :
                            :
IN THE MATTER OF:           :
                            :
DISTRICT OF COLUMBIA        :
        Plaintiff           :
                            :
     v.                     :
                            :
MARRIOTT INTERNATIONAL, INC.:
                            :
     Defendant              :
                            :
_____   :
```

                    Friday,
                    May 18, 2018

                    Washington, D.C.


DEPOSITION OF:


               JEFFREY M. WOLFF


called for examination by Counsel for the

Plaintiff, pursuant to Notice of Subpoena, in the

District of Columbia Office of the Attorney

General, located at 441 4th Street, N.W., when

were present on behalf of the respective parties:

**APPEARANCES:**

On Behalf of the District of Columbia:

SONDRA MILLS, ESQ.
JIMMY ROCK, ESQ.
BRITTANI A. ZACCO, ESQ.
441 4th Street, N.W.
Suite 600 South
Washington, DC 20001
202-724-6622
brittani.zacco@dc.gov

On Behalf of Marriott International, Inc.:

THERESA COETZEE, ESQ.
10400 Fernwood Road
Bethesda, MD 20817
301-381-6614
theresa.coetzee@marriott.com

MILTON A. MARQUIS, ESQ.
Cozen O'Connor
1200 19th Street, N.W.
Washington, DC 20036
202-471-3417
mmarquis@cozen.com

ALSO PRESENT:

JAWARI GILANI

3

CONTENTS


WITNESS                    DIRECT CROSS REDIRECT RECROSS


Jeffrey Wolff           4



EXHIBIT NO.                                    PAGE


1     Subpoena . . . . . . . . . . . . . . . . .10

4

1          P-R-O-C-E-E-D-I-N-G-S
2                9:37 a.m.
3          MS. MILLS:  So we're on the record
4    now.  This is the oral examination under oath of
5    a corporate designee for Marriott International,
6    pursuant to a subpoena that was issued by the
7    Attorney General for the District of Columbia.
8          A copy that subpoena has been marked
9    as Exhibit 1, and what we'll be doing here is
10   I'll be handing the witness a copy and there's a
11   copy, I'm sorry, and then for the court reporter
12   also.  Thank you.  Will the reporter please swear
13   the witness?
14         COURT REPORTER:  Sir, could you raise
15   your right hand?
16   Whereupon,
17         JEFFREY WOLFF
18   was called as a witness and, after having been
19   first duly sworn, was examined and testified as
20   follows:
21   DIRECT EXAMINATION
22         BY MS. MILLS:

5

1          Q     Mr. Wolff, my name is Sondra Mills.
2    I'll be doing most of the questioning here today.
3    With me is my co-counsel Brittani Zacco and also
4    Jimmy Rock.  Ms. Zacco will also do some part of
5    the questioning this afternoon.
6          A     Okay, uh-huh.
7          Q     Would counsel please identify
8    themselves for the record?
9          MR. MARQUIS:  Yes.  Milton Marquis,
10   outside counsel, Cozen O'Connor.
11         MS. COETZEE:  Theresa Coetzee, Vice
12   President and Assistant General Counsel, Marriot
13   International.
14         MS. GILANI:  Jawari Gilani, co-
15   counsel, Cozen O'Connor.
16         BY MS. MILLS:
17         Q     Okay.  The Office of the Attorney
18   General has been informed that Marriott has
19   designated Jeff Wolff as its corporate designee
20   to provide testimony pursuant to the subpoena,
21   and could you just identify your name for the
22   record please?

6

1          A     Yes.  My name is Jeffrey, Jeff Wolff.
2          Q     It's Jeffrey?
3          A     Jeff.  Yes, Jeff.  I go by Jeff, but
4    Jeffrey Wolff is my full name.
5          Q     All right, thank you.
6          MR. MARQUIS:  Ms. Mills, before we
7    start with the questioning, I think we ought to
8    put something on the record about the objections.
9    If you -- if you want to go through that --
10         MS. MILLS:  I'm going to go through
11   some general objections.
12         MR. MARQUIS:  That's fine, okay.
13         MS. MILLS:  And there will be a moment
14   when that would be appropriate.
15         MR. MARQUIS:  All right, thank you.
16         BY MS. MILLS:
17         Q     So before we begin, I did want to give
18   you some general instructions and information
19   about the examination today.
20         A     Uh-huh.
21         Q     The court reporter has sworn you as a
22   witness, so the most important thing for you to

7

1    do is to answer the questions truthfully and
2    completely.  Do you understand that?
3          A     I do.
4          Q     Okay.  Have you ever been a witness
5    before?
6          A     No.
7          Q     Okay.  So we'll be asking you
8    questions and showing you documents today.  It's
9    not our intention to trick you or confuse you
10   with our questions.  If you don't understand a
11   question, then please say so and we will try to
12   reframe it until you do understand it.  Do you
13   understand that?
14         A     Yes.
15         Q     It's also not our intention to ask you
16   to divulge information that is subject to
17   Marriott's attorney-client privilege.
18         A     Uh-huh.
19         Q     However, we may ask you some questions
20   to help us clarify and understand the scope or
21   the basis of any privilege that is asserted.  Do
22   you understand that?

8

1    A    Yes.
2    Q    Milton, perhaps this is a good time.
3         MR. MARQUIS:  Certainly.  Marriott
4    understands that this is an investigative
5    deposition, and that the only objection that is
6    appropriate would be one of privilege, and
7    Marriott understands that and will abide by the
8    discussion that we had.  But Marriott preserves
9    and doesn't waive any objection outside of
10   privilege.
11        BY MS. MILLS:
12   Q    All right, thank you.  If you don't
13   recall information that would be responsive to
14   our questions, please say so.  But if you recall
15   at least something about it, let us know that.
16   A    Okay.
17   Q    And you can explain what is it you do
18   or do not recall.
19   A    Okay.
20   Q    We have a number of materials here
21   that are going to help, I think, to refresh your
22   recollection.

9

1    A    Okay.
2    Q    Another thing is it's very important
3    for you to give an audible, verbal response to
4    the questions.  The court reporter can't really
5    take down a shrug of your shoulders or nod of
6    your head, and I will certainly try to observe
7    that as well.  So do you understand that?
8    A    I do.
9    Q    Also if you need to take a break, let
10   us know that.  But if there's a question pending,
11   we would like you to complete your answer before
12   we take a break.  Do you understand that?
13   A    I do.
14   Q    Okay.  Do you have any questions
15   before we begin?
16   A    No.
17        MS. MILLS:  Okay.  So Marriott was
18   designated -- excuse me, was required to
19   designate a representative to testify regarding
20   the topics in the subpoena that's been marked as
21   Exhibit 1, and you have been selected as
22   Marriott's corporate designee.  Do you understand

10

1    that?
2         (Whereupon, the above-referred to
3         document was marked as Wolff Exhibit
4         No. 1 for identification.)
5         THE WITNESS:  I do understand.
6         BY MS. MILLS:
7    Q    Okay.  Prior to coming here today, did
8    you review the list of the topics of examination
9    that are set forth starting on page three of
10   Exhibit 1?
11   A    Let me review them real quickly if you
12   don't mind.
13   Q    Sure, go ahead.
14        (Pause.)
15        THE WITNESS:  Thank you, I understand.
16        BY MS. MILLS:
17   Q    Okay, and are you in fact prepared to
18   testify about the topics that are listed here on
19   pages three and four of the subpoena?
20   A    I am.
21   Q    Did you take any steps to prepare for
22   your testimony today?

11

1    A    Yes, I did.  I reviewed material.  You
2    have some I assume it was provided to you.  I
3    did.
4    Q    Okay.  So you reviewed documents.  Did
5    you spend any time talking to others at Marriott?
6    A    I talked primarily with our attorneys.
7    Q    Okay.  Did you speak with someone
8    other than your attorneys?
9    A    Not outside the normal course of
10   business, because I'm the representative.  So no,
11   not outside the normal course of my
12   responsibilities.
13   Q    All right, not specifically to prepare
14   for your testimony?
15   A    That is correct.
16   Q    Okay.  How much time did you spend
17   preparing?
18   A    I'm just guessing probably, and again
19   this is a guess, on and off over the last, you
20   know, since a couple of months, probably 12 to 15
21   hours.  I'm guessing.
22   Q    Okay.  Looking over documents

12

1  primarily?
2     A   Correct, yes.
3     Q   Did you bring any documents with you?
4     A   No.
5     Q   And so your full name was Jeffrey
6  Wolff?
7     A   Jeffrey Wolff.
8     Q   Okay.  Can you tell us a little bit
9  about yourself, your educational background?
10     A   Uh-huh, yes.  I graduated from
11  Northern Illinois University which is outside
12  Chicago with degrees in Management and Finance.
13  Began working for Marriott right out of college.
14  I had actually worked for Marriott prior when I
15  was high school, and have been with Marriott now
16  for 44 years.
17     Q   Forty-four years?
18     A   Uh-huh.
19     Q   So were you employed anywhere before
20  Marriott?
21     A   Just summer jobs.
22     Q   Summer jobs, okay.

13

1     A   Yeah.  Odd jobs, right.
2     Q   And what is your current position
3  title?
4     A   I am the Vice President-Market
5  Operations and Guest Experience for the Americas,
6  I'm sorry.  For the Americas.
7     Q   For the Americas.
8     A   Yes.  Excuse me, sorry.
9     Q   Not for their global operations?
10     A   Correct, just the Americas.
11     Q   All right, and how long have you had
12  that title?
13     A   That was been -- well that is a new
14  role, relatively new role.  Approximately one
15  year since the merger.  We reorganized slightly
16  after our organization, but I held a similar role
17  with slightly different responsibilities since
18  about 2010.
19     Q   The title that I saw on documents was
20  Vice President-Guest Experience and Rooms
21  Operations for the Americas?
22     A   Correct.  Yes, that is correct.  That

14

1  was the previous position that I held on, and
2  then again assumed this responsibility about a
3  year ago.
4     Q   Can you tell us what the difference is
5  in your new responsibilities versus your old
6  ones?
7     A   Yes.  In the past in that position I
8  was talking about before, Vice President of Room
9  Operations and Guest Experience, I had
10  responsibility in our hotels primarily on managed
11  hotels for rooms operations, which is
12  housekeeping, front office, spa, anything of that
13  nature.
14         Additionally, I had responsibility
15  overall for the guest experience in our hotels,
16  meaning guest levels of satisfaction, you know
17  how we deliver service, you know, to our
18  customers and so on.  So that was a brief
19  overview of what my responsibilities were then.
20     Q   And how long were you in that role?
21  It was until about a year ago but when --
22     A   Correct, but I didn't assume that role

15

1  -- I want to say it was either 2010 or '11.  So
2  probably six, I think it was about six years.
3     Q   All right then.  So then about a year
4  ago there was a reorganization?
5     A   Correct, after Marriott's acquisition
6  of Starwood.  We changed responsibility just
7  because of size.  So another position was added,
8  you know, to our team.  So basically what
9  happened is the room operation spun off and that
10  was the focus, and then there was another
11  individual who did food beverage.
12         My responsibility, you know, now is I
13  have direct accountability over individuals that
14  oversee the operations in the hotels.  So in
15  other words, and this is managed hotels, not
16  franchise but Marriott-managed hotels.  We really
17  don't have any oversight specifically into the
18  franchise hotels, my team.
19         So what I do now is I have a team of
20  about 15 area directors of operations who work
21  specifically with a group of hotels that are
22  approximately 25 managed hotels, and then we have

16

1  another individual who works with our what we
2  call Select hotels, which are courtyards,
3  Residence Inn hotels with less services.
4       So they all report in to me, you know,
5  from an operational perspective, and that's where
6  the guest experience, where we work on guest
7  experience and programs, and then additionally I
8  oversee a service team and then we have a team, a
9  Six-Sigma team as well that reports into me.  So
10  I have basically three different groups reporting
11  to me.
12       Q   Okay.  Who do you report to now?  Who
13  is your boss?
14       A   My boss is the Chief Lodging Services
15  Officer for the Americas.  Her name is Erica
16  Alexander.
17       Q   Okay, and what about in your previous
18  position?
19       A   It was to the same position.  During
20  that time, I reported in to -- Erica will be the
21  third person in that position, but the same -- I
22  reported into the same position.

17

1       Q   Okay.  How long did you report Erica
2  Alexander?
3       A   I think it's been -- I think it's
4  about three years now that she's been in
5  position.
6       Q   Okay.  We're going to look at some
7  documents and we're going to have some questions
8  about who all these folks are, so it's just
9  helpful to know who at least your immediate
10  supervisor is.  Who reports to you?  Now you've
11  described you have oversight over these various
12  managed, like 25 managed hotels, and then the
13  regional people who oversee particular areas
14  report to you; is that right?
15       A   Yeah.  So the way it works is, you
16  know, we have across the Americas, Canada, the
17  United States, Caribbean and Latin America, we
18  have groups of hotels.  So in other words within,
19  for example within the United States, we have
20  various positions called area vice presidents.
21  So there may be one person that oversees all of
22  our hotels down in Florida because that's a big

18

1  market.  There might be somebody up in the
2  northeast, the west and so on.
3       So they oversee groups of hotels,
4  managed hotels, approximately 25 hotels, large
5  hotels like the Washington, you know, the Wardman
6  Park, you know, the big hotels.  And then so the
7  individuals reporting to me are called area
8  directors of operations.
9       So again, they are specifically
10  focused on the same things that I am, and that is
11  the room's area, the food and beverage executing
12  all of the stuff that happens to service customer
13  within the hotels, and then also focus on the
14  guest experience.
15       So we look at operations, you know.
16  We help with sales.  That's our primary focus,
17  but we focus on profitability, we focus on
18  talent, we focus on guest experience in those
19  hotels.  So those individuals report into me.
20  There's a layer in there but they are all
21  reporting to me, and again approximately 15 of
22  those individuals.

19

1       There's a couple of anomalies.  You
2  know, there's one person who oversees, as I
3  mentioned, our Select brands.  He works in a
4  little bit different fashion but he works with
5  approximately 250 hotels.  It's a little bit
6  different, but again it's the same concept that
7  we focus on the exact same things I just
8  described before.
9       Q   All right.
10       A   So those are the primary areas of
11  responsibility, and I mentioned additionally that
12  there's a team we call break-through leadership,
13  but it's a service process that we put into all
14  of our hotels, and that individual and their team
15  reports into me.
16       Additionally, there is a Six-Sigma
17  team that reports into me.  Those are people who
18  again focus on guest quality, and execution and
19  look at LEAN hotels and so on.  So that group
20  reports into me too.
21       Q   All right.  Are there other kinds of
22  support staff that report to you as well?

20

1    A    No, there's support staff that help,
2  but they don't report to me.  They are not direct
3  report to me.
4    Q    Okay.  I know Marriott is a big
5  organization, but I'm trying to get an idea of
6  where you fit into the overall structure.  If
7  there's a way you can briefly describe that.
8    A    Sure, sure.  So again, for the
9  Americas, you know again that's Canada, U.S.,
10  Caribbean and Latin America, we have an
11  organization.  That is again primarily I'm
12  talking about managed hotels.  So again when we
13  talk about Marriott, I'm representing Marriott
14  International, the managed hotels.
15        There's a whole separate organization
16  for franchise hotels, which I assist with the
17  resort fee process.  But I do not operate.  We
18  are -- our policy is again, they're separate
19  companies.
20        So again, push that off to the side.
21  I worked with in the managed organizations, and
22  then there is a group president that oversees

21

1  pretty much everything, you know I mean within
2  the Americas.  Development, service, I mean just
3  responsible for the entire organization.
4        Dave, his name is Dave Grissen, and
5  then he has individuals who report to him.  One
6  of those individuals is my boss Erica Alexander,
7  and then there's other individuals again that
8  represent Engineering, Human Resources and so on
9  that report in to Mr. Grissen.
10        And then that's where I then fit in
11  and, you know, you've got Dave Grissen, Eric
12  Alexander and her counterparts and then myself
13  reporting into Erica.
14    Q    All right, and then so it's the
15  Americas?
16    A    The Americas.
17    Q    The Americas, and then obviously there
18  are other components and Marriott International?
19    A    Correct.
20    Q    So who is sort of above all of that?
21    A    The person who is ultimately
22  responsible is Arne Sorenson, who is the -- I

22

1  think his title is chief executive officer, if
2  I'm not mistaken.
3    Q    Okay.
4    A    He oversees the entire company.  He's
5  responsible for that.
6    Q    All right, okay.  That's helpful.
7    A    Okay.
8    Q    Thank you.  So why -- let me ask you
9  some specific questions about your current job
10  responsibilities.
11    A    Uh-huh.
12    Q    Does it presently include preparing
13  procedures for Marriott Hotels to charge reserve
14  fees or destination fees to hotel guests?
15    A    Can you explain that, ask it again?
16    Q    Do these include preparing procedures
17  for Marriott Hotels to charge resort fees or
18  destination fees to their guests?
19    A    So I -- I execute the procedures.  I
20  have input into what those policies might be, the
21  resort fee policy.  I have some input into that
22  because of my experience, but I am the person who

23

1  executes the policy with the hotels.
2    Q    All right.  We'll talk more about how
3  those policies are developed.
4    A    Uh-huh.
5    Q    But you're involved with those
6  policies and then executing them; is that
7  correct?
8    A    Yes.  My involvement with the policies
9  again is that they are in place, and what I will
10  do and if they're modest, minor changes, I will
11  check the committee who make minor changes.  But
12  the policies are in place and my primary role is
13  to execute them with some influence on the policy
14  itself.
15    Q    Okay.  Does it also include evaluating
16  whether a particular Marriott hotel could charge
17  a resort fee or a destination fee?
18    A    Yes.  If I'm understanding your
19  question correctly, yes.
20    Q    Okay.  So you qualified that a bit.
21  I'm asking you whether --
22    A    You need to ask the question again,

24

1  I'm sorry.

2      Q    Yeah.  Are you involved with

3  evaluating any given hotel could charge a resort

4  fee or a destination fee?  Say some hotel here in

5  D.C. that hasn't been charging a fee and they

6  want to charge one, are you involved in

7  evaluating that?

8      A    Yes, yes.  I am involved, yes.

9      Q    All right, and does it include

10  monitoring?  Do your duties include monitoring

11  which hotels are actually charging the resort

12  fees or destination fees?

13      A    Yes.

14      Q    Okay, and does it include monitoring

15  compliance by hotels with Marriott's procedures

16  who are charging the resort or destination fees?

17      A    Yes.  However, the accountability to

18  execute the resort fees or any other fees are the

19  responsibility at the hotel.  However, I monitor

20  them for compliance.

21      Q    Okay, and do your duties include

22  providing training to hotel managers to about

25

1  Marriott's policies and procedures for approving

2  the hotels to charge resort or destination fees?

3      A    We provide documents and on occasion

4  I provide training, webinars.

5      Q    All right.  Do your duties include

6  evaluating Marriott's agreements with its

7  franchisees?

8      A    No.

9      Q    Okay.  Does it include evaluating

10  Marriott's agreements with online travel

11  agencies?

12      A    No.

13      Q    Does it include evaluating Marriott's

14  reservation procedures and systems?

15      A    No.

16      Q    Okay.  Does it include how resort fees

17  and destination fees are actually displayed in

18  Marriott's online reservation system?

19      A    From a technical, from a pure display

20  perspective, no.

21      Q    But from some other perspective?

22      A    From the perspective of understanding

26

1  and looking at it to make sure we're compliant

2  with all of the policies of the FTC and other

3  government agencies are set.  I monitor to make

4  sure and compliance.

5      Q    Okay, and do your duties at time also

6  involve evaluating ways to increase revenues for

7  Marriott by using some ancillary fees?

8      A    Ancillary fees, meaning what?

9      Q    Ancillary fees such as resort or

10  destination fees?

11      A    So can you ask the question again?

12  I'm sorry, please.

13      Q    Yeah.  Does it include evaluating ways

14  for Marriott to increase revenues by using

15  ancillary fees such as resort or destination

16  fees?

17      A    One of my responsibilities is to

18  ensure that Marriott's profitable.  So I look at

19  fees.  I'm not the decider though.

20      Q    Okay.  Is there any other area that

21  you're particularly responsible for that I did

22  not ask you about?

27

1      A    I don't think so.  I mean my primary

2  responsibility is guest experience, the customer

3  experience.

4      Q    Okay, very good.  And your office is

5  located in Chicago, is that right?

6      A    I live in Chicago.  My business card

7  says Bethesda.  I travel most of the time.

8      Q    You travel, okay.  Do you travel to

9  the headquarters operation on Ferndale Road in

10  Bethesda?

11      A    Yes, I do.

12      Q    Okay, but do you travel to the hotels,

13  the various Marriott hotels?

14      A    I do, yes.

15      Q    Okay, and why do you travel to the

16  various Marriott hotels?

17      A    To understand issues in the hotels, to

18  assist them and the operating teams and my team

19  to improve guest service within the hotels.

20      Q    Okay.  So you've indicated your

21  position has included these issues relating to

22  resort fees and destination fees?

28

1    A   Yes.

2    Q   When did you first become responsible
3 for those fees?  When did that begin?

4    A   I became responsible when I took the
5 Vice President of Rooms Operations position that
6 I described, which I think was in 2010.

7    Q   All right.  Who did that before you
8 took that responsibility?

9    A   I am not 100 percent sure if there was
10 one person that oversaw it.  I would probably
11 need to go back and, you know, find a name.
12 There is one individual who was -- or assisted
13 me.  His name was John Adams in Operations, but I
14 don't know that he was over it at that point.

15    Q   All right.

16    A   Or responsible for this, excuse me.

17    Q   We have some documents that might help
18 you remember that.

19    A   Okay.

20    Q   When you became responsible for resort
21 fees, so just any hotel charge a resort fee, any
22 Marriott hotel that wanted to, could they do

29

1 that?

2    A   No.

3    Q   Okay.  Were there procedures in place
4 at Marriott for deciding which hotels could
5 charge a resort fee?

6    A   Yes.

7    Q   Okay.  Let's look at the document that
8 we have previously marked as Exhibit 21, and I'm
9 so I'm handing that to you now, Mr. Wolff.  Court
10 reporter.

11       This is a document that -- it's a
12 fairly complicated document I'll tell you because
13 there were a lot of attachments and then
14 attachments to attachments, and so I'm going to
15 try to walk you through this.

16       But the first page of this document,
17 has the Bates number ending in 41242, and it's an
18 email exchange that actually you have.  You
19 received an email from someone named Andrew
20 Houghton or How-ton at Marriott on October 1st of
21 2013.

22       The subject here, he's forwarding you

30

1 information about the Aruba service charge with a
2 number of attachments, and he says to you "FYI
3 Jeff.  Before my time, but seems like the charges
4 adopted by all hotels on the island and in our
5 existing lands.  What do you want to do next?"

6       So I'm not particularly focused on the
7 Aruba issue.  What I would like to direct your
8 attention to are some of the underlying documents
9 that were forwarded to you in connection with
10 this email exchange.  In particular, if you turn
11 to the page that ends in 41248, and it's a
12 memorandum on Marriott letterhead.  Do you see
13 that?  Keep going.  There you go, that's the
14 right page.

15       It's a memorandum to somebody named
16 Paul G-L-E-L-E-N, who was at that time the
17 general manager of Aruba Renaissance from someone
18 named Robert Everson, area director of Revenue
19 Strategy, dated January 31st of 2007, and the
20 subject is "Quarterly Resort Fee/Service Charge
21 Audit Findings January 2007."

22       Who is Robert Everson?  Do you know

31

1 who that is?

2    A   This says here that he is the area
3 director of Revenue Strategy, and since this is
4 from Aruba, I would assume that that role,
5 although I don't know for sure, was for the
6 Caribbean.

7    Q   All right, and in the first paragraph
8 of his email, "Greetings Paul," he says "In light
9 of the recent lawsuits against three of our major
10 competitors, we have tightened our focus on the
11 procedure for quoting and charging resort fees
12 and service charges.

13       "Our competitors were sued for
14 improper disclosure of resort fees and additional
15 hotel charges.  To mitigate the risk of a
16 potential lawsuit against Marriott International,
17 we feel it is necessary to implement a formalized
18 quarterly audit process whereby we review the
19 implementation, communication and execution of
20 resort fees and service charges."

21       So when you assumed responsibility for
22 this area, were there in place already some sort

32

1  of audit process for looking at the
2  implementation and the execution of resort fees
3  and service charges by Marriott hotels?
4      A   Can I look at this please?
5      Q   Please, take your time.
6          (Simultaneous speaking.)
7          THE WITNESS:  And the back is the
8  first documents or do you know?
9          BY MS. MILLS:
10     Q   Well this particular email, January
11 31st, 2007, says there are also other attachments
12 that were forwarded again to you in the original
13 email that we reviewed at the very first page of
14 this document, and among those an item on page
15 41253 called a "Resort Fees Training Energizer."
16     A   Uh-huh.
17     Q   And then beyond that is one that ends
18 in 41254, which is an undated memorandum
19 regarding the request for approval of resort fees
20 to resort general managers.  We do have metadata
21 for this.  Do you know what metadata is?
22     A   No, I do not.

33

1      Q   Oh okay.  What we can do with
2  documents that have been provided to us in
3  reviewing our own materials is that we can look
4  at the history of the document, who created it,
5  when it was sent, to whom it was sent, what the
6  title was, that sort of thing.
7      A   Okay.
8      Q   And so the metadata for the item at
9  41254 reflects the author is someone named
10 jeseg398, but the date on it is in October and
11 November of 2004.  So there's no date on this
12 document, but the metadata we've received from
13 the Marriott production indicates that it was a
14 2004 document.
15     A   Uh-huh.
16     Q   And so there's that item, and then
17 there's another item all the way toward the back,
18 ending 41257.
19     A   Okay.
20     Q   And this one, if you can find that.
21 Did you find that?
22     A   I have it, yes.

34

1      Q   This one, the title is "Resort fee
2  offerings," and it has a date of May 1st of 2002,
3  and it states the beginning develop, "The
4  objective is to develop and offer products and
5  services to the guests of resort properties that
6  are outside the normal scope of guest services."
7  Again, May 1st of 2002.
8          So it appears from the email that you
9  received in 2013 that Mr. Houghton forwarded
10 these  documents to you, and I do have some
11 questions for you about them.  Do you have any
12 recollection of receiving these materials?
13     A   Let me look at it.  What is this here?
14     Q   That's metadata.
15     A   I mean this -- that's metadata, so I
16 shouldn't -- that's not from us.  That was your
17 metadata, okay.
18     Q   Well, it's metadata taken from
19 Marriott's production.
20     A   Got you.  But it's not -- okay, got
21 you.
22     Q   It's not actually part of the

35

1  document.
2      A   Got you, and then dated August on the
3  back?  Is that how it is?  I mean this is the
4  start of it?
5      Q   Yes.  Starting at -- starting at the
6  very back of the document I was describing at
7  1257 is the May 1st, 2002 document.
8      A   Okay.
9      Q   And if you wanted to take a look at
10 that --
11     A   Let me look at it please.
12     Q   Please, yes.  It's a complex document
13 that had many attachments, as I've said.  So take
14 your time.
15         (Pause.)
16         THE WITNESS:  Okay, I read it.  Can
17 you ask me -- if there's a question.
18         BY MS. MILLS:
19     Q   Okay.  Yes, there are questions.
20     A   Okay.
21     Q   I just wanted to be sure you had an
22 opportunity to review this rather complicated

36

1  document.
2      A    Okay.
3      Q    So let's go back to the very beginning
4  for a moment, and you are receiving an email from
5  Andrew Houghton.  He's forwarding you material he
6  received from Robert Everson.
7      A    Uh-huh.
8      Q    And Everson is speaking here to Andrew
9  Houghton and says "The service charge in Aruba is
10  coming up in question, so thought I'd give you a
11  little background."  So he's filling him in on
12  some history here it appears.  Is that a fair
13  statement?
14     A    It looks like that --
15     Q    Okay, all right.  One of the things
16  that he said here in the second paragraph, that
17  is Mr. Everson "We used to charge a service
18  charge quite a few years ago, but when Marriott
19  did away with them we removed the charge.  The
20  hotel suffered in revenue, and we ended up
21  putting the charge back in place around 2006.
22          Because all hotels in Aruba charge a

37

1  service charge, not a resort fee, we did the
2  same."  Then he goes on to say "With a resort
3  fee, we were extremely strict on the disclaimers
4  to the guests, including," he says, "a disclaimer
5  in the reservations process."  Do you see that?
6      A    Right here, yes correct.  I see that,
7  uh-huh.
8      Q    Okay, and then he's again forwarding
9  this document that has the date of November 14th
10  of 2007 --
11     A    What page is that?
12     Q    That is at page 41244, and this is an
13  underlying email also that has other attachments.
14  I'm just trying to walk you through the
15  complexity of the document.  But then the
16  underlying item that we deferred to earlier dated
17  January 31st of 2007 at 41248 is what is the next
18  focus here.
19          This is the resort fee audit findings
20  memorandum from Robert Everson, and we read the
21  first paragraph here about recent lawsuits
22  against Marriott's major competitors.  Do you

38

1  have any knowledge of that, what those lawsuits
2  were about?
3      A    No.
4      Q    You don't, okay.  When you took over,
5  was this resort fee audit process that he has
6  described here in place?
7      A    I am not familiar with what he's
8  referring to.  This is from the Caribbean, so it
9  may have been specific.
10     Q    Okay.  Then if we look at page 41253,
11  that was this Training Energizer on resort fees.
12  If you look toward the middle of the page,
13  there's a general caption "What You Need To
14  Know," and then there are some bullet points.
15  The third bullet point down says "Resort fees
16  must be quoted to the customer."  Do you see
17  that?  It's the third bullet point.
18     A    Oh right here.  Oh got you, yes.
19     Q    "Resort fees must be quoted to the
20  customer," and then following that "Customers may
21  opt out of the resort fee once they have arrived
22  at the hotel.  Feel free to share this

39

1  information with customers that object to the
2  fee."
3          And then beneath that "A pop-up box
4  will alert you to resort fees when you sell a
5  participating hotel."  So I guess my question to
6  you is were you familiar with Marriott having a
7  procedure like this at the time that you took
8  over responsibility for resort fees?
9      A    No, I'm not.  I mean if this looks
10  like, based on this logo, it looks like it may be
11  from Caribbean.  So can you ask me again?  Which
12  is the specific question --
13     Q    The question is the procedures
14  relating to resort fees must be quoted to the
15  customers and customers may opt out of the resort
16  fee once they arrived at the hotel.  Was it your
17  understanding that those were the procedures that
18  Marriott hotels were following regarding resort
19  fees at the time that you took over?
20     A    Yes, yes, because that is part of the
21  policy.  That is --
22     Q    And that was the policy at the time

40

1  you took over?
2      A   That is correct.
3      Q   Okay.  So let's turn then to the page
4  also at 41254.  This is that undated memo that we
5  converted was from 2004.  This is describing
6  eligibility.  Do you see the second paragraph
7  "Eligibility for Resort Fees"?
8      A   Yes.
9      Q   "Resorts that meet each of the
10 following criteria may be candidates for an
11 exception to the existing resort fee standard,
12 which is not to have a resort fee in place."  So
13 was that the standard policy at Marriott when you
14 assumed responsibility for resort fees, that
15 essentially there was a policy not to have a
16 resort fee at hotels?
17     A   This was 2004, so my answer would be
18 I don't know.
19     Q   You don't know.
20     A   But I was uninvolved.
21     Q   Okay.  But at the time that you took
22 over responsibility, was that the policy, not to

41

1  have -- not to have a resort fee?
2      A   Marriott generally does not like to
3  have fees.
4      Q   Okay, generally.  But in particular
5  resort fees?  Was that something Marriott didn't
6  want to have in place?
7      A   Resort fees were based on -- are based
8  on, well back here, based on what I'm reading,
9  and similarly today, defined if our competitors
10 had it, it would be a competitive disadvantage
11 not to.  so that is why we would say we will
12 consider adding a fee.
13     Q   Okay.  Let's turn back to the 2002
14 document, which is at 41257, and if you -- there
15 are some captions here, Standard Criteria.  Do
16 you see that toward the middle of the page?
17     A   Yes.
18     Q   And let me just sort of read some of
19 these criteria into the record here.  The first
20 bullet point says "Each resort offering that is
21 not complimentary, e.g. has a fee, is to be
22 offered on an optional basis to guests and/or

42

1  meeting planners.  Mandatory fees are not
2  allowed."
3          At the time that you assumed
4  responsibility for resort fees, were mandatory
5  fees not allowed?
6      A   Based on the policy, fees were
7  allowed.  I don't know that I would categorize
8  them as mandatory, but fees were allowed when I
9  took over the policy, correct.
10     Q   Okay.  Well do you know whether
11 Marriott had a policy that essentially prohibited
12 charging mandatory resort fees?
13     A   What date?
14     Q   At the time that you took
15 responsibility.
16     A   I'm sorry, ask the question again.
17     Q   I'm sorry.  At the time you took
18 responsibility for resort fees, did Marriott have
19 in place a policy that prohibited charging a
20 mandatory resort fee?
21     A   No.
22     Q   In other words, where no one could opt

43

1  out of it?
2      A   You're talking specifically -- so I
3  think, let me rephrase the question.
4      Q   Yes.
5      A   Are you talking about did we allow
6  guests to opt out of resort fees?  Is that what
7  you're asking me, because I'm not clear.
8      Q   Well, I'm asking you whether mandatory
9  fees were not allowed?  Was that just a
10 prohibition?
11     A   Mandatory.  Mandatory fees were
12 allowed with approvals.  That's our approval
13 process.
14     Q   Okay.  That was at the time that you
15 took over?
16     A   That I took over, correct.
17     Q   Okay.
18     A   Yes.
19     Q   Mandatory fees were allowed, so long
20 as they were approved?
21     A   Met the criteria and approved,
22 correct.

44

1    Q   Okay.

2    A   Uh-huh.

3    Q   Do you know at some -- I mean this

4  memorandum says mandatory fees are not allowed.

5  At some point did Marriott put into place a

6  process for allowing mandatory fees?

7    A   I can't answer because that was before

8  my time.

9    Q   Okay, that was before your time, and

10  you don't have any recollection of discussions

11  with someone about that gee, we didn't use to do

12  it this way.  We do it now this way?

13    A   That's correct.  I have no

14  recollection.

15    Q   Okay.

16    (Pause.)

17    BY MS. MILLS:

18    Q   If we turn back to the page at 41254,

19  that's the later memorandum that we concluded

20  from metadata was from 2004, and this describes,

21  it appears to describe various criteria that had

22  to be satisfied to be able to charge a resort

45

1  fee.  Is that a fair statement, the eligibility

2  section?

3    A   Yes.

4    Q   And if we turn then to the next page

5  of this document, at 41255, there's a paragraph

6  number two that begins by stating "The resort fee

7  must be effectively communicated through all

8  Marriott and third party reservation channels,

9  and disclosed at the time the reservation's made.

10    "Guests purchasing the leisure and

11  business transient rates should be quoted the

12  resort fee at the point of reservation.  Once the

13  rate is purchased, the reservation agent should

14  disclose the resort fee and compliance and denote

15  the guest's agreement in the reservation."

16    At the time that you assumed

17  responsibility for resort fees was -- does this

18  describe the procedure that was in place at

19  Marriott, the language I just read from paragraph

20  two, where the agent is to quote the resort fee

21  at the point of reservation and once the rate is

22  purchased, the reservation agent should denote

46

1  the guest's agreement in the reservation?

2    A   This appears to be Marriott policy at

3  that time.  I don't know if when I took over that

4  was the policy in place at that point.

5    Q   Okay.  Then the next paragraph three

6  says "Guests must again be informed of the resort

7  fee a check-in, and be informed of the ability to

8  request a waiver of the resort fee and opt out.

9  If the guest has opted out at the point of

10  reservation, they will not be asked to confirm

11  their decision at check-in."

12    Now again, does this paragraph

13  describe the procedures that were in place when

14  you assumed responsibility for resort fees, that

15  is where guests had to be informed of the fee at

16  check-in and of the ability to request a waiver

17  to opt-out?

18    A   If you're asking for a specific

19  recollection that this was in place when I took

20  over, I can't answer that question.  I don't

21  know.

22    Q   You don't know?

47

1    A   Yeah.

2    Q   Okay.  It's possible; you just don't

3  know?

4    A   It's possible, but I would need to see

5  documents.

6    Q   Uh-huh, and again when you took

7  responsibility was that 2010 or 2011?

8    A   2010.  I had to look a minute.  It

9  could have been -- I think it was 2010 if my

10  memory serves me correctly.

11    Q   All right, and this, this document, as

12  we concluded, goes back to 2004?

13    A   Correct.

14    Q   So something may have changed in

15  between?

16    A   Yes.

17    Q   You just don't know?

18    A   I don't know.

19    Q   All right.  Then paragraph six toward

20  the bottom of page 41255, that reads "Resort fee

21  should be assessed to those guests that would

22  most benefit from the sort fee components, rather

48

1  than charge to all segments of the resort
2  business mix."
3       It goes on to provide some of the
4  following guidelines, and there appear to be
5  different segments that are described.  The first
6  one is the leisure/transient segment, then the
7  business transient segment and some wholesale
8  group and Marriott Rewards Redemption segments.
9       So for the leisure/transient segment,
10  this document says "Resort fees will be assessed
11  except as to a guest whose reservations were made
12  prior to implementation of the fee and notice
13  procedures, and guests whose stay is covered by a
14  corporate agreement that does not provide for the
15  resort fee."
16       Then if you look at the
17  business/transient segment, it says "Resort fees
18  will be assessed only if the service components
19  of the resort fee are substantially applicable to
20  the needs of the business transient resort stay,
21  the guest has agree to the fee and the components
22  of the stay is not covered by an existing

49

1  corporate agreement."
2       So at the time that you took
3  responsibility for resort fees in 2010, were
4  resort fees viewed differently with respect to
5  the various segments, the types of travelers,
6  leisure travelers versus business travelers?
7       A    The overall answer is it was the same.
8  However, looking at this, there may have been
9  some variations or changes which I'm not aware
10  of.  Again, this was five or six years before I
11  took over, but generally speaking if you're
12  asking in 2010, it would be very similar to this.
13       Q    In 2010, the leisure travelers and
14  business travelers were viewed differently with
15  respect to whether or not they should be charged
16  a resort fee?
17       A    Yes.
18       Q    That was in roughly 2010.  So those
19  procedures appear to have been still in place in
20  2010?
21       A    With the caveat that there may have
22  been some changes to the specifics here which I

50

1  can't compare, but yes.
2       Q    Okay, all right.  That's helpful.
3  Thank you.  So we can set this complicated
4  document aside.  Thank you for your patience with
5  it.
6       A    Good one to start with.
7       Q    Right.  We'll move to a somewhat
8  hopefully similar one.  This has been marked as
9  Exhibit 22, and I'm handing you that now.  It's
10  an email from you dated December 13th -- oh
11  excuse me, December 19th of 2013 to someone named
12  Patti LaChapelle.  Who is Patti LaChapelle?
13       A    The name does not really look -- let
14  me read this.
15       Q    Sure, take a moment.
16       A    Okay.
17       Q    The subject is "Resort Fee Policy
18  MIHDQ."  Is that MIHDQ, is that Marriott
19  International Headquarters?
20       A    That would be from Marriott.  I think
21  that's approximately correct.  It's a Marriott
22  document.

51

1       Q    Sure.  And so what's going on in this
2  document is someone has emailed, somebody called
3  Ask Opps, O-P-P-S.  What is Ask Opps?
4       A    Ask Opps is a general line where
5  hotels can send in a question if they don't know
6  who to ask, and it's kind of a help line.
7       Q    So then someone receiving these
8  requests does some homework and figures out who
9  should best get the request?
10       A    Yes, correct.
11       Q    So this has been apparently forwarded
12  to you by Patti LaChapelle, and she says, if we
13  look on page 82821, "Good afternoon everyone.
14  I'm trying to find the resort fee policy that is
15  referenced in Standards but have no luck.  Does
16  anyone have this or know where I can access it?"
17       The question that's being asked, if we
18  go all the way to the very beginning of this
19  email thread on 82823, is -- if you're there "Hi
20  there.  According to this standard, there should
21  be a resort fee policy, but I'm not able to find
22  it in Standards.  Could someone provide us with

52

1  the policy or direct us to it?"

2      A    Uh-huh.

3      Q    So that's the question, and you then
4  on page 82820 say "I oversee the resort fee
5  policy." You said that on December 17th of 2013.
6  "Please let me know how I can help you." So then
7  "The underlying question here is we're wanting to
8  make sure our EDRS, the data reference system
9  that the sales associates is updating, or is up
10 to date concerning the resort fee policy. I
11 wasn't able to find it."

12         And then Patti LaChapelle goes on to
13 ask at the very last sentence on that page,
14 82819, "Specifically, the opt out piece of the
15 policy is what we're looking at. Is it possible
16 to take a look at the policy?" So she's asking
17 in particular about an opt out piece of the
18 policy.

19         You then answer her at the very
20 beginning of this document "The resort fee is
21 mandatory. Having said that, if the guest notes
22 that they still object to the resort fee, I

53

1  recommend that the agent tell the guest that they
2  can discuss this at check-in. Having said that,
3  we do not want to encourage this, at it will
4  increase the chance of conflict with the
5  associate at check-in. I would ask that the
6  agents be trained how to sell the benefits and
7  value of the resort fee to the guest."

8         So in December of 2013, the answer
9  that you then provided to Patti LaChapelle was --
10 did that represent Marriott's policies at that
11 time regarding whether or not resort fees were
12 mandatory and how a guest could perhaps get out
13 of paying for them?

14     A    Yes.

15     Q    Do you know when that policy was put
16 into place?

17     A    It was in place when I took over, so
18 I don't know.

19     Q    You don't know.

20     A    It was there when I took over.

21     Q    All right. I'll show you another
22 document, Exhibit 25. This is again an email

54

1  from you. You're writing to Ralph Vick on
2  February 26th of 2014 regarding "Important SRQRZ
3  New Resort Fee." It appears that SRQRZ relates
4  to the Sarasota Ritz Carlton Hotel, if you look
5  at this document.

6      A    Uh-huh.

7      Q    And if you turn to the page beginning
8  at 83, or excuse 84304, someone named Chris Hoppe
9  or Hop-ey is writing on May 15th of 2013, and he
10 says here, he's describing the resort fee alert
11 for the Ritz Carlton Hotel in Sarasota. If you
12 look toward the bottom of his emails, down
13 towards this area, it says "Note: This is the
14 only Ritz Carlton resort with the option to opt
15 out of the resort fee."

16         And it's describing elsewhere in this
17 email that the resort fee would be $28 and there
18 was components and amenities that would be
19 included in the fee. So this has been forwarded
20 to Ralph Vick by someone named Catherine Belisle,
21 B-E-L-I-S-L-E on February 26th of 2014. I'm
22 looking at page 84304.

55

1         And she says "Please see the note that
2  Chris put in place for the agents. If you read
3  the bottom, it notes that it is a resort fee,
4  that it is optional." So she's apparently noting
5  what we've just looked at a moment ago, of this
6  is the only Ritz Carlton with the option to opt
7  out.

8         This is email is received by Ralph
9  Vick, who then says to you "I was a little
10 surprised when I saw this. I thought it was
11 mandatory that there had to be an opt-out option.
12 Is this not the case?" So who is Ralph? He says
13 here he's a general manager of a Ritz Carlton in
14 Greensboro, Georgia. Do you remember Ralph Vick?

15     A    Ralph Vick was -- he's from
16 Greensboro, Georgia. So I'm not sure if this is
17 when he transitioned, but he was the general
18 manager at a resort, a Ritz Carlton resort in
19 Georgia and apparently, I don't know for sure, it
20 seems like he was transferred to this property,
21 and is questioning the statement that was the
22 designated by Chris Hoppe, that the resort fee is

56

1 optional and he was questioning the validity.
2 Thus, the memo to me.
3     Q    Right, and he says he thought it was
4 mandatory that there has to be an opt-out option.
5 Is this not the case?  And then so finally
6 getting to your response to him on February 26th,
7 on the first page at 84302, you say "Hi Ralph.
8 It should not be considered optional.  When you
9 visit ritzcarlton.com, a dialogue box pops up
10 telling the guests about the resort fee.
11     When you get the price for the room it
12 shows up, and when you book the reservation it
13 shows up as a separate line item like a tax.  A
14 guest cannot opt out at the time of booking.  All
15 OTA sites reflect the same."  OTA is Online
16 Travel Agency, right?
17     A    Yes, correct.
18     Q    All right.  So at the time that you
19 wrote this email, February of 2014, did this
20 describe the procedures that were in place for
21 Ritz Carlton hotels or for all Marriott hotels or
22 both?

57

1     A    This reflected for all Marriott hotels
2 in the Americas.
3     Q    Okay.  If we then read down a little
4 bit further into your email, there's -- per the
5 documents you say the following is stated.
6 Number four.  "Upon check-in, the resort fee and
7 the product services received for the fees should
8 be disclosed in writing, e.g. a promotional
9 flyer.
10     "If the guest objects to the resort
11 fee, the resort should waive the fee.  If the
12 resort fee has been waived, the resort may charge
13 the guest for the individual services included in
14 the resort fee program, to the extent practical
15 to do so."  So if a guest, a customer objects you
16 can take it off as a guest relations gesture.
17 However, you must charge them a la carte for all
18 of the resort fee goods or services.  So was this
19 also part of Marriott's policy in February of
20 2014?
21     A    Yes.
22     Q    Okay, and do you know when that policy

58

1 was adopted?
2     A    Not without it being in front of me,
3 but I would say that that was the policy that was
4 in place when I took over, or perhaps shortly
5 thereafter, so that it was consistent.
6     Q    Okay.  Let's look at one more email
7 here.  This has been marked as Exhibit 53, and
8 it's an email exchange between you, among others,
9 and someone named Michelle Pajot or Paget, P-A-J-
10 O-T.  Who is Michelle Pajot?
11     A    Michelle Pajot was at that point in
12 Franchise, in the Franchise Division, and was my
13 counterpart.
14     Q    I see.
15     A    I.e., she oversaw Rooms Operations.
16     Q    Okay, and this particular email
17 relates to the Lake Arrowhead Resort and Spa
18 Autograph Hotel resort fee default letter, and
19 then there is an attachment.
20 LakeArrowheadResortandSpaPajot.pdf and Resort Fee
21 Policy memo of November of 2014.  If you turn to
22 that memo, it's at 60789.

59

1     A    Okay.
2     Q    Do you see that?
3     A    I do.
4     Q    Okay.  So let's focus on this
5 attachment at 60789.
6     A    Okay.
7     Q    This is a resort fees process
8 memorandum to Resort General Manager, November of
9 2014, from you, Jeff Wolff, right?
10     A    Uh-huh.
11     Q    With copies to the area vice
12 president, "Request for Approval, Resort Fees
13 Process."  Did you prepare this document?
14     A    Yes.  This is my document, yes.
15     Q    Okay, and the very beginning of the
16 paragraph here says, if we look at the last
17 sentence, "This procedure only applies for resort
18 fees that are automatically included and not
19 where a guest may choose to opt in."
20     A    Uh-huh.
21     Q    And then below that under Eligibility,
22 it describes these various criteria, whereby a

60

1  resort fee may be charged by a particular hotel
2  and it does say here "Resorts that meet each of
3  the following criteria may apply for an exception
4  to the existing resort fee standard, which
5  generally prohibits the imposition of a resort
6  fee."
7      So in 2014, we talked about this a
8  little bit earlier, Marriott's policy was to
9  generally prohibit charging resort fees.
10     A   Fees.
11     Q   Right, and that the policy here
12 applies only to those that are automatically
13 included, not to optional fees, is that right?
14     A   Right, yes.  The opt-in is different
15 from the resort fee.
16     Q   All right.  We'll talk about that.
17 But then there are these four criteria, the
18 market norm, what the resorts achieved in guest
19 satisfaction survey score that's sufficiently
20 high, the resort's owner/franchisee is requesting
21 the implementation of the fee, and the resort
22 resides in a jurisdiction in which the imposition

61

1  of a resort fee will not result in significant
2  legal risks.
3      Let's focus on that last one for a
4  moment.  What do you mean "a jurisdiction that
5  will not result in significant legal risks"?
6      A   Because each hotel is operated and
7  managed by a general manager or a franchise
8  operator, we put that in there to make sure that
9  they are fully compliant with all rules and
10 regulations.  This also goes to -- this fee will
11 also go to Caribbean and Latin America, which is
12 our 50 countries, and I would never have any
13 knowledge about their laws and regulations.
14     So we put that in there to ensure that
15 the general manager or the franchise company
16 understands if there are any legal risks or
17 ramifications in their market.
18     Q   Okay.  Do you know of any particular
19 markets where there were legal risks or have been
20 over time?
21     A   Not particularly.  There are certain
22 regulations such as Hawaii, which is noted in

62

1  resort fee documents, that require a
2  notification.  But beyond that, we leave it up to
3  the general managers or the franchise company to
4  ascertain if there are legal risks within their
5  markets.
6      Q   Okay.  Did these procedures apply
7  across the board to all Marriott hotels?
8      A   I can speak for the Americas.  For the
9  full service hotels in the Americas, yes.
10     Q   Describe what a full service hotel is.
11     A   Full service is Marriott, Renaissance,
12 J.W. Marriott, Ritz Carlton, those hotels that
13 have a full range of amenities, restaurants and
14 so on.  The other hotels that we call Select
15 hotels are Courtyard, Residence Inn, you know,
16 those that are basic type hotels, you know, that
17 don't have the full range of amenities that a
18 full service hotel would.
19     Q   So they don't have restaurants; they
20 might not have a fitness center?
21     A   Well, they have a restaurant or have
22 a fitness center, but not to the same level.

63

1  They may not have a business center, they may not
2  have meeting rooms, whereas a Marriott, a big
3  Marriott, a full service Marriott would.  So
4  they're different, they're scaled back.
5      Q   They're scaled back, okay.  So these
6  apply to all of those hotels in the Americas at
7  the time?
8      A   That's correct.
9      Q   Franchised and managed hotels?
10     A   Yes.
11     Q   All right.  Again, we read this
12 language at the very top.  The fee applies, the
13 procedure applies only to resort fees that are
14 automatically included?
15     A   Uh-huh.
16     Q   Did Marriott have a procedure for
17 resort fees that were not automatically included?
18     A   Excuse me.  That is where it says on
19 this last sentence "and not where a guest may
20 choose to opt-in."  So in other words you have a
21 mandatory resort fee and we follow all the
22 regulations on that, notifying the guest at the

64

1  time of booking, when they check-in, all the
2  policies and processes.
3        However, some hotels may choose to
4  have a package, you know, it could be a package,
5  it could be five packages that, as you are
6  checking in as a guest, we would offer to you the
7  option to buy into a package.  It may be more
8  specific.  If you're coming in with children, you
9  may have a package of additional amenities, very
10 specific, you know, to that individual.
11       If they say no thank you, then that's
12 it.  But it's not mandatory.  It's an up-sell.
13    Q    Okay.  So a special package offer?
14    A    That's not mandatory.
15    Q    That's not mandatory.
16    A    That's correct.
17    Q    Correct.  Did, I guess my question was
18 did Marriott have a procedure for resort fees
19 that were not automatically included?
20    A    If I'm understanding your question
21 correctly, mandatory resort fees, every hotel has
22 to follow our process and procedure.  If there is

65

1  a mandatory resort fee and those policies are
2  laid out in this document, they're meant to
3  ensure compliance with all policies.
4     Q    Okay.  But if they were offering, if
5  a hotel was offering sort of an opt-in package,
6  did Marriott get involved in approving,
7  overviewing that?
8     A    No, no.
9     Q    Okay.  So a Marriott hotel could only
10 charge a mandatory resort fee if it followed the
11 policy and process outlined in this memo?
12    A    That is correct, yes.
13    Q    Okay, and this is November of 2014?
14    A    Uh-huh.
15    Q    When did you put this together in
16 November of 2014?  Do you recall?  Was there a
17 particular reason?
18    A    Well, there's I'm sure you have seen
19 in the documents that there were various
20 iterations of these documents, and what I would
21 do in my normal course of business overseeing
22 resort fees, if there were any changes to any

66

1  specifics, I would make changes.
2        To my knowledge, we made no overall
3  major changes.  The changes that typically would
4  take place would be, for example, in bullet
5  number or in Item No. 2 of Eligibility, where it
6  says "GSS," that's our guest survey satisfaction,
7  overall satisfaction scores and a 70 and 70 or 51
8  for full service brands in the Americas is the
9  failing grade, so to speak.
10       That's since increased.  The current
11 grade is 55.  So what we do over the course of
12 years we set higher standards for our properties,
13 and the new red zone or the new non-compliant
14 level instead of being 51 was 55.  And then it
15 also notes in here that Ritz Carlton was 42.
16 They've since gone to a different system, and so
17 the number changed.
18       So in terms of making sure that hotels
19 complied, I would make modifications in those
20 types of areas, but no major policy changes.
21    Q    Okay, that's helpful.  Thank you.
22 Let's look at the implementation requirements.

67

1  Those are on 60790.
2     A    Uh-huh.
3     Q    All right.  So do these lay out the
4  basic parameters of what a resort fee is supposed
5  to be?
6     A    These are the requirements that must
7  be met for a property to implement a fee.
8     Q    Okay, and so they're supposed to be a
9  5 to 1 value ratio, the fee being the one and the
10 value being the five, is that right?
11    A    Yes, correct.
12    Q    Okay, and if we look at the next page,
13 there's a number three, and below that (d).  Now
14 this requires evidence of effective
15 communications that will be demonstrated through
16 periodic testing.  This relates to the effective
17 communication of the resort fee.  That's Item No.
18 3.
19       Then it says "Evidence of effective
20 communications will be demonstrated through
21 periodic testing, which is the responsibility of
22 the hotel leadership team, to show that 90

68

1  percent or more of guests charged the resort fee
2  received notice at the time of reservation, and
3  100 percent of guests received notice at or
4  before check-in."
5        And so the requirement here is the
6  communication actually of the resort fee, is that
7  the hotels have responsibility to show that 90
8  percent or more of the guests charged the fee
9  received notice at the time of the reservation,
10  is that right?
11      A   That's correct.
12      Q   Okay, and so then there's going to be,
13  have to be periodic testing.  The hotel does the
14  periodic testing?
15      A   There's two forms.  We require the
16  hotels, again going back to my comment on
17  franchise hotels, that they are responsible for
18  their operations.  So we tell them what we
19  expect.  On the managed hotels, the ones I'm
20  referring to they're managing, the question we're
21  on now, it is the general manager's
22  responsibility to monitor, to ensure the training

69

1  and the monitoring takes place.
2        Also, you know, we monitor through
3  annual shops of our hotels to see if they're
4  compliant and if they're not, those come to me
5  and they go back to the hotels.  So we have
6  another layer of audit.
7      Q   Okay.  So we'll talk more about this,
8  but the hotel management's supposed to show here
9  that 90 percent or more of guests charged a fee
10  received notice at the time of the reservation.
11  Why only 90 percent, whereas it's 100 percent
12  received notice at or before check-in?
13      A   Because there are multiple times in
14  the reservation, the booking process, the
15  reservation process, be it online, be it through
16  an OTA or referral, where the guests are told
17  about the resort fee.  So the 90 percent is a
18  realistic number.  It's not always going to --
19  nothing in the world's 100 percent, we understand
20  that.
21        But we want to set a very high level
22  for the customers, knowing that by the time they

70

1  get to the desk, they have probably -- they
2  couldn't have booked a reservation without
3  knowing about it, because it states it at several
4  locations.
5        Then when they get to the desk, it
6  makes a lot of sense, you know again, to remind
7  the guests about that.  So there's multiple
8  levels before they reach the desk to check in.
9      Q   And then to receive notice that a fee
10  is being charged; is that correct?  Just notice
11  that that fee is being charged, or is there more
12  involved with that notice requirement?
13      A   In terms of a desk or a policy, we ask
14  hotels to provide a written document that
15  promotes the amenities and the resort fees, to
16  make sure that the guests who are paying for the
17  resort fee use all the amenities and know all
18  about the amenity, because they've enhanced the
19  guest experience.
20      Q   All right, and as to the time of the
21  reservation, so what -- they're supposed to
22  receive notice of the fact that a fee is being

71

1  charged, is that right?
2      A   Yes.
3      Q   What else are they supposed to receive
4  notice of regarding the fee?  Are they supposed
5  to be told the amount?  Are they supposed to be
6  told what amenities are included?  Are they
7  supposed to be told that they can opt out of it
8  at the front desk when they check in?  All of
9  those things?
10      A   What we inform the guest on is that
11  there is a mandatory resort fee, and then we have
12  something I call a dialogue box, and when
13  you're making the reservation, it pops up and
14  says "Hotel has a resort fee of $25.  Includes,"
15  and then it will give an example of the
16  inclusions there, you know, and it's bold on the
17  top.
18        Additionally, if a customer calls the
19  800 number, there is a dialogue box that pops up.
20  Their agent would tell the customer there's a
21  resort fee that includes X, Y and Z, you know,
22  those types of things.  So the guest should know

72

1  at that point and is informed that there's a
2  resort fee and what the general amenities are.
3      Q   And what the amount is?
4      A   And what the amount is, correct, yes.
5  That is -- that's correct.
6      Q   All right.
7      A   Uh-huh.
8          MR. MARQUIS:  I'd interrupt here.  Can
9  we take a break for a few minutes?  Jeff, do you
10 want a break?
11         THE WITNESS:  Yeah.
12         MR. MARQUIS:  I mean I don't want to
13 interrupt  your line of questioning.
14         (Simultaneous speaking.)
15         MS. MILLS:  Yeah.  There's just a
16 couple more questions on this document.
17         MR. MARQUIS:  That's fine.
18         BY MS. MILLS:
19     Q   If we can just wait another minute.
20 It won't take much longer here.  And so this then
21 also describes, if we look at Point No. 4 on this
22 same page, 60791, "Upon check-in, the resort fee

73

1  and the product services received for the fee
2  should be disclosed in writing, e.g. a
3  promotional flyer."  You described that.
4      A   Uh-huh.
5      Q   If the guest objects, the resort
6  should waive the fee but must charge the guest
7  for the individual services included in the
8  resort fee program.  So that was -- that's the
9  policy in place as of 2014, and it sounds like it
10 was in place prior to that time as well; is that
11 correct?
12     A   That's correct, yes.
13     Q   Okay.  Could a guest opt out of the
14 fee at the time of booking the reservation?
15     A   No.
16     Q   No.  Why not?
17     A   It's in there as a fixed charge.  The
18 guest is told about it.  If the guests chooses,
19 you know, does not want to pay a resort fee, he
20 or she would have an option to look at another
21 hotel without a resort fee.
22     Q   Okay.  In establishing that part of

74

1  the procedure where the opt-out is at the time of
2  check-in, do you recall any discussions within
3  Marriott about what a guest's general state of
4  mind is at the time they check-in?
5          Maybe they're running late, they're in
6  a hurry, they maybe arrived in the middle of the
7  night because their flight was delayed.  They
8  want to get to the room, go to sleep, change
9  clothes, get to a meeting and so forth.  Do you
10 remember discussions about that?
11         If somebody checks in and they're in
12 a hurry, they're tired, they just need to keep
13 going.  Did you talk about that?
14     A   I don't recall having a conversation
15 specifically about that in terms of resort fees.
16     Q   Okay, and I'm gathering from what
17 you've said that the guests would be charged for
18 the individual services included in the fee, only
19 if they use them?
20     A   That's correct, uh-huh.
21     Q   Okay, and then one more item,
22 paragraph six, which is on the next page, 60792.

75

1  This then describes what we talked about earlier
2  of the leisure/transient segment versus the
3  business/transient segment.
4      A   Uh-huh.
5      Q   And so at least in November 2014,
6  those two types of travelers were considered in
7  somewhat different ways, as to whether or not the
8  imposition of a resort fee was appropriate; is
9  that correct?
10     A   That's correct, yes.
11     Q   Okay, and so it might not be so
12 appropriate for a business transient segment,
13 depending at least on what the amenities are?
14     A   That would be up to the customer.
15     Q   Up to the customer meaning?
16     A   If you're -- if you're asking the
17 question on business transient segment, there are
18 many individuals on business transient segment
19 that would opt, that would take the resort fee
20 because of the value yes, if that's your
21 question.
22     Q   Right.  But at the time the

76

1 reservation is booked, would there be a
2 difference in whether or not -- let's say you're
3 booking a reservation, and I've seen there is a
4 leisure rate at some hotels, or at least at
5 certain times at some hotels.
6     A    Uh-huh.
7     Q    So would the resort fee only be
8 mandatory for the leisure guest, or would it be
9 mandatory across the board for all guests?
10     A    It is mandatory across the board, but
11 on the business transient segment there are
12 negotiated rates with specific accounts, and the
13 person or the company negotiating the rate would
14 decide if they want to have a resort fee or they
15 don't want to have a resort fee.  That would be a
16 specific negotiation.
17     Q    So that would be a business account.
18 So for example, you know, employees of Apple are
19 traveling around, and Apple negotiates an
20 arrangement with Marriott for their employees to
21 stay at Marriott hotels.  Is that what you're
22 describing?

77

1     A    Correct.
2     Q    And so Apple might decide whether or
3 not they want to include a resort fee?
4     A    That would be part of the negotiation
5 with a specific company.
6     Q    Okay.  Some business travelers may not
7 be part of a larger negotiated arrangement
8 between their employer and the hotel chain.  What
9 about those folks?
10     A    They have the ability to opt out?
11     Q    At the desk?
12     A    Yes.
13     Q    But it's not part of the reservation
14 process?
15     A    I'm sorry, I didn't understand that.
16     Q    They can't opt out at the time of
17 reservation?
18     A    They cannot opt out at the time of
19 reservation, correct.
20         MS. MILLS:  Okay, all right.  I think
21 we can finish with this document and take a
22 break.

78

1         (Whereupon, the above-entitled matter
2 went off the record at 11:03 a.m. and resumed at
3 11:13 a.m.)
4     BY MS. MILLS:
5     Q    Speaking of the record, let's go back
6 on the record.  So we talked about these policies
7 in your memo of 2014, and you mentioned that you
8 did some periodic updates.
9     A    Uh-huh.
10     Q    And I'm handing to you now Exhibit 35,
11 which appears to me to be very similar to what we
12 just reviewed for 2014, but has a November of
13 2015 date on it.  Again, from you to the resort
14 general managers Request For Approval, Resort Fee
15 Process."  So this was the next iteration of this
16 process memo, is that right?
17     A    I believe it is.  If it was in the
18 record it must be, yes.
19     Q    If we look at the first pages in Bates
20 numbers 12 through -- let's see here, 12 through
21 21, these look pretty much the same to me as what
22 we looked at for the 2014 period, and that

79

1 paragraph two that you said you modified from
2 time to time regarding the overall guest
3 satisfaction score, the 2015 memorandum also
4 describes 51 for the Four Seasons brands and 42
5 for the Ritz Carlton.  So that doesn't appear to
6 have changed?
7     A    Correct.
8     Q    And maybe if you can just take a
9 moment to look through these pages.  Again, in 12
10 through 21 and compare it with what we just saw
11 --
12     A    Well, the change is on page 13.
13     Q    Page 13.  So there are some changes?
14     A    Yeah, the executive approval.
15     Q    I see.
16     A    Those are the changes.  Those were the
17 evident changes on this one, you know, so they --
18 the approval committee changed because of Mr.
19 Clotman retired.
20     Q    Oh, I see.  Let's talk about that
21 Approval Committee for a moment.
22     A    Uh-huh.

80

1    Q    There are five people involved
2 including you, is that right?
3    A    This as of 2015 there were five.  I
4 believe there are six now.
5    Q    Okay, and Erica Alexander, that's the
6 person that you report to, is that right?
7    A    Yes.
8    Q    All right, and then who are these
9 other folks, the Global Brand Officers?
10    A    Global Brand Officer who currently
11 -- at that point there were two.  Now today -- if
12 you're asking, are you asking about today?
13    Q    Well just as a general matter.
14    A    Okay.
15    Q    These positions are still -- whether
16 the individual names have changed, these
17 positions are -- have remained the same?
18    A    They are the same.
19    Q    But you said --
20    A    There's one addition to this as well
21 today.
22    Q    And what is that?

81

1    A    That is our chief revenue management
2 officer.  That is the person that oversees our
3 revenue strategy for the Americas, and he's not
4 on there but that person's name is not on there.
5 There was a sixth position that we added.
6    Q    And when was that added?
7    A    I think it was about a year ago.  I
8 think it probably would have been within the
9 year.
10    Q    Some time in 2017, mid or late 2017?
11    A    If memory serves me correctly, that
12 would be correct.
13    Q    Okay.  For the record, let me just
14 say, we do not have -- I don't believe we have a
15 resort fee process memorandum from that period.
16    MR. MARQUIS:  From which period?
17    MS. MILLS:  From the period of 2017.
18 The last one I was able to find was November of
19 2015.  We can discuss this later, but maybe it's
20 been produced, you can direct us to the Bates
21 numbers or get it to us if we don't have it --
22    (Simultaneous speaking.)

82

1    MR. MARQUIS:  I believe we have but --
2    MS. MILLS:  Maybe you did.  I have a
3 lot of documents.
4    MR. MARQUIS:  Mr. Knock is on
5 vacation, so he'd be the one who would know.
6    BY MS. MILLS:
7    Q    He would know, okay, all right.  So
8 this committee meets periodically, is that right?
9    A    It meets -- well, it predominantly is
10 a virtual committee.  We do have sometimes, if
11 there are issues to discuss, rare occasions I'll
12 get the group together as many possible.  But the
13 way that it works is that my position is -- I'm
14 the quarterback.  I oversee the process for the
15 committee, and then I will do the majority of the
16 leg work, you know, of validating, checking
17 scores, going through the offerings and all of
18 those things.
19    And at that point, I will send it to
20 committee, which those are the individuals, and
21 everybody has to vote if they approve or not
22 approve.

83

1    Q    Okay, yeah.  So a particular hotel
2 submits an application.  You kind of oversee
3 what's in it and vet it?
4    A    Correct.
5    Q    And make a recommendation, is that
6 right?
7    A    Yeah.  So I go through, make sure they
8 follow up, if they've met all of the
9 qualifications.  If they haven't, most of the
10 time I'll go back to the vice president or the
11 general manager, the vice president of that area
12 or the general manager of that hotel and tell him
13 or her, you know, you're not meeting the
14 qualifications.  This isn't a good value.
15    So we'll do a lot of the prep work
16 before that, and then if it reaches a point where
17 it meets all of Marriott's requirements, I then
18 send it to the committee.
19    Q    Okay, and so everyone has to vote, but
20 do you have to have a majority in favor?
21    A    No.  It's 100 percent have to approve.
22    Q    It has to be a complete, unanimous

84

1  decision?
2      A   Yes, correct.
3      Q   So anyone could hold it up?
4      A   Correct.
5      Q   All right.
6          (Pause.)
7      BY MS. MILLS:
8      Q   This particular iteration of the
9  resort fee process memorandum also has a lot of
10 attachments that we did not see in the 2014
11 version. Somehow, we just didn't. I assume they
12 were there but we didn't receive them. So those
13 attachments appear to start at -- at the page
14 with the Bates number 22 on it, and so let's --
15 let's see here.
16         I think if we turn to the page with
17 the number 38 in the lower right-hand corner.
18 There's -- you can see there's sort of a grayed
19 out box toward the upper part of the page "Resort
20 Fee Disclosure at Check-in."
21     A   Uh-huh.
22     Q   Okay, and the collateral -- I'm not

85

1  sure what that means. Collateral, you mean like
2  an object, a thing?
3      A   Yes. It would be a flyer, a
4  promotional flyer or a simple card the size of a
5  key card that would say resort fee amenities
6  include X, Y, Z, list the resort fee amenities.
7      Q   So then beneath that, toward the
8  bottom, there's a bullet point that says "Opt
9  Out," excuse me, "Object Opt Out."
10     A   Object Out Option.
11     Q   Yes, Object Out Option, sorry.
12     A   Uh-huh.
13     Q   And that says "If a guest objects to
14 the resort fee, the fee can be waived. However,
15 if the guest opts out of paying the fee, the
16 hotel must institute procedures to charge the
17 guest for the items included in the resort fees
18 and so forth to the extent the guest uses the
19 fees on an a la carte basis."
20         And "If the hotel institutes
21 procedures to charge for services on an a la
22 carte basis, such charges must be disclosed to

86

1  the guest at the time or he or she objects out of
2  the resort fee." So that -- again, this is an
3  opt out at the time of check-in at the hotel;
4  correct?
5      A   Yes. That's correct, yes.
6      Q   Let's assume the guests just didn't do
7  that. They weren't paying attention, they didn't
8  know. They were in a hurry, the kids were
9  screaming, those kinds of things can happen.
10         So when the guest then comes to check
11 out of the hotel and they get their statement and
12 they see there's a resort fee here, well we
13 didn't use that says the guest. We didn't want
14 to pay that. Can they opt out at that point?
15     A   Theoretically at the end, they would
16 have used some of the amenities or services. But
17 we're a guest-focused company. If a customer was
18 complaining and said that they didn't use any of
19 the amenities, I think most hotels would probably
20 take it off, you know. We don't want a customer
21 walking away upset. Some people may lie, but if
22 they really didn't use them, we'd take them off.

87

1      Q   Is there a written policy of Marriott
2  authorizing hotels to do that?
3      A   In terms of this policy?
4      Q   Yes, your policy.
5      A   No, but there's an empowerment policy
6  at all hotels, the service training that you
7  don't want a guest leaving the hotel upset. And
8  again, that would be an upset guest either for a
9  resort fee or a dirty room or whatever. You
10 never want a guest leaving upset. So I would say
11 that we would certainly listen to the customer,
12 to make sure he or she is happy.
13     Q   What about a situation where a guest
14 also checks out in a hurry and didn't really look
15 and they get home. When they look at their
16 credit card statement and they say oh, there's a
17 charge. There's a charge here for a resort fee.
18     A   Uh-huh.
19     Q   Can they contact Marriott? Would
20 Marriott consider removing the fee at that time?
21     A   We would absolutely listen to the
22 customer if he or she said that they didn't use

88

1  the amenities.  I mean so again as an example in
2  the resort fee, it's always included like
3  enhanced WiFi or high speed Internet access.
4      So they would use that.  We would be
5  able to see if they used it, and if you know
6  again, you don't want to upset a customer.  But
7  if they said take the 25 bucks off, you know, we
8  didn't use it, then you'd probably theoretically
9  put the WiFi back on, which is 14 or 15 dollars.
10      But having said that, our hotels do
11  not want to upset customers, you know.  I mean
12  guest engagement is the most important thing.
13  Otherwise, they're going to go to our competitor.
14  So we would probably empower the associate to
15  waive the fee.
16    Q   Probably, but that's not written in
17  these procedures; is that correct?
18    A   It's not written in the resort fee
19  policy, but it's in all of our service training,
20  what we call empowerment, that as an associate of
21  Marriott you have the -- you're empowered to make
22  decisions to satisfy the customer.

89

1    Q   Is that a written policy?
2    A   I believe it probably is in our
3  service training, yes, uh-huh.
4    Q   I'm not sure that we have information
5  about that, but we can discuss that at another
6  time, Milton.
7    A   Yeah, uh-huh.  Certainly, okay.
8    Q   So do you know if Marriott's ever had
9  credit card chargebacks for resort fees?
10    A   If you're asking do you know of
11  specific situations, I mean I don't honestly deal
12  with chargebacks.
13    Q   Uh-huh.  Have you heard that?  Have
14  you heard well, we had, you know, 500 chargebacks
15  on resort fees this month or something like that?
16    A   No, I have not heard that.
17    Q   So let's look at page 31 of this
18  procedures document, and if we look at the top of
19  the page, this appears to be a display of part of
20  a Marriott website for the J.W. Marriott Phoenix
21  Desert Bridge Resort and Spa.  Do you see that?
22    A   Yes.

90

1    Q   Okay, and there's a box there
2  underneath Standard Rates and Room Packages?
3    A   Uh-huh.
4    Q   This isn't in color; it's just a black
5  and white.  That's how we received it from
6  Marriott.  But it seems to say "Please note:  USD
7  29 daily resort fee added to rate incls, I-N-C-L-
8  S, spa, fitness center access, age 18 plus,
9  driving range, used bike rental and more!"  So is
10  this what a hotel is supposed to disclose at the
11  time the potential guest is looking at the
12  website, considering to book a room?
13    A   Yes.
14    Q   But then beneath that box it says
15  "Leisure rate, a resort fee applies.  See rate
16  details."
17    A   Uh-huh.
18    Q   So is the resort fee applied to
19  everybody, or is it only applied to the leisure
20  rate guests?
21    A   It would apply to whoever booked this
22  specific rate, this leisure rate.  There are

91

1  other rates available.  I'm assuming in this
2  specific situation that that wasn't the only rate
3  that was offered.
4    Q   Oh, I see.  So this particular box is
5  when you've already selected a leisure rate?
6    A   Correct.
7    Q   I see.
8    A   That's meant to be illustrative of the
9  notification we provide to the customers.
10    Q   So when would the guest see the box
11  that says "Please note: USD daily resort fee
12  added"?
13    A   When they select the hotel.  So if you
14  go to Marriott.com, the website and you say you
15  want to go Phoenix, there will be a selection of
16  hotels that will come up.  We have numerous
17  hotels in Phoenix, not just this one, probably 20
18  or 30 hotels.  Based on availability, we'll list
19  all the hotels.
20      And then at that point you say I want
21  to stay at this property and you chose that.
22  This would appear at that point, when you now say

92

1   "I want to, you know, I'm interested in staying
2   at the J.W. Marriott Phoenix Desert Ridge." You
3   click on that and then we show that your rate's
4   $359, and then --
5       Q   If you've chosen the leisure rate?
6       A   That's correct.
7       Q   Right.
8       A   And then for any rate that, you know,
9   where if it's available on there, again I can't
10  speak because I, you know, every hotel is
11  different. But any rate that has the resort fee,
12  this box would pop up.
13      Q   Okay. You have to click on a link to
14  see it or does it just come up?
15      A   It comes up automatically. So when
16  you look for a price at this hotel, when you
17  select that rate it automatically, you know, we
18  want the customer to know at that point if -- in
19  case they don't want to book based on resort fee.
20      Q   Okay. Do you know whether the J.W.
21  Marriott Phoenix Desert Ridge Resort and Spa only
22  charged the resort fee for guests that booked the

93

1   leisure rate?
2       A   That would be -- are you talking
3   generally or specifically with this situation?
4       Q   I'm talking this particular -- you
5   chose this example. You put this example into
6   the memorandum.
7       A   Uh-huh.
8       Q   And so -- and you showed it as the
9   leisure rate. Do you know whether the hotel
10  also, whether this box would have appeared for
11  non-leisure rate customers, business rate?
12      A   It would, yes. It would appear for
13  any rate that has the resort fee on it, and it
14  could be more than just leisure, yes.
15      Q   Do you know if the hotel only charged
16  the resort fee for the leisure rate?
17      A   I can't answer that question on that.
18  There's not enough information here to say that.
19      Q   You don't know, okay. And so if we
20  look at page 27 of this memorandum, this
21  describes audit requirements and disclosure
22  compliance requirements. Do you see that?

94

1       A   I do.
2       Q   Okay, and there's a description here
3   of -- let me see if I've got it right. Yeah. At
4   the very top under requirements, to maintain
5   eligibility for charging resort fees, properties
6   are required to (1) remain in compliance with the
7   company's resort fee policies and (2) submit
8   confirmation of compliance in all disclosure
9   areas to two times per year as provided for by
10  this audit.
11      "In addition to completing the audit,
12  please review the resort fee policy" and so
13  forth. So is the self-audit part --
14      A   This is the self-audit yeah, right.
15      Q   And then on page 30, there's a
16  description of the hotel is supposed to certify
17  compliance.
18      A   So let me see what you document you
19  have first, okay. Yeah. This is the 2015
20  process and procedures, and I'm looking at that
21  on page 30 as it's numbered here. I'm just
22  trying to see. I don't think this is part of the

95

1   document.
2       Q   Oh, it's not part of the document?
3       A   No, this is not -- no. This is -- so
4   here you have resort fee process memorandum.
5       Q   Uh-huh.
6       A   That's why I'm looking at the
7   attachments.
8       Q   Yes.
9       A   This is an attachment, this is an
10  attachment. So let me just look here. So this
11  is the group sales, and these documents are two
12  different documents.
13      Q   I see. Where does the second document
14  begin if you --
15      A   Well, it looks like -- so right here,
16  27. That looks to be --
17      Q   So page 27.
18      A   Page 27 is -- this was a specific --
19  if memory serves me correctly, I don't know if
20  you have the mem date on this, but this one,
21  again I don't remember exactly. But this may
22  have been in 2016. There's actually -- well, so

96

1    it looks like these documents are intermingled.
2        Q    I see.  So they were given consecutive
3    Bates numbers and all seemed to refer to this
4    resort fee process.
5        A    Yeah, so I --
6        Q    So I think we assumed they were the
7    same.
8        A    Yeah, yeah, no.  So like for example
9    on page 40, it says "Ritz Carlton resort fee
10   audit check list instructions."  We had asked
11   some hotels back then to help us to make sure we
12   were in compliance with the OTAs and everything.
13   You know, we were doing proper disclosures.  So
14   this I think, based on what I'm seeing, is a
15   separate.  The documents here are intermingled.
16       So you know on here, for example, you
17   have the resort fee process memorandum.
18       Q    You're talking about the first page
19   that was number 12?
20       A    Right, which is what I send out to
21   hotels interested.  But the audit process
22   documents in the back here, these are not what

97

1    goes to hotels.  This was a one-time project that
2    we asked hotels to go back, several hotels to
3    help us make sure we were in compliance with all
4    of the disclosures.
5        Q    Okay so --
6        A    So they're intermingled.
7        Q    Just to be clear then, the package
8    that you ordinarily would send out to hotels to
9    get them focused on the process would end at this
10   page 26?
11       A    Correct, but there may be -- I'd
12   really have to look at the entire package.  Let
13   me look one second.
14       Q    You think there may be material
15   missing from the package you sent out?
16       A    Yeah.  I have to -- I don't want to
17   say that for sure but I have to look.  This just
18   doesn't seem -- yeah.  These are not part --
19       Q    These being the resort fee audit
20   process?
21       A    Audit process, yeah.
22       Q    Are not part of the package?

98

1        A    They do not go out to hotels.  Now
2    over here --
3        Q    On which page?
4        A    Page 36, that is to be part of the
5    packet.  I'd have to look at my file, but that
6    appears to be part of the resort fee approval
7    packet.
8        Q    Oh, I see.  So it picks up again at 36
9    you said?
10       A    Yeah, and then it ends -- 40 is a
11   different packet, would not be going on with the
12   documents.  So 40 is a separate document as well,
13   and then page 44 is part of the packet.
14       Q    Oh.
15       A    So this is -- somehow, something got
16   intermingled in this.
17       Q    All right.  Again, we received this as
18   a consecutively Bates-numbered package that --
19       A    It appears to be something.  I'd like
20   to check it though.  Again, we would need to
21   verify it but so I'm sorry.  But is there a
22   question --

99

1        Q    Yeah.  But that's really helpful and
2    let's clean that up, you know, later.
3            (Simultaneous speaking.)
4            BY MS. MILLS:
5        Q    So what I was -- let's see.  I was
6    starting to ask you about the audit process.
7        A    And what page is that?
8        Q    Yeah.  Let me go back to where I lost
9    my thought here.  So page 30.  We were looking I
10   think at page 30, when you concluded that maybe
11   this was not part of the package that went out to
12   the hotels.  This is describing audit process for
13   Marriott.com, RitzCarlton.com and MARSHA.
14           And it says "To certify compliance,
15   please provide screen shots of the each of the
16   items indicated above."  So this is a separate
17   process from what we were discussing earlier on
18   page 27.  Page 27 described what you agreed was a
19   self-audit.  But again, this is not part of the
20   package that goes out?
21       A    As far as a one-time audit process,
22   this was part of a packet that we sent out to a

100

1 small group of hotels to assist us in going
2 through to make sure that their hotels and all
3 the hotels were compliant with all the disclosure
4 requirements.
5    Q    Okay.
6    A    So we asked them to go back and do a
7 deeper dive.
8    Q    When was that?  Do you recall?
9    A    I believe it was 2016.  I would have
10 to check my records, but if memory served me, I
11 think it was 2016 that we asked these hotels to
12 do it, the small group.
13    Q    Yeah.  I do not see any dates at the
14 bottom of these pages anywhere.
15    A    Right.
16    Q    So yes, so that also if we can be sure
17 that we have the right date.  We may have some
18 other materials that relate to this audit process
19 that might be helpful also, but we'll get to
20 those.
21    A    Okay.
22    Q    So on page 30, it's describing an

101

1 audit process where the hotel certifies
2 compliance and this is -- I'm sorry.  It
3 certifies compliance and provides screen shots of
4 each of the various items listed above, and so
5 where do hotels send these self-audits?  What
6 happens with them?  Do they just keep them in
7 their file or --
8    A    No.  So again, this was a one-time
9 process in 2016 that we did.  So what we did with
10 this is myself, primarily myself along with some
11 other folks who are more technical, you know, to
12 make sure.  So we were trying to make sure that
13 all of the disclosures required by the FTC or
14 whatever regulatory agencies were being done
15 correctly.
16        And Marriott.com, RitzCarlton.com and
17 then MARSHA is kind of the central warehouse, you
18 know, for all of our information.  So we were
19 asking these hotels to go back and do a self-
20 audit, but to provide us with information so that
21 we can validate that our disclosures were
22 correct.

102

1    Q    Okay.  So these were received by your
2 office?
3    A    Yes.
4    Q    You personally and other people
5 assisted you in evaluating them, is that right?
6    A    That's correct.
7    Q    All right.  What did you do when you
8 got these results?
9    A    Pretty much validated their
10 disclosures were compliant, yeah, and I don't
11 remember.  I had to look through my files to see
12 if there was any anomalies.
13    Q    Right.
14    A    But I, you know, there was one if I
15 remember correctly.  In this specific case, I
16 think we found at least one anomaly which was
17 immediately corrected, meaning there was by an
18 OTA maybe not a correct disclosure.  But beyond
19 that, all of the disclosures that we were looking
20 for were there, and it accomplished what we
21 intended it to accomplish.
22    Q    Okay.  Did you send people a thumbs up

103

1 or a thumbs down, yes it's fine, no it's not
2 fine?
3    A    For the three or four properties, it
4 was probably a verbal dialogue, you know, more or
5 less.  It wasn't meant to be like you failed.  It
6 was meant to be help us to make sure we're
7 compliant as a company.  So it would have been
8 thank you for your assistance and if memory
9 serves me correctly, I believe we were very
10 satisfied with all of our disclosures at that
11 point, based on this audit.
12    Q    And there's a different audit process
13 for Ritz Carlton hotels it appears.  Why would
14 that be?
15    A    No.  Well, on this, in this specific
16 case, there are different systems because the
17 Ritz Carlton was an acquisition I forgot how many
18 years ago.  But they use a different property
19 management system than Marriott did.  It's called
20 OPPA, and so, you know, there are some variations
21 in OPPA versus what Marriott hotels used.
22        We still have those two systems, so

104

1  there are some technical variations that require
2  us to look at it in a different way.
3      Q   Okay.  Now let's talk about systems
4  for a moment, because there are references to
5  same MARSHA.  Is that an acronym?
6      A   It's an acronym for Marriott Automated
7  Reservation System Housing or something like
8  that.  It's M-A-R-S-C-H-A, and it's an acronym
9  for our, you know, warehouse or information data.
10     Q   Okay.  If we look on page 36 and 37 of
11 this document, so there's a reference to -- okay.
12 Yeah, on 36.
13     A   Thirty-six.
14     Q   To MARSHA.  There's a general
15 inventory (VIF screen).  What's that, a VIF
16 screen?
17     A   I don't know the acronym to be honest
18 with you.  I'm sorry.
19     Q   Do you know what it shows?
20     A   Let me look at it.  Okay, oh yeah,
21 yeah.  So I don't know what VIF means or the
22 technical terms, but what this is, this box, the

105

1  squared area there under MARSHA.  So what this is
2  is this, if you are making a verbal reservation
3  if on the 800 number, and you say I want to go to
4  the Ritz Carlton in Sarasota, you know, the room
5  rates, you know, $150 then this would pop up
6  for the reservation agent to tell the guest that
7  there is a daily resort fee and then it gives
8  specific detail of what it includes, you know.  I
9  mean it lists out everything.
10         So this would come up.  This would pop
11 up on the reservation screen when a reservation
12 agent is making a verbal reservation for the
13 guest.
14     Q   I see.  So that's when they're
15 speaking on the phone?
16     A   Correct.
17     Q   So then under Marriott.com, there are
18 a bunch of terms used here.  One of them is a
19 hotel alert form, which is found on HDX Plus.  Do
20 you know what those refer to?
21     A   So the alert form, I'm not sure
22 exactly what HDIX and Epic is another system

106

1  where we house information on hotels.  So it will
2  have a lot -- again, I think that's what that's
3  called, but basically it is a system where the
4  number of rooms, how many doubles, how many
5  kings, you know, accessible rooms and all of
6  that.
7          And then so what this is talking about
8  here in terms of the total trip pricing.  What
9  was the bullet again?  I'm sorry.
10     Q   Well, the first bullet had to do with
11 the hotel alert form found on HDX Plus.
12     A   Oh right, yeah, thank you.
13     Q   And then -- and return to the Epic
14 help desk.  So that, that was in the first
15 bullet.  Then it goes on to talk about the alert
16 appears once on every channel, including GDS and
17 OTAs and also populates email confirmation.  I
18 don't know how much you understand about how
19 these systems work, but if you could explain that
20 --
21     A   Right.  Okay, yeah.  So what happens,
22 what we're talking about there is there again is

107

1  a central warehouse of information, and what we
2  do to make sure that all of our channels know
3  about the resort fee is we populate it into that
4  one channel.
5          What happens is it will result in that
6  box here that you just pointed out, the box, the
7  VIF screen or whatever.  This will -- it makes
8  sure that the 800 operator knows about the fee.
9  It also feeds into all the OTAs.  It provides
10 them the information with the OTAs that we have a
11 resort fee and it's whatever amount.
12         It also provides information to the
13 system on that dialogue box, and that was the one
14 you asked me.  I don't remember where it was, but
15 it was on page 31 that you asked me about the box
16 at the top that was squared.
17     Q   Yes.  This was for the Phoenix Desert
18 Ridge Hotel.
19     A   Phoenix, correct.  So that system
20 makes sure that every channel where a customer
21 books, that they're notified about the resort fee
22 as required by the -- the policies and

108

1  regulations.  So that's kind of a central area.
2  It's one place, and then it goes to all of those
3  sources I just noted.
4    Q   So that's within some database
5  electronic system that goes under the name
6  "Marriott.com."
7    A   In Marriott.com and RitzCarlton.com.
8  It feeds into all of those as well so --
9    Q   Yeah.  So these alerts then "populate"
10  the email confirmation?
11    A   Yeah.  That was the other thing I
12  should have mentioned.
13    Q   After you book the hotel.  It's then
14  put into that email confirming?
15    A   Yes, yeah.  That is something I left
16  out.  There is an email confirmation that a guest
17  gets, and that this system also ensures that on
18  the email, you're notified about the resort fee
19  as well.
20    Q   Okay.  Yeah.  You started to talk
21  about the total trip pricing issue.  That's the
22  last bullet point on page 36.  "As noted in the

109

1  MARSHA section, the total trip pricing
2  information populates the resort fee in the
3  reservation summary prior to confirming a
4  reservation online.
5    A   Okay, yeah.  So that is again if
6  you're going into Marriott.com and you actually
7  book a reservation, the first page has, you know,
8  the 15 different hotels that are available.  Then
9  you go in and you select your room and that box
10  comes up and lets you know.  Then if you agree
11  and you want to book that reservation, it
12  eventually gets down to the bottom and it will
13  tell you your room is $250.  Resort fee is $25
14  taxes and fees.  It will spell out all of the
15  mandatory fees and taxes and come up with the
16  total cost of the reservation.
17    Q   And when does that screen appear in
18  the process?
19    A   When you book?
20    Q   After you've booked?
21    A   Well it's -- you've got the selection.
22  It pops up and shows you everything, and then you

110

1  book.
2    Q   Okay.
3    A   Yeah.  So you see everything before
4  you book, so you know what all the fees are.
5    Q   Okay.  So that's how Marriott.com is
6  set up to automatically load this display?
7    A   Correct, yes.
8    Q   So let's look at the next page also.
9    A   What page, 37?
10    Q   I'm sorry, page 37.
11    Q   Okay.
12    Q   Now there's -- I think for
13  reservations P-U-R-E, PURE.  I assume that's an
14  acronym too.  Can you describe what this is
15  showing here?  It says "PURE prompts a pop-up box
16  for each hotel charging a resort fee."  Is that
17  right?  That's the second bullet point?
18    A   Yeah, and what that is, that's this.
19  This is the box.  So this one, I don't know what
20  PURE means to be honest with you.  But this is
21  the pop-up box for each hotel charging a resort
22  fee.  It comes -- it will automatically display

111

1  when a rate is self-indicated to the sales
2  associate at the hotel.
3        So this is what this is.  So if you're
4  a reservation agent and you're booking a room
5  verbally, this will pop up so that, you know,
6  then that agent will inform you as a customer
7  that there's a resort fee.  So that's what that
8  is.
9    Q   So the sales associate is somebody
10  who's helping to book the room.  This isn't at
11  the hotel is it?
12    A   Correct, yes.
13    Q   Okay.  Then there's a reservation
14  confirmation box here that describes "Even though
15  confirmation (reading) the resort fee amount,
16  frequency of charge and a description of what is
17  included, this information pulls from the hotel
18  (reading)."  So that's what you were describing
19  earlier then?
20    A   Yes.
21    Q   Okay.  On the Global Distributions box
22  immediately beneath that GDS, it says here "As

112

1 noted in the MARSHA section, the hotel must
2 update their total trip pricing/ARC table in
3 MARSHA to include the cost of reservation fee.
4 The resort" -- I'm sorry, the resort fee. I'm
5 sorry. I said reservation fee, I misspoke.
6       "The resort fee will be displayed in
7 the GDS. As noted in the central reservation
8 system, the hotel must email their resort fee
9 description to Epix Support. This information
10 will update the property information pages with
11 the resort fee details."
12       So what is the function of the Global
13 Distribution Systems? I'm not sure I quite
14 followed that.
15    A   I think there's a lot of -- I mean
16 this is pretty technical for me as well, to be
17 very frank with you because this is revenue
18 management. But the global distribution system
19 is basically how we distribute prices out to any
20 channel.
21       You know so again, a fair amount of
22 our business is through online travel agencies.

113

1 It could be physical travel agencies, that's how
2 we provide the prices to them. And then it talks
3 as well about as noted in the central
4 reservations section, we require a hotel fee
5 description to Epic Support.
6       So what that does is make sure again
7 that we're providing all the guests with the
8 details on the resort fee, so that they know what
9 they're getting.
10    Q   So this information is displayed to
11 sort of within Marriott or to the OTAs, is that
12 right? This isn't somebody that goes directly to
13 the public?
14    A   So the OTAs is somewhat of a separate
15 story. We provide them with the fee and then
16 there's negotiation about it, and they decide
17 what they display. They have to display
18 mandatory fees. They have to display the resort
19 fee.
20       For the description of what's included
21 on the website of the hotels, there should be a
22 description of the resort fee, you know, if you

114

1 want more specific information about what's
2 included. So again it's the central warehouse
3 that provides information to all systems so that
4 there's little chance of human error, you know,
5 for that to happen.
6       You know, so that a customer makes
7 -- so that we make sure a customer sees resort
8 fee information in every booking channel.
9    Q   Okay. Do you know what the ARC table
10 is?
11    A   I don't know what it is, I'm sorry.
12    Q   Who at Marriott maintains these
13 systems? Who's in charge of all this?
14    A   I don't know the specific person about
15 it, but I mean we have -- I mean it's like the
16 backbone of our company, you know, reservations.
17 I mean that's one of our competitive advantages
18 and, you know, there's -- we have a major
19 operation, a reservation operation in Omaha but I
20 don't know, you know, who is in charge of that.
21    Q   Sort of the whole large team of people
22 who --

115

1    A   Of people, yeah.
2    Q   --manage the online and telephonic
3 reservations?
4    A   Yes, you know, all the systems, MARSHA
5 and all that. They're a massive, you know,
6 there's a team that manages that, and I don't
7 know the answer to that.
8    Q   Okay. Do you know how long Marriott
9 retains the information in these systems?
10    A   I'm not 100 percent certain. So the
11 way that the system works is you've got MARSHA,
12 which is that central database. Then you have
13 each hotel. There's what we call the property
14 management system, EMS system at each property
15 and they're all independent and they communicate
16 between one another.
17       So the information that you book a
18 reservation is in MARSHA. Then it gets sent over
19 to, you know, the Bethesda Marriott, you know.
20 I'm just using that as an example, and then that
21 information is there. I'm not sure what the
22 specific requirement is for the hotel to maintain

116

1  it or Marriott.  I believe it may be in the
2  ballpark of four years but I'm speculating.  I
3  think, you know, that's all that is.
4     Q    But who would know about that?  Who --
5     A    I would have to find out, you know, I
6  have to do some more research.  I don't know off
7  the top of my head.
8     Q    You don't know who would be in charge
9  of those retention policies?
10    A    I would -- I can find out.
11        MR. MARQUIS:  Yeah.
12        BY MS. MILLS:
13    Q    All right.  That would be worth us
14 knowing if we could follow up on that.  Thank
15 you.  All right.  Well let's focus in a little
16 more on this topic of a resort.  Does a hotel
17 have to qualify as something called "a resort" to
18 be allowed to charge a resort fee by Marriott?
19    A    Yes.
20    Q    Okay.  So let's take a look at some
21 documents that talk a little bit about that.
22 This has been marked as Exhibit 10, and it's an

117

1  email between you and someone named Jim Fisher.
2  Who is Jim Fisher?
3     A    He's no longer with the company, but
4  Jim Fisher oversaw Owner and Franchise Services.
5  He would work with franchisees or ownership
6  groups, those that owned Marriott or ran
7  Marriotts.
8     Q    Okay.  So this email is December 12th
9  of 2012, and the subject is "Resort Fee Request,
10 Approval Blue Moon Autograph Hotel and Winter
11 Haven Autograph Hotel."  So if we're going down
12 into pages at 39020 through 21, if we look at
13 those email threads, that part of the email
14 thread.
15        So in the very bottom of 39020, you
16 are writing to David Grissen, I think you
17 mentioned him as --
18    A    Yes.  He is the president of our
19 hotels, for Marriott, for Marriott Americas.  He
20 used to be on the Resort Fee Committee when this
21 was written in 2012.  He's no longer on it, but
22 that's who he is.

118

1     Q    Okay, and then who is Ken Rehmann?
2     A    Ken Rehmann at that point I believe
3  was the brand leader, and Jim Fisher I mentioned
4  is OFS.  Jeff Holdaway is our Legal, and then Ray
5  Bennett at that time was chief lodging service
6  officer.
7     Q    Okay.  So you say -- now you're
8  writing on December 7th of 2012.  "Good day
9  gentlemen, I'm presenting to the Approval
10 Committee a resort fee request from two hotels,
11 the Blue Moon and the Winter Haven.  Both hotels
12 are owned and operated by Urgo."
13        Then you say in bold down here "Please
14 note that I am not fully endorsing the resort fee
15 request for these hotels.  They do not fit the
16 typical request and are not a 'typical' resort.
17 I am presenting this to our group because we are
18 beginning to get requests such as this that are
19 not clear-cut, and I thought we should have a
20 discussion about these hotels."
21        And then you go on to describe, you
22 know, the information that you say you've

119

1  reviewed in depth.  So and it appears the issue
2  here is that this hotel in Miami wants to be able
3  to provide its customer with beach chairs, and in
4  order to do that they have to have a relationship
5  with somebody called the Boucher Brothers, which
6  has an exclusive contract with the City of Miami
7  for beach chairs.
8     A    Yes.
9     Q    So that was sort of their thing.  They
10 wanted to be able to do that.  So they wanted, I
11 gather here, to recoup the costs through adding
12 in a resort fee.  Is that your recollection of
13 this?
14    A    That's a correct recollection, yes.
15    Q    Okay.  So this wasn't nearly a clear-
16 cut situation of a resort fee type request?
17    A    Yeah.  There were -- this was -- these
18 hotels were not officially categorized as
19 resorts, and there were some other issues with
20 these properties, which was the reason I
21 recommended not approving the resort fee for
22 them.

120

1    Q   Right, okay.  You say that you're
2  beginning to get requests such as that are not
3  clear-cut.  You're writing here in late 2012.
4  Can you explain a little more what that was, that
5  you were getting more requests about?
6    A   So these hotels were good examples.
7  They were -- if you're familiar with South Beach
8  at all, there are basically some older
9  properties, you know, art deco type properties
10  that were renovated.  These properties, at least
11  one of them was not on the beach, and perhaps
12  didn't have what I would call resort amenities,
13  meaning upgraded spa, restaurants, beach access
14  and so on.
15        So we had requirements around what a
16  resort is, so that customers, you know, don't go
17  to a property that calls itself a resort and is
18  not a true resort.  However in this case with
19  these hotels, they were close to the beach and
20  again this is a very unusual situation with the
21  Boucher Brothers.
22        For some reason on South Beach there's

121

1  one vendor that sells chairs.  The hotels have no
2  access to it, and if you are a customer at a
3  hotel on Miami Beach at any of the properties,
4  Marriott or non-Marriott, the hotel or the
5  customer will pay for that chair and the
6  umbrella.
7        And so typically in Miami Beach, on
8  Miami Beach resort fees typically include chair
9  and umbrellas on Miami Beach.  And so again to
10  your point a second ago, these hotels have guests
11  that were using that, and they were seeking
12  approval for a resort fee.  We turned it down for
13  the reasons that are in this memo.
14    Q   You know, if you look at page 39020
15  towards the very top of the page, you are
16  speaking here about some options.  Actually, if
17  you look at 39019 at the bottom, you're
18  describing these options.  Making resort fee
19  optional, and you said "This option is not viable
20  since the Boucher Brothers charge the fee per
21  occupied room.  If there are not enough takers,
22  then ergo loses money."  So it needed to be an

122

1  across the board charge for it to be sufficiently
2  profitable?
3    A   So with the Boucher Brothers, again
4  the way that they operate is if you're an
5  individual and you want to rent the chair on
6  Miami Beach, you would pay a fee.  But if you're
7  a hotel, they would normally negotiate a deal
8  with you to say that if I have 200 rooms, it's
9  going to cost you, I'm just making this number
10  up, $10 a room, and we will provide all of your
11  people with chairs.
12        And so it was basically a discount.
13  It's a negotiated discount.  Other than that, if
14  the fee was $35 and you didn't have that
15  negotiated rate, you would pay $35.  So it was a
16  very onerous situation unfortunately in Miami
17  Beach.
18    Q   Okay.  So maybe the resort fee option
19  wasn't really going to work financially.  Then
20  you go on to say "We do not have any hotels that
21  are not classified as a resort with a resort fee,
22  with the exception of several hotels in Puerto

123

1  Rico," and you know, then you know -- "The resort
2  is in their name," you're speaking there of
3  Gaylord Hotels.
4        "However, you call them true resorts
5  is another story," and your concern here I guess
6  in the last bullet point about, you know, a
7  decision on these hotels are going to inform
8  their decision on basically everything in South
9  Beach, you know.
10        So you don't have any hotels that are
11  not classified as a resort with a resort fee that
12  has, I gather, been approved by Marriott, is that
13  right?
14    A   As of -- in 2012, this memo's from
15  '12, that was accurate.
16    Q   Correct, yes.  That was accurate.
17    A   Uh-huh, uh-huh.  Other than the bullet
18  noted above on Puerto Rico.
19    Q   Yes.  Obviously, yes.  No, I
20  understand that.
21        (Simultaneous speaking.)
22        BY MS. MILLS:

124

1    Q   So you were starting to get these
2  requests.  So what was that about?  What was
3  going on at this time?
4    A   Just some hotels that were by the
5  owner's view were upgraded hotels, extra special
6  type hotels in extra special locations, but did
7  not have all of the amenities and services that
8  we would need to make that a resort
9  classification, would come forward and you know,
10  started making some requests.
11    They weren't overwhelming at that
12  point, but these two hotels in South Beach were
13  examples of those.  So we were getting some
14  inquiries from franchisees, you know, can we
15  become a resort or can we put resort fee in for
16  reasons like these two hotels in Miami-South
17  Beach, to upgrade the guest service.
18    Q   I mean was there something in
19  particular that was driving the hotels to come to
20  you and request resort fees for these sort of
21  non-traditional resorts?
22    A   Not that I remember back in 2012,

125

1  other than the ability to add amenities and
2  services and offer to their guests.  I don't
3  remember anything specific to be honest with you
4  in '12.
5    Q   All right.  So if you look in the
6  middle of 39019, Jim Fisher says on December 12th
7  of '12 "I will vote to support the fees, but I
8  suspect we are heading toward a situation where,
9  as we faced years ago when we got out of the
10  resort fee business, a class action group will be
11  cashing up around, looking for an opportunity in
12  Florida, California, etcetera, etcetera, where
13  they can catch us failing to disclose properly.
14  Hopefully, this time around we can avoid the
15  suits."
16    So do you know what he was taking
17  about there, where they got out of the resort fee
18  business in connection with some class action
19  litigation?
20    A   I do not know what he's talking about.
21  I mean I -- you know, that could have been before
22  I was in charge of that and Mr. Fisher was

126

1  expressing his opinion to the Fee Committee at
2  that point.
3    Q   You then at the top respond that, you
4  know, that "The FTC is already focusing on resort
5  fees.  Jeff Holdaway and I are meeting with
6  Reservations, Marriott.com and others to review
7  all disclosures."
8    A   Uh-huh.
9    Q   So at this point, the Federal Trade
10  Commission had expressed some concerns about
11  resort fees, is that right?
12    A   I think generally speaking in what our
13  role and responsibility, you know, my role as a
14  leader of the Resort Fee Committee and Jeff
15  Holdaway as our legal expert on the Committee,
16  were making sure that we were in compliance with
17  all resort fee disclosure policies at that point.
18    Q   Well but you mentioned the FTC
19  particularly here.  Was there something that was
20  developing with respect to the Federal Trade
21  Commission at this time?
22    A   I don't remember specifically, but if

127

1  I put it in there, there may have been some type
2  of article or something at that point, or you
3  know, Jeff Holdaway or somebody could have
4  brought it up to me at that point.  I don't -- I
5  mean that was five or six years ago.  I'm not --
6    Q   Okay.  We have some other materials
7  about that that might help you to remember.
8    A   Okay, okay.
9    Q   So let's take a look at another email
10  on Exhibit 12.  This is an email between you and
11  John Adams and Patrick Willenborg.  You mentioned
12  John Adams earlier.  Who is that?
13    A   At that time, John was an Operations
14  leader for the Global organization.  So he was
15  -- and again I think it was at this time.  He may
16  have been in a different position, but John was
17  Operations but globally for Marriott.
18    Q   Okay.  So let's look at page -- I'm
19  going back into this, the page that ends in 18.
20  This is another Ask Opps request that's come in.
21    A   Uh-huh.
22    Q   And apparently you asked or Brand

128

1    leaders were asking you to Ask Opps to ask the
2    Brand leaders, to reach out and see if there's
3    any Brand document that defines what the
4    additional product and service offerings are for
5    resorts.  This is Andy Sorenson writing, and he
6    says "Years ago I recall brand integrity manuals
7    that did provide differentiators such as
8    recreational facilities, F&D outlets, 24 hour
9    room service, etcetera.
10        "I would appreciate if you would let
11   me know what resources you have that would help
12   me, that would help an owner management company
13   understand what minimum standards they would need
14   to achieve in order to classify their hotel as a
15   resort."
16        So you've asked Andy to access this
17   Ask Opps system I gather, right, and this is
18   September 7th of 2012.  Do you know what gave
19   rise to your need for this information?
20       A   Does it say -- let me, I didn't look
21   back.  I was just looking at it to see if there
22   was more information back there that talks about

129

1    it specifically.  Is this all related, this
2    email?
3        Q   Yes.  These are all part of a longer,
4    complicated email chain, and there are -- there's
5    discussion here, for example, on page that ends
6    in 21.  "Jeff Wolff just reached out to me based
7    on a request from Marcie to identify guidelines
8    for qualification for resort and spa
9    designations.  It brought to my attention that
10   the guidelines for an airport hotel have not been
11   followed up on, see below.
12        "As I am not the content owner or
13   decision maker, I do not feel comfortable making
14   that change myself."  So he's also -- then he
15   says "Marcie, regarding resort designation, I
16   will look to see if there is any one document
17   that calls together all of the additional
18   standards that resort properties must comply
19   with."
20        It's not exactly why you're asking
21   this question, I guess.  So that's trying to see
22   if you have a recollection of wanting some

130

1    information about what Marriott considers a
2    resort to be in this time frame, which is
3    September of 2012.
4        A   Unless I can identify the originator
5    of the hotel, that's a good question, excuse me,
6    of where that person came from.
7        Q   I think Ask Opps is asking you.  You
8    asked -- I'm sorry.  You asked Ask Opps to send
9    around a broader request.
10       A   Uh-huh, uh-huh.
11       Q   So I'm not sure that somebody has come
12   to you.
13       A   Right.
14       Q   Maybe they did, but in any event you
15   are accessing the Ask Opps system to see if
16   somebody else has this information.
17       A   Uh-huh, uh-huh.  Yeah, I mean but
18   looking at this document at the very bottom,
19   which you know, I mean -- I think it's on page
20   24.
21       Q   Yes.
22       A   There was the original question was

131

1    talking about airport hotels.
2        Q   Right, right.
3        A   So that's why I'm trying to find out,
4    you know, if there was anything specific.  But
5    the reason that hotel designations are important,
6    you know, such as airport hotel, is there are
7    requirements around airport hotels in terms of
8    airport shuttle, for example.
9        You know, I mean if you're designated
10   an airport hotel, there probably was a standard
11   about having a shuttle and, you know, those types
12   of things.  The same being for resorts, is to
13   make sure that we're very, very clear on what the
14   resort qualifications are, and that's probably
15   why this whole email chain began, and that we
16   were trying to make sure that we were consistent.
17        Because it's critically important to
18   be consistent within the company, because we have
19   different owners, and more importantly for our
20   customers.  So if a hotel added resort to their
21   name and they're not truly a resort, that's a
22   misrepresentation.  Additionally, if it's a

132

1 resort -- if it's not a resort you can't have a
2 resort fee.
3      So we wanted to make sure that there
4 was clarity around what a resort is within the
5 Marriott system.
6      Q    Okay.  So let's go back then off this
7 email thread to the page ending in 16, and this
8 was back to Marcie Fenster and copying you and
9 Patrick Willenborg, saying "Greetings Marcie.  I
10 want to close the loop on this one.  After
11 inquiring with Brand management, it doesn't
12 appear that any of the full service brands have a
13 document that identifies what minimum product and
14 service features and amenities a hotel must have
15 in order to be classified as a resort hotel and
16 be able to market this and include that
17 designation in their official name."
18      And so he's copying Patrick W, Jeff
19 Willenborg.  "As I do not know how this process
20 has worked in the past without any formal
21 documentation, I am unable to find it."  Marcie
22 Fenster then replies the next day on September

133

1 15th of 2012 "I will be happy to take part in
2 creating a document for resort properties.  There
3 is definitely a need for such information."
4      And the email thread, you can read the
5 rest of it, but and on page ending in 13, the
6 first page of this email, John Adams writes to
7 Patrick Willenborg and copying you "Pat, I don't
8 know if there is a report requirements document.
9 I have never seen or known of one."
10      And then you follow up in response on
11 December 19th of 2012 and you say "Hi John.  This
12 issue has been kicking around for a while now,"
13 and you mentioned this most recent request to
14 define what a resort is has to do with resort fee
15 requests for two autograph hotels in Miami Beach
16 and the Cosmopolitan.
17      "I think that the brand should
18 establish the criteria.  There are a set of
19 criteria for hotels.  Who should we ask?  This
20 seems simple and keeps coming up."  Now do you
21 know whether you got this resolved in terms of
22 what is a resort and whether Marriott had a

134

1 consistent definition?
2      A    Yeah.  I mean there are no -- there
3 are other documents after this one that would
4 help me on that.  I mean to tell you on your
5 specific question as a result of this, I can't
6 remember if we do.  I believe that there were --
7 there probably had to be because resorts are
8 pretty clear-cut of what resorts should be.
9      I mean I don't think there are
10 questions right now about that.  So I really
11 would need more information, you know, after this
12 to answer the more question.
13      Q    Okay.  Well I do have one, one more
14 item here.
15      A    Yes.
16      Q    This is Exhibit 20, and it's another
17 email.  This one is between you and someone named
18 Christoph Roshardt, and there is -- there's an
19 attachment to this email, but let's look first at
20 Mr. Roshardt's email to you of August 30th of
21 2013.
22      He says "Forgot to ask you on Michael

135

1 Scioscia's behalf as to what it would take for a
2 hotel to be able to change classifications from
3 hotel to resort, specifically for the Miami South
4 Beach Marriott as we are adding services, spa,
5 new restaurant.  The owners want to make it a
6 resort."
7      And you then answer on "August 31st of
8 2013 "We have had a great deal of conversation
9 around this topic recently.  There was not much
10 definition around what a resort is, and we have
11 been trying to establish this.
12      "I have attached a document which puts
13 some guidelines around this.  I've also attached
14 a recent analysis of existing resorts."  And then
15 you go on to say you didn't think that South
16 Beach would be considered a resort.
17      But let's look at these attachments
18 that you sent.  One of them ends in 67, 1967, and
19 that is titled "Minimum Credit Requirements
20 Features," and it's -- it looks like it's from a
21 Marriott, some kind of construction manual of
22 some sort with a date of October of 2000 at the

136

1  bottom, and it's got a list of resort hotels
2  differentiating features.  So kind of two pages
3  of that.
4       The other attachment, and I'm sorry,
5  but this is what we've got, it's not easy to
6  read, appears to me to be the list of some
7  various resorts, and then -- or at least hotels
8  with a resort and a name, and then the ones that
9  are charging the fee.  I beg your pardon.  It is
10  very small to read, but that's my understanding
11  of what this document is.
12       We do have some metadata around this,
13  if you look at the very last page, and it says
14  that the date it was last modified was February
15  26th of 2013.  But there's no author listed for
16  this particular document.  So you're looking into
17  this, and you have a lot of conversation around
18  it.
19       In particular, let's look at the
20  document on 1967 and 68 for a moment.  When you
21  were -- assumed responsibility for resort fees
22  around 2010, was this your understanding of what

137

1  Marriott considered a resort to be?
2       A   I can't answer if I saw this at that
3  time.
4       Q   Right.
5       A   I don't remember.
6       Q   You don't remember.  Well, if we look
7  at these criteria, there's food and beverage,
8  multiple restaurant facilities, children's area
9  programs, Rally parking station, multiple
10  recreational elements available such as fitness
11  center, pool and other athletic events, multiple
12  retail outlets, airport shuttle, concierge desk,
13  personal planning service area, convention
14  service, remote desk for convention check-in.
15       And then there are other criteria on
16  this next page about the overall environment
17  consistent with a vacation and leisure
18  experience, consistent being to stage experience
19  is evident throughout the property, creative
20  sense of revival, the lighting of the grounds,
21  walkways, abundant landscaping, sound, signage,
22  lobby indigenous to core and spacious guest

138

1  rooms.
2       Sitting here today, is this how
3  Marriot defines a resort?
4       A   This would be a good outline of what
5  a resort is, and so again it's interesting.  This
6  is from October of -- October 2000, you know,
7  which is quite some time ago.
8       Q   Right.
9       A   But the general elements, you know,
10  for the most part are correct.
11       Q   So do you remember a time when
12  Marriott sort of went through gee, here's a list
13  of all these hotels that are using their word
14  "resort" or "resort and spa," whatever.  We're
15  going to really look at these hotels and see
16  whether we think they meet the qualifications.
17       A   Uh-huh.
18       Q   Do you recall any effort in that
19  regard?
20       A   As part of my normal responsibility
21  over the Resort Fee Committee, we would not allow
22  any hotels like those two hotels in South Beach

139

1  that were not resorts to have a resort fee, and
2  again it's interesting.  So we've got this
3  document from 2000, but you know, having been in
4  the business as long as I have I know what a
5  resort is and I know what a resort isn't.
6       You know, so based on that, I would
7  not have recommended to the Resort Fee Committee
8  a resort fee at a hotel that did not represent
9  resorts to our guests properly.
10       Q   I gather from this email exchange that
11  you, aside from this document from going back
12  into October of 2000, you didn't find any other
13  guidance or definition of resorts?
14       A   I don't remember if there's anything
15  else.  I'm just looking at what you presented to
16  me.  So I can't say 100 percent.
17       Q   Okay, all right.  But is there
18  somebody else who would know more about that at
19  Marriott?
20       A   I would be very involved in that, and
21  then a Brand leader.  I mean we're constantly
22  looking at that.  We're trying to reevaluate now

140

1  as we speak actually on a totally unrelated
2  matter.  But the Brand team would be the team or
3  individual who would designate a resort.
4      Q    Okay, and who is in charge of the
5  Brand team?
6      A    Overall person, I mean and again, I
7  don't know that you've mentioned, it was Tina
8  Edmundson is our Brand leader for the company.
9      Q    Can you spell her last name, I'm
10 sorry?
11     A    E-D-M-U-N-D-S-O-N, Edmundson.
12     Q    Oh, Edmundson, okay.  I think I have
13 seen the name in some documents.  All right, and
14 you've been working on that of late you said?
15     A    Uh-huh, yes.
16     Q    What prompted you to look at that?
17     A    Just to ensure that we were
18 consistent, but there's also some changes to a
19 completely unrelated matter with our Loyalty
20 system, our Loyalty Rewards program, you know,
21 which again is confidential.  But we're looking,
22 you know, to make sure our resorts are designated

141

1  correctly.
2      Q    All right.  So then did there come a
3  time when Marriott started to consider allowing
4  hotels that weren't really resorts, at least in
5  your opinion, to try something called the
6  destination or destination amenities fee?
7      A    Yes.  I don't remember the exact date,
8  but we looked at hotels and defined what a
9  destination hotel or a destination itself was and
10 the amenities and services that were required,
11 and began considering hotels.
12     Q    Okay.  Let's look at Exhibit 26.  This
13 is an email between you and -- yeah actually Tina
14 Edmundson is on this particular document.  This
15 is dated April 2nd of 2014.  You're writing to
16 Jim Kauffman, Ray Bennett, Jeff Holdaway, Tina
17 Edmundson and Brian King.  Is that the Resort Fee
18 Approval Committee?
19     A    That is the Resort Fee Committee, yes.
20     Q    Okay.  What does HQ CFRST refer to?
21     A    Brian, that was his address, but at
22 that point he was in charge of our Select brands,

142

1  Courtyard, Fairfield, Residence, Springhill and
2  Town Place.  That's what that acronym means.
3      Q    Oh, I see.  So those are the Select
4  hotels, the ones that are not full service
5  hotels?
6      A    At that point.  There are more now,
7  but yes at that point, yes correct.
8      Q    Okay.  So this is dealing with
9  destination fees, and in particular for Niagara
10 Falls and J.W. Marriott Cusco, and what you say
11 here is "Good day everyone.  I'd like to bring to
12 your attention several recent requests for
13 destination or resort fees for hotels that would
14 not formally be designated resort, yet are in
15 destination markets.
16     "In the markets noted below, these are
17 locations where other hotels designate themselves
18 as resorts and charge a resort fee, or are in
19 specific tourist locations where amenities and
20 services could warrant the charging of a fee."
21 In discussing these, you say for example with
22 respect to Niagara Falls, "I feel that based on

143

1  our competition we should consider authorizing
2  these hotels to move forward."
3      And so what was it about the
4  competition that led you to believe this would be
5  an appropriate move for Marriott?
6      A    For Niagara Falls specifically?
7      Q    Well, for Niagara Falls or in a
8  broader sense?
9      A    Right.  Speaking on Niagara Falls
10 right now, or when this was written I should say,
11 a lot of the hotels in that market, competitors,
12 independent or chain for whatever reason used the
13 moniker in their name.  We would not allow our
14 Niagara Falls hotels to use resort in their name.
15     So other hotels at that point are
16 competitive, were charging resort fees.  We don't
17 allow hotels that are not designated as a resort
18 to charge a resort fee.  So we were at a
19 competitive disadvantage in that specific market,
20 I'm talking Niagara Falls right now.
21     Q    But why -- let me drill down on that.
22 Why is it a competitive disadvantage to not

144

1 charge an extra fee?
2    A    Because from the perspective of being
3 able our -- I can't speak for our competition,
4 but our resort fee is -- at this point it was 5
5 to 1 value ratio, and we were able to provide
6 amenities and services that we couldn't afford
7 for the customers, and package items into you
8 know like a value package for the customers, to
9 be able to compete with the other competitors,
10 with the competitors in that hotel, in that
11 market.
12    Q    So I'm not trying to put words in your
13 mouth, but it appears that what you're saying is
14 that these Niagara hotels didn't have sufficient
15 revenues to support offering these amenities
16 unless they charged an additional fee, is that
17 right?
18    A    And also to upgrade service for the
19 customers.  You know, for example in this
20 specific, a big deal in Niagara Falls is
21 transportation to tourist locations, and a lot of
22 our competitors in this situation, remembering

145

1 back to 2013, were providing services that we
2 were not able to provide.  So it was a
3 competitive disadvantage, you know, for us, for
4 those hotels in that market.
5    Q    But they didn't have the financial
6 wherewithal to just go ahead and provide them?
7    A    Those were franchise hotels, so I
8 didn't have the visibility into those hotels to
9 tell you specifically about that, but that is my
10 sense.
11    Q    Okay.  So it was competitively
12 disadvantageous because, at least your
13 understanding was they couldn't afford to provide
14 the services without being authorized to charge a
15 separate fee?
16    A    That's correct.
17    Q    They could have raised the room rates
18 though?
19    A    It's a complex -- if you're asking a
20 question, it's complex to answer because there
21 are many different factors about sorting.  If a
22 competitor does not include a resort fee in

146

1 there, which they shouldn't, I mean we were
2 putting a price out there.  We would be at a
3 competitive disadvantage.
4    Q    So your hotel would look more
5 expensive, even though you're providing the
6 amenities as part of the room rate and not as
7 part of a separate fee?
8    A    I'm sorry, I didn't hear that.  Can
9 you say that again?
10    Q    So your hotel would look more
11 expensive, less attractive from a price
12 standpoint?
13    A    If we took our rates up?
14    Q    If you raised your rates?
15    A    To be inclusive, and we would also
16 potentially be competing against other hotels.
17 So these two particular hotels in Niagara Falls
18 are called Falls View and Falls something.  They
19 are right on the falls.  They're spectacular
20 views of Niagara Falls, you know I mean full
21 visibility.
22        They're generally nice hotels, but

147

1 they also compete against the Comfort Inn which
2 is two miles down the road, or the Holiday Inn or
3 other hotels that are not in the same class.  So
4 when you're going in on price sorting, you would
5 theoretically be competing against a Comfort Inn,
6 you know, their rates at a completely inferior
7 hotel, a bad location compared to our hotels.
8        And again, I'm talking Niagara Falls
9 specifically at this point.  I'm not talking
10 about other markets.  This is a specific example.
11    Q    So all right.  Let's move on.  You
12 refer to something called "destination markets"
13 in this email.  What did you view, you can see
14 your language here, "that would not be formally
15 designated as a resort yet are in designation
16 markets."  What is a destination market?
17    A    A destination market is a highly
18 sought after market, normally a tourist area.
19 Niagara Falls would be an example of that.  Napa
20 Valley, wine country would be an example of that.
21 It could be gateway cities like New York.  Again,
22 highly sought after destination markets.

148

1    Q   What about Washington, D.C.?

2    A   That would be, I would give you a --

3  it would be a subjective answer at this point,

4  but you know, I mean people come here from all

5  over the world to see it.  You know, I mean it

6  could be a destination market absolutely, you

7  know, because of all the tourist attractions and

8  people come in from all the different areas.  It

9  could be.

10   Q   Okay, all right.  So was a procedure

11 then put in place for charging destination

12 amenities fees?

13   A   We put a procedure in place.  I don't

14 remember the exact date.  You may have

15 information on that, but it probably would have

16 been around this time, where we put some

17 additional formality around destination fees.

18   Q   All right.  Let's take a look at

19 Exhibit 27, or did we just look at 27?  That was

20 --

21   A   It was 26.

22   Q   26, I'm sorry.  Here's 27.  These

149

1  appear to be meeting minutes relating to

2  destination fees, and the meeting was apparently

3  attended by you, as you see on the attendees

4  portion at the top, led by a Richard Bowden.  Who

5  is he?

6    A   I don't remember who that was.  He may

7  have been in IT since this is an IT document.  I

8  don't remember what his specific role was.

9    Q   And then if you look kind of in the

10 right-hand part of this document, there's rather

11 faint date that appears to say July 17th, of

12 2014.  Do you see that?

13   A   Yeah, and there's a date right above

14 in the corner there too, July.

15   Q   Oh, I see that.  Yes, right.  That

16 says July 21st of 2014, right?  So this is the

17 middle of 2014?

18   A   Uh-huh.

19   Q   And there are other attendees of this

20 meeting.  Do you remember who those people are?

21   A   Bonnie Donohue is a person that I work

22 with who basically enters information into -- for

150

1  resort fees.  I know Lewis.  I don't know what he

2  did then.  Lisa, I don't know.  Christine Kettmer

3  was -- again today she's like an analyst.  I

4  don't know Sanjay.  Jody Larson is from our

5  Customer Service Center, our engagement, Customer

6  Engagement Center.

7         I don't know Sheila.  Chip Shrewbridge

8  is, had something -- perhaps was with Brand at

9  that point, although I'm not sure.  I don't know

10 what Ted did.  I don't know what Parag did.  I

11 don't know a lot of these people, I'm sorry.

12   Q   Did you actually go physically to a

13 meeting?  Do you have any recollection --

14   A   I don't recollect if that was by

15 phone.  I'm guessing it was by phone.

16   Q   Okay, and so the agenda was to review

17 destination fee scope, and discuss the impacts

18 and build on the system and channel requirements.

19   A   Uh-huh.

20   Q   So the meeting minutes then reflect

21 that you outlined, if you look at the bottom half

22 of that first page, outlined the basic scope and

151

1  requirements for the destination fee.  You talk

2  about how they need to be in a destination

3  market.  Hotels requesting destination fees would

4  have to go through the same approval process that

5  resort fees go through?

6    A   Uh-huh.

7    Q   The exact -- I think that's a typo

8  -- name of the fee still has to be determined.

9  Possible alternatives include premium service

10 fee.  Did you settle on destination fee?

11   A   I believe destination amenity fee,

12 yeah.

13   Q   Okay, and approval has to be gained

14 from Jim Kauffman, Tina Edmundson and Brian King

15 to add this fee.  Were you also going to be

16 involved in the approval process?

17   A   For adding the fee?  Well I was -- I

18 assume, based on my attendance at this, that was

19 I assigned to make, you know, to get the

20 information, to present back to the rest of the

21 Fee Committee.

22   Q   Okay, I see.  And so the third bullet

152

1  point down from there says "This fee cannot be
2  rolled into the room rate, as this would put the
3  properties at a disadvantage when price
4  comparison shopping is performed." So can you
5  explain that a little bit?
6      A    That's what I explained earlier, using
7  the example of a Comfort Inn or a Holiday Inn
8  Express, that when you go like a shopping, like
9  OTA, Priceline, Expedia, Booking.com that sort by
10  price, again if these hotels were to add in with
11  all the extra amenities into the room rate, we
12  would be at a disadvantage against hotels that
13  were, in our opinion, of inferior quality, not
14  the same level.
15     Q    But I'm assuming that you would
16  believe that the Marriott hotels were of superior
17  quality to say a Holiday Inn Express?
18     A    I don't assume that. I know that.
19  But I know that the customers do, if they're
20  looking at price only.
21     Q    You think that's how consumers shop,
22  by price only?

153

1      A    A lot of them do, yes. Not all of
2  them. But brand is very important for us.
3  That's why we focus on guest service and we're
4  trying to get parameters around all our fees. So
5  you know, I talked about the guest service. But
6  you know, from the perspective that there are
7  individuals who shop primarily by price, those
8  typically may be individuals who go to OTAs,
9  online travel agencies, and would put us at a
10  severe competitive disadvantage.
11     Q    Okay. Let's see if there's anything
12  else on here. No, I think that's fine for that.
13  Let's look at another one that frankly puzzled me
14  a bit. This is 28. This is an email exchange in
15  August of 2014 that you had with someone named
16  Kevin Stockford. Who is Kevin?
17     A    Kevin is -- let me see if his title's
18  on here, but he's the area Director of Finance
19  for the Western region.
20     Q    Okay, and if you look on the second
21  page ending in 86717, Kevin is actually writing
22  to someone named Eric Hilbert, and he says "Eric,

154

1  the San Diego properties are proposing three
2  potential add-ons to recoup the impact of the
3  coming minimum wage change laws." So I guess it
4  was going to cost the hotel more money to pay
5  their help, is that right?
6      A    That appears to be the case, yes.
7      Q    So they wanted to add on some fees, a
8  guest room fee, and outlet check fee or a banquet
9  service charge, and he's asking for some
10  thoughts. This gets forwarded to you as you see.
11  "It's best first to check with Jeff and I so we
12  can elevate, for this is sure going to hurt the
13  city and image. I wonder if we should not get it
14  all just in one shot?"
15         So then you respond "Kevin, this email
16  made its way to me. As more communities have
17  implemented living wages, we've seen an increase
18  in requests for add-on charges as you're
19  suggesting. We have not allowed them. If,
20  however, you would like to discuss further and
21  put forward a proposal, I'd be happy to bring
22  this to the Resort Fee/Fee Committee for

155

1  consideration."
2          So how would adding on to recoup extra
3  charges or extra costs the hotels were incurring
4  to pay their staff, how would that get into a
5  resort fee?
6      A    So because it's a fee, a lot of times
7  any of these fee requests would come to me, you
8  know, because I was associated with governing all
9  of our fee policies within the Americas.
10         So it was actually a good thing
11  because, you know, in a situation like this,
12  where somebody was making a proposal to add, you
13  know, fees like this onto the guest room, the
14  outlet check and a banquet service charge, we
15  never did that. That would be deceptive.
16         So we haven't allowed any of these
17  fees going forward, even though in some cities
18  like San Francisco independent restaurants are
19  adding fees on, we do not allow that. So there's
20  a governance around this, which again I
21  encouraged hotels if there are any requests for
22  any types of fees, you know, I said I would bring

156

1  it to the Fee Committee.  I don't remember if I
2  did, but it never happened.
3      Q    So you're just saying if we're going
4  to do this, you have to bring it to the Fee
5  Committee?
6      A    Right.  We don't want hotels making
7  decisions like that that could impact negatively
8  Marriott brand, to be deceptive to the customers
9  in any way, shape or form.  So that's why it came
10  to me.
11      Q    Was there anything about the suggested
12  fees that are listed on the page, the initial
13  page of this email that would support a resort
14  fee?
15      A    No.  These have nothing to do with the
16  resort fee.
17      Q    Guest room fees, outlet fees, banquet
18  service charge?
19      A    Yeah.  No, there's nothing -- these
20  have nothing to do with resort fees.  They
21  wouldn't be categorized as a resort fee, you
22  know, they wouldn't even come close to it.

157

1      Q    Why did you then suggest that they
2  make a proposal, so you could turn it down?
3      A    Yeah, so there would be documentation
4  that I turned it down, and so it wouldn't happen
5  again.
6      Q    All right.
7      A    You know I mean because I can't just
8  -- I mean if Kevin Stockford, you know, reports
9  in and if the area vice president Bridget
10  Bilinski, who's copied on this, you know, wanted
11  this to be put forward, I would do it.  But you
12  know again, I would go with the recommendation
13  not to do it and it wasn't -- it was never
14  implemented.
15      Q    Okay.  Let's look at -- this is
16  something that has to do with some of the
17  technology you're doing around this.  This is
18  Exhibit 34, and it's an email exchange between
19  you and someone named Chris Canizaro.  Who is
20  Chris?
21      A    Chris had something to do back then
22  with technology in the rooms area.  I don't

158

1  remember.  I don't see a specific title right
2  there.  But anyway, he was kind of a technical
3  person.
4      Q    Okay, and the discussion has to do
5  with the guest Internet connect screen for resort
6  hotels, and he says he needs your help.  So if
7  you look on page 51309, a few pages back, this
8  starts with something from Larry Schultz writing
9  to you.  "In an effort to clarify how best to
10  deploy connect screen for our resort hotels in
11  the Americas, I'm working to document all resort
12  properties."
13          And he's, you know, trying to
14  understand these various fees.  What is the
15  connect screen?  Do you know?
16      A    So when you go into your guest room
17  and you pull your personal computer up, and again
18  this is back in 2015, you know, and you want to
19  connect to the Internet in the hotel, you go and
20  say Marriott Hotel Guest Room.  You click on that
21  and then there's a pop-up.  That's the connect
22  screen, and it basically introduces, you know,

159

1  offers you options on Internet connectivity.
2          So there might be, you know, like a
3  low speed and a high speed.  So that pops up when
4  you're in a hotel.  That's what they're referring
5  to.
6      Q    So at this time, it appears you were
7  gathering information about the hotels that
8  charge resort and destination fees, and on 308
9  through 309, you have responded to Larry Schultz,
10  and you're saying, if you look at the top of 309,
11  "I'm counting 47 resorts with resort fees."
12  You're attaching the most recent list that has
13  all the resorts, and then you say "We have a
14  several hotels with a destination amenity fee."
15          This is basically a resort fee for
16  non-resorts.  So what do you mean by that, "a
17  resort fee for non-resorts"?
18      A    It's what -- when I was talking before
19  about when you were asking the question about
20  what defines a destination market, what defines,
21  and then what defines a destination hotel.  That
22  was the whole conversation about destination

160

1 amenity fee and putting some guidelines around
2 which hotels would be designated, you know, as
3 eligible for a destination amenity fee.
4     Q    So it's a resort fee for non-resorts?
5     A    That was the descriptive, yes.
6     Q    Okay.  But they're sort of
7 functionally equivalent?  Is that what you're
8 trying to say here?
9     A    Well, and the purpose of this, the
10 question on this was, and the whole purpose of
11 this email was how to make it simpler for the
12 guests when they check into the hotel to connect
13 to their screen and get charged properly.
14        So one of the standards with our
15 resort fee is that it must include enhanced WiFi.
16 So if you're paying the resort fee, you
17 automatically are upgraded to the enhanced WiFi,
18 and the purpose of this was to find a
19 technological way to make sure that if you're
20 paying the resort fee you automatically received
21 that Internet, the enhanced Internet without
22 being charged.

161

1        So we didn't want to hassle the
2 customer with an accidental charge.  So that was
3 the purpose of this, was to enhance the guest
4 experience.
5     Q    So resort fees cover the high speed
6 Internet access, is that right?
7     A    Yes.  That's a requirement if you have
8 a resort or a destination amenity fee, that it
9 automatically includes the -- what we call
10 enhanced, you know, which is the best WiFi as
11 part of the resort fee or destination fee, right.
12     Q    By "best WiFi," you mean high speed
13 Internet?
14     A    High speed.  Yes, yes, correct.
15     Q    All right.  So all right.  So if we
16 look then -- first, this is an interesting, the
17 next document is interesting.  This is Exhibit
18 30.  The first page of this is metadata, and I
19 will explain why that is.
20        If you look at the first page of the
21 actual document that has 46349 at the bottom, it
22 says the -- you list all these people that this

162

1 email is to, but it doesn't say who it's from.
2 And so we looked at the metadata and the metadata
3 identifies no particular author.  It does give a
4 date of August 30th of 2014, which is also not on
5 this email.
6        But if you look at the signature block
7 for this email on the next page ending in 50,
8 it's your name and title.  So I'm not sure when
9 this email was sent.  This has, you know again,
10 August 30th of 2014 on it, you know, or rather
11 maybe it's sent as a draft in your computer, or
12 if something was cut off perhaps in the
13 processing of the document?
14     A    Yeah.  I don't know if it was sent.
15 Yeah, I mean if -- but it's from me.
16     Q    Uh-huh.
17     A    You know, there's no question about
18 that.  It's my style and I'm not on the TO list.
19 I can't answer if it was sent or not sent.  I
20 don't know any reason it wouldn't have been, but
21 I can't answer that one.
22     Q    Milton, maybe we can look into that

163

1 and try to understand a little better.
2        MR. MARQUIS:  We'll make a note.
3        BY MS. MILLS:
4     Q    The provenance of this and whether it
5 was actually sent.  The metadata we have doesn't
6 say one way or the other so -- so this is --
7 relates to Resort Fee 2014 Mid-Year Update, and
8 let's look at some of the people who are
9 recipients here.  Jim Kauffman, who is that?
10     A    He is the president of North America
11 Hotels at that point.
12     Q    Okay, and Ray Bennett?
13     A    Ray Bennett, at that point he would
14 have been my boss, chief lodging services
15 officer.
16     Q    And then Rob Steigerwald?
17     A    Rob Steigerwald at that point, let me
18 just look.  This was '14.  He was either a senior
19 vice president or chief operating officer for one
20 of the regions in the Americas, as was David
21 Marriott.
22     Q    David Marriott was what if you recall?

164

1     A    He was I believe at this point, what
2   we call chief operating officer.  So today, I'm
3   not talking about -- this is 2014.  But today,
4   there are two -- in the United States, there are
5   two chief operating officers, one for the east
6   and one for the west.  Rob oversees the west;
7   David oversees the east.
8         At this point, they may have had
9   smaller regions.  But they were basically in
10  charge of large parts of the country.
11    Q    Okay.  So you're really reporting up
12  the chain here of command, is that right?
13    A    Looking at the rest, Tim Brown, Tim
14  Baker.  These were some of the key decision-
15  makers within the Americas, that's correct.
16    Q    Okay, and is David Marriott part of
17  the Marriott family?
18    A    He is.
19    Q    Okay.  So you are attaching a resort
20  fees survey, and you are summarizing the resort
21  fee revenues?
22    A    Uh-huh.

165

1     Q    So let me focus in on a couple of
2   specifics here.  On the page that ends in -- oh
3   well the first page, 46349, you begin by saying
4   is "You know one of our primary areas of focus to
5   drive ancillary revenue and profit is through the
6   thoughtful execution of resort fees."
7         So at this time in 2014, I think
8   August of 2014, was that a primary focus, was
9   using resort fees to drive ancillary revenue?
10    A    Resort fees, any types of -- I mean my
11  job and our job is to run a profitable company,
12  and we do that through a balanced scorecard.  So
13  it wouldn't surprise me to say that we are
14  driving revenue.  We wanted to have profit.
15        We wanted to have satisfaction, and we
16  wanted to drive associate engagement satisfaction
17  as well.  So we look at it from a balanced
18  perspective so, you know, we're not -- we're in
19  business to make profits, but also balance that
20  against guest satisfaction.
21    Q    Okay.  There's a section called
22  "Opportunity Areas" toward the bottom of that

166

1   page?
2     A    Uh-huh.
3     Q    And one of -- the third point is to
4   analyze all other resorts not charging a resort
5   fee to determine feasibility.
6     A    Uh-huh.
7     Q    Did you do that?
8     A    I don't remember specifically, but in
9   the normal course of business we would look at
10  resorts.  We meaning this group up here would
11  look at that type of situation.
12    Q    It's just in the ordinary course, to
13  see whether or not it was feasible for them to
14  add a resort fee?
15    A    Whether it would be appropriate, not
16  whether -- but whether it would be appropriate so
17  we would offer the amenities and services.
18    Q    And it says, it says "to determine
19  feasibility" here.  So I mean by feasibility, do
20  you mean appropriateness or just logistically if
21  possible?
22    A    Logistically I don't think that's an

167

1   issue.  You know, if you're talking about
2   technology, if I'm understanding your question
3   correctly, what I'm talking about whether or not
4   the property is appropriate for a resort fee,
5   whether we can, you know, drive the guest
6   services or guest amenities, you know, the guest
7   experience.
8     Q    So that's what you mean by
9   feasibility?
10    A    That would be part of it.
11    Q    Okay, and on the destination amenity
12  fee, you say at the bottom of the page, we are
13  moving forward to set up a new fee designed for
14  hotels that are in premier destinations, however,
15  are not called resorts, and you have an owner
16  here of a cross-functional team looking into all
17  of these things.
18        So then if we look at the attachment
19  to this email, if you look at the back, there is
20  a resort fee survey.  Again, this is rather tiny
21  print.
22    A    Uh-huh.

168

1    Q    But it's describing I gather the
2  various hotels that offer the fee, at least as of
3  that time, and when they started offering it
4  what's included in the package and so forth.  Is
5  that correct?
6    A    Can you repeat the question?  I'm
7  sorry.
8    Q    Yeah, I'm sorry.  The question, I'm
9  just asking you is that what this represents?
10  This attachment represents as of this is June of
11  2014, the various Marriott hotels that were
12  charging these fees and with some additional
13  information about the amounts, the packages that
14  were included and so forth.  Is that what this
15  represents?
16    A    Yes.
17    Q    Okay.  Did you prepare this sort of
18  survey type of document about resort fees on a
19  regular basis?
20    A    No.  This was probably an ad hoc.
21    Q    Okay, and I asked you earlier whether
22  you set up a process for charging destination

169

1  fees at Marriott, and I think they have a
2  document that speaks to that.
3      MR. MARQUIS:  Sondra, are we about to
4  start a new line.  It's one o'clock.
5      MS. MILLS:  It's one o'clock?
6      MR. MARQUIS:  Yes.
7      BY MS. MILLS:
8    Q    Let me see how long this would take,
9  just quickly.  Maybe we can power through it and
10  -- yeah.  I think this should just take a minute.
11  So this is Exhibit 36, and this is dated November
12  15th, November of 2015, a destination amenity fee
13  process memorandum from you to the hotel general
14  manager, with earlier request for approval for
15  destination amenity fee.
16      This looks an awful lot like the one
17  that we looked at previously for resort fees, is
18  that right?
19    A    Yes.
20    Q    Are they pretty much the same
21  requirements?
22    A    For the most part, this document is,

170

1  you know, there are some variations in terms of
2  when we determine a destination hotel.  There's
3  some slight variations we look at.  You know,
4  again the competitors.  We look at the hotel, the
5  amenities and so on.  The process is the same.
6    Q    Uh-huh, okay.
7    A    You know, we wanted to formalize it to
8  make sure that we were complying with everything
9  we needed to comply with.
10    Q    Okay, all right.  I think that's
11  sufficient for that particular item, and so it's
12  one o'clock you said?
13    A    Uh-huh.
14    Q    So we'll take maybe 45 minutes.
15      MR. MARQUIS:  Good, great.
16      (Whereupon, the above-entitled matter
17  went off the record at 1:04 p.m. and resumed at
18  1:53 p.m.)
19      BY MS. MILLS:
20    Q    Okay, back on the record.  We were
21  talking about destination amenity fees, and so I
22  have a few more items and questions on that

171

1  subject.  Let me give you what's been marked as
2  Exhibit 59.  This is an email exchange between
3  you and Ms. Michelle Pajot.  Did I pronounce her
4  name --
5    A    Correct.
6    Q    And in this exchange, this is taking
7  place on March 21st of 2017.  So it was a little
8  over a year ago, and in the underlying email --
9  oh.  Also involved in this is someone named
10  Julius Robinson.
11    A    Uh-huh.
12    Q    Who is Julius Robinson?
13    A    Julius is a Brand, was at that point
14  a Brand leader for the autograph brand.
15    Q    Okay.  Let's look at the page that's
16  marked 104675, and you are speaking to Michelle
17  at this point.  "I've attached the resort fee
18  application.  Here are the issues.  The hotel
19  does not appear to be a resort.  Only 20 percent
20  of the comp set charge a fee, proposition is
21  inadequate following any of the guidelines," and
22  so forth.

172

1         And there's some back and forth
2   between you all, but just to focus this in,
3   please go to the very first page of this document
4   which ends in 72.  What you say here is "Probably
5   makes sense to look at this as a destination,"
6   but wasn't in your view cutting it as a resort;
7   correct?
8       A   Yes, that's correct.
9       Q   And then you list some qualifications.
10  "Please note that the following are considered to
11  determine a destination."  You mention location,
12  length of stay, business mix, hotel location, a
13  Marriott Rewards redemptions, upgraded amenities
14  and services, competition charges a resort or
15  similar fee."
16      Were those -- are those criteria
17  somewhere adopted by Marriott in a formal way?
18      A   Excuse me, yes.  Those were at some
19  point when we formalized the destination amenity
20  fee.  I put into place some additional criteria
21  to help judge again, to take some of the
22  subjectivity out of what a destination is, what a

173

1   destination market and what a destination hotel.
2         So these were some of the criteria
3   that we put in place.  They don't have to be or
4   they were not meant to be, you know, you have to
5   have all five or whatever there are.  But it was
6   guidelines in terms of how we would determine a
7   destination.
8         If there were questions from the owner
9   or the franchisee, we would have a consistent
10  policy on that.
11      Q   Okay.  This related to a hotel I
12  believe called the Laylow?
13      A   Yes.
14      Q   In Hawaii near Waikiki Beach.
15      A   Uh-huh.
16      Q   So let's look at a screen shot of --
17  I will tell you this was captured just within the
18  last day or so of the website for the Laylow.
19      A   Uh-huh.
20      Q   So the first page is, you know, just
21  what you see initially and then all of the
22  following a resort as you scroll through the

174

1   website what you see.  When we get back to the
2   fourth page of this document and you are looking
3   at a standard rate room for May 18th of 2018, so
4   staying one night.
5         There's this box that you described
6   previously.  "Please note USD 29 daily
7   destination fee."  That added to room rate
8   includes nightly entertainment, welcome baskets,
9   shaved ice and ukulele lessons, if you want them
10  I guess.
11      A   Uh-huh.
12      Q   And so if you look at rate details for
13  the regular rate, that's the next page, that just
14  explains a few things about holding or cancelling
15  or modifying your reservation, is that right?
16      A   Correct.
17      Q   The next page is what you get when you
18  look at the room details, which lists what you
19  get with the room basically.
20      A   Uh-huh.
21      (Pause.)
22      BY MS. MILLS:

175

1       Q   The reservation details if you
2   actually select that you're going to book this
3   room, and what it shows is a -- this one shows a
4   destination amenity fee of $29 and estimated
5   government taxes, and the total cash rate of the
6   room.  You described some sort of a drop-down box
7   in your earlier testimony?
8       A   A dialogue, excuse me, dialogue box.
9   I call it a dialogue box, this right here.  Is
10  this what you're referring to on page -- oh,
11  there's no page number on it.
12      Q   I see.  That's what you're referring
13  to is this blue box?
14      A   Yes.
15      Q   "Please note."
16      A   Uh-huh.
17      Q   That's what you're referring to?
18      A   Yes, yeah.  So that comes up the first
19  time you look at the room rate.
20      Q   And so this is how, I mean the Laylow
21  apparently did go forward with a destination
22  amenities fee.

176

1    A    Yes.

2    Q    And that's how -- this is -- I believe
3  this is part of the actual booking and
4  reservation, review of the room details.  This is
5  not after a reservation has been booked?

6    A    That's correct.  They hit continue at
7  the bottom.  That will be --

8    Q    Uh-huh.  So continue is when you --

9    A    Yes, the actual booking.

10    Q    Okay.  At some point did Marriott also
11  start to consider charging, allowing hotels to
12  charge for sort of an urban destination fee, for
13  lack of a better term?

14    A    We categorize any fee that is not a
15  resort fee as a destination fee.  Destination,
16  destination amenities fee, and again those hotels
17  would need to meet the same qualification of a
18  destination.

19    Q    So let's look at Exhibit 61.  The
20  first page is the metadata.  I think we're trying
21  to see if we could tell something about the date
22  and the author of this document, and the author

177

1  is identified as a Nicole Wolf and the date is
2  3/29/17, according to the first page of floating
3  metadata.  This describes destination fees for
4  New York City, is that right?

5    A    Let me just look at it.  Yes.

6    Q    Uh-huh.  Do you know why this was
7  prepared?  Did you ask for it to be prepared?

8    A    I did not ask for this to be prepared.

9    Q    Do you know how this came about?  Do
10  you know who Nicole Wolf is?

11    A    I don't know Nicole.

12    Q    So about March of 2017, Marriott was
13  considering allowing hotels in New York to charge
14  a destination or urban destination fee, is that
15  right?

16    A    Yes.

17    Q    And do you know how this concept
18  arose, why?

19    A    The concept came about because of
20  competition, primarily because of competition,
21  because this one, this one notes here --

22    Q    What page are you looking at?

178

1    A    I'm on the first page.  There was at
2  the point that this was being analyzed, there was
3  over 40 hotels that are charging what they call
4  an urban fee.  Predominantly that was the
5  terminology used, and as it progressed, more and
6  more hotels were doing that as well.  So that is
7  the reason that we looked at it.

8    Q    So you looked at it because
9  competition was charging these fees?

10    A    Correct.

11    Q    But why would it be important for
12  Marriott to add a fee?  I mean if your price
13  overall is going to be lower than the
14  competition, isn't that better?

15    A    What do you mean?

16    Q    Well lower, the total price if you
17  include this fee, and they were ranging between
18  12 and 35 dollars a day.  Wouldn't that be -- why
19  not just let it drop?  In other words, why not
20  say oh, other people are charging these sort of
21  fees.  We don't need to do that, we're fine,
22  we're good, and it makes us price competitive?

179

1    A    Yeah.  I mean similar to when you
2  asked the question before about other destination
3  fees, it would be the same answer as I gave
4  before, and that is that it allows us to package
5  a robust amount of amenities and services for the
6  guest with a 4 to 1 value ratio.

7        And also importantly included in that
8  4 to 1 is the enhanced WiFi within that market is
9  very important as well.  So basically instead of
10  charging them for that, it was included and we
11  were able to bundle it to go into this 4 to 1
12  value package.

13    Q    You said 4 to 1.  If you look at the
14  page ending in 22, where it says "A la carte
15  pricing for 5 to 1."

16    A    Yeah.  So we changed from 5 to 1 to 4
17  to 1.  I don't know an exact date, but probably
18  it was slightly before this.  And so again, we
19  went to a different valuation and the reasoning
20  behind that, if that was the next question was
21  that we had disallowed items that we considered
22  to be non-valuable, such as in the past when

180

1  resort fees were developed.
2      We included telephone, long distance
3  telephone, local calls, faxes, bottled water,
4  stuff that is of no value these days.  So we've
5  told hotels to pull those out completely, which
6  is we went to 4 to 1.
7      Q   Okay.  So let's look at some screen
8  shots that were done just within the last day or
9  so for the Marriott Marquis in New York.  No
10  relation to you Milton.
11      A   (No audible response.)
12      Q   So this is -- I'm sorry.  The Marriott
13  Marquis is on Times Square?
14      A   Correct.
15      Q   If you turn again to the fourth page,
16  I guess, we see this blue box at the top or in
17  the middle.  I'm not -- I'm sorry, in the middle.
18  "Note that daily destination fee added to room
19  rate includes restaurant credit, enhanced
20  Internet, one hour ticket and more."  So the
21  enhanced Internet is something you get as part of
22  the resort fee or destination fee?

181

1      A   Correct.  That's a requirement.  And
2  then also just as a note, that USD $25.  So with
3  this $25 fee they get $25 of food and beverage
4  automatically with that.
5      Q   They get a restaurant credit at the
6  hotel?
7      A   Correct.
8      Q   Let me ask you about this language.
9  "$25, USD 25 daily destination fee added to room
10  rate."  Does that mean that it has been added or
11  it will be added?
12      A   It will be added.  It's not in --
13  that's not included in the $332 rate, that very
14  first one.  So it would be added, yes.
15      Q   Did you have some discussion about
16  whether you say "to be added, will be added, has
17  been added or added," or other variations?
18      A   No, we did not.
19      Q   Is it possible that someone could
20  think that the fee's already been added?
21      A   I suppose if they were looking at it
22  that way.  I don't read it that way, but I

182

1  suppose they could.
2      Q   Uh-huh, okay.  So let's see if we
3  select the regular rate here.  If you look at the
4  next page, you've got these great details, and
5  describes the on-site dining options and some
6  other issues about how to hold, cancel and modify
7  your reservation.  I don't see any further
8  discussion of the resort fee per se.
9      A   That would not be included in the rate
10  details.
11      Q   That would not, okay?
12      A   Correct.
13      Q   And then if you click on the room
14  details, you get this next page showing what you
15  get basically with a room?
16      A   Oh, I'm sorry.  This looks like -- I
17  don't know if that's the room detail.  This looks
18  like the hotel amenities.
19      Q   It's what we got when we clicked on
20  amenities.
21      A   Okay, all right.
22      Q   Yeah, there's two, there are two

183

1  links.
2      A   Oh, so the second page?
3      Q   Yes.  One of them the rate details and
4  then there's up on the right, on the first page,
5  there's room details?
6      A   I see.  Okay, yeah, yeah, yeah.  Okay,
7  gotcha.
8      Q   So that's what you get when you click
9  room details.  And then this one at the
10  reservation stage shows the cash rate, the
11  destination amenity fee of $25, and then the
12  government taxes and fees.
13      A   Uh-huh.
14      Q   For the total, okay.  So this is an
15  example of what they're doing in New York?
16      A   Yes.
17      Q   And was this sort of like -- this is
18  an experimental project, kind of test driving?
19      A   Yes, it is.  It's what we call POC,
20  proof of concept.
21      Q   Uh-huh.  Let me ask you about
22  something called --

184

1      (Pause.)

2      BY MS. MILLS:

3      Q    Something called "Project Rodeo."  The

4    cover email is at the back of this particular

5    document.  This is someone named -- actually, it

6    doesn't say who this is from.  It doesn't say who

7    this -- oh no.  Well, it says it's from you Jeff,

8    and again we're missing a date and a FROM line.

9    But it appears that this is happening sometime

10   around April of 2017, based on the attachments to

11   it.

12       "These were three presentations from

13   the CLS Americas meeting last week.  Don't know

14   if Rob saw this information."  So what is this

15   about, this Project Rodeo?  What is that about?

16      A    So this done partially due to the

17   Starwood acquisition, to number one assess the

18   fee structure for Marriott International and

19   Starwood, and you know, because they came into

20   our system with a different set of fees and maybe

21   some different processes and similar to when we

22   acquired Gaylord.

185

1      Brought them into our system.  We

2    thought it was important to look at that, and so

3    we identified some former Starwood Hotels that

4    had fees, different fees which are listed on one

5    of the attachments.  Some had resort fees, some

6    had some other fees.  So what we were trying to

7    get a handle on the various fees, and then as

8    part of that try to align on a strategy, a fee

9    strategy not only for resort and destination

10   fees, but any other fees that are out there.

11      Because as we said before, you know,

12   they're -- generally speaking we don't like fees,

13   but there are a lot of fees out there.  So we try

14   to define, you know, what kind of fees were out

15   there and set into motion a process where we

16   could help analyze and try to synchronize our

17   systems and the definitions for the entire

18   company.

19      (Pause.)

20      BY MS. MILLS:

21      Q    Do you recall that there were

22   discussions about differences in approach, shall

186

1    we say, or policy between the Marriott legacy

2    hotels and the new Starwood Hotels, about whether

3    or not resort fees should be opt-in and opt-out

4    on the one hand, or mandatory on the other?

5      A    At that meeting, I don't recall that

6    there was any conversation about opt-in/opt-out.

7    To my knowledge, I don't think there was -- if

8    you're asking are there opt-in, like I was

9    describing before, where you're offered a product

10   at the desk if that's what you're referring to.

11   To my knowledge, Starwood did not have those

12   types of fees, and we did not talk about that, if

13   that's what you're referring to.

14      Q    Did they have mandatory "resort fees"?

15      A    Yes, yes.

16      Q    They did.  So there was no fundamental

17   difference in approach between the Starwood and

18   the Marriott?

19      A    In terms of mandatory and non-

20   mandatory?

21      Q    Yes.

22      A    That is correct.

187

1      Q    Okay.  We talked a little while ago

2    about your responsibilities evaluating resort

3    fees as a way to increase revenues at Marriott.

4    Let me show you a document that's marked Exhibit

5    18.  This is an email from you, Sunday July 7th

6    of 2013, and you're writing to Jim Connelly, Ray

7    Bennett and Eileen MacElroy.  Who are they?

8      A    Jim Connelly at that time may have

9    been the chief financial officer.  I'm not 100

10   percent certain that, but that could have been

11   his role.  Ray Bennett was the chief lodging

12   services officer, which is now Erica Alexander's

13   position, and Eileen MacElroy was a senior vice

14   president of Operations dealing with owner

15   relations and so on.

16      Q    So you begin by saying "As we consider

17   the impact of lost revenue from HSIA and the need

18   to replace it, we can consider several options."

19   Now that's high speed Internet access, right?

20      A    Correct, yes.

21      Q    So how, what is this, "the lost

22   revenue from HSIA"?

188

1    A   So the hotel industry, you know, we
2  charge for access to high speed Internet, and it
3  was usually several speeds, you know.  There was
4  enhanced and the lower.  As -- and again, if this
5  is the same timing on this, if we moved on
6  Marriott Rewards, our loyalty program, people
7  would buy it.
8        We moved to a policy that if you were
9  a Marriott Rewards member, you would get it
10 complimentary.  So in other words if you were a
11 basic member, you would get the basic WiFi.  If
12 you happened to be one of our highest members,
13 you would get the enhanced.  So as a result of
14 that, there was a loss of high speed Internet
15 access revenue.
16   Q   I believe that you stated earlier that
17 if a hotel charges a destination or resort fee,
18 they must include high speed Internet access?
19   A   Yes.
20   Q   But not everyone was getting it
21 probably otherwise.  I mean if you're not paying
22 the fee or if you're not an elite member of some

189

1  sort, then you typically would have to pay for
2  high speed Internet access?
3    A   Well, as you pointed out, that's
4  correct.  If you were paying a resort or
5  destination fee it would be included.  If you
6  were a premier or platinum member with Marriott
7  you would get it.  If you were at any level, you
8  would get some type of free Internet.
9        Additionally, there are some accounts,
10 special corporate accounts that it's negotiated,
11 you know, to that as well.  So there was, I don't
12 know what the percentage, but there's a pretty
13 high percentage of people who were getting it
14 complimentary.
15   Q   Okay.  So let's look at captured
16 pricing revenue management on the first page, and
17 you said in the first paragraph that ancillary
18 revenue accounts for approximately 40 percent or
19 more of our total sales, but that somehow
20 Marriott was not managing the revenues.  So you
21 thought they needed to do more to manage
22 ancillary revenues, is that right?

190

1    A   Uh-huh, that's correct.
2    Q   What do you mean by "managing them"?
3    A   Well, ancillary revenue is anything
4  that -- I would define it as anything that is not
5  rooms revenues, excuse me.  So on rooms revenue,
6  on guest rooms, we manage it based on demand.  So
7  prices may go up if there's high demand and maybe
8  down if low demand and so on.
9        However, for all the other revenue in
10 the hotel, banquets, restaurants, spa, anything
11 else that is non-room revenue, that's what I
12 defined ancillary revenue.  The point of that was
13 we were not revenue managing it like we do guest
14 rooms.
15   Q   Okay, all right.  So you then go on to
16 discuss adding standardizing, mandating fees and
17 charges starting at the bottom of the page, and
18 you refer on the top of the page to the
19 ProSolutions survey.  What's that?  Do you
20 recall?
21   A   Uh-huh.  ProSolutions is a company
22 that is hired by hotels to solicit pricing

191

1  information from competitor hotels anonymously
2  obviously, of what they're charging.  So for
3  example we would call -- they would call the
4  Hilton or Hyatt and see what they were charging
5  for a gallon of coffee versus us, and see if we
6  were appropriately charging.
7        If we were overcharging,
8  undercharging, to make sure that we were
9  competitively priced against our competitors.
10   Q   Why would you be undercharging?
11   A   Because we didn't know any better.
12 You know I mean potentially somebody either busy
13 at a hotel and they may not know what the market
14 is, you know, a competitor and if somebody's
15 charging $10 for a gallon of coffee and we're
16 charging $7, it's an opportunity for us to go up
17 to the market.
18        So it's possible, because that's not
19 their primary function is to monitor rates, which
20 was the whole purpose of hiring this company.
21   Q   Okay.  You could just pass the savings
22 on to the customers, right?

192

1    A    (No audible response.)

2    Q    All right.  So you then start talking
3  in the middle of this page about charging for new
4  goods and services a la carte pricing, and you
5  say this is the most controversial route.  Why
6  would that be controversial?

7    A    Let me just read that.  You're talking
8  about this paragraph here, charging?

9    Q    Yes, charging for new goods and
10  services a la carte pricing.

11       (Pause.)

12       THE WITNESS:  Right.  So this was in
13  2013.  So  there was a lot of -- I think if I
14  remember correctly back at that time, you know,
15  there was some properties were starting to charge
16  for baggage, storage, stuff that you did not
17  normally charge for and stuff that we did not
18  support.

19       So that's why I said it was the most
20  controversial, because as you're looking to
21  increase revenues at that time, and I think this
22  was in an economy that was relatively soft,

193

1  minibar replacement, stuff like that we normally
2  wouldn't charge a customer.  It's more of a
3  detriment, and that's why I said it was
4  controversial.

5       BY MS. MILLS:

6    Q    So people get annoyed about extra
7  baggage fees?

8    A    Nickel and diming, yes.

9    Q    That sort of thing, okay.  So on the
10  next page ending in 701, here you give some
11  examples of some specific opportunity areas to
12  drive revenue.  Do you see that?

13    A    Uh-huh.

14    Q    So you talk about resort fees?

15    A    Correct.

16    Q    "The majority of our hotels charge a
17  resort fee.  Implement at those not currently
18  doing so."  Is that true, the majority of your
19  hotels were charging a resort fee?

20    A    The majority of our hotels that -- no.
21  It should say the majority of our resorts charge
22  a resort fee, yeah.

194

1    Q    Oh, I see.  That's just a
2  typographical error?

3    A    That's a typographical.  That was
4  never --

5    Q    Because I wondered about that.  I had
6  not seen that before.

7    A    Uh-huh.

8    Q    Sales and booking calls.  Include high
9  profit charges such as resort fees and meeting
10  room rental in sales manager's booking goals.  So
11  there were supposed to be some incentives, I
12  gather, for getting the sales people to get
13  people to sign up for these extra services that
14  charged a separate fee?

15    A    Typically, I'm not in sales and
16  marketing, but basically it's like any sales
17  person.  Their incented partially on their
18  bookings and the booking goals, and that's based
19  on more than likely rooms revenue.

20       So again, you know, looking for ideas,
21  I was asked to come up with ideas, if we wanted
22  to increase sales in areas such as meeting room

195

1  rentals which a lot of times are waived or resort
2  fees, to put it in as incentive for the sales
3  person.

4    Q    Okay.  There's also an attachment here
5  to this email thread, and if you turn to the page
6  that's ending in the Bates 40709.

7    A    Uh-huh.

8    Q    Ancillary Revenue Strategy 2011.

9    A    Uh-huh.

10    Q    All right.  Did you participate in
11  preparing this?

12    A    Yes.  I gave the introduction, so yes,
13  I would have been involved with this.

14    Q    All right.  So on the page ending in
15  713, why we must focus on ancillary revenue.  The
16  first bullet point, and you are identified by the
17  way as speaking at the bottom left-hand side of
18  the slide.  ████████████████████

19  ████████████████████████████████

20  ██████████  What is POR?

21    A    Per occupied room.  So we measure
22  revenue by occupied room.

196

1    Q    "During an unprecedented downturn in
2  our industry, we have primarily focused on
3  reducing operational cost."  So are you talking
4  essentially about the financial crisis that
5  started in 2008?
6    A    Yes, correct.
7    Q    So hotels, people I guess just weren't
8  traveling or staying in nice hotels much?
9    A    Yeah, it impacted us dramatically.  I
10 mean to see a ███████████████████████████
11 ████████████████████████
12   Q    Okay.  So that's -- is that part of
13 the reason why you're really focusing on these
14 ancillary revenues at this time?
15   A    That's part of the reason, yes.
16   Q    You're trying to recoup some of the
17 money that essentially was lost due to a downturn
18 in the market?
19   A    Yeah.  With ███████████████████, we
20 were trying to, you know, get people back in a
21 positive mood because I think at that point, I
22 don't know if that was officially in 2011, if we

197

1  were coming out of the recession.  I don't
2  remember, but it would be probably bad management
3  if we didn't focus on recovering some of the
4  sales that we lost.
5    Q    Okay.  You can put that one aside for
6  now.  In Exhibit 19, this is an email from Angela
7  Freiburg to you in August of 2013, and in this
8  email she's talking to you about ancillary
9  revenue follow-up and next steps.
10       So if you look at this, it appears
11 that you are actually moving forward to try to do
12 something more to capture ancillary revenues, is
13 that right?
14   A    That's correct.
15   Q    Do you recall what steps you took?
16   A    Well, these four key opportunities
17 were probably those areas, qualification for
18 rates.  That's basically we offer discounted
19 rates for groups, negotiated and somebody comes
20 in and claims they're with the government and
21 they're not with the government, they would get
22 the low rate unless we qualified them.

198

1        So we would ask, you know, we were
2  pushing you need to qualify to see if they -- you
3  need to ask if they qualify for the rate.  The
4  ProSolutions, as I described earlier, is more we
5  were competitive pricing against other hotels or
6  restaurants, to see if we were correctly priced.
7        Standardization of fees, again just
8  basically looking at the criteria with that and
9  if there are any opportunities, not just resort
10 fees but we're talking about any kind of other
11 fees that were out there, you know.  For example,
12 it could be an electric drop fee.  Some hotels
13 and events charge to set up electricity for
14 booths and a lot of the hotels weren't charging
15 for that and it's commonly accepted.
16       So again it was going back and saying
17 if you're not charging, you should be charging
18 for that, and the new services again, what
19 opportunities, you know, could we think outside
20 the box, you know, to look at more revenue.
21   Q    And were destination fees and these
22 urban sort of destination fees also part of the

199

1  consideration here?
2    A    In 2013, I don't think so, because I
3  don't see that in here, you know, that
4  terminology in here.
5    Q    The terminology isn't in it, although
6  there is a discussion of, you know, assessing
7  fees and other charges similar to the resort fee
8  approach.  It doesn't say similar to resort fees.
9    A    Right, right.  Yeah, using the
10 approach, the qualification to make sure that we
11 follow all guidelines, etcetera.
12   Q    Okay.  This one, I'm not sure if I can
13 find this as 5, Exhibit 5.  This is an email
14 going back into 2011, between you and Lisa F-U-E-
15 A?  F-U-E-S, I'm sorry.
16   A    (No audible response.)
17   Q    I guess I don't have an extra copy for
18 you.  I'm sorry.  Lisa Fues, what is her role?
19   A    Let me -- I know her name, but I'm
20 trying to see by reading this if I can figure
21 out.  Let me just read this real quick.
22       (Pause.)

200

1    BY MS. MILLS:
2       Q    This appears to be a request by a
3    hotel and you call that common area maintenance
4    fee?
5       A    Correct, yes.
6       Q    I'm not sure where this hotel is
7    located?
8       A    This is in Muskoka, Ontario.
9       Q    Oh, in Ontario.
10      A    Correct.
11      Q    And they want a fee -- they have a fee
12   that's 2.7 percent to support maintenance on the
13   grounds.  The question that is asked here by Lisa
14   on page ending in 936 "Why wouldn't the hotel
15   adjust their room rates to include the fee,
16   rather than creating a new fee type that
17   obviously could be done immediately?"
18           And then what I really want you to
19   focus on is the email at the bottom of the page
20   that you wrote ending in 934, that page, the
21   first page of this exhibit, when you say "We do
22   not feel that we can add this into the room rate,

201

1    as it will in effect mean a decrease of 2.7
2    percent in ADR."  What does that mean, ADR?
3       A    Average daily rate.
4       Q    Average, okay.  So if you're adding a
5    fee into the room rate, doesn't that increase the
6    ADR?
7       A    So I'm very familiar with this
8    specific hotel.  I helped open it, and it's on
9    -- it's a very unusual situation.  It's on a lake
10   up on Ontario, and it's owned by kind of a condo
11   association, where there is an assessment.
12           This 2.7 percent is built into the
13   contract, and it requires guests of the hotel
14   because they're using the facilities of the condo
15   owners, of the land owners, for that fee to be
16   paid directly to them.  In effect it's not a tax,
17   but it's the same effect as a tax.
18           So the guest will be charged or we're
19   required by contract to charge the guests that
20   2.7 percent and pay it directly to them.  So by
21   adding it in, it would take the ADR up by 2.7
22   percent, but reduce our revenue by 2.7.  So in

202

1    fact, we consider it to be similar to a tax or a
2    fee.
3       Q    So but you said it's a decrease of 2.7
4    percent in ADR?
5       A    Because we need to pay it out.  If we
6    collected $100, if the room rate was $100 and we
7    collected $102.07, that's what the guests would
8    be paying, and it would hurt us competitively,
9    because it would raise our rate by $2.07.  I'm
10   just using $100 as an example, and then we would
11   pay that out as a cost.
12      Q    So you're actually increasing the
13   average daily rate, at least in terms of what the
14   customer is paying?
15      A    The customer's paying, but reducing to
16   the owner, you know, by 2.7 percent.  It in fact
17   was a fee, and it was in the contract to be
18   charged to customers as a fee.  Said the person.
19   Lisa said that.  That was her opinion.
20      Q    So then you go on to say here "The
21   hotel prices that room, right, based on the comp
22   set demand etcetera.  If we felt that we could

203

1    add it into the room rate, we would have done it.
2    This is the same reason that we do not include
3    taxes or resort fee in the room rate."
4           So explain that.  So how does this
5    apply to resort fees?  What is sort of the
6    concern about ADR with respect to resort fees?
7       A    Because as I said, if we add the 2
8    point, and I'm using $100 as an example because
9    it's easy, if the room rate's $100 and the
10   Hilton, you know, down the road is $100 and the
11   Best Western is $80, you're going to get that
12   price sort.  This would put us at a disadvantage
13   because of the specific requirement of the land
14   owner compared to the other hotels.  It would
15   make our rate appear higher --
16      Q    It would make it look like it's a
17   hundred and --
18      A    And two dollars and 70 cents.
19      Q    And two dollars and 70 cents, as
20   opposed to $100?
21      A    $100, correct.
22      Q    So but then you have to pay it out, so

204

1  it's not really extra revenue to you?
2     A    Correct. It's not -- and again, it is
3  clearly a fee similar to a tax. It's not a tax.
4  I'm not implying that, but it's similar where
5  we're required to immediately pay it out to a
6  governing body. So that's the difference.
7     Q    But resort fees are not like that,
8  right?
9     A    That's correct.
10    Q    You don't have to pay it out to
11 somebody. I mean you're putting together some
12 package of amenities, but there's not sort of
13 "mandatory payout." The amenities are amenities.
14 Typically we talked about that, those beach
15 chairs in South Beach. That's different. We're
16 talking about some amenities are extra, you know,
17 Internet access or a free drink or something like
18 that at the hotel. These are provided by the
19 hotel itself.
20    A    With the concomitant cost as well.
21 There would be costs associated with those, which
22 is the fee helps to cover.

205

1     Q    Right, right. But the cost to the
2  hotel is not the same as what it would be for the
3  consumer to pay for it; correct?
4     A    That's correct, yes.
5     Q    Because these goods and services are
6  marked up already by the hotel?
7     A    Yes, that's correct.
8     Q    I have another item, and if you bear
9  with me, we've been trying to understand some of
10 the financial issues.
11    A    Uh-huh.
12    Q    So let's see if you know anything
13 about this. This is a publication by the Hotel
14 Association, the American Hotel and Lodging
15 Association, and this is a publication relating
16 to their uniform system of accounts for the
17 lodging industry, and it has a date of October
18 2013. It's the 11th revised edition, and do you
19 know anything about these guidelines, these
20 uniform system of accounts for the lodging
21 industry?
22    A    No. I only know the term USALI and I

206

1  know that the accounting department, the finance
2  people use this to make sure that our revenue and
3  costs are put into the right categories. That's
4  as far as I know, yeah.
5     Q    Okay. That's about argument. Let me
6  just show you, because the resort fee issue comes
7  up in this.
8     A    Okay, uh-huh, uh-huh.
9     Q    On page 18, there is a discussion
10 about resort fees and service charges, but then
11 on 19 it says that as of that year, resort fees
12 and certain type of surcharge are no longer
13 included in the room rate for purposes of this
14 accounting principles. They're now broken out as
15 a miscellaneous charge.
16    A    Uh-huh.
17    Q    Do you recall any discussion about
18 that?
19    A    I remember -- again, I don't remember
20 dates. I don't remember specifics on
21 conversation. I just remember that USALI or the
22 American Hotel Lobbying Association provided

207

1  guidance to the hotel companies, probably in an
2  effort to be consistent.
3     Q    So they were all kind of booking their
4  income the same way?
5     A    That's my understanding.
6     Q    That's what investors --
7     A    For investors and hotel owners, to be
8  able to compare one hotel against another or one
9  brand against another, you know, so that it's
10 apples to apples.
11    Q    Do you know why that change occurred
12 in 2013?
13    A    I don't. I do not.
14    Q    Do you know what this thing of REVPAR
15 is?
16    A    Uh-huh.
17    Q    What is REVPAR?
18    A    It's an acronym for revenue per
19 available room. So it would be a combination of
20 occupancy and average rate, or just basically how
21 much dollars. So it's like if you have 100 rooms
22 and your competitors have 100 rooms, my REVPAR is

208

1    $90, you know, and my competitor's is $87.  So
2    it's again a metric that you use to compare
3    yourself performance-wise against the
4    competition.
5         Q    So if you're adding the resort fee
6    into the room rate, your REVPAR goes up?
7         A    It would be elevated, correct, yes.
8         Q    I know you testified that you're not
9    really in charge of the franchise agreements or
10   in charge of the OTA agreements, but let me know
11   you a few excerpts of those, and let's see if we
12   can't just get a little clarity.  This is a
13   portion, and I'm going to say we excepted it
14   because these franchise agreements are very long.
15   They're hundreds of pages.
16        But I've had this marked, these
17   excerpts marked as Exhibit 39 and this excerpt in
18   particular, we're trying to look at what happens
19   with, you know, franchisees.  If you see onto the
20   second page of the document ending in 336, there
21   is a paragraph 3.2, Franchisees.
22        A    Okay.

209

1         Q    It states "The franchisee will pay the
2    franchiser," franchiser being Marriott here,
3    right?
4         A    Yeah.  Yes, uh-huh.
5         Q    And "for each month an amount equal to
6    the percentage of gross room sales in Item 11 of
7    Exhibit A."  So the franchisee is actually paying
8    a percentage of gross room sales, is that right?
9         A    From what I'm reading, I believe that
10   to be true.
11        Q    Okay.  If we look at the page ending
12   in 377, a couple of pages back, gross room sales
13   are then defined as "All revenues and receipts of
14   every kind that accrue from the rental of the
15   guest rooms, and they include, among other
16   things," if you look at Roman numeral 2, the
17   little Roman numeral ii, "resort fees,
18   destination fees and mandatory surcharges for
19   facilities."  Do you see that?
20        A    I see that.
21        Q    So is it your understanding that the
22   franchisees are paying a percentage of the resort

210

1    fees that they get to Marriott?
2         A    I really, I can't speak to that.
3         Q    You don't really know?
4         A    Yeah, I really don't know.  I'm not an
5    expert in that.  Really, this is probably the
6    first time I've seen this document or a
7    franchise.  I'm sorry.
8         Q    Well, is it your understanding that
9    the franchisees must comply with certain
10   advertising and marketing standards that Marriott
11   requires?
12        A    I don't know.
13        Q    You don't know, okay.
14        A    I'm more in Operations.  That's more
15   Legal and Franchising stuff.
16        Q    Let's take a quick look then at the
17   Expedia agreement with Marriott, or at least a
18   draft of it.  This is -- this is Exhibit 66.  So
19   Expedia, just for the record, is an online travel
20   agency, is that right?
21        A    Yes.
22        Q    And Marriott's hotel listings appear

211

1    on Expedia's online booking website, is that
2    right?
3         A    Okay.
4         Q    And there's some kind of agreement
5    between companies about that?
6         A    I would assume there was, yes.
7         Q    Okay.  If you look at the page ending
8    in 10345, that's the first page, and this refers
9    to I believe --
10        (Pause.)
11        BY MS. MILLS:
12        Q    Well, let's turn -- let's just turn to
13   10370.  10370 is quite a ways back in this
14   document.  So there are -- ████████████
15   ██████████████████
16   ████████████████████████
17   ████████████████████
18   ████████████████
19       ██████████████
20   ████████████████████████
21   █████████████
22        A    Yes.  My understanding is, and that

212

1  goes back to when we talked earlier about the
2  audits that we did in 2016, is that they're
3  ████████████████████████████████████
4  ████████████████████████████████████
5  ████████████████████████████████
6  ████████████████████  and even if it's
7  not in there, which I don't know, it's critical
8  that the customers know about that before they
9  book that there's a fee.
10     Q   Okay.  But you're not really involved
11 with this case document?
12     A   I'm not, yeah, yeah.  That's correct.
13     Q   All right.  We've referred a little
14 bit to the FTC, some issues that came to your
15 attention say around 2012 I believe was the
16 document we were reviewing at the time.  I'm
17 showing you what's been marked as Exhibit 9.
18 This is an email that you are part of this email
19 discussion.  It took place December 4th of 2012.
20 And turning back to the page ending in 766, it's
21 the second to last page.
22     A   Okay, uh-huh.

213

1      Q   You are writing to someone named Peter
2  W-E-I-E-N, Weien.
3      A   Yes.
4      Q   I'm not sure if that's -- you say "As
5  you may be aware, the FTC sent letters to several
6  Gaylord Hotels about resort fees not being
7  properly disclosed.  One hotel does not have the
8  notification on the opening screen like the other
9  three hotels.  We needed to get that changed
10 ASAP," and so forth.
11        So at that point you knew that letters
12 had been sent by the FTC?
13     A   Correct.
14     Q   Okay.  Did you actually receive copies
15 of them?
16     A   They did not come to me.  I may have
17 seen copies, but I don't remember.  I did know
18 that the letters were sent.
19     Q   Okay.  Let me see.  I think we have
20 -- yes.  Here is a copy and this is Exhibit 11.
21     A   Okay.
22     Q   And it's a letter to the vice

214

1  president and general manager of the Gaylord
2  Palms Hotel in Kissimmee, Florida, and looking at
3  this do you recall having seen this before?
4      A   I may have.  I know generally what
5  happened with this letter, but you know, I would
6  say that I'm familiar with the concept but I
7  don't remember if I saw the letter.
8      Q   Okay, and there's a carbon copy here
9  to Anne Sorenson?
10     A   Arne Sorenson, the CEO, uh-huh.
11     Q   He's the president and the CEO of
12 Marriott?
13     A   Yes.
14     Q   The second paragraph in this letter
15 says "On May 21st of 2012, the FTC held a
16 conference on 'Drip Pricing,' defined broadly as
17 a pricing technique in which firms advertise only
18 a part of its price and reveal other charges
19 later as the customer goes through the buying
20 process."  Did anyone from Marriott participate
21 in the FTC conference on Drip Pricing?
22     A   I don't know if that was -- I did not.

215

1      Q   You did not.  You don't know if anyone
2  --
3      A   I do not know if they did or not.
4      Q   Okay, and this letter provides a
5  definition of drip pricing.  Do you understand
6  what drip pricing means?
7      A   Yes.
8      Q   Okay.  Do you understand from this
9  what the FTC's concern was about drip pricing?
10     A   Specifically with the two Gaylord
11 hotels or --
12     Q   Yes.
13     A   Yes.  Well, what I do know about this
14 is that I think the timing on this was I believe
15 it was October, excuse me, of 2012.  Marriott
16 bought the Gaylord brand.  We didn't buy the
17 company, we bought the brand, and this note or
18 the incident took place prior to Marriott owning
19 the brand.
20        As soon as we bought the company, we
21 put their four hotels into our system and as I
22 understand it, by the time we got the letter the

216

1  hotels were compliant.  Marriott did not receive
2  any letters for our hotels.  They were all
3  considered to be compliant, and by the time this
4  letter came back and Mr. Sorenson responded, the
5  hotels were in the system and were compliant with
6  the FTC guidelines, after we took it over.
7       Q    Well let's read on a bit with this
8  letter, into this letter I'm sorry.  If we turn
9  to the second page, the paragraph at the top,
10  begins "These practices may violate the law by
11  misrepresenting the price consumers can expect to
12  pay for their hotel rooms.
13       "We believe that online hotel
14  reservation sites should include in the quoted
15  total price any unavoidable and mandatory fees
16  such as resort fees that consumers will be
17  charged at the hotel.
18       "While a hotel reservation site may
19  break down, the components of the reservation
20  estimate, e.g. room rate, estimated taxes and any
21  mandatory, unavoidable fees, the most prominent
22  figure for consumers should be the total

217

1  inclusive estimate." Do you see that?
2       A    I do.
3       Q    Okay.  So were there internal
4  discussions within Marriott about these letters,
5  this letter in particular or any of the letters
6  that were received by the hotels?
7       A    Well, Marriott International did not
8  receive the letter.  We were in compliance
9  apparently from the FTC.  Other hotels that were
10  non-Marriotts got them, and this note was sent to
11  Gaylord before it was a Marriott brand.  So there
12  was conversation that we were probably -- we
13  didn't have one of the letters.
14       When we found out that this letter
15  went to Gaylord, by that time we had already made
16  the change prior to the letter being put into the
17  system, and we were in compliance with the FTC
18  regulations for those two hotels.
19       Q    Did someone at the FTC tell you that
20  Marriott was in compliance?
21       A    I can't answer that.  This letter went
22  to Mr. Sorenson, but that was my understanding,

218

1  that we didn't get letters or a letter.  So, you
2  know, we had a lot of hotels so that was maybe my
3  assumption.
4       Q    So you assumed that, I mean that they
5  may have not surveyed every single hotel on the
6  planet, right?
7       A    I would assume, since we were one of
8  the largest companies that they probably did
9  ours, you know, since we have so many convention
10  and resort hotels and so on.
11       Q    Right.  But nobody said the FTC looked
12  at our practices at ABCD hotels and concluded
13  that we were "in compliance" with the guidance
14  they provided in this letter?
15       A    I don't think we got a letter saying
16  that.
17       Q    No, but nobody ever -- was ever
18  assured verbally or in writing you're in
19  compliance?
20       A    I was not.
21       Q    Okay.
22       A    Yeah.  That's all I can speak to.

219

1       Q    And you never heard of anybody else
2  within Marriott receiving an assurance Marriott's
3  in compliance?
4       A    I know from what my facts are at that
5  time that we were in compliance with the FTC
6  regulations --
7       Q    You believed you were in compliance?
8       A    Yes, correct.
9       Q    I mean just I'm trying to distinguish
10  between your -- if that's what your opinion is
11  about it, and whether anybody ever said the FTC
12  told us we were in compliance?
13       A    Right.  I can't answer that question.
14       Q    You just don't know?
15       A    I don't know.
16       Q    Okay.
17       (Pause.)
18       BY MS. MILLS:
19       Q    Let's move on to some issues involving
20  training.  I think we touched on that a little
21  earlier.
22       A    Uh-huh.

220

1    Q    Did Marriott undertake to train its
2  hotel managers and others within the company
3  about the process and procedures for charging
4  resort and destination fees?
5    A    That was the question, do we?
6    Q    Yes.  Did Marriott undertake to train?
7    A    So Marriott provides the guidance.
8  Marriott International, which I represent,
9  provided the guidance of what these standards are
10 for that, and the individual Marriott-managed
11 properties, the general manager and the team
12 there are responsible to execute the training
13 that we recommend, and that training can be
14 formal, informal or otherwise, and on the
15 franchise side we provide them with our standard,
16 with any available resources, and they are
17 required since they're independent businesses to
18 train their staff.
19        Additionally, I see you bringing out
20 now the conference calls, the webinars that we've
21 done.
22    Q    Yeah.  I'm giving to you what's been

221

1  marked as Exhibit 13.
2    A    Okay.
3    Q    Some are in color.  Make sure your
4  copy yes, is in color.  Is that correct?
5    A    Uh-huh, uh-huh.
6    Q    All right.  So this is an Americas
7  Resort Fee webinar, December 20th of 2012.
8  Resort fees in the news; don't surprise your
9  guests with resort fees, and there's an article
10 on page three here.  "FTC Broader Message in
11 Hotel Dripping Pricing Warning."
12        This particular article -- I'm sorry.
13 I'm trying -- I think there's a quotation in
14 here.  Just a moment.
15        (Pause.)
16 BY MS. MILLS:
17    Q    Well, I assume you were familiar with
18 this, since you've included that --
19        Uh-huh, yes.
20    Q    --with the training?  And then you are
21 describing the resort fee approval process?
22    A    Uh-huh.

222

1    Q    So after these FTC letters went out in
2  the fall, I gather; it may be much earlier than
3  that, the summer of 2012, Marriott undertook
4  doing some further training at the hotel?
5    A    Yeah.  So what we did -- I think this
6  was our first webinar training that I did, you
7  know, for the broad group of any hotel that we're
8  charging resort fees, and you know, the fact that
9  we put in, that I put in the various headlines
10 about resort fees and then this article about
11 drip pricing was basically to make sure that
12 hotels knew that there were issues, and that we
13 were reiterating our policies and procedures,
14 which we felt at that point and still are in full
15 compliance with the FTC regulations, and stating
16 to them, you know, make sure you're following our
17 policies and procedures to be compliant.
18    Q    Let's look at -- if you go to Slide 8,
19 there are two pages behind Slide 8 that don't
20 have page numbers.  One of them says "Hotel
21 Alert."
22    A    Uh-huh.

223

1    Q    And there is some circled language,
2  and again it's very small print.
3    A    Right.
4    Q    But it appears to say "Please note:
5  Daily resort fee of, I think its $15 added to
6  rate, which includes in-room Internet, fitness
7  facility, bottled water and more."
8    A    Uh-huh.
9    Q    So is this an example of what you said
10 hotels should do in disclosing their fees?
11    A    Yeah.  This is a screen shot of a
12 hotel that happened to be Gaylord Palms, to show
13 what our standard was in terms of notifying
14 customers of resort fees.
15    Q    Okay.  So that reflects your standard?
16 And again, this is using this language added to
17 room rate, not "will be added or has been added."
18 It's just "added."
19    A    Right.
20    Q    Okay.  It also refers to "and more."
21 Is that more amenities?
22    A    Yeah, and so with this dialogue box,

224

1  there's a limited number of characters, which is
2  why if you notice on some of the -- I mean again,
3  we're trying to be conservative with the numbers
4  of letters we use in the words, because I forgot
5  what the cap is, but it's very limited.  So
6  that's why we say "and more," rather than listing
7  all the amenities.
8      Q    You took that to be a sufficient
9  disclosure of the actual amenities that were
10  being offered by the hotel?
11     A    Yes, yeah.
12     Q    We've talked about some of the other
13  items that were flagged in this document, but
14  let's look at the very last line.  You've
15  described that a required action 12/21 and this
16  presentation that was going on the previous day,
17  on 12/20.  So you're guiding, you're instructing
18  the hotels to review the audit file to determine
19  which items still need to be completed for your
20  hotel, is that right?
21     A    Yeah.  I'm trying to remember what the
22  audit file was.  To be honest with you, this is

225

1  obviously quite a while ago.  But I assume that I
2  probably sent out some type of audit form or
3  checklist, and I'm guessing it may have just been
4  a resort fee packet, and asked all hotels to
5  ensure that they were compliant, you know, with
6  the fees just to double-check.
7      So I assume that's it, but again
8  unless there's a copy, unless you have a copy of
9  the audit, I'm assuming that's it because we
10  wanted to make sure they're in compliance.
11     Q    It doesn't appear to be a part of this
12  PowerPoint presentation, but we did look at, for
13  example, the audit process document that you said
14  was part of -- was not actually part of the
15  resort process memo.  But it's describing an
16  audit, a self-audit process?
17     A    Were you talking about the document
18  for '16, 2016?
19     Q    Yes.
20     A    Yeah.  Again, that was just a one-time
21  deep dive audit to make sure that we were
22  compliant.  So again, I assume that, you know, I

226

1  probably sent out the resort fee packet documents
2  that have checklists in them, you know, as part
3  of --
4      If you look at that resort fee packet,
5  there's like a checklist of all the things to do,
6  you know, if you're implementing a resort fee.
7      Q    Okay.
8      A    And so I'm assuming that's it, and if
9  it wasn't that, it was probably something pretty
10  similar to that.  Just again, the intention was
11  are you compliant.
12     Q    So were there particular concerns that
13  some hotels might not be compliant?
14     A    No.  I think just after the FTC letter
15  we wanted to, you know, be double-sure.
16     Q    Okay.
17     MR. MARQUIS:  Are you moving on to
18  another topic?
19     MS. MILLS:  I might be.  Just a
20  moment, why?
21     MR. MARQUIS:  Oh, we just wanted to
22  take a quick break.

227

1      MS. MILLS:  You'd like to take a quick
2  break.  Okay.  Let me just see here.  We can take
3  a quick break, that's fine.
4      MR. MARQUIS:  Okay.  We just want to
5  stretch.
6      MS. MILLS:  Yeah, okay.  That's fine.
7      (Whereupon, the above-entitled matter
8  went off the record at 3:04 p.m. and resumed at
9  3:16 p.m.)
10     MS. MILLS:  I beg your pardon.
11  There's an item that seems to have gone missing,
12  so forgive me.  We'll maybe have to -- we will
13  have to circle back to that later.  I beg your
14  pardon.
15     (Pause.)
16  BY MS. MILLS:
17     Q    Oh, I found it.  Thank you for your
18  patience.  This has been marked as Exhibit 52,
19  and it's -- it looks like a PowerPoint that was
20  presented on resort fees and destination amenity
21  fees.
22     It has a date of October 21st of 2016,

228

1  and it's discussing regulatory updates and
2  Americas policies and required practices.  The
3  facilitators are identified as you and Harvey
4  Kellman.  Do you see that?
5      A   Yes.
6      Q   So this is another webinar, is that
7  right?
8      A   That is correct.
9      Q   For whom?  Who would participate in
10  this?
11     A   This would be any, excuse me, any
12  hotels that charge a resort or destination fee.
13     Q   So in 2016, you were doing an
14  additional webinar on this?
15     A   Yeah, yes, uh-huh.
16     Q   Why, why was that?  Why do it again?
17     A   Well, as you probably saw, I think we
18  were averaging doing webinars I think every two
19  years on average, and somewhat just to remind
20  people because we have transition and turnover at
21  our hotels, and then there was probably some
22  additional, you know, the whole resort fee to

229

1  regulations issues were coming up again.  So we
2  wanted to inform the hotels about the situation.
3      Q   Okay.  There are a few items I would
4  want to bring to your attention about this
5  webinar.
6          On page 97718, you begin by talking
7  about -- in the second paragraph, "Please know
8  that all the information applies to" -- you're
9  talking about resort fees, but that "all the
10  information applies to similar fees sometimes
11  known as destination amenity fees or facility
12  fees."  What are facility fees?
13     A   Facility fees was a term used by a few
14  Starwood hotels, that when we took them over they
15  had what we probably call a destination fee.
16  They called it a facility fee.
17     Q   All right, and then you go on to say
18  that -- in this presentation that there has been
19  -- let's see.  Is it on this page?  Oh, it begins
20  at the bottom of page 118, actually 718.
21          "As you may have heard, there's been
22  quite a bit of action on the legal and regulatory

230

1  front that could potentially impact the way
2  resort and other fees are presented to our
3  guests."  What are you referring to there, the
4  legal and regulatory front?
5      A   That was the FTC.  At that point I
6  think it was the FTC action, as well as the 40
7  plus state attorney generals' actions that were
8  taking place.
9      Q   I see.  So you were incentivized based
10  on that to revisit this training process?
11     A   I just -- part of it was, as you see
12  on the front here, we also invited owners and
13  franchisees to the call.  Since it could impact
14  their hotels, we wanted to also inform them in
15  case they weren't informed of the FTC and
16  regulatory actions that were taking place at that
17  time.
18     Q   All right.  So if we start at 97720,
19  the next page, Harvey Kellman takes over the
20  presentation; is that right?
21     A   Yes, correct.
22     Q   And he's the vice president and

231

1  assistant legal counsel for Marriott
2  International?
3      A   Yes.
4      Q   And at the page ending in 7722, he
5  talks about the drip pricing guidelines, and sort
6  of this top slide seems to restate what we looked
7  at previously with respect to the FTC's warning
8  letter.
9          "The resort fee must be clearly
10  disclosed to the customer prior to the customer
11  committing to book.  The most prominent figure on
12  the hotel website must be the total room price,
13  that is room price plus mandatory fees equals
14  total price.  Replies to all booking channels and
15  room price remains operative rate in search.
16          So what do you understand that to
17  mean, the room price remains the operative rate
18  in search?
19     A   It's exactly that.  Wherever the room
20  rate is, when a customer is searching by rate, by
21  room rate, it's the room rate only.
22     Q   Okay.  That is Marriott's view of the

232

1  FTC's letter regarding drip pricing?
2      A   I don't know if Harvey was implying
3  that, but I believe that's the case, the room
4  rate.  I mean from a search perspective, the room
5  rate is the primary factor in the search,
6  correct.
7      Q   And here, this is what I'm trying to
8  clarify.  The 2012 drip pricing guidelines.  Are
9  those Marriott's guidelines or are these --
10     A   They would be.  I'm sure if he's
11  talking about drip pricing guidelines, it talks
12  here about the FTC issuing a warning letter.  So
13  I'm assuming it was from the drip pricing, and if
14  room price remained the operative rate in search,
15  is not part of that guidance, then Harvey
16  probably added it as a talking point.
17     Q   If we go back to the warning letter,
18  that was Exhibit 11.  I think you still have
19  that.
20     A   Yeah.
21     Q   What the FTC letter said was, in the
22  second page, the top paragraph "We believe that

233

1  online hotel reservation sites should include the
2  quoted total price, in the total quoted price any
3  unavoidable and mandatory fees such as resort
4  fees that consumers will be charged to stay at
5  the hotel."
6      So it's saying the online sites should
7  include the quoted total price, to include these
8  fees, and not just the room rate itself.
9      A   I can't answer, and again I don't know
10  what Harvey's intent was on that, other than to
11  state a fact that's how we currently, that's how
12  we had searched in 2012, and that's how the
13  search is done today.  That's a statement of
14  fact.
15     Q   So he's simply stating a fact as to
16  how Marriott has been operating?
17     A   Yes, that's correct.  That's my
18  understanding, correct.  I mean it notes down
19  here at the bottom, the last sentence "When a
20  consumer currently does a search, the website
21  sorts that hotel price, just the room rate is the
22  operative."  So it may have been a statement of

234

1  fact based on his speaking notes.
2      Q   Yes, I see that at the bottom, yes
3  correct, thank you.  Well, if the FTC letter
4  said, what we looked at a few moments ago, how
5  the online reservation sites should include in
6  the total quoted -- for the total pricing
7  unavoidable and mandatory fees such as resort
8  fees a consumer would be charged to stay at the
9  hotel.
10     How do you reconcile that statement in
11  the FTC's letter with Marriott's, at least the
12  representation that's made here is to how
13  Marriott is currently doing the online searching
14  by displaying the room rate separate from the
15  resort fee?
16     A   Yeah.  Again, I preface it by saying
17  I'm not a lawyer, so I'm not going to try to
18  interpret, you know, the letter.
19     But for the last five years since this
20  note has gone out, you know, we've displayed our
21  pricing and we've displayed our resort fee or
22  destination fee prominently at the beginning

235

1  during the booking process, and when the booking
2  process is completed at the desk.
3      So you know, I think -- and on the OTA
4  websites as well it's prominently displayed.  So
5  I'm making an assumption as a layman that, you
6  know, that these are the FTC guidelines.
7      Q   Okay.  That's your understanding?
8      A   That's my understanding personally as
9  a layman.
10     Q   Right, and why not just include the
11  resort fee in the room rate?  Why not just do it
12  that way?
13     A   Because I'll go back to the same thing
14  I said earlier, in that it would put us at a
15  competitive disadvantage against hotels, other
16  hotels, our competitors by doing that.
17     Q   But if all the hotels did that, would
18  it still put you at a competitive disadvantage?
19     A   Not all hotels charge a resort fee.
20  Again, if you're staying at a four or five star
21  resort and you're in the same sort as, you know,
22  a Best Western or even a Courtyard, you know

236

1   which I think is, you know, we're proud of.  But
2   if you're comparing them and just looking at
3   price, it doesn't show that we have four and five
4   star amenities at that hotel and the other one
5   doesn't if you're looking only at price.
6        So it puts us at a competitive
7   disadvantage, particularly with the way that
8   consumers shop today with OTAs and other
9   websites.
10      Q   So consumers are primarily focused on
11  price?
12      A   A lot of them are, yes.  Some are
13  going to look at amenities, but a lot of people
14  start with price and the OTAs are training
15  customers to look by price too, just by their
16  models.
17      Q   But if the price is so important, then
18  why doesn't Marriott make it clear to consumers
19  that the total price when they are shopping
20  online and looking at price includes that resort
21  fee?  It is a mandatory fee, right?
22      A   Yes.  But again I go back, and I would

237

1   say that we feel strongly that our declarations
2   throughout the booking process, you know, clearly
3   states to consumers they have, if they don't want
4   to pay a resort fee, there are other hotels that
5   don't charge resort fees and they can go to that.
6   So it's included in their decision.
7        Q   All right.  Well, we can discuss that
8   at length, but let's move on.
9        A   Okay.
10       (Pause.)
11       BY MS. MILLS:
12       Q   Starting at 97723, Mr. Kellman appears
13  to be walking through the online booking process
14  and how Marriott.com complies with the pricing
15  guidelines.  Is that fair to say --
16       A   It appears to be fair, yes.
17       Q   Okay.  The print unfortunately is very
18  small and we do not have a color copier for these
19  slides.  But it appears these boxes are circled
20  here.  Not by the website itself, but by
21  something that Mr. Kellman did to highlight
22  certain information.

238

1        A   Uh-huh.
2        Q   So but these screens represented what
3   Mr. Kellman said was the manner in which
4   Marriott.com was displaying these resort fees and
5   the pricing generally.  And that Marriott thought
6   that this complied with their pricing guidelines?
7        A   I mean --
8        Q   That's what he's telling all of his
9   people in this web presentation.  Is that fair?
10  I'm not trying to put too many words in your
11  mouth.
12       A   Yes, yes, no, no.  I think what he's
13  doing and we've gone through this in a couple of
14  other conversations is he's showing the booking
15  process on Marriott.com.  He's showing that the
16  first page that somebody would go to here, we're
17  showing Marco Island.  You know, the rate is
18  $200, and then if that guest selected that $200
19  price, it goes to Slide 7724, and that's where we
20  let the guest know that there is a resort fee
21  with no uncertain terms.
22       And then the next booking, then you go

239

1   to the next page.  So he's showing the
2   progression that a customer would go through, and
3   then you know again, if you're going to the Slide
4   9926, again there's another display that shows a
5   resort fee.
6        So that basically I think what Harvey
7   is showing that what our booking process and that
8   we're in compliance with the FTC guidelines that
9   prevent drip pricing.
10       Q   The slide that's on 7725, when does
11  that appear?  How does that box that's been
12  highlighted or at the bottom of the online
13  display?  It's very difficult to read it, but
14  when does this appear?
15       A   Well, my understanding is the previous
16  slide, 7724, if you book this and you select the
17  rate that's there, and it's the $200 rate that
18  Harvey used as the example, it then pops up again
19  and provides the consumer with what the total
20  cost is going to be.
21       It says down there total taxes and
22  fees $47.50, and then the next slide shows if you

240

1  click on that, it will provide the breakdown,
2  which shows that $25 is the resort fee and I
3  can't read the rest, 23.99 or something like
4  that.  22.50, I guess, is what that says, are the
5  fees.
6       Q    All right.  So get the breakout of the
7  total taxes and fees, you had to click on the
8  link that's shown in the box on 7725, and then
9  you get quickly to a drop-down box that's shown
10  on 7726, is that right?
11      A    7726, yes.  So I mean it shows the
12  progression, but it is just, you know, the third
13  or fourth time or third time that we're showing
14  the consumer that the resort fee is in there, you
15  know, because it's shown on the previous taxes.
16  We mentioned taxes and fees, the previous page to
17  that.
18           We took both that call out the resort
19  fee.  So it's again offering the consumers, you
20  know, more than enough opportunity to know that
21  they're paying a resort fee.
22      Q    All right.  Let's move to just in

241

1  touching briefly on the extent to which Marriott
2  undertook to be sure that hotels were compliant
3  with the resort fee process.  Now here for you is
4  another item, which I believe is Exhibit 43, if I
5  can find it.
6           (Pause.)
7       BY MS. MILLS:
8       Q    This is an email exchange between you
9  and various people, February 1st of 2016, and you
10  are asking three individuals, Rick Medwedeff --
11      A    Medwedeff.
12      Q    Bernd Kuhlen and Kellie Newman to test
13  drive a resort fee audit form.  So you then have
14  as an attachment this resort fee audit process,
15  and this looks something like the item that we
16  were discussing previously, as part of the
17  document you said was including additional items
18  that were not part of the original resort fee
19  process memo.
20      A    Uh-huh.
21      Q    So are these -- these are again self-
22  audits; is that correct?

242

1       A    So again, this was Rick, Bernd and
2  Kellie are some of our general managers at three
3  of the resort fee properties, very sharp
4  individuals and know, you know, been in resorts.
5  So I asked them to assist with this, and this is
6  where I went back again and we did some deep dive
7  into the various OTAs, you know, our processes to
8  ensure that we were in full compliance with this.
9           So this is not an annual, this is not,
10  you know, like -- this was a one-time audit that
11  we went through and the results came back very
12  positive, but we found a couple of items, you
13  know, that we needed to modify and correct, that
14  we didn't feel were up to our standards.  Other
15  than that, we felt very good about the results
16  that came back.
17      Q    Okay.  Marriott, also we referred to
18  mystery shops, undertook some mystery shops?
19      A    Uh-huh, yes.
20      Q    Ms. Zacco has some specific questions
21  on that subject, and perhaps we should trade
22  places?  I want to be sure the microphone is

243

1  going to pick up your voice adequately.  Can you
2  speak?
3           MS. ZACCO:  Yes, can you hear me.
4           MS. MILLS:  Okay.  That's loud enough?
5  Okay.
6           MR. MARQUIS:  Now are you going to
7  resume questioning after she --
8           MS. MILLS:  Yes, yes.  Is that all
9  right.  We're not going to double, you know, jump
10  in on top of each other.  There will only be one
11  person questioning at a time, all right?
12           MR. MARQUIS:  Okay, thank you.
13      BY MS. ZACCO:
14      Q    So just some preliminary questions on
15  mystery shops.  Who initiated the mystery shop
16  program at Marriott?
17      A    It was myself, along with -- we did it
18  in conjunction with Marriott Rewards Program and
19  my operation, to test guest service at the
20  hotels.
21      Q    When was it initiated?
22      A    I believe it was 2013 is the first

244

1  one.
2      Q    And why did you start the mystery stop
3  program?
4      A    The preliminary, the primary reason
5  was as, you know if you've seen the mystery
6  shops, was to basically look at guest service.
7  So again when I mentioned before, we partnered
8  with Marriott.  We have a loyalty program within
9  the company, and it's very important to us.
10         And so we want to make sure we're
11  executing Marriott Rewards, and you know they --
12  those customers generate a lot of revenue for us.
13  They're very loyal, so we want to make sure we're
14  delivering on all of the service points with
15  them.  So for all of the managed hotels, we did
16  these mystery shops to test that.
17      Q    Great.  Who at Marriott is in charge
18  of the Mystery Shop Program?
19      A    It was me.  That's since been turned
20  over as of probably last year or maybe the year
21  before to the person who took over the room
22  system when I described the reorganization we

245

1  had.  Stefan Lorch now oversees that program.
2      Q    Okay.  How about we go to Exhibit 82?
3  This is an email from May 2016 from you, and in
4  it, if you look at the third paragraph, you said
5  that Jennifer Laughner, I believe that's how you
6  pronounce her last name, is your project lead?
7      A    Yes.
8      Q    But she's not in charge of the whole
9  mystery shop program --
10      A    That's correct, yes.  She reports
11  -- she was on my time at that time.
12      Q    Okay.  Well what -- can you please
13  tell us the distinction between her job and the
14  person who was in charge of the whole program?
15      A    She basically executed, I mean the
16  technical.  She would coordinate with the
17  shopping company which hotels were open.  When
18  the shop came back, she would make sure that they
19  were sent out to the hotels under my name, and
20  anything, you know, again it was more -- not just
21  administrative, but primarily administrative
22  something.  She oversaw that program.

246

1      Q    Okay.  Can you please look at the
2  small paragraph below that that says "Since CLS
3  and Marriott Rewards pays for these shops, the
4  only cost to the hotel would be to rebate the
5  cost of the guest room and incidentals."
6      A    Uh-huh.
7      Q    Can you explain the reference to CLS
8  and to the Marriott --
9      A    So CLS is Continent Lodging Services
10  Americas.  That's who I work -- I work in that
11  organization, and Marriott Rewards is the
12  organization that oversees the Marriott Rewards
13  program for the entire company.
14      Q    And why do these two entities pay for
15  the mystery shopping?
16      A    Because we didn't want hotels to have
17  to pay for it, because then they may choose not
18  to.  So we paid it for them, because it was
19  important enough to us that we wanted to have the
20  shops done on our hotels.
21      Q    Is the Mystery Shop Program still
22  ongoing at Marriott?

247

1      A    It is, yes.
2      Q    Does Jennifer Laughner still retain
3  her position --
4      A    Oh no.  She has been promoted.  She
5  has moved to the hotel.  So there right now as I
6  said, it's now under a person called Stefan
7  Lorch, you know, took over my Rooms portion so he
8  oversees it.  There's somebody on his team that
9  fulfills the role that Jennifer Laughner did.  I
10  don't know who he assigned.
11      Q    Is the cost to hotels still only the
12  cost of the guest room and incidentals?
13      A    Yes.
14      Q    Are all hotels under operating
15  agreements with Marriott, both franchised and
16  managed hotels, subject to the Mystery Shop
17  Program and participate?
18      A    No, no.  And the purpose of this note
19  was to offer this to franchise hotels on an opt-
20  in basis.
21      Q    Why don't you require franchisees to
22  be part of the Mystery Shop Program?

248

1    A    Because they are separate operating
2  units, and they're responsible for their results.
3    Q    Do you ever force franchisee hotels to
4  participate, say if you receive numerous customer
5  complaints?
6    A    No, we can't do that.
7    Q    What is the purpose of the Mystery
8  Shop Program, if there are any purposes other
9  than compliance?
10    A    To offer the hotels specific
11  guidelines where they may be deficient in
12  executing and delivering service to our
13  customers, or any of the important programs, you
14  know, that we have in place.  It's a one-time
15  shop so, you know, there could be variability in
16  it.  We understand that.
17        But it provides guidance to the hotels
18  to improve, and additionally when all of the
19  shops are done, we summarize them and look where
20  we have opportunities as a company for
21  improvement as well.
22    Q    Being that part of the purpose is

249

1  compliance, are hotels permitted to continue
2  charging resort or destination fees when the
3  mystery shops show that they're not complying
4  with Marriott's rules regarding disclosure?
5    A    Actually repeat the question, I'm
6  sorry?
7    Q    Are hotels permitted to continue
8  charging resort and destination fees if your shop
9  shows that they have not been complying with the
10  disclosures?
11    A    Yes.
12    Q    Are they permitted to continue to
13  charge those fees when they fail to provide elite
14  numbers and item of additional value, such as the
15  high speed Internet?
16    A    Yes, uh-huh.
17    Q    Where does Marriott draw the line and
18  revoke the ability of a hotel to charge the
19  resort fee?  How many mystery shops must they
20  fail, or is there a different criteria?
21    A    We don't revoke the resort fee or
22  destination fee based on the shop.  It is just

250

1  like the rest of the shop; it's meant to assist
2  the hotel if there's deficiencies to improve.
3  You know I mean it's not meant to be an audit in
4  the sense that, you know, you would lose your
5  ability to charge a resort fee.
6        That would be very unfair, since it's
7  a one-time shop.  It's meant to be an indicator
8  of where the hotels can improve, and if there are
9  any overall problems, they would come back to us
10  and we would make modifications for the program.
11    Q    So has Marriott ever revoked the
12  ability of a hotel to charge these fees?
13    A    Based on the resort, on the mystery
14  shop?
15    Q    Resort and destination fees.
16    A    But I mean based on the mystery shop?
17    Q    Yes.
18    A    No, we have not.
19    Q    First, I would like to talk about
20  the Renaissance Esmeralda Indian Wells Resort and
21  Spa.  Are you familiar with this hotel?
22    A    I am.

251

1    Q    Was this hotel mystery shopped on a
2  number of occasions?
3    A    Yeah I assume so, because they're a
4  hotel that has been in place.  But you know, I
5  would need to see for sure.  But it would be
6  normally shopped, yes.
7    Q    Esmeralda failed at least part of the
8  resort fee questions from 2013 on in the mystery
9  shops?
10    A    Uh-huh.
11    Q    I have a document that we can look at
12  now.  I'm sorry.  In 2012 when you did mystery
13  shoppers, resort fees weren't at issue yet?
14    A    Uh-huh.
15    Q    So we can clear that one.  This is
16  Exhibit 76.  So this is from October 2012, and if
17  you look at page 296, 41296, you'll see under
18  1(a) that the virtual concierge contradicted the
19  confirmation email.  Additionally, the check-in
20  associate did not mention the resort fee until
21  the mystery shopper asked and was then given a
22  card.

252

1    But the associate still did not give
2  any kind of a verbal explanation about what was
3  the amenities included.  Do you -- are you
4  familiar with this document?
5    A   I'm looking at it now.  I know the
6  document.  I'm just looking at this specifically,
7  you know, the specifics for this hotel.  But yes,
8  I'm familiar with the document.
9    Q   All right.  So that was 2013.
10  Additionally in 2014, which will be Exhibit 77.
11  If you look at page 47159, again it's the same
12  format.  And again, the associate did not
13  verbally discuss the amenities with the shopper,
14  but this time the associate did give the card
15  without being prompted.  That was included.
16    Then again in 2016, this will be
17  Exhibit 78, if you look at page 59263.  Go to the
18  end.  It might be the last page, yes.  Second to
19  the last.  Again, the check-in associate failed
20  to discuss the amenities covered by the resort
21  fee, but a card was given.
22    Finally, this is all the same resort.

253

1  Exhibit 79 is in November 2016.  I direct your
2  attention to 62422, and if you look at numbers 3,
3  3(a), 4 and 4(a), once again the check-in
4  associate did not explain the resort fee or
5  include a card with the information.  That's out
6  of five mystery shops.
7    Do you know if any kind of action was
8  taken based on those five failed mystery shops
9  regarding this?
10    A   So the normal process on that, and
11  again it goes not just for the resort fee but any
12  other deficiencies in the hotel.  The resort
13  leadership is required to send back into their
14  area director of operations plans and actions to
15  address this.
16    We would then match this up against
17  their -- this is a one time a year administrative
18  audit.  We would then match that up against their
19  overall guest satisfaction score to see if
20  there's any trends, you know, to show that this
21  hotel is having a problem.  So when you look at
22  the overall execution, you know, the scores, they

254

1  did okay.
2    But obviously they missed on these,
3  and normally what I do is I send a separate note
4  on the resort fees to the general manager, asking
5  them to make sure that they go back and review
6  this.  We also would go back and take a look at
7  their comments from their guest satisfaction
8  reports as well, to see if there's trends on
9  here.
10    So again, you know of course we don't
11  want to see this, but our policy, our strategy is
12  we will shop all these hotels, and we try to
13  identify the deficiencies, you know.  I can't
14  answer specifically why these are, you know, this
15  is a pattern in this particular hotel.  But they
16  were addressed with the management of the
17  property, who is responsible for this.
18    Q   Was there a reason that this property
19  was mystery shopped in July and November 2016?
20  Do you know?
21    A   Yes, because they failed the first
22  one.  So the second one, we go back in.  If they

255

1  fail, that was the policy we put into place I
2  think about two years ago.  I don't remember
3  exactly, but if a hotel failed the mystery shop,
4  they would be required to get a second shop and
5  then they would pay for it.  It wouldn't be no
6  cost to them.  So it was incentive to fix the
7  problems.
8    Q   Were there any discussions within
9  Marriott about whether it's reasonable to require
10  hotel guests to look through documents they
11  receive at check-ins and find information and
12  decide whether to use the amenities that are
13  included in the resort fee?
14    A   Can you ask that question again
15  please?
16    Q   Were there any internal discussions
17  within Marriott about whether it was reasonable
18  to require your guests to look through
19  information that's handed to them at check-in?
20    A   So the document that's handed to them
21  at check-in is basically the last notification to
22  the customer, saying you know, because they've

256

1 gone through the booking process and they were
2 told about the resort fee, and this is meant to
3 be a service for the customer, to make sure that
4 they know all the services and amenities.
5        So it's not necessarily at check-in.
6 Most of the time it would go, fit into the
7 keypack, and they would look at it as they, you
8 know, went to their room and came back.  So that
9 they -- you know, now I can use, you know.
10 There's a yoga class every day and whatever.
11        So you know again, it was more of a
12 service for customers, to make sure that they
13 knew what they were getting and what the
14 possibilities are as well.
15    Q    Did any of those discussions about
16 this being a service to customers include the
17 consideration of the fact that the Marriott brand
18 prides itself as an elite experience and brand,
19 and were any concerns expressed within internally
20 within Marriott about whether customers expect
21 associates to be more forthcoming and to make
22 their stay more convenient?

257

1    A    No.
2    Q    We touched on this a little, but what
3 is Marriott's protocol if a hotel fails a mystery
4 shop, particularly the resort fee aspect?
5    A    Again, if they fail the overall resort
6 fee, they automatically get a re-shop.  If they
7 don't score in the green zone, which is shown --
8 I think it's 80 and above, they're required to
9 put a plan and action together and send it to
10 their immediate superior, you know, to tell us
11 how that property is going to fix it.
12        For the resort fee specifically, again
13 it's a one-time shop, you know, on the 365 days a
14 year.  I send the follow-up note to every one of
15 them saying, you know, please pay particular
16 attention to this, you know, to go back.  Then I
17 can continue and the hotels continue to monitor
18 the GSS, the guest satisfaction forms, to see if
19 there's any continuing trends.
20    Q    Next, I'll be handing him Exhibit 89.
21 This is an email between you and Mike Barnett.
22 Can you identify who Mike Barnett is?

258

1    A    Excuse me.  Mike is the director of
2 Resort Operations at the Renaissance Indian Wells
3 property.
4    Q    Please turn to page 64280, the second
5 page.
6    A    Uh-huh.
7    Q    Can you please read the second bullet
8 point aloud at the top of the page?
9    A    The one that says "Contacted the
10 company that conducts our quarterly shop and
11 added this test to their audit process for our
12 property and another step to test compliance."
13    Q    Yes.  Why was Esmeralda not required
14 to add this into its quarterly shop before?  Were
15 there any discussions to do so?
16    A    The quarterly shop that the hotel is
17 dealing was completely on their own.  That was
18 something that they took onto themselves to
19 improve guest service.
20        So what Mr. Barnett was saying is they
21 have these shops that take place on a regular
22 basis, and based on the fact that they didn't

259

1 well in the resort fee portion of that, which
2 even if you see my note that I sent to them, I
3 mean that -- if you're go back to 4280 and 4281,
4 is the note that I sent to this specific hotel
5 asking them to take action.
6        So what Mike was doing was going back
7 and saying because they failed this part of the
8 resort, the shop, they were going to add that to
9 an in-house shop to make sure that they were in
10 compliance going forward.
11    Q    Was there any communication with
12 regard to any discussion of adding that to the
13 in-house shop prior to this?  This occurred
14 after, I believe it was the fourth failed mystery
15 shop --
16    A    Yeah.  So no, I don't know because
17 that is something that an individual property
18 would decide, and it's something positive because
19 they're trying to improve guest service.
20    Q    Does Marriott ever require hotels to
21 test resort fee compliance outside of the mystery
22 shops?

260

1     A    The hotels are required to comply with
2  the resort fee policy.
3     Q    But are there any requirements to test
4  it?
5     A    Just in the resort fee policy itself,
6  you know.  It states that testing and training
7  and so on.  So that -- that is is required of the
8  property.
9     Q    Do you know if still hotel is still
10 charging a resort fee?
11    A    They are.
12    Q    I have -- it's $33.
13    A    I know they charge one, yeah, uh-huh.
14    Q    Next I would like to talk to you about
15 the J.W. Marriott Phoenix Desert Ridge Resort and
16 Spa.
17    A    Uh-huh.
18    Q    Once again, based on the documents
19 that I'll show you momentarily, they either did
20 not fully disclose the included amenities in the
21 online reservation or at check-in in five
22 consecutive mystery shops.  So then once again in

261

1  2012, the resort fee was not included in the
2  mystery shops, so we'll start in 2013.
3     If you look at page 41238, under 2(a)
4  the associate only mentioned access to a spa
5  included in the resort fee.  Do you generally
6  require associates to discuss all amenities
7  included in the resort fee?
8     A    As many are relevant as time permits.
9     Q    Okay.  She didn't talk about them.
10 Looking at Exhibit 70, this was 2014.  If you
11 look at page 47398, once again if you look under
12 1 through 2(a), the online reservation and the
13 check-in associate mentioned some, but not all.
14    But the shopper did receive a card
15 this time, I believe you call it collateral
16 detailing that, but didn't mention everything
17 upon check-in.
18    A    Okay.
19    Q    Next will be Exhibit 71, the mystery
20 shop from 2015.  If you look at 52157, under 1(a)
21 under resort fees and not just the number 1,
22 there was no explanation provided as to what was

262

1  included in the resort fee and the online
2  confirmation at all.  They're just a line item --
3     A    I would highly doubt that.  Do you
4  have the backup on this from my file, you know,
5  challenging that on number 1?  Because that's
6  typically almost always, you know, something
7  that's part of our system and process.
8     You know, usually when that happens,
9  the shopper missed it because they're -- for
10 whatever reason.  So there may be some backup in
11 my file about that.
12    Q    That's possibly provided.  I don't
13 have it at this time, at this moment.
14    A    Okay.
15    Q    Now we're to July of 2016.  If you
16 look at 58778, once again the online reservation
17 did not list all the included amenities, which
18 may be due to the dialogue box I believe you
19 referred to earlier.
20    A    Right, yeah.  I'm sure that's not
21 true, but it says -- it is what it is so --
22    Q    But the check-in associate did go over

263

1  the card.
2     A    Okay.
3     Q    And finally this is Exhibit 74, which
4  again was in November 2016 like the other resort.
5  If you would go to page 61798, there's actually a
6  picture here and the online reservation did not
7  list all resort fee amenities, if you look at the
8  picture at the bottom of the page.
9     A    Right, and that's because, as I
10 mentioned before, there's a capacity issue with
11 the dialogue box.  So that would be the maximum
12 amount of letters that were allowed in there.
13    Q    Has Marriott considered including an
14 HTML link or something that you could then click
15 and it would pop up and show you all the fees,
16 perks and all the amenities?
17    A    I don't know.  Yeah, not sure.
18    Q    And then once again if you flip the
19 page to 61799, the check-in associate didn't
20 verbally discuss the amenities at all, but the
21 collateral was received by the guests in their
22 check-in packet.  This is Exhibit 90.  This is

264

1  brief email that you sent to Erikk Hilgert,
2  Hiljert, Hilgert.  Who is Erikk?
3      A   He's an area director of Operations
4  for Southern California and the Southwest.
5      Q   All right.  You stated that in the
6  brief email "Failing a second time is
7  disappointing.  Could you please follow up with
8  the hotel to find out what is happening?  Thanks,
9  Jeff."  Do you know if a follow-up took place?
10     A   I don't remember off the top of my
11 head.  That was over a year ago.
12     Q   All right.
13     A   I assume he followed up if I sent him
14 a note like this.
15     Q   Do you know if the hotel is currently
16 charging a resort fee after failing to disclose
17 --
18     A   Yes.  Yes they are, because I said
19 that we would not revoke a resort fee based on a
20 random shop.
21     Q   Finally have there been any internal
22 discussions regarding in any inadequacies in the

265

1  resort fee disclosure?
2      A   No.
3      Q   In Marriott, okay.  This will be
4  Exhibit 81.  This is an email chain between you,
5  Jennifer Laughner and Michael Bormann in 2016.
6  I'd like to direct your attention to page 56122,
7  and if you could read the first full paragraph at
8  the top?
9      A   I need to read this whole thing.  Is
10 there a question?
11     Q   Take your time.
12     A   Is there a question on this or --
13     Q   My question was going to be did you or
14 anyone else in the company consider her
15 suggestion to make the resort fee readily
16 visible?  Was this discussed internally?
17         (Pause.)
18         THE WITNESS:  I don't know that this
19 is correct, because this is -- there's no
20 variables within -- from a hotel to modify this
21 information within the system.  So I'm not 100
22 percent following.

266

1      BY MS. ZACCO:
2      Q   This is an email produced by Marriott
3  from -- if you look at --
4      A   Yes, I see that.  Thank you.  So
5  what's the question on this?
6      Q   She specifically states on 122, and I
7  quote "If guests do not click the total taxes and
8  fees link, they will never know the amount of
9  resort fees."  Was there any discussion in making
10 it more readily visible?
11     A   I guess that's not true.  They will
12 know, because in the booking window, I mean that
13 was our opinion on this, that they won't know the
14 total resort but they go through the booking
15 process, it's the same for all those hotels.  So
16 I don't believe this is true.
17     Q   So you don't believe what she said was
18 true --
19     A   Yeah.  I think she may have been
20 mistaken, correct.
21     Q   Okay.  So there was no internal
22 discussion on making it more readily visible?

267

1      A   No, there was not because it's -- the
2  system is very complex and again it's served us
3  well, you know, since I've been in the position.
4  You know, we meet all the regulations and the
5  policies.
6      Q   Oh, if you can please go back to that
7  document.  So towards the end, it's Bates number
8  56124.  For some reason I think it wasn't
9  stamped, so it was not printed.
10         But if you look, this shows a --
11 there's a screen shot you're looking at, and if
12 you go -- if you continue to the next page, it's
13 a spreadsheet with hotel information that was
14 attached to this email.
15     A   Uh-huh.
16     Q   The chart lists 21 hotels.  You can
17 count or take my word for it, and 9 out of the 21
18 have an issue with resort fee disclosure at
19 booking or upon check-in.  How often do you
20 receive similar charts and summarizations?
21     A   Well this was Jennifer.  I believe
22 this document was a result of the mystery shops.

268

1  So this would be ad hoc, you know, as needed.
2  She was summarizing the findings. So it would
3  just be on an ad hoc basis.
4      Q   Okay. Do you have any recollection of
5  receiving some other documents more recently?
6      A   Other than this, I don't recall if
7  there was.
8      Q   I believe you said you haven't yet,
9  but what would it take for Marriott to revoke a
10 hotel's permission to charge a resort fee?
11     A   Are you talking about in relation to
12 the mystery shops? We would not revoke based on
13 a one-time shop per year.
14     Q   What if there -- well, if there were
15 a number of customer complaints, would you then
16 consider it?
17     A   We would ask the hotel to comply with
18 our policy and hold the team accountable. That's
19 what we have general managers for, and if they
20 continue to fail, and I don't know again on this
21 situation if there was documents, disciplinary
22 action taken against those individuals or what

269

1  happened with them.
2         But you know in our company, you can't
3  all of the sudden eliminate something based on a
4  one-time shop. So if there was a consistent
5  pattern and we go back to our policy, which is
6  very strict in terms of, you know, whether or not
7  they're in the red zone, you know,
8  underperforming in terms of guest satisfaction,
9  if they did that in almost for a period of a year
10 and so on, we would absolutely have a
11 conversation and warn them if they started
12 getting into those zones and there's
13 documentation on that, you know, that you need to
14 make sure that you're in compliance with the
15 policy and it's not based on a one-time audit.
16     Q   Certainly. But if there were
17 sufficient customer complaints and they continue
18 to stay in the red zone, would Marriott revoke
19 their ability to charge over time --
20     A   Excuse me. If they failed to meet our
21 standards based on the policy, we would
22 absolutely consider that, yes.

270

1      Q   I have one more document. This will
2  be Exhibit 80. This is an email from Matt Reid.
3  Can you please shed some light on who Matt Reid
4  is?
5      A   It looks like he's an employee of
6  Mercantile. I don't know him, but his email
7  address says "Mercsystems," so I assume he's with
8  Mercantile.
9      Q   So he's not someone you work closely
10 with or have worked in the past?
11     A   No, no.
12     Q   Okay. Please look at 41206.
13     A   Okay.
14     Q   So if you look at the bottom under
15 Travel Awards, it says "Daily resort fee of USD
16 25 in addition to room rates. Internet, bicycle
17 rental, use of driving range and much more.
18     A   Uh-huh.
19     Q   And that's on I believe the fourth
20 page of this confirmation email. So in the email
21 that Matt sent you originally, he was concerned
22 that consumers would not see this because it was

271

1  so far back down the email.
2         I believe it's on page four of an
3  email, of a confirmation email. Did you consider
4  whether or not it was likely that a hotel guest
5  would even read that far into a reservation
6  email?
7      A   No.
8      Q   Does Marriott consider this to be a
9  sufficient disclosure?
10     A   Yes.
11     Q   Did you follow-up with hotel
12 management about this, and address the fact that
13 it was most likely pretty difficult for your
14 guests to see?
15     A   Are you talking about on page 41206?
16     Q   Yes, that it was --
17     A   Yeah. I mean I think that was an
18 opinion of a person, and then probably I mean it
19 may have come up in the past out of the tens of
20 thousands of emails that have gone out. But I
21 had not heard that before.
22     Q   If you did not, would you have

272

1  addressed that the disclosure here did not
2  include all the amenities, because you're not
3  limited to a certain number of characters like
4  you are in a dialogue box?
5      A   We are.  We are limited on that.
6      Q   Even there?
7      A   Yes, yeah, because it can expand.  So
8  you know, within that system I described, there
9  is a limitation.  And so to go back in and add
10  other stuff in there, we would have the modify
11  the system and we don't have the capacity to do
12  that.  So it is limited to that.  This matches
13  what's on that dialogue box.
14     Q   Okay.  So the system can include four
15  pages.  It's just limited as to each section?
16     A   On the alert, yes, on that section.
17  I don't know about the others, but on the alert
18  section, there is a limitation to the number of
19  digits that can be used.
20     Q   How often is it brought to your
21  attention that even when information was
22  disclosed, it may have been difficult for your

273

1  guests to see?
2      A   Can you give me a little more
3  information about that, what you mean?
4      Q   Sure.  About how often or how many
5  times did someone, whether internally or
6  externally at Mercantile or somewhere else, bring
7  it to your attention that many of these
8  disclosures -- that the information may have been
9  disclosed, but it was likely difficult for your
10  guests to see?
11     A   If you're talking about Mercantile,
12  this is the -- there may be some others, you
13  know, out of the, you know, hundreds that we've
14  gotten.  But I don't remember seeing any, you
15  know, and again I don't remember this specific
16  document until you've presented it.  So I don't
17  think it was an overwhelming issue.
18         BY MS. MILLS:
19     Q   All right, thank you.  We've been
20  talking about when Marriott would revoke a
21  hotel's authorization to charge an inventory fee,
22  and let me show you Exhibit 38.  This is an email

274

1  from you to a general manager in Marriott's hotel
2  in Santa Monica in June 23rd of 2016.
3         You write to the general manager "By
4  a copy of this note, I am instructing Shirley
5  Coghill to take down your destination amenity
6  fee."  First of all, who was Shirley Coghill?
7      A   I don't know her exact title, but she
8  is the person that I send permission to enter a
9  resort fee.  She's the only person -- so we
10  prevent people from entering their own resort
11  fee, she's the person that enters into the
12  system.
13     Q   She's the beekeeper.
14     A   Beekeeper, correct.
15     Q   So you're telling her to take down the
16  amenity fee for this hotel.  "You had not posted
17  the required notifications for your guests and
18  are out of compliance.  See attachment."  Then
19  you say "Additionally, the example with guest
20  information document is low quality and not
21  acceptable.  It must be changed to a format
22  similar to the examples I've sent you."

275

1         And then you conclude with "We have
2  strict policies around destination amenity fees,
3  and until your hotel is in compliance, you are
4  not authorized to charge this fee.  Please make
5  sure that no guest is paying the DAF until you
6  meet our requirements."
7         So that's -- let's look at this
8  attachment here.  I'm not sure it's too helpful.
9  Now the attachment is a list of what needs to be
10  done in order to -- and continue to be done in
11  order to maintain the fee.  And then the very
12  last page is a screening capture of the
13  website for Santa Monica Marriott called Le
14  Merigot.
15     A   Uh-huh, uh-huh.
16     Q   And so this particular -- yes, it's
17  the very last page.  You have it there, yes.  So
18  this particular page does not show any resort
19  fee, is that right?
20     A   That is correct.  Is there a date on
21  this one?
22     Q   Let's see.

276

1    A    And there's the metadata in front of
2  it. Is that --
3    Q    Let's see, the metadata in front of it
4  would be -- it appears, yes. The screenshot --
5    A    June 23rd.
6    Q    --was June 23rd of 2016, and you're
7  email is the same date as this screenshot. I'm
8  assuming this screenshot was done on the 23rd or
9  very close to it.
10   A    Yeah. So I'm assuming that screenshot
11 was with this note that I sent to the general
12 manager, because we have approved -- I'm reading
13 through this now, excuse me. We had approved, I
14 had approved through the committee a destination
15 amenity fee on June 21st, which is the document,
16 page 57648.
17   Q    Yes, uh-huh.
18   A    And then on June 23rd it was brought
19 to our attention that they didn't post the proper
20 notification on here. That's the note that I
21 sent on the 23rd asking them to take the resort
22 fee or destination fee out immediately, because

277

1  it was out of compliance.
2    Q    So this didn't do what it was supposed
3  to do when you approved it, right?
4    A    So we monitored that. I mean we take
5  it, you know, that part is there. Everything is
6  straight, but that's a cardinal sin, and so it
7  was pulled down.
8        (Pause.)
9        BY MS. MILLS:
10   Q    So it looks like there were continuing
11 difficulties with this hotel. Let me show you
12 Exhibit 57. This is an email from you dated
13 February 8th of 2017, and you're talking about
14 the destination amenity fee revocation for this
15 J.W. Marriott Santa Monica, Le Merigot. You are
16 forwarding your underlying email of February 8th,
17 that you're transmitting to I gather Assad Karam
18 is a manager?
19   A    He's the vice president for this
20 management company, Columbia Sussex.
21   Q    I see, and you are forwarding to him
22 a letter relating to the J.W. Marriott Santa

278

1  Monica's destination amenity fee along with the
2  original authorization to charge the fee dated
3  June 21st, 2016.
4        "Unfortunately, we are revoking your
5  authorization to charge a destination amenity fee
6  effective February 13th of 2017." The email was
7  dated February 8th, so you're giving him I guess
8  five days' notice.
9    A    Uh-huh.
10   Q    So if you look at the letter that you
11 wrote dated February 8th, you've outlined what
12 the problems were with this hotel. It appears
13 that they did not keep their promises about
14 bathroom renovations, and in addition there were
15 I gather some deficiencies in their customer
16 satisfaction scores or guest satisfaction scores
17 as you call them.
18       So this, you know, was I guess the
19 second time you've notified them they're being
20 revoked. Do you remember how this played out?
21   A    Yeah. So on this note, the one dated
22 February 8th, 2017, this was -- at this hotel

279

1  they were having city issues and union issues
2  with their construction. So part of the reason
3  that they were in the red zone or non-compliant
4  with guest satisfaction scores was they were
5  going, they were undergoing a massive renovation.
6        And part of the reason that it was
7  delayed and their scores were so low was because
8  again union issues at the hotel and some
9  permitting issues. So it was, you know, a bunch
10 of different things. Nonetheless, we held them
11 accountable, you know. Go to current day,
12 they're doing quite well now, you know.
13       They've got the hotel turned around.
14 It was renovated. They're meeting all of our
15 requirements from a resort fee perspective.
16   Q    So you have followed up to --
17   A    We have followed up, yeah. I mean you
18 know, even if I didn't follow up, they would
19 follow up as well being the management company
20 for that hotel.
21   Q    Okay. You mentioned earlier Shirley
22 Coghill had I guess final control over who could

280

1  put in an amenity fee.  Let me show you what's
2  marked here as Exhibit 32.  Maybe this goes to
3  that topic.  There's a fellow who's emailed you
4  at the bottom, Bob Jones.
5      A   Uh-huh.
6      Q   Someone at Marriott, who says "I heard
7  that Mark Kauffman with Sunstone will tell them
8  to implement one without permission, so we need
9  to keep an eye on it," and by "one" he is talking
10  about a resort or destination fee at the Marriott
11  in Park City, Utah.
12          And then you reply to Bob Jones "We
13  had pretty tight controls on this.  The team that
14  enters these fees comes to me first to see if it
15  is approved.  He could try to collect it at the
16  hotel," collect it meaning I guess the resort
17  fee, "without putting it on the website.
18  However, that is unlikely."
19          So explain this to us.  The team that
20  enters these fees has to clear it through her?
21      A   Yeah.  So the process, you know, the
22  resort fee packets that we reviewed earlier today

281

1  several times, the hotels have to fill that out,
2  make sure they're in compliance, send it to me.
3  I go through all of the -- I ask them the
4  questions are you -- you know, the right
5  evaluation and so on and so forth.
6          At that point, if I'm comfortable with
7  the resort fee application, I send it to the rest
8  of the Resort Fee Committee for their review, and
9  they send me back a note saying yes or no, and
10  there's no, you know, they say you need to work
11  on this and this.  I'll go back and then resubmit
12  it to the Resort Fee Committee to see if they
13  approve or disapprove it.
14          Once it's approved, I send a letter,
15  a formal letter to the hotel saying their resort
16  fee's approved, you know, with the dialogue
17  instructing them what to do, you know, with
18  pretty specific outlines and I copy Shirley
19  Coghill on that.
20          And then she knows at that point to be
21  looking for the hotel to contact them to let her
22  know when they're going to enter the fee, when

282

1  they want to start the fee.  And then she is the
2  person that enters it.
3          So again it prevents, you know,
4  something like this.  I mean that was being
5  boisterous.  To be honest with you, I know this
6  person they're referring to and he would say that
7  all the time to try to pressure us to do
8  something and he couldn't do it.  I mean we would
9  have caught it in two hours.  So that's how we
10  control hotels not to put in, you know, fees that
11  are unauthorized.
12      Q   Okay, all right.  Let's take a look at
13  a screenshot of a Renaissance Las Vegas hotel
14  that was booking rooms last December.  This was a
15  screenshot created last December, and if I can
16  get the right one.  This is Exhibit 87, by the
17  way.
18          So the first page of Exhibit 87 would
19  be what you see when you are just looking at the
20  hotel, right, their main display.  This is
21  showing, you know, that the option to view the
22  rates and it says, among other things, this hotel

283

1  has is a pool and parking.  Parking is this
2  little yellow box is something that was placed on
3  this document by this office?
4      A   Correct.
5      Q   Not by Marriott.
6      A   Uh-huh.
7      Q   Just to kind of bring this to your
8  attention.  So then when you get to the -- when
9  you start the View Rates you click there, and you
10  see this blue box, you know, at the top that we
11  just looked at before.  It says "Please note: USD
12  20.99 daily destination amenity fee added to room
13  rate includes parking, Internet and more."
14          So there are options for member rates
15  and different sizes of rooms and so forth.  I
16  think the selection that was made here, if you
17  see to the right, was to book a room from the 5th
18  through the 7th of December of 2017.
19          The next page, once you've made your
20  selection, the next page of this exhibit shows a
21  summary of charges of one room for two nights,
22  and then what that adds up to, which is twice,

284

1  two times, $239 or $478.
2        Then beneath that is a, looks like a
3  hyperlink for total taxes and fees of $111.55.
4  In order to see that there is -- the destination
5  fee is included in taxes and fees, you have to
6  click on that link, the total taxes and fees, and
7  then you got to the next page that describes the
8  destination amenity fee.
9        But this says it's 23.99, whereas that
10  blue box said it was 20.99.
11     A    Right.
12     Q    Why would that -- why would there be
13  a difference?  Is there tax on the amenity fee
14  that's been added on to it?
15     A    That is a possibility.  I'm trying to
16  remember back to a situation with this hotel,
17  where Mr. Ziperman brought to our attention some
18  type of mistake on this site, in terms of --
19     Q    And we don't know whether it's a
20  mistake or what it is, but there was a
21  discrepancy, let's put it that way.
22     A    Correct.

285

1     Q    Right.
2     A    There was something that was with Phil
3  that he brought to our attention.  It is
4  possible, I can't answer this without looking at
5  the breakdown, there are municipalities, and I
6  believe Las Vegas is one, that in fact have a tax
7  on resort fees.  You know, it just depends on the
8  municipality.
9        So that it's very possible that there
10  would be a tax on the fee.  I would need to
11  investigate a little bit more on this one, to
12  answer you specifically.  But that is most
13  probably the case.
14     Q    And it's exactly three dollars more
15  than what --
16     A    It may have been there, but I've never
17  seen that before, where there's a discrepancy
18  like that, to be honest with you.  So I would
19  have to investigate this one a little bit more.
20     Q    Briefly on this topic of taxes over
21  here, you said some municipalities have a
22  separate tax on the amenity fee whereas others do

286

1  not?
2     A    Correct.
3     Q    So if -- but there is a tax on the
4  room rate, is that right?
5     A    Yeah.  I think in probably most
6  cities.
7     Q    Typically?
8     A    Yeah typically there is, correct.
9     Q    Right.
10     A    Yeah.
11     Q    So if they're in a city where there's
12  no tax on the amenity fee but there is a tax on
13  the room rate, then Marriott will certainly have
14  an incentive to keep the amenity fee out of the
15  room rate; correct?
16     A    Well, we wouldn't get the tax.
17     Q    But the tax has to be assessed; it has
18  to be paid?
19     A    Right.  So can you ask that question
20  -- I'm sorry, I didn't --
21     Q    So the consumer is actually paying the
22  tax and effectively the amenity fee would go up?

287

1     A    Correct.  Yeah I mean the -- it's a
2  tax that you just follow whatever the
3  municipality.  If they say the tax or resort fee,
4  or they have a convention center fee, we just tax
5  whatever the government tells us to do, and then
6  we remit that to the government.
7     Q    But if you put the amenity fee into
8  the room rate, then the amenity fee would always
9  be included as part of the amount that gets
10  taxed?
11     A    Yeah, and that -- and again, I'm not
12  a finance person.
13     Q    Right.
14     A    But that may go back to that document
15  that you brought up before about USALI.  I would
16  probably refer you back to that, you know, that
17  we instruct the hotels -- this is a franchise
18  hotel -- to follow USALI.  And again, I don't
19  know the details of it, but I'm guessing that
20  they're in compliance with USALI, excuse me.
21     Q    To break out the -- as a miscellaneous
22  charge any resort fees not included in the room

288

1 rate?

2    A    That's I think what that said, if I'm
3 not mistaken USALI.  They're talking about --

4    Q    Yeah.  Well as of 2013, they changed
5 how resort fees were to be listed as income like
6 other terms.

7    A    Right, right.  So they would be taxed
8 however they were charged out.  Again, yeah, that
9 would be a local issue.

10    Q    Well, I wanted to see if we could get
11 some clarity around this discrepancy here of
12 20.99 and 23.99.  But I have another question --

13        MR. MARQUIS:  Not to interrupt you,
14 but I don't have specific recollection sitting
15 here.  But I thought that we did clear that up
16 with your office.  I mean we can talk offline
17 about that, but I think there may be -- I think
18 this is the one where there was a mistake.

19        MS. MILLS:  It was just a mistake?

20        MR. MARQUIS:  And it was brought to
21 our attention and that we fixed it.

22        THE WITNESS:  That's what I was

289

1 talking about.  Phil Ziperman brought it to our
2 attention, yeah.

3        MS. MILLS:  Okay.  So that was a
4 mistake.  It's not a question of taxes?

5        MR. MARQUIS:  No.  I think we wrote a
6 letter and we clarified it, but --

7        MS. COETZEE:  It was a typo, and we
8 informed you.

9        MS. MILLS:  Okay.  Well, I'm sorry if
10 I --

11        MR. MARQUIS:  That's okay, that's all
12 right.  I just -- I just thought I'd put a marker
13 down that we will follow it up with you, but I
14 believe that that was an error that was
15 identified, brought to our attention, and we
16 clarified it with the property.  So we will --
17 we'll follow up with you offline.  I don't want
18 to take up your time with this.

19        MS. MILLS:  Well perhaps this issue
20 was raised as well, but there's a question of the
21 parking here.

22        MR. MARQUIS:  Okay.

290

1    BY MS. MILLS:

2    Q    So this -- the blue box says "Please
3 note the fee will include parking, Internet and
4 more."  But then when you look at the summary of
5 the charges, additional charges, onsite parking
6 fee, $45 daily, but complimentary valet parking.

7    A    Uh-huh.

8    Q    So was parking included in the resort
9 fee?

10    A    Yeah.  So yes it is.  It's listed on
11 here, and so one of the requirements of the
12 resort fee for a hotel is that on issue of
13 putting value against something that's in the
14 resort fee like parking, you need to have a
15 charge that if somebody is not paying the resort
16 fee, they would pay, you know, that fee.

17        So in other words, they're not getting
18 that parking free when they're not paying the
19 resort fee.  So in other words, what you're
20 seeing down here, this is not an additional
21 charge where it's listed.  It's simply informing
22 the customer on this -- there's no page on it,

291

1 but the one here that shows the parking fee down
2 at the bottom.

3        It's simply informing the customer
4 that if you're bringing a car, you know, there's
5 an onsite parking fee of $45 daily.  But it is
6 included in the resort fee.

7    Q    Well, it doesn't say that, I'm sorry.
8 I don't see that it says that.  It says, it says
9 that there's something that includes parking in
10 amenity fee, but then there's an additional
11 charge.

12    A    There's an additional charge.

13    Q    Well it says "additional charges."

14    A    No, that's simply informing the
15 customer that if you are -- it's not in here in
16 the total, because we don't know if this person,
17 you know, necessarily is going to be bringing a
18 car.  So that's simply there to tell people, you
19 know, that if you're going to park, you know,
20 valet parking.

21        Just like the hotel I stayed at last
22 night, they informed me, you know, that if you're

292

1 parking it's $42 or whatever it was. So I mean
2 there's no additional charge but it is included
3 in there, and if you're not paying a resort fee
4 at this hotel, a destination fee at this hotel,
5 you're going to pay for parking.
6     Q   But there's no way opt out of paying
7 the destination fee at the time this reservation
8 was made?
9     A   Oh potentially if there's a group, you
10 know, that negotiated or it's government business
11 or a special corporate account that is not paying
12 the resort fee or the destination fee, there
13 would be, yes. So we're informing customers that
14 there is a charge associated with that, if
15 they're not paying the resort fee, the
16 destination fee I'm sorry.
17     Q   Well, this particular room was booked
18 at a Marriott Rewards advance purchase rate.
19     A   Uh-huh.
20     Q   It's not at some corporate rate or
21 some other group rate.
22     A   Right. But maybe I'm not being clear.

293

1 It says -- on additional charges, it says that if
2 -- it basically is saying if you're parking,
3 you're going to pay $45. It's not automatically
4 assessing it to the guest. It's just
5 information, you know, being provided to the
6 guest.
7     Q   Well, I'm sorry. I don't read it that
8 way, and we can debate this at some length
9 perhaps, but I find that very confusing.
10     A   Okay.
11     Q   I want to take a short break, because
12 we have this electronic web flows that we have
13 captured, and we would like to take a moment to
14 set that up, so that we can look at that on the
15 screen and ask a few questions.
16     A   Okay.
17     Q   So I'm not sure what time we have
18 here.
19         MR. MARQUIS: All right. It's 4:33.
20         MS. MILLS: 4:33.
21         MR. MARQUIS: And we've discussed --
22         MS. MILLS: About 5:30.

294

1         MR. MARQUIS: Yes.
2         MS. MILLS: We should be close to
3 wrapping up around 5:30.
4         MR. MARQUIS: Okay.
5         (Simultaneous speaking.)
6         MS. MILLS: At 6:30.
7         THE WITNESS: It boards at 6:30, so
8 yeah.
9         MS. MILLS: Well okay. You're going
10 to have a tough time getting out to National
11 Airport?
12         THE WITNESS: Correct.
13         MR. MARQUIS: If we're down to 5:30,
14 he can get there.
15         MS. MILLS: Well, you should have
16 mentioned this, that there was an absolute drop
17 dead time, but we'll do our best. So if you can
18 give me a moment, let me make sure this
19 technology actually works. If you want to --
20         MS. COETZEE: Will you be going to
21 our live website?
22         MS. MILLS: No. We captured this on

295

1 a thumb drive, so but I have to get a thumb
2 drive.
3         MR. MARQUIS: All right, very well.
4         MS. MILLS: If you want to stretch for
5 a minute, that's fine.
6         (Whereupon, the above-entitled matter
7 went off the record at 4:35 p.m. and resumed at
8 4:50 p.m.)
9         MS. MILLS: There's the onsite parking
10 fee of $35, valet parking is 45 and so forth.
11 That's just to show you the entire flow of that
12 page. All right. So now what she's doing is
13 she's selecting a room, a guest room. Summary of
14 Charges.
15         So here's what is displayed when you
16 click on Summary of Charges, and I'm going to try
17 to pause this if I can. This won't listen to me.
18         MS. ZACCO: Try just by pressing the
19 space button.
20         MS. MILLS: Okay. I need it to move
21 again. This is not -- why is this not
22 responding? The mouse -- Jimmy, do you use this?

296

1  I can't get the mouse -- oh, there it is. It's
2  not responding. There we go. It's moving again.
3  So we've clicked on Linmark. That just gives you
4  rate details.
5      A   Okay.
6      Q   About how to modify your reservation
7  and so forth. So then you close that out. So
8  now she's clicking continue, to actually -- well,
9  first the screen pops up asking if you want to
10  become a member, which she didn't select to do.
11  So now she's adding in the guest information in
12  order to be able to book this room, and she just
13  used her name and our regular address for this
14  purpose.
15      (Pause.)
16      BY MS. MILLS:
17      Q   She's finishing putting in the address
18  at this point. Just, you know, reviewing her
19  address information here, because she wasn't
20  booking it officially I guess for her job. All
21  right. So now this is where credit card
22  information has to be put in. So she goes

297

1  through that process.
2      Okay. Now she's got everything in
3  there, and she's going to book now. So this
4  little blue box that shows up. A daily
5  destination amenity fee of blah blah blah added
6  to room rate. She scrolls through the rest of
7  this. This is just I believe a repeat of the
8  entire video. So what I want to see is what you
9  see before you actually book the room, before you
10  book.
11      Then we do have an exhibit of -- it's
12  in here. It's showing her actual,
13  confirmation that she received. So she's picking
14  standard rates. We looked at rate details, we
15  looked at room details. There was nothing about
16  resort fees in either of those. I just wanted to
17  be sure there wasn't any statements made at that
18  point. Nothing there.
19      Select. Now this is what you see when
20  you select. So I want to pause this here, and
21  we'll do that. You see what the room charge is,
22  the total so-called cash rate, estimated

298

1  government taxes and fee is 28, but those numbers
2  do not add up to $240.
3      Those two numbers of 189, 189 and
4  28.43 add up to $240.93. No, I'm sorry. I'm
5  looking at the wrong place. That adds up to 43,
6  9. That adds up to $209.43. So the numbers,
7  these numbers don't add up to the total for stay
8  in hotel's currency, and I'm not sure what
9  hotel's currency refers to.
10      A   I don't know.
11      Q   There's additional charges, onsite
12  parking fee, valet parking fee, changes in taxes
13  or fees after booking will affect the room price.
14  The only way you can kind of get to this number
15  is oh, I remember there was something about a
16  resort fee here. So whatever that fee was, you
17  have to remember that there was going to be a
18  resort fee added up, and that gives you this
19  total number.
20      We captured these -- can't play. Oh
21  dear. Well, it's just going back to the
22  beginning again. I can't -- the mouse still

299

1  isn't responding.
2      MS. MILLS:  I can email this to you,
3  Milton.
4      MR. MARQUIS:  Okay, that's fine.
5      BY MS. MILLS:
6      Q   When we did -- we did actually three
7  different hotels. We did this same process for
8  -- I can't get this to stop because the mouse is
9  not responding.
10      A   You say you captured that --
11      Q   Yeah, we did. We captured these web
12  flows. For the actual bookings, this is the only
13  one where did the actual booking. So we captured
14  the web flows for other hotels, and for none of
15  them on the web flows do you see broken out, you
16  know, when you look at your total room charge,
17  for none of them do you see the destination or
18  amenity fee amount.
19      You have to look at and you see oh,
20  these numbers don't add up. Then, after you
21  book, you do get a confirmation, and the
22  confirmation shows -- and this has been marked as

300

1  Exhibit 67. This is what the confirmation shows.
2  When you look at the first -- you see this total
3  charge of $240.93.
4       Then when you get back through pages
5  in here, then finally on this page the resort, oh
6  here are the destination amenity fees. It's
7  displayed in the separate item, and then we see
8  what the totals are. But prior to the booking,
9  prior to the booking, you do not see this broken
10  out so that the destination or amenity fee is
11  listed. The dollar amount is listed separately.
12       MS. COETZEE: How is the process that
13  you used in the web flow different than the
14  process you used to create these screenshots?
15       MS. MILLS: There's really not any
16  real difference. That's a different hotel.
17  That's a different hotel.
18       MR. MARQUIS: And I'll let him ask if
19  there's a question. I want to try to understand.
20  We want to be helpful so --
21       MS. MILLS: I don't understand why
22  these web flows when you do this, and there are a

301

1  number of other screenshots that we have looked
2  at, where you see this same thing, where the ones
3  that we looked at today, and frankly to my
4  knowledge, this may be just as of today. Those
5  were done this morning.
6       MR. MARQUIS: Exhibit 67, I'm sorry?
7  MS. MILLS: Which hotel is that?
8  MR. MARQUIS: This is the --
9  THE WITNESS: Renaissance Las Vegas.
10  MR. MARQUIS: Renaissance Las Vegas.
11  BY MS. MILLS:
12  Q   The Renaissance Las Vegas.
13  A   Yep, uh-huh.
14  Q   Yes or no. But this, this is the
15  -- the booking was done. The booking was done
16  and these web flows were created last Friday.
17  MR. MARQUIS: Okay.
18       MS. MILLS: All right, and the
19  confirmation email came in right away, and then
20  it took her a half hour frankly to cancel this
21  reservation. She couldn't do it online. It
22  wouldn't recognize her. She had to call and was

302

1  on hold for half an hour. So that was --
2       MS. COETZEE: Is she sure she was on
3  Marriott.com?
4       BY MS. MILLS:
5  Q   You can see this. We scrolled
6  through. We scrolled through. I showed you the
7  Marriott logo at the bottom.
8  A   Can you guys send us to us?
9  Q   Yes, I will send this to you.
10  A   Okay.
11       MS. COETZEE: I only ask, and I don't
12  want to suggest wrongly, but there are -- there's
13  a --
14       MS. MILLS: I made an extra effort to
15  be sure we were on the Marriott.com official
16  website. We looked at a lot of possibilities.
17  That's why I showed you we scrolled all the way
18  to the bottom.
19       MS. COETZEE: That's fine.
20       MS. MILLS: This was the official
21  Marriott website.
22       MR. MARQUIS: Is there a question --

303

1  I mean I'm happy to engage.
2       MS. MILLS: Well my question
3  ultimately is why is this resort fee amount, and
4  when you look at the total prices being charged,
5  only broken out after you've already given them
6  your credit card and paid for this, or at least
7  given your credit card to hold it?
8       This is the first time in this entire
9  web flow booking process that we saw a $23.50
10  destination amenity fee added in as a dollar
11  amount that totaled the $240.93 charge. I'll
12  tell you, other state AGs have looked at these
13  same sites and found the same thing. We are not
14  the only ones.
15       THE WITNESS: This is on the
16  Marriott.com?
17       MS. MILLS: This is not Marriott.com.
18       MS. COETZEE: That's why I asked. I
19  don't want to suggest you're wrong, but there is
20  a company out there that we've had to write
21  letters to called Reservation Counter who mimics
22  our site, and I don't know. I'm speculating, but

304

1   I suspect that might be one of the mimics we have
2   because what tipped me off to the possibility was
3   the trouble with the confirmation, with the
4   cancellation.  I suspect, you know --
5          (Simultaneous speaking.)
6          MR. MARQUIS:  Well, let's get this on
7   the -- I mean we are happy to engage you and look
8   at this, but --
9          MS. MILLS:  Well obviously a lot of
10  consumers are concerned.
11         MR. MARQUIS:  No, no, no.  I'd like
12  this on the record, and I'll let you answer the
13  question.  But I mean Jeff did want to say
14  something about this.
15         THE WITNESS:  Yeah.  This is not --
16  this reservation up here, Renaissance Hotel
17  reservations and it's got reservations at
18  resmarriott.  That is not a Marriott website.
19  That is not a Marriott email address.
20         BY MS. MILLS:
21     Q    I sat with my paralegal and we
22  searched to be sure we were looking at an

305

1   official, what appeared to be an official
2   Marriott website.
3      A    Yeah, but you've sent notes to this
4   company.
5      Q    Yes, and so I -- we will investigate.
6          MS. COETZEE:  I have a strong
7   suspicion that you may have been duped as
8   consumers have in the past, and we've had to
9   write letters to a company called Reservation
10  Counter.  When you do Marriott.com searches for
11  specific hotels, sometimes that comes up as the
12  first in the search.
13         (Simultaneous speaking.)
14         MS. COETZEE:  But we can find out.
15  I'm not, I think we need to investigate to make
16  sure that --
17         (Simultaneous speaking.)
18         MR. MARQUIS:  I did hear him on the
19  record saying.
20         MS. COETZEE:  I don't want -- I just
21  want to make sure that there's no
22  misunderstanding, and we should follow up because

306

1   when you made the statement about the difficulty
2   in cancelling the confirmation.
3          MS. MILLS:  It's impossible to cancel
4   online.  We sat there --
5          (Simultaneous speaking.)
6          MS. COETZEE:  That is why I have a --
7   that's why I have a suspicion that you may have
8   been at one of the sites that tries to dupe our
9   consumers.  But we need to investigate.
10         MS. MILLS:  We made web flow reviews
11  of the entire booking process for this particular
12  hotel.  We made web flow videos leading up to
13  just before you book for other hotels, and I can
14  email all of this to you.
15         MR. MARQUIS:  Yes.  Did you make the
16  reservations on the same website for the other
17  hotels?
18         BY MS. MILLS:
19     Q    We didn't make reservations.  We only
20  looked at -- the only one we booked was this
21  particular hotel.
22     A    You know, I'm just looking at this

307

1   visually.  This doesn't look like one of our
2   websites, but anyway, let us check on it okay,
3   because this doesn't make sense, you know, the
4   email address and so on.
5      Q    Well, when we were looking at this, we
6   scrolled all the way to the bottom, and it showed
7   the Marriott information at the bottom, I mean
8   all of the same stuff that we have seen for you
9   everywhere.
10         MS. COETZEE:  It's a known problem
11  that we have that we have to fight with this
12  company called Reservation Counter.
13         We've sent them cease and desist
14  letters in the past, and I can't say for 100
15  percent certain, but it's an issue that the
16  company has seen in the past, and when you --
17  I'll repeat myself when you couldn't cancel
18  online, that's a clear indicator of a problem.
19  So it's usually a simple click and then another
20  click to cancel online.  It's a two-button
21  process if the reservation is made through
22  Marriott.com.

308

1     So I would very much like to
2  investigate that, because if I need to send
3  another cease and desist letter, I'm going to
4  have to.
5         MR. MARQUIS:  So but I propose that we
6  --
7         MS. COETZEE:  Let's investigate.
8  Send us the flows and we can investigate.
9         MR. MARQUIS:  Give us the flows.
10        MS. MILLS:  Yeah.  I will send you
11  what we have.  But what we'll need from you all
12  web flows, and we really would like historical
13  web flows.  I know that there's been some
14  discussion between you and Phillip LeFleur about
15  whether or not you all have that.
16        MR. MARQUIS:  Correct.
17        MS. MILLS:  But you know, that would
18  be very important to our investigation.  What
19  you're doing precisely today may not be what you
20  were doing a year or two years ago.
21        MR. MARQUIS:  We can -- we can talk
22  offline.  I know that you may want to finish up

309

1  with Mr. Wolff.  But we can talk offline about
2  that, so I can bring up to speed on the
3  discussions we had previously on this issue.  But
4  I do want to -- since you gave Mr. Wolff Exhibit
5  67, I do want on the record his view that Exhibit
6  67, that the email confirmation is not from a
7  Marriott website.
8         THE WITNESS:  That's correct, yes.
9         BY MS. MILLS:
10    Q    The reservations aren't -- what about
11  the cancellation?  There's a separate
12  cancellation at the back, yeah.  The last page or
13  two of this is the cancellation.
14    A    Yeah.  From the looks -- again, it's
15  got on the cancellation document that's on there,
16  it has the same reservations at res-marriott.com,
17  which appears to me not to be a valid Marriott
18  email address.
19        I'd have to compare this.  This does
20  not look like a Marriott document, to be very
21  frank with you, but we can compare it against
22  another document, you know, from our side with

310

1  the cancellation.  It does not appear to be from
2  Marriott.
3     Q    But you can keep that version of it
4  for the time being.
5     A    Okay, thank you.  Okay.
6     Q    I only -- if we -- I assume we're
7  still on the record.  Let me show just two
8  additional documents, because one of the things
9  we've been trying to determine, Mr. Wolff, is how
10  many hotels and which ones were charging resort
11  fees or destination fees at various points in
12  time.
13        And I have two documents that have
14  lists.  This is one of them.  The other documents
15  are -- and that is Exhibit 40.  This one has a
16  date of 1/8/2013, and according to the metadata,
17  a Gina Atkinson prepared this document.  And so
18  who is Gina Atkinson?
19    A    She was my administrative assistant
20  during that time.
21    Q    Did you ask her to do this, to prepare
22  this?

311

1     A    To prepare?  So what I do is as the
2  administrator for the resort and destination fees
3  for the company, whenever a new resort fee is
4  approved, or destination fee or when there's a
5  change in the amount of the fee, I keep a running
6  master list.
7     Q    Okay.
8     A    So this would be -- this is one of the
9  times.  So I have one, you know like for example
10  that I got this morning that had a change on it.
11  So whenever there's a change, I always ask that
12  they send me an accurate list so I have one.
13    Q    All right, and so how often do you get
14  these updates?
15    A    On an as-needed or when changes are
16  made.  Whenever there's a change to a resort fee
17  at a particular hotel price or an addition or
18  deletion, she updates it for me.
19    Q    Okay.  Well, this one is for, you
20  know, the period of January 8th of -- I'm sorry,
21  of 2013.
22    A    Uh-huh.

312

1    Q    And then we have another one which is
2   even more unwieldy unfortunately, because it has
3   even more columns in it.  But it looks pretty
4   much the same.
5    A    Uh-huh, uh-huh.
6    Q    And that particular one --
7    A    This one, it's the same document.
8   That just didn't go down to one page I think so
9   --
10   Q    No, it's not the same, it's not the
11  same document, because this is an attachment.
12  The cover email, if you read the cover email, it
13  says "Here is the current version as of January
14  24th, 2017."
15   A    Okay.
16   Q    So this is the most, you know, current
17  one and maybe some hotels dropped out of resort
18  fees or destination fees over time.  Did that
19  happen?
20   A    Yeah, that's possible, uh-huh.
21   Q    This list is probably -- I think it is
22  longer.  It's got more fees in it because you

313

1   were adding destination and sort of the urban, at
2   least the New York hotel fees as well.  So I'm
3   just trying to understand what hotels, at what
4   points in time, have been authorized to charge
5   which dollar amounts, and these are the main
6   lists that I've be able to find that we've
7   received from Marriott.  So either you can flesh
8   that out for us --
9        MR. MARQUIS:  Oh yes.  No absolutely,
10  yes.
11       THE WITNESS:  You mean an accurate
12  list, I mean an up-to-date list are you saying?
13       MS. MILLS:  And up-to-date list, and
14  also if there's -- if anybody's dropped out or if
15  fees have changed.
16       MR. MARQUIS:  That's right, yeah, uh-
17  huh.
18       MS. MILLS:  You know, that we follow
19  --
20       MR. MARQUIS:  We can identify what's
21  been produced and we can get you the current
22  list.

314

1        MS. MILLS:  All right, okay.  I think
2   that's all for today, and I know you have a plane
3   to catch.  Thank you very much.  We will be
4   following up.
5        THE WITNESS:  Thank you very much,
6   okay.
7        MS. MILLS:  And I do appreciate your
8   time.
9        THE WITNESS:  Thank you.
10       (Whereupon, the above-entitled matter
11  went off the record at 5:16 p.m.)
12
13
14
15
16
17
18
19
20
21
22

# Exhibit E

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

+ + + + +

_____

IN THE MATTER OF:                   :
                                    :
DISTRICT OF COLUMBIA,               :
                                    :
            Plaintiff,              :
                                    :
     v.                             :   Civil Action No.
                                    :   2019 CA 004497 B
MARRIOTT INTERNATIONAL,             :
INC.,                               :
                                    :
            Defendant.              :
                                    :
_____:

Friday,
March 19, 2021

Via Video/Teleconference

DEPOSITION OF:

SCOTT MCCOY

called for examination by Counsel for the
Plaintiff, pursuant to Notice of Deposition, when
were present on behalf of the respective parties:

**APPEARANCES:**

**On Behalf of Defendant:**
PAUL LEARY, ESQ.
MILTON MARQUIS, ESQ.
Cozen O'Connor
One Liberty Place
1650 Market Street
Suite 2800
Philadelphia, PA 19103
(215)665-2000
pleary@cozen.com
mmarquis@cozen.com


**On Behalf of Plaintiff:**
MATT JAMES, ESQ.
CHRISTOPHER PASCUAL
Assistant Attorneys General
JIMMY R. ROCK, ESQ.
Assistant Deputy Attorney General
400 6th Street, N.W.
Washington, D.C. 20001
(202)724-5558
matthew.james2@dc.gov
christopher.pascual@dc.gov


**Also Present:**
THERESA COETZEE, VP & Assistant General Counsel,
Marriott
BENJAMIN WISEMAN, Director, Office of Consumer
Protection, OAG

CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Scott McCoy | 4 | 152 | 163 | 164 |

EXHIBIT NO.                                         PAGE
1 - Notice of deposition . . . . . . . . . .  11
2 - Meeting minutes - destination fees . . .  41
3 - Master list of resort fees . . . . . . .  44
4 - Resort/Destination fee policy . . . . . .  50
5 - Resort/Destination fee process . . . . .  59
6 - Resort/Destination fee amenity guidance   73
7 - Resort/Destination fee best practices . . 80
8 - Resort fee audit checklist . . . . . . .  90
9 - Excel spreadsheet from audit . . . . . . 104
10 - Resort/Destination fee acknowledgment    113
11 - Resort fee 2014 mid-year update . . . . 124
12 - Resort fee survey - June 2014 . . . . . 129
13 - Hotel distribution agreement . . . . . 134
14 - Screen capture $169 USD . . . . . . . . 142
15 - Screen capture $225 USD . . . . . . . . 144

4

1          P-R-O-C-E-E-D-I-N-G-S
2              (10:08 a.m.)
3   WHEREUPON,
4              SCOTT McCOY
5   was called as a witness by Counsel for the
6   Plaintiff, and after having been first duly
7   sworn, was examined and testified as follows:
8          DIRECT EXAMINATION
9   BY MR. JAMES:
10      Q    Good morning.  My name is Matt James.
11  I am an assistant attorney general with the
12  Office of Consumer Protection for the Office of
13  the Attorney General for the District of
14  Columbia.
15          We represent the District of Columbia
16  in the matter that brings you here today, DC v.
17  Marriott International, Inc.  Could you please
18  state your name for the record?
19      A    Scott McCoy.
20      Q    Could you please provide your personal
21  address and telephone number?
22      A    189 Copley Circle, Gaithersburg,

5

1   Maryland, 20878.  And my phone number is 415-307-
2   6629.
3       Q    Thank you.  Have you been deposed
4   before?
5       A    I have, yes.
6       Q    How many times have you been deposed?
7       A    My recollection may not be perfect,
8   but perhaps two or three times over the last 30
9   odd years.
10      Q    Okay.  Were those depositions business
11  related or personal?
12      A    Business related.
13      Q    Did any of those depositions involve
14  your work for Marriott organizations or
15  companies?
16      A    That's correct, yes.  Previously at
17  hotels.
18      Q    So all your previous depositions
19  involved your work for Marriott?
20      A    That's correct.
21      Q    Okay.  What do you recall about those
22  depositions?

6

1       A    Those depositions were relevant to
2   individual hotels.
3       Q    And which individual hotels were they?
4       A    The most recent one would be roughly
5   10 or 12 years ago in San Francisco and that
6   would be the Stanford Court Renaissance Hotel.
7   Prior to that another hotel in San Francisco.
8       Q    Okay.  Do you remember the case names
9   or case styles of those cases, like this is DC v.
10  Marriott.  Do you remember what those case names
11  were?
12      A    I do not, no.
13      Q    Okay.  That's fine.  So I'm just going
14  to go over some general ground rules.  I'm going
15  to be asking you a number of questions today.  If
16  any of my questions are unclear or confusing just
17  please ask me to rephrase them and I'll try to
18  make it clear.  That will happen a lot.
19          I ask that you please wait until I
20  complete my question before you begin your
21  answer.  That will give your lawyers time to
22  object if they need to.  It will also help the

7

1   court reporter and keep the transcript clear.
2          Please make your answers audible.  Do
3   not nod or shake your head.  We need an audible
4   answer for the record.
5          If at any time you need a break just
6   let us know.  I only ask that you do not ask for
7   a break right after I ask a question without
8   first answering the question.  But just if I ask
9   a question you can answer the question.  Just let
10  us know if you need a break.
11          I'm going to go over some general
12  terminology.  I understand that Marriott owns and
13  operates some of its own hotels directly, and
14  operates others through franchises, is that
15  correct?
16      A    That's correct.
17      Q    Okay.  So when I'm going to be
18  referring to a Marriott hotel I mean that to
19  include both hotels owned and directly operated
20  by Marriott, and owned by its franchises.  Is
21  that okay?
22      A    Yes.

8

1    Q   Okay.  If you need to distinguish
2  between Marriott hotels and franchises to
3  properly answer a question please do so.  If I
4  need to distinguish between them what I'll do is
5  I'll say Marriott owned and operated hotels, and
6  by that I'll mean hotels that are owned by
7  Marriott and not franchises.  So, do you
8  understand?
9    A   Yes.
10   Q   So, I also understand that Marriott
11  also operates hotels under other brand names such
12  as the Renaissance, the Ritz-Carlton, et cetera.
13  Is that correct?
14   A   That's correct.
15   Q   So when I refer to Marriott hotels I
16  mean to include all the hotels and the brand
17  names owned and operated by Marriott.  Will that
18  be okay?
19   A   Yes.
20   Q   So, when I refer to a resort fee
21  unless otherwise specified I mean to include
22  amenity fees, destination amenity fees, or

9

1  anything else functionally similar to a resort
2  fee.  Will that be okay?
3    A   There may be clarifications required,
4  but understood.
5    Q   If you need to distinguish between
6  those to properly answer a question please do so.
7  Yes, feel free to do that if you need that for
8  the proper answer.
9        And I'm also going to refer to an OTA
10  or an online travel agency, and by that I'll mean
11  a website that offers hotel rooms from multiple
12  companies like Travelocity, Expedia, or the like.
13  Will that be okay?
14   A   Yes.  Sorry, I had to turn my phone
15  off.
16   Q   Okay.
17   A   Sorry.
18   Q   Thanks for doing that.  No problem.
19  I'm surprised I remembered to do it.  Do you have
20  an attorney with you today?
21   A   I do, yes.
22   Q   Okay.  Who is your attorney?

10

1    A   Paul Leary and Milton Marquis.
2    Q   Okay.  Your attorney or other
3  attorneys may make objections to the questions.
4  Again, please allow the attorney to state the
5  objection, but unless your attorney instructs you
6  not to answer the question that's presumably
7  going to be on the grounds of attorney-client
8  privilege or something alike, please go on to
9  answer the question.  So let them state their
10  objection and then go on to answer the question
11  unless they instruct you not to.  Do you
12  understand?
13   A   Yes.
14   Q   Is there any reason you cannot give
15  full and complete testimony today?
16   A   No.
17   Q   Are you under the influence of any
18  medications or other things that might impair
19  your ability to testify today?
20   A   No.
21   Q   All right.  Let's get rolling.  I'll
22  go ahead and share what will become exhibit 1.

11

1  Can you see that?
2        (Whereupon, the above-referred to
3  document was marked as McCoy Deposition Exhibit
4  No. 1 for identification.)
5    A   Yes.
6    Q   Is that a good zoom size?  Can you
7  read it clearly?
8    A   Yes.
9    Q   Okay.  Do you recognize this?
10   A   Yes.
11   Q   What is it?
12   A   It's essentially the court documents
13  for the matter we're going to discuss today.
14   Q   Have you been designated by Marriott
15  to provide deposition testimony on the subjects
16  in this notice?  And take some time to read it if
17  you need more time to review it.
18       PARTICIPANT:  You might have to scroll
19  through it.
20       MR. JAMES:  Okay.  I'll scroll through
21  it slowly.  If I'm going too fast just let me
22  know.  So you're not going to be opening these up

12

1  independently.  I'll have to scroll through them
2  for you.  Is that all right?
3      THE WITNESS:  Yes.
4      BY MR. JAMES:
5      Q   Okay.  It might be easier if we could
6  set up a way -- let's go off the record for a
7  second.
8          (Whereupon, the above-entitled matter
9  went off the record at 10:15 a.m. and resumed at
10  10:16 a.m.)
11      MR. JAMES:  So, you've just been
12  provided with a link to all the exhibits in this
13  deposition.  In that link would you open up the
14  one that's entitled DC 30(b)(6) notice?
15      THE WITNESS:  Yes.
16      BY MR. JAMES:
17      Q   Okay.  Would you just take a minute
18  and scroll through to review the document,
19  please?
20      A   Yes.
21      Q   And just let me know when you're done.
22      A   Yes.

13

1      Q   Thank you.  Do you recognize this
2  document?
3      A   Yes.
4      Q   What is it?
5      A   It's a -- essentially the document
6  relevant to the legal matter that we're going to
7  discuss today, specific to what may be asked of
8  me.
9      Q   Okay.  So you've been designated by
10  Marriott to provide deposition testimony on the
11  subjects in this notice?
12      A   Yes.
13      Q   Thank you.  That will be all for that
14  one.  So, what did you do to prepare for this
15  deposition today?
16      A   I spoke to counsel over the last day
17  and a half or so about today.
18      Q   Okay.  Let me ask you some questions
19  about that.  I don't want any answers involving
20  what you talked to counsel about.  Those are
21  privileged.  But I'm just going to ask you
22  general questions about who you talked to and how

14

1  long, and other things like that.  But I don't
2  want any actual conversations between you and
3  your counsel.  Do you understand?  Okay.
4          Did you review any documents in
5  preparation for this deposition?
6      A   I did, yes.
7      Q   What documents did you review?
8      A   I reviewed our policy.  I reviewed
9  some of the notes that I have from conversations
10  relevant to resort and destination fees, and I
11  reviewed this document that you've just presented
12  a moment ago.
13      Q   Thank you.  Did you review anything
14  else?
15      A   I reviewed a number of -- well, of
16  course I went online and double checked a few
17  things to refresh my memory on how hotels are
18  demonstrating the resort fee.  And I reviewed my
19  own notes relevant to the policy, practices, and
20  procedures for resort fees, yes.
21      Q   Thank you.  You said you met with your
22  attorneys a couple of times in the last couple of

15

1  days.  When did you meet with them?
2      A   Yesterday morning I met with them and
3  the day before in the morning.
4      Q   Okay.  How long was that first meeting
5  two days ago?
6      A   Probably a couple of hours or so.
7      Q   Okay.  And who was present at that
8  meeting?
9      A   Milton was present as was Paul, and
10  then Theresa Coetzee from Marriott.
11      Q   Okay.  And the meeting yesterday, how
12  long did that meeting last?
13      A   A couple of hours again.
14      Q   And who was present at that one?
15      A   Paul, and Theresa, and there may have
16  been one or two other members of Paul's team.
17      Q   Okay.  Were they attorneys?
18      A   I believe so.
19      Q   All right.  Did you talk to anyone
20  else about this deposition?
21      A   No.
22      Q   Okay.  Have you talked to anyone else

16

1   employed by Marriott about this case?
2       A   I've talked to my boss that I was
3   being deposed, but not specific to what we're
4   talking about today, other than yes, I'm being
5   deposed for this particular case.
6       Q   Okay.  Yes.  Good to give him a heads
7   up.  What's your boss's name?
8       A   Erika Alexander.
9       Q   Okay.  Is there anything else besides
10  what we discussed that you did to prepare for
11  your deposition today?
12      A   Other than rest last night and just
13  try to be, you know, prepared for today in terms
14  of open-mindedness.
15      Q   Thank you.  I tried to rest and be
16  prepared today.  We'll see how well I did.  So,
17  describe your background a little bit.  Would you
18  describe your educational background, like your
19  college, if any?
20      A   Yes.  I have a college degree in
21  business and hotel management.  And go ahead, I'm
22  sorry.

17

1       Q   No, go ahead.
2       A   And of course during my career I've
3   taken a number of advanced education courses to
4   further my understanding for the business that
5   we're in and the competitive environment that
6   we've faced at various points along my career.
7       Q   Where did you go to college?
8       A   Penn State University.
9       Q   And when did you graduate?
10      A   '87.
11      Q   And what was your degree in?
12      A   Hotel management.
13      Q   Who is your -- what is your current
14  occupation?
15      A   I'm vice president for market
16  operations for U.S. and Canada.
17      Q   And who is your employer?
18      A   Marriott International.
19      Q   When did you start in your current
20  position?
21      A   I started in my current position in
22  October of 2019.

18

1       Q   What are your current job duties in
2   that position?
3       A   I have responsibility over the
4   operational procedures, policies, practices, for
5   our hotels managed in North America essentially,
6   all 30 brands.
7       Q   Who directly reports to you?
8       A   Names or roles?
9       Q   We'll just do roles first.
10      A   There's a vice president for
11  operations over full service, two senior
12  directors over luxury, and then I have a vice
13  president over openings/transitions, and then a
14  couple of key roles that lead -- subject matter
15  expertise, breakthrough leadership and a couple
16  of other things.
17      Q   And approximately how many employees
18  are -- in your chain of command how many
19  employees do you have control over?
20      A   About 130.
21      Q   Would you please summarize your
22  employment in the hotel industry starting with

19

1   your first job in the hotel industry.  Like for
2   example, say from 2018 to -- from 2019 I was vice
3   president of global operations at Marriott and so
4   forth.  But just starting with your first job in
5   the hotel industry would you just summarize your
6   work history?
7       A   Chronologically in reverse, in other
8   words, for clarification.
9       Q   Chronologically would probably be
10  easier.  If you have to do it in reverse that's
11  fine.
12      A   Well, my first role as a leader was as
13  a manager at a hotel in Florida.  And then
14  subsequent to that I held a number of roles in
15  food and beverage, and leadership roles,
16  management roles, executive committee roles.
17          And then in roughly 2000 began more of
18  an executive committee role over large-scale
19  properties, large resorts, big box hotels in
20  California.  And then in roughly 2003 I began a
21  hotel leadership role where I was responsible for
22  a hotel.  Subsequent to that I'd been a general

20

1  manager three times at different hotels.  And
2  then just prior to this role I had global
3  responsibility of operations over three of our
4  brands, Marriott, Sheraton, and Delta.
5      Q    Thank you.  What hotels were you
6  general manager of?
7      A    I was general manager of the Stanford
8  Court Renaissance Hotel in San Francisco, general
9  manager of the Renaissance in Los Angeles, and
10 general manager of the Irvine Marriott Hotel in
11 southern California.
12     Q    Thank you.  Do your current duties
13 involve managing or dealing with resort fees?
14     A    They do, yes.
15     Q    And what are your duties with regard
16 to resort fees?
17     A    I have oversight over the policy, the
18 practices, the application process, oversight
19 over and review of the conditions that hotels
20 need to meet in order to apply for and maintain
21 their resort and destination fees.
22     Q    Who was your predecessor in that

21

1  position?
2      A    His name is Jack Wolff.
3      Q    Are you aware that Mr. Wolff
4  previously gave deposition testimony on behalf of
5  Marriott in the DC Attorney General's pre-suit
6  investigation of Marriott's resort fee practices?
7      A    I am, yes.
8      Q    Did you review that testimony in
9  preparation for this deposition?
10     A    Only a summary.
11     Q    We'll just move on to structure of
12 Marriott and Marriott hotels generally.
13 Approximately how many Marriott owned and
14 operated hotels, not franchises, are there?
15     A    So, owned, very few actually, probably
16 maybe between 18 -- maybe 18 or 19 hotels that we
17 own.  It's not part of our business model to own
18 hotels.
19          Total hotels globally, we have just
20 over 7,300.  So, the majority of those are in
21 fact franchised hotels.  We manage about 850 in
22 the U.S. and Canada.

22

1      Q    Okay.  What control does Marriott have
2  over its franchises?
3      A    Procedures and standards control we
4  have over our franchisees.  They are their own
5  entities, their own companies.  So we have brand
6  standards, procedures, et cetera.
7      Q    Okay.  When you say Marriott manages
8  approximately 800 hotels, what does Marriott do
9  for those?
10     A    We -- as the name implies we manage
11 that hotel on behalf of a particular ownership
12 group across our brand portfolio.
13     Q    Okay.  What is a resort fee?
14     A    A resort fee essentially is a bundling
15 of amenities.  And then they're assigned a value,
16 and that fee is associated with that particular
17 experience that's defined for that particular
18 hotel.  So a resort fee as an example might be a
19 $20 resort fee that includes approximately 100 or
20 more dollars of value amenities for a consumer.
21     Q    What was your first personal
22 experience with resort fees in your work at

23

1  Marriott?
2      A    My personal experience with resort
3  fees would have been as a consumer experiencing
4  resort fees at hotels that I've stayed at.  My
5  business experience would be being responsible
6  for resort fees.
7      Q    Okay.  When did you first remember
8  experiencing a resort fee as a consumer?
9      A    I would say probably maybe a decade
10 ago would be the first time I experienced it.
11     Q    And when did you first encounter a
12 resort fee in your business work for Marriott?
13     A    When I became responsible for resort
14 fees is when my engagement with resort fees truly
15 was relevant to business.
16     Q    Okay.  Did any of the hotels you
17 worked at before that impose a resort fee?
18     A    We did not, not while I was there.
19     Q    Okay.  Why did Marriott hotels start
20 imposing resort fees?
21     A    I think the primary driver, and it
22 continues today, is to provide a convenient way

24

1   for hotels to bundle if you would a selection of
2   amenities based on that particular hotel.  And
3   that bundling of amenities enables the consumer
4   to experience a broad swath of hotel-specific
5   experiences.
6         The resort fee itself also enables
7   that hotel to provide more of those amenities
8   because there's more certainty in the provision
9   of those amenities than if it was simply a la
10  carte.
11     Q   Do you remember when Marriott hotels
12  first imposed resort fees?
13     A   I do not recall.
14     Q   Okay.  What is a destination amenity
15  fee?
16     A   Similar to a resort fee, the
17  difference is in those hotels that are not
18  resorts and the other difference is that they are
19  required by our policy to have a like for like
20  food and beverage credit.  So if your destination
21  fee is $20 you have a $20 food and beverage
22  credit as part of your 4 to 1 value proposition.

25

1     Q   And why did Marriott hotels start
2   imposing destination amenity fees?
3     A   We became at a competitive
4   disadvantage in a number of markets, and the
5   capability disadvantage was that those hotels in
6   that market were already bundling those items in
7   terms of a destination fee.  And Marriott saw
8   that the market norm if you would became
9   destination fees, which is by the way a part of
10  our policy, that you have to have market normalcy
11  in order to charge a destination fee.
12     Q   So if there were not market normalcy,
13  if the other hotels in the area were not charging
14  destination amenity fees would Marriott still
15  impose a destination amenity fee?
16     A   No, no.  You have to be at a minimum
17  of 50 percent threshold.  So more than 50 percent
18  of your competitors, and that's just one, one of
19  the pillars of requirement.
20     Q   Are there any other terms that
21  function like resort fees or destination amenity
22  fees that Marriott uses?

26

1     A   No, not that we use.
2     Q   Okay.  So every fee that's like these
3   is either called a resort fee or a destination
4   amenity fee?
5     A   That's correct.
6     Q   Okay.  Are resort fees, and I'm going
7   back to speaking of resort fees inclusive of
8   destination amenity fees -- are resort fees
9   generally mandatory?
10     A   If you offer a resort fee it is a
11  mandatory fee.  But generally speaking we do not
12  require mandatory resort fees.  So as an example,
13  a resort fee is a market exception.  There's just
14  slightly more than 200 hotels that have resort
15  and destination fees out of thousands of hotels.
16  So we don't require resort fees.  But if you have
17  a resort fee, yes, it is mandatory.
18     Q   Okay.  And how long does the market
19  saturation where other hotels are imposing
20  destination fees, how long does that have to be
21  in place before Marriott will allow hotels to
22  impose a resort fee or a destination fee?

27

1     A   You will have had --
2         MR. LEARY:  Just object to the form,
3   but that's okay.  You can answer.
4         THE WITNESS:  You would have
5   demonstrated in order to apply for a destination
6   or resort fee, you will have to have demonstrated
7   that you are competing against those hotels.  So
8   at a minimum you would have had to compete for at
9   least three months, perhaps six months to
10  demonstrate and track against the competitor.
11         MR. JAMES:  Okay.  Is there any way a
12  customer can opt out of a resort fee?
13         THE WITNESS:  A customer can select
14  another hotel throughout the process.  We have a
15  very robust process to check in to a hotel
16  including the booking window, use of the web
17  page, et cetera, to arrive at the hotel, and
18  during that process you can certainly up until
19  the time you've booked you can choose another
20  hotel.  So it is a mandatory fee.
21         BY MR. JAMES:
22     Q   But if you select a hotel there is no

28

1  way to opt out of the particular fee at that
2  hotel, right?  If it imposes a resort fee.
3      A    If after the process of selecting a
4  city and then choosing a hotel, having reviewed
5  the disclosure of the resort fee and then gone
6  through the booking process, arrived at the hotel
7  and at check-in been reminded of the resort fee,
8  no, you would not have been able to opt out
9  necessarily, using the terminology that you've
10  just shared.
11      Q    Okay.  When did Marriott first
12  institute the policy that the market has to
13  consist of at least 50 percent competitors
14  imposing a resort fee in order to impose -- in
15  order for a Marriott hotel to resort fee.  When
16  did that first become a requirement?
17          MR. LEARY:  Just, I'm only objecting
18  to the word "impose."  You've used that several
19  times.  But you can go ahead and answer, Scott.
20          THE WITNESS:  Thank you.  So, the 50
21  percent evolution of our policy, our practice
22  occurred in the late fourth quarter of 2019.

29

1          MR. JAMES:  Okay.  Before that was
2  there a similar requirement?
3          THE WITNESS:  Yes.  It was 75 percent
4  before that.
5          BY MR. JAMES:
6      Q    Okay.  And before that was there a
7  similar requirement?
8      A    I don't recall.  That was before my
9  time.
10      Q    Are resort fees included in the
11  initially advertised prices for rooms on Marriott
12  websites?
13      A    On our websites because of the
14  familiarity that customers use to draw
15  comparisons across a portfolio of hotels the
16  first you see is the room rate.  That allows
17  essentially apples to apples if you would across
18  our portfolio certainly, and across the market
19  based on the city you've selected.
20          Immediately following that page when
21  you've selected a hotel should that hotel have a
22  resort or destination fee that very next page

30

1  will denote that that fee exists at that hotel.
2      Q    So, why is the resort fee not included
3  in the initial room rate?
4          MR. LEARY:  Objection.
5          THE WITNESS:  I'm sorry?
6          MR. LEARY:  You can answer.
7          THE WITNESS:  So, two things.  One, in
8  the U.S. in particular, but I can speak to North
9  America.  In the U.S. in particular our customer
10  base, and that's essentially everything about
11  what we do is very customer-centric.  Our
12  customers' familiarity with how they choose and
13  compare rooms is room rate.  That's really the
14  first approach.
15          Now, the second piece of that is on
16  that very page we now have a toggle switch if you
17  would that enables you to filter to include all
18  taxes, fees, associated with that room rate.  And
19  that was because we had another country, another
20  continent that has different approach to how
21  their consumers see rates, and we made that
22  adjustment, and also made that choice available

31

1  to customers here in the U.S.
2          MR. JAMES:  You said that your
3  customers are generally familiar with Marriott's
4  offerings and the use of resort fees.  Has
5  Marriott done any studies or other surveys to
6  verify that consumers are in fact familiar with
7  and knowledgeable about resort fees?
8          THE WITNESS:  We routinely survey our
9  guests.  We routinely -- you used the term
10  "studies."  I would use the term research to
11  gather insights.  And if in the process of that
12  we gather information about how people feel about
13  resort fees and other types of programs that we
14  have in our hotels the answer to that is yes, we
15  do do that.  Do we have specific studies targeted
16  only at that?  Not to my recollection.
17          BY MR. JAMES:
18      Q    Okay.  If you were advertising
19  Marriott rooms on an online travel agency or OTA
20  website like Travelocity or Expedia would the
21  room rate -- would the resort fee be included in
22  the initially advertised price on those websites?

32

1    A   I don't know that I can speak to every
2  OTA.  Some OTAs, Expedia as an example as part of
3  their business model include that in their total
4  price.  That is a part of their business model.
5  Not all OTAs follow that business model. █████
6  ██████████████████████████████████████
7  █████████████████████████████████
8    Q   Okay.  When Marriott provides a room
9  rate to an OTA does that room rate include a
10  resort fee?
11    A   If that hotel offers a resort fee the
12  OTA would be instructed that the resort fee
13  exists and they would need to portray that
14  clearly for that guest.  Again, their business
15  models may vary, and I don't know all of the
16  OTA's business models, █████████████████████
17  █████████████████████████████  We don't
18  control what those rates are.  And in hotels that
19  have resort or destination fees they're required
20  to portray that.
21    Q   So when a Marriott hotel provides a
22  room rate to an OTA is there two components to

33

1  that?  Is there the room rate and the resort fee,
2  or are those two included in one price?  Are they
3  sent to the OTA separately, or is it one entity?
4    A   So, again, I would say that the -- we
5  have negotiated agreements with the various OTAs.
6  Room rates are separate from resort fees.  So
7  they would be provided separately.
8    Q   Does Marriott require its hotels to
9  abide by any resort fee policies?
10    A   Can you ask that again?  I'm sorry.
11    Q   Are there any resort fee policies that
12  Marriott requires all of its hotels to abide by?
13    A   So, to clarify, those hotels that
14  offer a resort or destination fee are required to
15  abide by policies, yes.  But not all hotels are
16  required to abide by resort and destination fee
17  policies.
18    Q   If a hotel -- if a Marriott hotel
19  imposes a resort fee what are the specific
20  policies that it is required to abide by?
21    A   So, first and foremost they have to
22  have a 4 to 1 value proposition.  So what that

34

1  means is if you have a fee of X and it's $20 then
2  the 4 to 1 value proposition means that you have
3  to have $80 -- if it's a $20 fee you have to have
4  $80 worth of value associated with that fee.
5        The second piece is that at least 50
6  percent of your market should be offering a
7  resort or destination fee.
8        And then third, you would have to have
9  complete evidence of that on your web page.  So
10  there's an alert, as I mentioned earlier on your
11  web page, on your hotel web page.
12        And then you have to follow
13  essentially the deck-related scripting as a
14  reminder to the guest.  And so there's training
15  associated with that that you would have to abide
16  by.
17        And then finally, you have to have
18  maintained a certain standard of service
19  expectations for our guests.  We measure that
20  over time, obviously, and audit that to make sure
21  that all of those robust policies are followed,
22  adhered to, and that the hotels are delivering

35

1  against guest service which is essentially what
2  we do.
3    Q   You said they're measured and audited.
4  How are these resort fee policies measured and
5  audited?
6    A   So, there's two ways that they're
7  measured and audited.  There is an internal, so
8  property-based certification.  Hotels are
9  required to monitor and ensure that they are
10  following the procedures.
11        And then we have a third party audit.
12  So some may call this a mystery shop.  And that
13  third party audit essentially is our standards
14  audit all hotels are audited for.  And that is a
15  very immersive experiential audit.  In that sense
16  all hotels are audited.  We can draw conclusions
17  across the broad portfolio of which hotels are
18  performing at which level, et cetera.
19    Q   Have Marriott's resort fee policies
20  changed in any significant way since it first
21  implemented them?  I believe you mentioned that
22  there used to be a 75 percent comparable hotel in

36

1  the relevant market requirement.  Now there's a
2  50 percent one.  Have the resort fee policies
3  changed in any other significant way?
4       A    Well, first -- so I would say, one,
5  all of our policies essentially have some degree
6  of evolution over time for a couple of reasons.
7            One, we're very customer-centric, and
8  in being customer-centric we have to evolve with
9  the consumer psyche.  And as consumers change
10  over time we adopt and evolve our approach.
11            So in that we would obviously be
12  evolving our approach in terms of in this case
13  resort and destination fees, among other
14  experiential related, standards and/or programs
15  that we have.
16            So, the answer is yes, we evolve those
17  procedures just like we evolve all of our
18  procedures.
19       Q    Has Marriott evolved its resort fee
20  procedures in response to consumer feedback?
21       A    I don't know that it's in direct
22  response to consumer feedback, but rather market

37

1  prevalence and/or understanding of specific
2  markets.  Certainly we have as I've said earlier
3  slightly more than 200 hotels out of over 7,000
4  that have a resort or destination fee.  So there
5  is evidence in certain markets, Hawaii being one,
6  where it's very prevalent.  So consumer feedback
7  of the value is inherent in that.  But I wouldn't
8  say it was in direct response to consumer
9  feedback in its entirety.
10       Q    At least in the instance you gave you
11  said there was consumer feedback as to the value.
12  What did you mean by that?
13       A    So, consumer feedback often is in the
14  format of a guest saying it's convenient to do X,
15  or more convenient to do Y.  And we see feedback
16  both in aggregate meaning hotel X outperforms
17  hotel Y, and perhaps hotel X happens to have a
18  resort fee whereas hotel Y doesn't.
19            And in the format of having a resort
20  fee they have managed to bundle conveniently
21  amenities that allow that consumer to have the
22  experience that the promise of that hotel was

38

1  defined by.  So, there's inherent tacit feedback
2  if you would that we've learned they're doing
3  something right, and in doing something right
4  they're performing well with their customers who
5  we know vote with their feet.  They have many
6  choices and they can choose others.
7       Q    Is there explicit feedback from
8  consumers regarding resort fees that Marriott has
9  considered or incorporated?
10       A    I don't have or recall specific
11  feedback other than isolated instances.
12       Q    So you said that Marriott audits or
13  does third party mystery shops and internal
14  audits.  Have Marriott hotels ever failed or not
15  passed one of these audits?
16       A    Yes, that's correct.  I'm sorry.
17       Q    Okay.  What would be the standard for
18  determining when a Marriott hotel didn't pass its
19  audit or its mystery shop?
20       A    So, not passing an audit means you've
21  failed on a number of parameters because they're
22  not a single item audit.  So there are hundreds

39

1  and hundreds of questions that add up to more
2  than a few thousand points associated with a
3  particular experience.
4            And there are different brands,
5  there's 30 brands in our portfolio.  While not
6  all brands have hotels with resort or destination
7  fees, those hotels that have resort or
8  destination fees are being audited against their
9  brand expectations which is, as I said, hundreds
10  and hundreds of questions, and a few thousand
11  points.  So failure would be an aggregate of
12  falling below a set number or threshold.
13       Q    And that's generally for the entire
14  audit, not specifically as regard to resort fees?
15       A    Correct.  If you -- you can fail in
16  terms of your resort fees by also not taking care
17  of your customers.  So there's a threshold you
18  have to meet in terms of what we call intent to
19  recommend which is a guest voice metric.  So
20  intent to recommend is essentially a guest
21  satisfaction survey metric.
22            If you fall below a certain point you

40

1  are failing to provide service and therefore you
2  are flagged to have your resort fee suspended.
3      Q    Has Marriott ever flagged any hotel to
4  have its resort fee suspended?
5      A    Yes.
6      Q    Which -- how many times has that
7  happened?
8      A    Prior to my time I don't know.  During
9  my tenure at least once.
10     Q    And which hotel was that?
11     A    That was Santa Monica in California.
12     Q    When you say it was flagged to be
13 revoked, does that mean it was actually revoked,
14 or were they just put on notice that it might be
15 revoked if it was not improved?
16     A    They were put on notice, that's
17 correct.
18     Q    Okay.  But it was not actually
19 revoked.
20     A    Correct, because they mitigated the
21 challenge that they faced.
22     Q    So, in your tenure Marriott has never

41

1  revoked, fully revoked a resort fee.
2      A    Not in my tenure.
3      Q    And it has only flagged at least one
4  hotel for potentially losing its resort fee in
5  your tenure, is that correct?
6      A    Correct.
7      Q    Okay.  Let's start digging into some
8  documents here.  Give me a second.  This will be
9  tab 34 if you could go ahead and open that up,
10 Mr. McCoy.  For the record this is Marriott-
11 0045388.  I'm going to go ahead and share it.
12     MR. LEARY:  045389?  Is that the first
13 page?  I'm sorry, 38.
14     MR. JAMES:  That's the first page,
15 yes.  0045388 is the first page.
16     MR. LEARY:  Okay.  So this is going to
17 be number 2, Matt.
18     MR. JAMES:  Yes, this is exhibit 2.
19     (Whereupon, the above-referred to
20 document was marked as McCoy Deposition Exhibit
21 No. 2 for identification.)
22     MR. LEARY:  And it's a two-page

42

1  document.  Okay, thank you.
2      MR. JAMES:  Mr. McCoy, do you have
3  this document up?  It says Meeting Minutes -
4  Destination Fees at the top.
5      THE WITNESS:  Yes, sir.
6      BY MR. JAMES:
7      Q    Would you just take a second, review
8  the document and let me know when you're done?
9      A    Yes.
10     Q    Thank you.
11     A    Okay, I've reviewed it.
12     Q    Do you recognize this document?
13     A    I recognize what it is, yes.
14     Q    Okay.  And what is it?
15     A    Meeting minutes for destination fees
16 amongst a group of apparently leaders.  I don't
17 know them all.
18     Q    Does Marriott continue to keep
19 meetings in this format?
20     A    So, no, I do not keep meeting minutes
21 in this format, and do others amongst our
22 organization?  It's possible that they may keep

43

1  meeting minutes in this format.
2      Q    But you recognize that as a meeting
3  minutes format that Marriott employees have used.
4      A    No, actually.  It's the first time
5  I've seen it in this format.
6      Q    Okay.  So, in the block labeled
7  attendees near the top, the last person listed is
8  named Jeff Wolff.  That is your predecessor,
9  correct?
10     A    Correct.
11     Q    Okay.  Please scroll down to the
12 second to last bullet point on the first page.
13 It will be this one right here.  It says this fee
14 cannot be rolled into the room rate as this would
15 put the properties at a disadvantage when price
16 comparison shopping is performed.  And this is
17 referring to a resort fee.  Would you agree with
18 that statement?
19     A    If you're asking me would I agree
20 having the resort fee in the room rate, yes, that
21 it would put you at a disadvantage when price
22 comparison occurs on that first page on our

44

1  website.
2      Q    Is this one of the reasons why
3  Marriott does not include resort fees in its
4  first initially advertised price?
5      A    It is one of the reasons.  This
6  minutes seems to be from 2014 so it's possible --
7  I'm only speculating, but conditions do evolve
8  over time.  Certainly it continues to be a
9  potential disadvantage to have it included on the
10  initial page where you are shopping for room
11  rates.
12      Q.  Okay.  I think that will be all for
13  that document.  Next I'd like you to open what is
14  going to be tab 82.  I'll share it.  This is what
15  it looks like.  This would be I guess exhibit 3.
16          (Whereupon, the above-referred to
17  document was marked as McCoy Deposition Exhibit
18  No. 3 for identification.)
19      Q    The Bates number for this is Marriott-
20  DCAG0000001.  And I'm fairly sure that's the
21  right number of zeroes.
22          MR. LEARY:  Is that listed there,

45

1  Matt?
2          MR. JAMES:  I don't think it's listed.
3  I think this was initially a spreadsheet and I
4  had to put it into a PDF to get it to display.
5  But the original document I think was a
6  spreadsheet and the Bates was Marriott-
7  DCAG0000001.
8          MR. LEARY:  Okay.  So just to clarify,
9  was this production through this case or the AG
10  separate investigation case?
11          MR. JAMES:  This came through this
12  case.  The Marriott DCAG numbers refer to
13  documents produced in this case.  It's just a
14  Marriott number, I believe those are the Bates
15  stamps for our preceding investigation.  Since
16  this is a DCAG number I believe it was produced
17  as part of productions in this case.
18          MR. LEARY:  Okay.
19          MR. JAMES:  Okay.  So Mr. McCoy, do
20  you have this document up?
21          THE WITNESS:  I do.
22          BY MR. JAMES:

46

1      Q    Okay.  Would you just take some time
2  to review it and let me know when you're done?
3      A    I'm done, thank you.
4      Q    Okay.  Do you recognize this document?
5      A    I do.
6      Q    Okay.  What is it?
7      A    It's essentially a master listing of
8  hotels in our portfolio that offer a resort and
9  destination fee.  I can't tell the dating of it,
10  but I am familiar with this.
11      Q    Okay.  So, Marriott keeps a master
12  list of resort fees.  Is there just one master
13  list that's updated periodically, or are there
14  separate lists?
15      A    No, that's correct.  There's one list
16  that we create, or have created for some time
17  that contains the list of hotels that have a
18  resort or destination fee.
19      Q    Okay.  The document itself is not
20  dated, but the metadata on this document
21  indicated that it was last modified on May 1,
22  2020.  Does this at least appear to you to be an

47

1  accurate list of all the Marriott hotels that
2  charge resort fees as of approximately May 2020?
3      A    As of May 2020, yes.  It would be
4  approximate only in that during COVID we had a
5  number of hotels that were unable to continue
6  either to be open and operate, or offer resort or
7  destination fees under the conditions of their
8  particular jurisdiction.  So, it is possible that
9  some hotels listed on here as of May of 2020
10  would have been inaccurately portrayed given the
11  circumstances that they found themselves in
12  during COVID.
13      Q    Okay.  How often does Marriott update
14  this document?
15      A    Every month.
16      Q    Okay.  It's hard to see from this, but
17  in the original spreadsheet there are 182 lines
18  on this chart.  Does it represent approximately
19  the total number of Marriott hotels that charge
20  resort fees?
21      A    That's a fair approximation.  I would
22  say it's probably slightly over 200.  But that's

48

1  a fair approximation, yes.
2      Q    So do the amounts and fees listed on
3  this seem accurate as of approximately May 2020?
4          MR. LEARY:  Could you repeat that one
5  more time, Matt?
6          MR. JAMES:  Do the amount of fees
7  listed on this screen seem accurate as of
8  approximately May 2020?
9          MR. LEARY:  Object to the number.
10  There's many listed fees, but go ahead, Scott, to
11  the extent you can answer.
12          THE WITNESS:  Yes, there are nearly --
13  to your point that you've offered earlier there's
14  188 lines here.  So I, you know, in my capacity
15  of understanding if they're all accurate I would
16  say it's a close approximation.  Yes, it feels
17  like it would be accurate.
18          MR. JAMES:  We're not quizzing you on
19  all 182, just does it seem accurate to you.
20          THE WITNESS:  Yes.
21          BY MR. JAMES:
22      Q    Are there any ways in which this

49

1  document might have changed significantly since
2  May 2020?
3      A    It's possible that hotels listed here
4  would have today either a lower fee, or no fee.
5  And it's possible that there are hotels not
6  listed here today on this document that today
7  have a resort or destination fee that's been
8  introduced let's say in the last few months as
9  they've either been opened.  We open on average
10  one hotel every single day in U.S. and Canada.
11  And there's some percentage of those over time
12  that would likely have a resort or destination
13  fee.
14      Q    Okay.  Are a lot of those changes, is
15  that due to COVID?
16      A    That's correct.  Yes.
17      Q    I think that'll be done with that one.
18  Next I'll go to tab 29 if you could open that,
19  please.
20          MR. LEARY:  Bear with me one second as
21  well, Matt.  I'm having computer problems.  Okay,
22  so 29 will be 4?

50

1          (Whereupon, the above-referred to
2  document was marked as McCoy Deposition Exhibit
3  No. 4 for identification.)
4          MR. LEARY:  Okay.
5          MR. JAMES:  That will be exhibit 4.
6  This is Marriott-DCAG0000002.  So if you would
7  just take a minute and review this document.  Let
8  me know when you're done.
9          THE WITNESS:  Okay, I've reviewed it,
10  Matt.
11          BY MR. JAMES:
12      Q    Okay.  Thank you.  Do you recognize
13  this document?
14      A    I do.
15      Q    What is it?
16      A    It's our resort and destination fee
17  policy for the Americas.
18      Q    Okay.  Scrolling down to the bottom of
19  the page it says confidential and proprietary
20  information, January 2020 in the footer.  Does
21  this appear to be current as of January 2020?
22      A    That's correct.

51

1      Q    Have there been any substantial
2  changes in it since January of 2020?
3      A    I am looking for one change.  There is
4  one change that was made, yes.
5      Q    And what was that change?
6      A    There is on page -- on your document
7  it's page 7.  It's item number 11.  It references
8  Bonvoy Earned (Redemption) Stays and states that
9  we expect effective January 2020 changes to the
10  program may include.  That has been removed.
11      Q    Okay.  Thank you.  Please scroll back
12  up to what is the third page of this document.
13  It's the first sentence.  It's number 1.  It says
14  the hotel must maintain the required intent.  Are
15  you there?
16      A    Yes.
17      Q    Okay.  It says, "The hotel must
18  maintain the required intent to recommend
19  guestVoice brand standard to charge a resort
20  destination fee."  So, we talked about this a
21  little bit, but how does Marriott determine
22  whether hotels have maintained the required

52

1  intent to recommend guestVoice brand standard?
2      A   A random sampling of guests staying at
3  hotel X then are reporting out their experience.
4  They are essentially scoring that experience.
5  That is collected daily, and we have real-time
6  reporting on how a hotel performs.  That's noted
7  as what I referred to earlier at ITR which is
8  intent to recommend.
9          And ITR, we have a minimum expectation
10  for our brands of 56, essentially meaning that if
11  they're not maintaining 56 and drop below that
12  they are in jeopardy of not being able to charge
13  a resort or destination fee.
14      Q   What is that 56 out of?  Is it 56 out
15  of 100, or 56 out of?
16      A   Yes.  It's not quite that.  So, it's
17  at least 56 percent are checking 9 or 10.  So the
18  experience of 90 percent or better.  That's what
19  that means.  So 56 percent of the people have
20  checked that hotel as a 9 or a 10.
21      Q   Is that overall a 9 or a 10, or in
22  regard to a specific item on the survey?

53

1      A   That particular item happens to be an
2  overall.  It's its own metric.
3      Q   Okay.  So, they have to get -- 56
4  percent of the people have to give an overall
5  score of 9 or 10 to pass, is that correct?
6      A   That's correct.
7      Q   Okay.  As part of that overall score
8  are there questions related to resort fees?
9      A   There are not.
10      Q   The next paragraph, number 2, says,
11  "If a hotel falls below the brand standard in any
12  six-month cycle, one wave, the general manager
13  must submit a detailed action plan to the
14  Marriott area vice president or account executive
15  that outlines what steps are being taken to meet
16  the brand standard in the next six-month cycle,
17  no later than 30 days after the end of the wave.
18          "In addition to the action plan,
19  falling below the intent to recommend brand
20  standard requires the hotel to increase the value
21  of the amenity bundle from 4 to 1 to 7 to 1
22  within 30 days of the end of the wave.  The

54

1  proposed 7 to 1 amenity bundle must be submitted
2  to the fee administrator for approval at
3  America's Fee Request at Marriott.com.  The hotel
4  must complete one full wave of the intent to
5  recommend brand standard to decrease the value of
6  the amenity bundle back from 4 to 1 to 7 to 1.
7          "Failure to comply may result in the
8  revocation of your right to charge a destination
9  or a resort fee."  Sorry, I just wanted to read
10  all that into the record.
11          Is this the procedure that Marriott
12  uses when a hotel stops maintaining the required
13  standard to impose a resort fee?
14      A   That's correct.
15      Q   And you said once one hotel had been
16  flagged for potentially having their resort fee
17  removed, were they flagged for failing this
18  process, or meeting the standard here?
19      A   That's correct.  They -- for one wave,
20  that's right.  So that's what I spoke to earlier,
21  relevant to that was one wave.  That's right.
22      Q   Okay.  And it says they must increase

55

1  the value of the amenity bundle from 4 to 1 to 7
2  to 1 within 30 days of the end of the wave.  Did
3  this hotel do that?
4      A   I actually believe that hotel, and I
5  don't completely recall, but I do believe they --
6  they were out of the red if you would quite
7  quickly, within a few months.  It wasn't an
8  entire wave.
9      Q   But did they increase the value of the
10  amenity bundle from 4 to 1 to 7 to 1 like it says
11  here?
12      A   That's correct.
13      Q   They did that?
14      A   I believe they did, that's right.
15      Q   Do you remember how they did that?  Do
16  you remember what additional amenities they
17  included?
18          MR. LEARY:  Objection to form.  You
19  can answer.
20          THE WITNESS:  I don't recall, no.
21          MR. JAMES:  Okay.  It says there's a
22  fee administrator for approval.  Who is the fee

56

1  administrator?

2      THE WITNESS:  The fee administrator

3  works for me.  Her name is Lisa Simpson.

4      BY MR. JAMES:

5      Q    Okay.  All right.  If you would,

6  please scroll down to what is the eighth page of

7  this document.  The first sentence on the top

8  says Bonvoy Loyalty Tiers and Reservation Types.

9  Are you there?

10     A    Yes.

11     Q    Okay.  In the middle of the page

12  there's a paragraph entitled Annual

13  Certification.  It says, "A representative from

14  each hotel will be required to submit on an

15  annual basis a certification of compliance to the

16  Marriott's Resort Destination Fee Policy.  This

17  annual certification document will be distributed

18  by the America's fee administrator in January to

19  all hotels charging a resort or destination fee."

20  Is this certification of compliance, is it a

21  self-certification by the hotels?

22     A    Yes.

57

1      Q    Okay.  What document is required to

2  accompany the self-certification?

3      A    There is a certification document that

4  they would follow the checklist, and then once

5  completed, submit.

6      Q    Are they required to submit any

7  additional documentation other than the

8  certification and the checklist?

9      A    No.  I will offer this.  This process

10  was introduced to begin this year, so January,

11  this past January, and because of COVID we have

12  delayed audits and other burdens on hotels simply

13  because of the COVID pandemic these last 12

14  months.  So as of right now that certification

15  which was introduced to begin this January hasn't

16  commenced.

17     Q    Okay.  But it's just a certification

18  form.  There's no additional documentation

19  required to be submitted with it.

20     A    Correct, that's correct.

21     Q    Does Marriott take any steps to verify

22  the accuracy of the information provided in these

58

1  annual certifications?

2      A    Yes, it would.  And we do that now.

3  We take steps now through my facilitator as you

4  mentioned earlier.  We have an administrator that

5  we do random audits of hotels.  We obviously also

6  have a very robust brand standards audit which I

7  mentioned earlier.  And we have mystery shops

8  that we do for our Bonvoy members of our hotels

9  as well.

10     Q    All right.  I think that will be it

11  for that one.

12     MR. LEARY:  Hey Matt, is this a good

13  spot just to take a bathroom break?  We've been

14  going a little while.

15     MR. JAMES:  Oh yes, that would be

16  perfectly fine.  Yes.

17     MR. LEARY:  Okay.  I just need five

18  minutes if that works for you.

19     MR. JAMES:  Let's make it -- let's

20  just do -- let's just make it an even 10.  11:25.

21  All right, thank you.

22     (Whereupon, the above-entitled matter

59

1  went off the record at 11:13 a.m. and resumed at

2  11:26 a.m.)

3      MR. JAMES:  Okay, next I'd like you to

4  open up tab 61.  It's a document entitled the

5  Americas Resort/Destination Fee Process.  Do you

6  have it up?

7      THE WITNESS:  Yes.

8      BY MR. JAMES:

9      Q    Please take a moment to review it.

10  Let me know when you're done.

11     MR. LEARY:  While he's doing that this

12  will be number 5, Matt?

13     MR. JAMES:  Yes, I believe so.

14     (Whereupon, the above-referred to

15  document was marked as McCoy Deposition Exhibit

16  No. 5 for identification.)

17     MR. LEARY:  For the record it's Bates

18  DCAG0000013.

19     MR. JAMES:  Yes, thank you.  Yes,

20  Marriott-DCAG0000013.

21     THE WITNESS:  I've reviewed it.  Thank

22  you.

60

1      BY MR. JAMES:
2      Q    Thank you.  Do you recognize this
3   document?
4      A    I do, yes.
5      Q    What is it?
6      A    It's as of the -- in 2019 the
7   destination fee process required of hotels
8   wishing to apply for a destination or a resort
9   fee.
10     Q    Okay.  As you noted at the bottom in
11  the footer it says March 2019, so is that date
12  correct?
13     A    Correct.
14     Q    Okay.  Have there been any updates to
15  this document since then?
16     A    Not -- no.  I would say no, no
17  substantial update.
18     Q    Okay.  Who receives this document?
19     A    So, hotels wishing to apply would
20  receive this document.  So, noting that resort
21  and destination fees are an exception to our
22  general rule and based on market.  So hotels

61

1   wishing to pursue this process would receive
2   this.
3          AVPs which are area vice presidents
4   over various territories or geographies, they
5   would have received this as part of their
6   learning and understanding of the process for
7   hotels in their markets wishing to pursue a
8   resort or destination fee.
9      Q    So, a hotel wishing to start assessing
10  a resort fee would submit a request and then they
11  would get this form back as a checklist in
12  response to that request, is that right?
13     A    Yes.  They could also find this
14  process in our repository which we refer to as
15  Marriott Global Source.  So it is readily
16  available to hotels wishing to pursue this.
17     Q    Okay.  The top of the document says
18  this checklist outlines necessary steps for
19  property to complete prior to implementing the
20  resort destination fee.  So, is that an accurate
21  description of this document?
22     A    It is.

62

1      Q    It says necessary.  Does that mean all
2   these steps are necessary for approval to impose
3   a resort fee?
4      A    All of these steps are necessary to
5   guide you in creating the right value
6   proposition, and understanding your market which
7   would then enable you to present your packet for
8   lack of a better term for approval.
9      Q    Okay.  So, is this a guidance
10  document, or is it a checklist?  Is this
11  something that they -- do they have to do all of
12  the items on this document, or is this just a
13  helpful guidance document?
14     A    Absence of doing the majority if not
15  all of the necessary steps would result in
16  rejection.  It would not likely be approved in
17  the absence of all the steps, although some of
18  the steps overlap others.  So it is possible to
19  have informed your application from one step to
20  another without necessarily hitting every single
21  step as thoroughly if you understand what I said
22  -- what I'm saying.

63

1      Q    Yes.  I've got you.  What
2   documentation would be submitted as part of that
3   packet that you described?
4      A    So, if you go through the various
5   steps, what they would be required to do is
6   submit, one, their Star report.  So that lists
7   their competitive set, readily identifiable
8   performance, the mix of the hotel, you know,
9   leisure, group, transient, which has an impact on
10  the types of amenities that you can offer in your
11  value proposition.
12         Ultimately that packet would then
13  include an owner understanding letter, or
14  acknowledgment for lack of a better term.  And
15  then a list of your amenities, thorough
16  description of what your competitors' amenities
17  are, and then the ability in that document for us
18  to draw a comparison across your market of how
19  your particular hotel, hotel X, competes in a
20  marketplace that has either a destination or
21  resort fee, or some mix of those.
22     Q    Okay.  So here in the second box it

64

1  says attach letter from owner and attach Star
2  report.  Those are documents that they would
3  absolutely have to attach to the application, is
4  that correct?
5      A   That is correct.
6      Q   Okay.  Below that for instance it says
7  complete total potential revenue model.  Would
8  they have to submit that revenue model as part of
9  the application, or would they just have to
10 complete it as part of their preparation?
11     A   So, they have to complete it and in
12 the application itself there is an opportunity
13 for them to represent that.
14     Q   Okay.  So, they would complete it and
15 then for example, the revenue model would be a
16 line on the application form.
17     A   Correct.
18     Q   How about for -- it says below that
19 create communication plans.  Would they submit
20 those communication plans that they created as
21 part of the application?
22     A   They're not required to submit the

65

1  communication plan as part of the application.
2  That's correct.  Not required.
3      Q   Okay.  So as part of their application
4  they would have to complete the application form
5  and attach anything that this checklist says they
6  have to attach, but all of these other steps are
7  not -- they don't have to submit documentation of
8  all these other steps in order to apply for a
9  resort fee, unless they're reflected on a line.
10 It's a very long question.  I apologize.  But do
11 you understand?
12     A   I believe I do.
13     Q   Object to the paragraph form of the
14 question.  I got it.  Okay.  So is that correct?
15 Unless these steps are on the form, or they're
16 required to attach documents these are just --
17 Marriott would not receive documentation of these
18 steps otherwise.
19     A   Correct.  Several of these steps are
20 intended to provide guidance as it relates to
21 delivery of the expectation you may have in your
22 market, in your hotel for the resort or

66

1  destination fee amenities versus evaluation of
2  the feasibility or the application itself.
3          So, we don't necessarily need to see
4  the script at the desk in order to evaluate the
5  amenity package.
6      Q   Okay.  Does Marriott retain all the
7  documentation submitted with the applications for
8  resort fee?
9      A   We do, yes.
10     Q   And how long does Marriott retain
11 that?
12     A   I don't know the answer of how long
13 it's retained.
14     Q   Okay.  Scrolling down to the middle of
15 the page there's a box that says develop training
16 plans and -- for front office and all other
17 departments that are involved with the resort or
18 destination fees at your hotel.
19         And the first line under that says
20 create confirmation of fee and opt out process.
21 What does create confirmation of fee and opt out
22 process mean?

67

1      A   So, confirmation of fee is designed
2  for the insurance that at check-in, at arrival
3  our hotels are able to re-confirm, remind the
4  guest that that hotel has a resort or destination
5  fee.
6          The opt out process enables the hotel
7  to accurately script and instruct or coach their
8  staff for those isolated instances where perhaps
9  a business traveler arrived at 10 p.m. and they
10 must leave the next morning at 6:30 or 7 a.m. and
11 therefore are unable to participate in any of the
12 amenities that the resort or destination fee is
13 designed to deliver or bundle for their
14 convenience.  And therefore there has to be an
15 opportunity for that associate to recognize,
16 acknowledge that, and allow the guest -- or have
17 their resort or destination fee waived.
18     Q   Okay.  So the guest would be allowed
19 to opt out if for instance, there was no feasible
20 way for them to enjoy whatever the value was
21 provided by the resort fee.  How would a guest
22 opt out of providing the resort fee?

68

1    A    They would have to -- yes, so they
2  would have to inform us of what I just described
3  as an example using that -- to make it real if
4  you would.  Unknown to us, we don't know what the
5  guest's timetable or experience expectations are,
6  and therefore if we're informed and there are a
7  number of ways that they can inform us via chat
8  if they're using our mobile app, via email
9  response if it's through email, or if they're
10  verbally talking with one of our customer agents,
11  or in fact at the hotel at the desk.
12        Using the example I gave you just a
13  moment ago the associates as part of this process
14  that you've noted here in this document are
15  required to -- or for lack of a better term would
16  be empowered to on behalf of the guest suggest
17  that they might not be taking advantage of all of
18  those amenities and therefore may waive the
19  resort fee or destination fee.
20    Q    Would the guest have to request this
21  opt out process or is it something that Marriott
22  associates have authority to do on their own?

69

1    A    The guest needs to request it, but
2  again, leveraging the example I just shared, if a
3  desk clerk at the desk noticed Mr. Smith arrived
4  at 10:30 at night, and he mentions that hey, I'm
5  leaving early tomorrow morning, what time does
6  the shuttle leave.  And the desk agent says, you
7  know, Mr. Smith, it looks like you're only going
8  to be here for six or eight hours.  I think it's
9  in our best interest and yours that we waive the
10  resort fee.  They have the ability to do that
11  because we're a customer-centric company and we
12  definitely want to enable our staff to make
13  decisions like that.  That one is merited to be
14  proactive.  But in general it would be
15  responsive.  We would be responding to guests.
16    Q    Okay.  Could somebody opt out of a
17  resort fee while making a reservation online?
18    A    No, they cannot while online.  It is
19  possible for group guests, business, transient
20  guests that have contracted rates, group guests
21  that have contracted contracts for events to --
22  to use your terminology, opt out or negotiate

70

1  either a reduced or no resort or destination fee
2  based on, again, their contracted terms,
3  expectation of stay, all of those elements.
4    Q    Okay.  The next one below that is
5  create guest complaint process.  What does that
6  mean in this context?
7    A    In this context it's essentially
8  asking the hotel to ensure that they have a
9  process for associates to surface complaints
10  specific to resort or destination fees.  So that
11  is on property based so that the senior leaders
12  on property are made aware of and informed upon
13  any instances where a guest may have a concern or
14  a challenge similar to what I just said a few
15  moments ago.
16        It wouldn't surprise me that in the
17  millions of customers over time, that someone
18  arrives at 10:30 at night and leaves at 6:30 in
19  the morning and says hey, you know, I didn't even
20  know that I was going to leave this morning at
21  6:30.  I thought I might be here all day, but I'm
22  unable to take advantage of these various

71

1  amenities and therefore I'd like to have this fee
2  waived.
3    Q    Okay.  So this document says create
4  confirmation of fee and opt out process.  Create
5  guest complaint process.  But it just says to
6  create them.  These would not be -- these
7  processes would not be required to be submitted
8  with the application for a resort fee, is that
9  correct?
10    A    That's correct.
11    Q    Okay.  How would guests be made aware
12  of these resort fee complaint processes or opt
13  out processes?
14    A    We in general don't make guests aware
15  of our customer complaint processes other than
16  that they know in general we have a complaint
17  process and they -- so regardless of whether it's
18  resort fee, or food and beverage experience, or
19  room experience, they understand that they can
20  connect with us through the desk, through email,
21  through our customer care lines.  We have a
22  number of channels that we use to connect with

72

1 our guests and our current customer experience
2 scores note that we have a pretty stable
3 relationship after all these decades. So I think
4 they're fairly familiar with that. They wouldn't
5 know there's a specific process isolated to this
6 specific item.
7     Q   So there would just be the general
8 guest complaint processes. Guests would not be
9 specifically made aware of any opportunity to
10 contest resort fees specifically, is that
11 correct?
12     A   That's correct with one added
13 deepening of that understanding, and that is that
14 we wouldn't want the burden on the guest. We
15 wouldn't want the guest to think there are 10
16 different processes. There's a process for X,
17 there's a process for Y. There's only a process.
18       If you have a concern or a challenge,
19 we have a process to voice those concerns or
20 challenges. I don't know that it would be in our
21 best interest or the guest's best interest to
22 have multiple processes for every program or

73

1 system that we have.
2     Q   Okay. Thank you. I think that will
3 be it for that one. Next if you would please go
4 up to open what's tab 17. I think we're on
5 exhibit 6 now, is that right? Yes.
6       (Whereupon, the above-referred to
7 document was marked as McCoy Deposition Exhibit
8 No. 6 for identification.)
9     Q   And this is going to be Marriott-
10 DCAG0000011.
11     A   This one won't let me download it for
12 some reason.
13       MR. LEARY: Same with me.
14       MR. JAMES: Weird. Okay. We'll go
15 off the record for a second and I'll try and get
16 this up.
17       (Whereupon, the above-entitled matter
18 went off the record at 11:44 a.m. and resumed at
19 11:47 a.m.)
20       MR. JAMES: We're now looking at
21 what's been renamed and uploaded as tab 42. This
22 will be the exhibit 6. And it's entitled Resort

74

1 Destination Fee Amenity Guidance. This is what
2 it looks like. Could you review the document and
3 let me know when you're done?
4       THE WITNESS: Yes. Yes.
5       BY MR. JAMES:
6     Q   All right. Do you recognize this
7 document?
8     A   I do, yes.
9     Q   Okay. What is it?
10     A   It's a resort and destination fee
11 amenity guidance.
12     Q   Let's see. At the bottom lefthand
13 corner it's labeled March 2019. Does that seem
14 to be correct?
15     A   Yes, it does.
16     Q   Okay. What's the purpose of this
17 document?
18     A   The --
19       MR. LEARY: I'm sorry, you cut out,
20 Matt. Could you just say that again?
21       MR. JAMES: What is the purpose of
22 this document?

75

1       THE WITNESS: The primary purpose of
2 this document is to provide some degree of
3 familiarity of hoteliers of what is working. By
4 working meaning guests are receptive to and
5 appreciate these as amenities that have value
6 inherent to their travel experience and these
7 learnings we benchmark over time, again
8 respectful as I said earlier that consumer
9 perceptions evolve over time, their psyche about
10 travel and their stay experience evolves over
11 time. And therefore the amenities that we offer
12 as part of our value proposition should in fact
13 evolve over time.
14       So this gives a hotelier wishing to
15 apply for a resort or destination fee the
16 opportunity to see what has real value, and what
17 might work in their particular hotel.
18       BY MR. JAMES:
19     Q   So you said this evolved over time.
20 How often is this guidance updated?
21     A   We review this with some frequency.
22 Obviously it comes up in the course of

76

1  conversation with hotels that are wishing to
2  pursue resort or destination fees, but also
3  hotels that find themselves in the unique
4  position of seasonal change.
5        To make that real for you, you might
6  be at a ski resort where in the season of ski,
7  skis and ski lift tickets, and access to ski
8  facilities has real value.  But perhaps in the
9  summer months there's a new emerging, you know,
10  mountain biking was hot for a while, but perhaps
11  now it's electric trek bikes.  It's something
12  different.
13        So we review this in the course of
14  those conversations as well as on an annualized
15  basis.
16     Q    So, you review this annually and ad
17  hoc as needed, would that be correct?
18     A    That's correct.
19     Q    Okay.  Who receives this document?
20     A    So, there's two ways to receive this.
21  There's one, you have applied for a resort or
22  destination fee and you wish to pursue that.  Or

77

1  two, in the course of trying to inform either
2  yourself or your group of hotels about resort or
3  destination fees you find this on our essentially
4  a library of resources which is our Marriott
5  Global Source.
6     Q    Okay.  The first two columns are under
7  the heading of acceptable amenity examples.  What
8  is the purpose of those two columns?
9     A    So those two columns help a hotelier
10  to understand that these are items that generally
11  speaking in most markets consumers see real
12  value.  They have noted that they have value and
13  inherently then would perhaps based on their
14  market and the needs of their hotel have an
15  opportunity to be included in their 4 to 1 value
16  proposition.
17     Q    Okay.  And the column on the right
18  side is non-acceptable amenity examples.  What's
19  the purpose of that column?
20     A    These are items that -- I'm sorry?
21     Q    Yes.  What is the purpose of the non-
22  acceptable amenities example column?

78

1     A    I'm sorry.  I heard a popping sound.
2  My apologies.  So, this actually is designed to
3  inform hotels of what perhaps is either -- has
4  waned meaning it may have previously had value.
5  So think digital library, or DVD access.  Ten
6  years ago that may have had value.  Today it has
7  no value.
8        Things like local or long distance
9  calls may have in fact had value have no value
10  today.  So again, those are good examples of
11  where over time either the consumer psyche or the
12  desirability of items for their stay or their
13  experience has changed.  New entrants, new things
14  emerging.  Or sunsetted as the example of board
15  games, DVD access, et cetera.
16     Q    So, were these non-acceptable amenity
17  examples, were they all amenities that were
18  included in a resort fee at one time previously,
19  but are no longer deemed acceptable to include?
20     A    It would be speculation, but I would
21  say yes.  The majority of them were at some point
22  in time seen as having value, and today are no

79

1  longer seen as having that value.
2     Q    Okay.  Are you aware of any problems
3  with including these amenity examples in resort
4  fees?  Did customers complain?  Were there any
5  issues with any of these listed items, or other
6  similar items?
7     A    I'm not aware of any, although I
8  suspect that over time we learned by engaging
9  with customers, and learned from our customers
10  that, you know, again, the example of long
11  distance calls as the proliferation of cell
12  phones became more prevalent in 2010 and beyond.
13  Cell phone would replace local long distance
14  calls.  So I suspect we learned from engagements
15  with customers.
16     Q    Okay.  That will be it for that one.
17  If you would please open up tab 37.  Hope it
18  opens.  Are you able to open it?
19     A    Yes.
20     Q    Okay.  Just take a minute and review
21  this document and let me know when you're done.
22  And for the record this is Marriott-DCAG0000017.

80

1        MR. LEARY:  So, I just want to make
2   sure -- oh, I see.  Is the first page called
3   Resort and Destination Fees?
4        MR. JAMES:  Yes.  Operations and Best
5   Practices.  Yes.
6        MR. LEARY:  Okay, thanks.
7        MR. JAMES:  Yes, please.
8        (Whereupon, the above-referred to
9   document was marked as McCoy Deposition Exhibit
10  No. 7 for identification.)
11       THE WITNESS:  I reviewed it.  Thank
12  you, Matt.
13       BY MR. JAMES:
14   Q    Thank you.  Do you recognize this
15  document?
16   A    I do, yes.
17   Q    What is it?
18   A    It appears to be an older version of
19  our resort and destination fee best practice.
20  Perhaps it was a presentation of some form it
21  looks like.
22   Q    Okay.  You said that it was older.  Is

81

1   there a newer, updated version of this document?
2    A    Not of this document, no.
3    Q    Okay.  The document is undated, but
4   the metadata on the document said that it was
5   last modified on April 2020.  Does that seem like
6   an accurate date/time period, or does it seem
7   older than that?
8    A    I did not produce it so while I may
9   have accessed it on April 2020 which probably
10  would have updated the data.  It was produced
11  during Jeff Wolff's time.
12   Q    Okay.  Thank you.  Has it been updated
13  in any significant way?
14   A    No.  No, my reason for saying it's
15  somewhat older is it seems purposely built for a
16  particular hotel or two, or at least the
17  examples.
18   Q    Okay.  So who would this document have
19  been provided to then?
20       MR. LEARY:  Objection to form.  If you
21  know you can answer.
22       THE WITNESS:  I don't know who it

82

1   would have been provided to.  I can speculate
2   that similar to guidance I give it would have
3   been presented to perhaps area vice presidents
4   and others as reminders of the policy, the
5   practice, reinforcement of our training and
6   socialization and so forth for the procedures
7   required to have a resort or destination fee.
8   I'm speculating but that's how I would have used
9   it.
10       MR. JAMES:  Okay.  Thank you.  Does
11  Marriott currently have an operations best
12  practices document that would be more
13  authoritative than this?
14       THE WITNESS:  No.  We have not updated
15  this particular document.  What we have used and
16  we've talked about already this morning is a
17  combination of the policy that you -- represented
18  here earlier from January of 2020, the amenities
19  listing that we've just spoken to a few moments
20  ago, and of course the ongoing conversations that
21  we have with AVPs relevant to the training
22  materials that were outlined in the process that

83

1   you noted earlier.
2    Q    Okay.  Thank you.  If you would please
3   scroll down to what is going to be page 7 of this
4   document.
5    A    I'm there.
6    Q    It's titled Build and Display
7   Collateral at the top.  Are you there?
8    A    Yes.
9    Q    Okay.  Thank you.  Below that the
10  first paragraph is entitled Front Desk Collateral
11  Display.  And the next line says providing
12  signage or pamphlets at the front desk that
13  explain the offerings can help your front office
14  team explain the resort or destination fee
15  offerings.  Are Marriott hotels required to
16  provide signage or pamphlets at the front desk to
17  explain resort fees?
18   A    That's correct.
19   Q    Okay.  What does that signage consist
20  of?
21   A    Generally speaking that signage, it
22  doesn't have to be signage.  It can be collateral

84

1  that is part of the scripting and can be shared
2  with the guest.  It can be a room key packet.
3       I think it's worth noting that during
4  COVID because of jurisdictional requirements
5  across the U.S. and Canada we removed collateral
6  that could not be cleaned effectively based on
7  CDC guidance.  And also we do not exchange with
8  guests directly collateral simply because of the
9  CDC guidance for COVID.
10    Q   Okay.  So as collateral this could
11  take the form of this as a sign at the front
12  desk, but not always, correct?
13    A   That's correct.  It could be
14  essentially a pamphlet or a brochure, as well as
15  a key packet, cover or insert.
16    Q   Okay.  And that pamphlet or brochure,
17  would that be provided to every guest who stayed
18  at that hotel that has a resort fee?
19    A   That's correct.  Again, with the
20  caveat that in many jurisdictions, certainly
21  these last 12 months we've been unable to deliver
22  that.

85

1    Q   Okay.  Does Marriott take any steps to
2  verify whether this signage or pamphlets or
3  collateral is provided at its hotels?
4    A   We do.  As I mentioned earlier the
5  brand standards audit would capture that as part
6  of our audit of that guest experience in a hotel
7  that has a resort or destination fee.  And in our
8  mystery shops of our managed hotels.
9    Q   Okay.  The second one -- paragraph
10  there says, it's entitled In Room Collateral.
11  And the first sentence says, "Similar to the
12  front desk collateral, in room collateral can
13  help guests better recognize the benefits that
14  are being offered to them."  So what does the in
15  room collateral mean here?
16    A   In room collateral, this is a
17  recommendation, not a requirement.  And in room
18  collateral would have been designed to provide an
19  additional reminder of the experiences that are
20  assigned to the resort fee, or destination fee of
21  those particular hotels.
22       And again, in this past year since

86

1  late March/early April of last year all room
2  collateral was removed based on CDC requirements
3  and recommendations, and in some instances
4  jurisdictional requirements and recommendations
5  based on where the hotels reside.
6    Q   The in room collateral, would this
7  also be a sign or a pamphlet?  What form does it
8  take?
9    A   It could.  It could also be as part of
10  the guest room entertainment system.  So that
11  would be on your TV.  It could again as an added
12  measure, not a requirement.
13    Q   Okay.  So, this is not a requirement.
14  Does Marriott take any steps to verify whether
15  its hotels put in room collateral regarding
16  resort fees?
17    A   It's captured in our -- as I said
18  earlier, our brand standards audit.  We would
19  capture what is in the room, what is seen.  That
20  is photographically represented in a brand
21  standard audit and all hotels are audited.
22    Q   But it's not required, correct?

87

1    A   That's correct.
2    Q   So a hotel might not be docked for not
3  having any in room collateral if they didn't have
4  any.
5    A   That's correct.  If they had
6  collateral and it was erroneous, meaning a typo,
7  perhaps soiled in some way, other experiential
8  damage to that collateral, that would be noted.
9  Also noted would be it doesn't have the
10  collateral.  So that would be evidence in the
11  photography that's captured as it relates to the
12  guest room experience in the brand standard
13  audit.
14    Q   Okay.  Thank you.  Scroll down please
15  all the way to the last page of this document.
16  It's entitled Flawless Execution.  Let me know
17  when you're there.
18    A   I am.
19    Q   Okay.  Thank you.  The first heading
20  under that is entitled Front Office and below is
21  listed a weekly destination fee critique meeting.
22  What does that mean?

88

1    A    So, this essentially would be if hotel
2  X had a destination or a resort fee there's a
3  recommendation that during the front office's
4  meeting to review customer experience, to review
5  what's occurred over the last week that might be
6  an improvement opportunity, or an opportunity to
7  benchmark great services, they are discussing
8  their particular destination and resort fee.
9        That might take the form in them
10  highlighting that Suzy or Johnny did a phenomenal
11  job with Mr. Smith.  It might also take the form
12  that they noticed that Suzy and Johnny need to
13  share a little more information as it relates to
14  the reminder to guests about particular
15  experiences that are included in the resort or
16  destination fee.
17    Q    Okay.  Thank you.  So you said this is
18  recommended, but it's not required, correct?
19    A    Yes.  This -- and again, I have not
20  used this particular deck myself, but as I would
21  imagine it's being used as a benchmarking.  This
22  is how you achieve flawless execution.  This is

89

1  guidance being provided to leaders as it relates
2  to their particular hotel.
3    Q    Do you know approximately how many
4  hotels have these weekly destination fee critique
5  meetings?
6    A    I do not.  And I would add to that as
7  a means of clarification that I suspect they may
8  not call their meeting a weekly destination fee
9  critique meeting.  They may in fact have many
10  meetings and this could be a part of that
11  meeting.
12        Every individual system and/or process
13  that a hotel has doesn't have its own meeting.
14  Often those processes are aggregated into
15  individual meetings where they might include it
16  as a line item or a discussion point.
17    Q    Okay.  Thank you.  I think that will
18  be all for that document.  Next if you would
19  please open up what is called tab 54.
20    A    I have it.
21    Q    Okay.  If you would just take a moment
22  to review it and let me know when you're done.

90

1  This will be exhibit 8 I believe, and it's
2  Marriott-0055677.
3        (Whereupon, the above-referred to
4  document was marked as McCoy Deposition Exhibit
5  No. 8 for identification.)
6        MR. LEARY:  Just, Matt, to confirm for
7  the record that designation suggests this was
8  produced in AG's DC investigation.
9        MR. JAMES:  That is correct.  It's my
10  understanding.  I apologize for the unusual email
11  header.  I've been trying to find a dated version
12  of this document and that's the only way I can do
13  it.
14        THE WITNESS:  Okay, yes.  I've
15  reviewed it.  Thank you, Matt.
16        BY MR. JAMES:
17    Q    Okay.  Thank you.  Do you recognize
18  this document?
19    A    Not this specific document, but I
20  recognize what it entails.
21    Q    Okay.  So by that you mean there's a
22  very untechnical email header --

91

1    A    Correct.
2    Q    And then there's the resort fee audit
3  process.  So you're --
4    A    Right.
5    Q    -- familiar with the resort fee audit
6  process aspect of it, is that correct?
7    A    Yes, that's correct.
8    Q    Okay.  Thanks.  Dated on the email
9  header it says created -- the bottom of the
10  second page I believe it is.  Let me check.  Yes.
11  Bottom of the first page it says that it was
12  created January 20, 2016.  Modified January 25,
13  2016.  I know you're not familiar with this
14  specific one, but looking at the document does it
15  appear to be roughly from January 2016?
16    A    Yes.  I mean -- yes.
17        MR. LEARY:  I would just object.  I
18  mean, the document says (audio interference).
19        MR. JAMES:  I just wanted to confirm.
20  If you would just scroll down to the third page
21  of the document.  It's the first page of the
22  attachment.  It's entitled Resort Fee Audit

92

1  Processes. Does Marriott currently maintain a
2  document like this entitled Resort Fee Audit
3  Process or something similar?
4       THE WITNESS: Yes, something similar.
5  So, again, mystery shop, resort and destination
6  fee audit process look similar. But yes.
7       BY MR. JAMES:
8       Q    In the middle of the first page of the
9  actual document itself there's a heading entitled
10 Disclosure Compliance Requirements. Do you see
11 that?
12      A    Yes.
13      Q    Okay. And below that in paragraph A
14 it says properties must accurately disclose the
15 amount of the resort fee as well as the services
16 covered by the resort fee shown and appear to
17 list the inclusions in the fee at the time of
18 reservation or booking on any internal or
19 external channel. Is that a correct statement of
20 Marriott hotels' obligations with regard to
21 disclosing resort fees?
22      A    Yes.

93

1       Q    Okay. What does it mean that a
2  property must accurately disclose the amount of
3  the resort fee?
4       A    I think as stated that the consumer
5  during the booking process should see that hotel
6  has a resort or destination fee, and what that
7  resort or destination fee is.
8       Q    And how would they see the resort or
9  destination fee and what it is?
10      A    As we have previously talked through
11 the first page where I am selecting a hotel
12 within a destination, so among many, I am seeing
13 a room rate. While I have the opportunity to
14 then see all fees and inclusions by clicking our
15 toggle switch the very next page once I've
16 selected hotel X let's say in Miami, on that
17 page, I'm now at the hotel page, I select that
18 hotel. I'm in a position now to see that. So
19 that would be -- now that I am on a hotel I will
20 see an alert. It's a blue dialogue, we refer to
21 it as a dialogue box which will say resort or
22 destination fee if they happen to have that there

94

1  and what that fee is.
2       Q    Okay. It says it must be disclosed at
3  the time of reservation or booking. So, what is
4  meant by at the time of reservation or booking?
5       A    So, when you are shopping, that's page
6  1, right. So at that point you're shopping for
7  rooms amongst a particular set of hotels in a
8  market. You're most likely shopping for areas of
9  a city and you're looking at room rate.
10      Once you move to the next page you've
11 now selected a hotel, and in that process you're
12 now in the reservations path for hotel X. At
13 that point the disclosures begin and subsequent
14 to that there are reminders included in that path
15 up and to including at the time of your booking
16 and arrival at the hotel an additional reminder
17 which is noted here to reinforce at check-in.
18      Q    You said there are additional
19 reminders in the reservation process itself.
20 What are those additional reminders?
21      A    So, on the second page that you would
22 now know which hotel you're at. There's the blue

95

1  box. Subsequent then to that on following pages
2  you have built into your rate. So you have your
3  rate, and then you'll have taxes and fees. It's
4  included in taxes and fees, and also on your
5  final page before moving forward with your
6  booking.
7       Q    Is the resort fee displayed separately
8  under taxes and fees?
9       A    It's included as part of taxes and
10 fees and there's a small little dropdown box to
11 further detail that should you wish.
12      Q    So the consumer would only see that if
13 they clicked on the small -- they would only see
14 a line for a resort fee, that said resort fee or
15 destination fee if they clicked on that dropdown
16 box? Otherwise they wouldn't see it?
17      A    No, they would have already seen it on
18 the prior page. That's very clearly -- I mean
19 it's really the first thing you see at the top of
20 the page. We refer to those as alerts. In fact,
21 that is the location where you would see it
22 first.

96

1       Following that there's subsequent
2   reminders where it's included.  But that first
3   page, you would have already seen that.  You
4   can't get to the next page until you see the page
5   before it.
6       Q    And what are the subsequent reminders
7   after that dialogue box?
8       A    So, now you're in the page where
9   you've gone past the first dialogue box.  The
10  next one that's included in your taxes and fees,
11  and then you have a reminder that that hotel has
12  a resort fee when you get your confirmation
13  email, and you also have it at the desk when you
14  arrive.
15      Q    Would a consumer be able -- you said
16  that it was included in taxes and fees.  If the
17  consumer does not click on the dropdown box do
18  they see a line for resort fee in the taxes and
19  fees?
20      MR. LEARY:  Objection to form.  You
21  can answer.
22      THE WITNESS:  It's included in taxes

97

1   and fees.  So you can click on the arrow and
2   reveal all of what those fees and taxes may be.
3   But you've already seen it on the page prior to
4   that.
5       MR. JAMES:  But if you don't click on
6   the arrow you will not see what all the taxes and
7   fees individually may be?
8       THE WITNESS:  Correct, I believe.
9   We'd have to walk through the specific hotel.
10      BY MR. JAMES:
11      Q    Okay.  So moving down to paragraph C
12  it says that properties must establish compliance
13  in the following distribution channels to ensure
14  that the resort fee is being disclosed in
15  accordance with point A at the time of
16  reservation or booking.  And then it lists below
17  that websites like Expedia, Travelocity, OTAs and
18  the like.
19      So, how does a hotel property
20  establish compliance that the resort fee is being
21  disclosed in accordance with point A at the time
22  of reservation and booking?  What does that mean?

98

1       A    So, a property would have direct
2   engagement through our revenue team and digital
3   channels team as to what's on Marriott.com,
4   what's in our MARSHA system which is our Marriott
5   reservation system, and in any agreements that we
6   have with OTAs.  So, reflective of -- excuse me,
7   and including group sales agreements, et cetera.
8       So through those conversations,
9   negotiations, and that work stream that's how
10  they ensure that it's reflected.  And they have a
11  responsibility to ensure that it's reflected in
12  those various channels.
13      Q    What is meant with -- how can they
14  determine whether they've met that
15  responsibility?
16      MR. LEARY:  Can you just clarify that,
17  Matt?
18      MR. JAMES:  How would a Marriott hotel
19  determine that they have met that responsibility?
20      THE WITNESS:  Well, if it's not there
21  they haven't met that responsibility.  So they
22  audit it.  I mean, we are unable -- a hotel is

99

1   unable to independently, independently reflect
2   what's on MARSHA, what's in Marriott.com.  They
3   have to work through our channels, and our teams
4   that make those adjustments know that that has to
5   be reflected.  So that's how you know.  It's a
6   system of checks and balances essentially.
7       BY MR. JAMES:
8       Q    So how would that system of checks and
9   balances apply to, say, Expedia or Travelocity?
10  How would Marriott verify that Expedia or
11  Travelocity are properly disclosing the resort
12  fees?
13      A    Periodic auditing of those
14  relationships and contractual obligations that
15  they have.
16      Q    ███████████████████████████████
17      A    ███████████████████████████████
18  are being represented on that website.
19      Q    Okay.  Is there any particular point
20  in the reservation process where Marriott
21  requires the resort fee to be disclosed for, say,
22  Expedia or Travelocity?  In other words, when do

100

1   these other websites have to disclose a resort
2   fee under their contractual obligations with
3   Marriott?
4       A    They have to disclose them prior to
5   booking. So that has to be clear to the guest
6   prior to the booking. And that is in following
7   the regulations that we have for the U.S. and
8   Canada.
9       Q    Is there any specific point in the
10  reservation process where they have to disclose
11  that?
12      A    I don't know that I could speak to
13  every OTA. Some business model and their digital
14  platforms are different. But I would suspect
15  that they have to have it articulated when the
16  hotel has been selected, similar to our
17  platforms.
18      Q    Okay. So, and when the hotel has been
19  selected that's the second stage on Marriott's
20  process. So, you believe that for a majority of
21  the OTAs that compliance -- they would be in
22  compliance if they disclosed the resort fee in

101

1   some manner when the hotel has been selected. Is
2   that correct?
3       A    Another way to represent that, and I
4   may not have been completely clear, is that how
5   they represent a subset of hotels is their
6   business model. So on that first page they're
7   representing hotels outside of our portfolio,
8   they're representing a subset of hotels that may
9   include our portfolio.
10      Once they've selected -- once the
11  guest has selected a hotel within our portfolio
12  and assuming that hotel has a resort or
13  destination fee that would need to be revealed to
14  the guest at that selection. So, that may or may
15  not occur on that first or second page of OTA X,
16  Y, or Z. Honestly, I don't know how all of their
17  business models operate.
18      But once you've selected one of our
19  hotels, and if that hotel has a resort or
20  destination fee it should be displayed for the
21  guest.
22      Q    Okay. Thanks. That wasn't exactly my

102

1   best question, so thank you. If you would,
2   please scroll down. I don't have a good page
3   number, but it's the one that's labeled Marriott
4   55681 in the bottom right-hand corner.
5       MR. LEARY: Same exhibit?
6       MR. JAMES: Same exhibit, yes. At the
7   top it starts out, you will see a screen like
8   this. Are you able to find that page?
9       THE WITNESS: Say the number again,
10  Matt? I'm sorry.
11      BY MR. JAMES:
12      Q    It's 55681. And at the top of the
13  page you will see a screen like this and a black
14  box.
15      MR. LEARY: You're not sharing right
16  now Matt.
17      MR. JAMES: Oh there it is. Sorry.
18      MR. LEARY: Okay.
19      MR. JAMES: So, have you found it?
20      THE WITNESS: I'm there now. Thank
21  you.
22      BY MR. JAMES:

103

1       Q    Yes, sorry. I should have shared
2   that. In the middle of that page it says audit
3   process for internal and external channels. In
4   paragraph 2 under that it says for the eChannel
5   shops, test sell your property and proceed as if
6   you're going to make a reservation. Please
7   provide a screen print of shop that verifies each
8   site is properly displaying your property's
9   resort fee. What does that sentence -- what do
10  you understand that sentence to mean in terms of
11  the audit process as described here?
12      A    So, there was a couple of sentences in
13  there. So which sentence? The one if the resort
14  fee does not -- which one were we talking about?
15      Q    For the eChannel shops test sell your
16  property and proceed as if you're going to make a
17  reservation. ████████████
18  ████████████████████████
19  ████████████████████████
20  ████████
21      A    Correct.
22      Q    The next one is ████████████

104



1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2 ▮▮▮▮▮▮▮▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4 ▮▮▮
5     A   Correct.
6     Q   ▮▮▮▮▮▮▮▮▮▮▮▮
7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8 ▮▮▮▮▮▮▮
9     A   ▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮
11     Q   Okay.  ▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮▮
13     A   We would.  ▮▮▮▮▮▮
14 ▮▮▮▮▮▮
15     Q   Okay.  Thank you.  I believe that will
16 be all for that one.  Next we'll go to tab 81 if
17 you would and we'll share it this time.  I
18 apologize again.  This will be -- I believe we're
19 on exhibit 9.
20        (Whereupon, the above-referred to
21 document was marked as McCoy Deposition Exhibit
22 No. 9 for identification.)

105

1     Q   And this is sort of -- this is a PDF
2 but I believe the document was originally an
3 Excel spreadsheet.  It's Marriott-0054493.
4        MR. LEARY:  0054493.
5        MR. JAMES:  Yes.
6        MR. LEARY:  Okay.  So this was part of
7 an attachment, Matt?
8        MR. JAMES:  This was an Excel
9 spreadsheet.  And I had to format it in a way to
10 display it, but it was originally an Excel
11 spreadsheet.
12        MR. LEARY:  Okay.  All right.
13        MR. JAMES:  Take a moment and review
14 this document if you would, and let me know when
15 you're done.
16        MR. LEARY:  While he's looking at it,
17 Matt, do we have a date on this?  What is it?  Do
18 we have a date on this?
19        MR. JAMES:  We don't have a date.  The
20 metadata indicated that it was last modified on
21 December 18, 2014.  So, my guess it's probably
22 pretty dated.

106

1        MR. LEARY:  Okay.
2        THE WITNESS:  I think -- I'm familiar
3 with this style of document.  Yes.
4        MR. JAMES:  What is this style of
5 document?
6        THE WITNESS:  This document appears to
7 be a representation of an audit that was pooled
8 of hotels in the system that are offering a
9 resort or destination fee, or a fee because it is
10 possible during these audits to pool up a hotel
11 that has a fee that may be related to a
12 jurisdiction they happen to be in and was
13 erroneously labeled either destination fee or
14 something else, would have been captured in a
15 document or in a search of this type.
16        BY MR. JAMES:
17     Q   Okay.  Does Marriott regularly conduct
18 searches of these types?
19     A   We do do audits regularly, that's
20 correct.
21     Q   Okay.  So Marriott has other documents
22 similar to this as part of audits?

107

1     A   It's not under my responsibility, but
2 we have obviously in finance and other areas we
3 do routine audits of reporting, routine audits of
4 tax code compliance, et cetera.  Those audits
5 which looks very similar to this generate
6 sometimes -- because it's a wide net it may
7 generate that a hotel X has a marketing fee, or a
8 destination marketing fee.  And because the word
9 "destination" was included it surfaces and sent
10 to me to verify or validate is it a destination
11 fee or some other jurisdictional requirement of
12 that particular location.
13     Q   Okay.  If you would please scroll down
14 to what would be the fifth page of this document.
15 It says Hotel Alert Description at the top.
16     A   Yes.  I'm there.
17     Q   Are you there?
18     A   Yes, sir.
19     Q   Okay.  What does this appear to be to
20 you?
21     A   By definition what it appears to be is
22 that they have stated these are items that were

108

1  captured in a hotel alert audit. So, again, I'm
2  speculating. This is my first time reviewing
3  this document, but it would appear to show hotels
4  that have on their alert these -- this text.
5      Q   So this would be the text of the
6  dialogue box that we were discussing earlier, the
7  blue box?
8      A   Presumably.
9      Q   Okay. So just to be clear Marriott
10 doesn't regularly maintain a document like this.
11 This is just part of an audit that Marriott
12 periodically does.
13     A   Again, I didn't -- I can't speak to
14 this particular one, but I suspect it was part of
15 an audit, yes.
16     Q   Does Marriott maintain any document
17 that captures all of the languages that its
18 hotels are using in the dialogue box or the blue
19 box?
20     A   We maintain our audits as it relates
21 to our brand standards which would capture what
22 is listed here. And we also maintain audits

109

1  which would capture what is similar to this which
2  is listed as either an alert or a fee.
3      Q   So, the dialogue in these boxes, they
4  would be included in individual audits, but
5  Marriott does not maintain one master list of all
6  dialogue boxes, is that correct?
7      A   Not that I'm involved in.
8      Q   Okay. Is there somebody else who
9  would be involved in maintaining a list or
10 monitoring the text of the dialogue boxes?
11     A   I'm involved in monitoring the text of
12 dialogue boxes that are surfaced to me. If
13 there's someone else in the organization I am not
14 aware of that.
15     Q   Okay. So, you would become aware of
16 these particular dialogue boxes if they're
17 surfaced or if they show up in an audit, but you
18 do not keep a full list of all dialogue boxes,
19 and you're not aware of anyone who does, correct?
20     A   That's correct.
21     Q   Okay. About a quarter of the way
22 through the page there's a line that says, "All

110

1  prices/rates are quoted in USD." Can you see
2  that?
3      A   On page 5?
4      Q   Yes, on that page.
5      A   Yes, I believe so.
6      Q   It's hard to see. That says, "All
7  prices/rates are quoted in USD. Charges are
8  payable in local currency at applicable official
9  tourism exchange rate." Does that mention a
10 resort fee anywhere in there?
11     A   It does not, but I don't know whether
12 this hotel has a resort fee or does not. But it
13 does not say that there, no.
14     Q   Okay. In the middle of the page
15 there's a line that says, "Guests must be 21
16 years or older to check in/register at this
17 hotel." Do you see that?
18     A   Yes.
19     Q   Does that mention a resort fee?
20     A   No, but this page looks like it's just
21 capturing hotel alerts, not necessarily
22 specifying whether those hotel alerts are resort

111

1  fees or destination fees. So it could be the
2  only alert this hotel has is guests must be 21
3  years or older to check in or register at this
4  hotel.
5      Today if we ran this report there
6  would be 4,000 hotels listed that said under
7  COVID the current conditions exist at this hotel.
8  So it may just be capturing a few hotels that
9  don't have resort fees and denoting what that
10 alert states.
11     Q   Okay. Go back to the very first page
12 of the document at the top. Just if you would
13 take a minute and review the hotels listed under
14 property display name. Just on your knowledge
15 are there any hotels on that list that do not
16 impose a resort fee?
17     MR. LEARY: Meaning today?
18     MR. JAMES: Yes, today. I won't
19 expect you to remember them all in 2014.
20     MR. LEARY: Object but just to the
21 extent it might call for speculation. You can
22 answer as best you can.

112

1      THE WITNESS:  Yes, you know, I'd have
2  to go and do a reconciliation against our
3  existing list.  It's possible there may be hotels
4  on here that aren't even our hotels any longer.
5  So, in general there appears to be a number of
6  hotels that do have fees.  There may be a few
7  here that don't have fees, but did have to
8  reconcile it against our list.
9      MR. JAMES:  But just looking at it
10  right now you don't see anyone that you know for
11  sure does not offer a resort fee.
12      THE WITNESS:  Correct.  Right off the
13  top of my head, no.
14      BY MR. JAMES:
15    Q    Okay.  That will be it for that one.
16  Can we go off the record for just a second?
17      (Whereupon, the above-entitled matter
18  went off the record at 12:35 p.m. and resumed at
19  1:02 p.m.)
20      MR. JAMES:  Okay.  Next I'd like you
21  to open what is called tab 48, please.  It would
22  be entitled --

113

1      THE WITNESS:  It won't open for me,
2  Matt.  It's not opening for me.
3      MR. JAMES:  All right.  We'll go off
4  the record and do this again.  Sorry.
5      (Whereupon, the above-entitled matter
6  went off the record at 1:02 p.m. and resumed at
7  1:04 p.m.)
8      MR. JAMES:  Okay, this is tab 96.
9  It's entitled Resort/Destination Fee Request
10  Owner/Franchisee Acknowledgment.  It's Marriott-
11  DCAG0000015.  If you would take a minute to
12  review the document and let me know when you're
13  done.  This will be exhibit 10 I think.
14      (Whereupon, the above-referred to
15  document was marked as McCoy Deposition Exhibit
16  No. 10 for identification.)
17      THE WITNESS:  Yes, thank you.
18      BY MR. JAMES:
19    Q    Do you recognize this document?
20    A    I do, yes.
21    Q    What is it?
22    A    This is an acknowledgment form for

114

1  owners wishing to apply for a resort or
2  destination fee to acknowledge a number of
3  requirements and items to inform them.
4    Q    Okay.  At the -- I'll share it.  At
5  the bottom of the page the footer says February
6  2020.  Does this look to be current as of
7  February 2020?
8    A    Yes.  There's one adjustment that's
9  occurred since then.  Similar to what we spoke to
10  earlier in that on item C it says we expect that
11  effective January 2021 changes to the program may
12  include.  That's been removed.  Simply the date.
13  But the materiality of the statement remains the
14  same.
15    Q    Okay.  Was this document in use prior
16  to February 2020?
17    A    I don't believe so, no.  So there may
18  have been a form similar to this, but not this
19  document, no.
20    Q    What was the difference between the
21  form similar to this and this document?
22    A    There may have been other forms, and

115

1  I'm speculating, where owners acknowledged some
2  of these points made here.  But this particular
3  form was developed in December or January of 2019
4  and formalized in February of 2020.
5    Q    In your tenure is this the only form
6  like this that you've developed?
7    A    That's correct.
8    Q    Okay.  Was there a one previously in
9  use like this at the beginning of your tenure?
10    A    No.  Previously there were what I'll
11  refer to as owner acknowledgments, or owner
12  letters dating back -- that I have seen dating
13  back several years.  But they were individual
14  owner acknowledgments or letters specific to
15  hotels, and their relationship with Marriott.
16    Q    So those were specific to their
17  hotels.  Is this a general document that applies
18  to all hotels that have resort fees now?
19    A    That's correct.
20    Q    So in February of 2020 Marriott
21  required all of its hotels that were using resort
22  fees to sign or complete this acknowledgment,

116

1  correct?
2      A    That's incorrect.  As a means of
3  revision to that, or perhaps further
4  clarification we developed this as a means for
5  owners wishing to apply.  So owners that are
6  newly applying, or owners that are newly making
7  changes or adjustments would be required to
8  acknowledge this.
9      Q    Okay.  But hotels that were already
10 previously using resort fees were not required to
11 sign this.
12     A    At this point in time that's correct.
13 They may in fact have signed other agreements
14 and/or letters that have similar elements
15 independent of this, but this is intended to be a
16 uniform approach across all hotels offering a
17 resort and destination fee.
18     Q    Around February 2020 did Marriott
19 require hotels that were already using resort
20 fees to sign an acknowledgment like this, or
21 update their letters around that time period?
22     A    We did not require as of February 2020

117

1  hotels that were currently at that time offering
2  a resort or destination fee to update their
3  information as it relates to this particular
4  letter.  No, we did not require those previous
5  hotels yet to do that.
6      Q    Okay.  But every hotel going forward
7  -- every hotel since February 2020 that applies
8  to start using a resort fee has to execute this
9  acknowledgment, is that correct?
10     A    That's correct.  They have to
11 acknowledge these key points listed here as items
12 A through G.  That's correct.
13     Q    Okay.  In the middle of the page on
14 paragraph A it states that, "Owner has received
15 or viewed online a copy of Marriott's fee policy
16 and assumes all costs of implementation and
17 administration, expenses, and/or liabilities
18 associated with the resort/destination fee
19 including an allocation of all costs arising from
20 any governmental action or third party claim
21 contesting the imposition of the
22 resort/destination fee or the adequacy of this

118

1  disclosure."  What does this paragraph mean?
2      MR. LEARY:  Objection, it speaks for
3  itself.
4      MR. JAMES:  What do you understand
5  this paragraph to mean?
6      THE WITNESS:  Yes, yes.  Oh, what do
7  I understand it to mean?  I understand it to mean
8  that you as the owner/operator, or owner of that
9  hotel assume the responsibility to ensure these
10 policies are correct and accurate.  And of course
11 any burden that should result in execution of
12 that policy accuracy would be yours to bear.
13 BY MR. JAMES:
14     Q    Okay.  So at the end it says it
15 includes an allocation of all costs arising from
16 governmental action or third party claim
17 contesting the imposition of the
18 resort/destination fee or the adequacy of the
19 disclosure.  Would that involve actions such as
20 this one, the District of Columbia v. Marriott
21 case?
22     MR. LEARY:  Objection to form.  You

119

1  can answer if you know.
2      THE WITNESS:  I don't know.  I think
3  the intention of this is to -- is ensure
4  awareness of what the implications of the process
5  and what you're intending to do as an owner or
6  operator of that hotel may entail.
7      MR. JAMES:  Okay.  Would Marriott
8  consider anyone acknowledging this form to be
9  liable for any costs associated with this action
10 or other similar actions?
11     MR. LEARY:  Objection to form.  Same
12 -- asked and answered.  You can answer if you
13 know, sir.
14     THE WITNESS:  I don't know.  I would
15 be speculating.  It's beyond my responsibility or
16 expertise.
17     MR. JAMES:  Okay.  I think I'll be
18 done with that one.  Approximately how much money
19 do Marriott hotels make from resort fees
20 annually?
21     MR. LEARY:  Objection to form and I
22 think we -- that was listed in our 30(b)(6) and

120

1  we objected to it there as well.  Let me just be
2  sure it falls in line with that question, Matt.
3  Just give me a second.
4        Yes, at question number 9 as part of
5  this topic we had imposed an objection to the
6  extent that the topic on the ground -- that the
7  topic relates to damages and per the court's
8  order granting complainant's consent motion to
9  bifurcate liability remedies dated January 29,
10  2001, only issues relating to liability would be
11  the subject of discovery at this time.  And I
12  understand your question to be one towards
13  damages I'm assuming.
14        MR. JAMES:  It's just a general
15  question about how much revenue Marriott makes
16  from resort fees.  You're -- kind of implies that
17  revenue is to be used as a measure of damages and
18  that really hasn't been established yet.  It's
19  just a general question about how much revenue
20  Marriott makes from resort fees so I think that's
21  within the scope of the 30(b)(6).
22        MR. LEARY:  I would actually agree

121

1  with you 100 percent that revenue is not a
2  measure used in damages, but to the extent the
3  witness knows, go ahead.  I believe it's beyond
4  the scope, but if you can answer, Scott, fine.
5        MR. JAMES:  Okay.  All right.  So the
6  question is approximately how much money does
7  Marriott make -- do Marriott hotels make annually
8  from resort fees.
9        THE WITNESS:  I don't have a number
10  from 2020.  I have in my mind a very round
11  approximation which would be U.S. and Canada from
12  2019.  I think the number at that point █████
13  ███████ was the number for Marriott
14  that we received in terms of fees specific to
15  resort and destination fees.
16        BY MR. JAMES:
17    Q    And does that include all Marriott
18  hotels and franchises that are conducting resort
19  fees, or is that just revenue that Marriott
20  received directly from resort fees at hotels that
21  it operates or manages?
22    A    That's all revenue -- that's all fees

122

1  that we associated with resort or destination
2  fees across the portfolio for U.S. and I believe
3  Canada as well.  Finances is not my
4  responsibility, but that's a number, a very good
5  approximation.
6    Q    So, every Marriott hotel collected a
7  total of approximately ████████ in resort fees
8  in 2019.  Is that correct?
9    A    That's not correct.
10    Q    And I don't mean individually, but
11  collectively, the total amount of revenue
12  collected in resort fees for every Marriott
13  hotel, is that ████████, or is that something
14  else?
15    A    Yes, I may not be understanding the
16  question quite as well as I should.  So, what I
17  would share is that my number that I've
18  represented to you represents what I believe to
19  be the fees that Marriott received for that
20  subset of hotels, be they franchised or managed,
21  that had resort and destination fees.
22        So what I understood the question to

123

1  be was how much did Marriott receive in fees from
2  resort and destination fees, and that number I'm
3  giving you is, again, I'm not the finance leader,
4  but that's the approximation as I understand it.
5    Q    So that is how much money Marriott
6  itself made from resort fees, is that correct?
7    A    Correct.
8    Q    Okay.  Do you know how much money all
9  the Marriott hotels made in charging resort fees?
10  Do you know what the revenue of all Marriott
11  hotels is?
12        MR. LEARY:  Objection.  First of all,
13  he's not going to answer that question.  It goes
14  well beyond the scope.  This matter is about
15  Marriott and not anyone else so he's not going to
16  answer questions, particularly since he can't
17  even tell what Marriott's numbers are.  So the
18  witness isn't going to answer questions on that.
19        MR. JAMES:  That's a nice instruction.
20  We'll reserve the right to challenge that later
21  of course.  It's not privileged and we believe
22  it's within the scope.  But if you're instructing

124

1 him not to answer we'll just move on.
2        If you would please open up what is
3 labeled tab 6.
4        MR. LEARY:  Mine's a little delayed.
5 Okay, all right.  I'm there.  This would be 11.
6        MR. JAMES:  Okay.  Yes, this would be
7 exhibit 11.  It is Marriott-0046349.
8        (Whereupon, the above-referred to
9 document was marked as McCoy Deposition Exhibit
10 No. 11 for identification.)
11        MR. JAMES:  Just take a minute and
12 review it and let me know when you're done,
13 please.
14        THE WITNESS:  Okay, I've reviewed it.
15 BY MR. JAMES:
16    Q    Okay.  Do you recognize this document?
17    A    I recognize some of the names on it.
18 I don't recognize the document itself, no.
19    Q    Okay.  If you scroll down to the
20 bottom of the second page, the signature block
21 looks like it's from Jeffrey M. Wolff.  That's
22 your predecessor, correct?

125

1    A    Yes.
2    Q    Okay.  Scrolling back up to the top of
3 the page, top of page 1 the first sentence of the
4 email after the introduction says that, "as you
5 know one of our primary areas of focus to drive
6 ancillary revenue and profit is through the
7 thoughtful execution of resort fees."
8        Is one of Marriott's primary areas of
9 focus to drive revenue and profit through the
10 thoughtful execution of resort fees?
11        MR. LEARY:  Objection to form.
12        THE WITNESS:  Well, a part of what
13 this sentence also says which you didn't mention
14 is that it says that obviously driving
15 substantial revenue while balancing with
16 enhancing the resort experience.  So this
17 document appears to have an approach to drive the
18 experience which also happens to drive revenue.
19        MR. JAMES:  But at least part of that
20 is to drive revenue and profit, correct?
21        THE WITNESS:  That's correct.  We are
22 a business, that's correct.

126

1 BY MR. JAMES:
2    Q    Yes.  In business to make money.
3 Scrolling -- below that is a headline, there's
4 Resort Fee Review, and then there's Resort Fees
5 Participating.  It says 63 resorts in the
6 Americas in the first bullet point, 42 managed
7 resorts in the second bullet point, and 21
8 franchised resorts.  Are managed resorts, does
9 that refer to resorts that are managed directly
10 by Marriott?
11    A    Presumably, yes.
12    Q    Okay.  And below that --
13        MR. LEARY:  Hold on, Matt.  Just for
14 the purposes of the record since there may be
15 some questions on this document I just want to
16 confirm it's dated 2014 I believe.
17        MR. JAMES:  Oh, yes.  It's titled
18 Resort Fee 2014 Mid-Year Update and --
19        MR. LEARY:  Thank you.
20        MR. JAMES:  I don't see a time stamp,
21 but it is dated -- sorry.  I don't know why
22 there's not a time stamp.  But we'll agree that

127

1 it's 2014.
2        In the middle of the email it says
3 Revenue - Managed Resorts Only.  So does that
4 mean that the numbers below that are just for
5 resorts that Marriott manages and not its
6 franchises?
7        THE WITNESS:  Again, presumably that
8 was the intention of that.  Yes, I would say
9 presumably that's the intention.
10 BY MR. JAMES:
11    Q    Okay.  So for 2012 it was ███████,
12 for 23 it was ███████, and for 24 year to
13 date looks like it is -- it says ███████ and
14 then it says projected ███████ full
15 year.  Do you know if those numbers are accurate
16 for the amount of revenue that Marriott managed
17 resorts earned in those years?
18    A    I don't and what I would also say, I
19 don't know what our revenue was even in 2019.
20 The numeric representation I gave you earlier was
21 fees earned on hotels that have fees.  So that's
22 different than revenue which this appears to be

128

1  articulating.  It's revenues from these itemized
2  years listed here.
3      Q.   Okay.  So your previous answer of
4  approximately ▮▮▮▮▮▮ that was the fees, or
5  I guess what would be Marriott's share of the
6  resort fees, not the total resort fee revenue?
7      A.   That's correct.  I'm not privy to
8  those numbers.
9      Q.   Okay.  So, you do not know the total
10 number -- you do not know the total amount of
11 resort fee revenue for Marriott hotels every
12 year, is that correct?
13     A.   That's correct.  The finance, that
14 area of responsibility is outside the scope of my
15 responsibility.
16     Q.   You aren't provided that as part of
17 your duties of managing resort fees?
18     A.   No.
19     Q.   So who would have that information?
20     MR. LEARY:  Object to the form.  You
21 can answer if you know.
22     THE WITNESS:  We would have to seek

129

1  someone in the finance organization that would
2  know.  I mean, clearly the chief financial
3  officer for our continent would know.  Others in
4  that department.
5      MR. JAMES:  You said the CFO for your
6  continent would know.  Who is that person?
7      THE WITNESS:  Her name is Jen Mason.
8      BY MR. JAMES:
9      Q.   Okay.  All right.  That will be the
10 end of that one.  That was 11, right?
11     MR. LEARY:  That was 11.
12     MR. JAMES:  Okay.  Next if you would
13 please open tab 32.  This will be 12.  It's
14 Marriott-00463452.
15     (Whereupon, the above-referred to
16 document was marked as McCoy Deposition Exhibit
17 No. 12 for identification.)
18     MR. LEARY:  Matt, could you just give
19 me that one more time?  I'm sorry.
20     MR. JAMES:  It's Marriott-00463452.
21     MR. LEARY:  And this is taken off an
22 Excel again?

130

1      MR. JAMES:  Yes, I believe it was.
2  Yes, a printout from an Excel.
3      MR. LEARY:  Okay.
4      MR. JAMES:  Yes, on my notes this was
5  originally a spreadsheet so that's correct.
6      MR. LEARY:  Okay.
7      MR. JAMES:  Just take a minute to read
8  the document if you would and let me know when
9  you're done.
10     MR. LEARY:  I will just tell you at
11 least my version is -- well, not even small but
12 when I enlarge it I'm not getting -- at least I
13 can't.  I'm trying to see if I can read some of
14 this stuff.
15     MR. JAMES:  Is my version readable?
16 I've enlarged it a little bit.
17     MR. LEARY:  Hold on, let me check,
18 switch screens.  A little bit better, yes.
19     MR. JAMES:  Okay, well that's huge but
20 I think 150 is about as good as I can do.
21     THE WITNESS:  Sorry, Matt, it just
22 keeps on disappearing off my screen, I'm sorry.

131

1      BY MR. JAMES:
2      Q.   That's all right.  You can load it.
3      A.   Yes.  I've got it back now.  For some
4  reason -- it was user error.  Okay.  I think I
5  reviewed most of it now.
6      Q.   Okay.  Do you recognize this document?
7      A.   No, actually I don't.
8      Q.   Okay.  Have you seen any other
9  documents like it?
10     A.   No.
11     Q.   Okay.  So this is entitled Resort Fee
12 Survey June 2014 and at least to your knowledge
13 Marriott does not regularly conduct or produce
14 documents like this.
15     A.   Not during my time.  Not to my
16 knowledge.
17     Q.   Okay.  Is it possible that some other
18 department such as finance might produce these
19 documents?
20     A.   I'm unaware of that.
21     Q.   Okay.  So, we've probably gone over
22 this, but just looking at this document it says

132

1   entitled Resort Fee Survey June 2014.  On the
2   left it lists a bunch of Marriott hotels that use
3   resort fees.  And it has columns for 2013, FY,
4   presumably fiscal year resort fee revenue.
5        For instance, the Gaylord Opryland
6   hotel, the first line on the spreadsheet, the
7   2013 FY resort fee revenue listed is ███████,
8   and the 2014 resort fee revenue is listed as
9   ██████ after that.    Do these numbers seem
10  accurate to you?
11      A   I don't know.  There's no way for me
12  to know whether they're accurate or not.
13      Q   Okay.  Do you have comparable numbers
14  for, say, 2019 that you've seen?
15          MR. LEARY:  Objection to form.
16          THE WITNESS:  No, I'm not -- I'm
17  sorry, I didn't hear what Paul said.
18          MR. LEARY:  Just objection to form.
19  You can answer.
20          THE WITNESS:  No, I can't say whether
21  -- because I don't have the revenue numbers for
22  2019, no.  So I couldn't say whether they're

133

1   reflective of 2019 or other years.
2          MR. JAMES:  Do you have the revenue
3   numbers for 2018?
4          THE WITNESS:  No.
5          BY MR. JAMES:
6      Q   Okay.  All right.  That'll be that for
7   that document.  If you would please open up tab
8   58.  It should say Hotel Distribution Agreement
9   at the top.
10         MR. LEARY:  Mine is not loading.  If
11  you just want to bring it up to save time I can
12  work off of yours.  That's fine.
13         MR. JAMES:  Okay.  I should be sharing
14  it now.  Mr. McCoy, is yours loading, or do I
15  need to re-upload it?
16         THE WITNESS:  I can see it now.
17         BY MR. JAMES:
18     Q   Okay.
19         MR. LEARY:  Thank you.
20         MR. JAMES:  Sure.  Take a minute to
21  review this document and let me know when you're
22  done.

134

1          THE WITNESS:  Okay.
2          BY MR. JAMES:
3      Q   Paul, I'll scroll through it a little
4   bit for you so you can at least get an idea.
5          MR. LEARY:  Just give me a sense.
6   Yes, that's fine.
7          MR. JAMES:  You should probably
8   recognize what this is.
9          MR. LEARY:  Yes.  Yes.  Just tell me
10  the first Bates again.  This is 13.
11         (Whereupon, the above-referred to
12  document was marked as McCoy Deposition Exhibit
13  No. 13 for identification.)
14         MR. JAMES:  Yes, this is exhibit 13.
15  It is Marriott-DCAG0001800.  So 0001800.
16         MR. LEARY:  Gotcha.  This one is
17  entitled Hotel Distribution Agreement and it's
18  for 2008.
19         MR. JAMES:  Yes.
20         MR. LEARY:  Okay.
21         THE WITNESS:  Okay, Matt, I think I
22  have an understanding, a general understanding of

135

1   the document.
2          MR. JAMES:  All right.  Do you
3   recognize this document?
4          THE WITNESS:  I recognize what it is.
5   I'm not familiar with the document, but I do
6   recognize what it is.
7          BY MR. JAMES:
8      Q   Okay.  What is it?
9      A   This appears to be an agreement
10  between Marriott and an OTA, or in this case a
11  platform, Orbitz.
12     Q   Okay.  So in paragraph 1, definitions
13  about a third of the way down there's a
14  definition for best available rate.  It says,
15  ████████████████████████████████████
16  ███████████████████████████
17  ████████████████████████████████
18  ████████    What do you understand that
19  definition to mean?
20     A   ███████████████████████████████
21  ███████████████████████████
22  ██████████████████████████████████████

136

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3 ▓▓▓▓▓▓
4    Q   Okay.  Thank you.  If you would please
5 scroll down to page 5 of the agreement.  The
6 first heading is on number 9, Rates.  Do you see
7 it?
8    A   Yes.
9    Q   Okay.  Paragraph A begins saying,
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15 ▓▓▓▓▓▓▓   What do you understand that to
16 mean?
17    MR. LEARY:  Objection.  You can
18 answer.
19    THE WITNESS:  I think it means what it
20 says, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 I think it's clear.

137

1    MR. JAMES:  Okay.  ▓▓▓▓▓▓▓▓▓
2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5 ▓▓▓▓▓▓▓▓▓▓▓▓  ▓▓▓▓▓▓▓
6 ▓▓▓▓▓▓▓▓▓▓▓▓▓h
7 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8    MR. LEARY:  Same objection.
9    THE WITNESS:  Yes, I think you just
10 answered it.  ▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓   I think you just said what it means.
12 That is what it means.
13    MR. JAMES:  Okay.  This deposition
14 would go a lot easier if you just let me give all
15 your answers for you.  So if I can do that we'll
16 get out of here in a hurry.  Okay, so the next
17 one, maybe this is a little easier.  It says,
18 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓
22    So, it means what it says of course,

138

1 but ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4 ▓▓▓▓▓▓▓▓
5    THE WITNESS:  Marriott hotels,
6 individual hotels in individual markets,
7 establish rates based on their individual hotels'
8 needs.  ▓▓▓▓▓▓▓▓
9 ▓▓▓▓▓▓▓▓▓▓▓▓   So it's not at
10 the discretion of Marriott International per se,
11 but rather at the individual hotel level within
12 an individual market and ▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓   That's the intention.
15 ▓▓▓▓▓▓▓▓
16    BY MR. JAMES:
17    Q   So do Marriott hotels have to share
18 the same rate across all of those platforms?
19    A   Marriott hotels share their rate.  So
20 when we say their rate I'm speaking as an
21 individual hotel has its own rate which is a
22 designated appropriate for its individual hotel's

139

1 conditions and the market that they serve.  So
2 there could be a group of hotels in that area all
3 with different rates, and they are sharing those
4 platforms -- to that platform, the same platform,
5 different rates.  So we're not designating from
6 above property or from center what the rate needs
7 to be.
8    Q   Okay.  But a Marriott hotel would set
9 a rate.  ▓▓▓▓▓▓▓▓▓▓▓▓
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓
12    A   A better way to answer that would be
13 -- or a better way to ask that, or a better way
14 for me to answer that ▓▓▓▓▓▓▓▓▓▓▓▓
15 ▓▓▓▓▓▓▓▓▓▓   So the hotels set
16 their rates, and the platforms then have based on
17 their business model and ▓▓▓▓▓▓▓▓▓▓▓
18 ▓▓▓▓▓▓▓▓▓▓
19    So, to answer your question is it
20 possible that one platform versus another might
21 have a different rate, yes.  Some OTAs use select
22 types of rooms that they offer versus other OTAs



140

1  which might offer only standard rooms.  Because
2  their platform doesn't enable that.
3      Q    So the next sentence says, ███████
4  ████████████████████████████
5  ████████████████████████████
6  ███████████████████████████  Can
7  Orbitz lower the rate that the hotels provide to
8  it?  Can it go under the best available rate
9  provided by a hotel?
10     A    ████████████.  Is it in their
11 best interest?  I don't know.  I would be
12 speculating.  But we set -- as part of our
13 relationship ████████████████
14 ████████████████████████████
15 █████
16     Q    And as part of that relationship,
17 admittedly it might be possible but are --
18 generally speaking are these OTAs or other
19 partners -- can they just deliberately go lower
20 than the best available rate?
21     MR. LEARY:  Objection to form.  You
22 can answer.

141

1      THE WITNESS:  Again, ███████████
2  ████████████████████████████████
3  ████████████████████████████
4  ████████
5      MR. JAMES:  Okay.  Are these
6  agreements or terms of these agreements, are
7  these fairly standard across Marriott's
8  agreements with OTAs or other websites?
9      THE WITNESS:  I'm sorry, ask that
10 question again, Matt?
11     BY MR. JAMES:
12     Q    Yes, it's a long one.  Are these terms
13 standard across Marriott's contracts with OTAs?
14 This one's short.  Or mostly standard.
15     MR. JAMES:  Objection to form.  You
16 can answer.
17     THE WITNESS:  I'm not engaged in these
18 negotiations, Matt, so I don't know that I could
19 accurately depict the consistency of these
20 agreements across the various platforms.
21     MR. JAMES:  Okay.  Well, I'll just let
22 these speak for themselves.  I should probably

142

1  just read the whole thing into the record.  That
2  will be that for that one.
3      Next we're going to go if you would,
4  please, open up tab 20.  You might have to resize
5  this one a little bit.  I apologize.  It's a
6  screen capture.  This will be -- we're on exhibit
7  14.  This has not been Bates stamped.  It's a
8  screen capture I did.
9      (Whereupon, the above-referred to
10 document was marked as McCoy Deposition Exhibit
11 No. 14 for identification.)
12     MR. LEARY:  Okay.  Then I guess the
13 screen capture speaks for itself in terms of the
14 date.
15     MR. JAMES:  Yes.
16     MR. LEARY:  Although I shouldn't say
17 the date.  Let me clarify.  You were looking for
18 the dates of the hotel but you did it just
19 relatively recent.
20     MR. JAMES:  Yes.  I'm going to Vegas
21 tonight.  Staying at Marriott.
22     MR. LEARY:  Perfect.

143

1      MR. JAMES:  Do you recognize this
2  document or what this document is?
3      THE WITNESS:  I recognize the screen
4  style, and yes, this appears to be one of our
5  screens from M.com.
6      BY MR. JAMES:
7      Q    Okay.  What is the room rate listed
8  for the Renaissance Las Vegas Hotel?
9      A    The room rate is listed at $169 per
10 night.
11     MR. LEARY:  Let me just clarify the
12 document to make sure it's read in the record.
13 It says from $169 a night.
14     THE WITNESS:  That's correct.
15     MR. JAMES:  $169 USD a night too.
16 Does that rate -- does that from $169 USD a
17 night, does that include the resort fee?
18     THE WITNESS:  It does not.  It's a
19 rate listing for that room at this point.
20 However, just above it there's a clickable box
21 that says show rates with taxes and all fees
22 which would automatically toggle that to reflect

144

1  all taxes and in fact resort fees if they happen
2  to charge it.
3       BY MR. JAMES:
4       Q   Okay.  So, if they toggle that show
5  rates with all taxes and fees you will get a rate
6  that includes all taxes and fees including the
7  resort fee, correct?
8       A   That's correct.
9       Q   Okay.
10      A   It's right above, it's literally right
11  above.  At least on my screen it shows up as
12  right above the example.
13      Q   Well, you're getting ahead of me
14  because I'm pretty predictable, but that'll be
15  that for that one.  And as you can imagine the
16  next one, this will be tab 92.  This would be 15
17  I think.
18          (Whereupon, the above-referred to
19  document was marked as McCoy Deposition Exhibit
20  No. 15 for identification.)
21          MR. LEARY: Tab 92 is not loading on
22  mine so you're going to have to bring it up.

145

1          MR. JAMES:  Okay.  Mr. McCoy, can you
2  load it?
3          THE WITNESS:  It just came up.  I can
4  see it now.
5          BY MR. JAMES:
6       Q   Okay.  There's not too much to see
7  here.  Paul, can you see it on my screen?
8          MR. LEARY:  I can see it on your
9  screen, yes.
10         MR. JAMES:  Okay.
11         MR. LEARY:  Matt, we're going to keep
12  this all as one exhibit, or are we going to move
13  to 15?
14         MR. JAMES:  Easier just to keep this
15  as 15 I think.
16         MR. LEARY:  Okay.  And just so I'm
17  clear on the record you're representing that this
18  was a continuation on clicking on the room from
19  the prior tab that you showed at the first page
20  with the from rate?
21         MR. JAMES:  Yes.  Yes, it is.
22         MR. LEARY:  Okay, thanks.

146

1          MR. JAMES:  All right, great.  So, Mr.
2  McCoy, do you recognize this?
3          THE WITNESS:  I do, yes, thank you.
4          BY MR. JAMES:
5       Q   And as Mr. Leary stated, does this
6  appear to be a continuation of the previous
7  website with the box show rates with all taxes
8  and fees clicked?
9       A   It does.  Yes, it does.
10      Q   Okay.  What's the room rate listed for
11  the Renaissance Las Vegas Hotel on this one?
12      A   With the show rates and taxes and all
13  fees box checked it shows as from $225 USD per
14  night, taxes and all fees included.
15      Q   Okay.  So I think the other one was
16  $169.  This is $56 higher than the rate on the
17  previous exhibit, would that be correct?
18      A   If my math serves me correctly that
19  sounds right.
20      Q   You can do math.  That's why you're
21  not a lawyer.  So, has Marriott's website always
22  included the show rates with taxes and all fees

147

1  button?
2          MR. LEARY:  Objection to the form.
3  You can answer.
4          THE WITNESS:  It did not always, no.
5          MR. JAMES:  When did it change to
6  include this button?
7          THE WITNESS:  In 2020 it changed.
8          BY MR. JAMES:
9       Q   Okay.  Approximately when in 2020?
10      A   I want to say perhaps in the spring,
11  maybe early spring.
12      Q   Okay.  Why did Marriott add this
13  button to its website?
14         MR. LEARY:  Same objection.  You can
15  answer.
16         THE WITNESS:  We're constantly
17  evolving as a company in reflection of our
18  learnings, and those learnings aren't U.S.-
19  centric necessarily.  We're a global company.  In
20  the U.S. primarily the way guests interface with
21  their selection of rooms is on the first screen
22  to look for room rate first.  On other continents

148

1  there's a slightly different approach for a
2  myriad of reasons and we had a learning from
3  another continent that some guests sought to have
4  that included.  And where technology enabled us
5  to do so we were able to make that change this
6  past year so guests can choose to have that as
7  part of their -- as you've just done in this
8  example, as part of their evaluation before
9  selecting an individual hotel, or they could
10 compare apples to apples across the portfolio as
11 we did on the first screen that you showed
12 earlier.
13        MR. JAMES:  Okay.  And approximately
14 how long did it take Marriott to implement this
15 change in the website once they decided they were
16 going to add this little box?
17        THE WITNESS:  I don't know the answer
18 to that.  That's part of our digital e-commerce
19 team and information technology group.  I don't
20 know the answer to that.
21        BY MR. JAMES:
22    Q    When do you first recall any

149

1  discussions of adding this button?  When did
2  adding this button first come to your attention?
3     A    My first engagement with this would
4  have been probably December or January --
5  December of 2019, January of 2020.
6     Q    Okay.  Thank you.  If Marriott wanted
7  to could it add a button that said show rates
8  with resort fees?
9        MR. LEARY:  Objection to form.
10        THE WITNESS:  I don't know the answer
11 to that.  I would have to engage a number of
12 individuals relevant to our platforms, the
13 infrastructure, the architecture of our software
14 system.
15        MR. JAMES:  Any reason why the
16 infrastructure of your system would be different
17 for a show rates with taxes and fees button than
18 it is for a show rates with resort fees button?
19        MR. LEARY:  Objection to form.
20        THE WITNESS:  Beyond my expertise.
21        MR. JAMES:  Okay.  All right.  That
22 will be that for that one.  Why don't we take a

150

1  10-minute break, come back at 2 and I'll review
2  some notes.
3        Well, wait, before I do that, one more
4  question.  Throughout this deposition -- you
5  stated that you assumed this position in 2019,
6  correct?
7        THE WITNESS:  That's correct.
8        BY MR. JAMES:
9     Q    And your predecessor was Jeffrey
10 Wolff.  Do you know how long he was in that
11 position?
12    A    I want to say maybe eight years or so.
13 It might have been a little bit less than that
14 but somewhere around there, perhaps a little bit
15 longer.
16    Q    Okay.  Throughout -- at several points
17 you've given answers that you say that's before
18 your time, or you didn't know.  Would Mr. Wolff
19 be in a better position to know those kind of
20 answers that occurred during his tenure?
21        MR. LEARY:  Objection to form.  If you
22 know.

151

1        THE WITNESS:  Presumably.  I mean, if
2  you're asking would Jeff Wolff know about Jeff
3  Wolff the answer is probably yes.
4        MR. JAMES:  I'm asking you for, I
5  mean, you've only been in this position a year,
6  and you've said that there were -- despite being
7  designated as Marriott's representative for
8  resort fees you've said that there are several
9  issues that were before your time and you didn't
10 know.  For those issues would Jeff Wolff
11 presumably know the answer?
12        MR. LEARY:  Wait a sec, wait a sec.
13 You've misrepresented what he said.  He said some
14 of the documents were before his time.  He didn't
15 say he wasn't familiar or could answer them.  So
16 I disagree with your representation of his
17 testimony.
18        MR. JAMES:  Okay.  Yes, that'll be it
19 for that one.  Yes, we'll take a 10-minute break
20 if that's okay and reconvene.
21        MR. LEARY:  Yes.
22        THE WITNESS:  Great, thank you.

152

1       MR. JAMES:  Thank you.
2       (Whereupon, the above-entitled matter
3   went off the record at 1:50 p.m. and resumed at
4   2:02 p.m.)
5       MR. JAMES:  Okay, at this point I
6   don't have any further questions subject to
7   anything, any questions or anything that counsel
8   asks.
9       I do just want to state for the
10  record, I don't want to re-argue this, but just
11  to state and put it on the record that we believe
12  the instruction not to answer questions regarding
13  revenue wasn't proper, is not based on any
14  grounds of privilege or any other recognized
15  justification for instructing not to answer, and
16  we reserve the right to seek additional discovery
17  on that through other means as appropriate.  And
18  Paul, if you want to put an objection on the
19  record feel free to go ahead and do so.
20      MR. LEARY:  Well, let me address that.
21          CROSS EXAMINATION
22      BY MR. LEARY:

153

1   Q    Mr. McCoy, you don't have any
2   knowledge in terms of the total amount of
3   revenues that are generated through resort fees,
4   correct?
5   A    That's correct.
6   Q    You were able to at least approximate
7   what you believe the resort fees might be for
8   Marriott or Marriott International, correct?
9   A    That's correct.
10  Q    Okay.  And the total amount of revenue
11  fees, that's something that is -- would be sent
12  out to actual hotel owners or operators.  It's
13  not necessarily comes to Marriott, does it?
14  A    That's correct.
15  Q    Okay.  And does Marriott receive a
16  resort fee for each of its hotels that it either
17  owns, manages, or franchises?
18  A    No.
19  Q    Let me clarify.  For every hotel of
20  which a resort fee is charged does Marriott in
21  fact receive a resort fee for each of those?
22  A    No, not all hotels that charge a

154

1   resort fee would generate a fee or monies to
2   Marriott.
3   Q    Okay.  Let me just go over and clarify
4   or ask you a question as well on the complaint.
5   I'm going to screen share and see if this works.
6   And I may not be able to.  One second.  Is there
7   anything on the screen now?
8   A    It's gray.
9       MR. JAMES:  There it is.
10      THE WITNESS:  I see something now.
11      MR. LEARY:  All right.  Can you see
12  it?  Basically --
13      MR. JAMES:  Oh there it went away
14  again.
15      THE WITNESS:  It's gray again.
16      MR. LEARY:  Let me --
17      THE WITNESS:  It's back.
18      MR. LEARY:  All right, basically what
19  that is is the complaint in this case that brings
20  us here today.  And I want to ask you some
21  questions about allegations that have been put in
22  a filing by the attorney general's office

155

1   regarding FTC warning letters.
2       And specifically there is a statement
3   in a complaint that Marriott directly received an
4   FTC warning letter back in November 2012.  Is
5   that accurate, Mr. McCoy?
6       THE WITNESS:  No, it's not accurate.
7       BY MR. LEARY:
8   Q    Are you familiar with that letter in
9   general?  Have you seen that letter from back in
10  2012 as part of your preparation?
11  A    I'm familiar with the letter, that's
12  correct.
13  Q    Okay.  And was that letter addressed
14  to the Gaylord property?
15  A    It was, yes.
16  Q    Now, in fairness the CEO at the time,
17  Mr. Sorenson, was copied on that letter, correct?
18  A    That's correct.
19  Q    And at that time can you tell me what
20  relationship was between Marriott and Gaylord?
21  A    We were in the process of acquiring
22  the Gaylord set of brands or hotels.

156

1    Q    And in that letter did the FTC
2 indicate that they had reviewed the website of
3 Gaylordhotels.com.
4    A    That's correct.  It was Gaylord
5 Hotels.  That's right.
6    Q    And did you have an understanding of
7 what concerns might have been there with respect
8 to the Gaylord Hotel?
9    A    Yes.
10    Q    And could you tell me what those were?
11    A    There was a concern that -- I'm sorry.
12        MR. JAMES:  Objection.  Speculation.
13 Go ahead and answer.
14        THE WITNESS:  From what I understand
15 there was a concern that the fee was not
16 displayed as appropriately defined under the
17 regulation.
18        MR. LEARY:  Okay.  And to the extent
19 -- how was that addressed, if at all, in
20 connection with the acquisition by Marriott?
21        THE WITNESS:  As we acquired Gaylord
22 they migrated to our reservation platform which

157

1 was in compliance with the FTC regulation.
2        BY MR. LEARY:
3    Q    As far as you know as the corporate
4 designee here today has Marriott ever received a
5 letter from the FTC indicating that it is in any
6 way in violation of any drip pricing issues that
7 have been raised by the FTC in the hotel
8 industry?
9    A    No, we have not, and I definitely
10 would have been made aware of that.
11    Q    All right.  And to the extent that
12 there were questions asked of you today relating
13 -- a lot of questions, frankly, about documents
14 dating back 8, 9, 10 years, correct?
15    A    Correct.
16    Q    And in fairness to you, you may not
17 have been either listed as a party on that
18 document, or been even in a meeting when a
19 document was generated that you were shown today,
20 correct?
21    A    That's correct.
22    Q    But you in advance of this deposition

158

1 received a notification of topics that were going
2 to be asked of you in connection with this
3 deposition?
4    A    That's correct.
5    Q    And through a combination of your
6 personal experience working with Marriott's
7 counsel and also Marriott employees were you able
8 to gather information to allow you to answer the
9 questions related to those topics?
10    A    Yes.
11        MR. JAMES:  Objection to form.
12        MR. LEARY:  And exhibit 14.  I'm not
13 going to bring it back up, but counsel showed you
14 at least two print screens that they had
15 identified as they had come through a booking
16 process for rooms.  Do you remember seeing those?
17 It was I think in Las Vegas.
18        THE WITNESS:  Yes.
19        BY MR. LEARY:
20    Q    With respect to those screens do you
21 have an understanding that there were still
22 additional screens that users would have gone

159

1 through that would have notified them of a resort
2 fee?
3    A    That's correct.
4    Q    Okay.  And would that have been in
5 connection with the dialogue box?
6    A    Yes.  Actually, the very next screen
7 after you selected the hotel would have put you
8 in a position to begin seeing the dialogue box,
9 and then subsequent to that additional screens
10 would continue the opportunity to see resort fees
11 amongst other taxes and fees.
12    Q    And then again at the time of checkout
13 there is an opportunity for a consumer to look
14 and see the summary of all charges that may occur
15 for their stay, correct?
16    A    That's correct, along with daily on
17 our GRE systems.  So you would see your daily
18 bill.  You would also have confirmation of the
19 resort fee upon arrival as well.
20    Q    Okay.  So at the time of checkout the
21 price that's listed there for the consumer having
22 already gone through one, two, or possibly even

160

1  three pages now where they are notified of a
2  resort fee, that final price includes all fees
3  and taxes including the resort fee, correct?
4        MR. JAMES:  Objection to form.
5        MR. LEARY:  I'm sorry?
6        MR. JAMES:  Just objection to form.
7        MR. LEARY:  Okay.  I didn't hear the
8  answer, I'm sorry.
9        THE WITNESS:  That's correct.
10       BY MR. LEARY:
11    Q    And then how else is a consumer
12  notified of the resort fee even after the
13  reservation process?
14    A    Both through their confirmation email
15  and upon arrival at the hotel.  And then of
16  course subsequent to that during your stay you
17  have the opportunity to review your folio where
18  you would see the resort fee daily, assuming the
19  hotel has a resort or destination fee, on your
20  folio.
21    Q    And during this deposition you were
22  asked several questions about resort fee policies

161

1  with Marriott, correct?
2     A    That's correct.
3     Q    And I think by my notes your testimony
4  is that formalized policies were put in place
5  sometime back in '13 or '14.
6     A    That's correct.
7     Q    And you are familiar with how those
8  have evolved over time?
9     A    I am.
10    Q    And has Marriott always endeavored to
11  try to make sure that the resort fees being
12  charged to consumers are transparent and known to
13  consumers?
14       MR. JAMES:  Objection to form.
15       THE WITNESS:  I'm sorry, Matt, go
16  ahead.
17       MR. JAMES:  You can go ahead and
18  answer.
19       THE WITNESS:  The answer is yes.
20  Obviously we continue to evolve both our service
21  experience and our approach to the research we
22  have with guests.  And after 90 years maintaining

162

1  a reputation that we've spent so long to build is
2  critical.  And so yes, we continue to evolve our
3  approach both in terms of our services
4  experiences as well as in this case a resort or
5  destination fee.
6        MR. LEARY:  And as far as you know in
7  your position at Marriott or other positions
8  before have you ever understood that it was
9  Marriott's policy or intention to hide fees from
10  customers as they're booking rooms at hotels?
11       THE WITNESS:  No, that would not be in
12  our best interest.
13       BY MR. LEARY:
14    Q    And these policies that you've
15  discussed that have been in place regarding
16  disclosure of resort fees, I believe you've
17  touched upon it, but once those fees are in place
18  Marriott still has procedures in place to make
19  sure as best they can that those policies are
20  carried out?
21       MR. JAMES:  Objection to form.
22       MR. LEARY:  Yes?

163

1        THE WITNESS:  Yes, that's correct.
2        BY MR. LEARY:
3     Q    And that would include I think some of
4  the audits you mentioned, and mystery shops, and
5  other matters?
6     A    That's correct.
7     Q    I think that's all the questions I
8  have.  Thank you.
9        MR. JAMES:  Just one follow-up.
10       REDIRECT EXAMINATION
11       BY MR. JAMES:
12    Q    Has Marriott ever received a letter
13  from the FTC stating that its website is in
14  compliance with the FTC's 2012 letter?
15    A    I'm not aware of that letter saying
16  that, no.
17    Q    Okay.  No further questions.
18       MR. LEARY:  Do you know whether FTC
19  has as a practice sent out letters to all the
20  hotel companies in the United States or in the
21  world telling them that they are in compliance?
22       MR. JAMES:  Objection to form and

164

1 speculation.

2 MR. LEARY: Are you aware if they even

3 that policy, Scott?

4 THE WITNESS: I am not aware that they

5 send out notices that we're in compliance, no.

6 RECROSS EXAMINATION

7 BY MR. LEARY:

8 Q But you know they have sent out a

9 letter to at least one hotel back in 2012

10 suggesting they may not be in compliance,

11 correct?

12 A It was a non-Marriott hotel, that's

13 correct.

14 Q And Marriott has never received that

15 same or identical type of letter at any time

16 telling them they are in non-compliance, correct?

17 MR. JAMES: Objection to form.

18 THE WITNESS: That's correct.

19 MR. LEARY: Okay.

20 THE WITNESS: We have not received a

21 letter stating that we're not in compliance.

22 MR. LEARY: Okay. I'll stop sharing

165

1 my screen now. Thank you. Okay. Thank you.

2 MR. JAMES: All right. I have no

3 further questions.

4 MR. LEARY: Matt, will you as a

5 housekeeping get the exhibits to the court

6 reporter? Had you done that already so they can

7 just attach to the transcript?

8 MR. JAMES: Yes, I sent the same Box

9 link to them that I sent to you so they have

10 everything. And it should have updated with all

11 the exhibits that I had to re-update. And

12 Allison, if there's any problem with that just

13 let me know.

14 MR. LEARY: Okay. Will do. Okay,

15 thanks everyone. Have a good weekend.

16 MR. JAMES: All right. Thank you for

17 your time, Mr. McCoy.

18 (Whereupon, the above-entitled matter

19 went off the record at 2:15 p.m.)

20

21

22

**A**

**a.m** 4:2 12:9,10 59:1,2 67:10 73:18,19
**abide** 33:9,12,15,16,20 34:15
**ability** 10:19 63:17 69:10
**able** 28:8 52:12 67:3 79:18 96:15 102:8 148:5 153:6 154:6 158:7
**above-entitled** 12:8 58:22 73:17 112:17 113:5 152:2 165:18
**above-referred** 11:2 41:19 44:16 50:1 59:14 73:6 80:8 90:3 104:20 113:14 124:8 129:15 134:11 142:9 144:18
**absence** 62:14,17
**absolutely** 64:3
**acceptable** 77:7,22 78:19
**access** 76:7 78:5,15
**accessed** 81:9
**accompany** 57:2
**account** 53:14
**accuracy** 57:22 118:12
**accurate** 47:1 48:3,7,15 48:17,19 61:20 81:6 118:10 127:15 132:10 132:12 155:5,6
**accurately** 67:7 92:14 93:2 141:19
**achieve** 88:22
**acknowledge** 67:16 114:2 116:8 117:11
**acknowledged** 115:1
**acknowledging** 119:8
**acknowledgment** 3:9 63:14 113:10,22 115:22 116:20 117:9
**acknowledgments** 115:11,14
**acquired** 156:21
**acquiring** 155:21
**acquisition** 156:20
**action** 1:7 53:13,18 117:20 118:16 119:9
**actions** 118:19 119:10
**actual** 14:2 92:9 153:12
**ad** 76:16
**add** 39:1 89:6 147:12 148:16 149:7
**added** 72:12 86:11
**adding** 149:1,2
**addition** 53:18

**additional** 55:16 57:7 57:18 85:19 94:16,18 94:20 152:16 158:22 159:9
**address** 4:21 152:20
**addressed** 155:13 156:19
**adequacy** 117:22 118:18
**adhered** 34:22
**adjustment** 30:22 114:8
**adjustments** 99:4 116:7
**administration** 117:17
**administrator** 54:2 55:22 56:1,2,18 58:4
**admittedly** 140:17
**adopt** 36:10
**advance** 157:22
**advanced** 17:3
**advantage** 68:17 70:22
**advertised** 29:11 31:22 44:4
**advertising** 31:18
**AG** 45:9
**AG's** 90:8
**agency** 9:10 31:19
**agent** 69:6
**agents** 68:10
**aggregate** 37:16 39:11
**aggregated** 89:14
**ago** 6:5 14:12 15:5 23:10 68:13 70:15 78:6 82:20
**agree** 43:17,19 120:22 126:22
**agreement** 3:11 133:8 134:17 135:9 136:5
**agreements** 33:5 98:5,7 116:13 141:6,6,8,20
**ahead** 10:22 16:21 17:1 28:19 41:9,11 48:10 121:3 144:13 152:19 156:13 161:16,17
**alert** 34:10 93:20 107:15 108:1,4 109:2 111:2,10
**alerts** 95:20 110:21,22
**Alexander** 16:8
**alike** 10:8
**allegations** 154:21
**Allison** 165:12
**allocation** 117:19 118:15
**allow** 10:4 26:21 37:21 67:16 158:8
**allowed** 67:18
**allows** 29:16
**amenities** 22:15,20

24:2,3,7,9 37:21 55:16 63:10,15,16 66:1 67:12 68:18 71:1 75:5,11 77:22 78:17 82:18
**amenity** 3:7 8:22,22 24:14 25:2,14,15,21 26:4,8 53:21 54:1,6 55:1,10 66:5 74:1,11 77:7,18 78:16 79:3
**America** 18:5 30:9
**America's** 54:3 56:18
**Americas** 50:17 59:5 126:6
**amount** 48:6 92:15 93:2 122:11 127:16 128:10 153:2,10
**amounts** 48:2
**ancillary** 125:6
**and/or** 36:14 37:1 89:12 116:14 117:17
**Angeles** 20:9
**annual** 56:12,15,17 58:1
**annualized** 76:14
**annually** 76:16 119:20 121:7
**answer** 6:21 7:4,9 8:3 9:6,8 10:6,9,10 27:3 28:19 30:6 31:14 36:16 48:11 55:19 66:12 81:21 96:21 111:22 119:1,12 121:4 123:13,16,18 124:1 128:3,21 132:19 136:18 139:12 139:14,19 140:22 141:16 147:3,15 148:17,20 149:10 151:3,11,15 152:12 152:15 156:13 158:8 160:8 161:18,19
**answered** 119:12 137:10
**answering** 7:8
**answers** 7:2 13:19 137:15 150:17,20
**apologies** 78:2
**apologize** 65:10 90:10 104:18 142:5
**app** 68:8
**apparently** 42:16
**appear** 46:22 50:21 91:15 92:16 107:19 108:3 146:6
**APPEARANCES** 2:1
**appears** 80:18 106:6 107:21 112:5 125:17

127:22 135:9 143:4
**apples** 29:17,17 148:10 148:10
**applicable** 110:8 136:10,13 137:4
**application** 20:18 62:19 64:3,9,12,16,21 65:1 65:3,4 66:2 71:8
**applications** 66:7
**applied** 76:21
**applies** 115:17 117:7
**apply** 20:20 27:5 60:8 60:19 65:8 75:15 99:9 114:1 116:5
**applying** 116:6
**appreciate** 75:5
**approach** 30:14,20 36:10,12 116:16 125:17 148:1 161:21 162:3
**appropriate** 138:22 152:17
**appropriately** 156:16
**approval** 54:2 55:22 62:2,8
**approved** 62:16
**approximate** 47:4 153:6
**approximately** 18:17 21:13 22:8,19 47:2,18 48:3,8 89:3 119:18 121:6 122:7 128:4 147:9 148:13
**approximation** 47:21 48:1,16 121:11 122:5 123:4
**April** 81:5,9 86:1
**architecture** 149:13
**area** 25:13 53:14 61:3 82:3 128:14 139:2
**areas** 94:8 107:2 125:5 125:8
**arising** 117:19 118:15
**arrival** 67:2 94:16 159:19 160:15
**arrive** 27:17 96:14
**arrived** 28:6 67:9 69:3
**arrives** 70:18
**arrow** 97:1,6
**articulated** 100:15
**articulating** 128:1
**asked** 13:7 119:12 157:12 158:2 160:22
**asking** 6:15 43:19 70:8 151:2,4
**asks** 152:8
**aspect** 91:6
**assessing** 61:9

**assigned** 22:15 85:20
**assistant** 2:10,11,15
  4:11
**associate** 67:15
**associated** 22:16 30:18
  34:4,15 39:2 117:18
  119:9 122:1
**associates** 68:13,22
  70:9
**assume** 118:9
**assumed** 150:5
**assumes** 117:16
**assuming** 101:12
  120:13 160:18
**attach** 64:1,1,3 65:5,6
  65:16 165:7
**attachment** 91:22 105:7
**attendees** 43:7
**attention** 149:2
**attorney** 2:11 4:11,13
  9:20,22 10:2,4,5 21:5
  154:22
**attorney-client** 10:7
**attorneys** 2:10 10:3
  14:22 15:17
**audible** 7:2,3
**audio** 91:18
**audit** 3:8,9 34:20 35:11
  35:13,14,15 38:19,20
  38:22 39:14 58:6 85:5
  85:6 86:18,21 87:13
  91:2,5,22 92:2,6
  98:22 103:2,11,17
  104:3,8,9,12 106:7
  108:1,11,15 109:17
**audited** 35:3,5,7,14,16
  39:8 86:21
**auditing** 99:13,16,17
**audits** 38:12,14,15
  57:12 58:5 104:13
  106:10,19,22 107:3,3
  107:4 108:20,22
  109:4 163:4
**authoritative** 82:13
**authority** 68:22
**automatically** 143:22
**available** 30:22 61:16
  135:14,15,20 137:19
  137:20 138:14 140:6
  140:8,13,20
**average** 49:9
**AVPs** 61:3 82:21
**aware** 21:3 70:12 71:11
  71:14 72:9 79:2,7
  109:14,15,19 157:10
  163:15 164:2,4
**awareness** 119:4

**B**
**B** 1:8
**back** 26:7 51:11 54:6
  61:11 111:11 115:12
  115:13 125:2 131:3
  150:1 154:17 155:4,9
  157:14 158:13 161:5
  164:9
**background** 16:17,18
**balances** 99:6,9
**balancing** 125:15
**base** 30:10
**based** 24:2 29:19 60:22
  70:2,11 77:13 84:6
  86:2,5 138:7 139:16
  152:13
**basically** 154:12,18
**basis** 56:15 76:15
**Bates** 44:19 45:6,14
  59:17 134:10 142:7
**bathroom** 58:13
**bear** 49:20 118:12
**began** 19:17,20
**beginning** 115:9
**begins** 136:9
**behalf** 1:18 2:2,8 21:4
  22:11 68:16
**believe** 15:18 35:21
  45:14,16 55:4,5,14
  59:13 65:12 90:1
  91:10 97:8 100:20
  104:15,18 105:2
  110:5 114:17 121:3
  122:2,18 123:21
  126:16 130:1 135:21
  152:11 153:7 162:16
**benchmark** 75:7 88:7
**benchmarking** 88:21
**benefits** 85:13
**BENJAMIN** 2:16
**best** 3:8 69:9 72:21,21
  80:4,19 82:11 102:1
  111:22 135:14,15,20
  137:20 138:13 140:6
  140:8,11,13,20
  162:12,19
**better** 52:18 62:8 63:14
  68:15 85:13 130:18
  139:12,13,13 150:19
**beverage** 19:15 24:20
  24:21 71:18
**beyond** 79:12 119:15
  121:3 123:14 149:20
**bifurcate** 120:9
**big** 19:19
**bikes** 76:11
**biking** 76:10
**bill** 159:18

**bit** 16:17 51:21 130:16
  130:18 134:4 142:5
  150:13,14
**black** 102:13
**block** 43:6 124:20
**blue** 93:20 94:22 108:7
  108:18
**board** 78:14
**Bonvoy** 51:8 56:8 58:8
**booked** 27:19 136:11
  136:14 137:5
**booking** 27:16 28:6
  92:18 93:5 94:3,4,15
  95:6 97:16,22 100:5,6
  158:15 162:10
**boss** 16:2
**boss's** 16:7
**bottom** 50:18 60:10
  74:12 91:9,11 102:4
  114:5 124:20
**box** 19:19 63:22 66:15
  93:21 95:1,10,16 96:7
  96:9,17 102:14 108:6
  108:7,18,19 143:20
  146:7,13 148:16
  159:5,8 165:8
**boxes** 109:3,6,10,12,16
  109:18
**brand** 8:11,16 22:5,12
  39:9 51:19 52:1 53:11
  53:16,19 54:5 58:6
  85:5 86:18,20 87:12
  108:21
**brands** 18:6 20:4 39:4,5
  39:6 52:10 155:22
**break** 7:5,7,10 58:13
  150:1 151:19
**breakthrough** 18:15
**bring** 133:11 144:22
  158:13
**brings** 4:16 154:19
**broad** 24:4 35:17
**brochure** 84:14,16
**build** 83:6 162:1
**built** 81:15 95:2
**bullet** 43:12 126:6,7
**bunch** 132:2
**bundle** 24:1 37:20
  53:21 54:1,6 55:1,10
  67:13
**bundling** 22:14 24:3
  25:6
**burden** 72:14 118:11
**burdens** 57:12
**business** 5:10,12 16:21
  17:4 21:17 23:5,12,15
  32:3,4,5,14,16 67:9
  69:19 100:13 101:6

  101:17 125:22 126:2
  139:17 141:3
**button** 147:1,6,13 149:1
  149:2,7,17,18

**C**
**C** 97:11 114:10
**CA** 1:8
**California** 19:20 20:11
  40:11
**call** 35:12 39:18 89:8
  111:21
**called** 1:17 4:5 26:3
  80:2 89:19 112:21
**calls** 78:9 79:11,14
**Canada** 17:16 21:22
  49:10 84:5 100:8
  121:11 122:3
**capability** 25:5
**capacity** 48:14
**capture** 3:11,12 85:5
  86:19 108:21 109:1
  142:6,8,13
**captured** 86:17 87:11
  106:14 108:1
**captures** 108:17
**capturing** 110:21 111:8
**care** 39:16 71:21
**career** 17:2,6
**carried** 162:20
**carte** 24:10
**case** 6:8,9,10 16:1,5
  36:12 45:9,10,12,13
  45:17 118:21 135:10
  135:21 138:9 154:19
  162:4
**cases** 6:9
**caveat** 84:20
**CDC** 84:7,9 86:2
**cell** 79:11,13
**center** 139:6
**centric** 147:19
**CEO** 155:16
**certain** 34:18 37:5
  39:22
**certainly** 27:18 29:18
  37:2 44:8 84:20
**certainty** 24:8
**certification** 35:8 56:13
  56:15,17,20 57:3,8,14
  57:17
**certifications** 58:1
**cetera** 8:12 22:6 27:17
  35:18 78:15 98:7
  107:4
**CFO** 129:5
**chain** 18:18
**challenge** 40:21 70:14

72:18 123:20
**challenges** 72:20
**change** 36:9 51:3,4,5
76:4 147:5 148:5,15
**changed** 35:20 36:3
49:1 78:13 147:7
**changes** 49:14 51:2,9
114:11 116:7
**channel** 92:19
**channels** 71:22 97:13
98:3,12 99:3 103:3,19
**charge** 25:11 47:2,19
51:19 52:12 54:8
144:2 153:22
**charged** 153:20 161:12
**charges** 110:7 159:14
**charging** 25:13 56:19
123:9
**chart** 47:18
**chat** 68:7
**check** 27:15 91:10
110:16 111:3 130:17
**check-in** 28:7 67:2
94:17
**checked** 14:16 52:20
146:13
**checking** 52:17
**checklist** 3:8 57:4,8
61:11,18 62:10 65:5
**checkout** 159:12,20
**checks** 99:6,8
**chief** 129:2
**choice** 30:22
**choices** 38:6
**choose** 27:19 30:12
38:6 148:6
**choosing** 28:4
**CHRISTOPHER** 2:9
**christopher.pascual...**
2:13
**Chronologically** 19:7,9
**Circle** 4:22
**circumstances** 47:11
**city** 28:4 29:19 94:9
**Civil** 1:1,7
**claim** 117:20 118:16
**clarification** 19:8 89:7
116:4
**clarifications** 9:3
**clarify** 33:13 45:8 98:16
142:17 143:11 153:19
154:3
**cleaned** 84:6
**clear** 6:18 7:1 100:5
101:4 108:9 136:22
145:17
**clearly** 11:7 32:14
95:18 129:2

**clerk** 69:3
**click** 96:17 97:1,5
**clickable** 143:20
**clicked** 95:13,15 146:8
**clicking** 93:14 145:18
**close** 48:16
**coach** 67:7
**code** 107:4
**Coetzee** 2:15 15:10
**collateral** 83:7,10,22
84:5,8,10 85:3,10,12
85:12,15,16,18 86:2,6
86:15 87:3,6,8,10
**collected** 52:5 122:6,12
**collectively** 122:11
**college** 16:19,20 17:7
**Columbia** 1:1,5 4:14,15
118:20
**column** 77:17,19,22
**columns** 77:6,8,9 132:3
**combination** 82:17
158:5
**come** 149:2 150:1
158:15
**comes** 75:22 153:13
**command** 18:18
**commenced** 57:16
**commercially** 140:4
**committee** 19:16,18
**communication** 64:19
64:20 65:1
**companies** 5:15 9:12
22:5 163:20
**company** 69:11 147:17
147:19
**comparable** 35:22
132:13
**compare** 30:13 148:10
**comparison** 43:16,22
63:18
**comparisons** 29:15
**compete** 27:8
**competes** 63:19
**competing** 27:7
**competitive** 17:5 25:3
63:7
**competitor** 27:10
136:15 137:5,7
139:11
**competitors** 25:18
28:13 137:19 138:3
**competitors'** 63:16
**complain** 79:4
**complainant's** 120:8
**complaint** 70:5 71:5,12
71:15,16 72:8 154:4
154:19 155:3
**complaints** 70:9

**complete** 6:20 10:15
34:9 54:4 61:19 64:7
64:10,11,14 65:4
115:22
**completed** 57:5
**completely** 55:5 101:4
**compliance** 56:15,20
92:10 97:12,20
100:21,22 107:4
157:1 163:14,21
164:5,10,21
**comply** 54:7
**components** 32:22
**computer** 49:21
**concern** 70:13 72:18
156:11,15
**concerns** 72:19 156:7
**conclusions** 35:16
**conditions** 20:19 44:7
47:7 111:7 136:11,13
139:1
**conduct** 106:17 131:13
**conducting** 121:18
**confidential** 50:19
**confirm** 90:6 91:19
126:16
**confirmation** 66:20,21
67:1 71:4 96:12
159:18 160:14
**confusing** 6:16
**connect** 71:20,22
**connection** 156:20
158:2 159:5
**consent** 120:8
**consider** 119:8
**considered** 38:9
**consist** 28:13 83:19
**consistency** 141:19
**constantly** 147:16
**consumer** 2:16 4:12
22:20 23:3,8 24:3
36:9,20,22 37:6,8,11
37:13,21 75:8 78:11
93:4 95:12 96:15,17
159:13,21 160:11
**consumers** 30:21 31:6
36:9 38:8 77:11
161:12,13
**contains** 46:17
**CONTENTS** 3:1
**contest** 72:10
**contesting** 117:21
118:17
**context** 70:6,7
**continent** 30:20 129:3,6
148:3
**continents** 147:22
**continuation** 145:18

146:6
**continue** 42:18 47:5
159:10 161:20 162:2
**continues** 23:22 44:8
**contracted** 69:20,21
70:2
**contracts** 32:6 69:21
141:13
**contractual** 99:14
100:2
**contractually** 32:16
**control** 18:19 22:1,3
32:18
**convenience** 67:14
**convenient** 23:22 37:14
37:15
**conveniently** 37:20
**conversation** 76:1
**conversations** 14:2,9
76:14 82:20 98:8
**copied** 155:17
**Copley** 4:22
**copy** 117:15
**corner** 74:13 102:4
**corporate** 157:3
**correctly** 146:18
**costs** 117:16,19 118:15
119:9
**counsel** 1:17 2:15 4:5
13:16,20 14:3 152:7
158:7,13
**country** 30:19
**couple** 14:22,22 15:6
15:13 18:14,15 36:6
103:12
**course** 14:16 17:2
75:22 76:13 77:1
82:20 118:10 123:21
137:22 141:3 160:16
**courses** 17:3
**court** 1:1 6:6 7:1 11:12
20:8 165:5
**court's** 120:7
**cover** 84:15
**covered** 92:16
**COVID** 47:4,12 49:15
57:11,13 84:4,9 111:7
**Cozen** 2:3
**create** 46:16 64:19
66:20,21 70:5 71:3,4
71:6
**created** 46:16 64:20
91:9,12
**creating** 62:5
**credit** 24:20,22
**critical** 162:2
**critique** 87:21 89:4,9
**CROSS** 3:2 152:21

currency 110:8
current 17:13,19,21
18:1 20:12 50:21 72:1
111:7 114:6
currently 82:11 92:1
117:1
customer 27:12,13 30:9
68:10 71:15,21 72:1
88:4
customer-centric 30:11
36:7,8 69:11
customers 29:14 31:1,3
38:4 39:17 70:17 79:4
79:9,9,15 162:10
customers' 30:12
cut 74:19
cycle 53:12,16

**D**

D.C 2:12
daily 52:5 159:16,17
160:18
damage 87:8
damages 120:7,13,17
121:2
data 81:10
date 60:11 105:17,18
105:19 114:12 127:13
136:3 142:14,17
date/time 81:6
dated 46:20 90:11 91:8
105:22 120:9 126:16
126:21
dates 142:18
dating 46:9 115:12,12
157:14
day 13:16 15:3 49:10
70:21
days 15:1,5 53:17,22
55:2
DC 4:16 6:9 12:14 21:5
90:8
DCAG 45:12,16
DCAG0000001 44:20
45:7
DCAG0000011 73:10
DCAG0000013 59:18
DCAG0000015 113:11
dealing 20:13
decade 23:9
decades 72:3
December 105:21
115:3 149:4,5
decided 148:15
decisions 69:13
deck 88:20
deck-related 34:13
decrease 54:5

deemed 78:19
deepening 72:13
Defendant 1:10 2:2
defined 22:17 38:1
156:16
definitely 69:12 157:9
definition 107:21
135:14,19
definitions 135:12
degree 16:20 17:11
36:5 75:2
delayed 57:12 124:4
deliberately 140:19
deliver 67:13 84:21
delivering 34:22
delivery 65:21
Delta 20:4
demonstrate 27:10
demonstrated 27:5,6
demonstrating 14:18
denote 30:1
denoting 111:9
department 129:4
131:18
departments 66:17
depict 141:19
deposed 5:3,6 16:3,5
deposition 1:15,17 3:5
11:3,15 12:13 13:10
13:15 14:5 15:20
16:11 21:4,9 41:20
44:17 50:2 59:15 73:7
80:9 90:4 104:21
113:15 124:9 129:16
134:12 137:13 142:10
144:19 150:4 157:22
158:3 160:21
depositions 5:10,13,18
5:22 6:1
Deputy 2:11
describe 16:17,18
described 63:3 68:2
103:11
description 61:21
63:16 107:15
designated 11:14 13:9
138:22 151:7
designating 139:5
designation 90:7
designed 67:1,13 78:2
85:18
designee 157:4
desirability 78:12
desk 66:4 68:11 69:3,3
69:6 71:20 83:10,12
83:16 84:12 85:12
96:13
despite 151:6

destination 3:5 8:22
14:10 20:21 24:14,20
25:2,7,9,11,14,15,21
26:3,8,15,20,22 27:5
29:22 32:19 33:14,16
34:7 36:13 37:4 39:6
39:8 42:4,15 46:9,18
47:7 49:7,12 50:16
51:20 52:13 54:8
56:16,19 60:7,8,21
61:8,20 63:20 66:1,18
67:4,12,17 68:19 70:1
70:10 74:1,10 75:15
76:2,22 77:3 80:3,19
82:7 83:14 85:7,20
87:21 88:2,8,16 89:4
89:8 92:5 93:6,7,9,12
93:22 95:15 101:13
101:20 106:9,13
107:8,9,10 111:1
114:2 116:17 117:2
121:15 122:1,21
123:2 160:19 162:5
detail 95:11
detailed 53:13
determine 51:21 98:14
98:19 136:21
determining 38:18
develop 66:15
developed 115:3,6
116:4
dialogue 93:20,21 96:7
96:9 108:6,18 109:3,6
109:10,12,16,18
159:5,8
difference 24:17,18
114:20
different 20:1 30:20
39:4 72:16 76:12
100:14 127:22 139:3
139:5,21 148:1
149:16
digging 41:7
digital 78:5 98:2 100:13
148:18
direct 3:2 4:8 36:21
37:8 98:1
directly 7:13,19 18:7
84:8 121:20 126:9
155:3
Director 2:16
directors 18:12
disadvantage 25:4,5
43:15,21 44:9
disagree 151:16
disappearing 130:22
disclose 92:14 93:2
100:1,4,10

disclosed 94:2 97:14
97:21 99:21 100:22
disclosing 92:21 99:11
103:19
disclosure 28:5 92:10
118:1,19 162:16
disclosures 94:13
discovery 120:11
152:16
discretion 138:10
discuss 11:13 13:7
discussed 16:10
162:15
discussing 88:7 108:6
discussion 89:16
discussions 149:1
display 45:4 83:6,11
105:10 111:14
displayed 95:7 101:20
156:16
displaying 103:8 104:2
distance 78:8 79:11,13
distinguish 8:1,4 9:5
distributed 56:17
distribution 3:11 97:13
103:18 133:8 134:17
District 1:1,5 4:13,15
118:20
DIVISION 1:1
docked 87:2
documentation 57:7,18
63:2 65:7,17 66:7
104:12
documented 104:13
documents 11:12 14:4
14:7 41:8 45:13 64:2
65:16 106:21 131:9
131:14,19 151:14
157:13
doing 9:18 38:2,3 59:11
62:14
dollars 22:20
double 14:16
download 73:11
draft 139:15
draw 29:14 35:16 63:18
drip 157:6
drive 125:5,9,17,18,20
driver 23:21
driving 125:14
drop 52:11
dropdown 95:10,15
96:17
due 49:15
duly 4:6
duties 18:1 20:12,15
128:17
DVD 78:5,15

## E

e-commerce 148:18
earlier 34:10 37:2 48:13
 52:7 54:20 58:4,7
 75:8 82:18 83:1 85:4
 86:18 108:6 114:10
 127:20 148:12
early 69:5 147:11
earned 51:8 127:17,21
easier 12:5 19:10
 137:14,17 145:14
eChannel 103:4,15
education 17:3
educational 16:18
effective 51:9 114:11
effectively 84:6
efforts 140:4
eight 69:8 150:12
eighth 56:6
either 26:3 47:6 49:4,9
 63:20 70:1 77:1 78:3
 78:11 106:13 109:2
 153:16 157:17
electric 76:11
elements 70:3 116:14
email 68:8,9 71:20
 90:10,22 91:8 96:13
 125:4 127:2 160:14
emerging 76:9 78:14
employed 16:1
employees 18:17,19
 43:3 158:7
employer 17:17
employment 18:22
empowered 68:16
enable 62:7 69:12
 140:2
enabled 148:4
enables 24:3,6 30:17
 67:6
encounter 23:11
endeavored 161:10
engage 149:11
engaged 141:17
engagement 23:14 98:2
 149:3
engagements 79:14
engaging 79:8
enhancing 125:16
enjoy 67:20
enlarge 130:12
enlarged 130:16
ensure 35:9 70:8 97:13
 98:10,11 118:9 119:3
 138:13 140:5
entail 119:6
entails 90:20
entertainment 86:10

entire 39:13 55:8
entirety 37:9
entities 22:5
entitled 12:14 56:12
 59:4 73:22 83:10
 85:10 87:16,20 91:22
 92:2,9 112:22 113:9
 131:11 132:1 134:17
entity 33:3
entrants 78:13
environment 17:5
Erika 16:8
erroneous 87:6
erroneously 106:13
error 131:4
ESQ 2:2,3,9,10
essentially 11:12 13:5
 18:5 22:14 29:17
 30:10 34:13 35:1,13
 36:5 39:20 46:7 52:4
 52:10 70:7 77:3 84:14
 88:1 99:6
establish 97:12,20
 138:7
established 120:18
 139:18
et 8:12 22:6 27:17 35:18
 78:15 98:7 107:4
evaluate 66:4
evaluation 66:1 148:8
events 69:21
evidence 34:9 37:5
 87:10
evolution 28:21 36:6
evolve 36:8,10,16,17
 44:7 75:9,13 161:20
 162:2
evolved 36:19 75:19
 161:8
evolves 75:10
evolving 36:12 147:17
exactly 101:22
examination 1:17 4:8
 152:21 163:10 164:6
examined 4:7
example 19:2 22:18
 26:12 32:2 64:15 68:3
 68:12 69:2 77:22
 78:14 79:10 144:12
 148:8
examples 77:7,18
 78:10,17 79:3 81:17
Excel 3:9 105:3,8,10
 129:22 130:2
exception 26:13 60:21
exchange 84:7 110:9
excuse 98:6
execute 117:8

execution 87:16 88:22
 118:11 125:7,10
executive 19:16,18
 53:14
exhibit 3:4 10:22 11:3
 41:18,20 44:15,17
 50:2,5 59:15 73:5,7
 73:22 80:9 90:1,4
 102:5,6 104:19,21
 113:13,15 124:7,9
 129:16 134:12,14
 142:6,10 144:19
 145:12 146:17 158:12
exhibits 12:12 165:5,11
exist 111:7
existing 112:3
exists 30:1 32:13
expect 51:9 111:19
 114:10
expectation 52:9 65:21
 70:3
expectations 34:19
 39:9 68:5
Expedia 9:12 31:20
 32:2 97:17 99:9,10,22
 139:10,10
expenses 117:17
experience 22:17,22
 23:2,5 24:4 37:22
 39:3 52:3,4,18 68:5
 71:18,19 72:1 75:6,10
 78:13 85:6 87:12 88:4
 125:16,18 158:6
 161:21
experienced 23:10
experiences 24:5 85:19
 88:15 162:4
experiencing 23:3,8
experiential 35:15
 36:14 87:7
expertise 18:15 119:16
 149:20
explain 83:13,14,17
explicit 38:7
extent 48:11 111:21
 120:6 121:2 156:18
 157:11
external 92:19 103:3,18

## F

faced 17:6 40:21
facilitator 58:3
facilities 76:8
fact 21:21 31:6 68:11
 75:12 78:9 89:9 95:20
 116:13 144:1 153:21
fail 39:15
failed 38:14,21

failing 40:1 54:17
failure 39:11 54:7
fair 47:21 48:1
fairly 44:20 72:4 141:7
fairness 155:16 157:16
fall 39:22
falling 39:12 53:19
falls 53:11 120:2
familiar 31:3,6 46:10
 72:4 91:5,13 106:2
 135:5 151:15 155:8
 155:11 161:7
familiarity 29:14 30:12
 75:3
far 157:3 162:6
fast 11:21
favorable 136:12 137:4
 137:6,11
feasibility 66:2
feasible 67:19
February 114:5,7,16
 115:4,20 116:18,22
 117:7
feedback 36:20,22 37:6
 37:9,11,13,15 38:1,7
 38:11
feel 9:7 31:12 152:19
feels 48:16
feet 38:5
fifth 107:14
filing 154:22
filter 30:17
final 95:5 160:2
finally 34:17
finance 107:2 123:3
 128:13 129:1 131:18
Finances 122:3
financial 129:2
find 61:13 76:3 77:3
 90:11 102:8
fine 6:13 19:11 58:16
 121:4 133:12 134:6
first 4:6 7:8 15:4 18:9
 19:1,4,12 22:21 23:7
 23:10,11 24:12 28:11
 28:16 29:16 30:14
 33:21 35:20 36:4
 41:12,14,15 43:4,12
 43:22 44:4 51:13 56:7
 66:19 77:6 80:2 83:10
 85:11 87:19 91:11,21
 92:8 93:11 95:19,22
 96:2,9 101:6,15 108:2
 111:11 123:12 125:3
 126:6 132:6 134:10
 136:6 145:19 147:21
 147:22 148:11,22
 149:2,3

**fiscal** 132:4
**five** 58:17
**flagged** 40:2,3,12 41:3
  54:16,17
**flawless** 87:16 88:22
**Florida** 19:13
**focus** 125:5,9
**folio** 160:17,20
**follow** 32:5,6 34:12
  57:4
**follow-up** 163:9
**followed** 34:21
**following** 29:20 35:10
  95:1 96:1 97:13 100:6
**follows** 4:7
**food** 19:15 24:20,21
  71:18
**footer** 50:20 60:11
  114:5
**foremost** 33:21
**form** 27:2 55:18 57:18
  61:11 64:16 65:4,13
  65:15 80:20 81:20
  84:11 86:7 88:9,11
  96:20 113:22 114:18
  114:21 115:3,5
  118:22 119:8,11,21
  125:11 128:20 132:15
  132:18 140:21 141:15
  147:2 149:9,19
  150:21 158:11 160:4
  160:6 161:14 162:21
  163:22 164:17
**formalized** 115:4 161:4
**format** 37:14,19 42:19
  42:21 43:1,3,5 105:9
**forms** 114:22
**forth** 19:4 82:6
**forward** 95:5 117:6
**found** 47:11 102:19
**fourth** 28:22
**franchised** 21:21
  122:20 126:8
**franchisees** 22:4
**franchises** 7:14,20 8:2
  8:7 21:14 22:2 121:18
  127:6 153:17
**Francisco** 6:5,7 20:8
**frankly** 157:13
**free** 9:7 152:19
**frequency** 75:21
**Friday** 1:12
**front** 66:16 83:10,12,13
  83:16 84:11 85:12
  87:20 88:3
**FTC** 155:1,4 156:1
  157:1,5,7 163:13,18
**FTC's** 163:14

**full** 10:15 18:11 54:4
  109:18 127:14
**fully** 41:1
**function** 25:21
**functionally** 9:1
**further** 17:4 95:11
  116:3 152:6 163:17
  165:3
**FY** 132:3,7

---

**G**

**G** 117:12
**Gaithersburg** 4:22
**games** 78:15
**gather** 31:11,12 158:8
**Gaylord** 132:5 155:14
  155:20,22 156:4,8,21
**Gaylordhotels.com**
  156:3
**general** 2:10,11,15 4:11
  4:13 6:14 7:11 13:22
  19:22 20:6,7,8,10
  53:12 60:22 69:14
  71:14,16 72:7 112:5
  115:17 120:14,19
  134:22 141:3 155:9
**general's** 21:5 154:22
**generally** 21:12 26:9,11
  31:3 39:13 77:10
  83:21 140:18
**generate** 107:5,7 154:1
**generated** 153:3 157:19
**geographies** 61:4
**getting** 130:12 144:13
**give** 6:21 10:14 16:6
  41:8 53:4 82:2 120:3
  129:18 134:5 137:14
**given** 47:10 150:17
**gives** 75:14
**giving** 123:3
**global** 19:3 20:2 61:15
  77:5 147:19
**globally** 21:19
**Gotcha** 134:16
**governmental** 117:20
  118:16
**graduate** 17:9
**granting** 120:8
**gray** 154:8,15
**GRE** 159:17
**ground** 6:14 120:6
**grounds** 10:7 152:14
**group** 22:12 42:16 63:9
  69:19,20 77:2 98:7
  139:2 148:19
**guess** 44:15 105:21
  128:5 142:12
**guest** 32:14 34:14 35:1

37:14 39:19,20 67:4
  67:16,18,21 68:16,20
  69:1 70:5,13 71:5
  72:8,14,15 84:2,17
  85:6 86:10 87:12
  100:5 101:11,14,21
**guest's** 68:5 72:21
**guests** 31:9 34:19 52:2
  69:15,19,20,20 71:11
  71:14 72:1,8 75:4
  84:8 85:13 88:14
  110:15 111:2 147:20
  148:3,6 161:22
**guestVoice** 51:19 52:1
**guidance** 3:7 62:9,13
  65:20 74:1,11 75:20
  82:2 84:7,9 89:1
**guide** 62:5

---

**H**

**half** 13:17
**happen** 6:18 93:22
  106:12 144:1
**happened** 40:7
**happening** 141:2
**happens** 37:17 53:1
  125:18
**hard** 47:16 110:6
**Hawaii** 37:5
**head** 7:3 112:13
**header** 90:11,22 91:9
**heading** 77:7 87:19
  92:9 136:6
**headline** 126:3
**heads** 16:6
**hear** 132:17 160:7
**heard** 78:1
**held** 19:14
**help** 6:22 77:9 83:13
  85:13
**helpful** 62:13
**hey** 58:12 69:4 70:19
**hide** 162:9
**higher** 146:16
**highlighting** 88:10
**history** 19:6
**hitting** 62:20
**hoc** 76:17
**Hold** 126:13 130:17
**Honestly** 101:16
**Hope** 79:17
**hot** 76:10
**hotel's** 138:22
**hotel-specific** 24:4
**hotelier** 75:14 77:9
**hoteliers** 75:3
**hotels'** 92:20 138:7
**hours** 15:6,13 69:8

**housekeeping** 165:5
**huge** 130:19
**hundreds** 38:22 39:1,9
  39:10
**hurry** 137:16

---

**I**

**idea** 134:4
**identical** 164:15
**identifiable** 63:7
**identification** 11:4
  41:21 44:18 50:3
  59:16 73:8 80:10 90:5
  104:22 113:16 124:10
  129:17 134:13 142:11
  144:20
**identified** 158:15
**imagine** 88:21 144:15
**Immediately** 29:20
**immersive** 35:15
**impact** 63:9
**impair** 10:18
**implement** 148:14
**implementation** 117:16
**implemented** 35:21
**implementing** 61:19
**implications** 119:4
**implies** 22:10 120:16
**impose** 23:17 25:15
  26:22 28:14,18 54:13
  62:2 111:16
**imposed** 24:12 120:5
**imposes** 28:2 33:19
**imposing** 23:20 25:2
  26:19 28:14
**imposition** 117:21
  118:17
**improved** 40:15
**improvement** 88:6
**in/register** 110:16
**inaccurately** 47:10
**include** 7:19 8:16,21
  30:17 32:3,9 44:3
  51:10 63:13 78:19
  89:15 101:9 114:12
  121:17 143:17 147:6
  163:3
**included** 29:10 30:2
  31:21 33:2 44:9 55:17
  77:15 78:18 88:15
  94:14 95:4,9 96:2,10
  96:16,22 107:9 109:4
  146:14,22 148:4
**includes** 22:19 118:15
  144:6 160:2
**including** 27:16 79:3
  94:15 98:7 117:19
  144:6 160:3

**inclusions** 92:17 93:14
**inclusive** 26:7
**incorporated** 38:9
**incorrect** 116:2
**increase** 53:20 54:22
  55:9
**independent** 116:15
**independently** 12:1
  99:1,1
**indicate** 156:2
**indicated** 46:21 105:20
**indicating** 157:5
**individual** 6:2,3 89:12
  89:15 109:4 115:13
  138:6,6,7,11,12,21,22
  148:9
**individually** 97:7
  122:10
**individuals** 149:12
**industry** 18:22 19:1,5
  157:8
**influence** 10:17
**inform** 68:2,7 77:1 78:3
  114:3
**information** 31:12
  50:20 57:22 88:13
  117:3 128:19 148:19
  158:8
**informed** 62:19 68:6
  70:12
**infrastructure** 149:13
  149:16
**inherent** 37:7 38:1 75:6
**inherently** 77:13
**initial** 30:3 44:10
**initially** 29:11 31:22
  44:4 45:3
**insert** 84:15
**insights** 31:11
**instance** 37:10 64:6
  67:19 132:5 139:10
**instances** 38:11 67:8
  70:13 86:3
**institute** 28:12
**instruct** 10:11 67:7
**instructed** 32:12
**instructing** 123:22
  152:15
**instruction** 123:19
  152:12
**instructs** 10:5
**insurance** 67:2
**intended** 65:20 116:15
**intending** 119:5
**intent** 39:18,20 51:14
  51:18 52:1,8 53:19
  54:4
**intention** 119:3 127:8,9

138:15 162:9
**interest** 69:9 72:21,21
  140:11 162:12
**interface** 147:20
**interference** 91:18
**internal** 35:7 38:13
  92:18 103:3
**International** 1:8 4:17
  17:18 138:10 153:8
**introduced** 49:8 57:10
  57:15
**introduction** 125:4
**investigation** 21:6
  45:10,15 90:8
**involve** 5:13 20:13
  99:16 118:19
**involved** 5:19 66:17
  109:7,9,11
**involving** 13:19
**Irvine** 20:10
**isolated** 38:11 67:8
  72:5
**issues** 79:5 120:10
  151:9,10 157:6
**item** 38:22 51:7 52:22
  53:1 72:6 89:16
  114:10
**itemized** 128:1
**items** 25:6 62:12 77:10
  77:20 78:12 79:5,6
  107:22 114:3 117:11
**ITR** 52:7,9

**J**

**Jack** 21:2
**January** 50:20,21 51:2
  51:9 56:18 57:10,11
  57:15 82:18 91:12,12
  91:15 114:11 115:3
  120:9 149:4,5
**Jeff** 43:8 81:11 151:2,2
  151:10
**Jeffrey** 124:21 150:9
**Jen** 129:7
**jeopardy** 52:12
**JIMMY** 2:10
**job** 18:1 19:1,4 88:11
**Johnny** 88:10,12
**June** 3:10 131:12 132:1
**jurisdiction** 47:8
  106:12
**jurisdictional** 84:4 86:4
  107:11
**jurisdictions** 84:20
**justification** 152:15

**K**

**keep** 7:1 42:18,20,22

109:18 145:11,14
**keeps** 46:11 130:22
**key** 18:14 84:2,15
  117:11
**knowledge** 111:14
  131:12,16 153:2
**knowledgeable** 31:7
**known** 161:12
**knows** 121:3

**L**

**la** 24:9
**labeled** 43:6 74:13
  102:3 106:13 124:3
**lack** 62:8 63:14 68:15
**languages** 108:17
**large** 19:19
**large-scale** 19:18
**Las** 143:8 146:11
  158:17
**late** 28:22 86:1
**lawyer** 146:21
**lawyers** 6:21
**lead** 18:14
**leader** 19:12 123:3
**leaders** 42:16 70:11
  89:1
**leadership** 18:15 19:15
  19:21
**learned** 38:2 79:8,9,14
**learning** 61:6 148:2
**learnings** 75:7 147:18
  147:18
**leave** 67:10 69:6 70:20
**leaves** 70:18
**leaving** 69:5
**left** 132:2
**lefthand** 74:12
**legal** 13:6
**leisure** 63:9
**let's** 10:21 12:6 41:7
  49:8 58:19,19,20
  74:12 93:16
**letter** 63:13 64:1 117:4
  155:4,8,9,11,13,17
  156:1 157:5 163:12
  163:14,15 164:9,15
  164:21
**letters** 115:12,14
  116:14,21 155:1
  163:19
**level** 35:18 138:11
**leveraging** 69:2
**liabilities** 117:17
**liability** 120:9,10
**liable** 119:9
**Liberty** 2:4
**library** 77:4 78:5

**lift** 76:7
**line** 64:16 65:9 66:19
  83:11 89:16 95:14
  96:18 109:22 110:15
  120:2 132:6
**lines** 47:17 48:14 71:21
**link** 12:12,13 165:9
**Lisa** 56:3
**list** 3:6 46:12,13,15,17
  47:1 63:15 92:17
  109:5,9,18 111:15
  112:3,8
**listed** 43:7 44:22 45:2
  47:9 48:2,7,10 49:3,6
  79:5 87:21 108:22
  109:2 111:6,13
  117:11 119:22 128:2
  132:7,8 143:7,9
  146:10 157:17 159:21
**listing** 46:7 82:19
  143:19
**lists** 46:14 63:6 97:16
  132:2
**literally** 144:10
**little** 16:17 51:21 58:14
  88:13 95:10 124:4
  130:16,18 134:3
  137:17 142:5 148:16
  150:13,14
**load** 131:2 145:2
**loading** 133:10,14
  144:21
**local** 78:8 79:13 110:8
**location** 95:21 104:10
  107:12
**long** 14:1 15:4,12 26:18
  26:20 65:10 66:10,12
  78:8 79:10,13 141:12
  148:14 150:10 162:1
**longer** 78:19 79:1 112:4
  150:15
**look** 92:6 114:6 147:22
  159:13
**looking** 51:3 73:20
  91:14 94:9 105:16
  112:9 131:22 142:17
**looks** 44:15 69:7 74:2
  80:21 107:5 110:20
  124:21 127:13
**Los** 20:9
**losing** 41:4
**lot** 6:18 49:14 137:14
  157:13
**lower** 49:4 140:6,7,19
**lowest** 135:16,22
**Loyalty** 56:8
**luxury** 18:12

**M**

M 124:21
M.com 143:5
maintain 20:20 51:14
  51:18 92:1 104:11
  108:10,16,20,22
  109:5
maintained 34:18 51:22
maintaining 52:11
  54:12 109:9 161:22
majority 21:20 62:14
  78:21 100:20
making 69:17 116:6
manage 21:21 22:10
managed 18:5 37:20
  85:8 122:20 126:6,8,9
  127:3,16
management 16:21
  17:12 19:16
manager 19:13 20:1,6,7
  20:9,10 53:12
manages 22:7 121:21
  127:5 153:17
managing 20:13 128:17
mandatory 26:9,11,12
  26:17 27:20
manner 101:1
March 1:12 60:11 74:13
March/early 86:1
marked 11:3 41:20
  44:17 50:2 59:15 73:7
  80:9 90:4 104:21
  113:15 124:9 129:16
  134:12 142:10 144:19
market 2:4 17:15 25:6,8
  25:10,12 26:13,18
  28:12 29:18 34:6 36:1
  36:22 60:22 62:6
  63:18 65:22 77:14
  94:8 136:1,21 138:12
  139:1
marketing 107:7,8
marketplace 63:20
markets 25:4 37:2,5
  61:7 77:11 138:6
Marquis 2:3 10:1
Marriott's 21:6 31:3
  35:19 56:16 100:19
  117:15 123:17 125:8
  128:5 141:7,13
  146:21 151:7 158:6
  162:9
Marriott- 41:10 44:19
  45:6 73:9 113:10
Marriott-00463452
  129:14,20
Marriott-0046349 124:7
Marriott-0054493 105:3

Marriott-0055677 90:2
Marriott-DCAG00000...
  50:6
Marriott-DCAG00000...
  59:20
Marriott-DCAG00000...
  79:22
Marriott-DCAG0018...
  134:15
Marriott.com 54:3 98:3
  99:2
MARSHA 98:4 99:2
Maryland 5:1
Mason 129:7
master 3:6 46:7,11,12
  109:5
materiality 114:13
materials 82:22
math 146:18,20
Matt 2:9 4:10 41:17
  45:1 48:5 49:21 50:10
  58:12 59:12 74:20
  80:12 90:6,15 98:17
  102:10,16 105:7,17
  113:2 120:2 126:13
  129:18 130:21 134:21
  141:10,18 145:11
  161:15 165:4
matter 1:4 4:16 11:13
  12:8 13:6 18:14 58:22
  73:17 112:17 113:5
  123:14 152:2 165:18
matters 163:5
matthew.james2@dc...
  2:13
McCoy 1:16 3:2 4:4,19
  11:3 41:10,20 42:2
  44:17 45:19 50:2
  59:15 73:7 80:9 90:4
  104:21 113:15 124:9
  129:16 133:14 134:12
  142:10 144:19 145:1
  146:2 153:1 155:5
  165:17
mean 7:18 8:6,16,21
  9:10 37:12 40:13 62:1
  66:22 70:6 85:15
  87:22 90:21 91:16,18
  93:1 95:18 97:22
  98:22 103:10 118:1,5
  118:7,7 122:10 127:4
  129:2 135:19 136:16
  137:6 151:1,5
meaning 37:16 52:10
  75:4 78:4 87:6 111:17
means 34:1,2 38:20
  52:19 89:7 116:2,4
  135:15,20 136:19

137:10,11,12,22
  152:17
meant 94:4 98:13
measure 34:19 86:12
  120:17 121:2
measured 35:3,4,7
medications 10:18
meet 15:1 20:20 39:18
  53:15
meeting 3:5 15:4,8,11
  15:12 42:3,15,20 43:1
  43:2 54:18 87:21 88:4
  89:8,9,11,13 157:18
meetings 42:19 89:5,10
  89:15
members 15:16 58:8
memory 14:17
mention 110:9,19
  125:13
mentioned 34:10 35:21
  58:4,7 85:4 163:4
mentions 69:4
merited 69:13
met 14:21 15:2 98:14
  98:19,21
metadata 46:20 81:4
  105:20
metric 39:19,21 53:2
Miami 93:16
mid-year 3:10 126:18
middle 56:11 66:14
  92:8 103:2 110:14
  117:13 127:2
migrated 156:22
million 121:13 122:7,13
  127:11,12,13,14
  128:4 132:7,9
millions 70:17
Milton 3:3 10:1 15:9
mind 121:10
mine 133:10 144:22
Mine's 124:4
minimum 25:16 27:8
  52:9
minute 12:17 50:7
  79:20 111:13 113:11
  124:11 130:7 133:20
minutes 3:5 42:3,15,20
  43:1,3 44:6 58:18
misrepresented 151:13
mitigated 40:20
mix 63:8,21
mmarquis@cozen.c...
  2:7
mobile 68:8
model 21:17 32:3,4,5
  64:7,8,15 100:13
  101:6 139:17

models 32:15,16
  101:17
modified 46:21 81:5
  91:12 105:20
moment 14:12 59:9
  68:13 89:21 105:13
moments 70:15 82:19
money 119:18 121:6
  123:5,8 126:2
Monica 40:11
monies 154:1
monitor 35:9
monitoring 109:10,11
month 47:15
months 27:9,9 49:8
  55:7 57:14 76:9 84:21
morning 4:10 15:2,3
  67:10 69:5 70:19,20
  82:16
motion 120:8
mountain 76:10
move 21:11 94:10
  124:1 145:12
moving 95:5 97:11
multiple 9:11 72:22
myriad 148:2
mystery 35:12 38:13,19
  58:7 85:8 92:5 163:4

**N**

N.W 2:11
name 4:10,18 16:7 21:2
  22:10 56:3 111:14
  129:7
named 43:8
names 6:8,10 8:11,17
  18:8 124:17
near 43:7
nearly 48:12
necessarily 28:9 62:20
  66:3 110:21 147:19
  153:13
necessary 61:18 62:1,2
  62:4,15
need 6:22 7:3,5,10 8:1
  8:4 9:5,7 11:17 20:20
  32:13 58:17 66:3
  88:12 101:13 133:15
needed 76:17
needs 69:1 77:14 138:8
  139:6
negotiate 69:22
negotiated 32:6 33:5
  139:17
negotiations 98:9
  141:18
net 107:6
never 40:22 164:14

**new** 76:9 78:13,13
**newer** 81:1
**newly** 116:6,6
**nice** 123:19
**night** 16:12 69:4 70:18
  143:10,13,15,17
  146:14
**nod** 7:3
**non-** 77:21
**non-acceptable** 77:18
  78:16
**non-compliance**
  164:16
**non-Marriott** 164:12
**norm** 25:8
**normal** 104:3
**normalcy** 25:10,12
**normally** 104:7
**North** 18:5 30:8
**note** 72:2
**noted** 52:6 60:10 68:14
  77:12 83:1 87:8,9
  94:17
**notes** 14:9,19 130:4
  150:2 161:3
**notice** 1:17 3:5 11:16
  12:14 13:11 40:14,16
**noticed** 69:3 88:12
**notices** 164:5
**notification** 158:1
**notified** 159:1 160:1,12
**noting** 60:20 84:3
**November** 155:4
**number** 4:21 5:1 6:15
  14:15 17:3 19:14 25:4
  38:21 39:12 41:17
  44:19,21 45:14,16
  47:5,19 48:9 51:7,13
  53:10 59:12 68:7
  71:22 102:3,9 112:5
  114:2 120:4 121:9,12
  121:13 122:4,17
  123:2 128:10 136:6
  149:11
**numbers** 45:12 123:17
  127:4,15 128:8 132:9
  132:13,21 133:3
**numeric** 127:20

**O**

**O'Connor** 2:3
**OAG** 2:17
**object** 6:22 27:2 48:9
  65:13 91:17 111:20
  128:20
**objected** 120:1
**objecting** 28:17
**objection** 10:5,10 30:4

55:18 81:20 96:20
  118:2,22 119:11,21
  120:5 123:12 125:11
  132:15,18 136:17
  137:8 140:21 141:15
  147:2,14 149:9,19
  150:21 152:18 156:12
  158:11 160:4,6
  161:14 162:21 163:22
  164:17
**objections** 10:3
**obligated** 32:17 138:1,2
**obligations** 92:20 99:14
  100:2 137:2
**obviously** 34:20 36:11
  58:5 75:22 107:2
  125:14 161:20
**occupation** 17:14
**occur** 101:15 159:14
**occurred** 28:22 88:5
  114:9 150:20
**occurs** 43:22
**October** 17:22
**odd** 5:9
**offer** 26:10 32:17 33:14
  46:8 47:6 57:9 63:10
  75:11 112:11 139:9
  139:22 140:1
**offered** 48:13 85:14
  140:5
**offering** 34:6 106:8
  116:16 117:1
**offerings** 31:4 83:13,15
**offers** 9:11 32:11
  136:14
**office** 2:16 4:12,12
  66:16 83:13 87:20
  154:22
**office's** 88:3
**officer** 129:3
**official** 110:8
**older** 80:18,22 81:7,15
  110:16 111:3
**once** 40:9 54:15 57:4
  93:15 94:10 101:10
  101:10,18 148:15
  162:17
**one's** 141:14
**ongoing** 82:20
**online** 9:10 14:16 31:19
  69:17,18 117:15
**open** 12:13 41:9 44:13
  47:6 49:9,18 59:4
  73:4 79:17,18 89:19
  112:21 113:1 122:4
  129:13 133:7 142:4
**open-mindedness**
  16:14

**opened** 49:9
**opening** 11:22 113:2
**openings/transitions**
  18:13
**opens** 79:18
**operate** 47:6 101:17
**operated** 7:19 8:5,17
  21:14
**operates** 7:13,14 8:11
  121:21
**operational** 18:4
**operations** 17:16 18:11
  19:3 20:3 80:4 82:11
**operator** 119:6
**operators** 153:12
**opportunity** 64:12
  67:15 72:9 75:16
  77:15 88:6,6 93:13
  159:10,13 160:17
**Opryland** 132:5
**opt** 27:12 28:1,8 66:20
  66:21 67:6,19,22
  68:21 69:16,22 71:4
  71:12
**Orbitz** 135:11 136:14
  137:5,7,19 138:3,4,9
  138:13 139:10 140:3
  140:7
**order** 20:20 25:11 27:5
  28:14,15 65:8 66:4
  120:8
**organization** 42:22
  109:13 129:1
**organizations** 5:14
**original** 45:5 47:17
**originally** 105:2,10
  130:5
**OTA** 9:9 31:19 32:2,9
  32:12,22 33:3 100:13
  101:15 135:10
**OTA's** 32:16
**OTAs** 32:2,5,6 33:5
  97:17 98:6 100:21
  103:19 139:21,22
  140:18 141:8,13
**outlined** 82:22
**outlines** 53:15 61:18
**outperforms** 37:16
**outside** 101:7 128:14
**overall** 52:21 53:2,4,7
**overlap** 62:18
**oversight** 20:17,18
**owned** 7:19,20 8:5,6,17
  21:13,15
**owner** 63:13 64:1
  115:11,11,14 117:14
  118:8 119:5
**Owner/Franchisee**

113:10
**owner/operator** 118:8
**owners** 114:1 115:1
  116:5,5,6 153:12
**ownership** 22:11
**owns** 7:12 153:17

**P**

**P-R-O-C-E-E-D-I-N-G-S**
  4:1
**p.m** 67:9 112:18,19
  113:6,7 152:3,4
  165:19
**PA** 2:5
**package** 66:5
**packet** 62:7 63:3,12
  84:2,15
**page** 3:4 27:17 29:20
  29:22 30:16 34:9,11
  34:11 41:13,14,15
  43:12,22 44:10 50:19
  51:6,7,12 56:6,11
  66:15 80:2 83:3 87:15
  91:10,11,20,21 92:8
  93:11,15,17,17 94:5
  94:10,21 95:5,18,20
  96:3,4,4,8 97:3 101:6
  101:15 102:2,8,13
  103:2 107:14 109:22
  110:3,4,14,20 111:11
  114:5 117:13 124:20
  125:3,3 136:5 145:19
**pages** 95:1 160:1
**pamphlet** 84:14,16 86:7
**pamphlets** 83:12,16
  85:2
**pandemic** 57:13
**paragraph** 53:10 56:12
  65:13 83:10 85:9
  92:13 97:11 103:4
  117:14 118:1,5
  135:12 136:9
**parameters** 38:21
**part** 21:17 24:22 25:9
  32:2,4 45:17 53:7
  61:5 63:2 64:8,10,21
  65:1,3 68:13 75:12
  84:1 85:5 86:9 89:10
  95:9 103:17 104:7,9
  105:6 106:22 108:11
  108:14 120:4 125:12
  125:19 128:16 140:12
  140:16 148:7,8,18
  155:10
**PARTICIPANT** 11:18
**participate** 67:11
**participating** 126:5
  135:16,17 136:10,13

137:18
**particular** 16:5 22:11
  22:16,17 24:2 28:1
  30:8,9 39:3 47:8 53:1
  63:19 75:17 81:16
  82:15 85:21 88:8,14
  88:20 89:2 94:7 99:19
  104:10 107:12 108:14
  109:16 115:2 117:3
  136:1,2,2,3
**particularly** 123:16
**parties** 1:18
**partners** 138:9 140:19
**party** 35:11,13 38:13
  117:20 118:16 157:17
**PASCUAL** 2:9
**pass** 38:18 53:5
**passed** 38:15
**passing** 38:20
**path** 94:12,14
**Paul** 2:2 10:1 15:9,15
  132:17 134:3 145:7
  152:18
**Paul's** 15:16
**payable** 110:8
**PDF** 45:4 105:1
**Penn** 17:8
**people** 31:12 52:19
  53:4
**percent** 25:17,17 28:13
  28:21 29:3 34:6 35:22
  36:2 52:17,18,19 53:4
  121:1
**percentage** 49:11
**perceptions** 75:9
**perfect** 5:7 142:22
**perfectly** 58:16
**performance** 63:8
**performed** 43:16
**performing** 35:18 38:4
**performs** 52:6
**period** 81:6 116:21
**Periodic** 99:13
**periodically** 46:13
  108:12
**person** 43:7 129:6
**personal** 4:20 5:11
  22:21 23:2 158:6
**phenomenal** 88:10
**Philadelphia** 2:5
**phone** 5:1 9:14 79:13
**phones** 79:12
**photographically** 86:20
**photography** 87:11
**piece** 30:15 34:5
**pillars** 25:19
**place** 2:4 26:21 161:4
  162:15,17,18

**Plaintiff** 1:6,17 2:8 4:6
**plan** 53:13,18 65:1
**plans** 64:19,20 66:16
**platform** 135:11 139:4
  139:4,20 140:2,15
  156:22
**platforms** 100:14,17
  138:15,18 139:4,14
  139:16 141:20 149:12
**pleary@cozen.com** 2:6
**please** 4:17,20 6:17,19
  7:2 8:3 9:6 10:4,8
  12:19 18:21 43:11
  49:19 51:11 56:6 59:9
  73:3 79:17 80:7 83:2
  87:14 89:19 102:2
  103:6,22 107:13
  112:21 124:2,13
  129:13 133:7 136:4
  142:4
**point** 39:22 43:12 48:13
  78:21 89:16 94:6,13
  97:15,21 99:19 100:9
  116:12 121:12 126:6
  126:7 143:19 152:5
**points** 17:6 39:2,11
  115:2 117:11 150:16
**policies** 18:4 32:7 33:9
  33:11,15,17,20 34:21
  35:4,19 36:2,5 118:10
  160:22 161:4 162:14
  162:19
**policy** 3:6 14:8,19
  20:17 24:19 25:10
  28:12,21 50:17 56:16
  82:4,17 117:15
  118:12 162:9 164:3
**pool** 106:10
**pooled** 106:7
**popping** 78:1
**portfolio** 22:12 29:15
  29:18 35:17 39:5 46:8
  101:7,9,11 122:2
  148:10
**portray** 32:13,20
**portrayed** 47:10
**position** 17:20,21 18:2
  21:1 76:4 93:18 150:5
  150:11,19 151:5
  159:8 162:7
**positions** 162:7
**possible** 42:22 44:6
  47:8 49:3,5 62:18
  69:19 106:10 112:3
  131:17 135:22 139:20
  140:10,17 141:1,4
**possibly** 159:22
**potential** 44:9 64:7

**potentially** 41:4 54:16
**practice** 28:21 80:19
  82:5 163:19
**practices** 3:8 14:19
  18:4 20:18 21:6 80:5
  82:12
**pre-suit** 21:5
**preceding** 45:15
**predecessor** 20:22
  43:8 124:22 150:9
**predictable** 144:14
**preparation** 14:5 21:9
  64:10 155:10
**prepare** 13:14 16:10
**prepared** 16:13,16
**present** 1:18 2:15 15:7
  15:9,14 62:7
**presentation** 80:20
**presented** 14:11 82:3
**president** 17:15 18:10
  18:13 19:3 53:14
**presidents** 61:3 82:3
**presumably** 10:6 108:8
  126:11 127:7,9 132:4
  151:1,11
**pretty** 72:2 105:22
  144:14
**prevalence** 37:1
**prevalent** 37:6 79:12
**previous** 5:18 117:4
  128:3 146:6,17
**previously** 5:16 21:4
  78:4,18 93:10 115:8
  115:10 116:10
**price** 31:22 32:4 33:2
  43:15,21 44:4 159:21
  160:2
**prices** 29:11
**prices/rates** 110:1,7
**pricing** 157:6
**primarily** 147:20
**primary** 23:21 75:1
  125:5,8
**print** 103:7 104:1
  158:14
**printout** 130:2
**prior** 6:7 20:2 40:8
  61:19 95:18 97:3
  100:4,6 114:15
  145:19
**privilege** 10:8 152:14
**privileged** 13:21 123:21
**privy** 128:7
**proactive** 69:14
**probably** 15:6 19:9
  21:15 23:9 47:22 81:9
  105:21 131:21 134:7
  141:22 149:4 151:3

**problem** 9:18 165:12
**problems** 49:21 79:2
**procedure** 54:11
**procedures** 14:20 18:4
  22:3,6 35:10 36:17,18
  36:20 82:6 162:18
**proceed** 103:5,16
**process** 3:7 20:18
  27:14,15,18 28:3,6
  31:11 54:18 57:9 59:5
  60:7 61:1,6,14 66:20
  66:22 67:6 68:13,21
  70:5,9 71:4,5,17 72:5
  72:16,17,17,19 82:22
  89:12 91:3,6 92:3,6
  93:5 94:11,19 99:20
  100:10,20 103:3,11
  103:18 104:4,8,10,12
  119:4 155:21 158:16
  160:13
**processes** 71:7,12,13
  71:15 72:8,16,22
  89:14 92:1
**produce** 81:8 131:13,18
**produced** 45:13,16
  81:10 90:8 138:14
**production** 45:9
**productions** 45:17
**profit** 125:6,9,20
**program** 51:10 72:22
  114:11
**programs** 31:13 36:14
**projected** 127:14
**proliferation** 79:11
**promise** 37:22
**proper** 9:8 152:13
**properly** 8:3 9:6 99:11
  103:8,19 104:2
**properties** 19:19 43:15
  92:14 97:12
**property** 61:19 70:11
  70:12 93:2 97:19 98:1
  103:5,16 111:14
  139:6 155:14
**property's** 103:8 104:2
**property-based** 35:8
**proposed** 54:1
**proposition** 24:22
  33:22 34:2 62:6 63:11
  75:12 77:16
**proprietary** 50:19
**Protection** 2:17 4:12
**provide** 4:20 11:15
  13:10 23:22 24:7 40:1
  65:20 75:2 83:16
  85:18 103:7,22 138:1
  138:2,4 140:7
**provided** 12:12 33:7

57:22 67:21 81:19
82:1 84:17 85:3 89:1
104:7 128:16 140:9
**provides** 32:8,21
**providing** 67:22 83:11
136:1
**provision** 24:8
**psyche** 36:9 75:9 78:11
**published** 135:17,21
**purpose** 74:16,21 75:1
77:8,19,21
**purposely** 81:15
**purposes** 126:14
**pursuant** 1:17
**pursue** 61:1,7,16 76:2
76:22
**put** 40:14,16 43:15,21
45:4 86:15 152:11,18
154:21 159:7 161:4

**Q**

**quarter** 28:22 109:21
**question** 6:20 7:7,8,9,9
8:3 9:6 10:6,9,10
65:10,14 102:1 120:2
120:4,12,15,19 121:6
122:16,22 123:13
139:19 141:10 150:4
154:4
**questions** 6:15,16 10:3
13:18,22 39:1,10 53:8
123:16,18 126:15
152:6,7,12 154:21
157:12,13 158:9
160:22 163:7,17
165:3
**quickly** 55:7
**quite** 52:16 55:6 122:16
**quizzing** 48:18
**quoted** 110:1,7

**R**

**R** 2:10
**raised** 157:7
**ran** 111:5
**random** 52:2 58:5
**rate** 29:16 30:3,13,18
31:21 32:9,9,17,22
33:1 43:14,20 93:13
94:9 95:2,3 110:9
135:14,15,17,20,22
136:20 137:21 138:8
138:18,19,20,21
139:6,9,9,18,21 140:6
140:7,8,13,20 143:7,9
143:16,19 144:5
145:20 146:10,16
147:22

**rates** 30:21 32:18 33:6
44:11 69:20 136:6
137:2,3,20 138:2,3,7
138:14 139:3,5,15,16
140:5 143:21 144:5
146:7,12,22 149:7,17
149:18
**re-argue** 152:10
**re-confirm** 67:3
**re-update** 165:11
**re-upload** 133:15
**read** 11:7,16 54:9 130:7
130:13 142:1 143:12
**readable** 130:15
**readily** 61:15 63:7
**real** 68:3 75:16 76:5,8
77:11
**real-time** 52:5
**reason** 10:14 73:12
81:14 131:4 149:15
**reasonable** 140:4
**reasons** 36:6 44:2,5
148:2
**recall** 5:21 24:13 29:8
38:10 55:5,20 148:22
**receive** 60:20 61:1
65:17 76:20 123:1
153:15,21
**received** 61:5 117:14
121:14,20 122:19
155:3 157:4 158:1
163:12 164:14,20
**receives** 60:18 76:19
**receptive** 75:4
**recognize** 11:9 13:1
42:12,13 43:2 46:4
50:12 60:2 67:15 74:6
80:14 85:13 90:17,20
113:19 124:16,17,18
131:6 134:8 135:3,4,6
143:1,3 146:2
**recognized** 152:14
**recollection** 5:7 31:16
**recommend** 39:19,20
51:18 52:1,8 53:19
54:5
**recommendation** 85:17
88:3
**recommendations** 86:3
86:4
**recommended** 88:18
**reconcile** 112:8
**reconciliation** 112:2
**reconvene** 151:20
**record** 4:18 7:4 12:6,9
41:10 54:10 59:1,17
73:15,18 79:22 90:7
112:16,18 113:4,6

126:14 142:1 143:12
145:17 152:3,10,11
152:19 165:19
**RECROSS** 3:2 164:6
**red** 55:6
**Redemption** 51:8
**REDIRECT** 3:2 163:10
**reduced** 70:1
**refer** 8:15,20 9:9 45:12
61:14 93:20 95:20
115:11 126:9
**references** 51:7
**referred** 52:7
**referring** 7:18 43:17
**reflect** 99:1 143:22
**reflected** 65:9 98:10,11
99:5
**reflection** 147:17
**reflective** 98:6 133:1
**refresh** 14:17
**regard** 20:15 39:14
52:22 92:20
**regarding** 38:8 86:15
152:12 155:1 162:15
**regardless** 71:17
**register** 111:3
**regularly** 106:17,19
108:10 131:13
**regulation** 156:17
157:1
**regulations** 32:7 100:7
**reinforce** 94:17
**reinforcement** 82:5
**rejection** 62:16
**related** 5:11,12 36:14
53:8 106:11 158:9
**relates** 65:20 87:11
88:13 89:1 108:20
117:3 120:7 135:22
**relating** 120:10 157:12
**relationship** 72:3
115:15 138:12 140:13
140:16 155:20
**relationships** 99:14
**relatively** 142:19
**relevant** 6:1 13:6 14:10
14:19 23:15 36:1
54:21 82:21 149:12
**remains** 114:13
**remedies** 120:9
**remember** 6:8,10 23:7
24:11 55:15,16
111:19 158:16
**remembered** 9:19
**remind** 67:3
**reminded** 28:7
**reminder** 34:14 85:19
88:14 94:16 96:11

**reminders** 82:4 94:14
94:19,20 96:2,6
**removed** 51:10 54:17
84:5 86:2 114:12
**Renaissance** 6:6 8:12
20:8,9 143:8 146:11
**renamed** 73:21
**repeat** 48:4
**rephrase** 6:17
**replace** 79:13
**report** 63:6 64:2 111:5
**reporter** 7:1 165:6
**reporting** 52:3,6 107:3
**reports** 18:7
**repository** 61:14
**represent** 4:15 47:18
64:13 101:3,5
**representation** 106:7
127:20 151:16
**representative** 56:13
138:13 151:7
**represented** 82:17
86:20 99:18 122:18
**representing** 101:7,8
145:17
**represents** 122:18
**reputation** 162:1
**request** 54:3 61:10,12
68:20 69:1 113:9
**require** 26:12,16 33:8
116:19,22 117:4
**required** 9:3 24:19
32:19 33:14,16,20
35:9 51:14,18,22
54:12 56:14 57:1,6,19
60:7 63:5 64:22 65:2
65:16 68:15 71:7 82:7
83:15 86:22 88:18
115:21 116:7,10
**requirement** 25:19
28:16 29:2,7 36:1
85:17 86:12,13
107:11
**requirements** 84:4 86:2
86:4 92:10 114:3
**requires** 33:12 53:20
99:21
**research** 31:10 161:21
**reservation** 56:8 69:17
92:18 94:3,4,19 97:16
97:22 98:5 99:20
100:10 103:6,17
156:22 160:13
**reservations** 94:12
**reserve** 123:20 152:16
**reside** 86:5
**resize** 142:4
**resort/destination** 3:6

3:7,7,8,9 59:5 113:9
117:18,22 118:18
**resorts** 19:19 24:18
126:5,7,8,8,9 127:3,5
127:17
**resources** 77:4
**respect** 135:15 156:7
158:20
**respectful** 75:8
**respective** 1:18
**responding** 69:15
**response** 36:20,22 37:8
61:12 68:9
**responsibility** 18:3
20:3 98:11,15,19,21
107:1 118:9 119:15
122:4 128:14,15
**responsible** 19:21 23:5
23:13
**responsive** 69:15
**rest** 16:12,15
**result** 54:7 62:15
118:11
**resumed** 12:9 59:1
73:18 112:18 113:6
152:3
**retain** 66:6,10
**retained** 66:13
**reveal** 97:2
**revealed** 101:13
**revenue** 64:7,8,15 98:2
120:15,17,19 121:1
121:19,22 122:11
123:10 125:6,9,15,18
125:20 127:3,16,19
127:22 128:6,11
132:4,7,8,21 133:2
152:13 153:10
**revenues** 128:1 153:3
**reverse** 19:7,10
**review** 11:17 12:18 14:4
14:7,13 20:19 21:8
42:7 46:2 50:7 59:9
74:2 75:21 76:13,16
79:20 88:4,4 89:22
105:13 111:13 113:12
124:12 126:4 133:21
150:1 160:17
**reviewed** 14:8,8,11,15
14:18 28:4 42:11 50:9
59:21 80:11 90:15
124:14 131:5 156:2
**reviewing** 108:2
**revision** 116:3
**revocation** 54:8
**revoked** 40:13,13,15,19
41:1,1
**right-hand** 102:4

**Ritz-Carlton** 8:12
**robust** 27:15 34:21 58:6
**ROCK** 2:10
**role** 19:12,18,21 20:2
**roles** 18:8,9,14 19:14
19:15,16,16
**rolled** 43:14
**rolling** 10:21
**room** 29:16 30:3,13,18
31:21 32:8,9,22 33:1
33:6 43:14,20 44:10
71:19 84:2 85:10,12
85:15,16,17 86:1,6,10
86:15,19 87:3,12
93:13 94:9 143:7,9,19
140:1 147:21 158:16
162:10
**rooms** 9:11 29:11 30:13
31:19 94:7 136:11,14
137:4,19 139:22
140:1 147:21 158:16
162:10
**roughly** 6:4 19:17,20
91:15
**round** 121:10
**routine** 107:3,3
**routinely** 31:8,9
**rule** 60:22
**rules** 6:14

---

**S**

**sales** 98:7
**sampling** 52:2
**San** 6:5,7 20:8
**Santa** 40:11
**satisfaction** 39:21
**saturation** 26:19
**save** 133:11
**saw** 25:7
**saying** 37:14 62:22
81:14 136:9 163:15
**says** 42:3 43:13 50:19
51:13,17 53:10 54:22
55:10,21 56:8,13
60:11 61:17 62:1 64:1
64:6,18 65:5 66:15,19
69:6 70:19 71:3,5
83:11 85:10,11 91:9
91:11,18 92:14 94:2
97:12 103:2,4 107:15
109:22 110:6,15
114:5,10 118:14
125:4,13,14 126:5
127:2,13,14 131:22
135:14 136:20 137:3
137:17,22 140:3
143:13,21
**scope** 120:21 121:4
123:14,22 128:14

**score** 53:5,7
**scores** 72:2
**scoring** 52:4
**Scott** 1:16 3:2 4:4,19
28:19 48:10 121:4
164:3
**screen** 3:11,12 48:7
102:7,13 103:7 104:1
130:22 142:6,8,13
143:3 144:11 145:7,9
147:21 148:11 154:5
154:7 159:6 165:1
**screens** 130:18 143:5
158:14,20,22 159:9
**screenshots** 104:6
**script** 66:4 67:7
**scripting** 34:13 84:1
**scroll** 11:18,20 12:1,18
43:11 51:11 56:6 83:3
87:14 91:20 102:2
107:13 124:19 134:3
136:5
**Scrolling** 50:18 66:14
125:2 126:3
**se** 138:10
**search** 106:15
**searches** 106:18
**season** 76:6
**seasonal** 76:4
**sec** 151:12,12
**second** 12:7 30:15 34:5
41:8 42:7 43:12 49:20
63:22 73:15 85:9
91:10 94:21 100:19
101:15 112:16 120:3
124:20 126:7 154:6
**seeing** 93:12 158:16
159:8
**seek** 122:12 152:16
**seen** 43:5 78:22 79:1
86:19 95:17 96:3 97:3
115:12 131:8 132:14
155:9
**select** 27:13,22 93:17
139:21
**selected** 29:19,21
93:16 94:11 100:16
100:19 101:1,10,11
101:18 159:7
**selecting** 28:3 93:11
148:9
**selection** 24:1 101:14
147:21
**self-certification** 56:21
57:2
**sell** 103:5,15
**send** 164:5
**senior** 18:11 70:11

**sense** 35:15 134:5
**sent** 33:3 107:9 153:11
163:19 164:8 165:8,9
**sentence** 51:13 56:7
85:11 103:9,10,13
125:3,13 140:3
**sentences** 103:12
**separate** 33:6 45:10
46:14
**separately** 33:3,7 95:7
**serve** 139:1
**serves** 146:18
**service** 18:11 34:18
35:1 40:1 161:20
**services** 88:7 92:15
162:3
**set** 12:6 39:12 63:7 94:7
136:10,20 137:1
139:8,15,15 140:12
155:22
**setting** 137:2
**shake** 7:3
**share** 10:22 41:11
44:14 88:13 104:17
114:4 122:17 128:5
138:17,19 154:5
**shared** 28:10 69:2 84:1
103:1 138:8,14
**sharing** 102:15 133:13
139:3 164:22
**Sheraton** 20:4
**shop** 35:12 38:19 92:5
103:7 104:1
**shopping** 43:16 44:10
94:5,6,8
**shops** 38:13 58:7 85:8
103:5,15 163:4
**short** 141:14
**show** 108:3 109:17
143:21 144:4 146:7
146:12,22 149:7,17
149:18
**showed** 145:19 148:11
158:13
**shown** 92:16 157:19
**shows** 144:11 146:13
**shuttle** 69:6
**side** 77:18
**sign** 84:11 86:7 115:22
116:11,20
**signage** 83:12,16,19,21
83:22 85:2
**signature** 124:20
**signed** 116:13
**significant** 35:20 36:3
81:13
**significantly** 49:1
**similar** 9:1 24:16 29:2,7

70:14 79:6 82:2 85:11
92:3,4,6 100:16
106:22 107:5 109:1
114:9,18,21 116:14
119:10
**simply** 24:9 57:12 84:8
114:12
**Simpson** 56:3
**single** 38:22 49:10
62:20
**sir** 42:5 107:18 119:13
**site** 103:8 104:1
**sites** 136:12 140:5
**six** 27:9 69:8
**six-month** 53:12,16
**size** 11:6
**ski** 76:6,6,7,7
**skis** 76:7
**slightly** 26:14 37:3
47:22 148:1
**slowly** 11:21
**small** 95:10,13 130:11
**Smith** 69:3,7 88:11
**socialization** 82:6
**software** 149:13
**soiled** 87:7
**somebody** 69:16 109:8
**somewhat** 81:15
**Sorenson** 155:17
**sorry** 9:14,17 16:22
30:5 33:10 38:16
41:13 54:9 74:19
77:20 78:1 102:10,17
103:1 113:4 126:21
129:19 130:21,22
132:17 141:9 156:11
160:5,8 161:15
**sort** 105:1
**sought** 148:3
**sound** 78:1
**sounds** 146:19
**Source** 61:15 77:5
**southern** 20:11
**speak** 30:8 32:1 100:12
108:13 141:22
**speaking** 26:7,11 77:11
83:21 138:20 140:18
**speaks** 118:2 142:13
**specific** 13:7 16:3
31:15 33:19 37:1
38:10 52:22 70:10
72:5,6 90:19 91:14
97:9 100:9 115:14,16
121:14
**specifically** 39:14 72:9
72:10 155:2
**specified** 8:21
**specifying** 110:22

**speculate** 82:1
**speculating** 44:7 82:8
108:2 115:1 119:15
140:12
**speculation** 78:20
111:21 156:12 164:1
**spent** 162:1
**spoke** 13:16 54:20
114:9
**spoken** 82:19
**spot** 58:13
**spreadsheet** 3:9 45:3,6
47:17 105:3,9,11
130:5 132:6
**spring** 147:10,11
**staff** 67:8 69:12
**stage** 100:19
**stamp** 126:20,22
**stamped** 142:7
**stamps** 45:15
**standard** 34:18 38:17
51:19 52:1 53:11,16
53:20 54:5,13,18
86:21 87:12 103:17
140:1 141:7,13,14
**standards** 22:3,6 35:13
36:14 58:6 85:5 86:18
108:21
**Stanford** 6:6 20:7
**Star** 63:6 64:1
**start** 17:19 23:19 25:1
41:7 61:9 117:8
**started** 17:21
**starting** 18:22 19:4
**starts** 102:7
**state** 4:18 10:4,9 17:8
152:9,11
**stated** 93:4 107:22
146:5 150:5
**statement** 43:18 92:19
114:13 155:2
**states** 51:8 111:10
117:14 163:20
**stating** 163:13 164:21
**stay** 70:3 75:10 78:12
159:15 160:16
**stayed** 23:4 84:17
**staying** 52:2 142:21
**Stays** 51:8
**step** 62:19,21 104:3
**steps** 53:15 57:21 58:3
61:18 62:2,4,15,17,18
63:5 65:6,8,15,18,19
85:1 86:14
**stop** 164:22
**stops** 54:12
**stream** 98:9
**Street** 2:4,11

**strong** 72:2
**structure** 21:11
**structures** 136:21
139:18
**studies** 31:5,10,15
**stuff** 130:14
**style** 106:3,4 143:4
**styles** 6:9
**subject** 18:14 120:11
152:6
**subjects** 11:15 13:11
**submit** 53:13 56:14
57:5,6 61:10 63:6
64:8,19,22 65:7
**submitted** 54:1 57:19
63:2 66:7 71:7
**subsequent** 19:14,22
94:13 95:1 96:1,6
159:9 160:16
**subset** 101:5,8 122:20
**substantial** 51:1 60:17
125:15
**suggest** 68:16
**suggesting** 164:10
**suggests** 90:7
**Suite** 2:5
**summarize** 18:21 19:5
**summary** 21:10 159:14
**summer** 76:9
**sunsetted** 78:14
**SUPERIOR** 1:1
**surface** 70:9
**surfaced** 109:12,17
**surfaces** 107:9
**surprise** 70:16
**surprised** 9:19
**survey** 3:10 31:8 39:21
52:22 131:12 132:1
**surveys** 31:5
**suspect** 79:8,14 89:7
100:14 108:14
**suspended** 40:2,4
**Suzy** 88:10,12
**swath** 24:4
**switch** 30:16 93:15
130:18
**sworn** 4:7
**system** 73:1 86:10
89:12 98:4,5 99:6,8
106:8 149:14,16
**systems** 159:17

| T |
| --- |

**tab** 41:9 44:14 49:18
59:4 73:4,21 79:17
89:19 104:16 112:21
113:8 124:3 129:13
133:7 142:4 144:16

144:21 145:19
**tacit** 38:1
**taken** 17:3 53:15
129:21
**talk** 15:19
**talked** 13:20,22 15:22
16:2 51:20 82:16
93:10
**talking** 16:4 68:10
103:14
**targeted** 31:15
**tax** 107:4
**taxes** 30:18 95:3,4,8,9
96:10,16,18,22 97:2,6
143:21 144:1,5,6
146:7,12,14,22
149:17 159:11 160:3
**team** 15:16 83:14 98:2
98:3 148:19
**teams** 99:3
**technology** 148:4,19
**telephone** 4:21
**tell** 46:9 123:17 130:10
134:9 155:19 156:10
**telling** 163:21 164:16
**Ten** 78:5
**tenure** 40:9,22 41:2,5
115:5,9 150:20
**term** 31:9,10 62:8 63:14
68:15
**terminology** 7:12 28:9
69:22
**terms** 16:13 25:7,20
36:12 39:16,18 70:2
103:10 121:14 136:11
136:13 137:4 139:17
141:6,12 142:13
153:2 162:3
**territories** 61:4
**test** 103:5,15
**testified** 4:7
**testify** 10:19
**testimony** 10:15 11:15
13:10 21:4,8 151:17
161:3
**text** 108:4,5 109:10,11
**thank** 5:3 13:1,13 14:13
14:21 16:15 20:5,12
28:20 42:1,10 46:3
50:12 51:11 58:21
59:19,21 60:2 73:2
80:11,14 81:12 82:10
83:2,9 87:14,19 88:17
89:17 90:15,17 102:1
102:20 104:15 113:17
126:19 133:19 136:4
146:3 149:6 151:22
152:1 163:8 165:1,1

165:16
**thanks** 9:18 80:6 91:8 101:22 145:22 165:15
**Theresa** 2:15 15:10,15
**things** 10:18 14:1,17 18:16 30:7 78:8,13
**third** 34:8 35:11,13 38:13 51:12 91:20 117:20 118:16 135:13
**thorough** 63:15
**thoroughly** 62:21
**thought** 70:21
**thoughtful** 125:7,10
**thousand** 39:2,10
**thousands** 26:15
**three** 5:8 20:1,3 27:9 160:1
**threshold** 25:17 39:12 39:17 140:14
**tickets** 76:7
**Tiers** 56:8
**times** 5:6,8 14:22 20:1 28:19 40:6
**timetable** 68:5
**titled** 83:6 126:17
**today** 4:16 6:15 9:20 10:15,19 11:13 13:7 13:15,17 16:4,11,13 16:16 23:22 49:4,6,6 78:6,10,22 111:5,17 111:18 154:20 157:4 157:12,19
**toggle** 30:16 93:15 143:22 144:4
**tomorrow** 69:5
**tonight** 142:21
**top** 42:4 43:7 56:7 61:17 83:7 95:19 102:7,12 107:15 111:12 112:13 125:2 125:3 133:9
**topic** 120:5,6,7
**topics** 158:1,9
**total** 21:19 32:3 47:19 64:7 122:7,11 128:6,9 128:10 153:2,10
**touched** 162:17
**tourism** 110:9
**track** 27:10
**training** 34:14 66:15 82:5,21
**transcript** 7:1 165:7
**transient** 63:9 69:19
**transparent** 161:12
**travel** 9:10 31:19 75:6 75:10
**traveler** 67:9
**Travelocity** 9:12 31:20

97:17 99:9,11,22
**trek** 76:11
**tried** 16:15
**truly** 23:14
**try** 6:17 16:13 73:15 161:11
**trying** 77:1 90:11 130:13
**turn** 9:14
**TV** 86:11
**two** 5:8 15:5,16 18:11 30:7 32:22 33:2 35:6 76:20 77:1,6,8,9 81:16 158:14 159:22
**two-page** 41:22
**type** 106:15 164:15
**types** 31:13 56:8 63:10 106:18 139:22
**typo** 87:6

_____

**U**

**U.S** 17:16 21:22 30:8,9 31:1 49:10 84:5 100:7 121:11 122:2 147:20
**U.S.-** 147:18
**Ultimately** 63:12
**unable** 47:5 67:11 70:22 84:21 98:22 99:1
**unaware** 131:20
**unclear** 6:16
**undated** 81:3
**understand** 7:12 8:8,10 10:12 14:3 62:21 65:11 71:19 77:10 103:10 118:4,7,7 120:12 123:4 135:18 136:15 156:14
**understanding** 17:4 37:1 48:15 61:6 62:6 63:13 72:13 90:10 122:15 134:22,22 156:6 158:21
**understood** 9:4 122:22 162:8
**uniform** 116:16
**unique** 76:3
**United** 163:20
**University** 17:8
**Unknown** 68:4
**untechnical** 90:22
**unusual** 90:10
**update** 3:10 47:13 60:17 116:21 117:2 126:18
**updated** 46:13 75:20 81:1,10,12 82:14 165:10

**updates** 60:14
**uploaded** 73:21
**USD** 3:11,12 110:1,7 143:15,16 146:13
**use** 26:1 27:16 29:14 31:4,10 69:22 71:22 114:15 115:9 132:2 139:21 140:4
**user** 131:4
**users** 158:22
**uses** 25:22 54:12

_____

**V**

**v** 1:7 4:16 6:9 118:20
**validate** 107:10
**value** 22:15,20 24:22 33:22 34:2,4 37:7,11 53:20 54:5 55:1,9 62:5 63:11 67:20 75:5 75:12,16 76:8 77:12 77:12,15 78:4,6,7,9,9 78:22 79:1
**various** 17:6 33:5 61:4 63:4 70:22 98:12 141:20
**vary** 32:15
**Vegas** 142:20 143:8 146:11 158:17
**verbally** 68:10
**verifies** 103:7 104:1
**verify** 31:6 57:21 85:2 86:14 99:10 107:10
**verifying** 103:18
**version** 80:18 81:1 90:11 130:11,15
**versus** 66:1 139:20,22
**vice** 17:15 18:10,12 19:2 53:14 61:3 82:3
**Video/Teleconference** 1:13
**viewed** 117:15
**violation** 157:6
**voice** 39:19 72:19
**vote** 38:5
**VP** 2:15

_____

**W**

**wait** 6:19 150:3 151:12 151:12
**waive** 68:18 69:9
**waived** 67:17 71:2
**walk** 97:9
**waned** 78:4
**wanted** 54:9 91:19 149:6
**warning** 155:1,4
**Washington** 2:12
**wasn't** 55:7 101:22

151:15 152:13
**wave** 53:12,17,22 54:4 54:19,21 55:2,8
**way** 12:6 23:22 25:9 27:11 28:1 35:20 36:3 67:20 81:13 87:7,15 90:12 101:3 105:9 109:21 132:11 135:13 139:12,13,13 147:20 157:6
**ways** 35:6 48:22 68:7 76:20
**web** 27:16 34:9,11,11
**website** 9:11 31:20 44:1 99:17,18 146:7,21 147:13 148:15 156:2 163:13
**websites** 29:12,13 31:22 97:17 100:1 141:8
**week** 88:5
**weekend** 165:15
**weekly** 87:21 89:4,8
**Weird** 73:14
**went** 12:9 14:16 59:1 73:18 112:18 113:6 152:3 154:13 165:19
**wide** 107:6
**window** 27:16
**WISEMAN** 2:16
**wish** 76:22 95:11
**wishing** 60:8,19 61:1,7 61:9,16 75:14 76:1 114:1 116:5
**witness** 3:2 4:5 12:3,15 27:4,13 28:20 29:3 30:5,7 31:8 42:5 45:21 48:12,20 50:9 55:20 56:2 59:7,21 74:4 75:1 80:11 81:22 82:14 90:14 92:4 96:22 97:8 98:20 102:9,20 106:2,6 112:1,12 113:1,17 118:6 119:2,14 121:3 121:9 123:18 124:14 125:12,21 127:7 128:22 129:7 130:21 132:16,20 133:4,16 134:1,21 135:4 136:19 137:9 138:5 141:1,9,17 143:3,14 143:18 145:3 146:3 147:4,7,16 148:17 149:10,20 150:7 151:1,22 154:10,15 154:17 155:6 156:14 156:21 158:18 160:9

180

161:15,19 162:11
163:1 164:4,18,20
**Wolff** 21:2,3 43:8
124:21 150:10,18
151:2,3,10
**Wolff's** 81:11
**word** 28:18 107:8
**words** 19:8 99:22
**work** 5:14,19 19:6
22:22 23:12 75:17
98:9 99:3 133:12
**worked** 23:17
**working** 75:3,4 140:14
158:6
**works** 56:3 58:18 154:5
**world** 163:21
**worth** 34:4 84:3
**wouldn't** 37:7 70:16
72:4,14,15 95:16

**X**

**X** 34:1 37:14,16,17 52:3
63:19 72:16 88:2
93:16 94:12 101:15
107:7

**Y**

**Y** 37:15,17,18 72:17
101:16
**year** 57:10 85:22 86:1
127:12,15 128:12
132:4 148:6 151:5
**years** 5:9 6:5 78:6
110:16 111:3 115:13
127:17 128:2 133:1
150:12 157:14 161:22
**yesterday** 15:2,11

**Z**

**Z** 101:16
**zeroes** 44:21
**zoom** 11:6

**0**

**0001800** 134:15
**004497** 1:8
**0045388** 41:11,15
**0054493** 105:4
**045389** 41:12

**1**

**1:02** 112:19 113:6
**1:04** 113:7
**1:50** 152:3
**10** 3:9 6:5 52:17,20,21
53:5 58:20 67:9 72:15
113:13,16 132:7
157:14

**10-minute** 150:1 151:19
**10:08** 4:2
**10:15** 12:9
**10:16** 12:10
**10:30** 69:4 70:18
**100** 22:19 52:15 121:1
127:14
**104** 3:9
**11** 3:5,10 51:7 124:5,7
124:10 129:10,11
**11:13** 59:1
**11:25** 58:20
**11:26** 59:2
**11:44** 73:18
**11:47** 73:19
**113** 3:9
**12** 3:10 6:5 57:13 84:21
129:13,17
**12:35** 112:18
**124** 3:10
**129** 3:10
**13** 3:11 134:10,13,14
161:5
**130** 18:20
**134** 3:11
**14** 3:11 142:7,11 158:12
161:5
**142** 3:11
**144** 3:12
**15** 3:12 144:16,20
145:13,15
**150** 130:20
**152** 3:2
**163** 3:2
**164** 3:2
**1650** 2:4
**169** 3:11 143:9,13,15,16
146:16
**17** 73:4 121:12
**18** 21:16,16 105:21
121:13 122:7,13
128:4
**182** 47:17 48:19
**188** 48:14
**189** 4:22
**19** 1:12 21:16
**19103** 2:5

**2**

**2** 3:5 41:17,18,21 53:10
103:4 150:1
**2:02** 152:4
**2:15** 165:19
**20** 22:19 24:21,21 34:1
34:3 91:12 142:4
**200** 26:14 37:3 47:22
**2000** 19:17
**20001** 2:12

**2001** 120:10
**2003** 19:20
**2008** 134:18
**2010** 79:12
**2012** 127:11 155:4,10
163:14 164:9
**2013** 132:3,7
**2014** 3:10,10 44:6
105:21 111:19 126:16
126:18 127:1 131:12
132:1,8
**2016** 91:12,13,15
**2018** 19:2 133:3
**2019** 1:8 17:22 19:2
28:22 60:6,11 74:13
115:3 121:12 122:8
127:19 132:14,22
133:1 149:5 150:5
**202)724-5558** 2:12
**2020** 46:22 47:2,3,9
48:3,8 49:2 50:20,21
51:2,9 81:5,9 82:18
114:6,7,16 115:4,20
116:18,22 117:7
121:10 147:7,9 149:5
**2021** 1:12 114:11
**20878** 5:1
**21** 110:15 111:2 126:7
**215)665-2000** 2:6
**225** 3:12 146:13
**23** 127:12
**24** 127:12
**25** 91:12
**2800** 2:5
**29** 49:18,22 120:9

**3**

**3** 3:6 44:15,18
**30** 5:8 18:6 39:5 53:17
53:22 55:2
**30(b)(6)** 12:14 119:22
120:21
**32** 129:13
**34** 41:9
**37** 79:17
**38** 41:13

**4**

**4** 3:2,6 24:22 33:22 34:2
49:22 50:3,5 53:21
54:6 55:1,10 77:15
**4,000** 111:6
**400** 2:11
**41** 3:5
**415-307-** 5:1
**42** 73:21 126:6
**44** 3:6
**48** 112:21

**5**

**5** 3:7 59:12,16 110:3
132:8 136:5
**50** 3:6 25:17,17 28:13
28:20 34:5 36:2
**54** 89:19
**55681** 102:4,12
**56** 52:10,11,14,14,15,17
52:19 53:3 146:16
**58** 127:13 133:8
**59** 3:7

**6**

**6** 3:7 73:5,8,22 124:3
**6:30** 67:10 70:18,21
**61** 59:4
**63** 126:5
**66** 127:11
**6629** 5:2
**6th** 2:11

**7**

**7** 3:8 51:7 53:21 54:1,6
55:1,10 67:10 80:10
83:3
**7,000** 37:3
**7,300** 21:20
**73** 3:7
**75** 29:3 35:22

**8**

**8** 3:8 90:1,5 157:14
**80** 3:8 34:3,4
**800** 22:8
**81** 104:16
**82** 44:14 127:12
**850** 21:21
**87** 17:10

**9**

**9** 3:9 52:17,20,21 53:5
104:19,22 120:4
136:6 157:14
**90** 3:8 52:18 127:14
161:22
**92** 144:16,21
**96** 113:8

Neal R. Gross and Co., Inc.
Washington DC

www.nealrgross.com

# Exhibit F

**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
MICHAEL T. HOUCHIN (SBN 305541)
*mike@consumersadvocates.com*
LILACH HALPERIN (SBN 323202)
*lilach@consumersadvocates.com*
651 Arroyo Drive
San Diego, CA  92103
Tel: (619) 696-9006
Fax: (619) 564-6665

**LAW OFFICE OF ROBERT L. TEEL**
ROBERT L. TEEL (SBN 127081)
*lawoffice@rlteel.com*
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
Tel: (866) 833-5529
Fax: (855) 609-6911
*Interim Class Counsel*

**BURSOR & FISHER, P.A.**
L Timothy Fisher (SBN 191626)
Sean L. Litteral (SBN 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
           slitteral@bursor.com

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD HALL, KEVIN BRANCA, and GEORGE ABDELSAYED individually and on behalf of all others similarly situated,<br><br>   *Plaintiffs*,<br><br>v.<br><br>MARRIOTT INTERNATIONAL, INC., a Delaware corporation;<br><br>   *Defendant*. | Case No. 3:19-cv-01715-JO-AHG<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, TO APPOINT CLASS REPRESENTATIVES, AND TO APPOINT CLASS COUNSEL**<br><br>Date:   July 27, 2022<br>Time:  9:30 a.m.<br>Ctrm:  4C<br>Judge: Hon. Jinsook Ohta<br><br>**SPECIAL BRIEFING SCHEDULE ORDERED [Dkt. No. 136]** |

# <u>**TABLE OF CONTENTS**</u>

I. INTRODUCTION ................................................................................. 1

II. FACTS ................................................................................................ 3

  A. Marriott Charges Deceptive Resort Fees Through Its Website ............ 3

  B. Government Investigations into Marriott's Deceptive Resort Fees ........................................................................................... 5

  C. Consumer Survey Evidence Shows that the Resort Fees Charged on Marriott's Website Are Deceptive ................................. 6

  D. Internal Documents Show that Marriott Knows that Its Resort Fees Are Deceptive ............................................................. 7

  E. Plaintiffs' Experiences with Marriott ................................. 9

III. LEGAL STANDARD ...................................................................... 11

IV. ARGUMENT .................................................................................. 12

  A. The Requirements of Rule 23(a) Are Satisfied ................................... 12

    1. Numerosity ................................................................. 12

    2. Commonality ............................................................... 12

    3. Typicality ................................................................... 14

    4. Adequacy ................................................................... 15

  B. The Requirements of Rule 23(b)(3) Are Satisfied ............................. 17

    1. Predominance ............................................................. 17

      a. Defendant's Liability Will be Adjudicated Pursuant to Objective Standards, Using Common Evidence ................................................................ 18

        i. Common Issues Predominate with Respect to Plaintiffs' Claims Under California's Consumer Protection Laws ................................. 18

        ii. Common Issues Predominate with Respect to Plaintiffs' Common Law Intentional

-i-

Misrepresentation, Negligent
Misrepresentation, and Concealment/Non-
Disclosure Claims ................................................20

iii.    Common Issues Predominate with Respect
to Plaintiffs' Quasi Contract/Unjust
Enrichment Claim ...............................................22

b.    Damages Stem Solely from Defendant's Actions
that Created Legal Liability..............................22

c.    Proposed Damages Model...............................24

2.    Superiority ...............................................25

C.    The Requirements of Rule 23(b)(2) Are Satisfied............................27

D.    Alternatively, the Court Should Certify a Rule 23(c)(4) Class ..........28

E.    The Court Should Approve Notice to the Classes ..............................29

V.    CONCLUSION ..............................................................................29

-ii-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, TO APPOINT CLASS REPRESENTATIVES, AND TO APPOINT CLASS COUNSEL

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ...................................................................13, 26

*Bateman v. Am. Multi-Cinema, Inc.,*
  623 F.3d 708 (9th Cir. 2010) ................................................................26

*Berger v. Home Depot USA, Inc.,*
  741 F.3d 1061 (9th Cir. 2014) ..............................................................17

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) ................................................................11

*Brazil v. Dell Inc.,*
  2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) ....................................20

*Brickman v. Fitbit, Inc.,*
  2017 WL 5569827 (N.D. Cal. Nov. 20, 2017)......................................20

*Briseno v. ConAgra Foods, Inc.,*
  844 F. 3d 1121 (9th Cir. 2017) .............................................................11

*Brockey v. Moore,*
  107 Cal. App. 4th 86 (2003) ...........................................................18, 19

*Broomfield v. Craft Brew All., Inc.,*
  2018 WL 4952519 (N.D. Cal. Sept. 25, 2018)...............................20, 27

*Bruno v. Eckhart Corp.,*
  280 F.R.D. 540 (C.D. Cal. 2012).........................................................19

*Butler v. Sears, Roebuck & Co.,*
  727 F.3d 796 (7th Cir. 2013) ...............................................................22

*Chowning v. Kohl's Dep't Stores, Inc.,*
  2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) ....................................23

*Clark v. Super. Ct.,*
  50 Cal. 4th 605 (2010)..........................................................................23

*Comcast Corp. v. Behrend*,

   133 S. Ct. 1426 (2013)...................................................17, 18, 19, 22

*Cortez v. Purolator Air Filtration Prods. Co.*,

   23 Cal. 4th 163 (2000)........................................................23

*Culley v. Lincare Inc.*,

   2016 WL 4208567 (E.D. Cal. Aug. 10, 2016) ...................................26

*Davidson v. Kimberly-Clark Corp.*,

   889 F.3d 956 (9th Cir. 2018) ................................................28

*De La Fuente v. Stokely-Van Camp, Inc.*,

   713 F.2d 225 (7th Cir. 1983) ................................................15

*Deposit Guar. Nat'l Bank v. Roper*,

   445 U.S. 326 (1980) ........................................................26

*Ellis v. Costco Wholesale Corp.*,

   657 F.3d 970 (9th Cir. 2011)................................................27

*Engalla v.Permanente Med. Grp., Inc.*

   15 Cal. 4th 951 (1997)......................................................20

*Erica P. John Fund, Inc. v. Halliburton Co.*,

   563 U.S. 804 (2011) ........................................................18

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,

   326 F.R.D. 592 (N.D. Cal. 2018) ............................................14

*Fletcher v. Sec. Pac. Nat'l Bank*,

   23 Cal. 3d 442 (1979)......................................................23

*Gonzalez v. Millard Mall Servs., Inc.*,

   281 F.R.D. 455 (S.D. Cal. 2012) ............................................11

*Guido v. L'Oreal, USA, Inc.*,

   284 F.R.D. 468 (C.D. Cal. 2012)............................................19

*Hale v. State Farm Mut. Auto. Ins. Co.*,

   2016 WL 4992504 (S.D. Ill. Sept. 16, 2016) ...............................13, 18

-iv-

*Hanlon v. Chrysler Corp.*,

    150 F.3d 1011 (9th Cir. 1998) ......................................................13, 14, 16, 17, 26

*Hanon v. Dataproducts Corp.*,

    976 F.2d 497 (9th Cir. 1992) ...................................................................14, 15, 19

*Harris v. Palm Springs Alpine Estates*,

    329 F.2d 909 (9th Cir. 1964) ..............................................................................12

*Hilsley v. Ocean Spray Cranberries, Inc.*,

    2018 WL 6300479 (S.D. Cal. Nov. 29, 2018) ...........................................11, 27

*Hinojos v. Kohl's Corp.*,

    718 F.3d 1098 (9th Cir. 2013) .....................................................................24, 29

*Hofstetter v. Chase Home Fin., LLC*,

    2011 WL 1225900 (N.D. Cal. Mar. 31, 2011) ...................................................12

*In re Abbott Labs. Norvir Anti-Trust Litig.*,

    2007 WL 1689899 (N.D. Cal. June 11, 2007) ...................................................12

*In re Brazilian Blowout Litig.*,

    2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) .....................................15, 16, 26

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,

    2013 WL 5429718 (N.D. Cal. 2013) ..................................................................22

*In re Ferrero Litig.*,

    278 F.R.D. 552 (S.D. Cal. 2011) ........................................................................20

*In re First All. Mortg. Co.*,

    471 F.3d 977 (9th Cir. 2006) ..............................................................................20

*In re Morning Song Bird Food Litig.*,

    320 F.R.D. 540 (S.D. Cal. 2017) ........................................................................20

*In re Tobacco II Cases*,

    46 Cal. 4th 298 (2009) ..................................................................................19, 27

*Jefferson v. Chase Home Fin.*,

    2008 WL 1883484 (N.D. Cal. Dec. 14, 2007) ...................................................18

-v-

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ............................................................13

*Johns v. Bayer Corp.*,
  280 F.R.D. 551 (S.D. Cal. 2012) .......................................................20

*Keegan v. Am. Honda Motor Co., Inc.*,
  284 F.R.D. 504 (C.D. Cal. June 12, 2012) .......................................19

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) .............................................................13

*Keilholtz v. Lennox Hearth Prods.*,
   268 F.R.D. 330 (N.D. Cal. 2010) .....................................................12

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) .....................................................................23

*Krueger v. Wyeth, Inc.*,
  310 F.R.D. 468 (S.D. Cal. 2015) .......................................................22

*Lambert v. Nutraceutical Corp.*,
  2020 WL 12012559 (C.D. Cal. Jan. 8, 2020) ....................................25

*Lambert v. Nutraceutical Corp.*,
  870 F.3d 1170 (9th Cir. 2017) ...........................................................23

*Lavie v. Procter & Gamble Co.*,
  105 Cal. App. 4th 496 (2003) ............................................................18

*Lazar v. Super. Ct.*,
  12 Cal. 4th 631 (1996) .......................................................................20

*Levya v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) .......................................................17, 18

*Lilly v. Jamba Juice Co.*,
  308 F.R.D. 231 (N.D. Cal. 2014) ..........................................15, 18, 29

*Makaeff v. Trump Univ., LLC*,
  309 F.R.D. 631 (S.D. Cal. 2015) .......................................................25

*Martin v. Monsanto Co.*,
　2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) ....................................17

*McGill v. Citibank*, N.A.,
　2 Cal. 5th 945 (2017)..................................................................27

*Mezzadri v. Med. Depot, Inc.*,
　2016 WL 5107163 (S.D. Cal. May 12, 2016) ...............................13

*Milan v. Clif B. & Co.*,
　2021 WL 4427427 (N.D. Cal. Sept. 27, 2021)..............................14

*Moyle v. Liberty Mut. Ret. Benefit Plan*,
　823 F.3d 948 (9th Cir. May 20, 2016).........................................19

*Parkinson v. Hyundai Motor Am.*,
　258 F.R.D. 580 (C.D. Cal. 2008)................................................19

*People ex re. Bill Lockyer v. Fremont Life Ins. Co.*,
　104 Cal. App. 4th 508 (2002) ...................................................25

*People ex re. Kennedy v. Beaumont Inv., Ltd.*,
　111 Cal. App. 4th 102 (2003) ...................................................25

*Petersen v. Costco Wholesale Co., Inc.*,
　312 F.R.D. 565 (C.D. Cal. 2016)................................................28

*Price v. Synapse Grp., Inc.*,
　2017 WL 3131700 (S.D. Cal. July 24, 2017)...............................22

*Pulaski Middleman, LLC v. Google, Inc.*,
　802 F.3d 979 (9th Cir. 2015) ..........................................18, 23, 24, 25

*Richmond v. Dart Indus., Inc.*,
　29 Cal. 3d 462 (1981) ...............................................................11

*Rodman v. Safeway, Inc.*,
　2014 WL 988992 (N.D. Cal. 2014)............................................13

*Salvagne v. Fairfield Ford Inc.*,
　264 F.R.D. 321 (S.D. Ohio 2009)...............................................15

-vii-

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,

   559 U.S. 393 (2010) ..................................................................11

*Simpson v. Fireman's Fund Ins. Co.*,

   231 F.R.D. 391 (N.D. Cal. 2005) .............................................14

*Smith v. Microsoft Corp.*,

   297 F.R.D. 464 (S.D. Cal. 2014) ..............................................11

*Smith v. Univ. of Wash. Law Sch.*,

   233 F.3d 1188 (9th Cir. 2000) .................................................27

*Spann v. J.C. Penney Corp.*,

   2015 WL 1526559 (C.D. Cal. Mar. 23, 2015) ..........................25

*Spann v. J.C. Penney Corp.*,

   307 F.R.D. 508 (C.D. Cal. 2015).........................................14, 29

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,

   256 F.R.D. 284 (D. Conn. 2009) .............................................21

*Stearns v. Ticketmaster Corp.*,

   655 F.3d 1013 (9th Cir. 2012) .................................................19

*Stearns v. Ticketmaster Corp.*,

   655 F.3d 1013, 1021 (9th Cir. 2011) ......................................24

*Tait v. BSH Home Appliances Corp.*,

   289 F.R.D. 466 (C.D. Cal. 2012)........................................19, 26

*Veera v. Banana Republic, LLC*,

   6 Cal.App.5th 907 (2016) .......................................................24

*Wal-Mart Stores, Inc. v. Dukes*,

   564 U.S. 338 (2011) ....................................................12, 13, 27

*Williams v. Gerber Prods. Co.*,

   552 F.3d 934 (9th Cir. 2008) ..................................................18

*Wolin v. Jaguar Land Rover N. Am., LLC*,

   617 F.3d 1168 (9th Cir. 2010) ...........................................14, 26

-viii-

*Yokoyama v. Midland Nat. Life Ins. Co.*,

    594 F.3d 1087 (9th Cir. 2010) ................................................................28

*Zinser v. Accufix Research Inst., Inc.*,

    253 F.3d 1180 (9th Cir. 2001) ...........................................................26, 27

**Statutes**

Cal. Bus. & Prof. Code § 17535 ................................................................23

Cal. Bus. & Prof. Code §§ 17200, *et seq.* .............................................2, 18

Cal. Bus. & Prof. Code §§ 17203 ..............................................................23

Cal. Bus. & Prof. Code §§ 17500, *et seq.* .............................................2, 18

Cal. Civ. Code § 1780(a)(3) .......................................................................23

Cal. Civ. Code §§ 1750, *et seq.* ............................................................2, 18

**Rules**

Fed. R. Civ. P.  23(a) ...............................................................................1, 2

Fed. R. Civ. P.  23(a)(2) .......................................................................12, 13

Fed. R. Civ. P. 23 .......................................................................................11

Fed. R. Civ. P. 23(a)(1) .............................................................................12

Fed. R. Civ. P. 23(a)(3) .............................................................................14

Fed. R. Civ. P. 23(a)(4) .............................................................................15

Fed. R. Civ. P. 23(b)(2) .......................................................1, 2, 11, 27, 28

Fed. R. Civ. P. 23(b)(3) .............................................1, 2, 11, 17, 25, 27

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................29

Fed. R. Civ. P. 23(c)(4) ..............................................................................28

**Treatises**

Restatement of Restitution § 151 ...............................................................23

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, TO APPOINT CLASS REPRESENTATIVES, AND TO APPOINT CLASS COUNSEL

# I.  **INTRODUCTION**

This is a straight-forward class action case involving the false and deceptive advertising of the amount consumers must pay for Defendant Marriott International, Inc.'s ("Marriott" or "Defendant") hotel rooms, services, and amenities. Plaintiffs Todd Hall and George Abdelsayed's (collectively, "Plaintiffs") consolidated Third Amended Complaint ("TAC") alleges that Marriott deceptively advertises a low-quoted daily room rate that is less than a consumer will actually pay because it does not include the mandatory resort fees that Marriott adds to the daily room charge. TAC ¶ 9. This deceptive pricing scheme, which the Federal Trade Commission (FTC) refers to as "drip pricing," causes consumers to believe that Marriott's hotel rooms are cheaper than they are and this conduct violates consumer protection laws.

The case is readily amenable to certification. Each of the Rule 23(a) criteria are satisfied. Regarding numerosity, many hundreds of thousands of consumers were charged mandatory resort fees after booking hotel rooms through the Marriott website and Marriott mobile app, which uniformly employed a deceptive, bait and switch pricing scheme. For commonality, Plaintiffs demonstrate that Marriott's unlawful conduct was the same to all class members so that liability to each will be determined by answering the same questions, including whether Marriott violated California consumer protection laws and whether this conduct was likely to deceive a reasonable consumer. For typicality, Plaintiffs demonstrate that the legal theory and type of injury is the same for all class members, and with respect to adequacy, Plaintiffs demonstrate that they and their counsel have no conflicts and have been vigorously prosecuting the case on behalf of the proposed classes.

In addition, each of the Rule 23(b)(2) and 23(b)(3) criteria is satisfied. The class claims present predominating common questions based on objective standards that can be resolved through class-wide evidence. Because a determination of the deceptive nature of Marriott's advertising will resolve an issue that is central to the validity of each one of Plaintiffs' claims in one stroke, Plaintiffs' claims are

appropriate for class treatment. Because the classes challenge a uniformly deceptive advertising scheme, class damages necessarily flow from Marriott's conduct creating the legal liability.

For the reasons set forth below, Plaintiffs respectfully move the Court for an order pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), certifying Plaintiffs' claims for unjust enrichment/quasi contract, negligent misrepresentation, intentional misrepresentation, and concealment/non-disclosure, a United States class defined as follows:

> All persons in the United States who reserved or booked a Marriott managed or franchised hotel room online through the Marriott.com website or Marriott mobile app and who paid a resort fee, destination fee, amenity fee, or destination amenity fee in their respective state of citizenship on or after September 9, 2015 and until the Class is certified excluding Defendant and Defendant's officers, directors, employees, agents and affiliates, and the Court and its staff.

Plaintiffs also move the Court for an Order pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), certifying, with respect to their claims for violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA") violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"), unjust enrichment/quasi contract, negligent misrepresentation, intentional misrepresentation, and concealment/non-disclosure, a California class defined as follows:

> All persons in California who reserved or booked a Marriott managed or franchised hotel room online through the Marriott.com website or Marriott mobile app and who paid a resort fee, destination fee, amenity fee, or destination amenity fee on or after September 9, 2015 and until the Class is certified excluding Defendant and Defendant's officers, directors, employees, agents and affiliates, and the Court and its staff.

## II.   FACTS

### A.   Marriott Charges Deceptive Resort Fees Through Its Website

Marriott advertises and sells hotel rooms on its own website (www.marriott.com) and mobile app. TAC ¶ 5. For certain hotels, Marriott charges additional mandatory fees that it refers to as "resort fees," "destination fees," "amenity fees," or "destination amenity fees" (collectively, "resort fees"). TAC ¶¶ 5, 8; HD[1] ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 23:3-19]. These fees are not included in the initial advertised room rates. TAC ¶¶ 9, 23-24.

For instance, a room at the Marriott Marquis San Diego Marina is initially advertised for $420, which does not include a mandatory $35 per night destination amenity fee. HD ¶ 5 & Ex. 4 [Marriott's Request for Judicial Notice in support of its Motion to Dismiss ("Marriott's RJN," Dkt. No. 18-2) at Ex. B]; HD ¶ 2 & Ex. 1 [Wolff Dep. Tr. 93:4-9]. This price deception is compounded by the fact that the hotel room is advertised next to room rates for other hotels that do not charge resort fees. *Id.*

The destination amenity fee only first (and obliquely) appears after a consumer selects a hotel room based on the initial low-ball advertised rate and is directed to a new web page, in a blue box at the top of this page above the advertised room rates at the hotel. HD ¶ 5 & Ex. 4 [Marriott's RJN at Ex. C]. The language used in the "blue box" disclosure would lead a consumer that even notices it to believe the resort fee has been already "added" to the quoted room rate, which is incorrect. Jeffery M. Wolff ("Mr. Wolff"), Marriott's long-time Vice President for Guest Experience and Room Operations, who supervised the resort fee program for Marriott from 2010 through 2019, conceded this disclosure was at best ambiguous during a deposition conducted by the Washington D.C. Office of Attorney General where he testified as Marriott's corporate representative. HD ¶ 3 & Ex. 2 [Wolff

---

[1] "HD" refers to the Declaration of Michael T. Houchin filed in support of Plaintiffs' Motion for Partial Summary Judgment and its attached exhibits.

1    D.C. Dep. Tr. at 181:8-182:1 ("Q: Is it possible that someone could think that the

2    fee's already been added? A: I suppose if they were looking at it that way. I don't

3    read it that way, but I suppose they could.")]. As a further testament to their

4    deceptive nature, these "blue box" statements at times do not mention the amenities

5    that are included with the resort fees (HD ¶ 5 & Ex. 4 [Marriott's RJN at Ex. C]; HD

6    ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 95:17-21]) or even mention the amount of the resort

7    fees. HD ¶ 6 & Ex. 5. Marriott's current director of resort fees, Scott McCoy,

8    testified that Marriott does not maintain any list of the blue box statements used by

9    its hotels, and only reviews them *ad hoc.* HD ¶ 4 & Ex. 3 [McCoy D.C. Dep. Tr. at

10   108:16-109:20]. After the ambiguous "blue box," the resort fee does not appear

11   again in the regular reservation process. HD ¶ 5 & Ex. 4 [Marriott's RJN at Exs. D-

12   F]. Consumers would only see reference to the resort fee charge if they

13   independently click on a separate dropdown box for "Summary of Charges," toward

14   the end of the booking process. HD ¶ 5 & Ex. 4 [Marriott's RJN at Ex. E]; HD ¶ 2

15   & Ex. 1 [Wolff Dep. Tr. at 97:10-23].

16       Marriott's resort fee practices constitute "drip pricing," where only a part of a

17   product or service's price is advertised upfront and additional charges are revealed

18   later in the purchase process. HD ¶ 22 & Ex. 21. The purpose of this "drip pricing"

19   is to increase Marriott's revenue and profit, while avoiding the competitive

20   disadvantage in upfront advertising. HD ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 23:20-24:10;

21   208:7-209:14]; HD ¶ 8 & Ex. 7; HD ¶ 3 & Ex. 2 [Wolff D.C. Dep. Tr. at 235:10-

22   16]; HD ¶ 4 & Ex. 3 [McCoy D.C. Dep. Tr. 44:2-11]. In 2019 alone, Marriott hotels

23   charged consumers approximately $289,452,183 in resort fees. HD ¶ 10 & Ex. 9.

24   During the class period, approximately $303,752,000 in resort fees were charged to

25   United States residents who booked rooms through the Marriott website and Marriott

26   mobile app and $37,906,000 in resort fees were charged to California residents who

27   booked rooms through the Marriott website and Marriott mobile app. HD ¶ 11 & Ex.

28   10 [Podlipna Expert Rpt. at ¶¶ 9-10].

-4-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, TO APPOINT CLASS REPRESENTATIVES, AND TO APPOINT CLASS COUNSEL

Marriott retains complete control over whether its hotels charge resort fees. HD ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 31:3-10]. For hotels that want to charge a resort fee but could not reasonably be considered a resort, Marriott allows them to impose a "destination amenity fee," which is, in the words of Marriott's own resort fee program managers, "basically a resort fee for non-resorts." HD ¶ 3 & Ex. 2 [Wolff D.C. Dep. Tr. at 159:15-16]. As one Marriott employee stated in an email: "I like the Destination Fee. I think it's easier to convey to the guest and doesn't give the suggestion that it's optional." HD ¶ 32 & Ex. 31. Further, in spite of a variety of failures to comply with Marriott's nebulous resort fee policies, Marriott has never revoked a single one of its hotels' authority to impose a resort fee. HD ¶ 3 & Ex. 2 [Wolff D.C. Dep. Tr. at 249:7-16; 250:11-18].

**B.    Government Investigations into Marriott's Deceptive Resort Fees**

In November of 2012, the Federal Trade Commission ("FTC") put the hotel industry on notice that the aforementioned resort fee practices may violate federal consumer protection laws by sending out warning letters to 22 hotel chains. HD ¶ 26 & Ex. 25. Marriott received two of these letters. HD ¶¶ 23-25 & Exs. 22-24. Then, in 2017, the FTC issued a study demonstrating the consumer harm caused by resort fee drip pricing like Marriott engages in here. HD ¶ 22 & Ex. 21.

On July 9, 2019, the Office of the Attorney General for the District of Columbia filed a consumer protection lawsuit against Marriott regarding the disclosure of resort fees on the Marriott website.[2] HD ¶¶ 29-30 & Exs. 28-29. Recently, on December 23, 2021, the court in the D.C. Action denied Marriott's Motion for Summary Judgment. HD ¶ 31 & Ex. 30.

---

[2] The Court previously ordered Marriott to produce all discovery materials from the D.C. Action to the Plaintiffs in this Action "[g]iven the substantial overlap in the factual allegations in the D.C. action and the instant case[.]" Dkt. No. 80 at 14-15.

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, TO APPOINT CLASS REPRESENTATIVES, AND TO APPOINT CLASS COUNSEL

### C.    Consumer Survey Evidence Shows that the Resort Fees Charged on Marriott's Website Are Deceptive

Plaintiffs retained Dr. J. Michael Dennis, Ph.D. to conduct a consumer survey regarding the disclosure of resort fees on the Marriott website. HD ¶ 12 & Ex. 11. Dr. Dennis is a well-qualified consumer survey expert who has testified in numerous matters. HD ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶¶ 5-20]. Dr. Dennis was asked "to design, conduct, and report on a consumer survey to measure the extent to which reasonable consumers' perceptions of the relevant Marriott.com website are consistent with Plaintiffs' theories of liability, that is, the allegation that Defendant misleads consumers into misunderstanding the (i) actual daily room rate and (ii) the cost components of the daily room rate." *Id.* at ¶ 25. Accordingly, Dr. Dennis designed a survey whereby respondents were assigned to two different groups: (1) a partial disclosure group whereby respondents were shown hotel website information that mapped Plaintiffs' allegations with respect to the specific ways Marriott engaged in price deception, and (2) a full disclosure group whereby respondents were shown website information that did not mislead consumers (*i.e.* contained no price deception), according to Plaintiffs. *Id.* at ¶ 49.

The hypothetical hotel room used for both groups had a room rate of $369 USD per night plus a $30 resort fee. HD ¶ 12 & Ex. 11; *id.* at ¶ 56. However, the advertised room rate for the partial disclosure group was $369 per night (not including the $30 resort fee and government-imposed taxes) whereas the advertised room rate for the full disclosure group was $446 per night (including the $30 resort fee and government-imposed taxes). *Id.* at ¶¶ 56-57. The partial disclosure group was shown a "blue box" stating the amount of the resort fee, which replicates how Marriott displays resort fees on its website. *Id.* at ¶ 60. The partial disclosure group could also view the resort fee amount by clicking on the "Summary of Charges" drop down box in a manner consistent with how Marriott displays resorts fees on its website. *Id.* at ¶ 63.

Dr. Dennis' survey measured "the extent to which Full Disclosure hotel information did or did not result in a difference in consumers' understanding of the actual price they would pay for a night of lodging, compared to being provided Partial Disclosure hotel information based on Defendant's actual practices, as alleged by Plaintiffs." *Id.* at ¶ 65. First, the survey found "where consumers are shown only the $369 price point without any other cost information, consumers on average perceived the website to convey that the lowest price they would pay would be $372.63, compared to $450.67 for the Full Disclosure group." *Id.* at ¶ 66. Second, the survey "measured the impact of adding the light-blue disclosure statement to the Partial Disclosure version of the survey." *Id*. at ¶ 67. The survey found that "the impact of the disclosure was marginal. Whereas before the disclosure, consumers understood the lowest price would be $372.63 on average, the additional information increased consumers' understanding of the hotel website information to convey a total price of $385.64, compared to $449.55 for the Full Disclosure group." *Id*. Moreover, "[p]roviding respondents information about 'Taxes and fees' was not effective in communicating the presence of a 'Resort Fee' for the Partial Disclosure group respondents." *Id*. at 68.

Dr. Dennis concluded that his "consumer survey demonstrates that reasonable consumers were deceived by Defendant's websites" and "[t]hroughout the purchase journey of booking a hotel room online on Marriott's websites, consumers shown hotel website information mapped to Defendant's actual practices consistently understood the total cost of lodging to be substantially lower, compared to the understanding of consumers presented hotel website information meeting Plaintiffs' criteria as non-deceptive." *Id*. at ¶ 91.

### D.   Internal Documents Show that Marriott Knows that Its Resort Fees Are Deceptive

Marriott is also aware that its resort fees are deceptive to consumers. In an email dated October 10, 2011 from Jim Fisher, Marriott's Chief Owner and

Franchise Services Officer, sent to Mr. Wolff and others at Marriott, Mr. Fisher stated he "would still like to know where we are going relative to the overall [resort fee] concept… which just a few years ago we fought hard to get out of…now we are jumping back into. ***It was all about nickel and diming the guest and being unable to handle the disclosure requirements***… or give a good value add for the fee." HD ¶ 13 & Ex. 12 (emphasis added). Another Marriott email concerning resort fees stated "this is a very sensitive topic that is attracting a lot of negative press. ***The customers hate it.***" HD ¶ 14 & Ex.12 (emphasis added).

In an email dated April 4, 2016 from Erika Alexander sent to Mr. Wolff and others at Marriott, Ms. Alexander stated, "I actually think ***the comments about fees are fairly negative***" and "many comments across each of these verbatim summaries were related to 1) ***frustration around disclosure (may have been there, but guests didn't notice it)***, and 2) guests unable or unwilling to use the amenities due to the nature of visit or personal interest[.]" HD ¶ 15 & Ex. 14. Ms. Alexander is Marriott's chief global officer of global operations who serves on Marriott's resort fee committee. HD ¶ 16 & Ex. 15 [Alexander Dep. Tr. at 16:1-5; 19:12-22]. Ms. Alexander was Mr. Wolff's supervisor at Marriott. HD ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 12:23-13:3]. During her deposition, Ms. Alexander conceded that "no one likes the idea of a fee" and that it is conceivable that consumers could overlook Marriott's blue box notification. HD ¶ 16 & Ex. 15 [Alexander Dep. Tr. at 25:10-16; 117:17-118:1-4].

Marriott also hired a third-party company called Mercantile to perform mystery shops at its hotels to monitor, among other things, compliance with Marriott's resort fee policies. HD ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 51:23-52:6; 53:2-8; 178:20-25]. The results of these mystery shops from 2015 showed that only "67% (2/3) of the time the resort fee was disclosed at the time of booking the online reservation." HD ¶ 17 & Ex. 16 at MAR099824; HD ¶ 2 & Ex. 1 [Wolff Dep. Tr. at 178:1-182:12]. In an email from a Mercantile employee to Mr. Wolff, the Mercantile

employee explained the resort fee information in a confirmation email for a Marriott hotel "was very hard to see[.]" HD ¶ 18 & Ex. 17.

Marriott has also considered changing its website to better disclose resort fees. In an October 21, 2016 Marriott presentation on resort fees, it was noted that "40+ State Attorney Generals launched investigations into whether resort fees violate consumer protection laws" and that Marriott had received subpoenas from two state attorneys' generals. HD ¶ 19 & Ex. 18 at MAR152274. The presentation discussed "total price display," where "the first number the consumer sees when doing a search for a hotel is the room rate plus the resort fee." HD ¶ 19 & Ex. 18 at MAR152275. The presentation noted that total price display "may have a negative competitive impact on resort fee hotels" and that one of Marriott's primary goals was to "retain resort fee revenue." HD ¶ 19 & Ex. 18 at MAR152276. Instead of a total price display, Marriott considered what it called a "page one disclosure" where the amount of the resort fee would be "displayed in the same size font as the daily room rate" on the first page where the consumer sees the advertised room rate. HD ¶ 19 & Ex. 18 at MAR152278. However, Marriott never implemented either the total price display or the page one disclosure. HD ¶ 5 & Ex. 4. In essence, Marriott chose to continue deceiving consumers. This class action lawsuit followed. Dkt. No. 1.

### E.   Plaintiffs' Experiences with Marriott

Plaintiff Todd Hall is a resident of Rancho Cucamonga, California who stayed at the Marriott Marquis San Diego Marina from May 28, 2018 to May 29, 2018 and was charged a destination fee in the amount of $25. TAC ¶ 55; Declaration of Todd Hall attached hereto ("Hall Decl."), ¶ 2-5 & Ex. A [Hall Dep. Tr. at 47:17-24; 72:11-17]. Plaintiff Hall booked his room at the Marriott Marquis San Diego Marina from the Marriott website. TAC ¶ 55; Hall Decl., ¶ 6 & Ex. A [Hall Dep. Tr. at 54:21 - 55:6]. Plaintiff Hall also stayed at the Sheraton Maui from October 10, 2018 to October 12, 2018. TAC ¶ 56; Hall Decl., ¶ 7 & Ex. A Hall Dep. Tr. at 60:1-13; 62:2-10; 62:23 – 63:10]. Plaintiff Hall also booked his room at the Sheraton Maui from

-9-

the Marriott website. TAC ¶ 56. Plaintiff Hall read and relied on the representations on the Marriott website when booking his hotel room, including the quoted room price and the omission of the fact that the estimated total price did not disclose the mandatory resort fee. Hall Decl., ¶ 8 & Ex. A [Hall Dep. Tr. at 72:24 – 73:6; 78:20-25; 80:9-16; 97:25 – 98:12; 132:3-6]. Plaintiff Hall purchased the Marriott hotel rooms in reliance on the false and deceptive bargain and bait advertising and without knowledge of the true amount being charged based on Defendant's deceptive advertising and misleading disclosure of resort fees, including listing the resort fee within the 'USD Taxes and fees' category. Hall Decl., ¶ 9 & Ex. A [Hall Dep. Tr. at 84:19-23; 92:11-20; 132:11-17; 132:25 – 133:5; 133:16 – 134:19].

Plaintiff George Abdelsayed is a resident of San Diego County, California who stayed at the Marriott Coronado Island Resort and Spa in July 2020 and was charged a resort fee of $25 per night. TAC ¶¶ 76-76; Declaration of George Abdelsayed filed concurrently herewith ("Abdelsayed Decl."), ¶¶ 2-5 & Ex. B [Abdelsayed Dep. Tr. at 61:24 – 62:5; 87:12-20]. Plaintiff Abdelsayed booked his room from the Marriott website or Marriott mobile app. Abdelsayed Decl., ¶ 6 & Ex. B [Abdelsayed Dep. Tr. at 208:16-22]. Plaintiff Abdelsayed read and relied on Marriott's representations when booking the hotel room, including the quoted room price and the fact that the mandatory resort fee was omitted from the room price and not properly disclosed. Abdelsayed Decl., ¶ 7 & Ex. B [Abdelsayed Dep. Tr. at 50:2-5; 109:23 – 110:2; 117:1-25; 176:25 – 177:5; 189:6-18; 196:7-12; 238:3-6]. Plaintiff Abdelsayed purchased his hotel room in reliance on the false and deceptive bargain and bait advertising and misleading disclosure of resort fees, including listing the resort fee under the 'USD Taxes and fees' category. Abdelsayed Decl., ¶ 7 & Ex. B [Abdelsayed Dep. Tr. at 100:3-25; 218:11 – 219:21].

//
//
//

-10-

### III.   <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 23, "'[a] class action may be maintained' if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Rule 23(b)(3) authorizes certification when "questions of law or fact common to class members predominate over any questions affecting only individual class members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(2) permits certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). These are the only criteria that must be met. *Briseno v. ConAgra Foods, Inc.*, 844 F. 3d 1121, 1124-26 (9th Cir. 2017) ("declin[ing] to interpose an additional hurdle"—administrative feasibility—"into the class certification process delineated in the enacted Rule").

In ruling on a motion for class certification, the court "is bound to take the substantive allegations of the complaint as true." *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975). "In considering a motion for class certification, strict adherence to the Federal Rules of Evidence is not required and inadmissible evidence may be considered." *Hilsley v. Ocean Spray Cranberries, Inc.*, 2018 WL 6300479, at *5 n. 5 (S.D. Cal. Nov. 29, 2018) (citing *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 459 (S.D. Cal. 2012); *Smith v. Microsoft Corp.*, 297 F.R.D. 464, 473-74 (S.D. Cal. 2014).

California "has a public policy which encourages the use of the class action device." *Richmond v. Dart Indus., Inc.*, 29 Cal. 3d 462, 473 (1981). On a motion for class certification, the court makes no findings of fact. *Keilholtz v. Lennox Hearth*

-11-

*Prods.*, 268 F.R.D. 330, 337, n.3 (N.D. Cal. 2010). "In determining whether class certification is appropriate, the question is not whether . . . [plaintiffs] will prevail on the merits, but rather, whether the requirements of Rule 23 are met." *Hofstetter v. Chase Home Fin., LLC*, 2011 WL 1225900, at *6 (N.D. Cal. Mar. 31, 2011) (internal quotations and citations omitted).

## IV.   ARGUMENT

### A.   The Requirements of Rule 23(a) Are Satisfied

#### 1. *Numerosity*

Rule 23(a)(1) is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Where the exact size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *In re Abbott Labs. Norvir Anti-Trust Litig.*, 2007 WL 1689899, at *6 (N.D. Cal. June 11, 2007) (internal citations and quotations omitted). Numerosity is generally met if a proposed class has at least 40 members. *See, e.g., Harris v. Palm Springs Alpine Estates*, 329 F.2d 909, 913-914 (9th Cir. 1964). Documents produced by Marriott during discovery show that the total amount of resort fees paid by the Nationwide Class during the Class Period approximates ███████ and the total amount of resort fees paid by the California Class during the Class Period approximates ███████. *See* HD ¶ 11 & Ex. 10 [Podlipna Expert Rpt. ¶¶ 9-10, Schedules 1-2]. Common sense accordingly dictates that the classes are sufficiently numerous and that joinder of all class members is impracticable.

#### 2. *Commonality*

Rule 23(a)(2) is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This criterion is satisfied whenever "the class members have suffered the same injury," so that their claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ["*Dukes*"]. "Where questions common to class

-12-

members present significant issues that can be resolved in a single adjudication 'there is clear justification for handling the dispute on a representative rather than on an individual basis.'" *Rodman v. Safeway, Inc.*, 2014 WL 988992, at *4 (N.D. Cal. 2014) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (internal citation omitted)). "What matters" is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes,* 564 U.S. at 350 (quotation omitted); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014).

"[P]laintiff's burden for showing commonality is 'minimal,'" *Mezzadri v. Med. Depot, Inc.*, 2016 WL 5107163, at *3 (S.D. Cal. May 12, 2016) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts." *Hanlon*, 150 F.3d at 1019. Commonality is found "where a defendant has engaged in standardized conduct toward members of the class." *Hale v. State Farm Mut. Auto. Ins. Co.*, 2016 WL 4992504, at *6 (S.D. Ill. Sept. 16, 2016) (citing *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (collecting cases)). Under Rule 23(a)(2), "even a single common question will do." *Dukes*, 564 U.S. at 359.

Here, the classes include only persons who reserved or booked a Marriott managed or franchised hotel room online through the Marriott.com website or Marriott mobile app and who paid a resort fee. Plaintiffs' common contention is that class members booked Marriott hotel rooms through the Marriott website or mobile app which advertised prices using the same misleading pricing scheme, were baited to transact with Marriott due to the deceptive pricing scheme, and suffered damages as a result. *See generally*, TAC. This "common contention" is "capable of classwide resolution," *see Dukes*, 564 U.S. at 350, as Marriott's liability to all class members will be determined by answering the same questions. Because the pricing scheme utilized on the Marriott website was uniform, common questions include whether Marriott's pricing scheme was deceptive to reasonable consumers. *See e.g., Spann*

-13-

*v. J.C. Penney Corp.*, 307 F.R.D. 508, 518 (C.D. Cal. 2015). Here, "common evidence, such as consumer surveys and…internal documents, will be used to prove falsity, deception, and materiality." *Milan v. Clif B. & Co.*, 2021 WL 4427427, at *4 (N.D. Cal. Sept. 27, 2021); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 612–16 (N.D. Cal. 2018) (finding predominance of materiality and reliance based in part on consumer survey). Dr. Dennis' consumer survey "demonstrates that reasonable consumers were deceived by" Marriott's website. HD ¶ 12 & Ex. 11 [Dennis Expert Rpt. at ¶ 91].

Common questions also include (1) whether Marriott's representations and omissions on the Marriott website were material to consumers; (2) if the representations and omissions were material, whether they were unlawful; (3) if reasonable consumers who booked Marriott hotel rooms through the Marriott website were deceived by material misrepresentation and omissions; and (4) what is the proper method for calculating damages? Commonality is satisfied.

### 3. *Typicality*

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This means plaintiff's claims "are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "In determining whether typicality is met, the focus should be on the defendants' conduct and plaintiff's legal theory." *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005) (citation and internal quotation marks omitted).

"A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her

claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (quotation and citations omitted). Thus, "[t]o assess whether or not the representative's claims are typical, the Court examines 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *In re Brazilian Blowout Litig.*, 2011 WL 10962891, at *3 (C.D. Cal. Apr. 12, 2011) ["*Brazilian Blowout*"] (quoting *Hanon*, 976 F.2d at 508 (quotation omitted)). "In instances where it is alleged that the defendant[] engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent members." *Salvagne v. Fairfield Ford Inc.*, 264 F.R.D. 321, 328 (S.D. Ohio 2009) (quotation omitted).

Here, Plaintiffs allege that they and all class members all booked Marriott hotel rooms through the Marriott website or mobile app, were exposed to and deceived by the same deceptive and misleading advertising, and were injured in the same manner. TAC ¶¶ 91-93. Consumer research reveals that consumers are highly likely to be deceived by these exact misleading representations and omissions. *See* HD ¶ 12 & Ex. 11 [Dennis Expert Rpt. ¶¶ 66-68, 91]. Plaintiffs' claims are therefore typical of class members' claims. *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 240 (N.D. Cal. 2014) (plaintiffs' claims are typical when "they purchased products that are the same as, or very similar to, the products challenged by the rest of the proposed class."). The typicality requirement is also satisfied.

### 4. *Adequacy*

Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

-15-

class?" *Hanlon*, 150 F.3d at 1020 (citation omitted).

Plaintiffs have demonstrated that they and their counsel satisfy these criteria. Plaintiffs have standing, have no conflict of interest with other class members, are aware of their obligations as class representatives, and have prosecuted and will continue prosecuting the action vigorously on behalf of the classes. *See* Hall Decl., ¶¶ 5-6, 13-14 & Ex. A [Hall Dep. Tr.]; Abdelsayed Decl., ¶¶ 5-6, 11-12 & Ex. B [Abdelsayed Dep. Tr.]; *Brazilian Blowout*, 2011 WL 10962891, at *5 (class representatives adequate where they submitted declarations stating "they understand their responsibilities as class representatives, that no conflicts exist between their interests and other members of the class, and that they intend to vigorously pursue all claims asserted in this lawsuit"). Plaintiffs do not possess any interests that conflict with those of the proposed classes because, like absent class members, Plaintiffs relied on Marriott's misleading advertisements in purchasing Marriott hotel rooms through the Marriott website, lost money because they paid for hotel charges that were not as advertised, and are motivated to establish Marriott's liability and attain remedies equally applicable to and beneficial for the classes. *See* Hall Decl., ¶¶ 8-11, 13-15 & Ex. A [Hall Dep. Tr.]; Abdelsayed Decl., ¶¶ 4-9, 11-13 & Ex. B [Abdelsayed Dep. Tr.]. Plaintiffs are familiar with the underlying legal claims asserted in this case and have stayed informed about its status. *See* Hall Decl., ¶¶ 13-15; Abdelsayed Decl., ¶¶ 11-13.

Plaintiffs' counsel are adequate class counsel because they are experienced in consumer protection class actions and other false advertising litigation, have no conflicts, and have prosecuted and will continue prosecuting the action vigorously on behalf of the classes. Declaration of Ronald A. Marron in Support of Plaintiffs' Motion for Class Certification ("Marron Decl."), ¶¶ 1-48 & Ex. C; Declaration of Robert L. Teel in Support of Plaintiffs' Motion for Class Certification ("Teel Decl."), ¶¶ 1-15; Declaration of L. Timothy Fisher in Support of Plaintiffs' Motion for Class Certification ("Fisher Decl."), ¶¶ 1-8 & Exs. D-F); *Martin v. Monsanto*

*Co.,* 2017 WL 1115167, at *5 (C.D. Cal. Mar. 24, 2017) (finding the adequacy requirement satisfied when Plaintiffs' counsel "submitted declarations demonstrating that they have had substantial experience with similar class actions and other false advertising litigation, have no conflicts, and will continue prosecuting the action vigorously on behalf of the Class."). The Law Offices of Ronald A. Marron, The Law Office of Robert L. Teel, and Bursor & Fisher demonstrate the ability to diligently pursue the instant claims on behalf of Plaintiffs and the proposed classes and have sufficient resources to do so successfully. Marron Decl., ¶¶ 1-48 & Ex. C; Teel Decl., ¶ 1-15; Fisher Decl., ¶¶ 1-8 & Exs. D-F. The adequacy requirement is therefore also satisfied.

## B.   The Requirements of Rule 23(b)(3) Are Satisfied

### 1. *Predominance*

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623; *see also* Fed. R. Civ. P. 23(b)(3). Predominance exists where common questions present "a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation, brackets, and alteration omitted). "[W]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022 (quotation omitted).

In addition to showing that common questions concerning the substantive elements of the class's claims predominate, Rule 23(b)(3) requires a showing that the class's "damages stemmed from the defendants' actions that created the legal liability." *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) ["*Comcast*"]). Plaintiffs must also show that "damages are capable of measurement on a classwide basis,"

*Comcast*, 133 S. Ct. at 1433, so they can "feasibly and efficiently be calculated once the common liability questions are adjudicated." *Levya*, 716 F.3d at 514. "Often, this will impose only a very limited burden." *Lilly*, 308 F.R.D. at 244. "If damages are capable of measurement on a class-wide basis, questions of individual damage calculations will not overwhelm questions common to the class." *Hale*, 2016 WL 4992504, at *8 (citing *Comcast*, 133 S. Ct. at 1433).

     a.   <u>*Defendant's Liability Will be Adjudicated Pursuant to Objective Standards, Using Common Evidence*</u>

"Considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying causes of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

     i.   <u>Common Issues Predominate with Respect to Plaintiffs' Claims Under California's Consumer Protection Laws</u>

California's FAL, CLRA, and UCL "prohibit 'not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quotation omitted). This is "judged by the effect it would have on a reasonable consumer," who is the "ordinary consumer within the target population…" *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506-507, 510 (2003). "[T]he primary evidence in a false advertising case is the advertising itself," *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003), and "[t]he 'misleading character' of a given representation 'appears on applying its words to the facts.'" *Jefferson v. Chase Home Fin.*, 2008 WL 1883484, at *17 (N.D. Cal. Dec. 14, 2007) (quoting *Colgan*, 135 Cal. App. 4th at 679). "To state a claim under the UCL or the FAL 'based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived.'" *Pulaski Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) ["*Pulaski*"] (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312

(2009)). Advertising is misleading if it presents "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Brockey*, 107 Cal. App. 4th at 99.

If Plaintiffs demonstrate a representation was likely to deceive under this objective "reasonable consumer" test, relief "is available 'without individualized proof of deception, reliance and injury,' so long as the named plaintiffs demonstrate injury and causation." *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 482 (C.D. Cal. 2012) (quotation omitted); *see also Moyle v. Liberty Mut. Ret. Benefit Plan*, 823 F.3d 948, 964-65 (9th Cir. May 20, 2016) ("[W]here the defendant's representations were allegedly made on a uniform and classwide basis, individual issues of reliance do not preclude class certification.") (citing *Hanon*, 976 F.2d at 509 ("We emphasize that the defense of non-reliance is not a basis for denial of class certification."))). And while reliance is an element of the class's CLRA claims, "[t]he causation required by the CLRA does not make plaintiffs' claims unsuitable for class treatment because causation as to each class member is commonly proved more likely than not by materiality." *Guido*, 284 F.R.D. at 482 (quotation omitted). That is because "[a] presumption, or at least an inference, of reliance arises . . . whenever there is a showing that a misrepresentation was material." *Tobacco II Cases*, 46 Cal. 4th at 327; *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2012), *abrogated on other grounds by Comcast*, 133 S. Ct. 1426.

The objective test for deception and materiality "renders claims under the UCL, FAL, and CLRA ideal for class certification." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012). "For this reason, district courts in California routinely certify consumer class actions arising from alleged violations of the CLRA, FAL, and UCL." *Id.* (citing *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504 (C.D. Cal. June 12, 2012); *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 547 (C.D. Cal. 2012); *Chavez*, 268 F.R.D. at 375-80; *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 589 (C.D. Cal. 2008)).

1    Here, "the predominating common issues include whether [Defendant]
2  misrepresented" the Marriott hotel room rates and amenities "and whether the
3  misrepresentations were likely to deceive a reasonable consumer." *See Johns v.*
4  *Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012); *see also In re Ferrero Litig.*,
5  278 F.R.D. 552, 560 (S.D. Cal. 2011). Whether Marriott's bait and switch
6  advertising scheme is likely to deceive a reasonable consumer can be determined
7  through common evidence, including consumer survey evidence. HD ¶ 12 & Ex. 11
8  [Dennis Expert Rpt. at ¶ 91]. The Court should therefore find that common issues
9  predominate.

10    ii.    <u>Common Issues Predominate with Respect to Plaintiffs' Common Law</u>
11        <u>Intentional Misrepresentation, Negligent Misrepresentation, and</u>
12        <u>Concealment/Non-Disclosure Claims</u>

13    "The elements of fraud that will give rise to a tort action for deceit are: (a)
14  misrepresentation (false representation, concealment, or nondisclosure); (b)
15  knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d)
16  justifiable reliance; and (e) resulting damage." *Engalla v.Permanente Med. Grp.,*
17  *Inc.* 15 Cal. 4th 951, 974 (1997) (quoting *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638
18  (1996)) (internal quotation marks omitted). "As with Plaintiffs' consumer law
19  claims, resolution of each of these elements is common to the class." *Broomfield v.*
20  *Craft Brew All., Inc.*, 2018 WL 4952519, at *13 (N.D. Cal. Sept. 25, 2018)
21  (certifying class with respect to intentional fraud and negligent misrepresentation
22  claims."); *see also In re First All. Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006)
23  (affirming certification of fraud claim where defendant engaged in uniform conduct
24  toward whole class); *Brickman v. Fitbit, Inc.*, 2017 WL 5569827, at *6–*7 (N.D.
25  Cal. Nov. 20, 2017) (holding that materiality and reliance standards applied equally
26  to consumer law, common law fraud, and negligent representation claims); *Brazil v.*
27  *Dell Inc.*, 2010 WL 5387831, at *5 (N.D. Cal. Dec. 21, 2010); *In re Morning Song*
28  *Bird Food Litig.*, 320 F.R.D. 540 (S.D. Cal. 2017).

-20-

*Hall v. Marriott International, Inc.*, Case No. 3:19-cv-01715-JO-AHG
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION, TO APPOINT CLASS REPRESENTATIVES, AND TO APPOINT CLASS COUNSEL

Common issues predominate with respect to Plaintiffs' negligent and intentional misrepresentation and concealment/non-disclosure claims, as proof of the required elements will require consideration of only the misrepresentations and omissions that Marriott uniformly made to all class members. The common evidence that will prove each of these claims includes the Marriott website, showing Marriott's deceptive pricing scheme (HD ¶¶ 5, 7 & Exs. 4, 6), Marriott's internal documents showing Marriott's intent to defraud consumers through its advertising of Marriott hotel room rates (*see* HD ¶¶ 13-15 & Exs. 12-14), Dr. Dennis' survey showing that consumers rely on and are misled by such misleading advertising (*see* HD ¶ 12 & Ex. 11 [Dennis Expert Rpt., ¶¶ 66-68, 91]), and documents produced by Marriott during discovery showing the amount of resort fees paid by consumers who booked Marriott hotel rooms through the Marriott website and mobile app during the class period (HD ¶¶ 10-11 & Exs. 9-10).

Plaintiffs' fraud and negligent misrepresentation claims are also appropriate for nationwide class certification because "the fundamental elements of fraud are substantially similar from state to state." *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 300 (D. Conn. 2009). "Virtually every state requires that there be a misrepresentation made by the defendant, that the defendant had knowledge that it was false, the defendant intended to induce the reliance of the plaintiff, the plaintiff relied on the statement, and the plaintiff was injured as a result." *Id.* The *Spencer* Court found that "common legal issues predominate with respect to how states treat fraud claims" and the "Plaintiffs have adequately demonstrated that the elements of fraud are substantially similar from state to state." *Spencer*, 256 F.R.D. at 301. Moreover, for fraudulent omissions (as are alleged in this case), a person cannot rely on information not provided to them and, therefore, Plaintiffs only need prove that the omitted information was material, an objective standard that can be determined through common evidence.

iii.    Common Issues Predominate with Respect to Plaintiffs' Quasi Contract/Unjust Enrichment Claim

Plaintiff's quasi-contract claim arises from the same consumer protection violations and fraud claims that form the basis for the previously discussed claims. The same common evidence described above will show that Marriott charged consumers higher rates for hotel rooms than those originally advertised, thereby unjustly receiving additional money from Plaintiffs and the classes, where Marriott took undue advantage of Plaintiffs and the classes, and whereby money was exacted to which Defendant had no legal right. *See Price v. Synapse Grp., Inc.*, 2017 WL 3131700, at *10-11 (S.D. Cal. July 24, 2017). Certification is therefore appropriate.

b.    *Damages Stem Solely from Defendant's Actions that Created Legal Liability*

Plaintiffs allege Marriott is liable based solely on its misrepresentations and omissions with respect to its advertising of Marriott hotel rooms and amenities on the Marriott website and mobile app, and the classes' damages flow solely from that conduct. *See Comcast*, 133 S. Ct. at 1434. Thus, "[u]nlike the situation in *Comcast*, there is no possibility in this case that damages could be attributed to defendants' acts that are **not** challenged on a class-wide basis because all members of the current class attribute their damages" to the same deceptive practice. *See Krueger v. Wyeth, Inc.*, 310 F.R.D. 468, 482 (S.D. Cal. 2015) (emphasis in original); *accord Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (same); *cf. In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5429718, at *22 (N.D. Cal. 2013) ("*Comcast* has no application" where plaintiffs assert only one theory of liability and impact").

"Class wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving. California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Lambert v. Nutraceutical Corp.*, 870 F.3d

1170, 1183 (9th Cir. 2017) (quoting *Pulaski*, 802 F.3d at 989). The UCL, FAL, and CLRA all "authorize a trial court to grant restitution to private litigants asserting claims under those statutes." *Colgan*, 135 Cal. App. 4th at 694 (citing *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 180 (2000); *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442, 452 (1979)); *see also* Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(3). "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003). Restitution is "measured by what was taken from the plaintiff." *Clark v. Super. Ct.*, 50 Cal. 4th 605, 615 (2010). Thus, "[i]n its simplest form, restitution is simply 'the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.'" *Chowning v. Kohl's Dep't Stores, Inc.*, 2016 WL 1072129, at *5 (C.D. Cal. Mar. 15, 2016) (*quoting Cortez*, 23 Cal. 4th at 174).

Restitution under the UCL and FAL "must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal.App.4th 663, 698 (2006). The measure of recovery in restitution for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition. *Colgan*, 135 Cal. App. 4th at 698-99 (quoting Restatement of Restitution § 151). Here, damages can be calculated on a classwide basis by calculating the amount of resort fees paid by consumers who booked Marriott hotel rooms through the Marriott website or mobile app during the class period. This requires only a mathematical calculation based on objective evidence (Marriott's business records) that is purely mechanical and provides no obstacle to class certification. Plaintiffs' expert, Ms. Charlene Podlipna, CPA, has already performed such a calculation and has computed damages on a classwide basis. *See* HD ¶ 11 & Ex. 10 [Podlipna Expert Rpt., ¶¶ 9-30].

c.   _Proposed Damages Model_

Here, Marriott engaged in "bait and switch" advertising whereby it advertised a low-quoted rate for a hotel room, knowing that the actual hotel room Marriott intended to sell was more expensive than the initial price that drew customers in. "In such a scheme, one of the dangers is that the consumer will rely on the deceptive advertising to decide to buy merchandise. Then, when the deception is revealed, the consumer, now invested in the decision to buy and swept up in the momentum of events, nonetheless buys at the inflated price, despite his or her better judgment." _See Veera v. Banana Republic, LLC_, 6 Cal.App.5th 907, 921 (2016). California law has "created what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; [and] restitution is the remedy." _Stearns v. Ticketmaster Corp_., 655 F.3d 1013, 1021, fn. 13 (9th Cir. 2011); _accord Pulaski & Middleman, LLC v. Google, Inc.,_ 802 F.3d 979, 986 (9th Cir. 2015). The Ninth Circuit has also observed that "a product's 'regular' or 'original' price matters…" and "[m]isinformation about a product's 'normal' price is, therefore, significant to many consumers in the same way as a false product label would be." _Hinojos v. Kohl's Corp.,_ 718 F.3d 1098, 1106 (9th Cir. 2013).

In this case, Plaintiffs propose restitution based on the resort fees that were charged by Marriott and this simple calculation would be based on the amount of resort fees paid by consumers. This damages model is direct and straightforward, easy for a jury to understand, and relatively simple to apply to the facts of this case.

Plaintiffs obtained resort fee payment information from Marriott, which included resort fees paid by consumers through the Marriott website during the class period. _See_ HD ¶ 11 & Ex. 10 [Podlipna Expert Rpt., ¶¶ 16-22]. According to Ms. Podlipna, "the total amount of resort fees paid by the Nationwide Class during the Class Period approximates ███████████" and "the total amount of resort fees paid by the California Class during the Class Period approximates ████████." _See id._

[Podlipna Expert Rpt., ¶¶ 9-10]. These calculations are based on resort fee revenue data produced by Marriott, including "1,766 spreadsheets (exported from a Marriott database) that itemize charges by date, customer, and reservation booking method for Marriott U.S. managed hotels and franchised hotels that charged resort or destination fees for dates within the Class Period." *Id.* [Podlipna Expert Rpt., ¶ 16]. Accordingly, Ms. Podlipna was able to calculate total resort fees that were charged to guests who booked their reservation through the marriott.com website or Marriott mobile app. *Id.* [Podlipna Expert Rpt., ¶ 19].

Plaintiffs are seeking a full refund of resort fees that were charged to the class members and this damages model has been accepted by courts in this district and in cases involving similar allegations. Moreover, it does not matter that consumers may have used some of the amenities, "instead, the court focuse[s] on the fraud in the selling, not the value of the product [or service], in upholding full refunds." *Makaeff v. Trump Univ., LLC*, 309 F.R.D. 631, 638 (S.D. Cal. 2015); *accord Pulaski*, 802 F.3d at 987 ("The calculation need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase."); *see also People ex re. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 135 (2003), *as modified on denial of reh'g* (Sept. 9, 2003); (determining that restitution in the amount of full refunds is a permissible remedy); *People ex re. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 531 (2002), *as modified on denial of reh'g* (Jan. 16, 2003) (same); *Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *6 (C.D. Cal. Mar. 23, 2015) (same); *Lambert v. Nutraceutical Corp.*, 2020 WL 12012559, at *11 (C.D. Cal. Jan. 8, 2020) (same). Thus, Plaintiffs' proposed model is appropriate.

## 2. <u>Superiority</u>

In addition to predominance, Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of a controversy." Fed. R. Civ. P. 23(b)(3). The superiority analysis focuses on

"efficiency and economy[.]" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). The superiority inquiry also assesses whether the objective of the class action procedure will be achieved and compares alternative mechanisms for dispute resolution. *See Hanlon*, 150 F.3d at 1023. Courts are afforded wide discretion to evaluate superiority because they are "in the best position to consider the most fair and efficient procedure for conducting any given litigation." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). The superiority requirement "is met '[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis.'" *Tait*, 289 F.R.D. at 486 (quoting *Wolin*, 617 F.3d at 1175); *see also Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980). Class members have no incentive to prosecute separate actions since the resort fees charged averaged around $30.00, making individual claims exceedingly small in comparison to the costs of litigation. Courts routinely find the superiority requirement satisfied under similar circumstances. *See Brazilian Blowout Litig.*, 2011 WL 10962891, at *9.

Here, neither Plaintiffs nor the proposed class members have an interest in individual prosecution of their claims, as those claims are of small individual value and virtually identical. Class certification here promotes judicial efficiency because it permits Plaintiffs' and class members' common claims and issues to be tried once with a binding effect on all parties. Given the relatively small size of each class member's claim, class treatment is not merely superior but effectively is the only way for the Court to ensure fair and efficient adjudication of the classes' claims, as no individual consumer could reasonably bring an action to recover that amount. "The Ninth Circuit has recognized that a class action is a plaintiff's only realistic method for recovery if there are multiple claims against the same defendant for relatively small sums." *Culley v. Lincare Inc.*, 2016 WL 4208567, at *8 (E.D. Cal. Aug. 10, 2016) (citation omitted). The superiority requirement is satisfied.

## C.     The Requirements of Rule 23(b)(2) Are Satisfied

In addition to certification under Rule 23(b)(3), Plaintiffs also request certification under Rule 23(b)(2). In the Ninth Circuit, a class may be certified under both (b)(2) and (b)(3). *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1196 (9th Cir. 2000); *Hilsley*, 2018 WL 6300479, at *19; *Broomfield*, 2018 WL 4952519, at *7. Certification under Rule 23(b)(2) is appropriate where a defendant has acted on "grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Further, "[a] class seeking monetary damages may be certified pursuant to Rule 23(b)(2) where [monetary] relief is 'merely incidental to [the] primary claim for injunctive relief.'" *Zinser*, 253 F.3d at 1195 (citation omitted). Applying *Dukes*, the Ninth Circuit has held "the key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011) (quotations omitted).

Here, Marriott's conduct affected class members equally because Marriott's website and mobile app employ a uniformly deceptive pricing scheme that includes unlawful bait and switch business practices, and therefore all class members were exposed to the same or substantially similar misleading pricing scheme. *See* HD ¶ 5 & Ex. 4. Final injunctive relief is appropriate with respect to the classes as a whole and would ensure class members are protected in the future.

Further, Plaintiffs and class members are limited to their out-of-pocket cost as restitution damages, and this monetary relief is equitable in nature, flowing from the wrongs asserted. Injunctive relief in this action is not merely incidental to monetary damages because "the primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction." *McGill v. Citibank*, N.A., 2 Cal. 5th 945, 954, 393 P.3d 85, 89 (2017) (quoting *In re Tobacco II Cases*, 46 Cal.4th at 319).

Plaintiffs have standing to pursue the injunctive relief that they seek. In

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 966-69 (9th Cir. 2018) ["*Davidson II*"], the Ninth Circuit noted that "[i]t [was] an open question in this circuit to what extent a previously deceived consumer who brings a false advertising claim can allege that her inability to rely on the advertising in the future is an injury sufficient to grant her Article III standing to seek injunctive relief." *Id.* at 967. The Ninth Circuit "resolve[d] this district court split in favor of plaintiffs seeking injunctive relief" and held that a previously deceived consumer "may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." *Id.* at 969. Here, Plaintiffs "intend[] to, seek[] to, and will purchase rooms at the Marriott when [they] can do so with the assurance that the advertising of the room rates are lawful and consistent with federal and California regulations. *See* TAC ¶¶ 64, 83; *see also* Hall Decl., ¶ 12 & Ex. A [Hall Dep. Tr. at 101: 15-21]; Abdelsayed Decl., ¶ 10 & Ex. B [Abdelsayed Dep. Tr. at 261:5-9]. Thus, the requirements of Rule 23(b)(2) are satisfied.

## D. Alternatively, the Court Should Certify a Rule 23(c)(4) Class

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "As the Ninth Circuit has repeatedly made clear, 'damage calculations alone cannot defeat certification.'" *Petersen v. Costco Wholesale Co., Inc.*, 312 F.R.D. 565, 584 (C.D. Cal. 2016) (quoting *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)). Here, Plaintiffs have shown that Rule 23(b)(3) certification is appropriate because damages can easily be calculated on a classwide basis. HD ¶ 11 & Ex. 10 [Podlipna Expert Rpt., ¶¶ 9-30]. However, if the court is not inclined to certify a Rule 23(b)(3) class, then Plaintiffs alternatively request certification under Rule 23(c)(4) for purposes of establishing Marriott's liability. "[T]he fact that a class may not be satisfied for purposes of seeking damages does

-28-

not mean that it cannot be certified at all." *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244 (N.D. Cal. 2014). Several courts have certified classes under Rule 23(c)(4) for purposes of determining liability. *See id; Petersen.*, 312 F.R.D. at 584; *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 532 (C.D. Cal. 2015) ("Even if JCPenney is correct and the putative class is ultimately unable to recover restitution or obtain injunctive relief, the court could still certify a liability-only class at this stage. Contrary to defendant's arguments, the Ninth Circuit has held that victims of alleged false price comparison schemes have been injured even if there is 'no difference in value between the product as labeled and the product as it actually is [.]'") (quoting *Hinojos*, 718 F.3d at 1105)).

### E.   The Court Should Approve Notice to the Classes

Under Rule 23(c)(2)(B), for "any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Filed concurrently with this Motion is the Declaration of James Prutsman of Kroll Settlement Administration detailing a Notice Plan for this case. Because Marriott has records of consumers who booked hotel rooms through the Marriott website and paid resort fees during the class period, individual notice is simple in this action. Thus, to reach all potential class members, the best notice practicable under the circumstances is direct notice. Fed. R. Civ. P. 23(c)(2)(B).

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Class Certification, to Appoint Class Representatives, and Appoint Class Counsel.

DATED: April 15, 2022                    Respectfully submitted,


                                         /s/ Ronald A. Marron
                                         **LAW OFFICES OF RONALD A.**
                                         **MARRON**
                                         RONALD A. MARRON (SBN 175650)
                                         *ron@consumersadvocates.com*
                                         MICHAEL T. HOUCHIN (SBN 305541)
                                         *mike@consumersadvocates.com*
                                         LILACH HALPERIN (SBN 323202)
                                         *lilach@consumersadvocates.com*
                                         651 Arroyo Drive
                                         San Diego, California 92103
                                         Telephone: (619) 696-9006
                                         Facsimile: (619) 564-6665

                                         **LAW OFFICE OF ROBERT L. TEEL**
                                         ROBERT L. TEEL
                                         *lawoffice@rlteel.com*
                                         1425 Broadway, Mail Code: 20-6690
                                         Seattle, Washington  98122
                                         Telephone: (866) 833-5529
                                         Facsimile: (855) 609-6911

                                         **BURSOR & FISHER, P.A.**
                                         L. Timothy Fisher (SBN 191626)
                                         Sean L. Litteral (SBN 331985)
                                         1990 N. California Blvd., Suite 940
                                         Walnut Creek, CA 94596
                                         Telephone: (925) 300-4455
                                         Facsimile: (925) 407-2700
                                         E-mail: *ltfisher@bursor.com*
                                              *slitteral@bursor.com*
                                         ***Interim Class Counsel***